## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| GREGORY BOYD, JONATHAN LASSERS | CIVIL NO.: 24-CV-01569 |
| | FOR: |
| Plaintiffs, | |
| | Bank Holding Company Act Anti Tying Claim |
| **vs.** | |
| BANCO POPULAR DE PUERTO RICO | JURY DEMAND: TO BE SEEN BY JURY |
| Defendant | |

### COMPLAINT

**TO THE HONORABLE COURT:**

Plaintiffs Gregory Boyd and Jonathan Lassers, by and through their undersigned attorneys very respectfully **STATE, ALLEGE AND PRAY**:

### INTRODUCTION

Banco Popular de Puerto Rico granted Biomass Green Fuels $19 million in loans in exchange for an Off Take Agreement providing below-market price for Renewable Liquified Natural Gas and millions in environmental tax credits. The Bank Holding Company Act prohibits banks from tying a grant of credit to any form of service from the debtor. Banco Popular violated the Bank Holding Company Act by forbearing from executing on loans in default provided Biomass Green Fuels provided renewable natural gas and related environmental and tax credits.

Tying forbearance on a credit agreement to a below market Off Take Agreement and millions of dollars in environmental and tax credits is not standard practice in the banking industry.

On September 15, 2020, Banco Popular issued a direct loan for $11.8 million and a New Market Tax Credit Loan for $7.2 million ($19 million) to Biomass Green Fuels, LLC (BGF) to construct a plant that would convert landfill gas to renewable liquid natural gas (RLNG). Before issuing the loan, BGF provided Banco Popular with a draft contract to purchase RLNG. Two days later, Banco Popular issued a term sheet for the loan. BGF had been negotiating with three different banks for the loan, but only Banco Popular would agree to Olmar Lopez Vidal and Olmar Lopez Gomez being principals in both BGF and their construction firm, International Technical Services (ITS) contracted to build the biorefinery. The other banks deemed the inherent conflicts of interest in that scenario too risky. This was the prologue. The term sheet, tied to the Off Take Agreement, would lead to the violation of the BHCA, when, inevitably, having the Lopezes run both the biorefinery and the construction firm led to fraud and default.

Early on April 25, 2022, Boyd and Lassers filed a RICO lawsuit against, *inter alia,* the Lopezes and Banco Popular. Later that same day the Lopezes wired over a million dollars to two vendors as final payments for the project completion, which was not complete. The Lopezes did not deny in court filings that they received commissions to their entities for the early payments. With the $1 million gone, BGF missed three bank loan payments and received a default notice from the El Coqui Landfill Company (EC Waste). BGF had missed its already extended completion date, was in default, and did not have the money to continue construction or operations.

On July 18, 2022, Banco Popular signed an RLNG gas Off Take (supply) Agreement for below market value, including environmental benefits worth millions of dollars. No client of BGF had such favorable terms. In exchange, the bank exercised forbearance from collecting its $19 million loans to BGF and instead deposited the monthly loan payments in BGF's account for the next fourteen months. A week later, the bank amended the credit

agreement, extending the missed completion date from April 30, 2022, until October 31, 2022, and adding $1 million (the amount wired on the day of the RICO filing) to the direct loan, increasing BGF's debt to $20 million. The amendment did not have Boyd's approval, denied the existence of the RICO lawsuit, and denied the notice of default of the Gas Rights Agreement with the landfill owner.

The Bank Holding Company Act prohibits such conduct and imposes treble damages for the benefit of any person harmed by it. Banco Popular's conduct has harmed Boyd and Lassers. The Act's provisions aim to prevent anti-competitive practices by ensuring that banks do not use their leverage to force customers into additional transactions that are not directly related to the primary banking service being provided

Mr. Boyd filed this cause of action in the Superior Court of San Juan as a compulsory counterclaim. This Court has concurrent jurisdiction over the Bank Holding Company Act. The San Juan Superior Court does not have jurisdiction over Mr. Lassers, because Banco Popular is not suing him.[1]

## JURISDICTION AND·VENUE

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1338(a) as the Plaintiff's cause of action arises under The Bank Holdings Company Act, 12 U.S.C. § 1972 *et. seq.*.

2.      Venue is proper within this District pursuant to 28 U.S.C. § 139l(b) and§ 1400(a) because the violation occurred here.

## THE PARTIES

3.      Plaintiff Gregory Boyd is a founding member and owner of GFC Holdings (GFC) and Biomass Green Fuels (Biomass or BGF). Gregory Boyd is a resident of Humacao, Puerto Rico.

---

[1] Banco Popular is suing Mr. Boyd over a guaranty on a loan he was fraudulently induced to guarantee. That same loan has been amended seven times, each amendment containing false statements. Mr. Boyd only consented, only executed one of those amendments, in exchange for a cession of rights from one of the co-owners. Mr. Boyd did not consent or execute the remaining six novations of the Credit Agreement.

4.     Plaintiff Jonathan Lassers is a participant owner of GFC and Biomass. Mr. Lassers is a resident of Uruguay.

5.     Defendant Banco Popular de Puerto Rico, a subsidiary bank owned and controlled by the holding company Popular, Inc., is a Puerto Rico Corporation. Banco Popular de Puerto Rico's principal place of business is Avenida Muniz Rivera No. 209, Suite 913, San Juan, Puerto Rico, 00918. (787)765-9800.

**FACTS**

6.     Banco Popular conditioned its extension of the Non-Revolving Credit Agreement and the New Market Tax Credit[2] ("NMTC") loan to BGF to a contract which provided the bank with renewable natural gas in a 10-year fixed-price contract at a 65% discount to its fair market value plus carbon and environmental credits worth tens of millions of dollars.

7.     BGF's Landfill Gas Purchase and Sale Agreement with El Coqui Landfill Company (Gas Rights Agreement) is for 25 years with a ten-year extension expiring in 2054.

8.     A carbon credit is a tradable instrument (typically a virtual certificate) that conveys a claim to avoid greenhouse gases (GHG) emissions or to the enhanced removal of GHG from the atmosphere. Credits allow claims to be transferred from an entity that generated the avoided emissions or enhanced removals to a buyer. Carbon credits equate to one metric ton of Carbon Dioxide ("$CO_2$") or its equivalent in other greenhouse gases (GHG).

9.     RLNG stands for "Renewable Liquefied Natural Gas," which means it is renewable natural gas that was previously liquefied (LNG) and then warmed back up to its gaseous state at a regasification terminal, ready

---

[2] The New Market Tax Credit is a federal program to provide loans to high unemployment areas to businesses that will hire from and provide training to the depressed area.  It provides a federally guaranteed interest only loan for seven years to be used for equipment. If the employment goals are met and maintained, on the 7th year the borrower receives an option to receive 25-30% loan forgiveness, then repay the balance of the loan.

to be delivered through pipelines to consumers; essentially, it's the usable form of LNG after the liquefaction process is reversed.

10. The BGF plant would produce about 10,000 metric tons of RLNG annually.

11. RLNG is 98% methane.

12. Methane as a greenhouse gas (GHG) is 32 times more damaging than $CO_2$, so the BGF project is worth 320,000 metric tons of carbon credits for RLNG.

13. The project also plans to capture 18,000 tons of renewable $CO_2$ for 338,000 possible carbon credits a year.

14. The value of carbon credits range from $1 to $300 depending on quality, program and market sold.

15. The value of carbon credits is expected to increase from now until 2050.

16. The range of value to BGF is as low as $338,000 a year to $40 for Gold Standard carbon credit x 338,000 = $13,520,000 per year x 30 years left until contract expiration of $405,600,000.

17. Environmental attributes encompass a broader category of benefits and characteristics associated with environmental performance. These attributes include:

(1) Avoided Emissions: This includes reductions in pollutants like sulfur oxides (SOx), nitrogen oxides (NOx), and other harmful emissions due to the use of cleaner technologies or renewable energy sources.

(2) Renewable Energy Certificates (RECs): These certificates represent proof that one megawatt-hour (MWh) of electricity was generated from a renewable resource. RECs encapsulate the environmental benefits associated with renewable energy production, including avoided emissions.

(3) Renewable Identification Numbers (RINs) are credits used in the Renewable Fuel Standard program in the U.S., representing renewable fuel production and its associated environmental benefits. D3 is the type of RIN for RLNG. To convert D3 to MMBtu divide by .077. Today D3 RINs trade for about $3.00 or $38.96 per MMBtu. The BGF plant should make 540,000 MMBtu a year or $21 million in RINs x 30 years or $631,152,000 until 2054. The Gas Rights Agreement pays the El Coqui Landfill Company 35.5% of the RINs revenue with BGF retaining 64.5%.

(4) To qualify for RINs a State or Territory must join the U.S. EPA Renewable Fuels Standard (RFS). The program is of no cost to the state or territory.  Puerto Rico has not joined the RFS but is considering it.

(5) BGF can also earn RINs by shipping the LNG back to Florida and injecting it into the interstate gas pipeline system.

(6) The Inflation Reduction Act (IRA) 45z clean fuel credit applies to transportation fuels produced after December 31, 2024, and sold on or before December 31, 2027.  It is equivalent of $5 MMBtu for RLNG or $8.1 million to BGF over the three-year term.

18.    On November 11, 2019, BGF sent a renewable liquified natural gas (RLNG) supply (Off Take) agreement to Banco Popular.

19.    The original gas purchase agreement (the "Off Take Agreement") that BGF proposed had Biomass retaining the carbon and environmental credits, a benefit worth tens of millions of dollars to BGF and El Coqui Landfill Company.

20.    On November 13, 2019, Banco Popular sent BGF a term sheet for a construction loan and a New Markets Tax Credit Loan.

21.    Conditioning the credit agreement on the Off Take Agreement is not standard practice in the banking industry.

22.    This RLNG agreement may be the only one in the banking industry. Plaintiffs know of no other.

23.    Here, there is both conditionality and timing. The bank's language in the Off Take Agreement shows that one is conditioned on the other, demonstrating that a tying arrangement exists.

24.    Banco Popular had an incentive to condition the grant of credit on the Off Take Agreement to meet its corporate ESG (Environmental, Social and Governance) requirements and reduce its cost of electricity thanks to a 10-year fixed price for the renewable natural gas, plus carbon and environmental credits.

25.    According to its 2024 3rd Quarter Financial Results, "Popular, Inc. (NASDAQ: BPOP) is the leading financial institution in Puerto Rico, by both assets and deposits, and ranks among the top 50 U.S. bank holding companies by assets."

26.     Fitch Ratings reports that Banco Popular has over 55% of the market share in loans and deposits in Puerto Rico.

27.     The below market cost of the RLNG Off Take Agreement and related environmental and tax credits allows the bank to maintain and extend its monopolistic control over the Puerto Rico banking industry.

28.     Allowing lenders from other jurisdictions to enter the new and lucrative business of green energy and receive low-cost electricity in Puerto Rico could undermine Banco Popular's stranglehold on the banking industry in Puerto Rico.

29.     In 2019, Biomass Green Fuels, LLC (BGF) applied for construction loans from several banks. Except for Banco Popular, the banks recommended a combination of the federal Small Business Administration (SBA. And Department of Agriculture [which handles many green energy matters] USDA loan guarantees.)

30.     The SBA and USDA require that the borrower be independently owned and operated and that the principals do not have a direct or indirect interest in the construction company. This prevents the principals from using the loan to fund their other interests or to engage in self-dealing.

31.     Olmar Lopez Gomez, Olmar Lopez Vidal, and their son/brother Carlos Lopez Vidal own many companies with the same or similar names: five ITS companies, four Green $CO_2$ Companies, World Spirits, and Bravada, SRL, which are owned and or operated by co-defendants (Hereinafter "the Lopez Companies.") Necerthless, Olmar Lopez Vidal's 2018 personal financial statement submitted to the SBA shows he had a negative net worth of $100,000 and Olmar Lopez Gomez's 2018 Tax return showed an income of $4,500.

32.     After ITS could not qualify for a bond due to poor credit, the Lopezes proposed that ITS, in a joint venture with Accurate Solutions Corporation (ASC), be the construction company for BGF's biorefinery.

33.     On information and belief, Banco Popular knew that the Lopezes sought to self-deal through their companies, and the bank agreed to the self-dealing by allowing the ITS/ASC joint venture to provide construction services to BGF.

34.    Per the New Market Tax Credit QLICI Disbursement Agreement, Banco Popular investigated the construction contractor to see if it was "financially or otherwise unqualified."

35.    The bank found Olmar Lopez Gomez and ITS were being sued in *Ballester Hermanos Inc. v Olmar Lopez-Gomez et al*. Case # SJ2018CV03188 for non-performance on an energy project and failing to refund the clients' deposit. Banco Popular required the case to be settled before the loan closing.

36.    Neither the inability to qualify or pay for the required Performance Bond, nor the outstanding lawsuit raised any concerns at Banco Popular about the Lopezes and ITS's ability to engineer and construct the Caribbean's first landfill gas to renewable LNG and $CO_2$.

37.    No other bank would allow such a company to lead the engineering and construction of a $30 million biorefinery. Indeed, Byline Bank and others refused to allow it.

38.    The Tying arrangement was initiated when Banco Popular financed BGF's Biorefinery Project with Non-Revolving credit facility and New Market Tax Credit loans and allowed the Lopezes' ITS company to profit from the construction contract while overlooking multi-year delays and millions in cost overruns. Please see Case 3:22-cv-01190-ADC-BJM Document 145-1 filed January 23, 2023, for details.  **Exhibit 2.**

39.    The SBA and USDA required BGF to sign long-term Off Take Agreements with good-credit buyers showing enough revenue to pay for the loan. The lender would take a secure interest in these agreements.  Banco Popular did not require security over signed Off Take Agreements as a precondition for the direct loan because they planned to control and consume the RLNG.

40.    A precondition of the closing of the credit agreement is proof of payment for the Performance Bond for the construction company.

41.    Banco Popular required a Performance Bond not less than 100% of the amount of the Direct Costs.

42.    The direct costs, according to Cohn Resnick, CPA, who did the analysis for the New Market Tax Credit loan, exceed $18 million.

43.    Below is from the Credit Agreement between BGF and BPPR dated 9/15/2020.  On this date, the payment and performance bond for the construction company and 100% of the Direct Costs was not made.  No bond for 100% of the direct costs exists today. Had the bank followed its own requirements from the credit agreement it would have its unpaid loan 100% covered by the bond in the credit agreement they never perfected.

### ARTICLE III
### CONDITIONS OF LENDING

3.1    **Conditions Precedent to Effectiveness of this Agreement and to Initial Borrowing.**  The effectiveness of this Agreement, and the obligation of each Lender to make an Advance on the Initial Borrowing are subject to the following conditions precedent:

(h)    Insurance. The Administrative Agent shall have received evidence required under Section 6.2.1(a) of the existence of all the required Policies and the designation of the Administrative Agent, for the ratable benefit of the Lenders, as the loss payee or additional insured, as the case may be, thereunder to the extent required hereby, and evidence that all Insurance Premiums then due and payable with respect thereto have been paid, including without limitation, evidence that the required payment and performance bond(s) in relation to the Project, name the Borrower and the Administrative Agent, for the benefit of the Lenders, as dual obligees, for not less than one hundred percent (100%) of the amount of the Direct Costs with respect to the whole Project from an insurance company reasonably acceptable to the Administrative Agent, and reasonably satisfactory evidence that the premiums on such bonds have been paid in full.

44.    On the morning of September 14, 2020, Boyd notified BGF's attorneys at DLA Piper of his availability to sign the loan papers. They responded by sending blank signature pages.

45.    Throughout September 14th, various parties suggested changes to the Flow of Funds document, part of the loan documentation.

46.    At 9:46 a.m. on September 14th, 2020, Jones Day, the law firm advising Capital One on the NMTC, noted that only two people still needed to sign the signature pages: Boyd and Joval Rodriguez for Banco Popular. On September 14th, 2020, at 12:44 PM, Priscila Ramirez of PMA submitted Joval Rodriguez's signatures for the closing, including his signature on the Flow of Funds document.



47.    Priscila Rodriguez attached Joval Rodriguez's signature on the Flow of Funds signature page 6 of 6, recorded nine hours before Rodriguez amended the document to include a $70,500 payment for the Performance and Payment Bond for the Lopez Companies from BGF's checking account. This change to the Use of Funds occurred five hours after Boyd had submitted his signature for the Flow of Funds to the escrow.

48.    At 4:29 PM on September 14, 2020, Attorney Brett Heyman of Jones Day sent what appeared to be the final Flow of Funds. See in the message below he was requiring "updated invoices or written confirmation…"



49.    After Heyman's email, since the Flow of Funds appeared complete, Boyd submitted his signature for the Flow of Funds to Jose Sosa, DLA Piper attorney representing BGF at the September 15, 2020, financial close at 4:43 PM on September 14, 2020, to hold in escrow.



Greg Boyd
(787)463-1830

50.    In the email below, nearly five hours after Boyd submitted his signature, Banco Popular's Officer made another change to the disbursements, altering the Flow of Funds to include a fraudulent payment for the Lopez Companies' Pay and Performance Bond from BGF's direct loan proceeds in violation of the requirements of the Credit Agreement and New Market Tax Credit QLICI Disbursing Agreement. Joval Rodriguez sought to hide the $70,500 by miscategorizing it as "Closing Cost."

51.    The new Flow of Funds did not include "updated invoices or written confirmation…" as requested by attorney Brett Heyman. These invoices would have shown this payment as an obligation of the Lopez Companies, not BGF. As a result, the executed Flow of Funds Exhibit in the QLICI Disbursing Agreement do not include the $70,500 "Closing Costs."

**greg.boyd@icloud.com**

| | |
|---|---|
| From: | Joval Rodriguez Barnes <Joval.Rodriguez@popular.com> |
| Sent: | Monday, September 14, 2020 9:38 PM |
| To: | Jacen Killebrew; Heyman, Brett E.; Cristina Dominguez; john.chamberlain@capitalone.com; douglas.fields@capitalone.com; al.kropog@capitalone.com; mark.preston@capitalone.com; kyle.fontanille@capitalone.com; seth.bosworth@capitalone.com; taylor.leblanc@capitalone.com; lisa.irons@capitalone.com; Cronin, Patrick J.; McGuckin, Aurora P.; Humberto E. Gonzalez Caraballo; Gabriel Lopez Somohano; asantos@pmalaw.com; amolina@pmalaw.com; pramirez@pmalaw.com; Natalia Guzman; Jessika M. Corujo Rodriguez; Isaac Wilkins Velez Barbeito; Guillermo Franco; drew.marlar@kutakrock.com; carol.mihalic@kutakrock.com; edward.gillespie@kutakrock.com; nicole.wilson@kutakrock.com; Olmar López; olg@greenfuelspr.com; G Boyd; george.economou14@gmail.com; jose.sosa@dlapiper.com; ruben.fernandez@dlapiper.com; paul.ohanlon@leveragelaw.com; blake.mason@leveragelaw.com; neal.johnson@leveragelaw.com; Richard Davies |
| Subject: | RE: Biomass Green Fuels - Projections |
| Attachments: | ESI Energy - Invoice.pdf |

Jacen, I have a small difference ($4,742) with the direct loan disbursement at closing. It is related to ESI Energy's invoice which I think is not included in the amount to be disbursed. My understanding is that this invoice will be paid with the Direct Loan. Could you please confirm this.

| Closing Costs | Total Invoices | Direct Loan |
|---|---|---|
| BPPR Fees | | 233,750.00 |
| P&P Bond | | 70,500.00 |

52.    The email shows Banco Popular included the payment of the Lopez Companies' Construction JV Performance and Payment Bond by BGF in the Banco Popular Loan Disbursement.

53.    The email amount matches the invoice to the ITS/ASC Joint Venture from Popular Insurance for the Mapfre Bond.

54.    This bond was required by the credit agreement to be paid by the ITS/ASC Joint Venture BEFORE the closing on September 15, 2020.

55.    The Bank Officer, Joval Rodriguez, included paying for the ITS/ASC bond as a "closing cost" to BGF using the direct loan AFTER the closing. **Exhibit 3**, BPPR Credit Agreement with BGF

56.    BGF had no obligation to pay the bond, which was the responsibility of the construction JV.

57.    The bank was buying the bond for a third-party entity owned by the Lopezes from Popular Insurance as an initial act of tying.

58. Below is the invoice for the bond, showing the agent as Popular Insurance, showing the amount matching Rodriguez's email above and the wire below. It also shows that the bond is for ITS/ASC Joint Venture, not BGF.

W. www.mapfrepr.com                                                              Pág./Page    1    de/of    2

## Fianzas de Contrato / Contract Bonds
## FACTURA / INVOICE

| | |
|---|---|
| Asegurado / Insured | ITS/ASC JOINT VENTURE<br>PO BOX 11439<br>SAN JUAN PR 00922-1439 |
| Dirección Postal / Postal Address | |

| | |
|---|---|
| Póliza / Policy | 1301208000513 |
| Fecha Factura / Invoice Date | 14-SEP-2020 |
| Fecha Corrida / Run Date | 14-SEP-2020 |
| Expediente / File Number | WISE |
| Núm. Identificación / Identification Number | IND 1301208000513 |

| | |
|---|---|
| Acreedor / Mortgagee | |

| | |
|---|---|
| Código Acreedor / Mortgagee Code | |
| Núm. Préstamo / Loan Number | |

| | |
|---|---|
| Productor / Producer Corredor / Broker Agencia / Agency | 46561 . POPULAR INSURANCE LLC<br>PO BOX 70331<br>SAN JUAN PR 00936-8331 |

| | |
|---|---|
| Comisión / Commission | |
| Sucursal / Branch | POPULAR INSURANCE |

\* Claves al dorso/ See reverse side.

| Número de Factura / Invoice Number | Claves / Codes Trans. * | Efectividad/ Effective | Vencimiento / Expiration | Prima / Premium | Balance / Balance |
|---|---|---|---|---|---|
| 153467341 | NN | 14-SEP-2020 | 14-SEP-2021 | $70,500.00 | $70,500.00 |
| | | | Total a Pagar / Payment Amount : | $70,500.00 | $70,500.00 |

Según reglamentación actual, esta póliza no entra en vigor hasta que el pago de la prima requerida sea recibido. Véase endoso adjunto a la póliza. / According to present regulations, this policy will not be in force until the payment of the required premium has been received. See endorsement attached to the policy.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**TALON DE PAGO**
**PAYMENT STUB**

DESPRENDA ESTE TALON Y ENVIELO CON SU PAGO / DETACH AND SEND THIS STUB WITH YOUR PAYMENT

### MAPFRE PRAICO INSURANCE COMPANY
Una Compañía de Seguros por Acciones en adelante denominada la Compañía
PO BOX 70333, SAN JUAN PR  00936-8333
T. (787) 250-6500  F. (787) 250-5370
W. www.mapfrepr.com

**MAPFRE | PUERTO RICO**

| | |
|---|---|
| Asegurado / Insured | ITS/ASC JOINT VENTURE<br>PO BOX 11439<br>SAN JUAN PR 00922-1439 |
| Dirección Postal / Postal Address | |

| | |
|---|---|
| Póliza / Policy | 1301208000513 |
| Factura / Invoice | 153467341 |
| Vencimiento del Pago / Payment Due Date | 14-SEP-2020 |
| Total a Pagar / Payment Amount | $70,500.00 |

Copia del  Asegurado              /              Insured   Copy

JF_999_FACTURA(0)
02/06 52226865            1301208000513    091420    0007050000    6    153467341    2    00070274

59.    This Bond is an obligation of the Lopez Companies, not BGF. GFC's contract with the ITS/ASC [the Lopez Companies] Joint Venture provides that:

> 8.    Both parties agree to execute all applications and indemnity agreements required by the sureties upon any bond, or bonds, required in connection with the contract and the performance thereunder, and if required by such bonding JV, execute any indemnity agreement(s) jointly and severally between the Joint Venturers. Both parties also agree to pay their (50%) percent share of all insurance premium costs and to be responsible in their proportionate share for any deductible costs associated with said insurance coverage.

60.    Boyd did not approve the fraudulent Lopez Companies' Performance bond payment from the loan money.

61.    Boyd did not provide "express authorization to release" his signature from the escrow since the document had changed multiple times since submitting his signature 18 hours earlier, violating Federal Forgery laws 18 U.S.C. §471, 472, 473.

62.    On September 16, 2020, López Vidal fraudulently wired $70,500 to Popular Insurance for the MAPFRE Pay and Performance Bond for the Lopez Companies, with direct loan money intended for BGF's operations.

63.    Banco Popular's officer in charge of the loan facility, Joval Rodriguez and Lopez Vidal called the wire to Popular Insurance Closing Costs or "Pago Gastos de Cierre" in Spanish.



64.    Banco Popular breached the Credit Agreement by paying the Lopez Company's bond out of the direct loan for BGF.

65.    Banco Popular is the Administrative Agent of the direct or non-revolving and NMTC loans.

66.    Banco Popular did not follow the disbursement controls of their own Credit Agreement.

67.    The bank never perfected the Credit Agreement because no bond exists for 100% of the direct costs of the project, the Pay and Performance bond for the construction company was not paid before the September 15, 2020, closing, and it was paid with the direct loan proceeds of BGF in violation of the Flow of Funds agreement.

68.    Because Boyd, GFC, and BGF believed that Banco Popular, as the Administrative Agent, would enforce the disbursement controls to protect over $27 million of GFC/BGF's assets entrusted to the bank, they were falsely induced to sign the Credit Agreement.

69.    The Lopezes and their companies were not creditworthy, which prevented them from getting a Performance Bond for the project's construction.

70.    Olmar Lopez Vidal's 2018 personal financial statement submitted to the SBA shows he had a negative net worth of $100,000.

71.    Olmar Lopez Gomez's 2018 Tax return showed an income of $4,500.

72.    The Lopezes had to form a Joint Venture (JV) to use the credit standing of Accurate Systems Corporation for the required performance bond.

73.    No other bank would allow such a company to lead the engineering and construction of a $30 million biorefinery.

74.    The U.S. Environmental Protection Agency's Landfill Methane Outreach Program states as of September 2024, 542 Landfill Gas to Energy projects are operational in the United States with 121 under construction. The majority of these projects were funded by bank loans and most with federal guarantees from SBA and/or USDA.

75.    Indeed, Byline Bank and others refused to fund this project, because of the conflicts of interest posed by some of the owners of BGF also owning the construction contractors ITS and because the project had no signed Off Take Agreements.

76.     The EPA, citing 542 projects in production, proves there are many experienced engineering and construction firms in Landfill Gas to Methane projects.

77.    At the September 15, 2020, loan closing, Banco Popular assigned the NMTC put option worth $2.1 million to Green $CO_2$, LLC for $1,000.  This put option is part of the NMTC program that discounts the costs of a program and rewards that a program goes to fruition.

78.    Olmar Lopez Vidal owns Green $CO_2$, LLC.

79.    This assignment Green $CO_2$, LLC cost BGF and its holding company GFC Holdings $2.1 million.

80.    Banco Popular's focus was always on the highly lucrative renewable liquid natural gas rights Off Take Agreement, enough so that Banco Popular wired the money for the Pay and Performance Bond of the Lopezes construction company without the credit rating or their liquidity to pay that essential prerequisite.

81.    Despite BGF filing no audited financial statements in 2020, 2021, 2022, and 2023, and interim in 2024 as required by the direct and NMTC loan agreements, Banco Popular continued to lend to BGF.

82.    The Tying agreement came to light after Boyd and Lassers sued Banco Popular, the Lopezes, and various other parties for violating the Racketeering Influenced Corrupt Organizations Act on April 25, 2022 (22-CV-1190 (GMM)).

83.    The Lopezes reacted to the RICO Complaint by wiring more than $1 million to pay equipment suppliers later in the same day on April 25, 2022, like Galileo Technologies, for $1,029,460 and Tecno Project Industriale for $108,060. These final payments were not due until the plant was operational. The Lopezes paid the suppliers apparently to receive commissions and kickbacks from them.

84.    Those payments emptied BGF's checking account and were not authorized in the approved drawdown schedules.

85.    In court documents, the Lopezes never denied receiving compensation from these vendors for wiring the completion payment years before it was due.

86.    The plant was never operational.

87.    The Lopezes bounced four loan repayments due to the bank in April-June 2022:

88.    The Lopezes faced the RICO lawsuit with its RICO Statement accompanied by documents that verified each statement.

89.    The Lopezes then defaulted on their obligations to the landfill's owner, EC Waste.

90.    The Lopezes had no money to complete the construction that was long overdue, so they bounced loan payments to Banco Popular after draining the BGF bank account to pay suppliers that BGF did not owe money until the construction was complete.

91.    Faced with this trifecta of disaster, the Lopezes capitulated to a RLNG Off Take Agreement 65% below market price and ceded the carbon and environmental credits to Banco Popular in exchange for the bank's forbearance on the outstanding loan.

92.    On July 18, 2022, the Lopezes changed the 2019 draft contract from BGF keeping the related Carbon Credits and environmental attributes worth tens of millions of dollars, to those credits being transferred to Banco Popular. **Exhibit 1** The Popular Supply Agreement, aka. Off Take Agreement

| | |
|---|---|
| **Renewable Energy Credits (REC's) and Carbon Credits (CC)** | Seller will transfer free of charge all REC and CC to which Popular may be entitled to by Law or regulation, due to the RLNG sold to Popular.  Seller shall retain all REC's and CC's to which Seller is entitled to by Law or regulation. |
| **LNG Meter** | The  utility grade meter located at the inlet of the Popular LNG tanks. LNG Meter will be the point at which title and risk of loss will transfer from Seller to Popular. |
| **Seller's Backup Supplier** | Crowley or any other such other replacement Backup Supplier agreed to by the parties. |
| **Preventive Maintenance Deliverables** | • Inspection of system hoses. Replacement included.<br>• Maintain pump bearing lubrication.<br>• Sensor system yearly validation test.<br>• Seismic detector validation test every 2 years. |
| **Equipment Operation Deliverables** | • Fuel connections to skids from truck<br>• Assure safety conditions on station<br>• Precool lines, if necessary<br>• Transfer fuel from truck to tanks<br>• Monitor fuel levels and site conditions<br>• Report any deviation within 4 hours |

EJMM
7/18/2022

| Biomass Green Fuels LLC | Banco Popular de Puerto Rico |
|---|---|
| By: _DocuSigned by:_ Olmar López | By: _DocuSigned by:_ |
| Name: Olmar López Vidal | Name:  Ignacio Alvarez Zatarain |
| Title: President | Title: President & Chief Executive Officer |
| Signature Date:7/18/2022 | Signature Date:7/18/2022 |

JDP
7/18/2022

JDT
7/18/2022

93.    This favorable Off Take Agreement would only benefit Banco Popular if BGF finishes the construction and goes into production. This required the bank to double down on its wrongdoings to aid the Lopezes.

94.    The project was out of money and past its completion date due to the fact that the bank allowed Lopezes' thievery and incompetence.

95.    A week after the Off Take Agreement was signed, the Lopezes and the bank entered into Credit Amendment 3. **Exhibit 4**

96.    The bank intentionally omitted putative guarantor Boyd's consent and signature from this agreement.

97.    In this agreement, the bank extended the missed construction deadline from April to October 2022, extended the credit line by another million dollars, and denied the existence of the RICO lawsuit, the missed loan payments, and the default with EC Waste. The bank wanted the rights to the RLNG.

98.    After July 18, 2022, Banco Popular deposited the exact loan payment amount in BGF's account and withdrew that exact loan payment amount to Banco Popular hours later to keep BGF out of further default.

99.    The loan payment was lent with no supporting drawdown documentation, which Banco Popular's construction loan to Biomass required.

100.    The credit agreement allows the bank to make such loans to cover the payment and prevent non-payment.

101.    In every case, BGF already had enough money in the account to make the loan payment, so no non-payment would have occurred.

102.    Page 6 of the Banco Popular Off Take Agreement with BGF, <u>Section 2.8, provides;</u>

2.8    <u>Debts</u>. Popular may off-set any Seller debt or obligation owed to Popular or any of its affiliates that is more that ninety (90) days past due against any payment Popular owes to Seller hereunder.

103.   Section 2.8 shows the Credit Agreement is tied to the Off Take Agreement. A standard supplier agreement would not have a clause allowing payment of BGF's debts by offsetting Banco Popular's bills for RLNG. None of the gas purchase agreements sent to other customers contained such a clause.

104.   5.3 (F) of BGF's Off Take Agreement with Banco Popular states:

> "In the case of Seller, if the interruption of the **supply of RLNG or LNG** is not the result of a Force Majeure Event and exceeds ten (10) consecutive calendar days, and Popular's Facilities are unable to operate as a direct result of such interruption, Seller, will pay to Popular $2,100 per day pro- rated on an hourly basis after such ten (10) days, while Seller's Facilities remain inoperable. To the extent that on such payment date Seller owns <u>unencumbered, transferable carbon credits,</u> and only to such extent, Popular shall have the option of receiving payment of such $2,100 per day prorated on an hourly basis after 10 days **in the form of cash or in the form of carbon credits**. If Popular opts to receive all or part of such payment in the form of carbon credits, such credits shall be valued at a price agreed upon by the Parties. If the Parties fail to agree on a price, the price for such credits shall be set in accordance with the price established by S & P Global Platts or other agreed upon third party expert as of the date such payment becomes due." *Emphasis added.*

105.   If BGF gave all their other customers carbon credits as the Banco Popular Off Take Agreement requires, BGF would have no surplus "unencumbered, transferable carbon credits." Such business practices would make paying Banco Popular in carbon credits impossible. Banco Popular in requesting a payment in additional carbon credits recognizes that BGF does not give all their carbon credits away to other customers. Banco Popular knows ceding free carbon credits is not normal business practice because Banco Popular's Credit Agreement with Biomass requires that BGF submit all its Off Take Agreements (Project Contracts) to the bank, and Banco Popular has a secured interest in those Off Take Agreements as part of the Credit Agreement with BGF.  From the Banco Popular Direct Loan Agreement:

"**Loan Documents**" means, collectively, this Agreement, the Notes, the Security Agreement, the Environmental Indemnity Agreement, the Membership Interest Pledge Agreement, the Assignment of Leasehold Interest, the Assignment of Project Contracts, the Personal Guaranties, the Corporate Guaranty, the Accounts Control Agreement, the Assignment of Tax Credits, the Subordination Agreement, the Intercreditor Agreement, each of the other security instruments referred to in Section 3.1(c)(ii), and on and after the date of delivery thereof, such other guaranties, security instruments and other agreements as are required to be delivered

17

by a Loan Party under the terms of this Agreement or any other Loan Document, in each case as amended or otherwise modified from time to time.

106.   By contracting a portion of its RLNG to Banco Popular, BGF forfeited a minimum of $8.5 million of its profitability.

107.   Island Renewable Energy and Venture Engineering, companies that are building biorefineries in Puerto Rico, now charge $40 MMBtu for renewable natural gas from the Puerto Rico landfills in Ponce and Salinas. An email from Lopez Vidal to the GFC Board announced this fact on March 8, 2024.

108.   Banco Popular contract is for $14 MMBtu plus receiving carbon and environmental credits which is $26 below market at least as established by these other PR Biorefineries in PR.

109.   The Banco Popular Off Take Agreement is for 90 MMBtu daily (minimum quantity) for a ten-year term = 328,500 MMBtu x $26. That represents $8,541,000 BGF could have made selling at market rate.

110.   This tying arrangement ensured the Lopezes could pay their own companies from BGF's loan proceeds for work they never performed successfully for BGF. Please see Case 3:22-cv-01190-ADC-BJM Document 145-1 filed January 23, 2023, for details.  **Exhibit 2**. RICO Complaint

111.   By tying the credit and Off Take Agreements, Banco Popular ensured that, under the Lopezes' control, BGF was destined to run out of money and miss every construction deadline, ultimately allowing the bank to take estoppel on 100% of the RLNG rights.

112.   This agreement at $40 MMBtu is worth $766,500,000 over the 35-year term. (now 30 years left).

113.   Section 1.9 of the Banco Popular Off Take Agreement with BGF states: "Popular represents that accepting RLNG from Seller does not, and will not, create a conflict of interest in Seller's relationship with Popular and Affiliate." Exhibit 1

114.   Section 1.9 is Banco Popular's attempt to forestall this cause of action. However, saying no conflict of interest exists does not erase the conflict or tying. This clause calls attention to another Banco Popular's wrongdoing.

1.9    <u>Non-Exclusive</u>. This Agreement does not create an exclusive relationship between Seller and Popular. The Parties may enter into similar agreements with others. Seller represents that providing RLNG to other clients does not, and will not, create a conflict of interest in its relationship with Popular.    Popular represents that accepting RLNG from Seller does not, and will not, create a conflict of interests in Seller's relationship with Popular and Affiliate.

115.   Banco Popular intended to reduce its energy costs significantly by using BGF's renewable fuel for electricity generation for the "Carbon Neutral Facility at El Señorial Building."

| Delivery Location | Popular's combined heat and power facility located at the Carbon Neutral Facility at El Señorial Center, San Juan, Puerto Rico. |
|---|---|

116.    The only way for the Facility at El Señorial Building to be "Carbon Neutral" was to buy RLNG from BGF, as BGF is the only source of RLNG produced in Puerto Rico.

117.    Banco Popular named the facility before BGF provided a draft Off Take Agreement and Banco Popular provided credit terms on November 11 and 13, 2019, respectively.

118.    On November 16, 2022, Ignacio Alvarez, CEO of Banco Popular and founder of the PMA, the law firm defending Banco Popular, released a promotional video from GFR Media.

119.    Alvarez stated that Banco Popular's Environmental, Social, and Governance (ESG) strategy includes being the "first in Puerto Rico" to use renewable natural gas for its Combined Heat and Power systems (CHPs), making its buildings Carbon Neutral.

120.    This gas is sourced from a Puerto Rican landfill.



121.    Having personally signed the tied Off Take Agreement on July 18, 2022, Alvarez stated that Banco Popular would be the first in Puerto Rico to use RLNG to power its office buildings.

122.  The RLNG is sourced from EC Waste's Puerto Rican landfill for which BGF owned the gas rights to.

123.  RLNG will be an important part of Banco Popular's Environmental Social Governance (ESG) strategy.

124.  In Banco Popular's 2022 Proxy Statement states on page 4: "In 2021, Popular completed the combined heat and power generation in one of our buildings located in Puerto Rico, to be fueled mostly by renewable liquid natural gas produced in local landfills."

125.  The Off Take Agreement states that: "The Contract Price" shall be $14.00 per MMBtu for the duration of the ten-year contract.

> The "**Contract Price**" shall be the guaranteed price for RLNG or LNG up to the Maximum Quantity, measured by weight at Sellers Facility or at third party supplier facility, when transferred to the ISO Tank that will transport the RLNG or LNG to the Delivery Location and will be inclusive of the Delivery Costs up to the amount stated below. The RLNG/LNG guaranteed price is fourteen dollars and no cents (US$14.00) per MMBtu during the Initial Term (subject to renegotiation for any Renewal Term).

126.  The April 2024 Department of Energy study puts the average price of RLNG at over $29.91 per MMBTU.

| TABLE 3 National Average Retail Fuel Prices on an Energy-Equivalent Basis, April 2024 * | | | |
|---|---|---|---|
| | Per Gasoline Gallon Equivalent ($/GGE) | Per Diesel Gallon Equivalent ($/DGE) | Per Million British Thermal Units ($/MBtu) |
| Gasoline | $3.65 | $4.12 | $31.93 |
| Diesel | $3.62 | $4.07 | $31.62 |
| CNG | $2.90 | $3.28 | $25.37 |
| LNG | $3.43 | $3.85 | $29.91 |
| Ethanol (E85) | $3.85 | $4.35 | $43.95 |
| Propane** | $4.72 | $5.31 | $56.53 |
| Biodiesel (B20) | $3.55 | $4.02 | $28.09 |
| Biodiesel (B99/B100) | $4.48 | $5.03 | $38.26 |

*Includes public and private stations
**Includes primary and secondary stations

127.    In Puerto Rico, the buyer of RLNG is eligible for a 35% recycled products tax credit according to Section 2(d)(l)(l)(ii) in Law 73- 2008.

128.    Today, Island Renewable Energy owned by Venture Engineering, a BGF competitor, offers renewable natural gas in Puerto Rico for $40 MMBtu.

129.    Venture Engineering owns the gas rights to EC Waste's Ponce and Salinas landfills in Puerto Rico.

130.    Venture Engineering has built over twenty renewable natural gas facilities in the States and owns six. They know the market price for renewable natural gas. Although $14 MMBTU is priced well below the market for renewable natural gas in Puerto Rico, it is just a fraction of the value of the tying agreement to

Banco Popular. $14 minus the 35% recycled tax credit is $9.10. The DOE's average price of $29 plus the .35% recycled credit is $40. The ten-year fixed-price Off Take Agreement gives Banco Popular all the Carbon Credits and environmental incentives for BGF's Renewable Natural Gas. Section 2.7 of the Off Take Agreement:

> "Unless otherwise agreed in the Annex, any current and future environmental incentives and tax credits under federal or state law to which Popular is entitled (including but not limited to renewable identification numbers, renewable energy credits, carbon credits, reduction in or avoidance of Greenhouse Gas emissions, emissions reductions credits, low-carbon fuel standard credits, verified emission reductions, voluntary emissions reductions, offsets, allowances, voluntary carbon units, avoided compliance costs, emissions rights and authorizations and $CO_2$ reduction and sequestration) regarding the RLNG and LNG purchased from Seller will be retained by Popular."

131.    The market value of these credits varies depending on regulations and demand.

132.    These credits may well exceed the $14 MMBTU the bank is paying BGF during the period of the 10-year agreement.

133.    In 2025-2027, the 45z provision of the Inflation Reduction Act will pay $5 per MMBTU. This would reduce the effective cost ($14-35%=$9.10 - $5 45z credit = $4.10) to $4.10 per MMBtu. When one deducts RECs and Carbon Credits, the $4.10 can be less than $0 for a product sold to other customers in Puerto Rico for $40.

134.    As an example of the potential future value of these credits: If Puerto Rico joins the U.S. EPA Renewable Fuel Standard program (RFS), the renewable natural gas incentive (RIN) would be worth approximately $38 MMBtu plus $2 pipeline value.

135.    Under the RFS, Banco Popular could *get paid* $26 MMBTU ($40-$14=$26) to use renewable natural gas.

136.    $26 times the volume of gas BPPR contracted for in the ten-year Off Take Agreement would pay BPPR $8.5 million before the REC and Carbon Credit values are added.

137.    BPPR could get paid well over $8.5 million to use renewable natural gas to fuel its buildings while receiving a 35% recycled product tax credit.

138.    No properly managed renewable natural gas company would sell gas below market and give the carbon and environmental credits worth tens of millions of dollars away for free. Below is the table and signatures from the Banco Popular Off Take Agreement with BGF:Ignacio Alvarez was the President and is the CEO of Banco Popular, a $62 Billion banking institution and took the time to sign this important supplier agreement.

| Delivery Location | • Popular's combined heat and power facility located at the <u>Carbon Neutral Facility at El Señorial Center,</u> San Juan, Puerto Rico. |
|---|---|
| Seller's Facility | • Seller is in the process of establishing a biorefinery plant ("Seller's Plant") located at Road PR-3, intersection 923, Km 1.7 in Bo. Buena Vista, Humacao, Puerto Rico 00791 (the "Seller's Facility") that will produce Renewable Liquid Natural Gas (RLNG) for commercial and industrial use. |
| Delivery Point | • The LNG Meter at Popular's LNG tanks located at the Delivery Location. |

| Supply Start Date | • The earlier of (i) the date on which Popular's Facilities are capable of generating power using RLNG as fuel and (ii) the date on which the Seller's Plant is operational, which is estimated to be no later than August 1, 2022. In the case of (i), Popular shall have up to sixty (60) days for commissioning of Popular's equipment. Popular shall give Seller at least fourteen (14) calendar days prior written notice of the completion of construction of Popular's Delivery Site and at least seven (7) calendar days prior written notice of the completion of commissioning. If Popular's Delivery Site become capable of generating power prior to Seller's Plant becoming operational, then Seller shall supply LNG to Popular from Backup Supplier. During this interim period, Popular shall pay spot market price plus any other verifiable out of pocket costs incurred by BGF and the LNG supplied shall not count against the 98% RLNG guarantee. If on August 31, 2022, Seller does not begin supplying RLNG, Seller will continue supplying LNG at the Contract Price established herein. If on September 30, 2022, |
|---|---|

| | |
|---|---|
| | Seller has not begun supplying RLNG, Popular at its option may (i) permit Seller to continue supplying LNG at the Contract Price established herein (ii) terminate the Agreement for cause. and require the immediate payment of an amount equivalent to six (6) months Maximum Quantity supply of RLNG/LNG at Contract Price as provided in section 6.4(D). |
| Renewable Energy Credits (REC's) and Carbon Credits (CC) | • <u>Seller will transfer free of charge all REC's and CC's to which Popular may be entitled to by Law or regulation, due to the RLNG sold to Popular.</u> Seller shall retain all REC's and CC's to which Seller is entitled to by Law or regulation. |
| LNG Meter | • The utility grade meter located at the inlet of the Popular LNG tanks. LNG Meter will be the point at which title and risk of loss will transfer from Seller to Popular. |
| Seller's Backup Supplier | • Crowley or any other such other replacement Backup Supplier agreed to by the parties. |

| Effective Date | 1 April 2022 | Initial Term Expiration Date | 31 May 2032 |
| --- | --- | --- | --- |
| Renewal Term: | Upon mutual agreement. | | |

This Agreement includes the following Annexes and Exhibits:

- **Annex(es) of Service**
- **Exhibits:  (Annex 1) (Annex 1-A)**
- ☒ **(Exhibit 1)** Insurance Requirements for Popular Providers
- ☐ Certification Form
- ☐ _____
- ☐ _____

DS
*EJMM*
7/18/2022

**IN WITNESS WHEREOF**, the parties have executed this Agreement by their duly authorized representatives as of the Effective Date.

DS
*JDP*
7/18/2022

| Biomass Green Fuels LLC | Banco Popular de Puerto Rico |
| --- | --- |
| By: *Olmar López* DocuSigned by: CEB6E050A58F446 | By: DocuSigned by: 786E0A80DB8040A |
| Name: Olmar López Vidal | Name:  Ignacio Alvarez Zataraín |
| Title: President | Title: President & Chief Executive Officer |
| Signature Date:7/18/2022 | Signature Date:7/18/2022 |

DS
*JDT*
7/18/2022

{00035899 2 }

139.    Because this agreement provided significant benefits to the bank, both monetarily and in terms of its "Carbon Neutral" ESG status as a publicly traded company.  The picture below is of the BGF Renewable  LNG  tanks  at Señorial Carbon  Neutral  Center.



140.    Banco Popular paid BGF $280,000 for these tanks in December 2021, seven months before signing the Off Take Agreement.

141.    Flexitank is an investor in BGF and provides fuel delivery. This shows a plan and commitment to sign an Off-Take agreement with BGF.

142.    Galileo is a major equipment supplier to BGF.

143.    Indeed, Galileo is one of the two suppliers that Biomass made payments to the day Plaintiffs filed their RICO case.

144.    In 2024, BGF missed more completion deadlines, had damaged equipment trying to operate a mis-designed plant, and was still in default with El Coqui Landfill and now Banco Popular.

145.    In desperation, BGF executed an Off Take Agreement with Astra Zeneca, requiring a $350,000 advance payment to stave off estoppel with EC Waste.

146.    Astra Zeneca's price for the RLNG is $21.50 compared to Banco Popular's $14 MMBtu.

147.    In the rush to complete the Astra Zeneca Off Take Agreement, it mistakenly stated that both the buyer and the seller are to retain the carbon and environmental credits.

148.    In May 2024, Banco Popular took estoppel on the El Coqui Landfill Gas Purchase and Sale Agreement, which defaulted 21 days after the RICO lawsuit was filed on April 25, 2022.  This agreement gives Banco Popular control of the renewable natural gas rights for thirty years, as predicted by Boyd and Lassers in the RICO filings.

149.    Without the landfill gas rights BGF has 0 value.

150.    Banco Popular also filed a lawsuit against BGF, GFC Holdings, and Boyd as guarantors to repay the bank for the loan. With this collection lawsuit, BGF now has a negative value.

**BREACH OF FEDERAL ANTI-TYING STATUTE 12 U.S.C. 1972**

151.    Plaintiffs incorporate the prior allegations as if set forth in full.

152.    Banco Popular violated 12 U.S.C. §1972 by tying the Off Take Agreement to its loan to Biomass Green Fuels, LLC and GFC Holdings, LLC.

153.    In relevant part, 12 U.S.C. § 1972 provides, (1) A bank shall not in any manner extend credit, lease or sell property of any kind, or furnish any service, or fix or vary the consideration for any of the foregoing, on the condition or requirement …[C]that the customer provide some additional credit, property, or service to such bank, other than those related to and usually provided in connection with a loan, discount, deposit, or trust service.

154.    12 U.S.C. §1975 in turn provides that any person who is injured in his business or property by reason of anything forbidden by this statute shall be entitled to treble those damages and a reasonable attorney's fee as well as an injunction ending the tying agreement.

155.    Statutory and Regulatory Language: The specific language of the anti-tying laws and regulations does not typically require that the contracts be signed at the exact same time (contemporaneously) to be considered a tying arrangement.  Instead, the focus is often on whether one service is conditioned upon the taking of another.

156.    Conditionality, Not Timing, is Key: The essence of a tying arrangement is the conditionality of one product or service upon the acceptance of another, not the timing of when the agreements are signed. If the approval or favorable terms of one service (e.g., a loan) depend on the customer's agreement to use or provide another service, this is a tying arrangement regardless of whether the contracts are signed on the same day.

157.    Banco Popular is receiving the carbon credits for free as part of the illegal tying agreement. This is not normal business practice but the direct result of the tying, and it violates 12 U.S.C. 1972.

158.    Banco Popular violated the Anti-tying law when it "tied" the favorable loan agreement for the Lopezes to the Off Take Agreement favorable to Banco Popular, despite Lopezes' lack of creditworthiness, competence to build a biorefinery, conflicts of interest, and outstanding litigation..

159.    Banco Popular used its market dominance in Puerto Rico to force unfavorable agreements, which harmed Boyd.

160.   Banco Popular required BGF to sell RLNG for 65% below its market price and give away the Carbon Credits for no consideration in return to Banco Popular in exchange for forbearance on Biomass's Credit Agreement with the bank., extend the missed deadline by six months and an additional $1 million expansion of the direct loan.

161.   By allowing the Lopezes to operate Biomass with conflicts of interest, without any fiscal controls or audited financials, in exchange for the Off Take Agreement with its below-market pricing and the appropriation of the carbon and environmental credits, Banco Popular injured Biomass Green Fuels by destroying the value of Biomass Green Fuels, LLC and GFC Holdings, LLC in an amount not less than $338 million.

## DAMAGES

162.   "The damages inquiry does not allow a defendant to benefit from the scope of its wrongdoing; this is why '[e]ven 'speculation has its place in estimating damages, and doubts should be resolved against the wrongdoer." *Kaiser Foundation Health Plan, Inc. v. Pfizer, Inc.*, 712 F. 3d 21, 49-50 (1st Cir. 2013).

163.   PR is a civil-law jurisdiction which means that the District Court must follow the codified law of PR in computing damages.  *See, Escobar-Noble v. Luxury Hotels Int'l of P.R., Inc.,* 680 F.3d 118, 125 (1st Cir. P.R. 2012) ("Puerto Rico is a civil-law jurisdiction, rather than a common-law jurisdiction"); *Jones v. Pettingill*, 245 F. 269, 276 (1st Cir. P.R. 1917) ("the law of Porto Rico [] deals with the above questions from a somewhat different point of view, and its policy is to be gathered more from Codes based on the civil law, or from commentators thereon, than from reported decisions").

### The PR Civil Code

164.   PR Civil law is codified in writing in a Civil Code.

165.   Under PR's Civil Code, to determine the law applicable to the damage's computation, this Court must follow a proscribed sequence of analysis. First, it must use as the primary source of interpretation "the express letter of the Civil Code." Second, it should turn to the PR Supreme Court's

interpretive jurisprudence of the same. Third, it can look to any persuasive written comments or treatises by those recognized in the civilian world as authorities and whose works are widely published and available, construing the articles or similar provisions in the articles of the Civil Codes of Spain and other civil law countries. Lastly, only in cases where there is the need to consider a legal dispute that originated and developed in the "common law" of the United States and over which there are no "precedents [from the PR Supreme Court] that specifically meet the dispute" can the Court resort for guidance to the common law system or the treatises and other writings construing said law. *See*, *Burgos Lopez v. LXR/Condado Plaza Hotel & Casino*, 2015 TSPR 56 (P.R. 2015).

### Liability Arising from PR Contract Law

166.   The Civil Code governs the law that regulates all matters related to obligations and contracts. Under the PR Civil Law, "[c]ontracts are perfected by mere consent, and from that time they are binding, not only with regard to the fulfillment of what has been expressly stipulated, but also with regard to all the consequences which, according to their character, are in accordance with good faith, use, and law." 31 L.P.R.A. § 3375.

167.   The Civil Code also states that "[t]hose who in fulfilling their obligations are guilty of fraud, negligence, or delay, and those who in any manner whatsoever act in contravention of the stipulations of the same, shall be subject to indemnify for the losses and damages caused thereby." 31 L.P.R.A. § 3018.

168.   Civil Code states that "[t]he fault or negligence of the debtor consists of the omission of the steps which may be required by the character of the obligation, and which may pertain to the circumstances of the persons, time, and place. Should the obligation not state what conduct is to be observed in its fulfilment, that observed by a good father of a family shall be required." 31 L.P.R.A. § 3021. "Liability arising from negligence is also demandable in the fulfillment of all kinds of obligations." 31 L.P.R.A. § 3020.

169.    With respect to the damage's computation, under PR statutory law, "[t]hose who in fulfilling their obligations are guilty of fraud, negligence, or delay, and those who in any manner whatsoever act in contravention of the stipulations of the same, shall be subject to indemnify for the losses and damages caused thereby." 31 L.P.R.A. § 3018. The "**[i]ndemnity for losses and damages includes not only the amount of the loss which may have been suffered, but also that of the profit which the creditor may have failed to realize**." (*Emphasis supplied*), 31 L.P.R.A. § 3023.

170.    The Code adopted "the traditional norm, originating in Roman law, of the '*damnum emergens*' and the '*lucrum cessans*'". *Compensation for Damages and Damages for Breach of the Contract in the Principles of European Contract Law*, Juan Pablo Pérez Velázquez, State Agency Official State Gazette, Madrid, 2016, 222-223. That is the norm adopted by all European Civil Law systems. *Id.*

171.    The foregoing statutes adopt the "principle of the comprehensive repair of the damage". That is that "*the basic philosophy of action for damages is to place the injured party in the same economic conditions in which it would have been left if the contract had been fulfilled. The explicit reference to loss of profit is necessary because in some legal systems the concept of 'loss' in itself does not include that profit*". *(Notes omitted), The Compensation of Damages*, *op. cit.*, 222-223. "**The principles underlying the calculation are clear**. Damages in Puerto Rico are compensatory. The injured party has the right to recover for the damages actually suffered **and for lost profit**." (*Emphasis supplied), Noble v. Corporacion Insular de Seguros*, 738 F.2d 51, 54, (1st Cir. P.R. 1984).

## The Goal to Reestablish Equilibrium

172.    "'*[C]ompensation for damages is the economic compensation of the impairment caused to the injured party, and therefore, if the one that causes the damage must repair it, it must be done in its entirety so that when the disturbed right is restored, the balance and economic situation prior to the disturbance are restored without disproportion between such impairment and its repair.*'" *(Note omitted), The Compensation of Damages, op. cit.*, 113.

**The Principle of *Restitutio in Integrum* or Integral Restitution or Benefit of the Bargain**

173.    "The principle of the integral reparation of the damage or, in its Latin expression, *restitutio in integrum*, is nothing more than the main consequence of the function of the indemnity remedy in the contractual liability system. If the compensation has a reparative function, it can only be effective if the party that suffers the breach obtains compensation for all the impairments suffered, through rebalancing, the restoration to the state in which it would be, if the breach that obliges the defaulting party to indemnify had not occurred. The compensation must be specified in a sum of money equivalent to the complete damage produced, so that there is no part of the damage without compensation ..." *(Note omitted), The Compensation of Damages, op. cit.* 178.

174.    ""[T]he basic principle of contractual damages is that of *restitutio in integrum*, or full restitution, which involves putting the innocent party into the position it would have been in had the contract been performed. … The basic principle of damages for breach of contract is that the injured party is entitled, so far as money can do it, to be put in the position he would have been in if the contractual obligation had been properly performed. **He is entitled, that is to say, to the benefit of his bargain**'." (*Emphasis supplied*), *The Compensation of Damages, op. cit.*,182, n. 111.

**The Goal to put the injured in the closest possible to that if the duty had not been breached**

175.    Under the Code, "*[d]amages are generally an amount which places the injured party in the closest possible position to that it would have enjoyed had the terms of the contract been correctly executed." (Note Omitted), The Compensation of Damages, op. cit.,* 177-178 (construing the general applicable norm). That is "*the basic philosophy of action for damages is to place the injured party in the same economic conditions in which it would have been left if the contract had been fulfilled*", to "*put the creditor as nearly as possible into the position in which the creditor would have been if the obligation had been duly performed*", *The Compensation of Damages, op. cit.* 177, *n.* 91, "namely that the creditor is entitled to be put into the same position as he would have been had the debtor complied with the terms of his contract". *Id.* n. 96, 178. Under the applicable PR law it is clear, "[t]he goal in

damages actions is to put the injured party as nearly as possible where he would have been had the breach not occurred." (*Citations omitted*) (*Emphasis supplied*), *Noble, supra,* 54. "[T]he object of awarding damages for breach of contract is **to put the aggrieved party into as good a financial position as that in which he would have been if the contract had been duly performed**. This process has been called compensating the aggrieved party for loss of his bargain or of his 'expectation interest'". *(Note omitted) (emphasis supplied), The Compensation of Damages, op. cit.*, 182.

### The Emergent Loss and the Ceased Profits

176.  "'The losses actually suffered by the injured party', are referring to the emergent damage, and, with *'the profits that have ceased to be obtained'*, to the ceased profits. In very similar terms to the previous ones, article 1106 [same as PR 31 L.P.R.A. § 3023] of our Civil Code is pronounced: '*the compensation for damages includes not only the value of the loss that you have suffered, but also that of the gain that you have stopped obtaining*'." *The Compensation of Damages*, op. cit. 224.

### The Losses Actually Suffered

177.  "[T]he so-called emergent damage, the losses actually suffered that must be measured in the common market in the value of the good on which they fall, and the diminishment of economic value that by reflected means can occur". *(Notes omitted), The Compensation of Damages*, *op. cit.*, 225-226. The emergent damage is explained by the commentator authorities as "that something that exists disappears, that something that was counted is frustrated, that something that one had is lost, that is, as it constitutes" "the decrease in a utility that was already acquired by the patrimony", "the losses or impairments produced in the assets of the creditor due to the lack of counter consideration or the defective counter consideration", "the actual damage suffered in the victim's patrimony, which has lost a good or a right that was already incorporated into that patrimony". *Id.*

### The Lost Profits or "Lucro Cesante"

178.  "The *loss of earnings* has an economic significance; it tries to obtain the reparation of the *loss of earnings not received*, a concept different from that of material damages (thus, Judgment of May

1, 1993 [RJ 1993, 3530]), whose compensation for both concepts must cover all the patrimonial loss suffered by the injured party (thus, Judgments of October 21, 1987 [RJ 1987, 7308] and September 29, 1994 [RJ 1994, 7026]). *Civil Code, Concordances, Notes and Jurisprudence*, Francisco Javier Fernández Urzainqui, Editorial Aranzadi, 1302.

179.   "[T]he basis for the indemnifiable nature of loss of earnings derives from the principle of comprehensive damage reparation, from the need for the injured party to be placed in the same position in which he would be if the damage had not occurred." *The Compensation of Damages*, *op. cit.*, 226.

180.   The commentator authorities explain the loss of earnings as "the frustrated profit or the profits not obtained", "the benefits or advantages that the creditor would have obtained if the debtor had fulfilled the obligation exactly and in due course", "the frustrated gain, that is, the damages that are produced by the lack of income of certain assets or rights to the victim's patrimony, which is deprived of benefits that it would have obtained, had not mediated the harmful act". *(Notes omitted), The Compensation of Damages*, *op. cit.*, 225-226.

181.   Under the clear PR Law an ***award for lost profits*** is used to compensate for the future foregone gain that with "some probability it was expected to be obtained in the natural course of events" had not been because of Defendant's fault. *See, P.R. Freight Sys. v. Promoexport*, 187 D.P.R. 42, 61 (P.R. 2012); *S.L.G. Rodriguez v. Nationwide*, 156 D.P.R. 614, 624 (P.R. 2002). "[O]nce the reality or existence of the damage and its connection to the detrimental act or breach is proven its exact valuation **need not** be established with mathematic certainty, its calculation must at least rest on a reasonable basis and not on mere speculation or guess." *(Emphasis supplied), (citation omitted), Computec Systems Corp. v. General Automation, Inc.,* 599 F. Supp. 819, 827 (D.P.R. 1984). "The loss of earnings has an economic significance; to provide compensation for the loss of forgone profits, other than the material damage concept, whose compensation for both concepts should cover the entire equity loss suffered by the victim." *STS November 5, 1998 (RJ 1998, 8401).* "To distinguish between a genuine interest and one insecure or uncertain, we must distinguish between mere possibility and the probability of a future

gain considering that perhaps in some cases the mere possibility is compensable." *Velazquez v. Ponce Asphalt*, 113 D.P.R. 39, 48 (1982), quoting with approval from Santos Briz, *Derecho de Daños*, Madrid, Ed. Revista de Derecho Privado, 1963, p. 241.

**The Broader Reach of Compensable Loss When there is Bad Faith**

182.   "The losses and damages for which a debtor in good faith is liable, are those foreseen or which may have been foreseen, at the time of constituting the obligation, and which may be a necessary consequence of its nonfulfillment", but "[i]n case of fraud, the debtor shall be liable for all those which clearly may originate from the nonfulfillment of the obligation." 31 L.P.R.A. § 3024.

183.   Díez-Picazo, expression that better and more clearly exposes his thoughts on civil intent, is: "that generically encompasses the possible activities of a forced person, that are contrary to good faith and that therefore aggravates his responsibility. Fundamentally, they are presided over by the awareness of causing to the creditor unjust damage or placing him in a situation of unjust injury and in the absence of the necessary measures for the exclusion of such damage'. To which he adds, as special manifestations of fraud, the assumptions of bad faith of the debtor.  *(Note omitted), The Compensation of Damages*, *op. cit.*, 481. This is the flip side of the quantum delimitation *respondatur*." *Id.*

184.   Therefore, under PR statutory law, when the Defendant has incurred in fraud or bad faith it is liable for ***all damages*** that originate from its fault; and those damages will include any lost profits, even those that could not have been foreseen at the time when the obligation originated. *Id.*

**Plaintiffs' Entitlement to Capital Losses Plus Lost Profits**

185.   The evidence at trial will show the investment capital losses and lost profits for which Defendants are statutorily liable to put the Plaintiffs in the same situation it would have been if Defendants' breaches hadnot occurred. 31 L.P.R.A. § 3018. The lost profits should be computed taking into consideration that had the Defendants fulfilled their obligation to invest that capital in suitable securities to pursue capital preservation and a fixed income return, that capital would have not been

diminished and would have produced WMP returns. Thus, Defendants are also statutorily liable to compensate the Plaintiffs for the *lost profits* under WMP, *infra*. § 3023, *supra*.

### Benefit of the Bargain

186.   The full restitution principle adopted by the PR Civil Code, *supra,* 31 L.P.R.A. § 3023, is also known as Benefit of the Bargain (BOB). The BOB method compensates the Plaintiff for the expected value and return of the investment. The Plaintiff's measure of damages would be the amount the investment would have been worth but for Defendant's conduct of anti-tying, less what the investment is actually worth. For example, in Securities complaints it is recognized that "[a]llowing a Plaintiff to recover the diminished profits caused by a broker's fraud is consistent with allowing a plaintiff to recover the loss of his bargain." *Laney v. Am. Equity Inv. Life Ins. Co.*, 243 F. Supp. 2d 1347, 1355 (M.D. Fla. 2003). Huh? There are no statutory damages.

### Damages Causal Nexus

187.   Banco Popular's decision to allow the Lopezes to hire their own construction company to get favorable terms for the Off Take Agreement doomed the project, causing Plaintiffs to suffer the damages set forth in this section.

188.   The EC Waste deadline for BGF was called the Commercial Operations Date. This date was extended by payment of $250,000 to EC Waste on October 15, 2020. This payment extended the Commercial Operations Deadline from March 2021 until November 27, 2021. The project remains uncompleted and in default to this day.

189.   The construction contract for the plant with ITS and ASC (the Lopezes Construction JV) expired in June 2021 and had a fixed price of $5 million.  The contract has no approved change orders. The Banco Popular Credit and NMTC Agreements require the construction contract to be fixed cost.

190.   The Lopezes should not have paid ITS or ASC after June 2021 from BGF's checking account, but they did because Banco Popular's desire for the ESG, Carbon and Environmental Credits of the Renewable Liquified Natural Gas.

191.    Banco Popular caused this state of affairs by allowing the construction company to be owned by the co-owners of BGF, something no other financial institution with which BGF negotiated would have allowed.

192.    Federally backed loan requirements prohibit financial institutions from the payor and the payee to be the same person.  It is just too risky because of the inherent conflict.

193.    The results of those risks – deficient design and construction work finished well after every deadline - manifested themselves repeatedly, but Banco Popular kept disbursing the loan, millions of dollars after BGF had paid the full amount of the construction contract.

194.    The bank project required completion by the new Commercial Operations Date on November 27, 2021.

195.    The loans, equities, and tax credits were budgeted to cover the costs until that date. Thereafter, the positive cash flow from the operation of the Biorefinery after November 2021should have covered all costs.

196.    The Lopezes' frauds, design and construction failures caused the missing of the Commercial Operations Date.

197.    Banco Popular caused the Lopezes' fraud and construction failures by permitting the Lopezes to run BGF and the construction company causing BGF significant losses for every month of delay.

198.    Banco Popular permitted these misdeeds to secure the Off Take Agreement and never altered that decision despite the cascading evidence demonstrating that the Lopezes were corrupt and incompetent from before the September 15, 2020, financial close in the Ballester Hermanos case.

199.    Each month past the Commercial Operations Date, BGF owes EC Waste a $30,000 minimum gas payment, $4,166.67 rent, and about $8,000 a month in electricity = $42,166.67 x 37 months = $1,560,166.79.

200.    EC Waste charges an additional $250,000 to extend the commercial operations date by six months x 6 times to extend 36 months = $1,500,000.

201.    The required insurance costs $7,500 monthly, and the salary and overhead costs another $25,000 x 37 months = $1,202,500

202.    Each month the site is not finished, interest payments are made on the non-revolving loan ~ $80,000 and the NMTC $29,946 x 37 months = $4,068,002

203.    Losses from the 37-month delay = $1,550,166.79 + $1,500,000, + $1,202,500 + 4,068,002 = $8,320,668.79

204.    None of what the Lopez Companies built works. The repair estimate from an independent third-party landfill engineering and construction company is around $10 million.

205.    Although there is a $3.9 million cost overrun in the construction contract, this is a fraction of the loss, since a fully operational facility will take months to complete and cost another $10 million, so the real cost overrun is $3.9m + $10m = $13.9 million.

206.    The Lopezes intentionally started the plant before it could become eligible for a $10 million federal investment tax credit in June 2023. They also canceled an $8 million Puerto Rico Act 73 Rescue Credit, claiming the plant was in production. These $18 million in credits could have saved the company.

207.    The Lopezes did not want the company saved because new owners would perform forensic audits of the company and find all of their negligent, reckless, and criminal acts.

208.    The profit forecast by BGF at $29 MMbtu for RLNG and eighteen cents per pound for renewable $CO_2$ is $1,400,000 a month x 37 months delay= $51.8 million in lost profits. Banco Popular's quid for the quo of the Off Take Agreement caused that loss. $51.8m + $18m + 13.9m + $8.32m + $1.2m + $1.5m + $1.56m += $96.28 million loss to date, increasing by $1,400,000 each month of further delay. By agreeing to have the Lopezes' company construct the biorefinery, Banco Popular is responsible for that loss.

209.    These loss calculations above do not include the loss of profits for 30 years on El Coqui Landfill in Humacao and 35 years on the Ponce and Salinas landfills lost by the Lopezes by destroying any possibility of exercising the option to build those biorefineries. Those losses are calculated below

210.    Having watched the Lopezes raze the earth while trying to construct the Humacao plant, EC Waste would never allow them to be involved in any other biorefinery project. EC Waste signed contracts with Island Renewable Energy to develop those projects in 2024.  BGF held the first right of refusal on those projects from December 2018 until their third default with EC Waste in 2024.

211.    The BGF plant at El Coqui Landfill makes $1,400,000 a month for 30 years is $504 million for Humacao or a present value of $116,755,231 at a 5% discount rate

212.    Salinas and Ponce together produce approximately the same output as Humacao so $1,400,000 a month times 33 years (35 less two years to build) is $537.6 million or a present value of $124,978,452 at a 5% discount rate.

213.    The total loss is $96,280,000 to date, plus future loss of $116,755,231 for Humacao and $124,978,452 million for Salinas and Ponce, $338,013,683 as of December 2024. This figure increases by $798,444 for each month of delay.

214.    By allowing the Lopezes to operate BGF without any fiscal controls in exchange for the Off Take Agreement with its below-market pricing and the appropriation of the tax credits, Banco Popular injured Biomass Green Fuels by destroying the value of Biomass Green Fuels, LLC and GFC Holdings, LLC in an amount not less than $338,013,683 trebled = $1,014,041,049 of which Boyd is entitled to be paid 24.7%; Lassers is entitled to be paid 2.8%. These figures will be updated at the hearing dates to reflect actual damage at that time.

**Damages Calculation**

215.    The calculation of the damages incurred by the Plaintiffs at the hands of the defendants with the direct cause being their Anti-tying conduct is in a sum of not less than **$338,013,683** trebled

for the present value of the lost profits, Legal costs and expenses, and interest and whatever relief this Honorable Court may deem necessary and appropriate.

**WHEREFORE**, Gregory Boyd and Jonathan Lassers very respectfully ask this Honorable Court to enter a judgment in favor of Gregory Boyd and Jonathan Lassers in an amount not less than their respective percentage ownership in Biomass Green Fuels, LLC and GFC Holdings, LLC trebled in first place in a sum of not less than **$338,013,683** for the present value of the lost profits = **$1,014,041,049** of which Boyd is entitled to be paid 24.7%; Lassers is entitled to be paid 2.8%;[3] Legal costs, expenses and interest and whatever relief this Honorable Court may deem necessary and appropriate.

### JURY DEMAND

**Plaintiffs hereby demand a trial by jury.**

Dated December 9 , 2024.

## Respectfully submitted,

S/Jane Becker Whitaker/
**JANE BECKER WHITAKER**
USDC No. 205110
PO Box 9023914
San Juan, PR 00902-3914
Tel.(787) 585-3824
E-mail: jbw@beckervissepo.com
janebeckerwhitaker@gmail.com

S/ Luis E. Miñana/
**Luis E. Miñana, Esq.**
PR RUA No. 16297 USDC-PR No. 225608
**ESPADA, MIÑANA, & PEDROSA LAW OFFICES, PSC.**
122 Calle Manuel Dómenech Altos Urb. Baldrich
San Juan, PR  00918
minanalaw@yahoo.com  www.securitiesatty.com
Tel.:  (787) 758-1999 Mob. (787) 402-2226

S/Jean Paul Vissepó Garriga/
**JEAN PAUL VISSEPÓ GARRIGA**
USDC No. 221504
PO Box 367116
San Juan, PR 00936-7116
Tel.(787) 633-9601
E-mail: jp@vissepolaw.com

---

[3] The $338 million could increase because the calculation does not include revenue from Carbon Credits, RINs, e-RINS, RECs, other environmental and tax, market pricing and other attributes. These figures will be updated at the hearing dates to reflect actual damage at that time.