# EXHIBIT 1



**Renewable Liquid Natural Gas (RLNG)**

**PURCHASE, SALE & DELIVERY AGREEMENT**

**Amended Draft by AN of 4-13-2022 which amends Draft sent by Popular (Jael López)**

**on 3/16/2022 stating "borrador aprobado por nuestro departamento legal"**

This Agreement (the "**Agreement**") is entered into by and between Banco Popular de Puerto Rico ("Popular"), a banking corporation duly organized existing under the laws of the Commonwealth of Puerto Rico and the party identified as "**Seller**" (each a "**Party**" and together the "**Parties**"), as of the "**Effective Date**" set forth below.

| Seller | Biomass Green Fuels LLC | | |
|---|---|---|---|
| **Physical Address Main Office** | 584 Aldebarán Street, Altamira, San Juan, PR 00920 | | |
| **Entity Type** | LLC | **State of Formation** | Puerto Rico |
| **Seller Contact** | Name: Olmar Lopez Vidal<br>Postal Address: 584 Aldebarán Street, Altamira, San Juan, PR 00920<br>Phone: (787) 637 4375        email: olv@greenfuelspr.com | | |
| **Seller Legal Representative** | Name: Nevares, Sánchez Alvarez & Cancel, PSC<br>Postal Address 1307 San Alfonso Ave.<br>Phone: 787-723-9774        email: anevares@nsaclaw.com; lcancel@nsaclaw.com | | |
| **Popular Contact** | Name: Nelson E. Sandoval  Division: Corporate Real Este / Code: 716<br>Physical Address: PO Box 362708, San Juan, PR 00936-2708<br>Phone: 787-553-6649      email: nelson.sandoval@popular.com | | |
| **Popular Legal Representative** | Director of the Legal Division (Code 745)<br>PO Box 362708, San Juan, PR 00936-2708<br>Direct: 787-753-1017 Fax: 787-765-4064 email: contracts@popular.com | | |
| **Effective Date** | 1 April 2022 | **Initial Term Expiration Date** | 31 May 2032 |
| **Renewal Term:** | Upon mutual agreement. | | |

**This Agreement includes the following Annexes and Exhibits:**

- **Annex(es) of Service**
- **Exhibits:  (Annex 1) (Annex 1-A)**
- ☒ **(Exhibit 1)** Insurance Requirements for Popular Providers
- ☐ Certification Form
- ☐ _____
- ☐ _____

**DS** *EJMM*
7/18/2022

**IN WITNESS WHEREOF**, the parties have executed this Agreement by their duly authorized representatives as of the Effective Date.

**DS** *JDP*
7/18/2022

| Biomass Green Fuels LLC | Banco Popular de Puerto Rico |
|---|---|
| By: *Olmar López*<br>DocuSigned by:<br>CEB6E050A58F446 | By: DocuSigned by:<br>780FDA8D058040A |
| Name: Olmar López Vidal | Name:  Ignacio Alvarez Zataraín |
| Title: President | Title: President & Chief Executive Officer |
| Signature Date:7/18/2022 | Signature Date:7/18/2022 |

**DS** *JD↑*
7/18/2022

**THE PARTIES AGREE AS FOLLOWS:**

**1.     Purchase and Sale of RLNG**

1.1     <u>Sale and Delivery</u>.

(A)   Seller shall manufacture, sell and deliver to Popular, and Popular agrees to purchase and receive delivery from Seller, Renewable Liquid Natural Gas ("RLNG") or Liquid Natural Gas ("LNG" and if referring to RLNG or LNG indistinctively, the "Natural Gas") under the terms and conditions set out in this Agreement and in an annex executed by the Parties (each, an "**Annex**"). Each Annex shall be incorporated into and made a part of the Agreement. The terms and conditions of the Annex will be complementary or in addition to those set forth in this Agreement. If there is a conflict between the terms and conditions of such Annex and those as set forth in this Agreement, the provisions of this Agreement will prevail except that the provisions in the Annex shall control if they expressly reference the provisions of this Agreement that they intend to amend and will only be applicable to such Annex. The general terms and conditions of the Agreement may only be changed through an amendment to this Agreement and not through an Annex.

(B)   If Popular's parent company, or any of Popular's subsidiaries, or affiliates, as applicable (jointly referred to in this clause as "**Affiliate**"), wishes to obtain Natural Gas from Seller, Seller agrees that all obligations of each Affiliate are several and not joint, and in no event shall any Affiliate have any liability or obligation with respect to the acts or omissions of any other Affiliate. With regard to each such Annex, the term "Popular" shall mean the particular Popular Affiliate that executes the Annex. As applicable, Seller shall separately and directly charge the corresponding Affiliate, and such Affiliate shall pay for the Natural Gas delivered pursuant to a new applicable Annex, subject to the terms and conditions of this Agreement.  If there is a conflict between the Annex executed by such Affiliate and the present Agreement, the Affiliate shall execute a new agreement which resolves such conflict.

1.2     <u>Seller Obligations</u>.

(A)  Seller shall comply with its obligations under this Agreement safely, in accordance with best industry standards, and in full compliance with all applicable federal, state, and local laws, statutes, rules, regulations, administrative determinations, and guidance, as well as the judgments and orders issued by competent government authorities ("**Laws**").

(B)  Seller will perform or cause to be performed all operations as necessary to supply the Natural Gas to the Delivery Location at the Contract Price, as stated in the applicable Annex, including: (i) logistics associated with transportation and Seller's storage; (ii) procuring of all necessary Equipment for Seller to manufacture and produce RLNG; (iii) when allowed under the agreement, procuring the LNG from the Backup Supplier (as defined below); (iv) operating and maintening Seller's Equipment; (v) procuring all necessary government authorizations to deliver RLNG and LNG and (vi) provide reasonable cooperation and assistance to Popular to procure Popular's authorizations necessary to accept delivery of RLNG and LNG at the Delivery Location.

(C)  Seller will manufacture RLNG in Seller's Plant and be prepared to deliver to the Delivery Location the Minimum Quantities at the stated Quality Specifications and other requirements commencing on the Supply Start Date, as established in the applicable Annex.

(D)  Seller may supply RLNG from a facility other than Seller's Plant or, if allowable under the Agreement, LNG from a Backup Supplier only upon notice to Popular and so long as such RLNG or LNG meets the Quality Specifications and Seller continues to meet all other terms of this Agreement.

(E)  Seller will provide the services  specified in the applicable Annex for the following  RLNG equipment in Popular's facilities (the "Equipment"): pump skid, the inlet valves and inlet pipes to Popular's LNG tank, including control valves and pressure and temperature transmitters.   Controls will be calibrated yearly by Seller. Maintenance by Seller comprises of monitoring and preventive maintenance only. Seller shall provide Popular a corrective maintenance report.  Seller shall provide Popular a Maintenance Plan and Monitoring Formats on or before the Supply Start Date.  Popular shall, at Popular's expense, properly install such equipment.

(F)  Provide daily monitoring reports with at least the following information in an interval no less than 5 minutes: Current Time, Flow Meter Total, Flow Meter Flow Rate, Discharge Temperature, Discharge Pressure, Instrument Air Pressure, System Valve Position at Current Time, Tank Volume in MMBTU's, Tank Pressure in PSI, Vaporizer 1 Inlet Temp (F), Vaporizer 1 Water Diff Press (InH2O), Vaporizer 2 Inlet Temp (F), Vaporizer 2 Water Diff Press (InH2O).

(G)  Seller will certify compliance with the Quality Specifications by delivering with each shipment of RLNG/LNG a Certificate of Analysis (COA) generated by certified chromatograph.

1.3    Popular Obligations.

(A)  Popular shall comply with its obligations under this Agreement, safely, and in accordance with best industry standards and in full compliance with all applicable Laws.

(B)  Popular will perform all operations necessary to receive RLNG or, when allowed under the Agreement, the LNG at the Delivery Location stated in the applicable Annex, including (i) construct and install all necessary facilities and equipment necessary to effectively accept Natural Gas; (ii) providing reasonable and safe access to Seller; (iii) procuring all necessary authorizations required for it to legally perform its obligations under the Agreement and under applicable Law, including, but not limited to, authorizations necessary to accept delivery of the Natural Gas; and (iv) payment of the Contract Price and other applicable charges in accordance with its purchase obligations.

(C)  Popular is responsible for determining, the suitability, compatibility, and use of the RLNG for Popular's purposes, subject to the agreed specification set forth in the applicable Annex.

(D)  Equipment; Odorization.  Popular agrees that it will have properly constructed and installed at the Delivery Location all the equipment, including if it deems appropriate, the odorization equipment, necessary to receive, store and handle appropriately and safely the RLNG, complying at all times with all Laws, certifications requirements and safety technical requirements to store, handle and safely use RLNG and LNG.   Popular shall, at Popular's cost, properly install regasification skid(s) and odorization systems.  Odorization shall be the sole responsibility of Popular. Popular shall enter into a separate agreement with a third party for the installation and corrective maintenance of Popular's tanks and regasification station.

1.4    Seller Resources. Unless otherwise expressly provided for in this Agreement or in an Annex, Popular will not furnish Seller with administrative support, workspace, materials or equipment. Seller represents and warrants that it has sufficient experience and resources (including financial resources) to supply the RLNG and meet the timetables and service level agreements agreed to with Popular under an applicable Annex.

1.5    Title and Risk of Loss.  Title to, and risk of loss regarding the Natural Gas will pass from Seller to Popular immediately upon passage through the Delivery Point.

1.6    Parties' Personnel.

(A)    For purposes of this Agreement, "**Personnel**" means all individuals that the Parties may at any time assign to perform their respective obligations described herein, in whole or in part, including employees, contractors (including for consulting and staff augmentation purposes), agents, and those of the Parties' subsidiaries, or affiliates. Each Party represents and warrants that, relative to any Personnel:

1.    It complies with all applicable labor and employment Laws including those whose purpose is to prevent discrimination, harassment, or a hostile working environment as well as those related to equal employment opportunity, hours and wages. Specifically, **it represents that it complies with the requirements of 41 CFR 60-1.4(a), 60-300.5(a) and 60-741.5(a), which: (i) prohibits the discrimination against qualified individuals based on their status as protected veterans or individuals with disabilities, and discrimination against all individuals based on their race, color, religion, sex, sexual orientation, gender identity or national origin; and (ii) requires the affirmative action to employ and advance in employment individuals without regard to race, color, religion, sex, sexual orientation, gender identity, national origin, disability or veteran status.**

2.      It is responsible for: (i) hiring, contracting, and dismissing its Personnel; (ii) providing any uniforms and equipment; (iii) supervising, directing, and controlling Personnel performance; (iv) paying all salaries or other compensation and benefits due and owing; (v) withholding applicable income tax; and (vi) paying any and all Personnel benefits, including social security and payroll taxes, workers compensation insurance, and other similar payments.   Neither Party will be construed as a joint employer or a party to any employment or contractual agreement with any Personnel of the other Party for any purpose. Seller's Personnel will not receive payment from Popular or be covered by any Popular benefit programs and vice versa with regard to Popular's Personnel.

3.      It has sufficient and legally compliant screening and background verification controls, processes, and procedures in place; and, to the extent permitted by applicable Laws, it has not and will not knowingly assign Personnel that has been indicted or convicted of fraud, theft, larceny, embezzlement, or any other crime involving moral turpitude.

4.      Its Personnel will be adequately trained and have the appropriate level of experience and qualifications for the applicable tasks assigned; and will provide ongoing and necessary training sufficient to enable all Personnel to comply with Laws, including those applicable to the products and services contemplated in this Agreement.

(B) Prior to commencement of any delivery, Seller and Popular shall notify each other in writing of the names and relevant information of all Personnel assigned to deliver and receive the RLNG and LNG at Popular's physical facilities. The Parties may impose those requirements that they, in their sole and absolute discretion, deem necessary as a condition to delivery or receipt of RLNG and LNG and granting such access.

1.7     Independent Parties. Seller is an independent contractor. Nothing in this Agreement creates a partnership, affiliation, joint venture, agency relationship or other form of business association between the parties hereto. Neither party is granted any power, right or authority to act on behalf of or create obligations for the other, unless expressly provided herein.

1.8     Backup Supplier.

(A)   For purposes of this Agreement, a "Backup Supplier" means a third party contracted by Seller to provide any part of the RLNG or LNG contemplated in a particular Annex.  Crowley LNG Puerto Rico LLC ("Crowley") and any Crowley's affiliates are herein consented to and accepted by Popular as Backup Suppliers.  Regarding other Backup Suppliers, Seller shall notify Popular in writing with at least thirty (30) calendar days, and obtain Popular's written consent, prior to assigning any Backup Supplier to provide the RLNG or LNG or any delivery thereof, as well as prior to removing or substituting an already approved Backup Supplier. The name of the Backup Supplier may be included in the applicable Annex.

(B)   Seller shall remain primarily liable and continue to be responsible to Popular with respect to any Backup Supplier to the same extent as if Seller were performing the obligations itself, including selling the Natural Gas at the Contract Price. Popular shall not be responsible for the payment of fees and expenses owed to a Backup Supplier.

(C)   Seller will monitor its Backup Suppliers. Prior to engaging a Backup Supplier, Seller shall perform the necessary due diligence to manage all related vendor risks and to ensure the Backup Supplier meets the requirements of this Agreement to perform the subcontracted obligations. Thereafter, Seller shall periodically monitor Backup Supplier's compliance with applicable terms of this Agreement and related Annex. Upon Popular's request, Seller shall submit the information necessary to confirm that Seller has complied with these provisions. Popular may in its discretion withhold payments to Seller for obligations performed by a Backup Supplier for which Popular has not provided its consent or that does not meet the requirements of this Agreement.

1.9     Non-Exclusive. This Agreement does not create an exclusive relationship between Seller and Popular. The Parties may enter into similar agreements with others. Seller represents that providing RLNG to other clients does not, and will not, create a conflict of interest in its relationship with Popular.   Popular represents that accepting RLNG from Seller does not, and will not, create a conflict of interests in Seller's relationship with Popular and Affiliate.

## 2.    CONTRACT PRICE, INVOICES AND PAYMENT

2.1    <u>Contract Price; Contract Quantity</u>.  Seller shall charge, and Popular shall pay, for the amount of RLNG or LNG measured by weight and delivered to the Delivery Point at the prices specified in the Annex.  The Contract Price is inclusive of Delivery Costs and other fees and charges as stated in the Annex.  The Contract Price will be a fixed price during the Initial Term of this Agreement.

2.2    <u>Invoices</u>. Unless otherwise agreed in the Annex, Seller shall submit invoices on or before the fifteenth (15th) day of the month following that on which the Natural Gas was delivered and accepted by Popular. Seller shall submit all invoices electronically through such platforms as Popular may require. The invoice must include a detailed written report of the Natural Gas quantities supplied during the invoice period together with such other documentation Popular may reasonably require to certify compliance with the Quality Specifications contained in the Annex.

2.3    <u>Disputed Charges</u>. Popular may withhold the payment of any amount billed by Seller that Popular in good faith disputes, until the disputed item is resolved by the Parties.  Notice of dispute shall be given by Popular to Seller within 15 calendar days after Seller has provided the disputed service together with supporting documentation and a specific description of the causes for each dispute or otherwise waives right to dispute. Seller shall not treat any disputed amount as overdue and shall not impose late fees or other penalties. Notwithstanding, Seller shall continue performing its obligations under this Agreement during any such dispute.

2.4    <u>Payment</u>. Unless otherwise agreed to in the applicable Annex, Popular will pay all applicable undisputed amounts within thirty (30) days of the receipt of the underlying invoice. Popular shall not be liable for Natural Gas supplied that does not conform with the specifications stated in the Annex 1-A. Any such non-complaint Natural Gas, after verification of non-compliance by Popular by way of chromography, shall be promptly returned to Seller, and Seller shall promptly recover the noncompliant Natural Gas and pay for the return transportation cost thereof unless the product is finally determined to be compliant. Popular will deposit the payment electronically to the bank account designated by Seller or as otherwise mutually agreed to by the Parties. Seller will notify any changes to its account information to Popular's billing contact at least ten (10) business days prior to the date on which the Seller requests that the change take effect. Popular shall have no liability to Seller for Popular's failure or inability to make any changes to Seller's payment or account information if notice is not given within such  timeframe.

2.5    <u>Invoice Audits</u>. Popular may conduct audits or request supporting documentation of any invoice submitted, paid or disputed, at any moment, and Seller shall cooperate by providing all the supporting information.

2.6    <u>Taxes</u>. The Contract Price, unless otherwise agreed, is exclusive of Taxes. Seller shall pay all taxes or other government duties or tariffs related to its business (including income, gross receipts, social security, payroll, excise and franchise taxes, custom or import duties and property taxes). Popular will  pay any taxes on the purchase use, and storage on Popular facilities.  In keeping with the Contract Price being exclusive of Taxes, Popular  shall pay all taxes, duties and tariffs presently imposed on the RLNG and LNG.  New taxes, duties and tariffs imposed on the RLNG or LNG shall be passed on to Popular. If Popular is required by Law to withhold taxes on any amount payable to Seller, Popular will deduct such taxes and pay them to the appropriate taxing authority, unless Seller submits evidence of a government-issued exemption or waiver. However, Popular's omission from withholding any applicable taxes, in whole or in part, will not discharge Seller's responsibility to pay any such taxes when due. Seller shall indemnify Popular from any and all liability that may arise for nonpayment of any applicable taxes.  Popular shall pay any sales, use or value added tax relative to the Natural Gas or products purchased, if applicable, in the jurisdiction where they are delivered. Seller shall include such taxes as a separate line item in the invoice. Upon written request, the withholding Party shall provide proof of payment of the taxes withheld. Such requests shall be permitted after the termination of this Agreement, if made within the applicable document retention period provided by Laws.

2.7    <u>Importer of Record</u>. Seller will be deemed the importer of record for tax purposes, if any LNG is imported by Seller, Seller agrees to be responsible for all import fees, if any, and reporting requirements for RLNG and LNG sales under this Agreement.  Seller does not intend to import RLNG.

Unless otherwise agreed in the Annex, any current and future environmental incentives and tax credits under federal or state law to which Popular is entitled (including but not limited to renewable identification numbers, renewable energy credits, carbon credits, reduction in or avoidance of Greenhouse Gas emissions, emissions reductions credits, low-carbon fuel standard credits, verified emission reductions, voluntary emissions reductions, offsets, allowances, voluntary carbon units, avoided compliance costs, emissions rights and authorizations and $CO_2$ reduction and sequestration) regarding the RLNG and LNG purchased from Seller will be retained by Popular. Likewise, Seller shall retain all such present or future incentives and credits to which Seller is entitled by law or regulation.

2.8 <u>Debts</u>. Popular may off-set any Seller debt or obligation owed to Popular or any of its affiliates that is more that ninety (90) days past due against any payment Popular owes to Seller hereunder.

## 3.    TERM AND TERMINATION

3.1 <u>Term of the Agreement</u>. This Agreement will commence on the Effective Date and will continue in effect until the Initial Term Expiration Date set forth on page one (1) of this Agreement (the "**Initial Term**"). Any renewal term to the Agreement will be as provided on page one (1) or as agreed to in an amendment to the Agreement (each such renewal term being a "**Renewal Term**", which collectively with the Initial Term will be referred to as the "**Term**"). A new Annex will be negotiated and agreed to become effective during the renewal term. If there is a conflict between the terms of such new Annex and the terms of this Agreement the parties may execute an amendment to this Agreement or enter into a new agreement.

3.2 <u>Term of a Service Annex</u>. The Annex will state the term during which Seller must supply the corresponding RLNG. The duration of an Annex must not exceed the Term of the Agreement.

3.3 <u>Termination</u>. After the first five (5) years counted from the Supply Start Date, either Party may notify the other Party of its intent to terminate the Agreement, or an applicable Annex, at any time without cause upon written notice not less than ninety (90) calendar days prior to the desired effective date of termination. Either Party may terminate this Agreement, or any applicable Annex, for cause as follows: (1) if the cause for termination relates to a violation of Law, government action or other regulatory matter, the termination may be effective immediately (2) effective thirty (30) calendar days after delivery of the notice of the breach to the breaching Party if it remains uncured at the expiration thereof if the cause is related to: (i) a Party's noncompliance with its material obligations under the Agreement; (ii) a Party's unjustified discontinuation of the provision or receipt of the RLNG or LNG; (iii) a Party's cancellation, termination or revocation of any required business permits, approvals or licenses; or (iv) Seller's cancellation or nonrenewal of required insurance policies under this Agreement. Except in the event of breach by Popular, Popular may withhold payment of, and shall not be liable for, Natural Gas that has not been delivered by Seller and accepted by Popular at the effective date of termination.

3.4 <u>Effect of Termination</u>. Upon expiration or termination of this Agreement for any reason, each Party shall promptly: (a) return to the other Party all other Party-owned property, equipment, or materials in its possession or control; (b) remove any other Party-owned property, equipment, or materials located at other Party's locations; (c) deliver to other Party, all documents and tangible materials (and any copies) containing, reflecting, incorporating, evidence of compliance by the delivering Party with applicable Laws and regulations; (d) provide reasonable cooperation and assistance to the other Party, upon the other Party's written request, in transitioning the provision or receipt (as the case may be) of the RLNG or LNG inhouse or to an alternate party; (f) on a pro rata basis, repay all fees and expenses paid in advance or due for any RLNG or LNG which has not been provided and is not owed under the Agreement; and (h) certify in writing that the other Party has complied with the requirements of this Section. The termination of the Agreement shall not release the Parties from the obligations incurred prior to the termination date or otherwise those obligations that by their nature survive any termination of this Agreement. Except in the case of breach by Popular, if requested by Popular, Seller shall continue to provide the RLNG or LNG until the termination date and Popular shall continue to pay for such RLNG in a timely manner.

3.5 <u>Winding Up Arrangements.</u> Upon the expiration of the delivery and purchase obligations under this Agreement, any monies or penalties due and owing Seller shall be paid pursuant to the terms hereof, and any

corrections or adjustments to payments previously made shall be determined and any refunds due Popular made within five calendar days. Any imbalances in receipts or deliveries shall be corrected to zero balance within thirty (30) days of Popular's receipt of Popular's Transporter's final allocation statement. The Parties' delivery and purchase obligations shall remain in effect solely for the purpose of complying with this paragraph until the obligations under this paragraph have been fulfilled.

3.6     Survival of Terms. The termination of the Agreement terminates all Annexes to this Agreement. However, the termination of an Annex shall not terminate the Agreement or any other Annex. Any provision of this Agreement that expressly or by implication is intended to continue in force shall survive termination or expiration of this Agreement, including warranties, limitations of liability and indemnity.

## 4.     CONFIDENTIALITY OF INFORMATION

4.1     General. The Parties acknowledge that, in furtherance of the Agreement, a Party (the "**Receiving Party**") may receive from the other Party (the "**Disclosing Party**") Confidential Information. The privacy and confidentiality of such Confidential Information shall be maintained during and after the termination of the Agreement. The Receiving Party shall protect such Confidential Information from unauthorized or inadvertent use or disclosure in full compliance with this Agreement and all Laws.

4.2     Definition of Confidential Information.

    (A) The term "**Confidential Information**" means any and all of the Disclosing Party's confidential or proprietary non-public information or data, whether in electronic or hard copy format, that is collected, generated, developed, or used in its business or operations.  For purposes of this Agreement "Confidential Information" includes, but is not limited to, Popular's facilities and equipment design and location, RLNG volume requirements, government permits and applications, tax information, audit results, financial information, and the existence of this Agreement.

    (B) Confidential Information does not include information that the Receiving Party can reasonably demonstrate: (1) was already known to or was rightfully in the possession of the Receiving Party at the time of disclosure; (2) becomes a matter of public knowledge other than as a result of a breach of any obligation of confidentiality hereunder or under any confidentiality agreement that the Receiving Party may have with a third party; (3) was independently developed by the Receiving Party without reference to any Confidential Information of the Disclosing Party; (4) was lawfully received from a third party without a duty of confidentiality; or (5) was approved for release by the Disclosing Party in writing.

4.3 Permitted Use and Disclosure.

    (A) The Receiving Party may provide access to the Confidential Information to its Personnel, approved Subcontractors, consultants, and advisors ("**Representatives**") who: (1) are within the jurisdiction of the United States; (2) need such access for purposes consistent with this Agreement; and (3) have confidentiality agreements no less stringent than those herein or owe a duty of confidentiality to the Receiving Party. Unless otherwise agreed, the Disclosing Party will remain the owner of the Confidential Information and any derivative thereof and retains its entire right, title, and interest, including all intellectual property rights, therein. Any disclosure of such Confidential Information hereunder shall not be construed as an assignment, grant, option, license, or other transfer of any such right, title, or interest whatsoever to the Receiving Party or any of its Representatives. Other than the limited rights hereunder, the Receiving Party has no other rights in or to any Disclosing Party's Confidential Information.

    (B) Each party may provide access to other party's Confidential Information to its applicable regulatory authorities and auditors. Any disclosure by a Party or its Representatives of any Confidential Information of the other Party under applicable Laws (a "**Legal Order**") shall be subject to the terms of this Section. Before making any such disclosure, the Party shall provide the other Party with: (a) prompt written notice of such requirement so that the other Party may seek, at its sole cost and expense, a protective order or other remedy; and (b) reasonable assistance, at the other Party's sole cost and expense, in opposing such disclosure or seeking a protective order or other limitations on disclosure. If, after providing such notice and assistance, the Party (or its Representatives or other persons to whom such Legal Order is directed)  remains subject to a Legal Order to

disclose any Confidential Information, the Party shall disclose no more than that portion of the Confidential Information which, on the advice of the Party's legal counsel, such Legal Order specifically requires the it to disclose and, on the other Party's request, shall use commercially reasonable efforts to obtain assurances from the applicable court or agency that such Confidential Information will be afforded confidential treatment. Nothing herein shall require either party to fail to honor a subpoena, court or administrative order or a similar requirement or request on a timely basis.

4.4    <u>Prohibited use of Confidential Information</u>. Neither Party  shall, without the other Party's prior written consent: (i) use, reproduce, sell, market, disseminate, modify or disclose, render anonymous, aggregate, segregate or mine any Confidential Information for any purpose other than to perform the obligations for which the Confidential Information is being disclosed; (ii) disclose the Confidential Information other than to Representatives as provided above; (iii) use, access, disclose, process, transmit, share or store Confidential Information outside of the jurisdiction of the United States; or (vi) remove any proprietary rights or confidentiality legend from the Confidential Information.

4.5    <u>Protection of Confidential Information.</u>  Each Party agrees to have appropriate policies and procedures and employ reasonable controls (but in any event at least to the same degree of care and controls that such Party uses to protect its own confidential and proprietary information of similar importance) to protect the Disclosing Party's Confidential Information against any anticipated threats or hazards or unauthorized access to or use thereof.  The Receiving Party as a minimum shall implement internal controls and procedures to safeguard the security and confidentiality of Confidential Information and (ii) store, transmit or dispose of Confidential Information in digital or electronic format using industry standard secure means. In case the Receiving Party discovers it has suffered an unauthorized access, disclosure or use of the Disclosing Party's Confidential Information it will promptly notify the incident to the Disclosing Party and will take all reasonable steps to immediately mitigate, remedy and prevent any further disclosure at its expense.  If Confidential Information includes materials subject to the attorney-client privilege, work product doctrine or any other applicable privilege concerning pending or reasonably foreseeable legal proceedings or governmental investigations, the sharing of such material is not intended to, and shall not, waive or diminish in any way the confidential nature of the information or its continued protection under the attorney-client privilege, work product doctrine or other applicable privilege.

4.6    <u>Destruction</u>. Upon the Disclosing Party's request, the Receiving Party shall promptly return or destroy all Confidential Information and all copies thereof, including physical copies and copies embedded in computer files, extracts from computer files and analyses or other material based upon the Confidential Information; provided, however, that should the Disclosing Party request evidence of the destruction of any such Confidential Information, the Receiving Party shall submit, within thirty (30) days of such request (or such other time as agreed to between the Parties), an attestation executed by an authorized officer of the Receiving Party certifying that any such Confidential Information has been destroyed. Notwithstanding the foregoing, the Receiving Party will inform the Disclosing Party if it needs to retain copies of the Confidential Information: (i) to comply with applicable Law; or (ii) for purposes of record retention or audit requirements; provided, however, that the confidentiality obligations (including destruction and certification) hereunder shall survive with respect to any retained Confidential Information.

## 5.    COMPLIANCE AND AUDIT

5.1    <u>Legal Requirements</u>.

(A) The Parties represent that they have, and at all times during the Term shall maintain updated, all licenses, permissions, authorizations, consents, permits, approvals, certificates, or endorsements ("**Permits**") by any professional association or government agency that are required for it to provide, receive or use Natural Gas or products.   The Parties may, directly or through a representative, inspect copies of all such Permits. The Parties shall provide each other reasonable prior notice (and if not possible, immediately upon knowledge) in the event of expiration, nonrenewal, revocation or suspension of any such Permits and of any non-compliance with any Laws so that a Party can take any necessary measures, including termination of the Agreement. The Parties in good faith agree to revisit and amend this Agreement from time to time as necessary to comply with changes to Laws and any other relevant changes in industry standards generally.

(B) The Parties represent that they comply, and at all times during the Term shall continue to comply, with Federal, Puerto Rico and local Laws, regulations, and guidance applicable to their RLNG and LNG related business

and to the products and services provided and used, including those related to environmental, workplace safety, hazardous materials, transportation, equipment and accessibility requirements and any relevant reporting requirements to governmental authorities.

(C) <u>Law and Regulation</u>. If either Party's activities hereunder become subject to law or regulation of any kind which renders this Agreement illegal or unenforceable, as confirmed by the opinion of counsel of the other party, then either Party shall at such time have the right to terminate all Transactions and this Agreement upon written notice to the other Party without further obligation and liability.

(D) Each party understands that the Natural Gas is a hazardous material that must be handled in accordance to the requirement of Laws.  Each Popular and Seller shall develop a Safety Data Sheets ("SDS") and safety protocol for the RLNG and LNG to appropriately manage such hazards and to accordingly train and inform its employees and others who come in contact with or are exposed to the RLNG and LNG regarding the hazards associated with the RLNG and LNG, its delivery, receipt, handling, storage and use.

(E) Popular shall ensure that conditions at the Delivery Location(s) are safe and in compliance with applicable Laws to receive, store and use the RLNG.  Seller must ensure that its transportation, equipment and conditions for Delivery are safe and in compliance with applicable Law.   If either party determines (without assuming any duty to do so) that the delivery, storage or use of the LNG and RLNG is unsafe or violates applicable Law, such party may refuse to make or accept, as applicable, delivery of the LNG and RLNG  until the other party  remedies such conditions and in such case, Seller's failure to make such delivery(ies) or Popular's failure to accept delivery(ies) shall not be considered an Event of Default  and the non-complying party agrees to pay the other for any additional reasonable direct costs incurred by the complying party in connection with such conditions which caused such inability to deliver or receive.  Non complying party's failure to remedy such conditions within fifteen (15) days from the other party's notice to shall be an Event of Default under this Agreement.

(F) <u>Pollution Prevention, Mitigation, Response and Responsibility</u>. The Parties  shall take all reasonable measures to prevent gas escapes or spills and to mitigate adverse effects of any escapes or spills, releases or discharges or any contaminating or polluting event related to the Natural Gas ("Releases").  In the event of a Release, the Party (not responsible for the Release) is obligated to take all reasonable measures to effectively prevent or mitigate the adverse consequences of the Release.

5.2    <u>Access to Facilities</u>.  If a Party or its Personnel have physical access to other Party's facilities, equipment and controlled areas (collectively "Access"): (a) Such Party and its Personnel shall comply with Laws and the other Party's policies and procedures concerning such matters as operating procedures, security requirements, confidentiality, privacy, working conditions, equal opportunity, non-discrimination, working hours and holidays ("Requirements"); (b) Such Party shall share the Requirements with its Personnel and shall keep them updated and trained regarding any changes thereto; (c) Such Party shall not permit Access to its Personnel or any other person without the other Party's  express written authorization, and any such actual or attempted access will be consistent with such authorization; (d) Such Party shall inform the other Party  immediately of any changes in its Personnel that may affect any authorization hereunder; and (e) Such Party shall be liable for any breach or violation of these responsibilities by any of its Personnel or any other person to which it has provided access. Such Party shall not unreasonably disrupt the other Party's  normal operations.

5.3    <u>Business Continuity</u>.

(A) Business Continuity.  Each Party shall maintain in effect at all times during the term of the Agreement business continuity/disaster recovery plan (each, a "**Business Continuity Plan**") appropriate to its operations. Seller will deliver to Popular its Business Continuity Plan on or prior to the Supply Start Date.  Specifically, Seller represents and warrants that (1) its Business Continuity Plan addresses the continuation of the production and delivery of the RLNG in the event of a disaster or business interruption (an "Event") affecting its operations; (2) its Business Continuity Plan complies and will continue to be in compliance during the Term, with applicable Laws; (3) it shall resume the production and delivery of the RLNG within the recovery time objective (RTO) of less than 5 days (except during a Force Majeure Event, as defined below) which term may be extended by

Popular while Seller makes the provision of LNG through a Backup Supplier in accordance with the provisions of the Agreement.

(B)  Planned Interruptions.  Seller may from time to time be required to conduct regular service and maintenance activities and preventative inspections at Seller's Plant and Seller's Facility that may require shutting down or interrupting the Plant's operations for limited periods of time ("Planned Interruptions").  For purposes of the Agreement, such Planned Interruptions will not exceed: (1) three (3) Planned Interruptions in a calendar year; and (2) ten (10) consecutive calendar days in any one interruption. Seller and Popular will agree on the Planned Interruption dates, Seller shall give Buyer sixty (60) days notice of any proposed Planned Interuption.    In such event, if Seller procures RLNG or LNG through the Backup Supplier, it will be at no additional cost to Popular. The provision of any RLNG or LNG from the Backup Supplier during a Planned Interuption if approved by Popular, shall not count against the 98% RLNG guarantee.

(C)  Force Majeure Events.    No Party shall be liable or responsible to the other Party, nor be deemed to have defaulted under or breached this Agreement, for any failure or delay in fulfilling or performing an obligation under this Agreement, when and to the extent such Party's (the "**Impacted Party**") failure or delay is caused by or results from an Event or combination of Events that is beyond its reasonable control ("Force Majeure Event").  Without limiting the generality of the foregoing, Force Majeure Events include: (a) natural disasters such as flood, earthquake, hurricane, epidemic, pandemic; (b) war, invasion, hostilities, terrorist threats or acts, riots or other civil unrest; (c) unanticipated government order, law, or action, embargoes or blockades; (d) the action of or failure to act on the part of any government authority having or asserting jurisdiction that is binding upon the parties and has been opposed by all reasonable means and (e) other events that are beyond the reasonable control of Seller including unavoidable mechanical failure, breakage or production interruption beyond the reasonable control of Seller. A "Force Majeure Event  shall not include: (i) late deliveries, shortages, events that affect the cost of labor, equipment or materials, (ii) economic hardship (including lack of money); (iii) delays in transportation (including delays in clearing customs) other than delays in transportation resulting from a Force Majeure Event; (v) anticipated changes in applicable Laws; (vi) actions of a government authority with respect to a Party's noncompliance with applicable Laws or Permits; (vii) any failure by the a Party to obtain or maintain requirements of Laws or (viii) Seller's failure to begin operation by the Supply Start Date established in the Annex other than failure to begin operations due to a Force Majeure Event. The exclusion of liability will apply only if, and to the extent, the failure or delay due to the Force Majeure Event is not the result of the negligent or intentional actions or omissions of, or caused by, the Impacted Party, and is unavoidable or could not be prevented or overcome by the reasonable efforts and due diligence to mitigate and minimize the impact of the Event on its obligations, including compliance with its applicable Business Continuity Plans.  The provision of any RLNG or LNG from a Backup Supplier due to an interruption caused by a Force Majeure Event which meets the exclusion of liability requirements, shall not count against the 98% RLNG guarantee.

(D)      If a Party is impacted by an Event (including a Force Majeure Event) it shall give notice immediately after the occurrence to the other Party stating the date and impact of the Event on the production or delivery or receipt of the RLNG or LNG, the cause thereof, and the estimated time for the resumption of all or part of the production or delivery or receipt of the RLNG or LNG.

(E)      In case of a Force Majeure Event, the Impacted Party shall resume its obligations as soon as possible by implementing its Business Continuity Plan. If not a  Force Majeure Event, the Impacted Party shall resume its obligations within the time objectives established herein and in the Business Continuity Plan.

(F)      In the case of Seller, if the interruption of the supply of RLNG or LNG is not the result of a Force Majeure Event and exceeds ten (10) consecutive calendar days, and Popular's Facilities are unable to operate as a direct result of such interruption, Seller, will pay to Popular $2,100 per day pro-rated on an hourly basis after such ten (10) days, while Seller's Facilities remain inoperable.  To the extent that on such payment date Seller owns unencumbered, transferable carbon credits, and only to such extent, Popular shall have the option of receiving payment of such $2,100 per day prorated on an hourly basis after 10 days in the form of cash or in the form of carbon credits.  If Popular opts to receive all or part of such payment in the form of carbon credits,

such credits shall be valued at a price agreed upon by the Parties. If the Parties fail to agree on a price, the price for such credits shall be set in accordance with the price established by S & P Global Platts or other agreed upon third party expert as of the date such payment becomes due.

(G)    If the Seller Event, including a Force Majeure Event, results in Popular purchasing from Seller less than the Minimum Quantity, Popular will not be penalized or required to pay the difference below the Minimum Quantity for the duration of the period of interruption and Popular may procure the RLNG or LNG through a third party.

5.4    <u>OFAC</u>. Seller represents and warrants that: (a) Seller and all of its subsidiaries and affiliates are currently in compliance with and shall at all times during the term of this Agreement remain in compliance with the regulations of the U.S. Treasury Department Office of Foreign Assets Control ("**OFAC**") and any statute, executive order, or rule relating thereto, as well as any similar laws of a relevant jurisdiction as may be applicable to the Seller; (b) Seller and all of its subsidiaries, directors, officers, and employees, as well as, to the Seller's knowledge, all of its agents, and all other persons associated with, or acting on the Seller's behalf are not listed on, and shall not during the term of this Agreement be listed on, OFAC's Specially Designated Nationals and Blocked Persons List ("**SDN List**"), Foreign Sanctions Evaders List, or the Sectoral Sanctions Identification List ("**SSI List**"), or on any other similar list maintained by OFAC or any other governmental authority; (c) neither Seller nor any of its subsidiaries or affiliates are located in or organized under the laws of any country or territory that is the subject to the broad U.S sanctions prohibitions; and (d) neither Seller nor any of its subsidiaries or affiliates are currently the subject of any investigation relating to a sanctions violation or a potential sanctions violation.

5.5    <u>Anti-Bribery and Anticorruption</u>. Seller warrants and represents that neither it nor any of its officers, directors, employees, agents or other representatives has paid, offered or promised to pay, or authorized the payment of a bribe, either directly or through a third party, to any official or employee of any local or foreign government authority or organization, or to any political party or official thereof or to any candidate for political office. Seller further warrants that it will not make any such payment while performing any services or delivering any product for Popular nor purporting to act on behalf of Popular and that it will immediately notify Popular if it identifies that any such payment has taken place.

5.6    <u>Code of Ethics</u>. Seller represents that it has read, and shall comply with, the *Code of Ethics for Popular Suppliers*, as may be amended from time to time, a copy of which will be located at <u>http://www.popular.com/en/investor-relations/corporate-governance/</u> or other site identified by Popular.

5.7    <u>Audit Rights</u>.

(A) Seller acknowledges that its supply and delivery of RLNG to Popular may be subject to audits, including assessments, examinations, or review by Popular and, among others, Popular's regulators, internal audit, risk management or independent outside auditing firm ("**Audit**") in order to confirm compliance with the Agreement, as well as with Laws and industry standards. Seller further acknowledges that an Audit may include the activities of Resources or vendors and shall share the results of such Audits with Popular upon request. Upon Popular's written request, at a time, frequency and place reasonably agreed to between the Parties, Seller shall submit the information, provide periodic reports (including those of internal controls, systems, financial condition or compliance), respond to risk questionnaires or allow access to relevant Personnel, systems, documents or physical premises in a timely manner so as to permit Popular to comply with the Audit (including, as applicable, cybersecurity). If an Audit reveals areas of material concern to Popular, the Parties will agree on a plan to address the deficiency in an adequate and timely manner, which, if applicable, may include Popular directly performing any monitoring of Seller's Subcontractors at Seller's expense. If Seller does not address such material deficiencies in accordance to the plan, Popular may modify the frequency of the monitoring activities at Seller's expense or terminate the Agreement.

## 6.    SERVICE WARRANTIES, LIABILITY; INDEMNIFICATION

6.1    <u>Warranties</u>.

(A)    The Parties represent and warrant that on the Supply Start Date and thereafter throughout the Term they shall have all the necessary and applicable permits, licenses, regulatory authorizations, certificates, or endorsements and authorizations to deliver, receive, store, handle and use the RLNG and to perform the

obligations under the Agreement, as applicable (c) no bankruptcy proceedings are pending or being contemplated by it or, to its knowledge, threatened against it; and (d) no Legal Proceedings are pending or threatened that materially adversely affect its ability to perform their obligations under the Agreement.

(B)    Seller represents and warrants that the RLNG will conform to the Quality Specifications contained in Annex 1-A agreed to with Popular (and to prove and certify such compliance will provide a COA with each shipment) and that Seller will have good and merchantable title to, and the right to deliver and sell the RLNG to be delivered to Popular free and clear of all liens, claims, and encumbrances.

6.2    Popular represents and warrants that the persons assigned to accept and process the receipt of the RLNG at Popular's facilities will be duly trained and will have sufficient expertise to safely accept delivery and carry forth such activities.

6.3    <u>Additional Representations and Warranties</u>. Each Party represents and warrants to the other Party, as of the date hereof, that: (a) it is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization and is duly qualified to do business in the jurisdictions in which it operates; (b) the negotiation, execution, delivery, and performance by such Party to this Agreement has been duly authorized by all requisite corporate action and will not: (i) violate any Laws; (ii) violate the terms of any agreement or contract to which such Party is bound; (iii) violate its charter, by-laws or other organizational documents, except in each case for violations that will not materially and adversely affect the ability of such Party to perform its obligations hereunder; or (iv) require any additional third party consent or approval for such actions; (c) it has taken all necessary action to duly authorize the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby; and (d) that the Agreement constitutes a valid and binding obligation of such Party, enforceable against it in accordance with its terms except to the extent that enforceability may be limited by bankruptcy, insolvency, receivership, moratorium, reorganization or other similar laws affecting the enforcement of creditors' rights generally or general principles of equity or considerations of public policy. Each Party acknowledges that the other Party is relying on these representations and warranties in entering into this Agreement.

6.4    <u>Liability</u>

(A)    As between the Parties, Seller shall be deemed to be in exclusive control and possession of the RLNG or LNG deliverable hereunder and shall be responsible for any injury or damage caused thereby up to the Delivery Point, as defined in the Annex. At and after the Delivery Point Popular shall be deemed to be in exclusive control and possession of the RLNG or LNG and shall be responsible for any injury or damage caused thereby.

(B)    Seller and Popular each assume full responsibility and liability for, and shall indemnify, defend and hold harmless the other Party from and against any and all liability and expense on account of any and all damages, claims, causes, suits or actions (including any and all damages, claims, causes, suits or actions relating to injury to or death of persons or damage to property) arising from or related to their acts or omissions ("Release").

(C)    The party responsible for the Release (as defined above) shall be responsible for all the associated costs and expenses incurred by the Party not responsible.  The Party that is responsible for the Release shall indemnify, defend and hold harmless the other Party from any and all claims (including third-party claims and government penalties), costs, expenses, clean-up costs, fines, losses, damages or any other liability ("Release Damages") incurred by the non-responsible Party, except to the extent such Release Damages were caused by the fault, negligence or omission of the other Party.

(D)    <u>Damages for Failure to Deliver or Receive</u>.  Each Party will be liable for those charges directly arising from its breach of any delivery or receipt obligation under the Agreement. If Popular is the breaching Party, then Popular will pay Seller the Contract Price for RLNG that it does not receive in accordance with the applicable Annex up to the minimum amount required, unless otherwise excused pursuant to this Agreement. If Seller is the breaching party, then Seller will pay Popular (i) the actually incurred, reasonable price of RLNG from another vendor or of an alternative fuel (such as natural gas or diesel fuel) purchased by Popular plus additional costs up to the RNG Meter, minus (ii) the Contract Price for a quantity of RLNG that is the thermal equivalent of such alternative fuel.   The Parties agree that liability to each other will be limited to a maximum

DocuSign Envelope ID: AA882844-5C58-44F6-BF6B-906510F35885

for each ocurrence, in connection with a breach of this Agreement, of an amount equivalent to six (6) months Maximum Quantity supply of RLNG/LNG at Contract Price.

6.5     Indemnity.  Each Party  shall indemnify, hold harmless, and defend the other Party and each of its affiliates and their respective present and future officers, directors, employees, agents, successors, assigns and shareholders (collectively, "**Indemnitees**") against any and all actual losses, damages, liabilities, deficiencies, claims, actions, judgments, settlements, interest, awards, penalties, fines, costs, or expenses of whatever kind, including professional fees and reasonable attorneys' fees (collectively, "**Losses**"), related or incidental to, or arising out of: (a) the breach of any covenant, representation or warranty herein by the other Party or the failure by the other Party to perform its duties under this Agreement; (b) the actual or alleged violation by the other Party (or any of its Personnel) of Laws related to the activities, products or services under this Agreement; (c) any actual or alleged act, failure to act, omission, fraud, gross negligence or willful misconduct on the part of the other Party (or any of its Personnel) relating to the RLNG or LNG; (d) any third-party claim, suit, or proceeding arising out of, related to, or alleging infringement of any patent, copyright, trade secret, or other intellectual property right related to any Intellectual Property used to manufacture or provide or receive or use the RLNG; or (e) any and all claims alleging damage to persons or property caused by the other Party, its subcontractors or representatives. The indemnification obligations of the Parties shall survive any termination of this Agreement.

6.6     Indemnification Procedures. The Parties shall follow the following indemnification procedures: (i) the Indemnitee will provide the Indemnitor with prompt notice of any claim for which indemnification is sought, except that failure to provide such notice will not excuse the Indemnitor's indemnification obligations under this Section; (ii) the Indemnitee will permit the Indemnitor to assume and control the defense of such claim, with counsel chosen by the Indemnitor (who will be reasonably acceptable to  the Indemnitee as it relates the the claim asserted against it), and the Indemnitee will provide written notice regarding whether such counsel is acceptable within a reasonable amount of time; (iii)  the Indemnitor will not enter into any settlement or compromise of any such claim which would not be covered under the indemnification without the Indemnitee's prior written consent, which consent will not be unreasonably withheld; (iv)  the Indemnitor shall pay any and all Losses (even if incident to any appeals) awarded against or otherwise incurred by the Indemnitee  in connection with or arising from any such indemnified claim, suit, action or proceeding; and (v) the Indemnitor's obligations under this Section will in no manner be affected by the existence or non-existence of insurance.


EXCEPT IN THE CASE OF WILLFUL MISCONDUCT, FRAUD, VIOLATION OF LAW RELATED TO THE SERVICES, OR THIRD PARTY CLAIMS FOR PERSONAL INJURY OR DEATH FOR WHICH THERE SHALL BE NO LIMITATION OF LIABILITY, THE PARTIES AGREE THAT ANY LIABILITY TO EACH OTHER WILL BE LIMITED TO DIRECT ACTUAL DAMAGES, UNLESS OTHERWISE SPECIFICALLY PROVIDED IN THIS AGREEMENT.  NEITHER PARTY SHALL BE LIABLE FOR INCIDENTAL, SPECIAL, CONSEQUENTIAL, PUNITIVE OR INIDRECT DAMAGES, LOST PROFITS OR LOSS OF BUSINESS IN TORT, CONTRACT OR ANY OTHER SUCH LEGAL DOCTRINE.


## 7.    **INSURANCE**

7.1     Coverage. Seller shall maintain, at a minimum, and at all times during the Term, insurance coverage as listed in the *Insurance Requirements for Popular Service Sellers Exhibit 1.*  Popular may require additional coverage in the future considering changes in the risks associated with the Seller's business and the provision of the services and products contracted. Any limitation of liability set forth in this Agreement shall not preclude Popular from placing claims directly against the applicable insurance policies.

7.2     Endorsements. Seller shall furnish Popular with amendatory endorsements or copies of the applicable policy language effecting coverage required by this Agreement. The insurance policies are to contain, or be endorsed to contain, the following provisions:

(A) Insurance Carrier Rating. All insurance carriers must maintain at all times an AM Best rating of  A-VII or better for risks insured in Puerto Rico and an AM Best rating of A VIII for risk insured outside Puerto Rico.

(B) Additional Insured. All liability insurance (except for Workers' Compensation, Professional Liability, and Cyber Liability, if applicable) required under this Agreement must include an additional insured endorsement specifying Popular, its officers, employees and agents as Additional Insureds, including additional insured status

with respect to liability arising out of ongoing operations and completed operations, but only with respect to Seller's activities to be performed under this Agreement. Coverage shall be primary and non-contributory with any other insurance and self-insurance.

(C) <u>Notice of Change or Cancellation</u>. The Seller or its insurer must provide at least 60 days' written notice to Popular before cancellation of, material change to, potential exhaustion of aggregate limits of, or non-renewal of the required insurance coverages.

(D) <u>Waiver or subrogation</u>. Seller shall waive rights of subrogation, which Seller or any insurer of Seller may acquire against Popular by virtue of the payment of any Losses. Seller shall obtain any necessary endorsement to affect this waiver of subrogation, regardless of whether Popular has received a waiver of subrogation endorsement from the Seller or the Seller's insurers.

(E) <u>Extended Reporting Period</u>. If any required insurance is on a claims made basis and does not include an extended reporting period of at least 36 months, Seller shall maintain either tail coverage or continuous claims made liability coverage, provided the effective date of the continuous claims made coverage is on or before the effective date of this Agreement, for a minimum of 36 months following the later of: (i) Seller's completion and Popular's acceptance of all RLNG required under this Agreement; (ii) Popular or Seller termination of contract; or (iii) the expiration of all warranty periods provided under this Agreement.

(F) <u>Third Party Contractors (Subcontractors) Coverage</u>. If Seller outsources to a Subcontractor any part of the operations, products or services related to the RLNG, Seller's required insurance policies must be endorsed to provide coverage for liabilities that may arise through such Subcontractor to the same extent as if the operations, products, or services were provided by Seller. In the alternative, Seller must submit to Popular proof of Subcontractor's insurance under the same coverage and limits as required from Seller. Any claims arising from the work or product provided by the Subcontractor shall be paid first through Seller's insurance and, to the extent not covered, then by Subcontractor's insurance.

7.3     <u>Remedies</u>. Popular may reasonably require additional or different insurance coverage or requirements in the future considering the risks associated with Seller or its business. Popular will notify any changes in requirements no less than  30 days prior to the date of Seller's policy renewal. If a Popular assessment reveals inappropriate or inadequate insurance, Popular may, in addition to other remedies it may have, withhold Seller's payment for the RLNG until Seller satisfactorily complies with the insurance requirements defined in this Agreement. Popular may at its sole discretion terminate the Agreement for Seller's noncompliance with the insurance requirements after giving notice and 60 days to cure such non compliance.

7.4     <u>Insurance Carrier Insolvency</u>. The insolvency, bankruptcy or failure of any insurance company providing Popular coverage as required herein shall not relieve either Party of its obligations to maintain adequate insurance as provided in this section.

## 8.     GENERAL TERMS

8.1     <u>No Waiver</u>. The failure or the reasonable delay by either Party at any time to require performance of the other Party of any provision of this Agreement shall not affect the right of such Party to enforce the same provision, nor shall the waiver by either party of any breach of any provision hereof be taken or held to be a waiver of any succeeding breach of such provision, or as a waiver of the provision itself. A Party may exercise any applicable right or remedy in order to enforce the terms and conditions of this Agreement. The fact a Party does not take immediate action to enforce such rights shall not be construed as a waiver of its right to do so or an implicit amendment to this Agreement.

8.2     <u>Publications</u>. A Party (including all Personnel and other persons under its control) shall not make any statement, notice or disclosure to the public in any media, whether printed or electronic or otherwise, which mentions the existence of this Agreement, the provision or receipt of the RLNG or that a Party is a supplier, recipient or a customer, including communications, social media, social networking, promotional or advertising material, without the other Party's written consent prior to disclosure or publication. A Party may withhold its consent in its sole discretion.

8.3    <u>Non-Solicitation</u> Seller expressly covenants, represents and warrants that at no time shall it: (i) solicit for employment or otherwise induce, influence or encourage any employee of Popular or any of its affiliates or subsidiaries to terminate employment with Popular or any of its affiliates or subsidiaries, or employ or engage as an independent contractor, any current or former employee of Popular or any of its affiliates or subsidiaries; (ii) solicit, induce, encourage or engage any current or prospective client or customer of Popular to terminate any business relationship(s) with Popular or conduct business with any other financial institution to the detriment of Popular; or (iii) otherwise engage in bad faith with respect to, or interfere with, Popular's business relationships or operations or otherwise damage, disparage or adversely affect the good will of Popular.

8.4    <u>Notice</u>. All notices or communication required hereunder must be made in writing to the corresponding contact and address stated above. Legal notices (including claims, breach of contract, indemnification requests, and regulatory compliance issues) from Seller to Popular must be sent by messenger with acknowledgement of receipt, certified mail or national courier with copy to the Legal Representative in the same manner. Any changes or additions to the above contact information must be notified in writing with receipt acknowledged.

8.5    <u>Severability</u>. Should a court or arbiter with competent jurisdiction determine that any clause is illegal, invalid, or unenforceable under present or future law, such provision will be fully severable, and the remaining provisions of this Agreement will remain in full force and effect.

8.6    <u>Governing Law and Jurisdiction</u>. This Agreement and all transactions contemplated by this Agreement will be governed by, and construed and enforced in accordance with, the laws of the Commonwealth of Puerto Rico, without regard to any conflicts of law provisions thereof. Any civil action or legal proceeding arising out of or relating to this Agreement will be brought exclusively in the courts of the Commonwealth of Puerto Rico. Each Party consents to the jurisdiction of such court in any such civil action or legal proceeding and waives any objection to the venue of any such civil action or legal proceeding in such court. Service of any court paper may be effected on such Party by mail, as provided in this Agreement, or in such other manner as may be provided under applicable laws, rules of procedure or local rules. **EACH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS OR DUTIES UNDER THIS AGREEMENT**.

8.7    <u>Assignment and Delegation</u>. Upon thirty (30) days notice to Seller, Popular may assign any of its rights or delegate any of its obligations hereunder, in whole or in part, whether voluntarily or involuntarily, by operation of law or otherwise, to its parent company, its affiliate, or subsidiary (each as applicable). Seller shall not assign any of its rights (including any License) or delegate any of its obligations, in whole or in part, whether voluntarily or involuntarily, by operation of law or otherwise, without Popular's prior written consent, which consent shall not be unreasonably withheld.  Notwithstanding the foregoing, Seller may upon thirty (30) days notice to Popular and without consent from Popular, assign its rights to receive payment from Popular to a special purpose entity or vehicle in connection with the financing of the business of Seller.  Any purported assignment or delegation in violation of this Section shall be null and void. No assignment or delegation shall relieve the assigning or delegating Party of any of its obligations hereunder, unless the non-assigning or non-delegating Party enters into a novation releasing the assigning or delegating Party of its obligation under the Agreement.

8.8 <u>Entire Agreement and Amendments</u>. This Agreement and any Annex, Schedule, appendix, exhibit, certificate, amendment or other document attached or subsequently attached hereto or to which reference is made herein will be incorporated by reference and made a part hereof as if fully set forth herein and will be subject to the terms and conditions hereof and together with this Agreement will constitute the entire contract between the Parties, and supersedes all prior or contemporaneous agreements or understandings, written or oral, concerning the subject matter of this Agreement. This Agreement may not be modified, amended or supplemented in any manner except by mutual agreement of the Parties and set forth in a writing signed by a duly authorized representative of each Party.  The terms RLNG shall refer to the RLNG produced by Seller at the Seller's Plant, while LNG shall refer to the LNG produced by a third party.

8.9    EACH PARTY ACKNOWLEDGES THAT, BEFORE EXECUTING THIS AGREEMENT, SUCH PARTY HAS HAD THE OPPORTUNITY TO SEEK THE ADVICE OF INDEPENDENT LEGAL COUNSEL (WHETHER OR NOT IT ACTUALLY ELECTED TO DO SO), AND HAS READ AND UNDERSTOOD ALL OF THE TERMS AND PROVISIONS OF THIS AGREEMENT. THIS AGREEMENT SHALL NOT BE CONSTRUED AGAINST ANY PARTY BY REASON OF THE DRAFTING OR PREPARATION HEREOF.

DocuSign Envelope ID: AA882844-5C58-44F6-BF8B-906519E35885

8.10    <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which will be deemed an original, but all of which taken together will constitute one and the same instrument. Signatures to this Agreement transmitted by electronic mail in .pdf form, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, will have the same effect as physical delivery of the paper document bearing the original signature. The parties may sign this Agreement using DocuSign, an electronic signature application. If DocuSign is used, the parties acknowledge that the electronic signatures appearing on this Agreement are the same as handwritten signatures for the purposes of validity, enforceability, and admissibility.

8.11    <u>Authority to Sign</u>.  Each party represents that (i) the person signing the Agreement or any Schedule has all right, power and authority to sign the Agreement on behalf of such party; (ii) it has full power and authority and all necessary authorizations to comply with the terms of the Agreement and to perform its obligations hereunder; and (iii) if it signs the Agreement with an electronic signature, it (a) shall comply with all applicable electronic records and signatures laws, including but not limited to the Electronic Signatures in Global and National Commerce Act; (b) hereby acknowledges its electronic signature is effective and will not dispute the legally binding nature, validity or enforceability of the Agreement based on the fact that the terms were accepted with an electronic signature; and (c) shall ensure that its electronic signature vendor shall comply with the confidentiality obligations of the Agreement.

8.12    <u>No third-Party Rights.</u>  The Parties do not intend to confer and do not confer hereby contractual rights or benefits upon any third party, either directly or indirectly.

## Annex 1

**RLNG Supply for El Señorial Center**

This Annex 1 and Annex 1-A ("Annex 1-A"), together (the "Annex"), are effective as of the date of the last signature hereof (the "Annex Effective Date"), and is entered into by and between Seller and Popular as an Annex and integral part of the Agreement by and between Seller and Popular dated April 1st, 2022 (together the "Agreement").   All capitalized terms used in this Annex, not otherwise defined herein shall have the meaning set forth in the Agreement.

| | |
|---|---|
| **Quality Specifications** | The RLNG and LNG delivered by Seller to Popular will meet the minimum quality specifications set forth in **Annex 1-A** to this Annex ("Quality Specifications").  Popular has reviewed and agreed to these Quality Specifications.  Upon delivery of the RLNG or LNG to Popular, Seller will certify that the product meets the Quality Specifications by way of a Certificate of Analysis (COA) generated by a certified chromograph. |
| **Delivery Quantity** | <u>Minimum Quantity</u>.<br><br>(1) Popular commits to take and pay for, or pay for if not taken, an average minimum quantity of RLNG of 90 MMBtu per day, as measured on a quarterly basis (the "**Minimum Quantity**") subject to the RLNG Availability provision below.<br><br>(2) Seller commits to produce and make available to Popular the Minimum Quantity, subject to the RLNG Availability provision below.<br><br>(3) The Minimum Quantity will be prorated for any partial Month during the Term.<br><br><u>Maximum Quantity</u>. Seller commits to make available an average maximum quantity of RLNG of 155 MMBtu per day, as measured on a quarterly basis, for delivery to the Delivery Point ("**Maximum Quantity**"). In no event will Seller be obligated to deliver more than 155 MMBtu of RLNG on any single Day.<br><br><u>Additional Quantities</u>.  Seller will use commercially reasonable efforts to supply quantities requested over the Maximum Quantity. |
| **RLNG Availability** | Seller guarantees to Popular availability of the Minimum Quantity of RLNG during the Initial Term of the Agreement to be an average of 98% RLNG, whereby Seller may supply, at Seller's sole discretion, at the Contract Price, the remaining 2% with LNG from third party sources, including sources such as Crowley. If the Seller exceeds the 2% supply of LNG, Popular shall receive carbon credits from seller equivalent  to the compensation of the emissions generated by the LNG, upon availability, to be received no later than year end. RLNG or LNG supplied prior to Seller's Plant becoming fully operational and during Planned Interruptions and Force Majeure Event that meets the exclusion of liability |

DocuSign Envelope ID: AA882844-5C58-44F6-BF6B-906510E35885

| | |
|---|---|
| | requirements shall not count against the 98% RLNG guarantee. |
| **Contract Price** | The "**Contract Price**" shall be the guaranteed price for RLNG or LNG up to the Maximum Quantity, measured by weight at Sellers Facility or at third party supplier facility, when transferred to the ISO Tank that will transport the RLNG or LNG to the Delivery Location and will be inclusive of the Delivery Costs up to the amount stated below. The RLNG/LNG guaranteed price is  fourteen dollars and no cents (US$14.00) per MMBtu during the Initial Term (subject to renegotiation for any Renewal Term).<br><br>The purchase price for quantities over the Maximum Quantity are subject to negotiation.  To the extent practicable, Seller will use commercially reasonable efforts to minimize any increase in price above the Contract Price. |
| **Delivery Costs** | Delivery Costs means all  costs incurred by Seller to store, transport and deliver the RLNG or LNG up to Popular's Delivery Point, including the current transportation tariff established by the Bureau of Transport and Other Public Services (previously the Public Service Commission) (the "NTSP" by its initials in Spanish) based on mileage and type of transport and other costs up to the amounts stated herein. Popular shall assume Delivery Costs beyond said amounts as provided herein.<br><br>Seller will assume as part of the Contract Price: (1)  the current NTSP transportation tariff up to $0.76 per MMBtu's, (the "Basic Delivery Costs"):<br><br>As used in this Annex, the term "Holidays" means holidays observed by the federal or Commonwealth of Puerto Rico governments.<br><br>Seller will provide Popular a breakdown of Seller's actual Delivery Costs no later than 10 business days from the Supply Start Date, to be used as a benchmark for measuring change in Delivery Costs over the course of the Term of the Agreement.<br><br>Notwithstanding anything to the contrary in the Agreement, Seller reserves the right to pass through to Popular the following costs in excess of the Basic Delivery Costs (the "Additional Delivery Costs"):<br><br>• Any increase in the transportation tariff established by the NTSP in excess of $0.76 per MMBTU's.<br><br>• Cost incurred if the driver of the ISO tank truck is required to stay more than two hours at the Delivery Location. |

| | |
|---|---|
| | • The ISO tank truck driver charge per hour in excess of $35.00 per hour. |
| | • Deliveries on Holidays, Saturdays and Sundays whose cost is in excess of $250.00 per delivery per truck. |
| | • Actual additional cost incurred due to overtime deliveries (after 3 pm), presently $25.00 per hour additional charge. |
| | • Since Seller intends to make all deliveries by means of third party transportation providers, any additional charges or increases in charges and fees (as compared with charges as of the Effective Date) imposed by and payable to third party transportation providers. |
| | • Any additional out-of-pocket cost to Seller not presently included in the Delivery Cost. |
| | In the case of an Additional Delivery Costs which Seller proposes to pass through to Popular pursuant to the above, Seller will provide Popular with an estimate of the then current costs and the increase over the Basic Delivery Cost.  The Additional Costs Seller charges to Popular shall be reasonable actual costs, without a mark-up to Popular. |
| | Popular acknowledges and understands that Seller will use third parties for the purposes of delivering RLNG to Popular. |
| | Seller shall fully document and provide evidence to Popular of all such Additional Delivery Costs. |
| **Delivery Location** | Popular's combined heat and power facility located at the Carbon Neutral Facility at El Señorial Center, San Juan, Puerto Rico. |
| **Seller's Facility** | Seller is in the process of establishing a biorefinery plant ("Seller's Plant") located at Road PR-3, intersection 923, Km 1.7 in Bo. Buena Vista, Humacao, Puerto Rico 00791 (the "Seller's Facility") that will produce Renewable Liquid Natural Gas (RLNG) for commercial and industrial use. |
| **Delivery Point** | The LNG Meter at Popular's LNG tanks located at the Delivery Location. |
| **Supply Start Date** | The earlier of (i) the date on which Popular's Facilities are capable of generating power using RLNG as fuel and (ii) the date on which the Seller's Plant is operational, which is estimated to be no later than August 1, 2022.  In the case of (i), Popular shall have up to sixty (60) days for commissioning of Popular's equipment. Popular shall give Seller at least fourteen (14) calendar days prior written notice of the |

| | |
|---|---|
| | completion of construction of Popular's Delivery Site and at least seven (7) calendar days prior written notice of the completion of commissioning.  If Popular's Delivery Site become capable of generating power prior to Seller's Plant becoming operational, then Seller shall supply LNG to Popular from Backup Supplier. During this interim period, Popular shall pay spot market price plus any other verifiable out of pocket costs incurred by BGF and the LNG supplied shall not count against the 98% RLNG guarantee.  If on August 31, 2022 Seller does not begin supplying RLNG, Seller will continue supplying LNG at the Contract Price established herein.   If on September 30, 2022 Seller has not begun supplying RLNG, Popular at its option may (i) permit Seller to continue supplying LNG at the Contract Price established herein  (ii) terminate the Agreement for cause. and require the immediate payment of an amount equivalent to six (6) months Maximum Quantity supply of RLNG/LNG at Contract Price as provided in section 6.4(D). |
| **Renewable Energy Credits (REC's) and Carbon Credits (CC)** | Seller will transfer free of charge all REC and CC to which Popular may be entitled to by Law or regulation, due to the RLNG sold to Popular.  Seller shall retain all REC's and CC's to which Seller is entitled to by Law or regulation. |
| **LNG Meter** | The  utility grade meter located at the inlet of the Popular LNG tanks. LNG Meter will be the point at which title and risk of loss will transfer from Seller to Popular. |
| **Seller's Backup Supplier** | Crowley or any other such other replacement Backup Supplier agreed to by the parties. |
| **Preventive Maintenance Deliverables** | • Inspection of system hoses. Replacement included.<br>• Maintain pump bearing lubrication.<br>• Sensor system yearly validation test.<br>• Seismic detector validation test every 2 years. |
| **Equipment Operation Deliverables** | • Fuel connections to skids from truck<br>• Assure safety conditions on station<br>• Precool lines, if necessary<br>• Transfer fuel from truck to tanks<br>• Monitor fuel levels and site conditions<br>• Report any deviation within 4 hours |

7/18/2022

| Biomass Green Fuels LLC | Banco Popular de Puerto Rico |
|---|---|
| By: | By: |
| Name: Olmar López Vidal | Name:  Ignacio Alvarez Zataraín |
| Title: President | Title: President & Chief Executive Officer |
| Signature Date:7/18/2022 | Signature Date: 7/18/2022 |

7/18/2022

7/18/2022

DocuSign Envelope ID: AA882844-5C58-44F6-BF6B-906510E35885

**Exhibit 1**

**Insurance Requirements for Popular Providers**

**A.  Coverage** - Seller will obtain and maintain at all times during the term of the Agreement, insurance payable in such amounts and against such risks as follows (check as applicable):

☒ **Statutory Workers' Compensation Insurance** or a workers' compensation and employers' liability insurance, as applicable under the statutes of the jurisdiction where the services are rendered, covering all its employees and including occupational disease coverage.

☐ **Commercial General Liability Insurance** covering against claims for premises operations, bodily injury, property damage, personal injury, advertising injury, contractual liability and products/completed operations. With limits in an amount of not less than _____ dollars ($_____) per occurrence. Annual aggregate limit shall not be less than _____ dollars ($_____).

- The Insurance Office (ISO) Commercial General Liability occurrence coverage form CG 00 01 (or current form approved for use in the applicable territory) or equivalent, is to be used in the policy. Claims-made form is **unacceptable**.
- Policy shall be endorsed to include a per project/location aggregate limit endorsement; forms CG2503 (05-09) and CG2504 (05-09) or equivalents.
- For all general contractors, explosion, collapse and underground perils should be covered.

☒ **Automobile Liability Insurance** with limits not less than _____ dollars ($_1,000,000_____) each occurrence combined single limit of liability. This insurance shall include third-party bodily injury and property damage liability for the following automobile coverage classes: **(1)** Any Auto (Symbol #1), **or (2)** Owned auto (Symbol #2), Hired auto (Symbol #8) and Non-owned auto (Symbol #9).

- If the Scope of services in the Agreement requires the transportation of any hazardous materials or regulated substances, the policy shall provide coverage for claims resulting in bodily injury, property damage or cleanup costs associated with a pollution condition from transported cargo. Automobile Liability coverage should be endorsed to include the required auto pollution Endorsements and Motor Carrier Act Endorsement, MCS 90.
- The ISO form number CA 00 01 (current form approved for use in the applicable territory), or equivalent, is to be used in the policy.

☐ **Umbrella Insurance** with limits not less than _____ dollars ($_____) covering excess of loss over primary liability insurance policies, including Comprehensive General Liability, Comprehensive Automobile Liability and Employers Liability insurance policies, where applicable under state laws.

☐ **Crime Protection Coverage:** Third Party Employee Dishonesty or Fidelity Bond coverages for loss or damage to money, securities and other property owned or leased by Popular from dishonest acts of an employee of the Seller. Coverage limits shall not be less than _____ dollars $ _____ each occurrence.

☐ **Professional Liability insurance** covering any damages caused by an error, omission or any negligent acts related to the services or deliverables to be provided under this Agreement by the Seller and/or its

DocuSign Envelope ID: AA882844-5C58-4456-BE68-906510E35885

subcontractors, agents, officers or employees in an amount not less than _____ dollars $_____ per claim. Annual aggregate limit shall not be less than _____ dollars $_____.

- ▪ If coverage is on a claims-made basis, then either an extended reporting period of not less than 36 months shall be included in the Professional Liability insurance coverage, or the service Seller shall provide Extended Reporting Period Coverage as stated in Section 7.2 E.
- ▪ Seller warrants that any retroactive date under the policy shall precede the effective date of this Agreement; and that either continuous coverage will be maintained, or an extended discovery period will be exercised for a period of 36 months beginning at the time work under this Agreement is completed.

☐ **Employment Practices Liability Insurance** With limits in an amount of not less than _____ dollars ($_____) per claim and _____ dollars ($_____) general aggregate providing protection against inappropriate workplace conducts, including, but not limited to: wrongful termination, discrimination, harassment, retaliation, defamation, invasion of privacy, failure to promote, deprivation of a career opportunity, and negligent evaluation.

☐ **Cyber Liability:** Seller shall afford Cyber Liability (network security and privacy liability) insurance for the duration of the Agreement and for the period of time in which Seller (or its Business Associates or subcontractor(s)) maintains, possesses, stores or has access to Popular or client's data, whichever is longer, with a combined single limit of no less than _____ dollars $_____ per claim or incident. This insurance shall include coverage for third party claims and for losses, thefts, unauthorized disclosures, access or use of Popular or client's data (which may include, but is not limited to, Personally Identifiable Information ("PII"), Payment Card Data and Protected Health Information ("PHI")) in any format, including coverage for accidental loss, theft, unauthorized disclosure access or use of Popular's data.

☐ **Other Coverage:**

_____

☒ **Rolling Owner-Controlled Insurance Program (ROCIP)** (check as applicable):

☒ General Liability
☒ Excess Liability
☒ Contractors Pollution Liability
☐ Builders Risk

**B. Additional Insurance Provisions**

**1. Coverage Certification:**

Seller will direct its insurers to furnish Popular Certificate(s) of Insurance (COI) evidencing that all insurance required under the Agreement is in force. COIs will be provided to Popular as follows: (i) upon execution of this Agreement; (ii) annually, within forty-five (45) days following the insurance policy renewal (iii) whenever the insurer or the insurance coverage changes or (iv) upon Popular's request. The following information should be contained on each COI obtained as proof of insurance.

- Any disclaimers or noted exclusions of coverage

DocuSign Envelope ID: AA882844-5C58-44F6-BF6D-906510E35885

- Name and address of authorized agent
- Name and address of the service Seller that is under contract with Popular
- Name of insurer writing each policy
- Description of coverage in standard terminology
- Policy periods (operation, activity or contract **must** be within the policy period)
- Limits of Liability
- Description and location of property or operations – must be specific as to the date, duration, place and nature of the activities for which this service Seller was contracted.
- Name and address of certificate holder:

> Name of Popular's Subsidiary and Popular, Inc.
> C/O Department / Officer Name
> Mail Code of the contracting Popular officer that will be receiving and evaluating if the COI is adequate and complies with the contractual requirements Subsidiary Address

- Notice of cancellation minimum 60 days
- Authorized signature
- Date of issuance - The date of the certificate must be within 15 days of the contract signature or within 15 days after the petition was made.
- Except for Workers' Compensation, Professional Liability and Cyber Liability, the COI must acknowledge that Popular, Inc. /[Popular Subsidiary Name] are included as additional insured with respect to the work performed by the Seller on their behalf, within the body of the certificate.

## 2. Deductibles / Retentions:

Any deductibles or retentions must be declared. Deductible(s)/retention(s) greater than $100,000.00 per claim on any required coverage are not in compliance and must be approved by Popular. Sellers not in compliance with this requirement must attest in writing and provide evidence satisfactory to Popular guaranteeing payment of losses and related investigations, claim administration, and defense expenses. Popular reserve the right to modify this requirement based on the submitted evidence, any change must be approved in writing.

## 3. Additional key considerations:

a)  Policies shall be primary as respects to Popular, its officers, agents, employees and volunteers.

b)  The coverage shall contain no special limitations on the scope of protection afforded to Popular, its officers, officials, employees or volunteers.

c)  Any insurance or self-insurance maintained by Popular shall be excess and non-contributory of the service Seller's insurance.

d)  Service Seller's insurance shall apply separately to each insured against whom claim is made or suit is brought, except with respect to the policy limits.

e)  Sellers participating in Popular's Rolling Owner-Controlled Insurance Program (ROCIP): (1) acknowledge receipt of a copy of the Rolling Owner Controlled Insurance Program (ROCIP) Manual (hereinafter, the "Manual"); (2) represent that they have carefully read and are familiar with the Manual; and (3) agree to the terms and conditions set forth within the Manual.