EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

**GFC Holdings LLC, Biomass Green Fuels,
LLC, GREGORY BOYD** *et al.*,

      Plaintiffs,

      v.

**OLMAR LÓPEZ-VIDAL** *et al.*,

      Defendants.

Civil No. 22-1190 (ADC/BJM)

## SECOND AMENDED COMPLAINT

**TO THE HONORABLE COURT**

**COME NOW** Plaintiffs Gregory Boyd and Jonathan Lassers, individually and on behalf of

Biomass Green Fuels, LLC ("BGF") and GFC Holdings, LLC ("GFC") for their derivative claims

(collectively, "Plaintiffs"), by and through the undersigned counsel, and very respectfully state and

pray:

## INTRODUCTION

This action arises from the fraud and criminal activity of Banco Popular, Olmar López

Gómez, Olmar López Vidal (the "Lópezes"), George Economou and Roberto Acosta, who has

stolen, among other things, federal funds intended for the construction of BGF's biorefinery. The

other Defendants have committed their own predicate felonies under the RICO Act as they have

sought to benefit from the biorefinery project or profit from control of the $321 million of revenue

that BGF's biorefinery produces over the life of the gas rights agreement.

BGF's biorefinery will reduce air pollution from Puerto Rico's largest landfill by 90% and turn it into recycled natural gas and beverage-quality CO2. The BGF biorefinery project (the "biorefinery") is in Humacao, one of Puerto Rico's most impoverished areas. When completed, the biorefinery will create well-paying STEM jobs while making Puerto Rico more energy independent. The true tragedy of this case is that the Defendants' actions have deprived Puerto Rico of those benefits, which should have begun when the biorefinery was to be completed in **2020**.

Instead, the Lópezes diverted federal funds to support their lavish lifestyle. They enjoy life in a $2.5 million home in Casa De Campo Resort, the most exclusive secured resort in the Dominican Republic where they dock their million-dollar sport fishing boat. The Lopezes set up another biorefinery in the Dominican Republic with BGF's New Market Tax Credit money earmarked for poverty zones in the United States, including Humacao. The Lopezes reported incomes of between $4,000 and $39,000 in Puerto Rico and failed to report capital gains when they sold property in Puerto Rico.

The extent of the fraud cannot be overstated. Banco Popular Puerto Rico's ("Banco Popular") participation in the fraud and criminal activity of the "Lópezes" now threatens to turn this positive transformation of green energy into a racketeering boondoggle. Banco Popular extracted an offtake agreement from BGF for recycled natural gas on preferential terms, including tax and environmental credits.

In a material breach of their loan agreements and despite a clear warning of the fraud in November 2021, Banco Popular continued to lend to the Lópezes on an expired construction contract with BGF. The project remains uncompleted and the Lópezes have overspent by more than $3 million on a $5 million contract. The Lopezes made up invoices, approved and paid to themselves via the ITS/ASC Construction JV sham they created with Roberto Acosta. This scam allowed them to steal, among other things, federal funds intended to construct BGF's biorefinery.

The project has reached such a state that Banco Popular has been depositing and withdrawing their loan payments from BGF's account.

Banco Popular is the key lender and administrative agent for the Federal government's New Market Tax Credit funds for the Project. George Economou is the CFO of BGF. Banco Popular disbursed NMTC funds to the BGF account, allowing the Lópezes and Economou to pay fraudulently for their ASC/ITS joint venture. Banco Popular knew that the Lopezes and Economou had violated the terms of its loan and that of the New Market Tax Credit lender, an affiliate of Banco Popular. Joval Rodríguez a Banco Popular Commercial Relationship Officer joined the Lópezes and Economou in committing predicate felonies. Rodriguez financed the project from his personal account for the Lópezes while it was in its nascent stage. Rodriguez lent them money at loan shark rates of 120%, which the Lópezes paid back with funds raised by Boyd and Lassers and the BGF loan money designated for the project. As BGF's account manager, Rodríguez knowingly approved fraudulent drawdown certifications and conspired with the 'independent engineer' to falsify the construction inspections. These frauds enabled the Lópezes to divert much of the biorefinery's $19 million loan into their own pockets repeatedly. Banco Popular's fraud enabled the Lópezes to swindle plaintiff Gregory Boyd out of a third of his 50% ownership of BGF while leaving Boyd liable as a personal guarantor for the $19 million loans and reducing the value of BGF by tens of millions. Banco Popular has joined Rodriguez in their defense. And now Banco Popular adds amendment after amendment to the credit agreement – the Fifth Amendment on Friday, December 30, 2022,– like the rest, littered with false statements.

Six months before this litigation was initiated, the Plaintiffs' counsel informed Javier Ferrer-Fernández, Banco Popular's Executive Vice President and Chief Operating Officer, of the materially incorrect loan drawdowns and other frauds committed by bank staff. Per 7.1 (e) of the Bank Credit Agreement, these frauds constitute a loan default. Banco Popular's counsel responded

that it was investigating but has never provided the investigation results. The bank lent BGF over $6 million since the Plaintiffs reported the fraud putting the loan in default.

Banco Popular has doubled, tripled, and now quadrupled down since the Plaintiffs filed their original Complaint, lending money to BGF to pay its loan to Banco Popular. Banco Popular lent that money in the face of our motion for a temporary restraining order after the Plaintiffs realized that López Vidal had made final payments to equipment suppliers of more than a million dollars for uncommissioned equipment which put the bank loan into default. The equipment is still not operational and the Bank's Fifth Amendment to the Credit Agreement delays the completion date to March 31, 2023, eleven months after they made fraudulent $1.1 million wires for final commissioning payments on over $11 million to two suppliers, which the Plaintiffs suspect triggered kickback payments to the Lópezes. These wires were sent late on the same day the original complaint was filed.  Normally this payment is made with revenue from production gas sales after production and not from loan money.  These wires were not paid from a drawdown deposited for this purpose.  Since these wires, BGF has held three failed capital calls that would replace this money.

When has a bank ever loaned a borrower money to pay the very loan in default in the face of serious wrongdoing? Banco Popular submitted a Third, Fourth, and now a Fifth Amendment to the credit agreement requiring capital calls of an additional $1.5 and then $1 million more, both of which stated that there was no adverse litigation pending and bound Boyd as a guarantor without his consent. The Third Amendment, contingent on the capital infusion of $1.5 million, was proposed on July 8 and signed on July 26, 2022.  BGF failed to raise the required $1.5m, yet Banco Popular has lent over $2 million to BGF since July 27, 2022. The proposed Fifth Amendment will add another $700,000 of debt without new preconditions.

After the failure of the $1.5m capital call, required for the Third Amendment, the bank executed a Fourth Amendment requiring another million to be paid in by December 31, 2022. BGF did not make this payment, just like the previous failed Capital Calls. The Lópezes and Banco Popular have proposed a Fifth Amendment, which purports to further extend the loan, despite none of the terms of amendments three and four having been met, nor the representations and warranties of the Borrower contained in the Credit Agreement and its Amendments being true and correct in all material respects, as required by Banco Popular under the terms of the Amendments.

Why would Banco Popular take this risk? Because Banco Popular wants to obtain decades of renewable natural gas from the Project for its off-grid buildings below market prices, which it could do with or without foreclosing on the loan. Banco Popular's CEO, Ignacio Alvarez, created a promotional video touting the bank's vision of controlling Puerto Rico's only source of renewable natural gas to take its largest office complexes off-grid. Of course, he never mentioned the fraud Banco Popular has perpetrated.

Co-defendant Alexander Borschow, with the assistance of George Economou, packaged his private equity fund, Semillero Partners' investment of equity capital to provide a risk-free return on investment for him with 8% annual interest, 50% of distributable cash each year, then three times the original investment paid in 2027. The three times payment occurs even if Semillero had already received its investment back many times over. Semillero's deal suffocated returns for other owners and convertible noteholders to near zero for decades. Semillero was funded by investors who expected to invest in projects with a positive impact on Puerto Rico. Instead, Borschow masterminded a de facto hostile takeover by working with and enabling the Lópezes to steal millions, doing something no honest private equity investor would do. Semillero eliminated corporate controls and conflicts of interest oversight, thereby devastating BGF's Project, which is again on the brink of default. Borschow did all this intending to buy the Project for Semillero

Partners for a fraction of its value. When the Plaintiffs called Semillero and their co-investors, the Puerto Rico Fund for Growth (PRFG) and the Community Development Venture Capital Alliance(CDVCA) out on the fraud via this lawsuit, they doubled down and sent a capital call for $1.4 million to buy Olmar López Vidal's project in the Dominican Republic and replace the money illegally diverted from the federal New Market Tax Credits. No investor responded to the capital call. Even if the money had appeared, it would not have altered the Defendants' criminal actions. Replacing the funds will not alter the delay caused to the Humacao Biorefinery or fix the NMTC illegally spent in the Dominican Republic.  After the failed Dominican Republic capital call, Semillero, PRFG, CDVCA and the Lópezes have made two more failed $1.5 million Capital Calls to fund Amendments Three and Four required by the bank to make up for the $1.1 million wired by the Lopezes on the day the complaint was filed..

None of the Lópezes' frauds could have occurred without the active support, direction, actions, and participation of George Economou, BGF/GFC's Chief Financial Officer.  Economou drafted the majority of López Vidal's corporate emails and bank communications. A former bankrupt himself, Economou engineered the theft of the federal New Market Tax Credits, created the deception allowing the Lópezes to use BGF loan money to purloin Boyd's interest in BGF; and defrauded the investors who lent BGF and GFC millions of dollars with false promises of 20% return on investment, knowing that Semillero's position precluded such returns.

Despite over $27 million being spent, the Project is in shambles. The equipment installed at the biorefinery does not work and the site poses dangerous working conditions due to the ITS/ASC Construction JV's, Roberto Acostas' and the Lópezes' failure to supervise, design errors, mismanagement, and fraud. On September 21, 2021, Julio Reyes Salus, an unlicensed electrical subcontractor under the Lópezes' supervision was electrocuted to death with 14,300 volts while not wearing mandatory OSHA safety equipment. He did not have the preparation nor required

supervision and his blue body was later found dead by another worker.  The reaction of Borschow, Semillero Partners and CDVCA to the death of Julio Reyes Salas and to the Lópezes' lethal incompetence was simply to immediately increase their investment, buying more of BGF on the cheap. OSHA required International Technical Services to pay a fine for improper safety practices causing the man's death.

The Lópezes also diverted salaries, consulting hours, construction subcontractors and equipment away from BGF to construct World Spirits in Toa Baja, a boutique vodka distillery owned by the Lópezes' son and brother, Carlos López Vidal, and his wife Claudia Ferrer Tañon.[1] The Lópezes also diverted undisclosed fees and commissions from equipment manufacturers and suppliers that should have been directed to BGF's federally-funded Project and have spent some of the proceeds of the last uncertified $980,000 drawdown on their defense lawyers at AMRC for this case.

BGF's contract for the landfill gas rights with El Coqui initially set the deadline for the Commercial Operations Date on June 28, 2020, which was then moved to November 27, 2020. These deadlines required the entire plant to be operational.  After paying a $250,000 penalty to extend the contract to the first week of August 2021 and reducing the scope to only generating electricity for the El Coqui Landfill, which is about 15% of the project, the project is still not generating electricity.

After years of BGF missing deadlines and safety issues, the owner of the El Coqui Landfill hired an experienced biorefinery engineering firm to evaluate the construction site. Venture Engineering and Construction inspected the site with the Lópezes in July 2022.  Venture found dozens of critical problems, including design and safety deficiencies and missing equipment.

---

[1] An  article announcing the launch of the Case Bravada distillery can be found at this link: Casa Bravada is born, the first vodka microdistillery in Puerto Rico - El Nuevo Día (elnuevodia.com).

7

As a result of the Defendants' fraudulent actions, EC Waste has now placed the biorefinery in default as the Plaintiffs predict. BGF is in multiple defaults. Seventeen months after the deadline and promised completion dates of the first week of August 2021, then October 15, 2021, to December 31, 2022, and now proposed in the Fifth Amendment until March 31, 2023, nothing is completed, or operational, many design problems and safety issues exist - just all the money disappearing.

Any value remaining in this entity is in the landfill gas rights agreement. The owner, El Coqui Landfill, can remove those gas rights for delays, safety violations (death) and payment defaults. At the same time, the perpetrators have stolen millions in an attempt to satisfy their greed, and every day that goes by without a resolution reduces the potential to rescue the value of this project and the benefits for Puerto Rico. It should have been operational two years ago, with all the concomitant benefits.

The BGF project is 17 months late, many millions over budget and the site does not provide electricity, water or landfill gas to the processing equipment. Instead of building the biorefinery and managing the money, the Lópezes moved their assets to the Dominican Republic, effectively looting BGF. While Banco Popular, Semillero Partners, PRFG and CDCVA, having conspired to purchase additional percentages of the company for pennies on the dollar, giving out favorable off-take agreements to Banco Popular and suppressing minority owners. .

Consequently, the Plaintiffs sue to stop this illegal enterprise's criminal conduct in violation of the Racketeering Influenced and Corrupt Organizations (RICO) Act. Plaintiffs sue because Olmar López Vidal violated Rule 10(b)(5) by misrepresenting when and with what funds he purchased part of Gregory Boyd's participation in GFC/BGF, and he and Banco Popular have materially misrepresented information in the amendments to the Credit Agreement They sue to defend themselves from the Lópezes' threat of falsely accusing them of violating the Defend Trade

Secrets Act to isolate and intimidate them. They sue to hold Defendants accountable for conspiring to violate the use of the New Markets Tax Credits by diverting funds from Humacao, an area Congress intended to benefit, into their own personal accounts and businesses in Puerto Rico and the Dominican Republic.

Plaintiffs further invoke this Court's pendent jurisdiction to vindicate their rights as minority shareholders through breach of fiduciary claims and derivative action, for breach of contract, fraudulent inducement and concealment in connection with that contract, and the fraudulent use of BGF's Banco Popular loan drawdowns to negate Lassers' SAFE note, pay for the purchase of Boyd's membership interest in BGF and GFC, denying Boyd employment in breach of the MIPA; his seat on the Board of Directors; and any substantive involvement in the operations of BGF and GFC Holdings. In addition, Mr. Boyd, on his own behalf, sues Banco Popular for its breaches of the Credit Agreement, given that he is specifically identified as a third-party beneficiary of that agreement.



Promotional picture from the CDVCA home page showing Olmar López Vidal's seventeen-month late, millions over budget, non-operating biorefinery at the El Coqui Landfill which is now in default.  López-Vidal is showing the inside of equipment purchased from Galileo.  It is not work done by him or his family's company ITS or ASC.  The Galileo equipment just sits parked on a cement pad with no electricity, water, or landfill gas for it to process.

https://cdvca.org/

# Table of Contents

PROPOSED SECOND AMENDED COMPLAINT ...................................................... 1

INTRODUCTION ........................................................................................................ 1

JURISDICTION AND VENUE ................................................................................. 14

THE PARTIES............................................................................................................ 15

RACKETEERING ENTERPRISE ............................................................................ 20

FACTUAL BACKGROUND COMMON TO ALL CLAIMS ................................... 21

    The Creation of BGF and Launch of the Puerto Rican Landfill Projects ................................. 21

    Boyd and Lassers' Critical Roles in the Launch of BGF ........................................................ 23

    New Market Tax Credit Abuse ................................................................................................ 26

    Lópezes fraudulently divert BGF Loan to buy Boyd's shares and pay their Bond with

Banco Popular aiding and abetting that fraud. ..................................................................... 35

    MIPA Payment Flow Chart..................................................................................................... 49

    Fraudulent Drawdowns throughout the Construction ............................................................. 49

    Semillero Letter on the MIPA Securities Fraud...................................................................... 56

    Fraud Committed by the Financiers of the Project, Banco Popular & Semillero ...................... 58

    Details of other Payment Frauds ............................................................................................ 64

    The Lópezes' Fraudulent Conduct with Banco Popular ......................................................... 75

    The Role of Semillero Partners and Borschow ...................................................................... 84

    Diversion of BGF's Funds through the Lópezes' Web of Multiple ITS Entities ...................... 90

The Fraudulent Diversion of BGF's Funds within Puerto Rico ................................................. 96

ITS's Numerous Failures, Incompetence, and Fraudulent Misrepresentations ........................ 99

More Details of Banco Popular's Participation in the Criminal Enterprise ............................ 105

Usurpation of the Brugal Opportunity, Diverting BGF's Resources to Green CO2 ............... 107

The Diversion of Funds Outside of Puerto Rico .................................................................... 115

Borschow and Semillero Partners' Misconduct in the Fall of 2021 ....................................... 117

Banco Popular and the Lópezes' Fraudulent Diversion of BGF's Funds ............................... 119

The Fourth Amendment to the Credit Agreement .................................................................. 124

The Fifth Amendment to the Credit Agreement ..................................................................... 127

Banco Popular is Proud of its Quid Pro Quo ......................................................................... 132

FIRST CAUSE OF ACTION: DECLARATORY JUDGMENT UNDER THE DTSA ............. 139

SECOND CAUSE OF ACTION: RACKETEERING INFLUENCED AND CORRUPT

ORGANIZATION 18 U.S.C. 1962(a) ........................................................................................ 140

THIRD CAUSE OF ACTION: VIOLATION OF RULE 10-B5 OF THE SECURITIES

AND EXCHANGE ACT ............................................................................................................ 144

FOURTH CAUSE OF ACTION: BREACH OF FIDUCIARY DUTY AGAINST THE

LÓPEZES, BORSCHOW, AND ECONOMOU ......................................................................... 145

FIFTH CAUSE OF ACTION: BPPR'S BREACH OF THE CREDIT AGREEMENT ............. 150

SIXTH CAUSE OF ACTION ..................................................................................................... 150

DERIVATIVE CLAIM ON BEHALF OF BGF AND GFC HOLDINGS ................................. 150

SEVENTH CAUSE OF ACTION: DECLARATION THAT BOYD'S PERSONAL GUARANTIES ARE UNENFORCEABLE..................................................................... 152

EIGHTH CAUSE OF ACTION: BREACH OF CONTRACT ................................................... 152

NINTH CAUSE OF ACTION: FRAUDULENT INDUCEMENT/FRAUDULENT CONCEALMENT ("DOLO")..................................................................................................... 153

TENTH CAUSE OF ACTION: DEFAMATION...................................................................... 155

JURY DEMAND ...................................................................................................................... 158

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over this matter under the Declaratory. Judgment Act, 28 U.S.C. § 2201 because the Lópezes have accused Boyd of misappropriating BGF's trade secrets, specifically invoking the Defend Trade Secrets Act, 18 U.S.C. § 1836, et seq, (the "DTSA").

2.      This Court also has subject matter jurisdiction over this matter under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962, et seq. ("RICO"), because Defendants have committed more than the two predicate acts qualifying as violations of the crimes denominated in that Act.

3.      This Court also has jurisdiction under Section 10B-5 of the Securities and Exchange Act 17 C.F.R. §240.10b5 because Olmar López Vidal made a false statement as to a material fact when he told Gregory Boyd that he was purchasing Mr. Boyd's securities with his own money but instead used the proceeds of the Banco Popular loan to make that purchase, which Banco Popular knew because it managed the transactions.

4.      This Court has pendent jurisdiction over Plaintiffs' Civil Code claims, including their breach of fiduciary duty claims; their derivative suit on behalf of GFC and BGF; and their breach of contract and tort claims.

5.      This venue is appropriate because all of the Defendants are domiciled or do business in the District of Puerto Rico and all of the causes of action occurred here.

## **THE PARTIES**

6.      Plaintiff Greg Boyd is a former IBM systems engineer, a resident of Puerto Rico, and an injured party of Defendants' conspiracies, fraudulent acts, violations of their fiduciary duties, fraudulent efforts to devalue his ownership in GFC/BGF, and breaches of their contracts.

7.      Plaintiff Jonathan Lassers is a financier, a resident of Uruguay, and an injured party of Defendants' conspiracies, fraudulent acts, deception, and violations of their fiduciary duties, intentional efforts to devalue his ownership in GFC/BGF, and breaches of their contracts.

8.      Boyd and Lassers sue in their own right and on behalf of Biomass Green Fuels, LLC, and GFC Holdings, LLC, in order to vindicate their rights as limited liability companies.

9.      Defendant Olmar López Gómez is, on information and belief, married to Vivian Vidal de López, with whom he has a conjugal partnership, a resident of Puerto Rico, and a perpetrator of frauds and co-conspirator, who has breached his fiduciary duties and contractual obligations. López Gómez and/or the López family is/are the controlling owner of International Technical Services Inc. (Puerto Rico), International Technical Services Inc. (Delaware), International Technical Services Corp. of Puerto Rico, I.T.S. Corporation (Puerto Rico) and International Technical Service, (Dominican Republic). López Gómez and/or the López family is/are also 50% owners of JV Distributed Power Innovators, the joint venture structure under contract with BGF to construct the biorefinery as part of the BGF Project through their ownership of International Technical Services Inc. (Puerto Rico).

10.      Defendant Olmar López Vidal is, on information and belief, married to Cristina Ríos Mena, with whom he forms a conjugal partnership, a resident of Puerto Rico, and a perpetrator of frauds and co-conspirator, who has breached his fiduciary duties and contractual obligations. López Vidal and/or the Olmar family is/are the controlling owner of Green CO2, Green CO2

Dominicana LLC., (Puerto Rico), Green CO2 LLC, (Puerto Rico) and Green Hydrogen, LLC, (Puerto Rico).

11. Defendant Green CO2 Dominica S.R.L. ("Green CO2") is a corporation organized under the laws of the Dominican Republic, which is wholly owned by Defendant Olmar López Vidal and a co-conspirator.

12. Defendant Carlos López Vidal is, on information and belief, married to Claudia Ferrer Tañon, with whom he forms a conjugal partnership, a resident of Puerto Rico, and a perpetrator of frauds and co-conspirator. Carlos López Vidal and Claudia Ferrer Tañon are the owners of World Spirits, LLC.

13. Defendant World Spirits, LLC is, on information and belief, a limited liability company organized under the laws of Puerto Rico with its principal place of business at 1362 Magdalena Plaza Stella, Apt. 801, San Juan, PR 00907.

14. Defendant Alexander Borschow is married to Mariella Danspeckgruber, with whom, on information and belief, he forms a conjugal partnership. Borschow is a resident of Puerto Rico, a partner in Semillero Ventures and Partners, a board member of BGF and GFC, the Semillero consultant providing management advisory services to GFC/BGF, an active perpetrator of frauds, a participant in conflicts of interest, did not perform fiduciary responsibilities when deadlines and budgets were missed, and co-conspirator.

15. Defendant George Economou is the CFO of BGF, a resident of Puerto Rico and, on information and belief, is married to Lidiana Rodríguez Economou with whom he forms a conjugal partnership. Defendant Economou has previously financed and participated as an owner and beneficiary of bankrupted New Market Tax Credit Projects in Puerto Rico. Economou was bankrupt. Economou is a coconspirator and central to the creation of the frauds.

16.     Defendant Joval Rodríguez Barnes is, on information and belief, married to Stephanie Cummings with whom he forms a conjugal partnership. Rodríguez Barnes is a resident of Puerto Rico. While an employee of Banco Popular, Rodríguez personally lent money to GFC at usurious rates, repaid with BGF funds from the Banco Popular loan. Moreover, he improperly approved bank loan drawdowns based on certifications from the Lópezes that he knew to be falsified for work that the Lópezes claimed had been performed but, in reality, was never carried out. He is a co-conspirator and perpetrator of the frauds.

17.     Defendant International Technical Services, Inc. ("ITS") is owned by Olmar López Gomez and or the López family. Olmar López Gómez, Olmar López Vidal, and Carlos López Vidal, are its president, secretary, and treasurer, respectively. ITS is a 50% owner of ITS/ASC Construction JV. Olmar López Vidal and ITS submitted and signed for falsified drawdown certificates to Banco Popular among other crimes describe herein. ITS is a co-conspirator.

18.     Defendant Accurate Solutions, Corp. ("ASC") is owned by Defendant Roberto A. Acosta and is, in turn, a 50% owner of ITS/ASC Construction JV.  Acosta and ASC submitted and signed falsified drawdown certificates to Banco Popular. They are co-conspirators and perpetrators of the fraud.

19.     Defendant Distributed Power Innovators JV ("ITS/ASC Construction JV") is the Joint Venture structure established by International Technical Services, Inc. and Accurate Solutions Corp. which is under contract to construct the biorefinery at the El Coqui Landfill for BGF. The ITS/ASC Construction JV submitted falsified drawdown certificates to Banco Popular for work that was never performed on site. The JV is a co-conspirator.

20.     Defendant Banco Popular is a bank registered in Puerto Rico, which has participated in the enterprise to swindle the assets of BGF and GFC and conspired with the other co-Defendants to perpetrate the frauds detailed herein.  Banco Popular has submitted fraudulent

17

documents to the Lender of the New Market Tax Credit funds; has issued drawdown payments in excess of the approved loan; and has permitted ITS to commingle New Market Tax Credit funds with its bank loan enabling the Lópezes to misuse federal funds on their personal, unapproved projects. This is not the first time Banco Popular has been involved in criminal activity: In 2003, Banco Popular entered into a deferred prosecution agreement with the United States Department of Justice due to its failure to submit Suspicious Activity Reports that could have precluded continued money laundering. As part of the agreement, Banco Popular paid a $20 million fine, the largest in U.S. history at that time.

21.    Defendant Semillero Partners is a limited liability company registered in Puerto Rico, which, through its fund is a preferred shareholder in GFC/BGF and has a controlling interest over the project in conjunction with the Puerto Rico Fund for Growth and the Community Development Venture Capital Alliance.

22.    Defendants The Puerto Rico Fund for Growth and Community Development Venture Capital Alliance ("CDVCA") are preferred shareholders in GFC/BGF and investors in the Semillero Partners private equity fund. Semillero became a preferred shareholder when it invested $4.5 million on September 15, 2020.  It invested $658,735 on October 18, 2021

23.    Defendant Puerto Rico Fund for Growth is a member of the enterprise, a co-conspirator that plotted to refuse to impose controls on the Lópezes and ITS, a participant in conflicts of interest, did not perform fiduciary responsibilities when deadlines and budgets were missed, and a perpetrator of the frauds.  The PRFG is funded by the CDVCA.  Both the PRFG and CDVCA are preferred shareholders in GFC/BGF. PRFG became a preferred shareholder on September 15, 2020, by investing $2 million.

24.    Defendant CDVCA is a member of the enterprise, a co-conspirator that plotted to refuse to impose controls on the Lópezes and ITS, a participant in conflicts of interest, did not

perform fiduciary responsibilities when deadlines and budgets were missed, and a perpetrator of the frauds. The CDVCA purchased $191,235 in preferred shares on October 14, 2021.

25.     Defendant BGF is a limited liability company organized under the laws of Puerto Rico and a nominal defendant in this action. Boyd and Lassers are both asserting derivative claims on BGF's behalf because neither Olmar López Gomez nor Olmar López Vidal will assert such claims since they are participants in the predicate felonies.

26.     Defendant GFC is a limited liability company organized under the laws of Puerto Rico and a nominal defendant in this action. Boyd and Lassers are both asserting derivative claims on GFC's behalf because neither Olmar López Gomez nor Olmar López Vidal will assert such claims since they are participants in the predicate felonies.

**RACKETEERING ENTERPRISE**



"Racketeers intentionally operate without records, transparency, audit trails, or accountability and deny access to records."
(AICPA)

## FACTUAL BACKGROUND COMMON TO ALL CLAIMS

### The Creation of BGF and Launch of the Puerto Rican Landfill Projects

27.     The common owners of BGF include Gregory Boyd, Olmar López Gomez, Olmar López Vidal, John Dumas, and Jonathan Lassers.   In November of 2019, these shareholders assigned their BGF units to GFC, which accepted the ownership of BGF in exchange for these units as contributed capital.

28.     The plan was for GFC to invest and own separate entities besides BGF.

29.     To date, BGF is GFC's only asset.

30.     Boyd moved to Puerto Rico in 2014, intending to invest in and work on renewable energy projects, with which he had significant experience.

31.     Lassers has a background in finance and was a founder and partner in Semillero Partners, a private equity fund that finances food, agricultural, and other impact projects in Puerto Rico.

32.     Initially, Mr. Boyd held 50% of the ownership of BGF, with the Lópezes holding 25% each.

33.     The Lópezes and Boyd founded BGF to take advantage of the opportunity to purify the methane gas created at Puerto Rico's landfills and convert that gas into renewable liquified natural gas and renewable carbon dioxide.

34.     If the BGF Project were to be completed, air pollution from the landfill in Humacao would be reduced by 90%.

35.     The Project would also produce valuable local renewable energy and carbon dioxide for use in soft drinks and the pharmaceutical industry.

21

36.     The renewable liquified natural gas would substitute expensive imported fossil fuel products, which are subject to supply chain vulnerabilities and Jones Act high transportation costs that weaken the Puerto Rican economy.

37.     EC Waste owns the El Coqui Landfill, which is the site of BGF's first project.

38.     EC Waste also owns and operates additional landfills, on which BGF owns the right of first refusal for the gas rights.

39.     In December 2018, BGF entered into an agreement with EC Waste to purchase El Coqui Landfill's gas and convert it to natural gas and carbon dioxide.

40.     In March 2019, BGF entered into a lease agreement with EC Waste to lease the land where it intended to build its biorefinery at El Coqui to convert the landfill gas to natural gas.

41.     The Commercial Operations Date (COD) for the entire biorefinery was originally set for completion on June 28, **2020**, in an agreement between El Coqui Landfill and BGF.

42.     In the first amendment of the gas rights agreement with El Coqui, BGF received an extension of the COB until November 27, 2020.

43.     BGF obtained a new extension to August 7, **2021**, at the cost of $250,000.

44.     The new extension did not require that the biorefinery be fully operational, only that it meet El Coqui Landfill's electricity requirements.  These requirements would process about 3% of the landfill gas.

45.     El Coqui Landfill's electricity needs represent only 15% of the effort and equipment to build an operational biorefinery for BGF.

46.     In August **2022**, Defendants claimed that the biorefinery would be completed by October 15, 2022, based on a response to the $1.5 million capital call in the Third Amendment to the Credit Agreement that failed.

22

47.     There is a Fourth Amendment to the Credit Agreement, which requires a repayment of $1 million and a new construction deadline of December 31, 2022.

48.     No repayment was made.

49.     The biorefinery is not operational at the end of 2022.

50.     Since BGF is in default on its Fourth Amendment construction and repayment deadlines, there is a proposed Fifth Amendment to the Credit Agreement, which extends the deadlines to March 31, 2023.

51.     On January 17, 2023, El Coqui Landfill Company issued a default letter to BGF for non-payment of $773,480.98, demand for a payment of $250,000 to extend the missed Commercial Operations Date to April 17, 2023, a requirement to add a $2 million bond to the personal guarantees.  If these demands are not met, BGF will lose its 21-year gas rights agreement with the El Coqui Landfill.  BGF will have no source of revenue and fails.

**Boyd and Lassers' Critical Roles in the Launch of BGF**

52.     Until 2017, Lassers worked as a partner of Semillero Partners, which brought CDVCA to invest in Semillero Partners' Private Equity Fund.

53.     The Fund was established to invest in projects that promoted environmentally beneficial, sustainable food, agricultural, and import substitution projects in Puerto Rico.

54.     One of the key drivers of Semillero Partners' investment thesis was to **support, actively manage, and develop the management of emerging companies** in which the fund invested.

55.     CDVCA and their Puerto Rico Fund for Growth purport to be impact investors in private equity funds and are also the lead investors in Semillero Partners' private equity fund.

56.     CDVCA's supposed goal is to finance projects that have a positive impact on underserved communities by improving living standards and creating well-paid jobs.

57.     CDVCA created the $45 million Puerto Rico Fund for Growth to invest in Puerto Rico Private Equity and Venture Capital Funds.

58.     In April 2019, after having left Semillero Partners, Lassers approached CDVCA about investing in BGF. In response, CDVCA requested that Semillero Partners manage the investment in Puerto Rico because, at that time, CDVCA did not have the personnel to handle due diligence, oversight, or management on the island.

59.     The Puerto Rico Fund for Growth invested $2 million in BGF, for which it received preferred shares.

60.     Semillero Partners received preferred shares in GFC in exchange for its investment of $4.5 million.

61.     At the time that PRFG and Semillero received the preferred shares, they changed GFC operating agreement so that:

62.     Notwithstanding anything provided to the contrary in this Agreement, the Company will not, without the express and affirmative approval of both Series A Managers:

(l) address any real or potential conflict of interest matter, including the hiring, firing or otherwise entering into or be a party to, or permit any subsidiary to hire, fire or otherwise enter into or be a party to, any transaction with any Family Member or Affiliate of any Initial Member of the Company or its subsidiaries. All real or potential conflict of interest shall be addressed in accordance with the Board of Managers Conflicts of Interest Policy.

24

63.     BGF never addressed any conflict of interest in any way, although many such conflicts existed and exist.  As legendary investor Warren Buffett pointed out in his 1993 letter to Berkshire Hathaway shareholders...

"Directors can do great violence to shareholders while still claiming to be acting in their long-term interest.  A 2002 Washington Post article suggested board members at Enron voted to suspend conflict-of-interest rules in June 1999. That allowed Enron Chief Financial Officer Andrew Fastow to set up the off-balance-sheet partnerships that got the firm in trouble.  That same move did "great violence to shareholders," of Enron.

64.     By taking conflict of interests' controversies out of the purview of BGF's owners, PRFG, CDVCA and Semillero assured that Plaintiffs were bereft of the capacity of even addressing conflicts.

65.     PRFG, CDVCA and Semillero made this change to afford the Lópezes free reign, which allowed them to pillage BGF as a quid pro quo for PRFG's, CDVCA's and Semillero's increased secrecy from the minority owners and ownership interest in BGF.  This same move by **Semillero and CDVCA did "great violence to shareholders." of GFC/BGF**.


66.     To build and develop the project on the El Coqui Landfill, BGF needed funding.

67.     BGF approached Banco Popular for a loan to fund the construction and development.

68.     Banco Popular initially agreed to lend BGF $11.8 million as a construction loan to make the biorefinery Project operational with the provision that Boyd and the Lópezes each provide a personal guarantee.

69.     The September 15, 2020, Credit Agreement with Banco Popular shows Boyd as a manager of BGF.

70.     As a personal guarantor of the construction loan from Banco Popular to BGF, Boyd is a third-party beneficiary of that loan, as the Credit Agreement states.

### New Market Tax Credit Abuse

71.     On September 15, 2020, PCE-SUB CDE 13, LLC, which is a wholly-owned subsidiary of Banco Popular, along with Capital One, lent BGF $7.2 million through the Federal New Markets Tax Credit program for the purchase of the equipment for the biorefinery. The New Market Tax Credit program is directed at providing financing for projects providing employment in impoverished areas in the U.S.

72.     Banco Popular acts as the distributing agent for the New Markets Tax Credit or (NMTC) loan.

73.     Boyd is also a guarantor of the New Market Tax Credits loan.

74.     The New Markets Tax Credits program identifies specific poverty-stricken census tracts in the United States where the credits can only be used.

75.     In that NMTC loan, Banco Popular de Puerto Rico is solely the Depositary Bank, which is obligated to make disbursements in accord with the Disbursing Agreement.

76.     The Lópezes have produced only one quarterly report filed since PCE-SUB CDE 13 issued the NMTC loan and in September 2020. Banco Popular's PPC SUB CDE -13, LLC has not raised red flags despite being eight reports behind.

77.     The Disbursing Agreement also provides that "Each disbursement, including the first disbursement, of QILCI proceeds, shall be made only upon the Disbursing Agent's and Lender's determination that (A) the status of construction is proceeding in accordance with the current approved schedule, the Project Budget, and with the Plans and Specifications, satisfactorily

and in conformance with generally accepted Construction Standards for the area in which the Project is located…"

78.     The September 14, 2020, New Markets Tax Credit Disbursement Agreement requires that the biorefinery project be on schedule, in budget, and that it meet generally accepted Construction Standards in the area.

79.     The project has never been on schedule; it has been over budget since November 16, 2021, and it is not following ISO Construction Standards nor OHSA Safety requirements by allowing a worker to handle live electrical wires without safety equipment and be killed. Nor do the gross deficiencies described in the Venture Engineering report meet ISO Construction Standards. This conduct and failure to comply with basic construction standards and safety regulations continue

80.     Nor is it an ISO construction standard in any tropical place to leave expensive, sensitive food grade (beverage quality CO2) and biorefinery equipment exposed to the elements without protection.

81.     The Disbursing Agreement also provides that disbursements must be made only pursuant to the QLICI (Qualified Low-Income Community Investment) schedule, which requires that those funds be spent solely on equipment.

82.     Since George Economou and Banco Popular, as the Disbursing Agent, did not require a distinct account for the released QLICI funds, those funds were commingled with all the funds in BGF Operating Account and, thus, were indiscriminately spent on López Vidal's vacations, efforts to discredit Boyd, the Green CO2 project in the Dominican Republic, and the World Spirits distillery. Economou, Lopez-Vidal and Lopez-Gomez conspired to hide these facts from the Kevane Grant Thorton auditors causing a multi-year delay in the release of audited financial statements.

83.     BGF had to buy the equipment for the biorefinery to get the New Market Tax Credit and the Act 73 Startup Credits.

84.     The September 15, 2020, Community Benefits Agreement provides that all of the NMTC money is to be spent on equipment.

85.     ITS/ASC JV provided a limited scope of equipment: containers for the CHPs, batteries for the backup, and the landfill gas pretreatment system.

86.     This equipment totals approximately $2 million of the $5 million of the JV Construction contract.  Much of this equipment was paid with NMTC funds.

87.     BGF paid for the other $18+ million in equipment directly with much of it paid by NMTC.

88.     To date, none of the equipment provided by the JV works.

89.     The entire 18-month delay in generating electricity for EC Waste derives from problems with equipment the JV provided.

90.     ASC/Roberto Acosta provided the battery system, electronic controls on and container for the Jenbacher 208 power generation equipment for the El Coqui Landfill.  Much of this equipment was paid for with NMTC funds.

91.     The Jenbacher 208 was delivered to the El Coqui Landfill in February of 2020.

92.     The Jenbacher 208 was paid with a promissory note to the supplier guaranteed by Greg Boyd. Yet nearly three years after delivery and eighteen months past the commercial operations date this equipment does not operate.   Racketeering occurs when the ITS/ASC Construction JV sells a service (electric generation for the El Coqui Landfill), pays themselves, then never delivers electricity.

93.     By law none of the landfill gas can be released into the atmosphere due to methane being 32 times worse for the environment than carbon dioxide. The gas has to be flared, processed by the biorefinery or some combination.

94.     ITS provided a nonfunctional gas pretreatment system with no controls to handle the variable gas flow between the landfills gas system, flaring system, and the biorefinery's variable need for landfill gas.

95.     By providing nonfunctioning equipment paid with NMTC, ITS and ASC further the purpose of the criminal enterprise by weakening BGF's financial situation. The lack of power generation caused BGF to pay minimum gas fees and the net electric bill of the El Coqui Landfill totaling approximately $646,000, plus interest payments to Banco Popular of over $1.5 million, plus paying themselves $3.1 million and growing over the $5 million construction budget. These actions made BGF vulnerable to takeover by vulture funds and predators such as Semillero and Banco Popular with a particular taste for carrion in the nature of BGF.

96.     With the El Coqui Landfill January 17, 2023 Default Notice, Banco Popular now per the Credit Agreement can "declare the Notes or any portion thereof, all or any portion of the interest thereon and all or any portion of the other amounts payable under the Notes and the other Loan Documents to be forthwith due and payable, whereupon the Notes or such portion thereof, all such interest or such portion thereof and all such amounts or such portion thereof shall become and be forthwith due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Borrower; (iii) foreclose on all or any portion of the Collateral and exercise all its rights under the Loan Documents and under applicable law; for its benefit and for the ratable benefit of the Lenders, shall have the right from time to time to partially foreclose all or any part of the Collateral in any manner and for any amounts secured by the Loan Documents then due and payable as determined by the Required Lenders in their sole

discretion including, without limitation…"  Instead of stopping the fraud when identified by the Plaintiffs in November of 2021, Banco Popular continued with the RICO Enterprise to destroy BGF to the detriment of the Plaintiffs for its own benefit.

97.    The Disbursement Agreement also provides that "Each and every Requisition presented by the Borrower to the Disbursing Agent shall constitute a re-affirmation of the representations and warranties made by the Borrower under the loan documents that the improvements existing at the time of each request have been constructed … in a good and workmanlike manner."  If improvements were workmanlike, the electricity would be flowing over seventeen months ago, and a subcontractor would not have died.

98.    Pursuant to the Disbursement Agreement, Banco Popular is responsible for monitoring the construction of the project.

99.    Pursuant to the Disbursement Agreement, no disbursement shall be made if an act of default has occurred.

100.    In violation of that provision, Banco Popular disbursed money to BGF when BGF was in default with its agreement with El Coqui Landfill by not paying rent; and in default with Banco Popular itself by not paying the loan and the NMTC interest.

101.    Pursuant to the Disbursement Agreement, Banco Popular is not to disburse funds if there are not enough funds remaining to complete the project.

102.    The project has been over the construction budget since November 2021, so by definition, every disbursement since then has been in violation of the Disbursement Agreement for the New Market Tax Credits.

103.    Since November 2021, when the project went over construction budget and when Plaintiffs reported the López' fraud, Banco Popular has lent Biomass Green Fuels $5,532,927.39.

104.    Often the bank disbursed loan amounts of less than $100,000, without requiring supporting drawdown documentation about the use of funds.

105.    When the bank disbursed undocumented drawdowns of less than $100,000 multiple times, it often used part or all of that money to make interest payments to itself throughout 2022.

106.    One example is on December 5, 2022, when Banco Popular, without a drawdown lent $65,972.35 and on the same day withdrew the same amount to pay itself while further obligating Boyd without approval as a guarantor.



**BANCO POPULAR.**

**Account Transactions**          **Customer: BIOMASS GREEN FUELS LLC**

### Account Details - Checking

| Account Number | Product | Book Balance | Available Balance |
|---|---|---|---|
|  | 021 - FLEXICUENTA DE NEGOCIOS | $208,040.48 | $200,440.07 |
| **Last Statement Date** | **Last Statement Balance** | **Total Fees CTD** | **Total Fees YTD** |
| 11/30/2022 | $216,255.75 |  |  |

### Transactions

| Date | Trace Number | Reference ID | Description | Debit | Credit | Balance |
|---|---|---|---|---|---|---|
| 2022-12-01 | 2022335100005 | 2022120100000000000 | CARGO POR FOTOCOPIA | $10.00 |  | $216,245.75 |
| 2022-12-01 | 2022335100010 | 2022120100000000000 | EFT PMT FIRST INSURANCE INSURANCE 900-96084603 | $13,033.91 |  | $202,311.84 |
| 2022-12-01 | 2022335100015 | 2022120100000000000 | EFT PMT POPULAR CR CARD PAYMENT 486-24357-22 | $2,000.00 |  | $200,311.84 |
| 2022-12-01 | 2022335100020 | 2022120108500105652 | CHEQUE NUMERO 2885 | $334.37 |  | $199,977.47 |
| 2022-12-02 | 2022336100005 | 2022120208501005238 | CHEQUE NUMERO 2920 | $1,027.68 |  | $198,949.79 |
| 2022-12-05 | 2022339100005 | 2022120500000000000 | EFT DEPOSIT BANCO POPULAR PRESTAMO 101-32683300001 |  | $65,972.35 | $264,922.14 |
| 2022-12-05 | 2022339100010 | 2022120508500197187 | CHEQUE NUMERO 2921 | $70.00 |  | $264,852.14 |
| 2022-12-05 | 2022339100015 | 2022120500000000000 | EFT PMT BANCO POPULAR PRESTAMO 101-32683300001 | $65,972.35 |  | $198,879.79 |

107.    In violation of the Disbursement Agreement, Banco Popular continued to disburse funds to BGF after learning that the health and safety standards at the construction site were so lax that a subcontractor was electrocuted and died because the ITS/ASC JV required him to work with live electrical wires without any protective equipment.

31

108.    As the funds were comingled by Economou, there is no way to trace the allocation of NMTC money to equipment or to payments, approximately 30% of every dollar BGF spent are NMTC funds.  This includes funds for Carlos López when he was working on the World Spirits distillery, making trips to Mexico or to Olmar López Vidal when he is spending weeks in the Dominican Republic, setting up Green CO2 or otherwise diverting funds.



**INTERNATIONAL TECHNICAL SERVICES INC**
PO BOX 11439
SAN JUAN, PR 00920-1439

BANESCO USA
HATO REY, PR 00917
63-1577/670

1314

3/8/2019

PAY TO THE ORDER OF    Carlos Lopez Vidal

$ **1,320.98

One Thousand Three Hundred Twenty and 98/100********************************************************************* DOLLARS

Calle B-49
Urb. La Colina
Guaynabo, PR 00969

MEMO    Reembolso de Gastos Viaje Mexico/ Green Fuels

AUTHORIZED SIGNATURE

⑈0013144⑈ ⑆067015779⑈

INTERNATIONAL TECHNICAL SERVICES INC
Carlos Lopez Vidal                                1314
Reembolso de Gastos Viaje Mexico/ Green Fuels    3/8/2019
                                                  1,320.98



**14 MAR 2019** ▶ **14 MAR 2019** DESTINO **GUADALAJARA, MÉXICO**

PREPARADO PARA
**CARLOS LOPEZ**

**AEROMEXICO.**

CÓDIGO DE RESERVACIÓN   OIWHVN

✈ PARTIDA: **JUEVES 14 MAR** Por favor verifique el horario de vuelo antes de la salida

| | | | |
|---|---|---|---|
| **AEROMEXICO**<br>**AM 0224** | **MEX**<br>CIUDAD DE MÉXICO | ▶ **GDL**<br>GUADALAJARA, MÉXICO | Avión:<br>Avión |
| Duración:<br>1horas 25minutos | Sale a la(s)<br>**17:00** | Llega a la(s):<br>**18:25** | Millaje: 286<br>Escala(s): 0 |
| Tipo de tarifa:<br>CLASICA | Terminal<br>TERMINAL 2 | Terminal:<br>TERMINAL 1 | |
| Estado:<br>Confirmado | | | |

| Nombre del pasajero:<br>» Carlos Lopez | Asientos:<br>21D / AEROMEXICO / Confirmado | Recibo(s) de boleto(s) electrónico(s):<br>1392110350316 |
|---|---|---|

109.    ITS charged Carlos López's trip to Mexico to Biomass Green Fuels.

110.    Carlos López is the son of Olmar López Gómez and a founder of World Spirits, LLC the maker of Bravada Vodka. This charge was reimbursed from the Biomass Green Fuels operating account after receiving NMTC funds. Biomass Green Fuels does no business in Mexico. World Spirits buys its alcohol from Mexico. This expense was fraudulent, and the Lópezes should not have used BGF's funds to reimburse it.

111.    Pursuant to the Community Benefits Agreement, the biorefinery creates 17 full-time employees with health insurance, technical education and training programs. BGF also estimates in the Community Benefit Agreement the construction provides 31,000 hours.  No formal technical education or training has occurred, and BGF employs less than five people.

112.    The Lópezes sent an unlicensed electrical worker, Julio Reyes Salas, to work with live electrical wires without appropriate equipment, training or supervision.

113.    The man died, and ITS' punishment was the payment of a $3,500 OHSA fine paid on February 15, 2022, and the requirement that it create a safety manual and train workers for which BGF paid IEMES, PSC on March 10, 2022 with check 2580 for $7,192.50 signed by both López Vidal and López Gómez.  This payment is fraudulent.  BGF is not liable for and should not pay for the ITS safety manual or training.

114.    In the Venture Engineering report on the construction, a major deficiency is the lack of labeling on the controls through the biorefinery.  This is both a safety and operational hazard. Perhaps Julio Reyes Salas would be alive today with proper labeling on the controls or proper training as required by the NMTC.

115.    Economou knowing the request for payment was fraudulent, approved the payment.

116.    The September 14, 2020, Disbursement Consent Agreement among GFC, BGF, Semillero, and the Puerto Rico Fund for Growth provides that "any deviation to the drawdown schedule which exceeds by 10% of each drawdown set forth in Schedule 2, will require the Purchasers [Semillero and Puerto Rico Fund for Growth]'s written consent."

117.    The deviations to the drawdowns have exceeded by 10% of the drawdown set forth in the Schedule every time.

118.    Plaintiffs have never seen the Purchasers' written consent. Semillero, and the Puerto Rico Fund for Growth are not performing their contractually required duties. Their lack of oversight allows the funds to be stolen and the project delayed to the point of default at great harm to the minority owners.

119.    The surrounding area of the El Coqui Landfill has a poverty rate of over 60%, so it qualifies under the NMTC program.

120.    There are no U.S. census tracts in the Dominican Republic, so using funds from the New Markets Tax Credits program there violates Section 45 of the Internal Revenue Code.

**Lópezes fraudulently divert BGF Loan to buy Boyd's shares and pay their Bond with Banco Popular aiding and abetting that fraud.**

121.    In the Spring of 2020, Boyd, Lassers and the Lópezes began the application and due diligence process to secure the loans to fund BGF's Project.

122.    The Lópezes could not qualify as guarantors of the loans with Boyd because their personal tax returns and financial statements reflected minimal income and assets notwithstanding their extravagant lifestyles because the Lópezes filed fraudulent tax returns electronically.

123.    In the absence of valid tax returns and financial statements, in a meeting where Boyd was present, Economou suggested that the Lópezes have "better" personal financial statements prepared.

124.    The Lópezes approached their usual accountant, Fernando Carbonell, to prepare those statements.

125.    At a meeting Boyd attended at the ITS offices, Carbonell questioned the ability of the Lópezes to make such statements truthfully because he knew that Olmar López Gómez had sold his house in Guaynabo in 2018 for $550,000 and had not reported it as income on his Puerto Rico tax return. Since Mr. López Gómez filed his tax return electronically, that tax fraud constitutes wire fraud under RICO.

126.    Recognizing that the Lópezes were weak guarantors, Economou suggested that the Lópezes' ITS entities be included as guarantors.

127.    However, all of the ITS companies' financial conditions were also too weak to support a guarantee.

35

128.    In fact, at that time, ITS did not have the funds or credit to support the required construction bond for the project even though it was negotiating to serve as the construction contractor.

129.    Hence, the Lópezes decided to create a joint venture Distributed Power Innovators JV (DPI JV) with another company, ASC, using ASC's credit rating to obtain a construction bond for the contract with BGF.

130.    The DPI JV was never properly constituted. The DPI JV did not follow contractual requirements and specifications for the JV set up in the construction contract. The DPI JV never opened a checking account nor filed tax returns.

131.    BGF should have paid DPI JV for construction per the contract. Instead, Olmar López Vidal and Olmar López Gómez made fake invoices, wrote checks and sent wires and ACH payments directly to themselves at ITS and Roberto Acosta at ACS. Without segregated accounting, this "DPI JV entity" cannot be audited and without tax returns, it is a fraud. Even the Performance Bond with Mapfre in 148 calls them the ITS/ASC Joint Venture, so in this amended complaint, we call the DPI JV, the ITS/ASC Construction JV.

132.    Neither Olmar López Vidal, Olmar López Gómez, nor George Economou ever paid the DPI JV per the construction contract. Instead, the Lópezes signed every check directly to themselves at ITS and Roberto Acosta at ASC without a contract. This makes every check, wire and ACH to ITS and ASC on this project a fraud. Plaintiffs identify a number of such transfers *infra.*

133.    Today ITS and ASC have been fraudulently paid over $8 million on a contract that was originally for $4 million.

134.    No Bank, no Board, or honest Private Equity Firm should approve dozens of payments to the wrong entities, particularly federal funds.

135.     No Bank, no Board, or honest Private Equity Firm should accept cost overruns, and project delays without replacing the conflicted management and construction contractor.

136.     The financial close was scheduled for September 15, 2020.   It included the simultaneous closing of the Semillero/CDVCA investment, Flexitank convertible note, the Banco Popular direct loan and NMTC loan with Capital One.

137.     On the morning of September 14, 2020, Boyd notified BGF's attorneys at DLA Piper on his availability to sign the loan and funding papers.   They responded with the blank signature pages.

138.     Throughout September 14th, various parties suggested changes to the Flow of Funds document.

139.     Boyd submitted his signature for the Flow of Funds to Jose Sosa, DLA Piper attorney representing BGF at the September 15, 2020, financial close at 4:43 PM on September 14, 2020.



140.     At 4:43 PM these signatures were put into Escrow for the financial close scheduled for early the following morning.

141.  Changes to the flow of funds continued after 5 PM on September 14, 2020 and during and after the financial close at PMA on September 15, 2020.

142.  Boyd is not liable for changes made to documents after his signature went into escrow and to which he did not consent.  Boyd **did not ever consent to release his signature** when Bret Heyman, an attorney for Capital One, one of the NMTC lenders, requested it, and yet Boyd's forged signature appears on the document.

---

**greg.boyd@icloud.com**

| | |
|---|---|
| **From:** | Joval Rodriguez Barnes <Joval.Rodriguez@popular.com> |
| **Sent:** | Monday, September 14, 2020 9:38 PM |
| **To:** | Jacen Killebrew; Heyman, Brett E.; Cristina Dominguez; john.chamberlain@capitalone.com; douglas.fields@capitalone.com; al.kropog@capitalone.com; mark.preston@capitalone.com; kyle.fontanille@capitalone.com; seth.bosworth@capitalone.com; taylor.leblanc@capitalone.com; lisa.irons@capitalone.com; Cronin, Patrick J.; McGuckin, Aurora P.; Humberto E. Gonzalez Caraballo; Gabriel Lopez Somohano; asantos@pmalaw.com; amolina@pmalaw.com; pramirez@pmalaw.com; Natalia Guzman; Jessika M. Corujo Rodriguez; Isaac Wilkins Velez Barbeito; Guillermo Franco; drew.marlar@kutakrock.com; carol.mihalic@kutakrock.com; edward.gillespie@kutakrock.com; nicole.wilson@kutakrock.com; Olmar López; olg@greenfuelspr.com; G Boyd; george.economou14@gmail.com; jose.sosa@dlapiper.com; ruben.fernandez@dlapiper.com; paul.ohanlon@leveragelaw.com; blake.mason@leveragelaw.com; neal.johnson@leveragelaw.com; Richard Davies |
| **Subject:** | RE: Biomass Green Fuels - Projections |
| **Attachments:** | ESI Energy - Invoice.pdf |

Jacen, I have a small difference ($4,742) with the direct loan disbursement at closing. It is related to ESI Energy's invoice which I think is not included in the amount to be disbursed. My understanding is that this invoice will be paid with the Direct Loan. Could you please confirm this.

| Closing Costs | Total Invoices | Direct Loan |
|---|---|---|
| BPPR Fees | | 233,750.00 |
| P&P Bond | | 70,500.00 |

---

143.  In the above email, nearly five hours after Boyd submitted his signature, Joval Rodriguez made another change to the disbursements which changed the Flow of Funds.

144.  The email shows Rodriguez is including the payment of the ITS/ASC Construction JV Performance and Payment Bond by BGF in the Banco Popular Loan Disbursement.  This Bond was a precondition of the financial close to be paid by ITS/ASC.  It was not to be paid after the

closing by BGF with funds from the bank loan to build the biorefinery, but that is what the Lópezes, ASC, and ITS did, with Banco Popular's approval and assistance.

145.    The ITS/ASC JV should have paid its own bond. By diverting funds intended for the biorefinery to the performance bond, Banco Popular and ITS/ASC committed bank fraud.

146.    In the Banco Popular Credit Agreement, Article 3, Conditions of Lending on page 46:

> (h)    Insurance. The Administrative Agent shall have received evidence required under Section 6.2.1(a) of the existence of all the required Policies and the designation of the Administrative Agent, for the ratable benefit of the Lenders, as the loss payee or additional insured, as the case may be, thereunder to the extent required hereby, and evidence that all Insurance Premiums then due and payable with respect thereto have been paid, including without limitation, evidence that the required payment and performance bond(s) in relation to the Project, name the Borrower and the Administrative Agent, for the benefit of the Lenders, as dual obligees, for not less than one hundred percent (100%) of the amount of the Direct Costs with respect to the whole Project from an insurance company reasonably acceptable to the Administrative Agent, and reasonably satisfactory evidence that the premiums on such bonds have been paid in full.

147.    This Bond is an obligation of the ITS/ASC Construction JV.

148.    BGF's contract with the Joint Venture provides:

> 8.    Both parties agree to execute all applications and indemnity agreements required by the sureties upon any bond, or bonds, required in connection with the contract and the performance thereunder, and if required by such bonding JV, execute any indemnity agreement(s) jointly and severally between the Joint Venturers. Both parties also agree to pay their (50%) percent share of all insurance premium costs and to be responsible in their proportionate share for any deductible costs associated with said insurance coverage.

149.    The Mapfre Bond is required by BGF as the Obligee.  It is ITS/ASC's responsibility as principals to pay it.

**MAPFRE PRAICO INSURANCE COMPANY**
, EDIFICIO MAPFRE, 297 CL. CÉSAR GONZÁLEZ, SAN JUAN PR
PO BOX 70333, SAN JUAN PR 00936-8333

⊛ **MAPFRE** | **PUERTO RICO**

---

**PAYMENT BOND**
**BOND NUMBER**    **1301208000513**

Principal:              **ITS/ASC JOINT VENTURE**
Principal's address:  **PO BOX 11439  SAN JUAN PR 00920**

Obligee:               **BIOMASS GREEN FUELS, LLC**

Obligee's address:

Contract / Project:

**SUPPLY, PROCUREMENT AND CONSTRUCTION/INSTALLATION CONTRACT. CONSTRUCTION OF A FACILITY FOR THE PRODUCTION OF RENEWABLE LANDFILL GAS TO RNG AND CO2 AT EL COQUI LANDFILL, HUMACAO.**

Contract date:            day of

KNOWN ALL MEN BY THESE PRESENTS:

That the Principal identified above, and the Surety are held and firmly bound unto the Obligee referenced above, to the just and full sum of

**FIVE MILLION AND 00/100 DOLLARS  ($***5,000,000.00)**

to the payment of which sum, well and truly to be made, the Principal and Surety jointly and severally bind themselves, their respective heirs, administrators, successors and assigns, firmly by these presents.

Whereas, the Principal has entered into a certain written contract ("Contract") with the Obligee for the construction of the project identified above for the amount of

**FIVE MILLION  AND 00/100 DOLLARS ($***5,000,000.00)**

40

150.    The López Defendants' own Exhibit to their Motion to Dismiss prove our point. Boyd did not approve the fraudulent payment of ITS/ASC Performance bond from the loan money.  Below is the forged signature from Exhibit 2 to the Flow of Funds of their response breaking Federal Forgery 18 U.S.C. §471, 472, 473.  Below are the signatures from the defendants Exhibit:



The signatures from Exhibit 1 of the Defendants' response submitted to DLA Piper **do not match the forged signature on the Flow of Funds**.



151.    Documents continued to change after the financial closing at Pietratoni Mendez & Alvarez (PMA), the attorneys for Banco Popular, on Tuesday, September 20, 2020.

152.    In Defendants' Exhibit 2, which contains a signed Flow of Funds, Bret Heyman requests authorization to release signatures.  Boyd never gave permission to release his signature to Brett Heyman, yet his signature is on the flow of funds.

Case 3:22-cv-01190-ADC-BJM   Document 110-2   Filed 08/08/22   Page 1 of 10

Exhibit 2

| **Subject:** | Biomass Green Fuels - Request for Authorization Release |
| **Attachments:** | Biomass Green Fuels - Flow of Funds (Executed).pdf |
| **Importance:** | High |

**From:** Heyman, Brett E. <bheyman@jonesday.com>
**Sent:** Tuesday, September 15, 2020 12:56 PM
**To:** john.chamberlain@capitalone.com; douglas.fields@capitalone.com; al.kropog@capitalone.com; mark.preston@capitalone.com; kyle.fontanille@capitalone.com; seth.bosworth@capitalone.com; taylor.leblanc@capitalone.com; lisa.irons@capitalone.com; Cronin, Patrick J. <pcronin@jonesday.com>; Heyman, Brett E. <bheyman@jonesday.com>; McGuckin, Aurora P. <amcguckin@jonesday.com>; joval.rodriguez@popular.com; humberto.gonzalez@popular.com; gabriel.lopezsomohano@popular.com; asantos@pmalaw.com; amolina@pmalaw.com; pramirez@pmalaw.com; natalia.guzman@popular.com; cristina.dominguez@popular.com; jessika.corujo@popular.com; isaac.velez@popular.com; gfranco@communitycapitallink.com; drew.marlar@kutakrock.com; carol.mihalic@kutakrock.com; edward.gillespie@kutakrock.com; nicole.wilson@kutakrock.com; olv@greenfuelspr.com; olg@greenfuelspr.com; gboyd@greenfuelspr.com; george.economou14@gmail.com; Sosa, Jose <Jose.Sosa@us.dlapiper.com>; Fernandez Agramonte, Ruben <Ruben.Fernandez@us.dlapiper.com>; paul.ohanlon@leveragelaw.com; blake.mason@leveragelaw.com; neal.johnson@leveragelaw.com; richard.davies@cohnreznick.com; jacen.killebrew@cohnreznick.com
**Subject:** Biomass Green Fuels - Request for Authorization Release
**Importance:** High

[EXTERNAL]

All,

We have confirmed that Capital One has everything they need in order to close the Biomass Green Fuels transaction. To begin the wiring process, at your earliest convenience, we kindly ask **(1) PMA, (2) Kutak Rock (on behalf of your firm and MNAT), (3) DLA, and (4) Leverage Law** to please reply all to this email providing express authorization to release signature pages (on behalf of your firm and/or respective clients, as applicable) and opinions.

After we receive authorization from all parties, we will then authorize release on our end by replying all to this email chain, and ask that BPPR please initiate the leverage loan wire and circulate the fed ref number immediately upon receipt. We will instruct Capital One to fund (after receipt of the leverage loan wire) in accordance with the attached Flow of Funds.

Please let me know if you have any questions.

Thanks!
Brett

Brett E. Heyman
Associate
**JONES DAY® - One Firm Worldwide℠**
100 High Street, 21st Floor
Boston, MA 02110-1781
Direct: +1.617.449.6898

153.    The signature on the Flow of Funds is forged in violation of forgery 18 U.S.C. §

472 and 473 in furtherance of the enterprise.

154.    Jones Day did not provide the final signed set of documents from the September

closing until **six** months later on March 26, 2021.  Boyd requested these when he left the closing

at PMA on September 15, 2020.

**From:** McGuckin, Aurora P. <amcguckin@jonesday.com>
**Sent:** Friday, March 26, 2021 5:05 PM
**To:** john.chamberlain@capitalone.com; douglas.fields@capitalone.com; al.kropog@capitalone.com; mark.preston@capitalone.com; kyle.fontanille@capitalone.com; seth.bosworth@capitalone.com; taylor.leblanc@capitalone.com; lisa.irons@capitalone.com; Cronin, Patrick J. <pcronin@jonesday.com>; Heyman, Brett E. <bheyman@jonesday.com>; McGuckin, Aurora P. <amcguckin@jonesday.com>; joval.rodriguez@popular.com; humberto.gonzalez@popular.com; gabriel.lopezsomohano@popular.com; asantos@pmalaw.com; amolina@pmalaw.com; pramirez@pmalaw.com; natalia.guzman@popular.com; cristina.dominguez@popular.com; jessika.corujo@popular.com; isaac.velez@popular.com; gfranco@communitycapitallink.com; drew.marlar@kutakrock.com; carol.mihalic@kutakrock.com; edward.gillespie@kutakrock.com; nicole.wilson@kutakrock.com; Olmar López <olv@greenfuelspr.com>; olg@greenfuelspr.com; G Boyd <gboyd@greenfuelspr.com>; george.economou14@gmail.com; jose.sosa@dlapiper.com; ruben.fernandez@dlapiper.com; paul.ohanlon@leveragelaw.com; blake.mason@leveragelaw.com; neal.johnson@leveragelaw.com; richard.davies@cohnreznick.com; jacen.killebrew@cohnreznick.com
**Subject:** Biomass Green Fuels Closing Binder

Good afternoon,

You should have received a Box.com invitation to access an electronic copy of the Biomass Green Fuels transaction Closing Binder. Given the uncertainty of workplace capacity as a result of COVID-19, we want to ensure all parties have access to the closing documents and diligence materials.

You can also access the binder using the following link: https://app.box.com/s/lb1q4q08zis8x9s5rzjhgvhad2vwbe2z

Please let us know if you have any questions or any trouble accessing the files on Box.

Thank you,
Aurora

Aurora McGuckin
Lawyer Support Assistant
JONES DAY® - One Firm Worldwide℠
100 High Street, 21st Floor
Boston, MA  02110-1781
Direct: +1.617.449.6805
amcguckin@jonesday.com

155.    On September 16, 2020, López Vidal fraudulently paid Popular Insurance for the

ITS/ASC Construction JV's, $70,500 construction bond with money intended for BGF's

operations, illegally diverting BGF's funds for the benefit of the Lópezes and Roberto Acosta of

ITS/ASC.

156.    The ITS/ASC Construction JV's provision of the bond was a condition precedent to the closing, but it was not paid until the day after the closing.

157.    The payment is not listed on the Flow of Funds agreement executed the day before with Banco Popular and Investors.

158.    López Vidal fraudulently identified the payment in a wire transfer form as a closing cost in violation of 18 U.S.C.§1343.

159.    At the October 8, 2020, Management meeting, Boyd raised the issue of the ITS/ASC Construction JV Bond being paid with BGF loan money he is guaranteeing, and Alex Borschow refused to take action to restore that money from the Joint Venture to BGF. After this, Boyd was not invited to any weekly management meetings where his comments would have to be in the minutes.

160.    Olmar López Gómez is not an officer, employee, or Director of BGF, yet Borschow allowed López-Gómez to be a signer on every BGF check, wire and ACH.

161.    Much of the loan money to BGF would be paid to López Gómez as the President of one of his ITS entities which owns 50% of the ITS/ASC Construction JV.

162.    No honest Private Equity Firm would allow a corporate outsider to write checks to himself unless involved in the RICO Enterprise.

163.    Borschow has intentionally and repeatedly failed to exercise his corporate responsibilities, accepted conflicts of interests, and has denied minority shareholders' rights with intent of taking advantage of GFC/BGF that he manipulated into distress on behalf of Semillero, PRFG, and CDVCA as part of the criminal enterprise.

164.    To close the financing with Banco Popular, the Lópezes also fabricated financial information on their Small Business Administration personal financial statement forms for the

New Market Tax Credit loan in violation of 18 U.S.C. §1344 and provided those forms to Banco Popular and Capital One electronically.

165.    By September 2020, after working on BGF without pay for nearly two years, and having suffered significant financial damages from Hurricane María, Boyd experienced financial difficulties because he was being forced to repay family funds and loans undertaken on behalf of BGF in the amount of $750,000.

166.    Unlike Boyd, the Lópezes received pay from ITS during these two years.

167.    Following the agreement being put in place to fully finance BGF's projects, the Lópezes with Economou's assistance, sensing Boyd's weakened financial position and the opportunity to take majority control of BGF and benefit fraudulently from Boyd's past financial contributions, refused to reimburse the loans that Boyd had taken out on behalf of BGF.

168.    López Vidal agreed to buy a percentage of Boyd's participation personally through a Membership Interest Purchase Agreement.

169.    López Vidal did not have the money to pay for Boyd's shares under the MIPA, but, at that point, Boyd did not know that, and López Vidal concealed that fact from Boyd.

170.    When Boyd sold 7.5% of his interest in GFC to López Vidal, López Vidal led Boyd to believe that López Vidal was purchasing that interest with the López family's money.

171.    Based on their tax returns and personal financial statements, the López family did not have $750,000.

172.    Through fraudulent means, aided and abetted by Banco Popular, the Lópezes managed to reduce Boyd's post-closing net percentage of BGF shares from 44% to approximately 31.1% and threatened him with litigation into closing the less than the advantageous transaction with Semillero Partners.

173.     Economou prepared false documentation that misrepresented the nature of the loans Boyd obtained on behalf of BGF.

174.     This falsified documentation was accompanied by threats by the Lópezes of specious litigation and threats to bankrupt Boyd if he did not comply within the timeline that was left to close the financing and repay the loans that Boyd had undertaken on BGF's behalf to launch BGF and buy the very gas rights that were the basis of BGF's entire value.

175.     Economou and the Lópezes engaged in this securities fraud, leveraging their knowledge that Boyd had taken a great personal financial risk to get BGF funded (which they themselves were incapable of financially and unprepared to do), while at the same time promising employment and a Board position to Boyd if he sold his interest to López Vidal to repay the startup loans Boyd had taken out to fund BGF.

176.     Banco Popular knew that the funds to pay for Boyd's MIPA did not come from López Vidal's account as López Vidal transferred money from either the BGF bank loan directly to himself or via ITS with the assistance of BGF's account manager at Banco Popular, Joval Rodriguez.

177.     The Lópezes effectively forced Boyd to pay for loans he undertook on BGF's behalf to start the company—for which the Lópezes invested no net equity —while coercing him into reducing his equity, all to gain control of BGF at the financial closing with Banco Popular and Capital One.

178.     The Lópezes' falsified documentation, threats of litigation, and fraudulent payment for the MIPA with loan money designated for the biorefinery also caused the negation of Lassers' rights to ownership under his SAFE note agreement with BGF as part of the MIPA agreement.

179.     In contrast, the Lópezes reimbursed themselves for every penny they spent on BGF plus the fraudulent usurious interest charges, and fraudulent personal expenses disguised as business expenses.

180.     This ownership reduction and promise of employment was ultimately reflected in a Membership Interest Purchase Agreement ("MIPA"), which Boyd signed shortly after receiving an executable copy from Jose Sosa of DLA Piper the afternoon of September 14th, 2020 at 1.30pm.

181.     MIPAs are used to set forth the relative interests of each member of the limited liability company and establish the parties' obligations to one another.

182.     The MIPA that Boyd and López Vidal signed provided that Boyd was to be a manager and director of GFC/BGF.

183.     López Vidal materially breached that provision of the MIPA by conspiring with Borschow and Ernesto Villanari of PRFG to preclude Boyd from being a manager.

184.     Borschow and Villanari later agreed that Boyd could be a subcontractor to meet the requirements of the bank and convertible noteholders for Boyd to be involved in the project.

185.     The MIPA also provided that Boyd was to be employed by GFC/BGF.

186.     López Vidal later provided a job description for Boyd to be the Director of New Business and Development.

187.     When Boyd accepted the position as a subcontractor, López Vidal materially breached that provision of the MIPA by ultimately refusing to provide the contractor job to Boyd which had been approved by the Board.

188.     Nonetheless, Boyd continued to work on behalf of BFG and GFC in the role of New Business and Development Director.

189.     GFC's attorney later denied that there was any obligation to hire Boyd as director, officer, and manager of the company.

47

190.    Days after the MIPA was verbally agreed upon on May 22, 2020, the Lópezes signed a new construction contract with their ITS/ASC Construction JV between themselves for $5 million and concealed it from Boyd in furtherance of the criminal enterprise. The previous vetted contract was for $4 million and signed by Boyd as CFO of BGF.

191.    The Lópezes fraudulently financed the $750,000 MIPA payment by increasing the construction cost by $1 million to be paid by BGF, and, with the assistance of Rodríguez at Banco Popular, used the proceeds from BGF's loans to purchase Boyd's interest in BGF in violation of the terms of the loan and the requisites of the New Market Tax Credits.

192.    This new construction contract was not revealed to Boyd or the board until September 14, 2020, as part of the closing of the Banco Popular construction loan for the biorefinery.

193.    This scheme also allowed López Vidal to use funds provided from BGF's loan to buy Boyd's interest for his own personal benefit. To achieve this, López Vidal relied on the undisclosed construction contract for $5 million, on fraudulent drawdowns, and fraudulent expense reports supported by fraudulent drawdown certificates for construction and equipment payments created with Economou's help and approved and enabled by Rodríguez at Banco Popular.



**MIPA Payment Flow Chart**

**Fraudulent Drawdowns throughout the Construction**

194.    Banco Popular's manager, Rodríguez, approved the fraudulent drawdowns, and, knowing that they were fraudulent, joined in the fraud engineered with the Lópezes.

195.    Nestor Rivera Galguera is the independent engineer hired by Banco Popular and paid by BGF to inspect the construction progress for each drawdown.

196.    The Lópezes and Rodríguez handpicked Nestor Rivera Galguera.

197.     López Vidal and Economou submitted drawdowns for work that Rivera Galguera had falsely certified as done.

198.     The ITS/ASC Construction JV was paid the full $5 million of their contract in November of 2021. It was impossible to finish the construction since the bulk of the equipment for the biorefinery did not arrive until February of 2022, yet Rivera Galguera, Economou, and López Vidal respectively falsely certified incomplete construction as complete, approved payment for work that was not done, submitted fraudulent certifications and fraudulent requests for new drawdowns that Rodríguez at Banco Popular approved.

199.     On March 8, 2022, in Drawdown 13, Olmar López-Vidal certified the ITS/ASC Construction JV was paid in full. After being certified as paid in full, Banco Popular continued to lend another $3.1 million to BGF to pay the ITS/ASC Construction JV, with an expired, fully paid contract, ignoring their own disbursement controls and credit agreement.

| | |
|---|---|
| GC Contract | $361,338.22 |
| Retainage | $7,839.00 |
| Total | $369,177.22 |
| GC Completed To Date | $5,000,000.00 |
| Retainage | $50,821.36 |
| Total | $4,949,178.64 |
| GC Contract | 5,000,000.00 |
| Balance to Finish | 50,821.36 |
| Direct Loan - Net Available | 437,594 |

Signature: 
Olmar Lopez Vidal (Mar 9, 2022 10:57 AST)

200.     Eighty percent of the biorefinery equipment arrived in February 2022, yet Olmar López Vidal fraudulently told the GFC Board nearly a year earlier, in March of 2021, all of the equipment was on-site.

201.    In fact, López-Vidal had only made the initial equipment down payment to TPI in January of 2021 which started a year-long custom manufacturing process.

202.    Economou further conspired with the Lópezes and Rodríguez to benefit from a paid position as CFO; receive commissions on money raised; create fraudulent drawdowns to enrich himself and potentially benefit from the sale of the company.

203.    Having fraudulently obtained control of GFC/BGF, the Lópezes took other improper actions to consolidate their control of the operations and finances of GFC/BGF and further exclude Boyd from management.

204.    Boyd had taken the lead in the contracting process on behalf of BGF and had set the terms and engaged with third-party subcontractors and suppliers.

205.    However, following the change in control of BGF, the Lópezes eliminated any role Boyd previously had in managing the supplier and construction contracts, pricing, schedules, and payments, further shutting him off from any decision-making within GFC/BGF.

206.    Without Boyd's oversight, the Lópezes were free to divert these critical funds at the Project's inception and potentially negotiate kickbacks for their own benefit.  The two main equipment biorefinery equipment contracts were not executed for over four months after the September 15, 2020, financial close.

207.    The López' failure to start work immediately caused the Project to fall behind and led to a series of cascading events that put the Project and its contracts into default.[2]

208.    Spending the money on the MIPA instead of the construction was not only a fraud against Boyd – whose shares were purchased with bank loan or equity investors funds intended for the Project – and against GFC/BGF, whose funds were diverted, but also bank fraud since the

[2] Defaulting on the contract with El Coqui Landfill to build the biorefinery may eliminate the ability of GFC/BGF to exercise the right to expand to additional landfills and cause further, significant harm to the other shareholders including the loss of the New Market Tax Credit benefits.

Lópezes provided false information to the bank, averring that the loan money would go to the construction of the biorefinery in violation of 18 U.S.C. §1344, not to increasing López Vidal's ownership percentage in BGF.

## Detailed Description of the Fraud and Semillero's Participation in the Criminal Enterprise for its Economic Benefit

209.     On September 24, 2019, López Vidal fraudulently certified that the New Markets Tax Credits Project Intake form was true, accurate, and complete, when it listed Gregory Boyd as the Chief Operating Officer of BGF.

210.     By the time the NMTC loan money arrived at BGF, Boyd was not even a manager, much less an officer of BGF.

211.     On September 2, 2020, López Vidal, through ITS, sent Economou at BGF a fraudulent invoice for design services not rendered for $200,000.

212.     López Vidal had told Nexus PMG, Semillero's technical due diligence team on June 12, 2020 that it would take months after the equipment vendors received down payments to perform a detailed design. Galileo did not receive its down payment until December 22, 2020 and TPI did not receive its down payment until January 26, 2021. Since the equipment vendors did not receive their down payments until at least three months after the September 2, 2020 invoice, ITS could not have incurred the design fees by that date

213.     Knowing the design invoice was fraudulent, Economou approved its payment.

214.     The money for the equipment vendors' down payments should have been sent immediately following the September 15, 2020 financial close according to the drawdown schedule and flow of funds prepared by Cohn Resnick CPA for the NMTC lenders.

215.     Delaying these down payments by four and five months caused the project significant delays and unbudgeted costs.

216.     Each day the landfill burns gases which could have been processed by the biorefinery to generate over $20,000 in profits to BGF or $600,000 a month, or a cost of $2.4 million for the four-month delay in making the order.

217.     The Lópezes were meant to make the equipment vendor contract down payments immediately after the financial closing.

218.     Their delay of over seventeen months from the signing of the December 2018 landfill gas agreement to the September 2021 financial close to execute these contracts was yet another critical failure.

219.      BGF missed the Commercial Operations Date in August of 2021, which added a monthly $30,000 minimum gas payment, $4,166 in rent, and liability for a $5 -10,000 electric bill from El Coqui as well as $100,000 in interest payments between the direct and NMTC loans.

220.      Each month of delay cost BGF $600,000 in lost profits and $170,000 of unfunded costs and overhead, a monthly total of $770,000.

221.     The Lópezes' construction delays have cost $770,000 x 17 months = $13.09 million.

222.     Banco Popular's proposed Amendment 5 extends the completion date yet another two months, or $770,000 x 19 months = $14.63 million. Yet, manifesting their support of the RICO enterprise, Semillero, PRFG, and CDVCA, the preferred shareholders and Board members with control of BGF, have done nothing to change the management or the ITS/ASC Construction JV.

223.    The López fraud, criminal acts, and incompetence while diverting funds to their own projects, and the theft of Boyd's MIPA have cost over $13.09 million to date, which continues to compound to the detriment of BGF and the Plaintiffs every day.

224.    The four and five-month delay became magnified by the lack of work on the biorefinery construction.

225.    Not ordering promptly as required by the drawdown schedule constituted fraud by the Lópezes.

226.    Instead of doing their jobs for BGF, they were embezzling money for their other projects and lifestyle.

227.    During this period of time, the Lópezes built the distillery for World Spirits founded by son Carlos López and his wife Claudia Ferrer. The Lopezes also developed a directly competing project in the Dominican Republic.  No wonder they did not have time to keep the BGF project on schedule and out of default.

228.    At the December 17, 2020, Board Meeting Olmar López Vidal said: "Made initial payments on Galileo and TPI equipment". This was a lie to cover up the fraud, López Vidal did not pay Galileo until the following day, and he did not pay TPI until 2021.

229.    López Vidal stated that that by end of January **2021** BGF should be able to coordinate a site visit for everyone, and BGF would have all the major equipment on site.  This was another lie to cover up the López' fraudulent conduct of diverting the loan money to pay the MIPA, construct World Spirits and their competing project in the Dominican Republic.

230.    The majority of the equipment did not arrive until February **2022,** as López Vidal knew it would not be on time because the equipment takes more than a year to build and ship overseas.

231.     When Boyd saw the detailed design invoice for $200,000 paid, he asked to see the detailed design. Borschow said no.

232.     Boyd then asked that Borschow have Nexus PMG (who did the original technical due diligence for Semillero) review the design, and again, Borschow refused.  The design review would have revealed fraud, incompetence, the lack of variable gas controls, lack of a cooling and water plan and may have stopped the waste of millions of dollars and years of time.  Borschow acted to conceal the fraud.

233.     The September 15, 2020, Credit Agreement among BGF, the Lender, and Banco Popular as administrative agent, provides that Banco Popular shall not disburse money for capital expenditures in excess of the annual budget unless there is equity provided by an approved advance, equity, or insurance that would cover the expense.

234.     The BGF Board did not approve the 2020 or 2021 annual budgets and never provided audited financial statements for the same periods of time.  This makes every drawdown a violation of the credit agreement perpetrated by a fraudulent collaboration among the Lópezes, Semillero, PRFG, CDVCA and Banco Popular in furtherance of the enterprise.

235.     On November 11, 2021, Boyd's and Lassers's Attorney Vanessa Carballido delivered to Banco Popular at their request, evidence of fraud by their employee, fraud in the drawdown requests and violations of the credit agreement with BGF.

236.     Rather than investigate the documentation of the fraud on the drawdown, Banco Popular deposited a drawdown loan of $677,094.76 the next day (November 12, 2021) into BGF's operating account.

237.     On November 16, 2021, the ITS/ASC Construction JV's drawdown certificates and payments exceeded the $5 million cost on the construction contract.

238.     Semillero, PRFG and CDVCA, the preferred shareholders and Board Members, chose to not hold the ITS/ASC Construction JV accountable for the cost overruns and delays, thereby perpetuating the RICO Enterprise.

239.     Banco Popular has knowingly and fraudulently been violating the credit agreement in furtherance of the enterprise to decrease the value of BGF for the benefit of Banco Popular, and the Semillero Defendants, enriching the Lópezes who are enjoying the collateral benefits of setting up World Spirits and Green CO2 Dominicana in the Dominican Republic with, at least in part, federal taxpayers' money, since at least mid-September of 2021.

240.     The Credit Agreement established the project's termination date as September 15, 2021, twelve months after the loan closed. The ITS/ASC Construction JV's contract ended in June of 2021.


## Semillero Letter on the MIPA Securities Fraud

241.     On October 28, 2020, Borschow, on behalf of Semillero, sent López Vidal a letter saying that, "On September 23rd, 2020, you informed us in person that you, Olmar López-Gómez ("López-Gomez") and Gregory Boyd ("Boyd") entered into a certain Membership Interest Purchase Agreement (the "MIPA") dated as of September 11, 2020. In the MIPA, you and López-Gómez agreed to purchase from Boyd 1,012,500 Class A Common Units (the "Boyd Units") of GFC Holdings Limited Liability Company ("GFC" or the "Company") for a purchase price of $750,000."

242.     Lassers had informed Borschow of the MIPA in June 2020.

243.     Boyd informed Borschow of the MIPA in a lunch meeting on Monday, August 30, 2020, at Numero Uno restaurant.  Boyd expected the MIPA payment before the September 15, 2020, financial close.

244.     Borschow continued in the October 28, 2020, letter, "On September 15, 2020, Semillero Investment Fund I, LLC ("Semillero") entered into a Series A Preferred Units Purchase Agreement with GFC for the purchase of certain Series A Preferred Units (the "Purchase Agreement"). As an inducement into the Purchase Agreement, GFC made certain representations and warranties to Semillero. Particularly, under Section 2 of the Purchase Agreement and Section 2.2 of the Purchase Agreement's Disclosure Schedule, GFC made certain representations, warranties and disclosures regarding GFC's capitalization, including all issued and outstanding units of GFC and the holders thereof. Such Section 2.2 of the Purchase Agreement's Disclosure Schedule indicated that on September 15, 2020, you were the holder of the Boyd Units. However, that appears not to have been the case."

245.     Borschow then implied that he was in the dark about the MIPA until after the closing, when the contrary was true. He wrote, "In an electronic communication sent by you to Semillero dated October 1, 2020, you provided Semillero with certain wire transfer confirmation documentation which evidenced that the transaction contemplated in the MIPA closed on September 16, 2020. As a result, you acquired the Boyd Units as of such date and not as of September 15, 2020, the day GFC made the mentioned material representation."

246.     Borschow, when he wrote the October 28, 2020, letter, knew that López Vidal did not have the money to buy Boyd's shares in September 2020.

247.     Borschow then pointed out what the Plaintiffs have alleged herein, "The foregoing facts show that the Purchase Agreement and its Disclosure Schedule contained a material misrepresentation. We expected that as part of our on-going diligence, GFC and GFC's founders

57

would have disclosed the existence of the MIPA and the agreement to transfer of the Boyd Units before the closing of the transaction contemplated in the Purchase Agreement."

248.     Borschow concluded by stating "Such misrepresentations allow for potential claims arising from the anti-fraud provisions of the 1933 Securities Act, including but not limited to: liability under Rule 10b-5 as the agreement to transfer the Boyd Units; the agreement to hire him as Director of New Business and Development of GFC; and to appoint him as an officer and Manager of the Company were all material information that was omitted from Semillero as it made its decision to enter into the Purchase Agreement and acquire its Series A Preferred Units. GFC's misrepresentations also allow an investor like Semillero to seek remedies under the Purchase Agreement's indemnity provision."

249.     Even though Borschow was aware of the MIPA, his implied threat of legal action, because he knew that the MIPA had not been paid for with López Vidal's funds, but instead with funds for the bank loan designated for construction, gave him significant leverage over López Vidal and the Board's actions.  Semillero and the Lópezes did not disclose the October letter to Plaintiffs until Semillero sent it to Boyd in January of 2021.

250.     López Vidal fraudulently signed the Disclosure Agreement to the Credit Agreement. The Disclosure Agreement falsely stated that López Vidal owned 35% of BGF on September 14, 2020, and that Gregory Boyd owned 31.5% as of that date.

251.     López Vidal did not acquire any percentage of Boyd's interest in BGF until a day later when he had access to the money from BGF's funds at Banco Popular designated for the construction of the biorefinery. Banco Popular had to have known this and permitted the transfers because all the transfers originated at Banco Popular.

**Fraud Committed by the Financiers of the Project, Banco Popular & Semillero**

58

252.     George Economou was paid a 1% fee for organizing the investors and convertible noteholders into the Project, even though he is not registered as an agent to do so.

253.     Economou fraudulently overpaid himself the 1% fee and did not deduct over $900,000 in New Market Tax Credit fees from the money raised.

254.     Economou conspired with the Lópezes to present Banco Popular, shareholders, and convertible noteholders with false financial statements, bank loan drawdown schedules, and drawdown certificates from May 2020 until the present.

255.     On May 13, 2020, when one of the convertible noteholders, Waleska Rivera, on behalf of Danosa Caribbean Inc. ("Danosa"), asked Economou for an analysis of her projected return on investment with the Semillero equity, Economou provided her with fraudulent information.

256.     Prior to Economou sending that false information to Ms. Rivera, Boyd set forth exactly why the projections were fraudulent in an email to inter alia, Economou, López Vidal, and López Gomez.

The email said:

Melba asked for "the cashflows for the Danosa investment **AFTER** the Semillero investment."

George attached a **BEFORE** Semillero investment schedule which was accurate at the time it was created in 2019.  This schedule does not answer Melba's question and is no longer accurate.  It could [be] misconstrued as an attempt to cover-up the reduced returns.  The SEC calls this securities fraud.  I know no one is trying to commit fraud, so let's fix this now.

When the 11 corrections/updates to the errors/old data below are made, the return is at least $70,000 less a year than we presented last summer and again in the model George attached.

The calculation below assumes BEST conditions: convert at bank closing, construction in 12 months and we use the unchanged (lower CAPEX) budget. With all the 11 changes listed below the **return will be 20% lower than presented in green**:

| BGF Humacao - ($USD) | | Construction | | | | P-Stock Projecte |
|---|---|---|---|---|---|---|
| Year | | 1 | 2 | 3 | 4 | 5 |
| Convertible common distribution | 5% | | $30,759 | $32,972 | $35,132 | $34,308 |
| | | 0% | 1.54% | 1.65% | 1.76% | 1.72% |

The moment Melba and Waleska realize the returns on the common stock, they will not convert and request the $1 million back after we pay $240,000 in interest. This scenario is not in our pro forma and would be very detrimental to the budget.

Based on the model attached above by George, the return expectations is about $106,018 a year for 5%, not $30,759

| Net Cash Flow | $2,120,364 | $2,208,873 | $2,175,262 | $2,142,304 | $2,107,960 | $3,170,337 |
|---|---|---|---|---|---|---|

There is plenty of return on this project to fix this, but only if we work with accurate budgets and models.

We need to do sensitivity analysis on: pay them back the $1 million or give them a better return upon conversion. Our best choice is to provide like 6% return guaranteed or (not and) actual dividends, whichever is higher in exchange for converting now and potentially saves $390,000 in interest payments.

Both scenarios will require a discussion with Semillero as well.

1) This cashflow does not show the Semillero 8% payment on $6.5 million = $520,000 a year to Semillero and the 50% of available dividends, the management holdback of 50%.

2) Does not show the $25.2 million dollar refinance at the end of year 7 with the company not having 35% in retained earnings to refinance.

3) Does not show the $25.2 million in debt in years 8-18.

4) The project budget is low by millions of dollars before any equipment changes

5) Sources and Uses does not include the Act 73 Credit nor the Flexitank investment and uses incorrect budget.

6) The convertible note interest payments in the model are not correct and do not include Flexitank

7) The Tranche B principal payments are wrong and do not match page 33 of the Banco Popular agreement

8) The amortization is not correct and does not amortize the El Coqui Contract (Company's biggest asset)

9) Model increases the $CO2$ production in year 6 without the associated capital expense to buy more equipment.  The OPEX does not increase to maintain the additional equipment.

10) Divide by Zero error year 14 and beyond

11) Model assumes 12 month construction despite contracts showing longer times.

Good luck with the new model, please share when done and the result of the sensitivity analysis to propose an increased return to Waleska in exchange for conversion now.

257.    Economou knowingly and with the intent to defraud concealed BGF's obligation to repay Semillero Partners three times its investment plus a guaranteed 8% preferred return and 50% of all distributable cash each year in the information he provided Ms. Rivera.

An accurate analysis would have notified Ms. Rivera that she would make a 1.5 to 2% return at best across the next 15 years. This low return would not justify the risk of the $1 million Danosa invested.

258.    However, Economou fraudulently represented to Ms. Rivera that Danosa would be making double-digit returns for fifteen years, thereby violating 18 U.S.C. §1343.

259.    In mid-May 2020, Boyd became aware of Economou's analysis before Economou sent it and told him in writing not to send it because it was fraudulent.

260.    Boyd copied José Sosa, BGF's attorney engaged by the Lópezes, on his communication to Economou asking him not to send the fraudulent analysis.

261.    As a consequence of Boyd calling out Economou's misrepresentation, the Lópezes and Economou cut Boyd from all company information.

262.    These Defendants cut Boyd off even though he had just negotiated a $3 million discount from Galileo, the company contracted to supply the equipment to separate the landfill gas into liquid natural gas, methane and carbon dioxide.

263.    The Lópezes also instructed BGF's suppliers not to talk to Boyd.

264.    The Lópezes' attorneys have twice written to Boyd to say they will sue him for violating the Defend Trade Secrets Act.

265.    Boyd complained in writing to Borschow about the lack of checks and balances at BGF.

266.    At the first weekly BGF Management meeting with Borschow, Gualberto Rodríguez of Semillero Partners and López-Vidal on October 8, 2020, Borschow again responded that the checks and balances measures that Boyd was requesting were not needed. Boyd was never

invited back to another BGF Management meeting after raising conflicts of interest and the need for financial controls.

267.     The types of checks and balances that Boyd requested, based on his background working with auditors and his knowledge of IRS requirements to justify the grant of the New Market Tax Credits were:

a.     Three bids for all work to be performed.

b.     No check signing for related businesses by the party related to that business: That is, no Lopez family member should have been approving and making payments to a Lopez family-owned or related business.

c.     No direct business with the Lopez construction company, ITS, unless it was at arms-length, overseen by independent third-party board members.

d.     Pass regular audits from reputable firms

268.     Borschow did concede that BGF needed audited financial reports, and that Kevane Grant Thornton was the only top tier firm that could do it properly. Boyd agreed.

269.     However, there is still no audited financial report for 2020 for an accounting that involves, at most, a few hundred entries.

270.     Nor is there an audited financial report for 2021.

271.     Despite no audited financial statements and no access to any financial details by the Plaintiffs, GFC and BGF still somehow submitted tax returns for 2020 and listed Boyd as the contact for Hacienda.  Boyd had nothing to do with the preparation of the tax returns. Since the returns were submitted electronically, this is wire fraud.

272.     Defendants have taken multiple steps to frustrate any financial oversight of BGF and GFC. For example, in the spring of 2021, the auditors, Kevane Grant Thorton, said that they did not have the information necessary to complete the audit.

273.     Among other things, the auditors wanted the minutes from the Board of Directors meetings.

274.     Economou allowed the auditors to review what he claimed were the board minutes in the ITS office but refused to provide copies to the auditors.

## Details of other Payment Frauds

275.     When Danosa signed a convertible note in GFC on August 16, 2019, López Vidal instructed Boyd to pay Torres & Garcia, PSC the sum of $6,817.25 for the related attorneys' fees, which Boyd did on behalf of BGF on September 19, 2019.

276.     On September 23, 2020, López Vidal fraudulently submitted an expense report to BGF, fraudulently paying himself for the Torres and Garcia bill for which BGF had already paid.

277.     Knowing that the invoice was fraudulent, Economou approved it.

278.     On October 5, 2020, ITS submitted the below expense statement with a $6,000 interest charge and another with an $8,000 interest payment to Olmar López Vidal. There is no agreement with the bank or the other owners to pay interest on expenses. The interest rate is usurious. BGF paid the ITS Expenses directly to Olmar López-Vidal via a check signed by López Vidal and his father:

| Vendor | Date | Amount | Service |
|---|---|---|---|
| Interim Finance Repayment 2 | 2/14/2020 | $    20,000.00 | Deposit made to BGF to pay the following transactions |
| Danosa Caribbean | 2/14/2020 | $    20,000.00 | Part Quarterly Interest Paid Convertible Note |
| SubTotal | | $    20,000.00 | |
| Unapproved Usury Interest | | $      6,000.00 | 30% |
| Total | | $    26,000.00 | |



0500040621   10/06/20   26,000.00

| Vendor | Date | Amount | Service |
|---|---|---|---|
| Interim Finance Repayment 1 | 11/14/2019 | $ 40,000.00 | Deposit made to BGF to pay the following transactions |
| Secretario de Hacienda | 11/14/2019 | $ 152.08 | Permits |
| Mileyshmi Holder Viera | 11/15/2019 | $ 121.63 | Expenses by Mileyshmi Holder |
| Rmiller | 11/15/2019 | $ 6,000.00 | Professional Services |
| Gregory Boyd | 11/18/2019 | $ 1,800.00 | Expenses by Gregory Boyd |
| Mileyshmi Holder Viera | 11/18/2019 | $ 1,088.10 | Professional Services |
| Danosa Caribbean | 11/21/2019 | $ 30,000.00 | Quarterly Interest Paid Convertible Note |
| Hector Ayala | 11/25/2019 | $ 990.27 | Professional Services ($77.73 was paid with existing balance of BGF Account) |
| SubTotal | | $ 40,000.00 | |
| Unapproved Interest | | $ 8,000.00 | 20% |
| Total | | $ 48,000.00 | |



0500040623   10/06/20   48,000.00

279. Knowing that the invoice was fraudulent, Economou approved it. In fact, Economou named all questionable payments, Interim Finance Repayment in the accounting records.

280. In Exhibit 1 of the Memorandum in Opposition to the TRO, Olmar Vidal López states:

18. The General Contractor ("GC") for the Project is a joint venture, consisting of the following entities: International Technical Services, Inc. and Accurate Solutions Corp.

19. I have no pecuniary interest in either of the two corporations comprising the joint venture referred to above. Specifically, I am not a shareholder of either corporation, nor a member of their respective Boards. I also have no pecuniary interest in the affairs of co-defendant Distributed Power Innovators, JV.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed in San Juan Puerto Rico on June 7, 2022

OLMAR LÓPEZ VIDAL

281. If Olmar López Vidal has no pecuniary interest in International Technical Services, Inc, then why does he directly receive reimbursements for ITS deposits to BGF?

282.     Olmar López Vidal submitted receipts for drawdown 2, where he reimbursed himself for work done for another company, Green Fuels Corp. The work predates Biomass Green Fuel's formation in 2018.

ENG. OLMAR LOPEZ VIDAL
GREEN FUELS CORP.
URB. ALTAMIRA
584 ALDEBARAN ST.
SAN JUAN, PR 00920
CC: LUIS HERNANDEZ

**Statement of Account as of April 8, 2019**
In Reference To:  Matter No. 9380-0001- Environmental General

| Date | Description | Amount | Balance |
|------|-------------|--------|---------|
| 2/1/2017 | Invoice #21446 | 1,078.00 | 1,078.00 |
| 3/1/2017 | Invoice #21497 | 555.00 | 1,633.00 |
| 4/1/2017 | Invoice #21551 | 878.75 | 2,511.75 |
| 6/1/2017 | Invoice #21642 | 1,715.50 | 4,227.25 |
| 7/1/2017 | Invoice #21697 | 46.25 | 4,273.50 |
| 8/1/2017 | Invoice #21749 | 1,017.50 | 5,291.00 |
| 9/1/2017 | Invoice #21799 | 1,202.50 | 6,493.50 |
| 10/1/2017 | Invoice #21856 | 138.75 | 6,632.25 |
| 3/1/2019 | Invoice #22673 | 185.00 | 6,817.25 |
| | Ending Balance | | 6,817.25 |
| | Amount Due | | 6,817.25 |

| Current | 30 Days | 60 Days | 90 Days | 120+ Days |
|---------|---------|---------|---------|-----------|
| $0.00 | $185.00 | $0.00 | $0.00 | $6,632.25 |

283.     On November 5, 2020, Olmar López Vidal and Olmar López Gomez fraudulently signed and U.S. mailed a check for $39,160 from BGF to Engineered Parts and Services for an obligation of the ITS/ASC Construction JV, even though the contract between the ITS/ASC Construction JV and BGF provides that BGF is not responsible for this purchase.

284.     Economou approved the invoice, knowing that it was false.

67

285. On May 28, 2021, López Vidal and López Gomez fraudulently signed and U.S. mailed a check for $18,216 to Duenas Trailers for an obligation of the ITS/ASC Construction JV, thereby committing mail fraud.

286. Economou approved the invoice, knowing that it was false.

287. On May 28, 2021, López Vidal and López Gomez fraudulently signed and U.S. mailed a BGF check for $17,996 to Lluch Fire and Safety for an obligation of the ITS/ASC Construction JV, not BGF.

288. Economou approved the invoice, knowing that it was false.

289. On June 15, 2021, López Vidal fraudulently wired from the BGF operating account a payment to Semillero Investment fund $20,060 for advisory services the company did not receive because Borschow never rendered such services, so those parties committed wire fraud as part of the criminal enterprise.

290. Economou approved the invoice, knowing that it was false.

291. On July 15, 2021, López Vidal and López Gomez fraudulently signed and U.S. mailed a BGF check for $39,160 to Engineered Parts and Services for an obligation of the ITS/ASC Construction JV, not BGF, thereby committing mail fraud on behalf of the criminal enterprise to drain funds from BGF.

292. Economou approved the invoice, knowing that it was false.

293. On July 29, 2021, López Vidal and López Gomez fraudulently signed and U.S. mailed a BGF check for $46,912.33 to Diamond Scientific for an obligation of the ITS/ASC Construction JV, not BGF thereby committing mail fraud on behalf of the criminal enterprise to drain funds from BGF.

294. Economou approved the invoice, knowing that it was false.

295.    On August 6, 2021, López Vidal and López Gomez fraudulently signed and U.S. mailed a BGF check for $65,289.60 to Q2 Technologies for an obligation of the ITS/ASC Construction JV, not BGF thereby committing mail fraud on behalf of the criminal enterprise to drain funds from BGF.

296.    Economou approved the invoice, knowing that it was false.

297.    On August 11, 2021, López Vidal and López Gomez fraudulently signed and U.S. mailed a BGF check for $8,120 to Victor Narvaez Maldonado for an obligation of the ITS/ASC Construction JV, not BGF thereby committing mail fraud on behalf of the criminal enterprise to drain funds from BGF.

298.    Economou approved the invoice, knowing that it was false.

299.    On August 12, 2021, López Vidal and López Gómez fraudulently signed and U.S. mailed a BGF check for $140,736.99 to Diamond Scientific for an obligation of the ITS/ASC Construction JV, not BGF thereby committing mail fraud on behalf of the criminal enterprise to drain funds from BGF.

300.    Economou approved the invoice, knowing that it was false.

301.    On August 17, 2021, López Vidal and López Gómez fraudulently signed and U.S. mailed a BGF check for $5,772.63 to Activated Carbon Order for an obligation of the ITS/ASC Construction JV, not BGF thereby committing mail fraud on behalf of the criminal enterprise to drain funds from BGF.

302.    Economou approved the invoice, knowing that it was false.

303.    On September 7, 2021, López Vidal and López Gómez fraudulently signed and U.S. mailed a BGF check for $18,500 to John Deere for an obligation of the ITS/ASC Construction JV,

not BGF thereby committing mail fraud on behalf of the criminal enterprise to drain funds from BGF.

304.    Economou approved the invoice, knowing that it was false.

305.    On September 8, 2021, López Vidal and López Gómez fraudulently signed and U.S. mailed a BGF check for $6,997.50 to SIMCOX for an obligation of the ITS/ASC Construction JV, not BGF thereby committing mail fraud on behalf of the criminal enterprise to drain funds from BGF.

306.    Economou approved the invoice, knowing that it was false.

307.    On September 13, 2021, López Vidal and López Gómez fraudulently signed and U.S. mailed a BGF check for $1,133.80 to Power Sports for an obligation of the ITS/ASC Construction JV, not BGF thereby committing mail fraud on behalf of the criminal enterprise to drain funds from BGF.

308.    Economou approved the invoice, knowing that it was false.

309.    On September 13, 2021, López Vidal and López Gómez fraudulently signed and U.S. mailed a BGF check for $2,750 to Ramon Pizzini for an obligation of the ITS/ASC Construction JV, not BGF thereby committing mail fraud on behalf of the criminal enterprise to drain funds from BGF.

310.    Economou approved the invoice, knowing that it was false.

311.    On September 27, 2021, López Vidal and López Gómez fraudulently signed and U.S. mailed a BGF check for $13,824 to Victor Narvaez Maldonado for an obligation of the ITS/ASC Construction JV, not BGF thereby committing mail fraud on behalf of the criminal enterprise to drain funds from BGF.

312.    Economou approved the invoice, knowing that it was false.

313.     On September 27, 2021, López Vidal and López Gómez fraudulently signed and U.S. mailed a BGF check for $6,090 to Victor Narvaez Maldonado for an obligation of the ITS/ASC Construction JV, not BGF thereby committing mail fraud on behalf of the criminal enterprise to drain funds from BGF.

314.     Economou approved the invoice, knowing that it was false.

315.     After ITS sold its office building in San Juan, it moved into Twenty One Century Building I.  BGF is paying the lease on the ITS office space. BGF has an office at the El Coqui Landfill.  This is fraud.



316.     López Vidal made the following 63 fraudulent payments via U.S. Mail on behalf of ITS/ASC with Economou's approval, despite Economou's actual knowledge that each of the below transactions was fraudulent, made after all the money to fulfill the ITS/ASC Construction JV contract was spent. The chart below is current as of mid-August 2022. Fraudulent payments exist after this date and will continue as long as Banco Popular lends and the Lópezes control the checking account.

| Date | Payee | | | |
|---|---|---|---|---|
| 11/16/2021 | International Technical Services | | $95,000.00 | |
| 11/16/2021 | International Technical Services | | $204,750.01 | |
| 11/20/2021 | Accurate Solutions | | | $121,612.63 |
| 11/20/2021 | Accurate Solutions | | | $480,294.12 |
| 11/20/2021 | Engineered Parts and Services | $117,480.00 | | |
| 11/20/2021 | Ervin Torres | $5,720.00 | | |
| 11/20/2021 | Servco | $2,830.21 | | |
| 11/22/2021 | Interest Payments | | | |
| 11/30/2021 | El Coqui Landfill Company | | | |
| 12/1/2021 | | | | |
| 12/2/2021 | | | | |
| 12/3/2021 | International Technical Services | | $746.54 | |
| 12/8/2021 | Victor Narvaez Maldonado | $8,640.00 | | |
| 12/15/2021 | International Technical Services | | $471.89 | |
| 12/15/2021 | International Technical Services | | $1,857.46 | |
| 12/20/2021 | International Technical Services | | $2,500.00 | |
| 12/20/2021 | Rimco | $3,700.00 | | |
| 12/20/2021 | | | | |
| 12/21/2021 | Accurate Solutions | | | $114,135.00 |
| 12/21/2021 | Rimco | $3,988.80 | | |
| 12/30/2021 | EC Waste | | | |
| 12/30/2021 | Equipnet Inc | $4,947.80 | | |
| 12/30/2021 | PCS | $16,484.00 | | |
| 1/3/2022 | | | | |
| 1/13/2022 | PCS | $23,504.00 | | |
| 1/20/2022 | | | | |
| 1/21/2022 | Twenty one century building | $1,820.29 | | |
| 1/24/2022 | Innova Industrial Contractor | $845.00 | | |
| 2/1/2022 | | | | |
| 2/9/2022 | Twenty one century building | $645.91 | | |
| 2/9/2022 | Twenty one century building | $1,820.29 | | |
| 2/17/2022 | Victor Narvaez Maldonado | $5,519.25 | | |
| 2/17/2022 | Victor Narvaez Maldonado | $8,500.00 | | |
| 2/22/2022 | | | | |
| 3/1/2022 | | | | |
| 3/8/2022 | Drawdown 13 certified Construction Contract Paid in Full | | | |
| 3/10/2022 | International Technical Services | | $55,567.00 | |
| 3/10/2022 | International Technical Services | | $305,771.00 | |
| 3/10/2022 | International Technical Services | | $302,250.00 | |

| Date | Description | Amount | |
|------|-------------|--------|---|
| 3/10/2022 | Celfire | $8,275.39 | |
| 3/10/2022 | Twenty one century building | $2,090.29 | |
| 3/10/2022 | Victor Narvaez Maldonado | $18,186.00 | |
| 3/10/2022 | Victor Narvaez Maldonado | $41,450.00 | |
| 3/10/2022 | El Coqui Landfill Company | | |
| 3/10/2022 | Berlin Ng Cortinas | $4,000.00 | |
| 3/10/2022 | Ches Services Corporation | $2,600.00 | |
| 3/10/2022 | CMA Architects & Engineers | $17,310.00 | |
| 3/11/2022 | El Coqui Landfill Company | | |
| 3/16/2022 | Olmar Lopez Vidal Served | | |
| 3/18/2022 | Ches Services Corporation | $2,500.00 | |
| 3/23/2022 | Jose Sanchesz | $70.00 | |
| 4/11/2022 | | | |
| 4/20/2022 | | | |
| 4/25/2022 | **Federal Complaint Filed** | | |
| 4/25/2022 | $1.1 million wired by BGF | | |
| 4/29/2022 | Industrial Fittings & Valves | $1,746.82 | |
| 5/2/2022 | | | |
| 5/4/2022 | NIC Engineering | $6,740.00 | |
| 5/20/2022 | | | |
| 4/21/2022 | CMA Architects and Engineers | $990.22 | |
| 4/27/2022 | Industrial Fittings & Valves | $1,786.48 | |
| 5/3/2022 | Jose Sanchesz | $70.00 | |
| 5/17/2022 | Jose Sanchesz | $70.00 | |
| 5/20/2022 | Victor Narvaez Maldonado | $9,000.00 | |
| 6/1/2022 | Jose Sanchesz | $70.00 | |
| 6/3/2022 | Guillermo Ramos | $5,000.00 | |
| 6/6/2022 | | | |
| 6/6/2022 | | | |
| 6/17/2022 | Alvarez Trading | $60,350.22 | |
| 6/17/2022 | NIC Engineering | $9,380.00 | |
| 6/17/2022 | Steel & Pipes | $3,991.70 | |
| 6/23/2022 | International Technical Services | | $150,000.00 |
| 6/23/2022 | Jose Sanchesz | $70.00 | |
| 6/23/2022 | Orlando Berrios Aponte | $2,520.00 | |
| 6/23/2022 | Professional Engineering Concepts | $14,774.24 | |
| 6/23/2022 | Twenty one century building | $6,748.54 | |
| 6/23/2022 | Victor Narvaez Maldonado | $35,312.50 | |
| 6/23/2022 | | | |

| | | | | |
|---|---|---|---|---|
| 7/1/2022 | Jose Sanchesz | $70.00 | | |
| 7/6/2022 | NIC Engineering | $6,924.59 | | |
| 7/7/2022 | Victor Narvaez Maldonado | $4,500.00 | | |
| 7/11/2022 | Rochet | $18,801.92 | | |
| 7/19/2022 | Victor Narvaez Maldonado | $7,875.00 | | |
| 7/20/2022 | | | | |
| 8/1/2022 | International Technical Services | | $145,000.00 | |
| 8/1/2022 | | | | |
| 8/9/2022 | Jose Antonio Gomez | $10,000.00 | | |
| 8/12/2022 | Alvarez Trading | $75,857.30 | | |
| 8/12/2022 | Orlando Berrios Aponte | $23,060.00 | | |

317.    As of mid-August 2022,

| BGF Out of Scope | ITS | ASC | Interest | Minimum Gas Payments |
|---|---|---|---|---|
| $1,186,458.96 | $4,398,080.52 | $1,952,293.77 | $1,020,450.22 | $313,804.44 |
| | | | | |
| | | | Total | **$8,871,087.91** |
| | | | Contract Maximum | $5,000,000.00 |
| | | | Amount owed BGF by ITS/ASC: | $3,871,087.91 |
| | | | Amounts paid to ITS/ASC and by BGF | $7,536,833.25 |
| | | | Amounts paid directly to ITS and ASC | $6,350,374.29 |
| | | | Amount paid to Distributed Power Innovators JV | 0 |
| | | | Amount loaned after Lopez Certified Construction GC Paid in Full | $2,815,681.07 |
| | | | | |
| * $4 million loaned AFTER Banco Popular was notified of fraud | | | | |
| This amount does not include the $10 million in revenue lost | | | | |
| Construction is NOT complete | | | | |
| Does not include the monthly electrical bills owed to El Coqui Landfill | | | | |

318.    To further the criminal enterprise, Banco Popular continued to disburse loan payments, even though it knew that the Lópezes and ITS/ASC with Semillero's consent had fraudulently submitted requests for loan money to which BGF had no legal entitlement.

### The Lópezes' Fraudulent Conduct with Banco Popular

319.    In addition to the previously detailed activities, Plaintiffs have discovered other illegal transactions between the Lópezes and co-defendants Joval Rodríguez - BGF's account manager at Banco Popular, ITS, and Carlos López Vidal.

320.    On December 31, 2018, entries made in GFC's Quickbooks accounting files contemporaneously reflect that Rodríguez deposited $30,000 into GFC's Banco Popular account.

321.    On January 9, and again on January 18, 2019, entries made in GFC's Quickbooks accounting files contemporaneously reflect that GFC, via a check signed by Olmar López Vidal, paid Rodríguez two checks of $33,000, for a total of $66,000.

322.    Copies of these transactions from the QuickBooks files and checks are set forth below:

| Date | Payee | Memo | Payment | Deposit | Reconciliation Status | Balance | Type | Account |
|---|---|---|---|---|---|---|---|---|
| 01/18/2019 | Joval Rodriguez | | 33,000.00 | | Reconciled | 138,579.19 | Bill Payment | Accounts Payable (A/P) |
| 12/31/2018 | Joval Rodriguez | Loan Shark for El Coqui Initial Payment of 150k total amount | | 30,000.00 | Reconciled | 111,337.13 | Deposit | El Coqui Initial Payment Shark Loan Payable |



323.    Loans at such usurious rates are criminal, and the U.S. Attorney in the Eastern District of Pennsylvania has prosecuted Defendants under RICO for violating state usury laws because of the use of the mail and the internet. 15CR236 U.S. v. Rubin.

324.    The entries made in GFC's QuickBooks accounting files contemporaneously reflect that the Lópezes paid their own construction company, ITS, $55,000 for a $50,000 18-day loan. Copies of these transactions from the QuickBooks files and checks set forth below:

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 01/18/2019 | International Technical Services | | 55,000.00 | | Reconciled | 28,579.19 | Bill Payment | Accounts Payable (A/P) |
| 01/18/2019 | Carlos Lopez Vidal | Carlos Lopez Vidal | 33,000.00 | | Reconciled | 105,579.19 | Bill Payment | Accounts Payable (A/P) |
| 12/31/2018 | Carlos Lopez Vidal | | | 30,000.00 | Reconciled | 141,337.13 | Deposit | El Coqui Initial Payment Shark Loan Payable |
| 12/31/2018 | International Technical Services | Loan Shark for El Coqui Initial Payment of 150k total amount | | 50,000.00 | Reconciled | 81,337.13 | Deposit | El Coqui Initial Payment Shark Loan Payable |







325. Despite Boyd and Lassers raising $525,000 in 30 days to complete the payment for BGF's gas rights contract with El Coqui Landfill, the Lópezes committed fraud and never informed Boyd, who was a 50% owner and CFO of BGF in 2018 and 2019, of the usurious interest being paid; the source of those funds; or Rodríguez' involvement.

326. Mr. Rodríguez also was responsible for the contracting of Nestor Rodríguez-Galguera, an engineer who fraudulently certified that work was being performed to justify the drawdown certificates for BGF's loans for the benefit of International Technical Services, Inc. ("ITS").

327. In the March 2021 Board Meeting (Exhibit 1) Olmar López-Vidal, CEO stated and recorded in the minutes, "all equipment is ready to be installed and connected.

### CEO Report

- **Greg Boyd joined meeting at 2:20PM**

**Construction Project Status**
- 2nd concrete pour being done today and will have 3rd concrete pour next week
- All equipment is on site and ready to be installed and connected

328. In Nestor Rivera Galguera's May 28 2021, $1M Officer Payment Certificate:

3.    The original projected completion date of the Project was September 15, 2021. The current projected completion date of the Project is September 15, 2021.

4.    As of the date hereof, the completed construction percentage is 72.1%, which percentage is measured by a percentage of the Total Budget.

329.    While 72.1% of the budget was spent, 72.1% of the work was not done.

330.    Banco Popular continued to disburse the loan despite the fraudulent drawdown statements.

331.    Semillero, PRFG, and CDVCA remained steadfast in their support of the López' chicanery because that conduct furthers the goal of the RICO Enterprise of weakening BGF for its ultimate takeover.

332.    For the Drawdown 9 inspection on June 7, 2021, Rodriguez submitted a photo of a CO2 tank from a different project at a different location to justify the CO2 expenditures in the drawdown and to support López-Vidal's statement that. "all equipment was onsite…".

333.    See the top picture (Drawdown Certificate 9).  This picture is not a new tank.  There is no tank like this nor the white stained fence behind it at the BGF construction site.



**Project: BMGF, LLC**
**LFG to RNG and CO2 Humacao**
**Inspection Certificate 009**



CO₂ Process Unit Equipment



Site-B Power Generation and LNG storage area – Continuous Erosion & Sediment (CES) Control Plan implementation and pad concrete form outlines

The lower picture above is of Site **A**, a 1.1 acre site that will hold 80% of the equipment.

334.    Nestor Rivera Gualguera, Banco Popular's agent, fraudulently mislabeled Site A as Site B.  Site A is five times larger than B and missing the majority of the equipment and construction.  This picture contradicts López Gómez's CEO Report in the March 2021 Board Meeting at which he falsely stated that all the equipment was on site. Rivera Gualguera calls the

lower picture Site B which is a much smaller site to hide the lack of any equipment on the larger site three months after López Vidal told the Board that all the equipment was on site.

335. This picture of the empty Site A was taken **60 days before the Commercial Operations Deadline** of the first week of August 2021. It does not require much effort or expertise to drive by a 1.1-acre empty field to conclude these statements of near completion are lies. Defendants fabricated these lies support the fraudulent drawdowns, time and resources working on World Spirits and Green CO2 Dominicana in the Dominican Republic instead of BGF. To scam this many drawdowns on this scale requires collusion by the entire RICO Enterprise: Lópezes, Economou, Roberto Acosta, Joval Rodriguez of Banco Popular, Nestor Rivera Gualguera, Banco Popular's "independent engineer," Alex Borschow of Semillero and Ernesto Villarini of the Puerto Rico Fund for Growth, and CDVCA.

336. Banco Popular continued and continues to disburse money for construction after the General Contractor (ITS/ASC Construction JV) certified it was paid in full on March 9, 2022. See 198 to see Lopez Vidal's signed copy of the certification.

337. Banco Popular's December 30, 2022, Fifth Amendment to the credit agreement now extends the construction deadline to March 31, 2023, a full year after the "GC Contract," was paid in full for incomplete work.

338. BGF's accounting records show the General Contractor was actually paid in full on November 16, 2021, five months earlier than López Vidal certified.

339. On March 8, 2022, López Vidal certified fraudulently that the ITS/ASC Construction JV had received $5 million and been paid in full for the construction contract. This was fraudulent since ITS/ASC was paid $5 million on November 16, 2021.

340. On March 31, 2022, via email, Laura Medina of Banco Popular indicated that the bank was disbursing $1,484,006.16 for the 14th drawdown, four months after the construction

81

contract was paid in full in line with the enterprise's goal of maintaining the project afloat until the timing best-suited Defendants. This disbursement was fraudulent.

341.     The fourteenth drawdown request did not include a request to pay TPI and Galileo $1.1 million, so López Vidal's wires of that amount of money on April 25, 2022, the day the Plaintiffs filed their lawsuit were fraudulent.  These final payments are not due until after the Galileo and TPI equipment are commissioned and in production.  As of this date of this filing, the equipment is not commissioned, much less in production.

342.     Economou knew the drawdown 14 and wires to TPI and Galileo were fraudulent, yet he approved the request.

343.     The plaintiffs' counsel informed Javier Ferrer, Banco Popular's Chief Operating Officer of the fraud committed up to November 2021.

344.     The bank's counsel responded that it was investigating but has never provided the investigation results and continued to lend another $5.5m to BGF over the next 13 months.

345.     The bank further offered to meet with the loan parties to mediate a resolution and rejected Boyd's averment that the bank's participation in the fraud voided his guarantee. The plaintiffs indicated their willingness, but the mediation never occurred.

346.     Banco Popular has amended its Credit Agreement four additional times with material misrepresentations since the Plaintiffs filed their original Complaint, lending money to BGF so that it can pay its loan to them.

347.     Banco Popular lent that money in the face of the motion for a temporary restraining order after the Plaintiffs realized that López Vidal had paid equipment suppliers more than a million dollars for uncommissioned equipment when he had put the bank loan into default.

348.    In the TRO Response, Economou, López Vidal and López Gómez never denied they or any of their entities received kickbacks from the $1.1 million wires which improperly concluded contracts totaling over $11 million.

349.    When has a bank ever loaned a borrower money to pay the very loan in default in the face of serious wrongdoing?

350.    Banco Popular submitted a third, fourth and fifth amendment to the credit agreement requiring a capital call of an additional $1.5 million and then $1 million repayment. All three amendments state that there was no pending litigation which if adjudicated against the Lópezes would affect the loan, which is a material misrepresentation, and bound Boyd as a guarantor without his consent or signature.

351.    The Third Amendment, which was contingent on the capital infusion of $1.5 million by September 15, 2022 and BGF's completion of the biorefinery failed. Banco Popular presented a Fourth Amendment to the Credit Agreement requiring a repayment of $1 million and construction completion by December 31, 2022. Neither payment nor completion occurred by December 31, 2022.

352.    Without waiting for Amendment 3's requisite of a $1.5 million investment to occur, Banco Popular deposited $980,943.46 into BGF's bank account on November 16, 2022.

353.    On December 5, 2022, Banco Popular deposited $65,972.35 and then withdrew the same amount on the same day to pay itself for the loan interest.

354.    Despite the failure to cure: the default of credit agreement 7.1 (e) when the Plaintiffs reported drawdown fraud on November of 2021, of Amendment 4's required $1 million repayment, the default on the $1.5 million required by Amendment 3 and the failure to meet the construction completion deadlines, Banco Popular issued Amendment 5 on December 30, 2022,

which extends the deadline to March 31, 2023, compounding further losses to BGF, all without Boyd's consent as a guarantor.

355.     Why would Banco Popular take this risk? Because Banco Popular wants to earn more interest and fees and gain control over the renewable natural gas from the Project for its own off-grid buildings at below-market prices, which it could do with or without foreclosing on the loan.

356.     On October 21, 2022, Banco Popular's CEO, Ignacio Alvarez, touted the bank's vision in a ten-minute marketing video in obtaining these rights without mentioning the fraud with which Banco Popular has both collaborated and initiated in order to keep its below market contract for renewable natural gas from BGF.

### The Role of Semillero Partners and Borschow

357.     Borschow and Semillero Partners conspired with the other Defendants by refusing to require the Lópezes to produce audited financial statements and to share contract and basic operating information.

358.     Borschow and Semillero Partners also conspired with the other Defendants by refusing to hold any annual shareholder meetings as required by both the GFC Holdings and Biomass Green Fuels operating agreements.

359.     With their actions, Borschow and Semillero Partners affirmatively acted to suppress the rights of minority shareholders.

360.     Conspiring with the Lópezes/Banco Popular's forgery and fraud afforded Semillero Partners and Borschow the opportunity to make BGF financially vulnerable; which in turn

devalued BGF; and gave Semillero the chance to buy more ownership of BGF on the cheap using its rights as a preferred investor.

361.   Borschow has not performed his fiduciary responsibilities for GFC or BGF, but Semillero has submitted fraudulent invoices for those services, Economou and López Vidal approved them and the bank has paid them.

362.   On Drawdown Certificate 9, on May 27, 2021, López Vidal submitted a bill for $20,000 from Semillero Investment Fund 1, LLC, which Economou approved, and Banco Popular paid.   It was wired on June 15, 2021

| 06-15 | 12106002501 | 210615002501000 -outgoing Wire | 20,060.00 |

363.   On Drawdown Certificate 10, on July 14, 2020, López Vidal submitted a bill for $10,000 from Semillero Investment Fund 1, LLC, which Economou approved, and Banco Popular paid.

**Semillero Ventures LLC**
1256 Ponce de Leon Ave. STE 102
San Juan, PR 00907

# INVOICE
# 1

| | | Date: | Jan 21, 2021 |
|---|---|---|---|
| Bill To: | | Payment Terms: | Upon receipt |
| **Biomass Green Fuels LLC** | | Due Date: | Jan 21, 2021 |
| C/O Olmar López-Vidal | | **Balance Due:** | **$10,000.00** |

| Item | Quantity | Rate | Amount |
|---|---|---|---|
| **Advisory services rendered to the Company during Q4 2020** | 1 | $10,000.00 | $10,000.00 |
| | | Total: | $10,000.00 |

Payment Instructions:
ACH Payments or checks.

Bank: Banco Popular de Puerto Rico
Account Name: Semillero Ventures LLC
Account Number: ▨▨▨▨
ABA Routing #: 021502011

364. For example, Borschow oversaw the elimination of accounting controls and the separation of duties, which enabled the Lópezes to sign checks and electronically transfer GFC/BGF's money among themselves and to other companies the Lópezes own without receipts or documentation in violation of 18 U.S.C. §§ 1343 and 1344.

365. Furthermore, Borschow has repeatedly and intentionally denied and allowed conflicts of interest between ITS, BGF, the Lópezes, CDVCA, Puerto Rico Fund for Growth and his own interests in BGF to proliferate in order to further the enterprise to undermine Plaintiffs.

366. When Boyd pointed out the conflicts of interest, Borschow asked Olmar López Vidal if he has any interest in ITS. López Vidal lied and said "no."

367.    Borschow could have easily verified the Puerto Rico Department of State Government records, which demonstrate that Olmar López Gómez is the president of ITS; Olmar López Vidal is the secretary of ITS; and Carlos López Vidal is the treasurer of ITS.

368.    Instead, Borschow declared that no conflict existed because he knew that the conflicts allowed the RICO enterprise to function, including allowing the fraudulent drawdowns to continue.

369.    By approving the conflicts of interest that were taking place within the GFC/BGF structure and by failing to separate duties and roles between family members with those conflicts of interest, Borschow conspired with the Lópezes and Banco Popular to perpetrate the financial frauds detailed herein.

370.    Borschow was the youngest ever director at BNP Paribas in New York, graduated with an MBA from MIT Sloan School of Management, and was the Director of Finance for Eataly in New York, where he built their budgets and designed and managed their $130 million financial reporting systems. Therefore, Borschow is a sophisticated businessman with the experience and background to know that his conduct contributed to the predicate felonies because that is what he intended.

371.    Borschow and Semillero Partners stand to gain financially from the Lópezes' criminal conduct.

372.    Borschow has personal financial gain to be made from his investment and management contract with Semillero Partner's private equity fund.

373.    Had Borschow wanted GFC/BGF to succeed, he would have held the Lópezes and Economou accountable for their lies, frauds and constantly missed construction deadlines. Borschow did not perform his fiduciary responsibility to GFC/BGF nor his investors in Semillero, but he fraudulently charged fees for doing so.

374. During the due diligence process on BGF prior to Semillero Partner's investment, Semillero Partners hired an independent third party, Nexus PMG, to perform technical due diligence.

375. As a result of that investigation, Nexus found the design to be incomplete and filled with many unanswered questions. Semillero sent a list of Nexus' questions to BGF via email on June 12, 2020.

376. The Lópezes said a detail design could not be completed until after the financial closing with Semillero Partners.

377. The Lópezes claimed that the closing would provide down payments to the equipment vendors, who would then perform their portion of the detailed design, thus allowing ITS to complete the overall technical design based on the equipment vendors' requirements.

378. Neither the GFC Board, nor EC Waste, nor Nexus, nor the project's technical due diligence assessors, ever saw the detailed design.

379. Boyd asked Borschow to have Nexus review the ITS completed detail design, and Borschow refused.

380. In addition, Boyd requested copies of the detail design, and the Lópezes never provided them.

381. These actions by Borschow demonstrate his conspiring and participating with the Defendants allowing them to divert funds from BGF, doing nothing to ensure a successful project by holding a third-party review of the design, and shutting Boyd out of the company, causing harm to Boyd and Lassers and to BGF/GFC.

382.     Semillero Partners' reaction to the death of Julio Reyes Salas and the Lópezes' lethal incompetence was simply to increase its investment, buying more of BGF below its true value.

383.     In pursuit of his own gain, Borschow has breached his fiduciary duties as a BGF board member, as a representative of Semillero Partners, and as an individual.

384.     Semillero Ventures required BGF to sign an Advisory Service Agreement. Below is the Scope of Work which was never delivered:

ANNEX A

SCOPE OF WORK

1. Consult with and advise the management of the Company, upon reasonable notice at reasonable times from time to time, on all matters relating to the operations of the Company.

2. Provide advice and guidance on any material development to or affecting the Company's business and affairs, such as significant changes in management personnel and compensation or employee benefits, introduction of new lines of business, important acquisitions, and the Company shall provide Semillero with the opportunity, on reasonable prior written notice, to consult with and advise the Company's management of his or her views with respect thereto.

3. Review financials and provide strategic guidance in financial planning and forecasting. Provide financial and strategic advisory when considering, or when the Company is in the process of, transactions encompassing disposal, acquisition or merging of businesses, their valuation or financial restructuring. Advise in financial management by supporting operational efficiencies.

4. Executive consulting and support on topics including corporate strategy, business planning, effective multi-disciplinary team collaboration and communication.

5. Advise on operating performance and competitive positioning by providing managerial skills development, executive coaching, customer engagement best practices and management system optimization.

6. Participate in the evaluation of market development plans, marketing campaign design, brand management and effectiveness analyses, new product/service assessments, process workflow design and optimization, salesforce development strategy.

7. Advise on corporate governance best practices including financial reporting, Board package preparation, and communication with the Board of Directors.

385.     When asked for the minutes of the advisory meetings, Semillero and López Vidal refused to provide any since the services described above were never delivered.

89

386.    Private Equity firms, at any hint of project delays, cost overruns, or problems with audited financials, would have replaced the GFC Management team and ITS/ASC Construction JV **long before** the Plaintiffs filed suit in April of 2022.

387.    Semillero was a paid management consultant with knowledge and involvement well beyond the Board.  This management consulting role gave Borschow early access to the problems yet he did nothing to stop the crimes. Even a hands-off Board, if it were honest, would wake up to the evidence in the complaint, perform their investigation, and change the ITS/ASC Construction JV and GFC management.

388.     Under Borschow's direction the Board decided to double down. PRFG/CDVCA, Semillero and the other Board members went beyond ignoring their fiduciary responsibility and chose to continue to participate in the crimes. For the Board of GFC/BGF the saying made famous by Watergate is appropriate: "It's not the crime, it's the cover-up."

389.    The Board chose the Lópezes' ITS/ASC Construction JV with an inherent conflict of interest and then chose to not change management nor the construction company after learning that the López' failure to meet deadlines and being excessively over budget was not due just to sheer incompetence but rather to their swindling and pocketing the money.

390.    The Board then issued a $1.4m Capital Call for Green CO2 to cover-up the Lópezes' theft of the opportunity of the project in the Dominican Republic and illegal use of the New Market Tax Credit money from the Humacao census tract to a foreign country.

391.    The Board's cover-up of the crimes is a significant reason Plaintiffs sue the Board members to vindicate GFC/BGF's rights.


**Diversion of BGF's Funds through the Lópezes' Web of Multiple ITS Entities**

392.     Via the use of web of multiple ITS companies, fraudulent invoices, billing, and drawdown certificates from the ITS/ASC Construction JV, the Lópezes transferred funds paid from the proceeds of the loan drawdowns to their personal accounts, to other ITS entities, or to another ITS entity established in the Dominican Republic in violation of 18 U.S.C. §1957.

393.     Through their ITS entities or other associated entities, the Lópezes were the recipients of millions of dollars from the fraudulent drawdowns signed for by both the Lópezes and Roberto Acosta of ASC, approved by co-defendant Joval Rodríguez as GFC/BGF's loan officer at Banco Popular.

## PROJECT ENGINEER CERTIFICATE FOR PAYMENT

In accordance with the Contract Documents, based on on-site observations and the data comprising this application, the Architect certifies to the Owner that to the best of the Project Engineer's knowledge, information and belief the Work has progressed as indicated, the quality of the Work is in accordance with the Contract Documents, and the Contractor is entitled to payment of the AMOUNT CERTIFIED.

**AMOUNT CERTIFIED** ..................................................................................     $838,067.88

*(Attach explanation if amount certified differs from the amount applied. Initial all figures on this Application and on the Continuation Sheet that are changed to conform with the amount certified.)*

**Project Engineer:**
By: _____    *Roberto D Acost*    Digitally signed by Roberto D. Acosta
DN: OU=Lic 13782, O=Accurate
Solutions, CN=Roberto D. Acosta,
E=racosta@accurate.works
Date: 2020-09-22 14:12:59
Date: __September 22, 2020__

This Certificate is not negotiable. The AMOUNT CERTIFIED is payable only to the Contractor named herein. Issuance, payment and acceptance of payment are without prejudice to any rights of the Owner or Contractor under this Contract.

# PROJECT ENGINEER CERTIFICATE FOR PAYMENT

In accordance with the Contract Documents, based on on-site observations and the data comprising this application, the Architect certifies to the Owner that to the best of the Project Engineer's knowledge, information and belief the Work has progressed as indicated, the quality of the Work is in accordance with the Contract Documents, and the Contractor is entitled to payment of the AMOUNT CERTIFIED.

**AMOUNT CERTIFIED** ............................................................................................ $621,844.00

*(Attach explanation if amount certified differs from the amount applied. Initial all figures on this Application and on the Continuation Sheet that are changed to conform with the amount certified.)*

**Project Engineer:**

By: _____  Date: November 30, 2020

Digitally signed by Roberto D. Acosta
DN: OU=Lic 13782, O=Accurate Solutions, CN=Roberto D. Acosta, E=racosta@accurate.works
Date: 2020-11-30 21:57:42

This Certificate is not negotiable. The AMOUNT CERTIFIED is payable only to the Contractor named herein. Issuance, payment and acceptance of payment are without prejudice to any rights of the Owner or Contractor under this Contract.

# PROJECT ENGINEER CERTIFICATE FOR PAYMENT

In accordance with the Contract Documents, based on on-site observations and the data comprising this application, the Architect certifies to the Owner that to the best of the Project Engineer's knowledge, information and belief the Work has progressed as indicated, the quality of the Work is in accordance with the Contract Documents, and the Contractor is entitled to payment of the AMOUNT CERTIFIED.

**AMOUNT CERTIFIED** ............................................................................................ $696,019.00

*(Attach explanation if amount certified differs from the amount applied. Initial all figures on this Application and on the Continuation Sheet that are changed to conform with the amount certified.)*

**Project Engineer:**

By: _____  Date: February 23, 2021

Digitally signed by Roberto D. Acosta
DN: OU=Lic 13782, O=Accurate Solutions, CN=Roberto D. Acosta, E=racosta@accurate.works
Date: 2021-02-24 09:47:51

This Certificate is not negotiable. The AMOUNT CERTIFIED is payable only to the Contractor named herein. Issuance, payment and acceptance of payment are without prejudice to any rights of the Owner or Contractor under this Contract.

**BIOMASS GREEN FUELS**
**FLOW OF FUNDS**
**SIGNATURE PAGES**

Agreed and Approved:

BANCO POPULAR DE PUERTO RICO,
a banking corporation organized under the
laws of the Commonwealth of Puerto Rico

By: _____
Name: Joval F. Rodríguez Barnes
Title: Commercial Relationship Officer

394.    The Dominican ITS entity was dissolved in December 2020 shortly after substantial funds were withdrawn from the BGF accounts by the Lópezes and paid to one or several of their many ITS entities.

395.    López Vidal violated 18 U.S.C. §2314 by transporting stolen money to the Dominican Republic, but the Plaintiffs do not currently know the dates when he violated that law or the amounts of money involved because that information is exclusively in the Defendants' possession.

396.    López Vidal and López Gómez violated 18 U.S.C. §2315 by receiving that stolen money in the Dominican Republic, but the Plaintiffs do not currently know the dates when they violated that law or the amounts of money involved because that information is exclusively in Defendants' possession.

397.    It was at this point in time, (around December 2020 to mid 2021), that the Lópezes acquired certain high-value assets in the Dominican Republic, namely a $2.5 million dollar mansion at La Romana, in the exclusive gated neighborhood of Casa De Campo Resort, and a 60-foot yacht moored in the Casa De Campo marina.

398.     There are multiple ITS, Green CO2 and World Spirts related entities owned by the
Lópezes, all with the same or similar names to evade taxes, government authorities, courts, banks,
and investors by transferring money within accounts without an ACH trail and by using physical
checks to deposit in accounts outside of Puerto Rico and outside of the United States:

(i)      International Technical Services Inc., (a Delaware entity), founded on June 3,
         1982.

(ii)     I.T.S. Corporation, (a Puerto Rico entity) founded on September 13, 1985, and still
         active.

(iii)    International Technical Services Inc., (a Puerto Rico entity), founded June 5, 2018
         and still operating.[3]

(iv)     International Technical Services Corp, founded on June 20, 2014 and closed on
         February 9, 2018.

(v)      ITS International Technical Service SRL, (an entity in the Dominican Republic),
         founded on December 20, 2010, and closed on December 20, 2020.

(vi)     Green CO2 LLC (a Puerto Rico entity).

(vii)    Green CO2 Dominicana, LLC (a Puerto Rico entity)

(viii)   Green CO2 Dominicana, SRL (a Dominican Republic entity).

(ix)     Green Hydrogen, LLC (a Puerto Rico entity founded on March 22, 2022.

(x)      World Spirits, LLC (A Puerto Rican entity fund by Carlos López and his wife
         Claudia Ferrer to distill Bravada Vodka)

(xi)     Distributed Power Innovators JV (Signed a contract with BGF to do the
         construction as a 50-50 joint venture between International Technical Services, Inc.
         and Accurate Solutions Corp. Entity)

---

[3] Owns 50% of the ITS/ASC Construction JV.

(xii) Accurate Solutions Corp. (Roberto Acosta, President, 50% owner in Distributed Power Innovators JV)

399.     There are multiple bank accounts for the multiple International Technical Services entities, including at least one known account with Banesco, a Venezuelan-owned bank with multiple branches in the Dominican Republic and associated branches in Puerto Rico and Florida.

400.     On March 11, 2022, after Banco Popular accepted a Second Amendment to the Credit Agreement without Boyd's signature, with Boyd continuing as a guarantor of the loan, López Vidal deposited a BGF check for $305,771 with control number 002584 he and his father had signed into the International Technical Services, Inc. account number ☒☒☒☒ at Banesco in Coral Gables, Florida. This may be a different ITS entity with a similar name.

401.     On March 11, 2022, after Banco Popular accepted a Second Amendment to the Credit Agreement without Boyd's signature, without Boyd's consent as a guarantor of the loan, López Vidal deposited a second BGF check for $302,240 with control number 002585 he and his father had signed into the International Technical Services, Inc. account number ☒☒☒☒ at Banesco in Coral Gables, Florida. These funds are in excess of the $5 million construction contract, should not have been given to ITS, and were never used for the biorefinery construction. Economou assisted the Lópezes with this fraud.

402.     Many other BGF checks made out to International Technical Services were also deposited in the Banesco account.

403.     In 2021, the Lópezes opened a Banco Popular account for International Technical Services Corp., a corporation canceled in 2018.

404.     The various ITS entities appear to have been used as shell companies, for the evasion of taxes, and laundering of the proceeds of the Lópezes' frauds.

405.    The Lópezes have a history of swindling partners, using the ITS shell company structure in Ballester Hermanos Inc. v Olmar López Gómez et al. Case # SJ2018CV03188 Estado Libre Asociado De Puerto Rico Tribunal De Primera Instancia Centro Judicial De San Juan Sala Superior, where they took $158,000 for a generator in October 2017 from Ballester Hermanos, but did not deliver it, and then bounced the check they gave to refund the money.

406.    They were accused of having engaged in similar, but less pervasive, fraudulent behavior in Douglas Fertilizer & Chemical Inc., vs. Olmar López Gómez and ITS., INC, a Puerto Rico Corporation – Case NO.: 3:08-cv-01076-JAG Filed in Orange County, Florida and then transferred to the Puerto Rico Federal District Court.

407.    On his 2018 SBA personal financial statement, which he filed electronically and signed under penalty of perjury, López Gómez failed to disclose the May 2018 litigation against him and his wife by Ballester Hermanos, Inc.

408.    In the SBA statement López Gómez avers that his personal income is $100,000.

409.    In his 2018 tax return, López Gómez states that he has no salary and has taxable income of only $4,182.

410.    In June 2018, López Gómez sold his condominium in Guaynabo for $550,000 and netted over $213,000.

411.    López Gómez did not report the capital gain from the sale of his condominium on his 2018 tax return. This constitutes wire fraud because López Gomez filed his return electronically.

### The Fraudulent Diversion of BGF's Funds within Puerto Rico

412.    In drawdown 3 submitted on October 21, 2020, the Lópezes reimbursed themselves for the $18,000 that Boyd paid in permitting fees ($14,000) and customs fees ($4,000) for

equipment that arrived before the closing of BGF's loans with Banco Popular and Capital One. This amounts to nothing more than swindling and theft from BGF.

413.    In December 2018, ITS assigned Carlos López Vidal, Olmar López Vidal's brother and Olmar López Gómez's son, to be the construction project manager of the biorefinery and introduced him to the El Coqui management staff as such.

414.    Carlos López Vidal, however, never performed any material work nor attended the construction project meetings with EC Waste/El Coqui.

415.    To excuse their delay and distract from their misconduct, the Lópezes have frequently claimed that COVID precluded the BGF biorefinery from being built, and they cited the pandemic for the alleged inability of the ITS/ASC Construction JV to perform its work on the Project.

416.    The Lópezes failed to mention that they ordered the major equipment for the project four and five months late.

417.    On-time orders would have been executed by the manufacturers long before Covid might have affected their operations.

418.    At the very same time they were claiming they could not perform their work for the Project due to COVID, the Lópezes and ITS were actively developing and building the World Spirits project owned by their son and brother, Carlos López Vidal.

419.    On November 9, 2021, Carlos López Vidal and his wife, opened World Spirits, LLC a "boutique vodka distillery," selling a product named Bravada.

420.    The Bravada distillery's website boasts of having been able to construct their project despite delays in equipment supply and other COVID-related problems.

421.    ITS, López family members, and their construction subcontractors, performed the construction on the Bravada distillery using the funds and resources that were supposed to be allocated to GFC/BGF, in violation of 18 U.S.C. §1344, notwithstanding their obligations to the federal government, Plaintiffs, and to Banco Popular to complete the construction of the GFC/BGF Project. [Of course, we now know that Banco Popular is and was unconcerned about the López' noncompliance.]

422.    This fraud can be demonstrated by the records of the El Coqui Landfill.

423.    The El Coqui Landfill is a 24/7/365 secure site. The only access point is a guardhouse which logs entry and exit.

424.    The security logs show that during the six months following the September 15, 2020 financial closing, the ITS/ASC Construction JV averaged being on the construction site a mere 2.5 hours per week.

425.    However, the ITS/ASC Construction JV's fraudulent drawdowns, detailed herein, billed BGF for substantial construction that was supposedly performed during this period for a total of $1,630,575 by ITS and $1,195,915 by ASC.  Simply put, much of these funds were not being used for the construction of the refinery as the Credit and Disbursing Agreements required and as claimed by ITS/ASC; they were being fraudulently diverted by the Lópezes and Acosta.

426.    While ITS was supposedly performing substantial construction for BGF and being paid for that work but not performing it, ITS was performing substantial construction for the World Spirits distillery and their Green CO2 project development in the Dominican Republic with Brugal and Linde Praxair.

427.    The bills for construction to BGF by ITS were actually used to build the World Spirits distillery.

98

428.    Today, Carlos López Vidal and Claudia Ferrer Tañón own World Spirits, LLC, a company likely making millions of dollars in profits from the sale of Bravada vodka, profits that Plaintiffs believe are generated from diverting federal funds intended to produce renewable energy in a high poverty area of Puerto Rico.  The news article regarding the opening quoted López saying they were funded by a private investor with $1.5 million.  What private investor would not want to participate in a grand opening with the Governor? But that private investor has never been publicly named.

**ITS's Numerous Failures, Incompetence, and Fraudulent Misrepresentations**

429.    The Lópezes falsely told investors that ITS was uniquely qualified to design and build the renewable biorefinery.  In December of 2022, years after the original construction deadline, BGF attempted to hire Venture Engineering and Construction to help finish the project.

430.    ITS has built landfill gas to energy installations for Conwaste.

431.    Such an operation requires only a small fraction of the sophistication required for a biorefinery compressing LNG and making beverage-quality CO2.

432.    Semillero Partners and Borschow never verified the Lópezes and ITS's fraudulent claims about ITS's capability and experience, despite being told that the Lópezes spent money designated for the Project on the ITS/ASC Construction JV construction bond and other expenses outside the approved scope of the flow of funds schedule at an October 8, 2020, Management meeting.

433.    Contrary to their claims, neither the Lópezes nor ITS had ever built a biorefinery.

434.    Relying upon the Lópezes' false representations about their alleged expertise in bio-gas refineries, the GFC/BGF Board, led by Borschow, never inspected the equipment or approved

any multi-million-dollar equipment contracts. By failing to do so, they violated their fiduciary duties to the company and the minority shareholders to oversee the Lópezes, Economou and ITS.

435.    To date, apart from the Lópezes, no one has seen these contracts or any commission agreements associated with them.

436.    ITS was so unqualified and financially weak, that it had to use the credit and operational history of another company, ASC, to obtain its construction bond.

437.    The DPI JV contract for the biorefinery expired in June 2021. ITS, ACS, Acosta, the Lópezes, Banco Popular, Borschow and Economou are intentionally operating without a valid contract for the biorefinery construction.

438.    The entire $5 million construction budget was spent by November 16, 2021, and a total of $29 million has been allegedly spent on the Project.

439.    Yet the construction of the Project is only 80% complete and 16 months late.

440.    ITS performed very little work on the biorefinery because it was diverting ITS's subcontractors and the Banco Popular loan money for BGF into World Spirits and into the Lópezes' competing Green CO2 project in the Dominican Republic. These actions violate 18 U.S.C §§ 1344, 1957, 2314, and 2315.

441.    The Project's electricity generation deadline was August 7, 2021 and has still not been met.

442.    ITS undersized the power systems needed for the project so dramatically that it required a fourth power generator, with an additional cost of over $430,967.

443.    The generator purchased to meet the commercial operations date has been on-site at the landfill since February 28, 2020, for 34 months and is still not operating. A typical implementation of a Jenbacher generator is 90 days plus 30 days of commissioning.

444.     Galileo Technologies is the largest equipment provider to BGF.

445.     Galileo provides its own landfill gas pre-treatment system integrated into its equipment including software supervisory control and data acquisition.

446.     Instead of using Galileo's integrated system, the Lópezes insisted on using their own home-grown, custom-built pre-treatment system which does not integrate with Galileo's equipment, is more expensive and, to date, still does not work.

447.     There have been other accidents that demonstrate that ITS and the Lópezes are neglecting and mismanaging the Project.

448.     The construction contract requires that all equipment follow the National Electric Code ("NEC") and American Society of Mechanical Engineers ("ASME") construction standards.

449.     The NMTC Disbursement Agreement code requires compliance with the building practices of the community, which would include Puerto Rico's 2018 Construction Code, NEC and ASME.

450.     On April 5, 2021, CMA Architects & Engineers sent ITS a copy of a report from Berlin NG CMA which it had received on March 10, 2021.

451.     The report concluded that the tank that ITS was installing should add a new slab of four to twelve inches of concrete inserted over the original slab and anchored with vertical rebar as designed by CMA Architects.

452.     To the Plaintiffs' knowledge, this work has not been carried out as required.

453.     ASME mandates that tanks for industrial gases have pressure relief valves to prevent tank ruptures.

454.    During pressure testing of the ITS pretreatment system in September 2021, an ITS-built tank blew up and pulled itself out of its concrete anchors. The photographs below demonstrate this accident and the resulting damage:





455.    The ITS-built tank is not ASME-compliant.

456.    Without access to independent third-party inspection, it is impossible to know the degree of sub-standard work and improper equipment located on the biorefinery site, a site that will process 700,000 metric tons of volatile methane annually.

457.    Plaintiffs continue to learn of further neglect in the form of substantial design flaws by ITS and the Lópezes in connection with the Project.

458.    Over three years after the Project began, ITS requested that El Coqui Waste assist ITS with an additional 18,000-40,000 gallons of water daily for the Project.

459.    This significant requirement was not in the design, budget, or project plans and, if allowed, will require a permitting process that could possibly cause months or even years of delays.

460.    ITS's fraudulent conduct, ineptitude, and failure to generate electricity by the contract commercial operations start date have put BGF in contract default multiple times.

461.    In addition, as of December 2022, ITS's failures and delay have created additional costs of $550,000 in fees payable to El Coqui Landfill, $1.2 million to Banco Popular in additional interest and $12 million in lost revenue which were not budgeted for and which continue to accumulate.

462.    El Coqui Landfill commissioned an independent engineering audit on July 26, 2022, by Venture Engineering and Construction.

463.    Olmar López Vidal was present for the audit and representatives from EC Waste: Mark Johnson, COO, Jamie Jaen, Vice President and Jaime Santos, Engineer.

464.    G. Kurt Miller of Venture Engineering and Construction performed the audit.

465.    The audit focused on LNG and did not examine the beverage quality $CO_2$ installation.

466.    The audit found that site A has no power, water or landfill gas.

467.    The main power transformer for Site A is not on the site, and BGF needed to know if it had been ordered.

468.    In over two years of funded work and $8.5 million spent on the construction of a $5 million contract, nothing works or is complete.

469.    Generating and distributing electricity, water and landfill gas are the main tasks of the ITS/ASC construction JV team.

470.    According to the Venture Engineering report the Lópezes still have not designed the water system and does not seem to know its own requirements, source of water or permitting requirements.

471.    Site B has significant safety issues including a large methane storage tank that "jumps around" when pressurized, the gas analyzer is not connected, the controls between the landfill gas flare and the biorefinery are not automated and none of the valves or controls are labeled.

472.    Venture estimated that with suitably skilled staffing, the missing items available, and the design issues resolved that the LNG would require 20-26 weeks to finish. The Venture estimate does not include the completion and certification of the beverage quality CO2. This contradicts Olmar López Vidal's then stated completion estimate of October 15, 2022, which he confirmed in early October, knowing that completion by that date was impossible.

473.    Semillero, CDVCA, Puerto Rico Fund for Growth, Nestor Rivera, Joval Rodríguez and Bank Popular are responsible for not performing their fiduciary responsibilities while enriching themselves in the RICO Enterprise.

474.    Instead of using Venture's likely accurate prediction of a finish date in five to six months provided all the equipment and resources are there; the Defendants stated in the latest Credit Agreement – the Fourth Credit Amendment that the biorefinery would be operational by December 31, 2022.

475.    The biorefinery is not operational.

**More Details of Banco Popular's Participation in the Criminal Enterprise**

476.    BGF is required to submit audited financial reports to Banco Popular to receive the drawdowns from the construction loan.

477.    Attorney Vanessa Carballido in November of 2021 delivered evidence of BGF's fraud to the legal department at Banco Popular. In January 2022, after having two months to investigate the fraud information, despite not receiving BGF's audited financial information for

2020 or 2021, 100% of the construction contract paid and only 20% of the biorefinery equipment being on-site, in violation of its Disbursing Agreement as to the New Market Tax Credits, Banco Popular continued to disburse the construction loan, which the ITS/ASC Construction JV falsely self-certified was near complete. The project is over seventeen months past the August 7, 2021, Commercial Operations Deadline and double the original construction budget.

478. In light of the information provided, Banco Popular should have concluded that the Project was at serious risk.

479. On information and belief, Banco Popular never informed Capital One, or PCC-SUB CDE 13, LLC the lenders of the New Market Tax Credit funding, of the fraud that the Lópezes and their co-conspirators have committed.

480. On information and belief, Banco Popular continued to disburse the loan because the Lópezes have committed to sell renewable liquified natural gas for the bank's off-grid power generation and renewable energy credits far below market value.

481. Banco Popular has spent over ten million to take their two largest office buildings off the electrical grid.

482. Indeed, it was only when Banco Popular committed to this off-grid project that it agreed to finance the construction loan and act as Disbursement Agent for the New Markets Tax Credit loan to BGF.

483. Banco Popular wants the renewable natural gas, for which it will receive environmental credits, and BGF is the only source in Puerto Rico.

484. On October 1, 2022, El Nuevo Día published an interview with Ignacio Alvarez, CEO of Banco Popular touting Banco Popular's supply of renewable natural gas from the Humacao biorefinery.

485.    https://www.elnuevodia.com/negocios/banca-finanzas/notas/banco-popular-apuesta-al-gas-metano-para-generar-energia/

486.    Alvarez is a founding partner in the law firm which bears his name and represents Banco Popular in this litigation, Pietrantoni Mendez & Alvarez LLC.

487.    PMA prepared all of Banco Popular's agreements and amendments with GFC/BGF.

488.    Amendments 3-5 to the Credit Agreement deny that, if resolved adversely to Defendants, this litigation could have any material effect on BGF.


**Usurpation of the Brugal Opportunity, Diverting BGF's Resources to Green CO2**

489.    At an October 2020 board meeting, the Lópezes sought permission from the GFC Holdings Board, which included representatives from Semillero Partners and the Puerto Rico Fund for Growth, to use BGF's funding for a CO2 project for the Brugal distillery in the Dominican Republic.

490.    This very same CO2 opportunity in the Dominican Republic had been previously identified by López Vidal to Boyd in 2019 as an opportunity for BGF.

491.    At that board meeting, the Puerto Rico Fund for Growth denied the Lópezes' request because its funding of projects is limited to those within the U.S.

492.    Additionally, funding of New Market Tax Credit projects is limited to specific census tracts within the U.S. and the diversion of federal funds to the Dominican Republic violates Section 45D(c)(2) of the Internal Revenue Code.

493.    The Lópezes commingled the New Market Tax Credits funds - earmarked exclusively for equipment used in Puerto Rico - with the general construction funds in one account, which Banco Popular allowed them to do, in violation of the Disbursement Agreement.

494.    When López Vidal learned that BGF's federal funding precluded BGF from constructing a site there, López Vidal decided to pursue the opportunity for himself with BGF's money, without disclosing his intentions to BGF/GFC.

495.    Green CO2 is already a participant in the Federal New Market Tax Credit program as a put and call buyer.

496.    López Vidal is listed as the Sole Member of Green CO2:

```
        IRS DEPARTMENT OF THE TREASURY
            INTERNAL REVENUE SERVICE
            CINCINNATI  OH   45999-0023

                                                Date of this notice:  06-15-2020

                                                Employer Identification Number:

                                                Form:  SS-4

                                                Number of this notice:  CP 575 G
            GREEN CO2 LLC
            OLMAR J LOPEZ VIDAL SOLE MBR
            584 ALDEBARAN STREET                For assistance you may call us at:
            SAN JUAN, PR  00920                 1-800-829-4933
```

497.    López Vidal spent BGF's time, including paying consultants and his own expenses in the Dominican Republic with BGF funds, creating Green CO2 Dominicana SRL so that Green CO2 Dominicana could contract with the Brugal Rum company solely for his benefit.

498.    Defendant López Vidal owns 100% of Green CO2 Dominicana, SRL in the Dominican Republic and Green CO2 Dominica, LLC in Puerto Rico per the corporate records. López Vidal told the IRS he is the Sole Member of the Green CO2 LLC.  Why would he go to the time and expense to create and maintain two entities of the same name in different countries?

499.    Even though using New Market Tax Credit funds outside the U.S. violates federal law, on December 15, 2020, López Vidal made a presentation to the leadership of Brugal Rum, that contemplated the use of some of the federal funds for the construction of a project in the Dominican Republic which directly competes with BGF.

500.    The Brugal project uses the same CO2 off taker as BGF at the El Coqui Landfill, Linde Praxair.

501.    In the PowerPoint presentations on behalf of Green CO2, López Vidal made false representations to Brugal Rum, the distillery owner, that the project owner and funder was GFC Holdings, which in fact, had been prohibited by its board from investing in the Dominican Republic. These PowerPoint presentations contained the following representations:



# Executive Summary



- Green $CO_2$ LLC. (Green $CO_2$) is presenting Brugal & CO. S.A (Brugal) a long term master plan to reduce their carbon footprint and to reduce carbon dioxide emissions at their San Pedro de Macoris Distillery

- With this master plan Brugal & CO. S.A will be able to reduce their carbon emissions up to 70-75% by year 2025

- Not only Brugal & CO. S.A will reduce their carbon footprint but they will also generate additional revenue from the $CO_2$ sales and this consortium will supply a new steam boiler with <u>no</u> capital expenditure by Brugal



## Thank You

Olmar López Vidal

GFC Holdings LLC./ Green $CO_2$ LLC.

President/CEO

olv@greenfuelspr.com

(787) 637-4375







# Resumen Ejecutivo



- GFC Holdings LLC, en común acuerdo con la empresa Green CO2 y Brugal & Co., tiene como objetivo re-establecer la planta de producción de dióxido de carbono en forma líquida ($CO^2$) y producción de hielo seco; localizada en los predios de la destilería de ron de Brugal en San Pedro de Macorix, R.D.

- La planta de producción de $CO^2$ (Green CO2) fue construida en el año 2009 con el objetivo de vender $CO^2$ líquido a empresas de refrescos en la República Dominicana y Haití; además a usuarios industriales de $CO^2$ líquido y/o Hielo Seco.

- Dióxido de Carbono ($CO^2$), es un gas que se forma naturalmente en el proceso de fermentación y es un sub-producto de las destilerías de ron.

© 2018 GFC Holdings LLC.

2



**6**

**Executive Summary**

- GFC Holdings LLC, by mutual agreement with Green CO2 and Brugal & Co., proposes to reestablish the liquid carbon dioxide ($CO^2$) and dry-ice plant located on the campus of the Brugal rum distillery in San Pedro de Macorix, Dominican Republic.

- The CO2 (Green CO2) plant was built in 2009 for the purpose of selling liquid CO2 to soft drink companies in the Dominican Republic and Haiti; as well as for industrial users of liquid $CO^2$ and/or dry ice.

- Carbon dioxide ($CO^2$), is a gas that is formed naturally in the fermentation process and is a byproduct of rum distilleries.

© 2018 GFC Holdings LLC



111

## Estructura de Financiamiento



- Project Owners: 100% GFC Holdings LLC.
- Capital Investment: <u>$612,300.00</u>

- Financial Structure: 30 % Equity / 70% Term Debt:
    - Project Equity 30%: **$612,300.00**
    - Project Term Debt 70%: **$1,428,700.00**

- Please refer to Project Financial Proforma

© 2018 GFC Holdings LLC.                    13

502.    López Vidal did not disclose his ownership in Green CO2 Dominicana or bring it to the attention of the shareholders of GFC/BGF.

503.    There is no mention of López Vidal creating Green CO2 Dominican SRL, signing a contract with Brugal, or signing a contract with Linde in the Dominican Republic in the 2021 GFC Board minutes.

504.    Indeed, Boyd only discovered López Vidal's ownership when a "Google" search revealed entries showing López Vidal's name and media reports about Green CO2 Dominicana's new operations.

505.    https://www.diariohispaniola.com/noticia/77795/mundo-verde/casa-brugal-recuperara-el-co2-de-su-destileria-para-reducir-aun-mas-su-impacto-ambiental.html

112

506.    López-Vidal created a series of Green CO2 Dominicana and Hydrogen companies he owns 100% of while in a full-time employment agreement with GFC/BGF.  He used company time, bank loans, investors' money, New Market Tax Credit monies and paid staff with these funds.

507.    By fraudulently diverting time, expenses, and funding from the Project into the Dominican Republic, López Vidal has violated his fiduciary duty to BGF and its investors; violated the terms of the Banco Popular and Capital One loan and has illegally used the proceeds of the Federal New Market Tax Credit loan in violation of 18 U.S.C. §§ 1344, and 1957 and Section 45 of the Internal Revenue Code.

508.    Plaintiffs have informed Banco Popular of the diversion of the loan funds; Banco Popular has repeatedly promised to investigate; and, more than a year after such promises began, continues to further the criminal enterprise disbursing funds while knowing that funds have not been spent on the approved project.

509.    For the last two years, the Lópezes have spent their time, BGF employees, contractors' time, and Banco Popular's and BGF investors' money on Green CO2 Dominicana and on the acquisition of other personal assets in the Dominican Republic.

510.    For example, the Lópezes fraudulently charged their time in the Dominican Republic to BGF. They approved their expenses for travel and money spent there as part of the BGF Project in violation of 18 U.S.C. §§ 1344 and 1957.

511.    The Lópezes transferred money obtained fraudulently from Banco Popular via Citibank at 111 Wall Street to Esq. Rafael Sanchez ,RSM Dominicana SRL on Avenida Lincoln Number 847, Profesional Lincoln, Suite 3B, Santo Domingo, Dominican Republic to their Green CO2 Dominicana project in the Dominican Republic.  This violated 18 U.S.C. § 1957.

512.    On the wire form, López Vidal falsely described himself as a student and stated that the wire to a Dominican Republic law firm was for tuition. This violated 18 U.S.C. § 1957.

113

513.    If López-Vidal were developing the Green CO2 Dominicana project for anyone other than himself, why would he send the wires from his personal account, lie about being a student, and setup the entities for himself?

514.    López Vidal contracted with Linde/Praxair as the offtaker of Green CO2, further diminishing the export potential of the CO2 that would be generated by BGF.

515.    The export potential for Humacao is 50,000 pounds of CO2 a day or about $3 million in profit per year.

516.    Had BGF's Project been timely completed, Linde/Praxair would have sourced gas for export from BGF facilities instead of the Dominican Republic.

517.    By contracting with Linde/Praxair, López Vidal has usurped this opportunity of BGF for his benefit. His Green CO2 Dominicana is competing with BGF and taking opportunities away from it while the Project languishes. For these reasons, López Vidal has breached his fiduciary duty of loyalty to BGF and has violated his full-time employment and non-compete agreement.

518.    The Lópezes, in collaboration with Borschow, issued a capital call for $1.4 million to buy Green CO2 Puerto Rico soon after the original complaint was filed in April of 2022.  A successful capital call would allow GFC Holdings to purchase Green CO2 Puerto Rico, which they claimed is the owner of Green CO2 Dominicana SRL, at an inflated cost in an attempt to cover up López-Vidal's crimes and BGF's losses already spent in violation of 18 U.S.C. § 1957. López-Vidal is repeating the same pattern of racketeering enterprise through this capital call with Borschow's collaboration: By again granting a no-bid construction contract to his family's ITS business with costs so highly inflated as to be fraudulent, he is creating profit for his family by defrauding shareholders by using highly dilutive funding from Semillero, CDVCA and the Puerto Rico Fund for Growth.

519.     As of the filing of this Proposed Second Amended Complaint, no investor has responded to the capital call.

520.     Plaintiffs subsequently discovered that Green CO2, Puerto Rico, a company wholly owned by López Vidal, is the owner of the put contract that gives it $2 million of equity for a $1,000 cost that BGF should earn on the successful completion New Market Tax Credit program.

521.     BGF's New Market Tax Credit provides on or before September 16, 2027, a $1000 Put Option to buy the COCRF Investor 193, LLC and its assets which will include $2+ million in its accounts. López Vidal fraudulently took this right for himself in the name of Green CO2, Puerto Rico, as the 100% owner of Green CO2, Puerto Rico. This $2 million rightfully belongs to BGF.

522.     Borschow is aware of the fraud and continues to aid and abet the Lópezes, who are on the BGF board with him and whom he purports to manage via Semillero's Preferred Shares rights and Semillero's professional services agreement to provide BGF with management services.

523.     More so, the failed Green CO2 Capital Call clearly shows an agreement to violate RICO, by paying for assets owned by López Vidal that all parties knew were the property of GFC/BGF or were created with BGF funds.

## The Diversion of Funds Outside of Puerto Rico

524.     The Lópezes have consistently submitted expenses to BGF without receipts and reimbursed themselves based on what they simply claim they spent without any breakdown or detail to BGF.

525.     López Vidal took many trips to the Dominican Republic, including three weeks over the holidays in 2020 and listed Brugal as the business purpose in violation of Section 45 of the Internal Revenue Code and 18 U.S.C. §1957.

526.  BGF paid López Vidal for his time in the Dominican Republic, which did not benefit BGF in any way.

527.  López Vidal went to the Dominican Republic approximately twelve more times in 2021 and 2022 and expensed every trip to BGF, telling staff it was for Brugal, thereby violating Section 45 of the Internal Revenue Code and 18 U.S.C. §1957.

528.  The Brugal Rum $CO_2$ project competes directly with BGF's potential for $CO_2$ exports.

529.  López Vidal spent considerable time on the Brugal project while being paid with fraudulently obtained funds from the Banco Popular loan designated for BGF in violation of 18 U.S.C. §1344.

530.  López Vidal worked on the Brugal project while the BGF project fell further behind schedule, despite having an employment agreement requiring full-time effort for only GFC/BGF.

531.  Héctor Ayala is a former 30-year Linde $CO_2$ engineer in Puerto Rico.

532.  BGF hired Ayala as a part-time $CO_2$ consultant in August 2019, and he continues in that role.

533.  Ayala performs significant amounts of work on the Brugal project.

534.  Before the September 2021 financial close, ITS paid most of Ayala's time and other BGF employees and subcontractors so that it could mark it up and bill BGF in violation of Section 45 of the Internal Revenue Code and 18 U.S.C. §1957.

535.  The Lópezes stopped paying Ayala from ITS after counsel for the Plaintiffs first notified Banco Popular of the nature and scope of the Lópezes' fraud in the Fall of 2021.

536.    BGF's staff have told Boyd that López Gómez instructed them to "shred this information, Greg's attorneys will see this as a kickback."

537.    Concerned with pending litigation and a potential criminal investigation López Gomez then sold the ITS office building in Puerto Rico, shredded more documents, and moved the proceeds to the Dominican Republic.

### Borschow and Semillero Partners' Misconduct in the Fall of 2021

538.    The Commercial Operations Deadline was missed in August of 2021 due to Lópezes' diversion of funds and resources.  Missing the date caused an additional and unbudgeted increase in monthly expenses of at least $140,000.

539.    In September 2021 the Banco Popular direct loan matured requiring principal payments, which along with the death of a subcontractor put additional pressure on the project.

540.    BGF required further capital to support the Defendants coverup of their RICO enterprise. They decided to use the coverup story of needing money to start the Ponce Landfill.

541.    No contract has been executed with EC Waste to start the Ponce project.

542.    None of the money raised was ever spent on Ponce making the fundraise a fraud.

543.    However, Defendants continued to refuse to provide any transparency regarding BGF's finances and operations, refused to explain how the original funds provided by investors and Banco Popular were being spent; and repeatedly rejected Boyd and Lassers requests for that information.

544.    On September 25, 2021, with virtually no advance notice to the shareholders, López Vidal pushed through two resolutions supported by Borschow at BGF's board meeting: (1) to remove Boyd from the Board due to unspecified breaches of fiduciary duty; and (2) to secure additional financing for $850,000 to meet the shortfall in funds, by offering preferred shares at an

unreasonably low price to Semillero Partners and CDVCA and to amend BGF's operating agreement.

545. López Vidal presented these resolutions to the shareholders two days later on September 27, 2021, giving Boyd and Lassers only two days (September 29, 2021) to respond.

546. Lassers analyzed the transactions proposed by Defendants and concluded that it would unfairly benefit Semillero Partners, PRFG, and CDVCA to the detriment of the minority shareholders as Semillero and CDVCA would purchase those preferred units based on a fraudulently low valuation and increase their ownership interest at what amounted to a heavily discounted price.

547. As a result, on October 5, 2021, Lassers presented a counterproposal to the Board expressing his concern about the proposal and offering to purchase the units at more favorable terms for BGF/GFC.

548. López Vidal criticized and rejected that proposal because there was "insufficient time" to receive the investment. The actual investment by Semillero was not made until October 14, 2021, and on October 18, 2021, by the CDVCA. Lassers' offer provided the investment immediately upon acceptance by the Board.

549. Despite the conflict of interest presented by the purchase of these shares for the benefit of Semillero Partners and CDVCA, Borschow voted in favor of the resolution and did not recuse himself nor did Ernesto Villarini of the Puerto Rico Fund for Growth/CDVCA, despite his personal benefit from the transaction.

550. As for Boyd's improper removal as a director, Defendants claimed that he had misappropriated alleged trade secrets.

551. Defendants have never identified those supposed trade secrets, but they have threatened in writing to sue Boyd for revealing them.

552. During the September 2021 Board Meeting, the Lópezes locked Boyd out of all his company emails without notice or a company policy allowing them to do so.

### Banco Popular and the Lópezes' Fraudulent Diversion of BGF's Funds

553. The Lópezes' fraudulent activity and consequent lack of effort on constructing the landfill gas biorefinery at El Coqui have put the Project and contract in default both with Banco Popular and with the owners of El Coqui Landfill.

554. Banco Popular is unconcerned with BGF's default because it knows the federal government guarantees $7.2 million of the debt at no risk to the bank. Meanwhile, they can suppress the minority shareholders for years, draining their legal fight financially, and the bank can take over the project or sell it to another investor with Banco Popular in a key position as the primary creditor to dictate terms and maintain access to the recycled natural gas and environmental credits to generate electricity for its own off-grid buildings at far below market rates.

555. However, El Coqui Landfill is missing significant revenue from BGF's delays and as the owner, can rescind pull the gas rights agreement at any moment, thereby rendering BGF and the Bank's off-take agreement worthless and destroying BGF's value. Time is not on Banco Popular's side.

556. Banco Popular, moreover, has participated with the Lópezes in violating the terms of the New Market Tax Credits, committing bank fraud, and fraud in the misuse of federal funds by wiring money from BGF to the Dominican Republic.

557. On November 11, 2021, the Plaintiffs advised Banco Popular through its Chief Operating Officer and General Counsel that:

558.    BGF misrepresented the facts of the project status and falsified the signatures and certification of drawdown certificates submitted to Banco Popular.

559.    The drawdown certificates lacked proper documentation from inspections that should have been undertaken by Banco Popular and most notable was the absence of the notarized signature of a third-party engineer for the work that the Lópezes represented that BGF had completed.

560.    These certificates were accepted on behalf of Banco Popular before September of 2021 by Joval Rodríguez, the account officer for BGF, in charge of the Banco Popular loan and construction drawdown, who was a co-conspirator in accepting and paying the fraudulent certificates, without or with fraudulent inspections undertaken by Banco Popular of the work done.

561.    The commercial operation date of the site was significantly delayed.

562.    Major construction flaws as shown by an independent site inspection conducted on November 7, 2021.

563.    Fraudulent behavior on the part of Banco Popular's account officer, Joval Rodríguez, who made loans to BGF and in his personal capacity and who received payments from the Lopezes and GFC/BGF.

564.    BGF was notified of a default of the project by El Coqui Landfill due to not paying the lease and the minimum gas payment.

565.    There was a death of an unlicensed construction worker on site due to electrocution and an ongoing investigation by OSHA.

566.    The Lópezes had eliminated Boyd from participating in the project, violating Banco Popular's loan agreement, which provided that he would be the chief operating officer. They had

also denied him and the other minority owners' access to the company's financial documents in violation of Article 7.10 of the Corporation Law of Puerto Rico.

567. Despite Banco Popular receiving all this information and the documents to substantiate it, as well as the information that a site inspection was scheduled for November 18, 2021, Banco Popular continued to participated in the fraud by issuing a drawdown on November 16, 2021, days before the inspection of the work was performed on-site.

568. What Plaintiffs did not then realize was that they were reporting a fire to one of the arsonists.

569. The Plaintiffs' December 2, 2021, follow-up letter about these facts remains unanswered.

570. Defaulting on its contract with El Coqui Landfill may eliminate the possibility of BGF contracting for the additional landfills and cause significant harm to BGF/GFC and its shareholders.

571. While the Project is nearing default, the Lópezes have been divesting themselves of assets in Puerto Rico and the U.S.

572. They have sold real estate and have emptied their bank accounts.

573. The plaintiffs believe that the Lópezes are moving assets to the Dominican Republic in anticipation of the potential bankruptcy of GFC/BGF.

574. López Vidal's wife is a bankruptcy lawyer.

575. Plaintiffs filed suit, and the Lópezes and Economou reacted by emptying BGF's bank account on the same day. The Lópezes and Economou paid two equipment suppliers whose contracts did not require payment $1.1 million until the biorefinery became operational, leaving BGF in default of the bank loan and to El Coqui Landfill. El Coqui Landfill sent a formal default

121

notice on May 16, 2022 and second much stronger default notice on January 17, 2023. Both default notices are not cured and threaten the existence of the only asset that matters to GFC/BGF: the 21-year gas rights to El Coqui Landfill.

576.    The payments López Vidal made were not authorized in the drawdown statement he made to the bank.

577.    When the Plaintiffs sought a TRO to try to force the Lópezes to get the money back from the suppliers, so the bank loan and El Coqui could be paid, Banco Popular lent BGF money to pay its loans but not to El Coqui Landfill.

578.    In response to the TRO, in May 2022, Economou stated under penalty of perjury, that BGF needed to purchase the equipment to release Tranche 2 of the tax credit money.

579.    Nine months after the final payment wire needed for the Tranche 2 tax credit, none of the Tranche 2 money has been released.

580.    Nine months after the final payment wire, the equipment is not operational.

581.    Nowhere in the Disbursement Agreement for the New Market Tax Credits is payment for equipment that cannot be made operational permitted. On the contrary, the Disbursement Agreement requires that Banco Popular only disburse funds while BGF complies with the loan's requisites of spending the money exclusively on equipment for the biorefinery construction.

582.    To make up for the shortfall, Banco Popular presented the Third Amendment to the Credit Agreement, providing a capital call for $1.5 million by September 15, 2022.

583.    September 15, 2022 has come and gone without any new equity materializing.

584.    On September 22, 2022, Banco Popular deposited $13,883.65 through an electronic funds transfer to pay its own interest so that BGF does not default to further the enterprise to keep the project breathing until it can be cannibalized.

585.    On September 26, 2022, Banco Popular deposited $31,014 through an electronic funds transfer to pay its own interest so that BGF does not default to further the enterprise to keep the project alive until it can be brought fully under their control.

586.    The Third Amendment to the Credit Amendment falsely states that there is no litigation existing or pending that could materially affect the project to build the biorefinery.

587.    Whatever anyone's opinion as to the merit of this lawsuit, it exists, and if it is decided adversely to Defendants, that would have an effect on the biorefinery project.

588.    When Boyd pointed out that falsehood, the Lópezes replied that their lawyers told them that the statement was not a problem.

589.    The Third Amendment also falsely states that no default event had occurred, even though BGF has an open May 16, 2022 default with El Coqui Landfill.

590.    BGF had also failed to pay the loan to Banco Popular, which also constitutes a default event.

591.    On November 9, 2022, López Vidal finally sent an executed copy of the Third Amendment to the Credit Agreement to Boyd.

592.    The budget attached to the Third Amendment confirms that paying for the equipment that has not been operational since April 2022 did not release Tranche 2 of the tax credits. 0.0% of that money has been released because that money will only become available when the project is operational and has passed a tax audit.

123

## The Fourth Amendment to the Credit Agreement

593.    When GFC/BGF failed to raise $1.5m by September 15, 2022, and the ITS/ASC joint venture failed yet again to complete construction on the announced date of October 31, 2022, Banco Popular agreed to loan BGF more money, this time yet another one million dollars.

594.    The Fourth Amendment to the Credit Agreement again states that there is no pending litigation that, if resolved adversely to BGF, is reasonably likely to have a material adverse effect on the project. This language is worth parsing: the construction of the sentence does not say that it is not reasonably likely that the Plaintiffs will prevail; what it says is that if the Plaintiffs prevail that it is not reasonably likely that a judgment against Defendants would have a material adverse effect, presumably on borrowers' ability to repay the loan. If the Plaintiffs prevail, a material adverse effect is a certainty.

595.    Yet, if the Lópezes are found liable to the Plaintiffs, they will most assuredly have no capacity to repay the loan with their assets now placed out of reach in the Dominican Republic.

596.    Before the Lópezes came into the windfall that is this project, their financial statements were negative. If they must repay the Plaintiffs for the harm they have done, the Lópezes will have no ability to repay the loan.

597.    The Fourth Amendment further states that all statements in the Amendment and the original Credit Agreement are true and correct. The bank and the Lópezes know this to be false and both parties were sent emails by Boyd on this subject.

598.    In the original Credit Agreement, the Lópezes agreed to spend all the loan money on the biorefinery project in Puerto Rico.

599.    Banco Popular knows that the Lópezes spent some of the money to pay back Banco Popular's employee, Joval Rodriguez, for usurious loans; some of it to buy a sufficient portion of Boyd's participation in the company to make him a minority shareholder; they spent some of it on the World Spirits Bravada Vodka project; they spent some of it on their own personal luxuries, and they misspent much of it by overpaying for equipment; redoing work that their companies performed negligently; now seeking to contract Venture Engineering and Construction to rectify the project.

600.    Banco Popular knows that the completion date in the original Credit Agreement is untrue because that date and all subsequent completion dates have passed without completion occurring.

601.    The information in the original Credit Agreement was untrue when signed and its distance from the truth has increased from the signing date to the present. Banco Popular knows this too, just as Banco Popular knew that even with BGF seeking to hire Venture Engineering and Construction to supervise, the project would not be completed by December 31, 2022. Venture Engineering and Construction stated that at least five to six months of work will be necessary - if all the necessary equipment were available and installed correctly with trained operators to run the facility.

602.    The Fourth Amendment to the Credit Agreement also states that the amendment is not a novation of the original Credit Agreement, purporting to bind Boyd to an agreement that is fraudulent and to which Boyd never consented.

603.    The Fourth Amendment to the Credit Agreement states that the biorefinery at the EC Waste plant in Humacao will be operational by December 31, 2022. This did not happen, and every Defendant knows that the biorefinery will not be operational without competent management.

604. After López Vidal executed the Fourth Amendment to the Credit Agreement, and Boyd sent a letter objecting to the Fourth Amendment on November 16, 2022, Banco Popular, in furtherance of the criminal enterprise, deposited $980,943.46 into BGF's bank account.

605. López-Vidal and López-Gomez used part of the BGF money from the drawdown based on Amendment 4 loan to pay the law firm defending them in this case.



WARNING: ORIGINAL DOCUMENT HAS MICRO PRINTING ON SIGNATURE LINES, WATERMARK AND BLEED-THRU ARABIC NUMBERS.

**BIOMASS GREEN FUELS LLC**
1353 AVE LUIS VIGOREAUX
PMB 796
GUAYNABO, PR 00966

**BANCO POPULAR**
ALTAMIRA BRANCH
GUAYNABO, PUERTO RICO

101-201
215

Security features included.
Details on back.

CONTROL NO.
002927

DATE  12/07/2022

PAY TO THE ORDER OF    AMRC, LLC

$  **20,899.40

Twenty thousand eight hundred ninety-nine and 40/100************************************************************

DOLLARS
VOID SIX MONTHS AFTER CHECK DATE.

AMRC, LLC
1412 Americo Salas
San Juan, Puerto Rico  00909

AUTHORIZED SIGNATURE

MEMO    Inv 18250

AUTHORIZED SIGNATURE

⑈002927⑈  ⑈021502011⑈



**The Fifth Amendment to the Credit Agreement**

606.    The proposed Fifth Amendment of December 30, 2022, is challenged by Boyd who was given an unfavorable legal opinion.

607.    Boyd is a personal guarantor of loans from Banco Popular to Biomass Green Fuels, LLC.  From Amendments 3-5 Section 4. A. (vi):

608.    Favorable opinion of counsel to the Borrower and the Guarantors covering such matters as the Administrative Agent and its counsel may reasonably request; and

609.    Boyd delivered an unfavorable legal opinion of Amendments 3 and 4 to Banco Popular, Humberto Gonzalez, Vice President of Commercial Lending, on November 16, 2022, and; on December 30, 2022

610.    Banco Popular signed Amendment 3 on July 26, 2022, which required BGF to replace the over $1.1 million in "final" payments wired to Galileo and TPI sent later the same day the complaint was filed in Federal Court.

611.    This payment was not on any approved bank drawdown schedule at the time.

612.    In April 2022, the Lópezes and Economou falsely claimed the construction was nearly complete and that BGF needed the payment to earn the 2nd tax credit tranche.

613.    Amendments 4 and 5 memorialize this mendacity by extending the construction completion date and the 2nd tax credit tranche to March 31, 2023, 11 months after the money was wired to Galileo and TPI.

614.    Despite questioning, the Lópezes and Economou have never denied receiving compensation in the form of illegal kickbacks that do not benefit BGF from Galileo or TPI to themselves or anyone or any company with which they are associated.

615.    The bank broke the terms of Amendment 3 by lending money without BGF providing an "additional Equity Contribution of $1.5 million by September 15, 2022.  This puts Amendment 3 in default.  Amendment 4 was issued to cover up the missing money.

616.    Amendment 4 requires repayment of $1 million before December 31, 2022.  This payment did not occur and as Mr. Boyd stated in his November 16 letter, the non-repayment of $1 million puts Amendment 4 in default and further jeopardizes the company and Plaintiffs.

617.    Amendment 5 is a fraudulent coverup for the failure of BGF to provide the $1.5m in equity in Amendment 3, the failure to repay the $1 million in Amendment 4 and the failure to complete construction.

618.    In Amendment 4 (g) The second tranche tax credit is not eligible for sale because the project must first be completed, then pass an audit by Hacienda.

619.    The project is not complete.

620.    Mr. Boyd requested a copy from Olmar López-Vidal of the completed tax credit audit on November 7, 2022 and has received nothing because completion is a condition precedent to the audit.

621. Banco Popular and its attorneys know Puerto Rico tax credit law and know requiring this prepayment before December 31, 2022, was also fraud.

622. Boyd never approved Amendment 3 and had personally guaranteed the $11.8 million loan for BGF per the original credit agreement.

623. Amendments 4 and 5 exceed this amount by $1 million, and Amendment 5 continues to expand the Credit Agreement without Boyd's approval.

624. Boyd never signed Amendments 2-5.

625. Calling Boyd a guarantor of a Credit Agreement despite his vociferous objections to Amendments 2 through 5 flies in the face of reason.

626. In Amendments, 3-5: 5 (e): "There is no pending or, to the Borrower's knowledge, threatened action"

627. There are two current proceedings affecting the Borrower and the Guarantors and Banco Popular: one before the United States Federal District Court for the District of Puerto Rico and the other before the Bayamon Superior Court.

628. The federal case is based on criminal violations of the RICO act, including fraudulent diversion of federal tax credits from bona fide census tracts in the United States to the Dominican Republic, transporting stolen money to a foreign country, fraudulent misappropriation of funds, usury, fraud and swindling, and bank fraud.

629. The case before the Bayamon Superior Court seeks an injunction based on BGF's violation of Puerto Rico corporate law, which requires limited liability companies to provide information of the company's operations to its ownership members. These cases predate Amendments 3-5.

630.    In Amendments 3-5: 5 (f) "No event has occurred and is continuing which constitutes a Default or Event of Default."

631.    The Commercial Operations Date deadline was the first week of August 2021. There is NO agreement extending this date by the El Coqui Landfill.

632.    Based upon the recent Venture Engineering and Construction independent engineering report irreparable harm could occur if BGF attempts to start the biorefinery without implementing the changes the independent engineering report requires. We do not need more loss of life. The Bank could be culpable should irreparable harm occur for its fraudulent inspections and activities after being informed of the problems and fraud.

633.    There is no proper authorization by the Company nor its guarantors for Amendments 3-5. No properly constituted meetings occurred authorizing these Amendments. In violation of Puerto Rico Corporate Law, no company shareholders meeting has ever occurred, much less one approving Amendments 3-5. Boyd did not attend the Amendments 4 or 5 meetings.

634.    In violation of the credit agreement, no audited financials of GFC/BGF were presented in a timely basis to the Bank

635.    Amendment 3-5, Section 1 (b) states, "The Borrower and the Guarantors acknowledge and agree that, as of the date hereof, they have no defenses, off-sets, claims or counterclaims of any nature, whether liquidated or unliquidated, matured or unmatured, direct or indirect, against any of the Lenders or the Administrative Agent, directly or indirectly related to the Outstanding Indebtedness, the Credit Agreement and all the other Loan Documents, and any and all such defenses, off-sets, claims and counterclaims are hereby expressly and forever waived and released."

636.    The Plaintiffs already have claims filed in Federal Court and in Bayamon Superior Court. The Plaintiffs are exercising their rights and do not waive them.

637.    Boyd did not and will not approve Amendments 3, 4 and 5.

638.    Boyd never signed Amendments 3-5.  Per footnote 1 on the draft Amendment 5, "1 Note to Bank: Please confirm if you will not require the personal guarantors to sign this amendment as set forth in the Credit Memorandum."

639.    From Amendments 3-5 Section 4: Notice of this Amendment shall have been delivered by the Administrative Agent on behalf of the Lenders to the NMTC Lenders fifteen (15) business days prior to the date hereof in accordance with Section 10 of the Intercreditor Agreement;

640.    If Banco Popular has not sent the notice of Amendment delivered to the NMTC 15 days prior on Amendments 3-5, it is violating the Intercreditor Amendment, with the attendant consequences of that violation.

641.    From Amendments 3-5: (5c) This Amendment constitutes the legal, valid, and binding obligations of the Borrower and the Guarantors, enforceable against the Borrower and the Guarantors in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws of general applicability affecting the enforcement of creditors' rights.

642.    Boyd is not a party to Amendments 3-5; these are not enforceable.

643.    From Amendments 3-5: (5g) Before and after giving effect to this Amendment, the representations and warranties set forth in this Section 5 and those contained in the Credit Agreement and the other Loan Documents are true and correct in all material respects on and as of the date of this Amendment, as though made by the Borrower and the Guarantors on and as of this date, except to the extent such representations or warranties expressly relates to a prior date, in which case such representation and warranty shall be true and correct in all material respects as of such earlier date.

644.     Amendment 3-5 are not true or correct. By signing Amendment 5 and disbursing more money Banco Popular is violating the original Credit and Intercreditor Agreements.

645.     Banco Popular continue to deny the existence of the litigation, uncured default notices, continued to ignore failure to meet construction deadlines and evidence of fraud submitted to the banks legal department in November of 2021. How do they do this? By the signatory to the amendments          refusing          to          even          read          or          respond.

| From | Laura Medina Castillo <Laura.Medina@popular.com> |
| To | greg.boyd@icloud.com |
| Subject | Not read: Biomass Green Fuels Amendment 5 |

```
Your message

        To:    Humberto E. Gonzalez Caraballo
        Cc:    Laura Medina Castillo; 'Jane Becker Whitaker'; 'Jonathan Lassers'
        Subject:    Biomass Green Fuels Amendment 5
        Sent:  12/30/2022 11:51 AM

was deleted without being read on 1/17/2023 5:26 AM.
```

## **Banco Popular is Proud of its Quid Pro Quo**

646.     El Nuevo Día has recently published an article with a video of an interview with Banco Popular President Alvarez, in which Mr. Alvarez states that "we have cogeneration, a natural gas plant, but the most innovative [thing] about the plant is that it is equipped to work with methane gas. We already have a contract with a business that captures methane gas from a landfill. This is extraordinary. We will be the first in Puerto Rico to do this."

647.     Mr. Alvarez does not mention the bank loan to BGF has been in default since November 2021 when the Plaintiffs presented evidence to the Bank's legal department per Section 7.1(e) of the bank's credit agreement, yet the bank lent another $6 million since the default, so Banco Popular can get renewable natural gas.

648.    The gas contract to which Mr. Alvarez refers is the quid pro quo with BGF.

# Humacao Treasure Pyramid

Banco Popular improperly lends funds adding to BGF's debt burden to gain more control and maintain favorable pricing over the gas rights

The Preferred Unitholders Semillero and CDVCA have $321 million reasons to try to capture control of BGF

The Lopezes are happy to profit from fraudulent payments while giving away equity to the Preferred unitholders and adding to BGF's debt burden to gain more construction profits, fund World Spirits and Green $CO_2$ Dominicana

**$321.4 million**

of Gross LNG and

$CO_2$ revenues remaining after ECW

Royalty for BGF unitholders over 31 years

**Value of LNG to Banco Popular over 31 Years**
**$90 million**

Banco Popular, Capital One and Federal NMTC Loans $19 million

Investor Equity $7.3 million


**Banco Popular Señorial Building with Biomass Green Fuels Tanks**



649.     The quo is Banco Popular's commission of the fraud detailed in this Second Amended Complaint: the transfer of federal loan funds to pay for Olmar López Vidal's acquisition of a controlling percentage of BGF; the approval of fraudulent drawdowns with the work specified incomplete; the refusal to respond to documented accusations of fraud in a way that holds the criminals responsible and stops the fraud; payments of loan money above the loan amount; two admissions that without capital infusions the biorefinery cannot become operational; and loans of additional money without those infusions.

650.     Banco Popular is not just complicit. Banco Popular is the moving force behind the criminal acts detailed herein. By creating a RICO enterprise and responding to criticism with coverups and more fraud, Defendants have allowed the chickens to come home to roost.

651.     On January 17, 2023, Randi Jensen, EC Waste's CEO sent a default letter to BGF, Gregory Boyd as guarantor, Olmar López Vidal as guarantor, Olmar López Gómez as guarantor, and Banco Popular de Puerto Rico as administrative agent.

652.     In the default letter, Mr. Jensen recounts that EC Waste sent a prior default and notice of right to recover expense and fees to the same parties on May 16, 2022 and received acknowledgement of receipt but no formal response.

653.     Mr. Jensen further states the obligation which BGF has failed to comply, to wit:

| Item | BGF Statement Obligation Due | Total Due |
|------|------------------------------|-----------|
| 1. | August 2021 (Lease & Purchase Agreement) | $31,687.00 |
| 2. | September 2021 (Lease & Purchase Agreement) | $31,278.36 |
| 3. | October 2021 (Lease & Purchase Agreement) | $7,093.83 |
| 4. | November 2021 (Lease & Purchase Agreement) | $6,254.19 |
| 5. | December 2021 (Lease & Purchase Agreement) | $6,401.96 |
| 6. | January 2022 (Lease & Purchase Agreement) | -$16,916.29 |
| 7. | February 2022 (Lease & Purchase Agreement) | $19,740.52 |
| 8. | March 2022 (Lease & Purchase Agreement) | $49,981.48 |
| 9. | April 2022 (Lease & Purchase Agreement) | $54,311.72 |

| 10. | May 2022 (Lease & Purchase Agreement) | -$48,499.38 |
| 11. | June 2022 (Lease & Purchase Agreement) | $23,532.76 |
| 12. | July 2022 (Lease & Purchase Agreement) | $63,598.52 |
| 13. | August 2022 (Lease & Purchase Agreement) | $58,185.31 |
| 14. | September 2022 (Lease & Purchase Agreement) | $61,404.64 |
| 15. | October 2022 (Lease & Purchase Agreement) | $60,711.96 |
| 16. | November 2022 (Lease & Purchase Agreement) | $56,498.71 |
| 17. | December 2022 (Lease & Purchase Agreement) | $58,215.69 |
| 18. | Cutoff Extension Payment | $250,000.00 |
| | **TOTAL** | **$773,480.98** |

654. Mr. Jensen then added,

The above table is a summary of the amount owed by BFG to ECL from August 2021 to December 2022 for obligations such as the Lease Monthly Payment, Monthly Minimum Off Take Payment, the Electricity Requirement Payment and the Cutoff Extension Payment. The basis for the Cutoff Extension Payment is described below. Concurrently, pursuant to Section 2.4 of the Purchase Agreement and Section 5 (i) of the Lease Agreement, BGF shall be aware that any amount payable under the Agreements that are not timely paid shall bear interest until such amount are paid at one percent (1%) per annum above the fluctuating prime rate. Additionally, BGF shall be held responsible for any and all legal fee expenses on this and prior process.

655. The letter continues:

As referenced before, Section 4 of the Lease Agreement states "[n]othwithstanding anything to the contrary in Article 2 of the Purchase Agreement regarding the timing of payments due with the delivery of each Monthly Statement, Lessee shall pay rent to Lessor without notice, demand, reduction or setoff (provided that Lessee may credit certain amounts payable by Lessor against rent payable by Lessee as set forth in Section 2.4 of the Purchase Agreement), for the term of this Lease". Therefore, BGF has been in default on its obligations since August 2021. Nonetheless, this is not the only aspect out of compliance for the Purchase Agreement.

656. At the same time, in the letter dated October 15, 2020, BGF and ECL agreed that the Commercial Operation Date (COD) will be deemed as of November 27, 2020. The aforementioned document states "COD is defined as the date on which ECL commences delivery of the landfill gas ("LGF") to BGF and BGF accepts the initial delivery of LFG from ECL. BGF has indicated that it will be requesting delivery of LFG from ECL on or before November 27, 2020, unless extended by an Extension Payment in the amount of $250,000. On the other hand, the LFG processing operations of BGF's Facility are anticipated to startup in July 2021, at which time the Facility will commence receiving additional LFG from ECL."

657.

658. Echoing this litigation, the letter continues,

Furthermore, 18 months after the proposed Cutoff Date for the Facility startup, the Facility is yet to be operational. Moreover, according to the ESS & J208 Operational Certification signed and sealed by engineer Roberto Acosta, "Jenbacher J208 Gas Engine was commissioned on October 2021…" and "Energy Storage System (ESS) was commissioned on November 2021…". Hence, BGF has failed to comply with either of the Cutoff Dates agreed between the parties on October 15, 2020. Therefore, pursuant of Section 2.2 (d) of the Purchase Agreement, ECL hereby notify BFG that a penalty payment of two hundred fifty thousand dollars ($250,000.00) shall be paid for and extension of the Cutoff Date. Consequently, the Final Cutoff Date for the Facilities Operation shall be on or before April 17, 2023. **Accordingly, ECL demands the following: (1) a formal reply to this Notice of Default on or before January 19, 2023; (2) Payment in full of any and all such amounts due and owing, and applicable fees, interest, penalties and expenses on or before January 27, 2023; (3) That the Administrative Agent cures all items on Default on or before February 16, 2023.**

659.    The letter further states,

In like manner, Section 11.19 of Purchase Agreement requires that BGF shall obtain and maintain, during the entire term of the Agreement, personal guarantees and/or performance bond, each on a form and substance acceptable to ECL in ECL's sole and absolute discretion. Currently, ECL holds personal guarantees from Mr. Olmar López Vidal, signed on July 23, 2019 as affidavit number 21,304 of the Public Notary Jatniel Padilla Norat; Mr. Greogory Boyd, signed on July 30, 2019 as affidavit number 307 of Public Notary Marina Contreras Velázquez; and Mr. Olmar Vidal Gómez signed on July 30, 2019 as affidavit number 308 of Public Notary Mariana Contreras Velázquez. All personal guarantees were accepted by ECL's Chief Executive Officer, Randy Jensen.

660.    The letter continues:

As stated on the Notice of Right to Recover Expenses/Fees Related to Complaint and Notice of Default from May 16, 2022, ECL was notified of a pending litigation between BGF guarantors in the United States District Court for the District of Puerto Rico on April 25, 2022. Due to the subject of litigation, ECL believes that the process devalues some or all the personal guarantees currently held. Thus, ECL is requesting BGF to obtain and furnish a Performance Bond in the amount of **TWO MILLION DOLLARS ($2,000,000.00)** from bonding company rated A+ (Superior) by A.M. Best Rating Services, Inc. The performance bond shall be furnished to ECL on or before fourteen (14) calendar day from receiving this Notice of Default.

661.    The above statement contradicts Banco Popular's false statements in the Third and Fourth Amendments to the Credit Agreement that there is no pending litigation that would have an adverse effect on the Project.

662.    Mr. Jensen's letter continues,

Consequently, pursuant to Paragraph 9 of the El Coqui Landfill Estoppel and Consent, dated August 20, 2020, ECL hereby provides notice and opportunity to cure to the Administrative Agent and the Lenders (as those terms are defined in the Credit Agreement) of BGF's monetary default under the terms of the Purchase Agreement and the Site Lease…

663.    EC ends its letter with a reference to the false hope that "BGF" [presumably the Lopezes, since Mr. Boyd did not provide this false information:

Finally, ECL recognizes BGF has proposed to offset and/or satisfy part or the whole debt by transfer of tax credits. Although conversations have taken place, at the date of this Notice of Default, none of the conversations have materialized to a workable understanding on this matter. Nonetheless, once BGF's tax credits can be transferable, ECL could resume conversations to develop an agreement for the transfer of such credits.

664.    BGF cannot transfer the tax credits to ECL because Banco Popular has the first right to them to pay off its loan.

665.    Thus, this is the current state of this Chronicle of a Death Foretold [with apologies to Gabriel Garcia Marquez].

## **FIRST CAUSE OF ACTION: DECLARATORY JUDGMENT UNDER THE DTSA**

666.    Plaintiffs repeat the foregoing paragraphs as if set forth in full herein.

667.    In retaliation for calling Defendants out for committing fraud, counsel for the Lópezes have twice threatened to sue Gregory Boyd for violating the DTSA.

668.    Boyd has denied that he misused any trade secrets of BGF. Boyd was simply doing his job as Director of New Business and Development.

669.    These claims have been used by the Lópezes to try to intimidate Boyd and to isolate him from the Board, shareholders and other stakeholders of GFC/BGF.

670.     A genuine and justiciable dispute exists between the parties about whether Boyd violated the DTSA.

671.     Boyd asks this Court to issue a declaratory judgment that he has not misappropriated BGF's trade secrets by negotiating discounts with suppliers for the biorefinery and that he has not violated the DTSA.


## SECOND CAUSE OF ACTION: RACKETEERING INFLUENCED AND CORRUPT ORGANIZATION 18 U.S.C. 1962(a)


672.     Plaintiffs repeat the foregoing paragraphs as if set forth in full herein.

673.     All Defendants herein participated in the overriding scheme to reduce and eventually eliminate the Plaintiffs' interest in GFC and BGF through unlawful means.

674.     The predicate crimes committed are violations of 18 U.S.C. §1341, fraud and swindles, Defendants having devised a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, in its more serious variant because the frauds herein affect a financial institution; 18 U.S.C. § 1343, wire fraud, also in the serious variant; 18 U.S.C. §1344, bank fraud, obtaining any sums of money, etc. from a financial institution under false pretenses; 18 U.S.C. §1952 travels in foreign commerce to distribute the proceeds of illegal activity; 18 U.S.C. §1957 engaged in monetary transactions in property derived from programs receiving federal funds transports, transports, or transmits funds from the U.S. to a foreign country; 18 U.S.C. § 2314, transports, transfers, transmits in foreign commerce more than $5,000 obtained by fraud; and 18 U.S.C. §2315, receipt of stolen money that has crossed a U.S. border. Forgery and involuntary manslaughter, also committed by the Lópezes, are not RICO offenses.

675. Section 1962(a) makes it a crime to use or invest any money derived from racketeering activity or the collection of an unlawful debt to establish, acquire an interest in, or operate an enterprise engaged in or affecting interstate commerce.

676. Olmar López Vidal took money derived from bank fraud to invest in BGF by buying part of Boyd's ownership in BGF with money from the bank loan to get a controlling interest in the enterprise. Banco Popular and Joval Rodriguez conspired with López Vidal to get this done. This conduct also violated 18 U.S.C. §1962(b) which prohibits acquiring an interest in an enterprise through a pattern of racketeering activity or collection of an illegal debt.

677. The example the U.S. attorneys' office gives of a violation of 1962(b) is of a racketeer taking over a legitimate business through acts of loan sharking or extortion. The former occurred in this case, and the López' conduct before the MIPA closing might not meet the definition of criminal extortion, but the fraud they committed with money's source was criminal.

678. López Vidal also used money and resources intended to build the BGF biorefinery derived from racketeering activity to invest in Green CO2 and Green Fuels Dominicana which the Lópezes invested in in violation of the New Markets Tax Credits law's purview and 18 U.S.C § 1957; and the World Spirits, LLC project to make Bravada Vodka, which violates 18 U.S.C. §1344.

679. Since López Vidal's net worth was negative before his involvement with BGF, he had to have used money swindled from BGF to make that investment.

680. Carlos López Vidal took resources derived from the defrauding and swindling of BGF to acquire an interest in and operate World Spirits, LLC, a business that engages in interstate commerce that Carlos López Vidal co-founded. Carlos López Vidal was presented to El Coqui/EC Waste as the construction project manager, a role which he did not perform.

681.    Banco Popular will be using money and the renewable natural gas worth over $90 million to generate power for its corporate headquarters acquired from its offtake agreement with BGF as part of the enterprises racketeering activity.

682.    Olmar López Gomez lied about his expertise in biorefineries to gain an unbid, non-competed design and construction contract for a company that did not even have the credit history to qualify for a construction bond. He failed to design and build the plant on time costing BGF tens of millions of dollars, and paid himself more than double the original construction budget.  He made up invoices and expenses, signed and approved dozens of checks and ACH transfers from BGF to his various companies. He deposited checks from BGF into accounts of various ITS entities in different countries. He arranged kickbacks to himself, his family members and his many entities. He falsified personal and ITS tax returns and filed them electronically.  He falsified bank drawdown documents and sent them electronically. He redirected the Brugal opportunity from BGF to his son's Green CO2 Dominicana, SRL.

683.    Economou created fraudulent financial documents, reports and drawdowns for investors, bankers, tax authorities and auditors to cover up the operations and activities of the RICO Enterprise and sent them electronically.  He drafted the majority of Olmar López Vidal communications to investors, the Board and the Banks to cover-up the fraudulent activities and sent those fraudulent communications electronically.

684.    Borschow removed the corporate controls of GFC/BGF to allow the loans to be swindled by the Lópezes and Economou.  He suppressed information flow to the other owners and compliance authorities at banks and government, including financial and project status to aid and abet the fraud and swindling.  He did not hold annual meetings, he did not take accurate minutes of Board Meetings as Board Secretary to aid and abet the swindling.  He did not perform his fiduciary responsibilities, including preventing conflicts of interest between GFC/BGF and ITS

and between GFC/BGF and Semillero/CDVCA/Puerto Rico Fund for Growth, all to aid and abet the swindling.

685.    Semillero Partners allowed Borschow to operate unchecked. Semillero's in-house legal counsel advised Borschow on legal strategy on GFC/BGF, including suppression of minority owners.

686.    CDVCA and PRFG supported Borschow in all of his efforts to suppress the truth and voted with him on every Board issue including conflicts of interests on their own investment to aid and abet the fraud and swindling for their economic gain

687.    18 U.S.C. §1962(c) makes it unlawful for any person employed by or associated with any enterprise engaged in or affecting interstate or foreign commerce "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of an unlawful debt."

688.    George Economou, the Lopezes and Banco Popular participated in a pattern of racketeering activity by approving fraudulent drawdown petition after fraudulent drawdown petition and sending them electronically in violation of 1962(c).

689.    Economou also participated in and profited with an illegal commission from a pattern of racketeering activity by materially and fraudulently misrepresenting the nature of the Semillero investment to Danosa, all with information sent electronically.

690.    All three Lópezes, Roberto Acosta, ITS, ASC, and World Spirits conducted the business of the ITS/ASC Joint Venture through a pattern of racketeering activity that included the fraudulent use of New Market Tax Credits for their personal and corporate gain.

691.    Banco Popular participated in the conduct of BGF's affairs through a pattern of racketeering activity by knowingly approving fraudulent drawdown certificates and loan

amendments in violation of its own credit agreement in section 7.1(e), all in order to protect its below market offtake agreement.18 U.S.C. §1962(d) makes it unlawful to conspire to violate sections a, b, and c of the act. Unlike the general federal criminal statute applicable to conspiracies, under RICO there is no requirement that a conspirator commit an overt act in furtherance of a RICO conspiracy.

692.     Here, all Defendants conspired to violate sections a, b, and c of the RICO Act.

693.     Defendants also perpetrated their comprehensive plan by diverting New Market Tax Credits and investments from lenders, Semillero and the Puerto Rico Fund for Growth from the Humacao biorefinery to a project in the Dominican Republic, further undermining the possibility of the success of BGF by signing up BGF's clients (Linde/Praxair) with the Dominican Republic entity, Green CO2, in violation of 18 U.S.C. §1957, 2313, and 2314.

694.     The Lópezes committed wire fraud by sending funds earmarked for the Humacao biorefinery to themselves, then to the Dominican Republic from their own accounts, violating 18 U.S.C § 1343 and 1344.

695.     These include Green CO2 Dominicana SRL, and Green CO2 LLC which are 100% owned by López Vidal, 18 U.S.C. §1962(b)

696.     Plaintiffs are entitled to treble damages for the RICO damages in an amount to be determined.

## THIRD CAUSE OF ACTION: VIOLATION OF RULE 10-B5 OF THE SECURITIES AND EXCHANGE ACT

697.     Plaintiffs repeat the foregoing paragraphs as if set forth in full herein.

698.     Gregory Boyd sold 7.5% of common units in BGF based on Olmar López Vidal's material misrepresentation to him that López Vidal himself was paying for that interest and that in exchange for the interest López Vidal would afford Boyd a seat on BGF's Board of Directors and the position of Chief Operating Officer.

699.     As Alexander Borschow pointed out, these material representations violate Rule 10-B5 of the Securities and Exchange Act.

700.     López Vidal made these material misrepresentations to Boyd, knowing them to be false, purchasing his interest with funds stolen from BGF itself, with the intention of inducing Boyd to gain control of Biomass Green Fuels.

701.     Banco Popular participated in this fraud, allowing López Vidal to wire money from the BGF loan to give the false impression that the money belonged to López Vidal and was not being diverted from the loan money earmarked for the Humacao biorefinery as it was.

702.     Boyd asks this Court to rescind the MIPA and order López Vidal and his co-conspirators, most principally Borschow and Banco Popular, to compensate Boyd for the damages that this violation of the Securities and Exchange Act caused Boyd in an amount to be determined.

703.     Economou made material misrepresentation to investors in BGF in order to deceive them so that they would invest in the company. He sent this information electronically.

704.     Banco Popular and López Vidal worked together to make material representations on Amendments Three, Four, and Five to the Credit Agreement.


## FOURTH CAUSE OF ACTION: BREACH OF FIDUCIARY DUTY AGAINST THE LÓPEZES, BORSCHOW, AND ECONOMOU

705.     Plaintiffs repeat the foregoing paragraphs as if set forth in full herein.

706. Together, the Lópezes purport to own a majority and/or controlling common interest of GFC/BGF and therefore owe fiduciary duties to the minority members of GFC/BGF.

707. López Vidal and Borschow are controlling board members of GFC/BGF and therefore owe fiduciary duties to GFC/BGF and its members.

708. López Vidal is the Chief Executive Officer of GFC/BGF and therefore owes fiduciary duties to BGF and its members. Indeed, López Vidal amended GFC and BGF's Operating Agreements to provide him with greater authority and discretion and therefore has heightened fiduciary duties to GFC/BGF and its members.

709. Defendant Economou is the CFO and an officer of BGF and owes fiduciary duties to BGF and its members.

710. Defendants López Gómez as owner in GFC/BGF and López Vidal and owner, CEO and Board member of GFC/BGF have breached their fiduciary duties owed to GFC/BGF and the minority members by, among other things:

711. Exploiting Boyd's financial difficulty to extract control of BGF by threat and manipulation with Economou;

712. Using BGF's funds and construction loan money to finance López Vidal's acquisition of Boyd's shares of BGF to the detriment and delay of the project.

713. Replacing a fully vetted construction contract signed by Boyd with another signed between the Lópezes and increasing the cost by $1 million to pay for the MIPA.

714. Paying for ITS/ASC's construction bond with BGF's money.

715. Fraudulently negating Lassers SAFE note.

716. Refusing to honor the MIPA and hire or contract for Boyd's services after Boyd signed the contracting agreement.

717.    Falsely accusing Boyd of misappropriating trade secrets to remove Boyd from the Board, isolate him from the company he founded and intimidate him from uncovering Defendants' fraud and misconduct.

718.    Diverting construction loan proceeds from Banco Popular and other investors for his personal benefit and to finance his and his family's other ventures, including Green CO2 Dominicana, World Spirits and Green Hydrogen LLC.

719.    Fraudulently presented BGF and its financial backers as the solution provider to Casa Brugal, then created a competing company, Green CO2, in the Dominican Republic that López Vidal owned.

720.    Usurping the corporate opportunity presented by Casa Brugal for López Vidal by diverting the opportunity presented by Linde/Praxair;

721.    Withholding and suppressing shareholder information and providing false schedules and status to the Board.

722.    Fraudulently acquiring the shares of Boyd and funding the payment of the MIPA with short-term loans paid with BGF construction loan money and padded expense reports from initial drawdowns,

723.    Conspiring with Borschow to remove Boyd from the Board.

724.    Defendant Borschow has breached his fiduciary duties owed to BGF and to the minority members by, among other things:

725.    Refusing to end conflicts of interests between ITS and the Lópezes, and giving full control of BGF's operations and finances, including its checkbook, contracts, budgets, schedules, technical design to the Lópezes without any oversight of any kind despite his contractual obligation to provide that oversight.

726.     Conspiring and voting against Boyd serving as an employee, manager, or contractor of BGF despite that requirement under Banco Popular's loan documents, Convertible Notes, and MIPA, to facilitate Defendants' denial of access to information of wrongdoing and to prevent any meaningful check and balance on BGF's finances and the project.

727.     Failing to provide Directors' insurance covering the very risks coming from Borschow's actions.

728.     Refusing to eliminate conflicts of interest when he chose to vote for Semillero and CDVCA's $850,000 investment in GFC/BGF over a better offer since CDVCA is an investor in Semillero Partners and PRFG.   This was a vote for self-interest in breach of his fiduciary responsibility. PRFG (Ernesto Villarini) and Semillero (Alex Borschow) should have abstained from this vote.

729.     Supporting the management and operation of BGF that refuses to hold annual shareholder meetings and/or issue audited financials.

730.     Failing to request or gain permission as a qualified person or entity from El Coqui Landfill as required by the Gas Rights Agreement, when taking effective control of GFC/BGF.

731.     Participating in the misconduct and fraud of the Lópezes to weaken GFC/BGF so that Semillero Partners can use its preferred shares to increase its ownership stake and value in those companies at the expense of the minority members.

732.     Making a capital call to cover up the illegal diversion of NMTC funds to the Dominican Republic.

733.     Defendant Economou has breached his fiduciary duties owed to BGF as CFO and to the minority shareholders by, among other things:

734.    Falsifying financial records to hide wrongdoings by himself and the Lópezes. Economou reclassified multiple payments to themselves and "loan sharks" as "Interim Finance."

735.    Stopping using commercially accepted accounting software (QuickBooks) with built-in audit trails and checks and balances, opting to do everything manually in Excel in order to be able to manipulate all financial records without being detected.  Since calling Economou and BGF out on his fraudulent accounting practice, BGF hired a new bookkeeper to hide the frauds and re-enter everything back into the QuickBooks accounting software

736.    Preventing Kevane Grant Thornton from completing a thorough 2020 and 2021 audit of GFC/BGF in a timely basis, if ever.

737.    Providing fraudulent estimates of returns to investors and convertible noteholders.

738.    Creating and presenting fraudulent bank drawdown information for BGF/GFC to Banco Popular.

739.    Concealing the full, true cost of the New Market Tax Credit program from investors, while paying himself 1% commission on all monies raised without deducting the $900,000 in NMTC related fees.

740.    Fraudulently paying himself twice for the money raised on the convertible note from Danosa.

741.    Assisting and supporting the efforts of the Lópezes to improperly wrest control of BGF from Boyd by issuing false and misleading documentation.

742.    Any extra judicial attempt to resolve these matters would be futile because the named Defendants are not impartial as to resolving these matters.

743.    Defendants' actions have proximately caused substantial damage and injury to Plaintiffs in an amount to be determined.

## FIFTH CAUSE OF ACTION:

## BANCO POPULAR'S BREACH OF THE CREDIT AGREEMENT

744.    Plaintiffs repeat the foregoing paragraphs as if set forth in full herein.

745.    As guarantor, Boyd is a third-party beneficiary of the Credit Agreement.

746.    Banco Popular ignores its own Bank Credit Agreement 7.1 (e) by continuing to lend $6 million after the Plaintiffs provided evidence of materially incorrect drawdowns in November 2021 and after additional evidence was provided in the legal complaints and RICO Statements filed with this Court.

747.    When Banco Popular has amended the Credit Agreement breaching the $11.8 million dollars of original debt, which Boyd guarantees, it harms Boyd.

748.    Boyd asks this Court to declare all the amendments to the Credit Agreement null and void ab initio because, as Banco Popular knows, Boyd did not consent to, nor sign amendments 3-5.

## SIXTH CAUSE OF ACTION

## DERIVATIVE CLAIM ON BEHALF OF BGF AND GFC HOLDINGS

749.    Plaintiffs repeat the foregoing paragraphs as if set forth in full herein.

750.    The plaintiffs had membership interests in GFC/BGF when these allegations and fraudulent transactions occurred. Thus, they have standing under Article 19.54 of the Puerto Rico General Law of Corporations, 14 L.P.R.A. § 4004, to seek redress against Defendants.

751.   As demonstrated above, the Lópezes have diverted and misused substantial funds of BGF and GFC for their own benefit.

752.   Defendants Borschow, Semillero Partners and CDVA have abetted the Lópezes' misconduct.

753.   Defendants caused substantial delays and damages to BGF and GFC and their shareholders.

754.   Defendants' misconduct has resulted in a near-default of the Project multiple times.

755.   Plaintiffs have brought the conflicts of interests and mismanagement to the Boards of BGF and GFC, which are dominated and controlled by Defendants and have been rejected, or worse, falsely accused of stealing trade secrets and removed from the Board.

756.   Any further attempts to remedy the flaws detailed in this pleading would be futile because the directors of BGF and GFC are not impartial, in fact, they are partial to the conflicts of interest, mismanagement, and fraud.

757.   Boyd has even had to sue Olmar López Vidal in the Superior Court of Bayamon to obtain basic corporate information.

758.   As he did in this case, López Vidal hid to avoid service, so Boyd has had to serve him by publication.

759.   Accordingly, any demand to the Boards of BGF and GFC would be futile.

760.   This action is not collusive to confer jurisdiction on this Court that would not otherwise exist.

761.   BGF and GFC have been substantially damaged by the misconduct of Defendants in an amount to be determined.

## SEVENTH CAUSE OF ACTION: DECLARATION THAT BOYD'S PERSONAL GUARANTIES ARE UNENFORCEABLE

762.    Plaintiffs repeat the foregoing paragraphs as if set forth in full herein.

763.    As a condition of the loan provided to GFC and BGF by Banco Popular, Boyd was asked by Banco Popular to execute multiple Personal Guaranties (the "Guaranties") in connection with that loan, which is described in each Guaranty as the "Credit Agreement."

764.    The Guaranty states that the consideration given was Boyd's bargained for exchange to "receive substantial direct and indirect benefits from the financing arrangements contemplated by the Credit Agreement."

765.    Boyd has notified Banco Popular of the misuse and criminal diversion of funds provided to the BGF and GFC by the Lópezes and that he was not receiving the required substantial direct and indirect benefits from the financing agreements contemplated by the Credit Agreement. Since Boyd provided Banco Popular with evidence of fraud in November of 2021, the bank has lent an additional $5.5 million.

766.    Banco Popular has rejected those warnings, has continued to issue drawdowns under the Credit Agreement, has amended the Credit Agreement without Boyd's consent, and contends that the Guaranties remain enforceable. A genuine and justiciable dispute exists between Boyd and Banco Popular regarding the enforceability of the Guaranties.

767.    Boyd asks for a declaration by this Court that the Guaranties are no longer enforceable.

## EIGHTH CAUSE OF ACTION: BREACH OF CONTRACT

768.    Plaintiffs repeat the foregoing paragraphs as if set forth in full herein.

769.    Boyd and the Lópezes entered into the MIPA.

770.    The MIPA was supported by consideration on Boyd's side, namely the transfer of approximately 7.5% of Boyd's interest in GFC to López Vidal in exchange for the commitment that Boyd would be on the Board of Directors of BGF and that he would be employed by BGF and by the payment of money.

771.    Boyd has fully complied with the terms of the MIPA, by among other things, transferring his shares to López Vidal.

772.    López Vidal has materially breached the terms of the MIPA by among other things proximately improperly causing Boyd to be removed as a director of BGF/GFC and improperly terminating and/or preventing him from serving as an employee or contractor of BGF.

773.    López Vidal has also materially breached the MIPA by using BGF's funds from Banco Popular, intended to be spent on the biorefinery to purchase his increased ownership percentage in BGF.

774.    As a result of the material breach of the MIPA, Boyd is entitled to substantial compensatory damages, including but not limited to, the return of his ownership interest in BGF; the salary owed to him as an employee.

775.    In addition to substantial compensatory damages, or in the alternative, Boyd is entitled to resolution/rescission of the MIPA, the return of his 7.5% of GFC and the restitution of Lassers SAFE note agreement.


**NINTH CAUSE OF ACTION: FRAUDULENT INDUCEMENT/FRAUDULENT CONCEALMENT ("DOLO")**


776.    Plaintiffs repeat the foregoing paragraphs as if set forth in full herein.

777.     The Lópezes offered to purchase 7.5% of Boyd's shares in GFC and represented that they had the assets to purchase those shares.

778.     Those representations, however, were false at the time they were made because the Lópezes did not have sufficient funds to purchase Boyd's shares and knew they lacked those funds.

779.     The Lópezes had no intention of purchasing those shares with their assets when they made those representations and instead planned to divert BGF's funds from Banco Popular's loan and other assets and funds of BGF and GFC to acquire those shares.

780.     The Lópezes concealed their intentions from Boyd and forged his signature on the Flow of Funds document so that he would not discover their fraud.

781.     Banco Popular assisted the Lópezes in this effort.

782.     Boyd reasonably relied on those representations, and they were material to his agreement to transfer those shares to López Vidal.

783.     Boyd would have never agreed to transfer his shares had he known that the Lópezes intended to divert the funds from Banco Popular and BGF and GFC, and effectively put the companies in a financially compromised position at the outset of the construction of the Project.

784.     If Boyd had continued to have a controlling interest in BGF, he would have hired a competent construction company from the beginning, would not have diverted funds to the constructive of a boutique vodka distillery, to a competing project in the Dominican Republic, or to the extravagant lifestyle of the Lópezes in Casa La Romana.

785.     Boyd has been substantially damaged by López Vidal's fraudulent misrepresentations. He is entitled to the resolution/rescission of the MIPA, return of his shares, the restitution of Lassers' SAFE note agreement and compensatory and punitive damages against the Lópezes.

## **TENTH CAUSE OF ACTION: DEFAMATION**

786.     Plaintiffs repeat the foregoing paragraphs as if set forth in full herein.

787.     Defendants Borschow and the Lópezes knowingly, intentionally, and/or with actual malice falsely published, stated, and reported to others that Boyd misappropriated alleged trade secrets.

788.     Defendants have never identified which supposed trade secrets were misappropriated.

789.     Despite Boyd's denial that he misused any trade secrets, Defendants Borschow and the Lópezes continue to falsely accuse him of wrongdoing to third-parties.

790.     Borschow and the Lópezes' statements to others regarding the alleged trade secrets were false.

791.     Borschow and the Lópezes have neither rights nor privileges to make false statements to others regarding the alleged trade secrets.

792.     Borschow and the Lópezes' statements to others have caused injury to Boyd's reputation; have otherwise exposed Boyd to public hatred, contempt, ridicule, shame, or disgrace; and/or have affected Boyd adversely in his trade, business dealings, or profession.

793.     As a direct and proximate result of Borschow's and the Lópezes' false statements to others, Boyd has been harmed for an amount to be determined.

794.     WHEREFORE, Plaintiffs request that judgment be entered in their favor and against Defendants, as follows:

(a)     An Order declaring that Boyd has not misappropriated any of BGF and/ GFC's trade secrets under the DTSA;

(b) Judgment in favor of Plaintiffs for an amount to be determined, such amount to be tripled, for Defendants' Racketeering Influenced Corrupt Organization Act violations;

(c) Judgment in favor of Gregory Boyd and against Olmar López Vidal as to his violation of Rule 10(b)(5) for making material misrepresentations as to the purchase of a portion of Gregory Boyd's investment in GFC and hence BGF with a determination that the MIPA is void ab inicio, and in favor of the Plaintiffs and against George Economou, BGF's chief financial officer, who made material misrepresentations as to BGF's return on investment after the Borschow investment to Danosa, which misrepresentations harmed Plaintiffs by lowering the value of their investment in BGF and GFC;

(d) An Order declaring that the Guaranties on the Banco Popular loans are no longer enforceable;

(e) Judgment in favor of Plaintiffs on behalf of Biomass Green Fuels, LLC and GFC Holdings, LLC, for an amount to be determined for the derivative claims;

(f) Resolution/Rescission of the MIPA and the return of Boyd's shares due to the fraudulent inducement and/or concealment of the Lópezes and Economou;

(g) Judgment in Plaintiffs' favor for the breach of contract claim in an amount to be determined;

(h) Judgment in Plaintiffs' favor for the fraudulent concealment inducement ("dolo") claim in an amount to be determined;

(i) Judgment in Plaintiff's favor for the tort claim for an amount to be determined;

(j) Temporary, preliminary and permanent injunctive relief, restraining and enjoining Defendants from further diverting any further funds, resources or assets to

themselves, their families, ITS, Green CO2, Semillero Partners, and/or World Spirits;

(k)     Temporary, preliminary and permanent injunctive relief, restraining and enjoining Defendants from further diverting any further funds, resources or assets to any project in the Dominican Republic;

(l)     Temporary, preliminary and permanent injunctive relief, restraining and enjoying Defendants Borschow and Semillero Partners, CDVCA, Puerto Rico Fund for Growth or any Preferred holders from purchasing any further shares or greater interest in either BGF or GFC;

(m)     Temporary, preliminary and permanent injunctive relief granting the Plaintiff's access to the Project so that they can investigate and inspect the Project;

(n)     Compensatory damages, punitive damages and attorneys' fees for Defendants' tortious and improper conduct and their breach of the above agreements; and

(n)     All other such relief as this Court may find just and equitable.

Dated: January 23, 2023                 Respectfully submitted,


                                        /s/Jane A. Becker Whitaker
                                        JANE A. BECKER WHITAKER
                                        P.O. Box 9023914
                                        San Juan, PR 00902-3914
                                        Tel: (787) 754-9191
                                        Fax: (787) 764-3101
                                        USDC-PR No. 2015110
                                          Email: janebeckerwhitaker@gmail.com
                                                 jbw@beckervissepo.com


                                        JOHN F. MARSH
                                        BAILEY CAVALIERI LLC
                                        10 West Broad Street, Suite 2100

157

Columbus, Ohio 43215
Telephone: (614) 229-3230
Facsimile: (614) 221-0479
jmarsh@baileycav.com

**ATTORNEYS FOR PLAINTIFFS**

**<u>JURY DEMAND</u>**

Plaintiff hereby demands trial by jury on all applicable issues, claims and/or defenses.

**I HEREBY CERTIFY** that I have filed this document with the Court's ecf system, which system will notify all counsel of record.

/s/Jane A. Becker Whitaker

JANE A. BECKER WHITAKER