# EXHIBIT 2

**FIRST AMENDMENT TO SECOND AMENDED AND RESTATED**
**OPERATING AGREEMENT OF**
**GFC HOLDINGS LIMITED LIABILITY COMPANY**

This **FIRST AMENDMENT TO THE SECOND AMENDED AND RESTATED OPERATING AGREEMENT** (this "Amendment") is made as of the 22nd day May, 2023 (the "Effective Date") by and among GFC HOLDINGS LIMITED LIABILITY COMPANY, a limited liability company organized and existing under the laws of the Commonwealth of Puerto Rico (the "Company") and the persons identified on the signature page hereof as the "Members", and each individually, a "Member".

**WHEREAS**, the Company operates pursuant to that certain Second Amended and Restated Limited Liability Company Agreement dated as of October 20, 2021 (collectively, the "Operating Agreement"), a copy of which is attached hereto as Exhibit 1;

**WHEREAS**, on April 11, 2023, the Company executed separate Convertible Note Purchase Agreements with The Community Development Venture Capital Alliance, Inc. ("CDVCA"), VRM Penzini Fund I L.L.C. – Renewable Series II ("VRM"), Parliament Capital Series II, LLC – Series F, as successor-in-interest to Danosa Caribbean, Inc. ("Parliament"), and Flexitank, Inc. ("Flexitank") (collectively, the "CNPA's") to obtain up to Three Million Dollars ($3,000,000.00) in liquidity for working capital;

**WHEREAS**, the CNPA's provide for certain amendments to the Operating Agreement as condition for the obtainment of such liquidity;

**WHEREAS**, pursuant to its Section 11.3, the Operating Agreement may be amended pursuant to the approval of: (a) the Members holding a majority of the Class A Common Units and (b) the Series A Holders holding a majority of the issued and outstanding Series A Preferred Units;

**WHEREAS**, as agreed in the CNPAs, the signatory Members hereof must amend the Operating Agreement to reflect the admission of VRM, Parliament and Flexitank as Members of the Company, update the capitalization table and modify certain terms and conditions thereof ;

**NOW, THEREFORE**, in consideration of the foregoing and the mutual covenants and agreements hereinafter set forth, the parties hereto agree as follows:

**Section 1.** The recitals to this Amendment are hereby incorporated by reference. All terms not defined herein shall have the meaning ascribed to such terms in the Operating Agreement.

**Section 2.** New Definitions. Article II of the Operating Agreement is hereby amended to eliminate the definition "Requisite Drag Holders" and include the following definitions:

*"**CDVCA**" means The Community Development Venture Capital Alliance, Inc.*

*"**Existing Convertible Notes**" means (a) the convertible note(s) issued to Parliament, as successor-in-interest to Danosa Caribbean, Inc. pursuant to the Parliament Existing Note Agreement; and (b) the convertible note(s) issued to Flexitank pursuant to a certain Convertible Note Purchase Agreement by and between the Company and Flexitank dated April 13, 2020.*

*"**Flexitank**" means Flexitank Inc.*

*"**Parliament**" means Parliament Capital Series II, LLC – Series F.*

*"**Parliament Existing Note Agreement**" means certain Convertible Note Purchase Agreement by*

and between Biomass and Danosa Caribbean, Inc., predecessor-in interest to Parliament, dated August 20, 2019.

"**Percentage Interest**" means the proportion that a Member's Units, including Common Units and Preferred Units, bears to the aggregate issued and outstanding Common Units and Preferred Units convertible to Common Units, on an as converted basis.

"**PF Manager**" has the meaning set forth in Section 6.1(c).

"**Series A Holder**" means each of Semillero, PRFG, CDVCA, VRM, Parliament and Flexitank.

"**VRM**" means VRM Penzini Fund I L.L.C. – Renewable Series II.

"**VRM Manager**" has the meaning set forth in Section 6.1(c).

"**VRM Option**" has the meaning set forth in Section 4.7.

"**VRM Purchase Agreement**" means that certain Convertible Note Purchase Agreement executed by and between the Company and VRM on April 11, 2023.

**Section 3.** Preemptive Right. Section 4.1(g) of the Operating Agreement is hereby amended to read as follows:

**Section 4.1 Capital Contribution; Membership Interests.**

(a)....

(g) The Company shall not propose to offer for sale any Units (the "**Offered Company Units**") unless the Company shall have first offered such Units pro-rata (excluding those issuances listed at the last paragraph of Section 4.2(h)(i) and the exercise by VRM of the VRM Option, which shall not trigger the Preemptive Right), to the Members, based on their percentage equity ownership in the Company, in accordance with the following provisions (the "**Preemptive Right**").

**Section 4.** Issuance of the Series A Preferred Units. Section 4.2(a) of the Operating Agreement is hereby amended its entirety to read as follows:

**Section 4.2 The Series A Preferred Units**

(a) Issuance of the Series A Preferred Units. Among the Preferred Units the Company is authorized to issue pursuant to Section 4.1(a) of this Agreement, the Company is authorized to issue [TEN MILLION FIVE HUNDRED AND EIGHTY FOUR UNITS (10,584,000)] of Series A Preferred Units which shall carry the rights described in this Section 4.2 and other applicable provisions of this Agreement (the "**Series A Preferred Units**").

Amendment to Second Amended and Restated Operating Agreement - 2

**Section 5**. <u>Voting Rights</u>. Section 4.2 (f) of Article IV is amended in its entirety to read as follows:

*(f) <u>Voting Rights</u>. Each Series A Preferred Unit shall carry the right to cast one vote per Series A Preferred Unit on any matter submitted to the Members of the Company. Holders of Series A Preferred Units shall be considered Members of the Company. The holders of the Series A Preferred Unit shall vote together with the holders of Common Units on an as-converted basis, and not as a separate class, except that: so long as any Series A Preferred Units are issued and outstanding, the Series A Holders shall be entitled to four (4) members of the Board of Managers ("**Series A Managers**") as provided in Section 6.1(c)).*

**Section 6**. <u>Anti-Dilution Rights</u>. Section 4.2(h)(ii) of Article IV is hereby amended in its entirety and a new Section 4.2(h)(iii) is hereby included in Article IV to read as follows:

*ii. Convertible Notes Anti-Dilution Protection*

*Notwithstanding the foregoing, in the event that Flexitank and/or Parliament exercise their right to convert either or both of the Existing Convertible Notes into Units, then the Company shall issue, without any additional payment or consideration and within five (5) business days after such conversion:*

*a.      to Semillero, PRFG, CDVCA and VRM, the number of Series A Preferred Units required for their respective Percentage Interests after such conversion to be equal to their respective Percentage Interests immediately prior to such issuance; and*

*b.      to Flexitank and Parliament, the number of Series A Preferred Units required for their respective Percentage Interests after such conversion to be equal to their respective Percentage Interests immediately prior to such issuance plus any such Percentage Interest acquired by Flexitank and/or Parliament upon conversion pursuant to Section 6 of the Existing Convertible Notes and Section 7 of Parliament Existing Note Agreement.*

*The Company shall take any actions reasonably requested by Semillero, PRFG, CDVCA, VRM, Parliament and/or Flexitank to document the issuance of such Units.*

*iii. Series A Holder Anti-Dilution Protection*

*In the event that the Company issues any Unit or any other equity security or security convertible into or exercisable for any equity of the Company other than the Existing Convertible Notes, then the Company shall issue to each of Semillero, PRFG, CDVCA, VRM, Parliament and/or Flexitank, without any additional payment and within five (5) business day after such event, the number of Series A Units required in order for their respective Percentage Interests after the issuance of such Units to be equal to their corresponding Percentage Interests immediately prior to such issuance. The Company shall take any action reasonably requested by any Series A Holder to document the issuance of such units.*

Amendment to Second Amended and Restated Operating Agreement - 3

**Section 7.** <u>Option to Purchase</u>. A new Section 4.7 is hereby added to the Operating Agreement to read as follows:

> ***Section 4.7.*** ***Special Option to Purchase.*** *Notwithstanding anything provided in Section 4.1(g) or elsewhere in this Agreement, so long as VRM's Percentage Interest is less than twenty-five percent (25%) (the "**25% Threshold**"), at any time in which the Board approves a resolution to issue additional Units, VRM shall have the option to subscribe and acquire such Units up to an amount as to allow VRM, at its option, to reach a Percentage Interest of up to Twenty-Five Percent (25%) (on an as converted basis) (the "**VRM Option**"). VRM shall notify the Company of its intention to exercise the VRM Option within twenty (20) days after written notice is delivered to VRM of the Board's approval of an issuance of Units. If VRM has not responded within such period, VRM shall be deemed to have waived its right to acquire Units on that occasion; provided however, that such waiver shall not be deemed as a waiver of the VRM Option, which shall remain in effect until VRM reaches the 25% Threshold. At all times prior to the second (2nd) anniversary of the conversion provided for in the VRM Purchase Agreement, the price per Unit for the VRM Option shall be $0.92764378 per Unit. After the second (2nd) anniversary of such conversion to or purchase of Series A Preferred Units, the price per Unit shall be negotiated in good faith by the Company and VRM. Notwithstanding anything provided in this <u>Section 4.7</u>, the 25% Threshold shall be determined based on VRM's Percentage Interest as the same may be adjusted upon acquisition of Units from other Members; further provided that when VRM does achieve the 25% Threshold the Option shall automatically terminate. If VRM elects not to exercise the VRM Option or if the number of Units to be issued exceeds the number of Units needed by VRM to achieve the 25% Threshold, then any Units not acquired by VRM shall be subject to the Preemptive Right pursuant to Section 4.1(g).*

**Section 8**. <u>Management</u>. Section 6.1(c) of Article VI is hereby amended in its entirety to read as follows:

> *(c) Notwithstanding as provided in Section 6.1(b) above, as of the Effective Date and while any Series A Preferred Units are held by Semillero, PRFG, VRM, Parliament or Flexitank (or their transferees pursuant to a Permitted Transfer or as otherwise allowed under this Agreement), the Board of Managers shall consist of at least seven (7) managers of which none shall be a Disqualified Person and: (i) two (2) representatives shall be designated by the Founding Members ("<u>Founding Members' Managers</u>") (ii) one (1) representative shall be designated by Semillero (for so long as it, or a transferee pursuant to a Permitted Transfer or as otherwise allowed under this Agreement, holds Series A Preferred Units)("<u>Semillero Manager</u>"), (iii) one (1) representative shall be designated by PRFG (for so long as it, or a transferee pursuant to a Permitted Transfer or as otherwise allowed under this Agreement, holds Series A Preferred Units)("<u>PRFG Manager</u>"), (iv) one (1) representative designated by VRM (for so long as it, or a transferee pursuant to a Permitted Transfer or as otherwise allowed under this Agreement, holds Series A Preferred Units)("<u>VRM Manager</u>"), (v) one (1) representative shall be designated jointly by Parliament and Flexitank (for so long as either of them, or a transferee of either pursuant to a Permitted Transfer or as otherwise allowed under this Agreement, holds Series A Preferred Units) ("<u>PF Manager</u>"), and (vi) one manager designated by the Founding Members Managers, the Semillero Manager, the*

> *PRFG Manager, the VRM Manager, and the PF Manager, which manager shall be an Independent Manager of the Board of Managers.*

**Section 9**. Matters Requiring Series A Manager's Approval. First paragraph of Section 6.3 of Article VI is hereby amended to read as follows:

> ***Section 6.3 Matters Requiring Series A Manager's Approval.***
>
> *Notwithstanding anything provided to the contrary in this Agreement, the Company will not, without express and affirmative approval of the majority of Series A Managers:*
>
> *(a) . . .*

**Section 10**. Restrictions on Authority of the Board of Managers. First paragraph of Section 6.4 of Article VI is hereby amended to read as follows:

> ***Section 6.4 Restrictions on Authority of the Board of Managers****. In addition to the restrictions provided elsewhere herein, without Majority Approval of the Members and the approval of the holders of a majority of the Series A Preferred Units then outstanding, the Board of Managers shall not have the authority to approve and the Company will not take any of the following actions:*
>
> *(a) . . .*

**Section 11**. Section 6.6 of Article VI is hereby amended by replacing the term "competition" with the term "compensation".

**Section 12**. Advisory Services. Section 6.14 of Article VI is hereby amended in its entirety to read as follows:

> ***Section 6.14 Advisory Services****. VRM will provide the Company business assistance and guidance advisory services pursuant to an Advisory Service Agreement dated September 14, 2020, by and between Biomass and VRM, as assignee of Semillero Partners, pursuant to that certain Assignment and Assumption Agreement executed by and among Biomass, Semillero Partners and VRM on _____, 2023 (collectively, the "Service Agreement"). The Assignment and Assumption Agreement shall be subject to the payment in full of the outstanding balances due to Semillero Partners.*

**Section 13.** Drag-Along Right. Section 10.4(a) of Article X is hereby amended by replacing the term "Requisite Drag Holders" with "Majority Approval of the Members and the holders of a majority of the Series A Preferred Units then outstanding".

**Section 14.** Amendment to Operating Agreement. Section 11.3 of Article XI is hereby amended in its entirety to read as follows:

> ***Section 11.3 Amendment to this Agreement****. This Agreement may only be amended, supplemented,*

*or restated by the written Majority Approval of the Members and* the holders of a majority of the Series A Preferred Units then outstanding*; provided, however, that Annex I to this Agreement may be amended by the Board of Managers to reflect any issuance of additional Units made in accordance with the provisions of this Agreement, including but not limited to Section 4.2; further provided that this Agreement may not be amended to modify the rights and preferences of the* Series A Preferred Units and/or of the *Series A Holders without the prior written consent of all of the Series A Holders.*

**Section 15.** Exhibit A is hereby replaced with attached Exhibit 2.

**Section 16.** Exhibit B is hereby replaced with attached Exhibit 3.

**Section17.** Exhibit C is hereby replaced with attached Exhibit 4.

**Section 18.** Annex I is hereby replaced with attached Exhibit 5.

**Section 19.** This Amendment may be executed in any number of counterparts (including e-mail thereof) with the same effect as if all signing parties had signed the same document. All counterparts shall be construed together and constitute the same instrument.

**Section 20.** The Company and the Members hereby agree and acknowledge that other than as specifically set forth in this Agreement all provisions of the Operating Agreement, as previously amended, shall continue in full force, and effect and bind the Members and the Company. This Agreement shall not constitute an extinctive novation of the Operating Agreement but merely an amendment as stated herein.

*[SIGNATURE PAGES FOLLOWS]*

**IN WITNESS WHEREOF**, the Members of the Company representing a majority of the Units hereby approve and ratify the Amendment.

**GREGORY BOYD**

_____

**OLMAR LÓPEZ GÓMEZ**

_Olmar López Gómez_
07FCE4890BA342E...
_____

**OLMAR LÓPEZ VIDAL**

_Olmar López Vidal_
46DB1046D8C0407...
_____

**JONATHAN LASSERS**

_____

**JOHN DUMAS**

_____

**JOHN RICHARDSON**

_____

**SEMILLERO INVESTMENT FUND I, LLC**

By: _Alexander Borschow_
894DD62F93CA438...
Name:    Alexander Borschow
Title: Authorized Representative

**PUERTO RICO FUND FOR GROWTH, L.P.**

By: _kerwin Tesdell_
6879576C307D465...
Name:  Kerwin Tesdell
Title:  Authorized Representative

**THE COMMUNITY DEVELOPMENT
VENTURE CAPITAL ALLIANCE, INC.**

By: _kerwin Tesdell_
6879576C307D465...
Name: Ernesto Villarini
Title: Authorized Representative

**VRM PENZINI FUND I L.L.C. – RENEWABLE
SERIES II
represented by its Manager VRM Penzini Capital
L.L.C.**

By: _[signature]_
0FBCDB6140A44AB...
Name: Carlos Penzini
Title: Managing Partner

**PARLIAMENT CAPITAL SERIES II, LLC –
SERIES F**

By: _Luis Cabrera Marín_
B9F2D49FE024471...
Name: Luis Cabrera Marín
Title: Authorized Representative

**FLEXITANK, INC.**

By: _[signature]_
A9EFDCB8AB2D4EB...
Name: Johnny Fernández
Title: Authorized Representative

Amendment to Second Amended and Restated Operating Agreement - 7

**EXHIBIT 1**


**OPERATING AGREEMENT OF**
**GFC HOLDINGS LIMITED LIABILITY COMPANY**

EXECUTION VERSION

**THE SALE AND/OR OFFER OF THE UNITS IN THE COMPANY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE PUERTO RICO UNIFORM SECURITIES ACT, AS AMENDED (THE "PRUSA") OR QUALIFIED UNDER ANY STATE SECURITIES LAWS IN RELIANCE UPON EXEMPTIONS THEREFROM. THE UNITS MAY NOT BE OFFER ED OR SOLD ABSENT AN EFFECTIVE REGISTRATION UNDER THE SECURITIES ACT, THE PRUSA AND QUALIFICATION UNDER SUCH STATE SECURITIES LAWS, UNLESS EXEMPTIONS FROM SUCH REGISTRATION AND QUALIFICATION REQUIREMENTS ARE AVAILABLE. THE COMPANY HAS THE RIGHT TO REQUIRE ANY POTENTIAL TRANSFEROR OF A MEMBERSHIP INTEREST IN THE COMPANY TO DELIVER AN OPINION OF COUNSEL ACCEPTABLE TO THE COMPANY PRIOR TO ANY TRANSFER TO THE EFFECT THAT AN EXEMPTION FROM REGISTRATION AND QUALIFICATION IS AVAILABLE FOR SUCH TRANSFER. ADDITIONAL SUBSTANTIAL RESTRICTIONS ON TRANSFER OF THE UNITS ARE SET FORTH IN THIS AGREEMENT.**

**SECOND AMENDED AND RESTATED OPERATING AGREEMENT**

**OF**

**GFC HOLDINGS LIMITED LIABILITY COMPANY**

## TABLE OF CONTENTS

**Page**

ARTICLE I ORGANIZATIONAL MATTERS..................................................................................1

Section 1.1    Formation .................................................................................................1
Section 1.2    Name ........................................................................................................1
Section 1.3    Registered Office and Principal Office of Company ...........................2
Section 1.4    Term..........................................................................................................2
Section 1.5    Limits of Company .................................................................................2
Section 1.6    Authorized Person; Certificate.............................................................2

ARTICLE II DEFINITIONS ........................................................................................................2

ARTICLE III PURPOSE, MEMBER AND UNITS ......................................................................10

Section 3.1    Purposes and Scope .............................................................................10
Section 3.2    Members ................................................................................................10
Section 3.3 ..............................................................................................................10

ARTICLE IV MEMBERS; CAPITAL CONTRIBUTIONS; CLASSES OF
MEMBERSHIP INTERESTS ............................................................................10

Section 4.1    Capital Contribution; Membership Interests.\ ..................................10

Section 4.2    The Series A Preferred Units ...............................................................12
Section 4.3    Approvals by the Members .................................................................16
Section 4.4    Registry of Transfers............................................................................16
Section 4.5    Redemption of Units ...........................................................................16
Section 4.6    Limited Liability ..................................................................................17

ARTICLE V DISTRIBUTIONS ..................................................................................................17

Section 5.1    Cash Distributions ...............................................................................17
Section 5.2    Distributions on Termination ............................................................17
Section 5.3    Limitation on Distributions ...............................................................17

ARTICLE VI MANAGEMENT OF THE COMPANY ...................................................................17

Section 6.1    Management Generally ........................................................................17
Section 6.2    Management by the Board of Managers .............................................19
Section 6.3    Matters Requiring Series A Managers' Approval................................20
Section 6.4    Restrictions on Authority of the Board of Managers ........................21
Section 6.5    Liabilities. Exculpation and Indemnification of Members, and
Managers ...............................................................................................21
Section 6.6    Competition of the Managers and Members.......................................22
Section 6.7    Removal of a Manager(s) .....................................................................22
Section 6.8    Election of Successor Managers. .........................................................23
Section 6.9    Committees of the Board of Managers ...............................................23
Section 6.10    Meetings.................................................................................................23
Section 6.11    Business Opportunities.........................................................................23
Section 6.12    Non-Completion and Non-Solicitation Agreements .........................23

Section 6.13    Non-Disclosure and IP Transfer Agreement ............................................. 23
Section 6.14    Advisory Services ........................................................................................ 24

**ARTICLE VII MEMBERSHIP INTERESTS** .......................................................................... **24**

Section 7.1    Certificates Representing Units .................................................................. 24
Section 7.2    Registration ................................................................................................. 24
Section 7.3    Mutilated, Destroyed, Lost or Stolen ....................................................... 24
Section 7.4    Record Holder ............................................................................................. 25
Section 7.5    Legend .......................................................................................................... 25

**ARTICLE VIII ACCOUNTING AND TAX MATTERS** ........................................................... **26**

Section 8.1    Books and Records ..................................................................................... 26
Section 8.2    Tax ............................................................................................................... 26

**ARTICLE IX DISSOLUTION AND LIQUIDATION** .............................................................. **26**

Section 9.1    Dissolution .................................................................................................. 26
Section 9.2    Effect of Dissolution .................................................................................. 26
Section 9.3    Winding Up Procedures .............................................................................. 26
Section 9.4    Distribution of Assets Upon Dissolution ................................................ 26
Section 9.5    Distributions in Kind .................................................................................. 27
Section 9.6    Articles of Dissolution ................................................................................ 27

**ARTICLE X TRANSFERS** ...................................................................................................... **27**

Section 10.1    General Restrictions on Transfer; No Right to Withdraw ..................... 27
Section 10.2    Parties to Agreement ................................................................................ 27
Section 10.3    Transfer of Units Pursuant to a Purchase Offer ..................................... 27
Section 10.4    Drag-Along Right ....................................................................................... 30
Section 10.5    Tag Along Right ......................................................................................... 31
Section 10.6    Involuntary Transfers ................................................................................ 33

**ARTICLE XI GENERAL PROVISIONS** ................................................................................ **34**

Section 11.1    Captions and Headings .............................................................................. 34
Section 11.2    Amendment of Certificate of Formation .................................................. 34
Section 11.3    Amendment of this Agreement .................................................................. 35
Section 11.4    Number and Gender ................................................................................... 35
Section 11.5    Binding Agreement ..................................................................................... 35
Section 11.6    Severability ................................................................................................. 35
Section 11.7    Counterparts ............................................................................................... 35
Section 11.8    Governing Law ........................................................................................... 35

ANNEX I        MEMBERS AND OUTSTANDING UNITS

ANNEX II       OFFICERS

## AMENDED AND RESTATED OPERATING AGREEMENT

This Second Amended and Restated Operating Agreement (the "**Agreement**") effective as of October, 20th,2021 (the "**Effective Date**") of **GFC HOLDINGS LIMITED LIABILITY COMPANY** (the "**Company**"), is by and among the Company and each of those Persons listed on <u>Annex I</u> hereto, those parties who from time to time execute this Agreement or counterparts hereof as Members and those other parties who comply with any other conditions for becoming a Member as set forth herein.

## <u>RECITALS</u>

**WHEREAS**, the Company has been formed as a Puerto Rico limited liability company under the Puerto Rico General Corporations Act, as amended;

**WHEREAS**, the Members entered into an Operating Agreement on June 24, 2015 (the "**Original Operating Agreement**");

**WHEREAS**, the Members entered into an Amended and Restated Operating Agreement on September 14th 2020 (the "**Amended and Restated Operating Agreement**");

**WHEREAS**, the Board and the Members have approved various amendments (the "**Amendments**") to the Amended and Restated Operating Agreement which they desire to incorporate into a single document;

**WHEREAS**, the current Members desire to adopt and enter into this Second Amended and Restated Agreement to amend and restate the Amended and Restated Operating Agreement to incorporate the Amendments, set forth the rules, regulations and provisions regarding the management and business of the Company, the governance of the Company, the conduct of its business, and the rights and privileges of its Common Units and Series A Preferred Units, its Members and its Board of Managers;

**NOW, THEREFORE**, in consideration of the mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Agreement agree as follows:

## ARTICLE I
## <u>ORGANIZATIONAL MATTERS</u>

**Section 1.1**   **Formation**.  The Company was formed as a limited liability company in accordance with the Act on June 24, 2015 (the "**Commencement Date**").  The Members hereby agree to continue the Company as a Puerto Rico limited liability company under and pursuant to the Act and agree that except as expressly provided and permitted herein to the contrary, the rights and obligations of the Members and the administration and termination of the Company shall be governed by the Act.

**Section 1.2**   **Name**. The name of the Company shall be, and the business of the Company shall be conducted under the name of GFC Holdings Limited Liability Company.

The Company's business may be conducted under any name or names approved by the Board of Managers.

**Section 1.3    Registered Office and Principal Office of Company**.  The Company shall maintain a registered office and a designated and duly qualified agent for service of process on the Company in the Commonwealth of Puerto Rico.  The Company may maintain offices at such locations as the Board of Managers deem advisable.

**Section 1.4    Term**.  The existence of the Company commenced on the Commencement Date, and the Company shall continue in existence until the dissolution of the Company pursuant to the express provisions of Article IX hereof.

**Section 1.5    Limits of Company**.  The Members intend that the Company shall be treated as a limited liability company in accordance with the Act for all purposes under Puerto Rico law and this Agreement shall not be construed to provide otherwise.

**Section 1.6    Authorized Person; Certificate**.  The Members hereby confirm that Olmar López Vidal was an "authorized person" under the Act at the time that he executed, delivered and filed the Certificate of Formation in such capacity.  The Board of Managers may execute, deliver and file any other certificates (and any amendments and/or restatements thereof) necessary for the Company to do business in Puerto Rico and in any other jurisdiction in which the Company may wish to conduct business.

## ARTICLE II
## DEFINITIONS

The following definitions shall for all purposes, unless otherwise clearly indicated to the contrary, apply to the terms used in this Agreement.

"**ACF Distribution**" has the meaning set forth in Section 4.2(d).

"**Act**" means the Puerto Rico General Corporations Act of 2009, as amended from time to time.

"**Additional Contribution**" means any Capital Contribution other than the Initial Contribution made to the Company pursuant to Section 4.2 hereof.

"**Additional Transfer Notice**" has the meaning set forth in Section 10.3(b).

"**Advisory Service Agreement**" has the meaning set forth in Section 6.14.

"**Affiliate**" means with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such other Person.  For purposes of this definition, "control" when used with respect to any Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities or other ownership interests, by contract or otherwise, and the terms "controlling" and "controlled" have correlative meanings.

"**Agreement**" shall have the meaning set forth in the preamble hereto.

"**Available Cash Flow**" means with respect to a given fiscal year, the aggregate amount of all Revenues, to the extent they result in cash receipts, of the Company on a consolidated basis, from any and all sources less all cash disbursements of the Company on a consolidated basis, as Series A Preferred Distributions and for Debt Service, Operational Expenses, Construction Expenses, Reserves, Taxes and Extraordinary Expenses or Payments.

"**Biomass**" means Biomass Green Fuels, LLC, a limited liability company organized under the Act and a wholly owned subsidiary of the Company,

"**Board of Managers**" has the meaning set forth in <u>Section 6.1(a)</u>.

"**Business**" means the design, development, construction and operation of bio economic recycled & renewable natural gas and carbon dioxide projects.

"**Business Opportunity**" has the meaning set forth in <u>Section 6.11</u>.

"**Capital Contribution**" means any Initial Contribution or Additional Contribution to the capital of the Company in cash, assets or in services provided to the Company when and as such contribution is actually made to the Company by the Members.

"**Cause**" means (1) a repeated or material breach of the Manager's (i) covenants under the Non-Disclosure and Intellectual Property Rights Assignment Agreement or the Non-Competition and Non-Solicitation Agreement; or (ii) any code of conduct or ethics to which the Manager is subject to; or (iii) Manager's abandonment of its duties as a member of the Board of Managers or his or hers gross negligence in the performance of its duties as a member of the Board of Managers; (2) the accusation by government authorities against the Manager of the commission of (i) a felony, or (ii) a crime involving moral turpitude that results in a conviction or in relation to which the Manager enters a guilty plea or a plea of no contest; (3) any act causing material harm to the standing or reputation of the Company or any of its Members; (4) actions by the Manager that cause the Company to violate a local, state, federal or any other applicable statute, regulation or law of any jurisdiction (including foreign jurisdictions); (5) Manager's negligence or misconduct in the conduct of his duties or management of the Company or which involves a breach of his fiduciary duties; (6) Manager's misappropriation of the Company's assets or business opportunities; (7) Manager's failure to comply with the reasonable and lawful directives (as opposed to objectives) adopted by the Majority Approval of the Members; (8) Manager's disclosure of operational, financial and commercial information and other confidential information of the Company to persons that are not employees, managers or Members of the Company without the knowledge, approval and consent of the Board of Managers; (9) Manager's misrepresentation to the Board of Managers, or failure to disclose to the Board of Managers information of commercial importance to the Company, its business and operations; (10) repeated or sustained absence from the meetings of the Board of Managers (not due to a disability or an approved absence or leave); (11) the appropriation (or attempted appropriation) or interference (or attempted interference) of a material business opportunity of the Company, including but not limited to attempting to secure or securing any personal profit or benefit in connection with any transaction entered into on behalf of the Company; (12) subject to applicable legal provisions, the use of illegal drugs, alcohol or the use of legal drugs in any manner inconsistent with medical advice that adversely affects the Manager's ability to perform his or her duties under the law and this Agreement.

"**Certificate**" means a certificate issued by the Company evidencing ownership of one or more Membership Interests.

"**Certificate of Formation**" means the Certificate of Formation of the Company filed with the Department of State of Puerto Rico, as it may be amended or restated from time to time.

"**Class A Common Unit/s**" means, with respect to any Member, the Membership Interest of such Member in the Company, including the right to vote on or participate in the management of the Company as applicable and as set forth in Exhibit A, as the same may be amended from time to time.

"**Class B Common Unit/s**" means, with respect to any Employee Member, the Membership Interest of such Employee Member in the Company, as may be set forth in Exhibit A and/or as the same may be amended from time to time. Membership Interest B shall not have voting rights.

"**Common Unit/s**" means the Class A Common Units and Class B Common Units.

"**Commencement Date**" shall have the meaning set forth in Section 1.1 hereto.

"**Company**" shall have the meaning set forth in the preamble hereto.

"**Company Acceptance Notice**" has the meaning set forth in Section 10.3(b).

"**Company Option Period**" has the meaning set forth in Section 10.3(b).

"**Construction Expenses**" means the construction expenses incurred by the Company on a consolidated basis in connection with the development and construction of facilities for the production of bio economic recycled & renewable natural gas and/or carbon dioxide projects located in Puerto Rico, including the project being developed by Biomass Green Fuels LLC.

"**Covered Persons**" has the meaning set forth in Section 6.5(a).

"**Conversion Price**" has the meaning set forth in Section 4.2(g).

"**Convertible Notes**" means (a) the convertible note(s) issued to Danosa Caribbean, Inc. pursuant to a certain Convertible Note Purchase Agreement by and between Biomass and Danosa Caribbean, Inc. dated August 20, 2019; and (b) the convertible note(s) issued to Flexitank, Inc. pursuant to a certain Convertible Note Purchase Agreement by and between the Company and Flexitank, Inc. dated April 13, 2020.

"**Debt Service**" means the debt service of the Company on a consolidated basis, including but not limited to the scheduled payments of principal and interests, and the payment of applicable premiums or penalties and other amounts due to lenders of the Company and of its subsidiaries.

"**Deemed Liquidation Event**" means a merger or consolidation (other than one in which equity holders of the Company own a majority by voting power of the outstanding shares or membership interest of the surviving or acquiring entity) and a sale, lease, transfer, exclusive license or other disposition of all or substantially all of the assets of the Company.

"**Disqualified Person**" means a person disqualified by the Board of Managers to continue to be a Manager in accordance with the terms of Section 6.1(f) of this Agreement and barred from nomination to such position unless reinstated pursuant to section 6.1(f).

"**Dissolution Event**" has the meaning set forth in Section 9.1.

"**Distributable Cash**" means fifty percent (50%) of Available Cash Flow.

"**Drag Along Sale**" has the meaning set forth in Section 10.4.

"**EBITDA**" means the Company's earnings before interests, taxes, depreciation and amortization.

"**Employee Members**" means any and all employee(s) who opt(s) to buy, or by any other means acquire(s), Class B Common Units.

"**Exercising Members**" has the meaning set forth in Section 10.5(a).

"**Extraordinary Expenses or Payments**" means extraordinary expenses or payments that are necessary for the proper operation of the Company but are not Operating Expenses or Construction Expenses which are approved by the Board of Managers. Extraordinary Expenses or Payments include but are not limited to capital improvements (CAPEX) and replacement of equipment or facilities.

"**Fair Market Value**" means the price in cash, or its equivalent, if then offered for sale in the open market in competition with other similar assets at or near the same location, with a reasonable time allowed to find a purchaser.

"**Fair Market Value per Unit**" will be equal to the market value of the Units on a fully diluted basis, determined at the time the Fair Market Value per Unit is computed, pursuant to reasonable valuation factors to determine the value of companies in the same industry as the Company; provided, however, that the Fair Market Value per Unit will be determined by a Certified Public Accountant duly appointed by the Board.

"**Family Member**" with respect to any person shall mean any one or more of the following persons: (i) such person's spouse, (ii) such person's natural or adopted lineal descendants, (iii) such person's siblings, (iv) the spouse of such person's sibling, (v) any natural or adopted lineal descendant of a person described in clause (iii), or (vi) such person's lineal ascendants.

"**Founding Members**" or "**Initial Members**" means Gregory Boyd, Olmar López Gómez and Olmar López Vidal.

"**Governmental Authority**" means the government of the United States, the Commonwealth of Puerto Rico or any other nation, any state, department or any other political subdivision thereof, and any governmental body, agency, authority, instrumentality, regulatory body, court, tribunal, central bank or other entity (including any federal or other association of or with which any such nation may be a member or associated) exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"**Independent Manager**" means an induvial that has no material relationship (including but not limited to being a partner, shareholder, equity holder, employee, contractor, director, manager, officer, agent or representative) with the Related Companies. In addition an Independent Manager is not: (i) an individual that has been within the last three (3) years, an employee of the Related Companies, or an immediate family member is, or has been within the last three years, an executive officer of the Related Companies; (ii) an individual that has received, or has an immediate family member who has received, during any twelve-month period within the last three years, more than $80,000 in direct compensation from the Related Companies; (iii) an individual that is (A) a current partner or employee of a firm that is the Company's internal or external auditor; (B) has an immediate family member who is a current partner of such a firm; (C) has an immediate family member who is a current employee of such a firm and personally works on the Company's audit; or (D) has an immediate family member that within the last three years was a partner or employee of such a firm and personally worked on the Company's audit within that time; (iv) an individual that is a current employee, or an immediate family member of a current executive officer, of a company that has made payments to, or received payments from, the Related Companies for property or services in an amount which, in any of the last three fiscal years, exceeds the greater of $1 million, or 2% of such Related Company's gross revenues.

"**Initial Contribution**" means the initial Capital Contribution to the Company made by the Members.

"**Involuntary Transfer**" has the meaning set forth in Section 10.6(a).

"**Involuntary Transferee**" has the meaning set forth in Section 10.6(a).

"**Majority Approval of the Members**" means the approval, consent, determination or vote (as the case may be) of the holders of Class A Common Units and Series A Preferred Units which, in the aggregate, represent more than fifty percent (50%) of the then Class A Common Units issued and outstanding and those issuable upon conversion of the Series A Preferred Units voting as a single class.

"**Manager**" means each Person which is not a Disqualified Person elected to act as a member of the Board of Managers and designated by the Company as an additional or substitute Manager pursuant to this Agreement. "Managers" refers to such Persons as a group.

"**Member Acceptance Notice**" has the meaning set forth in Section 10.3(b).

"**Member Option Period**" has the meaning set forth in Section 10.3(b).

"**Member Resolution**" has the meaning set forth in Section 3.2.

"**Members**" means each Member of the Company executing this Agreement on the date hereof, each Person admitted as an additional Member pursuant to this Agreement, and any Person admitted as a substitute Member pursuant to Section 6.2(d).

"**Member Acceptance Notice**" has the meaning set forth in Section 10.3(b).

"**Members Option Period**" has the meaning set forth in Section 10.3(b).

"**Membership Interest/s**" means, with respect to any Member, (a) that Member's status as a Member, (b) that Member's right to receive distributions (liquidating or otherwise) from the Company under the terms of this Agreement, (c) all other rights, benefits and privileges enjoyed by that Member (under the Act or this Agreement) in its capacity as a Member, including that Member's rights to vote, consent and approve those matters described in this Agreement and (d) all obligations, duties and liabilities imposed on that Member under the Act or this Agreement in its capacity as a Member.

"**Non-Competition and Non-Solicitation Agreement**" has the meaning set forth in Section 6.12.

"**Non-Disclosure and Intellectual Property Rights Assignment Agreement**" has the meaning set forth in Section 6.13.

"**Non-Voting Units**" has the meaning set forth in Section 10.6(b).

"**Officers**" has the meaning set forth in Section 6.2(a).

"**Offered Company Units**" has the meaning set forth in Section 4.1(g).

"**Offered Interests**" has the meaning set forth in Section 10.3(a).

"**Operational Expenses**" means expenditures to be incurred in the normal operations of the business of the Company on a consolidated basis, including but not limited to salaries, rent, royalties, utilities (power, water and tele-communications), information systems (software and hardware), maintenance and equipment repair, payments related to intellectual property rights (licenses), payment to suppliers and vendors, transportation services, employee benefits, insurance premiums, fees payable to Governmental Authorities (other than Taxes), payment of fees to accountants, lawyers, engineers, advisors and independent contractors of the Company and/or its Subsidiaries.

"**Original Operating Agreement**" has the meaning set forth in the Recitals to this Agreement.

"**Original Purchase Price**" means $1.00 per Series A Preferred Unit.

"**Overallotment Notice**" has the meaning set forth in Section 10.3(b).

"**Person**" means any individual, corporation, partnership, joint venture, limited liability company, limited liability partnership, association, joint stock company, trust, unincorporated organization, or other organization, whether or not a legal entity, and any governmental authority.

"**Pre-Organization Warrant**" means the warrants granted to Semillero Investment Fund I, LLC and to Puerto Rico Fund for Growth, L.P. on September 14, 2020.

"**Preemptive Right**" has the meaning set forth in Section 4.1(g).

"**Preemptive Right Notice**" has the meaning set forth in Section 4.1(g)(i).

"**Preferred Unit/s**" has the meaning set forth in Section 4.1(b).

"**Permitted Transfer**" means a Transfer of Units by a Member of the Company: (a) if Member is an individual (i) to any member of the Member's immediate family, or to a trust for the benefit of the Member or any member of Member's immediate family, or (ii) upon the death of a Member to his or her heirs; or (b) if Member is a limited partnership or limited liability company, to an Affiliate, partner or member of the Member; or (c) if Member is a corporation, to an Affiliate or shareholder of the Member; provided, however, that a Transfer referred to in this definition shall be permitted only if, as a precondition to such Transfer, the transferee executes a joinder to this Agreement, in a manner reasonably acceptable in form and substance to Parent, pursuant to which such transferee agrees to be bound as "Member" by all of the terms of this Agreement; or (d) any Transfer of Units to the extent required by governmental rule, law or regulation, or any directive or order of any governmental authority, or I any Transfer of Units pursuant to Section 4.2(i) of this Agreement.  Any such Permitted Transfer shall comply with applicable securities laws.

"**Proposed Sale**" has the meaning set forth in Section 10.3(a).

"**Proposed Transferee**" has the meaning set forth in Section 10.3(a).

"**PRFG**" means the Puerto Rico Fund for Growth, L.P., a limited partnership organized under the laws of the State of Delaware.

"**Purchase Right**" has the meaning set forth in Section 10.3(a).

"**Redemption Date**" has the meaning set forth in Section 4.2(h)(ii)(1).

"**Redemption Notice**" has the meaning set forth in Section 4.2(h)(ii)(2).

"**Redemption Price**" has the meaning set forth in Section 4.2(h)(ii)(1).

"**Redemption Request**" has the meaning set forth in Section 4.2(h)(ii)(1).

"**Related Companies**" means the Company, Biomass, Semillero, PRFG or the companies under the control of the Founders, Semillero, Semillero Partners or PRFG or their respective Affiliates.

"**Requisite Drag Holders**" means at any time (i) the holders of a majority of the Common Units then outstanding and (ii) holders of a majority of the Series A Preferred Units then outstanding.

"**Revenues**" means revenues generated by Biomass from its operations but does not include cash received as a result of an equity or debt financing of Biomass or of the Company or from the sale or monetization of any tax credits.

"**Second Additional Transfer Notice**" has the meaning set forth in Section 10.3(b).

"**Second Overallotment Notice**" has the meaning set forth in Section 10.3(b).

"**Semillero**" means Semillero Investment Fund I, LLC, a Delaware limited liability company authorized to do business in Puerto Rico, managed by its General Member, Semillero Partners, LLC.

"**Semillero Partners**" means Semillero Partners, LLC, a limited liability company organized under the laws of Puerto Rico."

"**Series A Preferred Units**" has the meaning set forth in Section 4.2(a).

"**Series A Preferred Distribution**" means the simple and cumulative distribution at a rate of eight percent (8%) per annum of the Original Purchase Price on the Series A Preferred Units, in preference to any distribution on Common Units or any other Membership Interest of the Company ranking junior to the Series A Preferred Units. For the avoidance of doubt, cumulative distributions refer to simple distributions that have accumulated because they were not paid by the Company when due.

"**Series A Holder**" means Semillero and PRFG.

"**Series A Holder Acceptance Notice**" has the meaning set forth in Section 10.3(b).

"**Series A Holder Option Period**" has the meaning set forth in Section 10.3(b).

"**Series A Managers**" has the meaning set forth in Section 4.2(f).

"**Subscription Notice**" has the meaning set forth in Section 4.1(g)(ii).

"**Record Holder**" means the Person in whose name Common Units and/or or Preferred Units are registered on the books of the Company as of the opening of business on a particular Business Day.

"**Reserves**" means cash reserves established by the Company as required by the lenders of the Company or cash reserves as the Board of Managers may deem reasonably necessary for the proper operation of the business of the Company on a consolidated basis, including but not limited to the establishment of reserves to deal with contingencies and self-insurance reserves.

"**Tag-Along Failure**" has the meaning set forth in Section 10.5(b).

"**Tag-Along Member**" has the meaning set forth in Section 10.5(b).

"**Tag-Along Notice**" has the meaning set forth in Section 10.5(a).

"**Tag-Along Notice Period**" has the meaning set forth in Section 10.5(b).

"**Tag-Along Portion**" has the meaning set forth in Section 10.5(b).

"**Tag-Along Right**" has the meaning set forth in Section 10.5(a).

"**Tag-Along Sale**" has the meaning set forth in Section 10.5(a).

"**Taxes**" means any and all present or future taxes (including value added tax), levies, imposts, duties, assessments, deductions, charges or withholdings (including backup withholdings) of whatever nature, together with any interest, charges, penalties, additions to tax or additional amounts imposed or collected by any Governmental Authority.

"**Third Party**" means any Person other than the Company and its Members and their respective affiliates.

"**Transfer**" means to endorse, sell, give, pledge, encumber, assign, transfer or otherwise dispose of, voluntarily or involuntarily or by operation of law all of or a portion of a Member's Units. Similar terms, such as "**Transferred**" or "**Transferring**" shall have correlative meanings.

"**Transfer Deadline**" has the meaning set forth in Section 10.3(b).

"**Transfer Notice**" has the meaning set forth in Section 10.3(a).

"**Transferring Member**" has the meaning set forth in Section 10.3(a).

"**Units**" has the meaning set forth in Section 4.1(a).

## ARTICLE III
## PURPOSE, MEMBER AND UNITS

**Section 3.1    Purposes and Scope**. The purpose of the Company is to transact any and all lawful business for which limited liability companies may be organized under the Act.

**Section 3.2    Members**. The Members of the Company are the Persons listed in **Exhibit A** hereto, those parties who from time to time execute this Agreement, counterparts hereof or a joinder agreement as Members and those other parties who comply with any other conditions for becoming a Member as set forth herein and are recorded in **Exhibit A** as a Member. Subject to any protective provisions in favor of the holders of the Series A Preferred Units, the Members may, subject to Section 4.2(j), act by written consent by the Majority Approval of the Members (a "**Member Resolution**").

**Section 3.3    Members' Information**. The mailing addresses of the Members are set forth in **Exhibit B** of this Agreement.

## ARTICLE IV
## MEMBERS; CAPITAL CONTRIBUTIONS; CLASSES OF MEMBERSHIP INTERESTS

**Section 4.1    Capital Contribution; Membership Interests.**

(a)    The Company is authorized to issue a total of 50,000,000 units representing the Membership Interest (collectively, the "**Units**") consisting of two classes, including 25,000,000 Common Units and 25,000,000 Preferred Units. The rights, duties, and obligations of the Members of the Company shall be governed by the terms and conditions of this Agreement and the

Membership Interest shall be represented by Units as herein provided.  The issuance of fractional Units shall be allowed.  The Company shall not issue Units in bearer form.

(b)  In the future, the Company intends to raise working capital through sale of preferred units (the "**Preferred Units**").  The Board of Managers has authority, subject to Sections 4.1(g) and 4.3(j) and in accordance with the other provisions of this Agreement, and without action by the Members, to designate and issue all or any portion of the authorized but unissued Preferred Units, and to determine the voting rights, preferences, privileges and restrictions, including distribution rights, conversion rights, voting rights, terms of redemption, liquidation preferences and the number of units constituting any series in the designation of such series.  Such Preferred Units, if and when issued, may carry rights superior to those of the Common Units.

(c)  The Common Units shall include Class A Common Units and Class B Common Units.

(d)  The Company may issue Class A Common Units.  Each Class A Common Unit shall carry the right to cast one vote on any matter submitted to the Members of the Company and be entitled to distributions as may be determined by the Board of Managers, from time to time.  Holders of Class A Common Units shall be considered Members of the Company.

(e)  The Company may issue interests in the manner of Class B Common Units to its employees as an additional benefit or compensation for performance or services rendered (i) in amounts not to exceed 5% of the total issued and outstanding Common Stock on a fully diluted basis after the exercise of all SAFEs, options, warrants and other securities and the conversion of all convertible securities, including, without limitation, the Series A Preferred Units and any convertible notes and (ii) subject to the Majority Approval of the Members. Such Class B Common Units shall not have voting rights or any other benefits upon those Membership Interests or this Agreement, except that they shall have the right to receive distributions upon such Class B Common Units, as may be determined by the Board of Managers, from time to time.

(f)  As of the date hereof, the Initial Members shall have made a Capital Contribution to the Company as set forth in **Exhibit A** hereto pursuant to a certain Capital Contribution Agreement by and among the Company, Biomass Green Fuels LLC and the Founding Members, dated November 5, 2019.

(g)  The Company shall not propose to offer for sale any Units (the "**Offered Company Units**") unless the Company shall have first offered such Units pro-rata (excluding those issuances listed at the last paragraph of Section 4.2(h)(i), to the Members, based on their percentage equity ownership in the Company, in accordance with the following provisions (the "**Preemptive Right**").

(i)  The Company shall deliver a written notice (the "**Preemptive Right Notice**") by certified mail or via electronic mail with confirmation receipt and acknowledgement to each of the Members stating: (i) its bona fide intention to offer to sell such Offered Company Units, (ii) the amount of money the Company is seeking to raise in connection with the sale of such Offered Company Units, (iii) the price per Unit for the Offered Company Units, (iv) the amount of Offered Company Units; and (v) any other information necessary for each Member to

accurately and adequately calculate how its Units in the Company will be reduced if such Member fails to exercise its preemptive rights hereunder in connection with such Offered Company Units.

(ii) Within thirty (30) calendar days after receipt of the Preemptive Right Notice, each Member may elect to purchase or obtain, at the price and on the terms specified in the Preemptive Right Notice (which price shall be no greater than the price to be paid by, and the terms no less favorable than those offered to, any other party to purchase such Offered Company Units), up to that portion of the Offered Company Units that will allow the Member to retain the same percentage equity ownership in the Company held by it immediately prior to the consummation of the sale of the Offered Company Units, by providing written notice to that effect to the Company (the "**Subscription Notice**"). In the event that any Member does not elect to purchase its pro-rata Units by providing the Subscription Notice within the thirty (30) day period described above, such Member shall be deemed to have elected not to purchase the Offered Company Units, and the Series A Holders shall fifteen (15) days after the expiration of said thirty (30) day period to elect to purchase such additional Units pro-rata.

(iii) Following the forty-five (45) day period described above, the Company shall have the right for a period of one hundred eighty (180) days to sell any Offered Company Units that the Members have elected not to purchase, on the same terms offered to the Members. Thereafter, any offer, sale or issuance of Offered Company Units shall again be subject to the provisions of this Section 4.1(g).

(h) The Company may, subject to Sections 4.1(g) and 4.2(j), issue additional Units or other convertible securities; provided that, such additional capital or securities are issued as approved by the Majority Approval of the Members, and to the extent applicable, by the Series A Holders, as provided in this Agreement.

(i) These Preemptive Rights shall also apply to companies formed outside the structure of the Company where the Pre-Organization Warrant granted to the Series A Holders is exercised.

**Section 4.2** **The Series A Preferred Units**

(a) Issuance of the Series A Preferred Units.  Among the Preferred Units the Company is authorized to issue pursuant to Section 4.1(a) of this Agreement, the Company is authorized to issue SEVEN MILLION THREE HUNDRED AND FIFTY UNITS (7,350,000)  of Series A Preferred Units which shall carry the rights described in this Section 4.2 and other applicable provisions of this Agreement (the "**Series A Preferred Units**").

(b) Distributions. Distributions on the Series A Preferred Units will be simple and cumulative and accrue, in preference to any distribution on Common Units or Series A Preferred Units, at a rate of eight percent (8%) per annum of the Original Purchase Price of such Series A Preferred Units. The Series A Preferred Distribution shall be subject to the operating results of the Company, governing law and the fiduciary obligations of the Board of Managers, but shall accrue to the extent not paid. It is expected that the Series A Preferred Distribution will be paid annually in arrears and upon a Deemed Liquidation Event or upon conversion or redemption. To the extent

that, as of any time, all distributions then-accrued on the Series A Preferred Units have been paid in full (including the ACF Distribution), then the Company may make distributions to the Common Units, other than an ACF Distribution, and the Series A Preferred Units shall participate in any such distributions made to the holders of Common Units on an as-converted basis.

(c)    Seniority Status. The Series A Preferred Units will be senior to all other Units of the Company, but as equity capital of the Company, is subordinated to the third-party bona-fide debt of the Company.

(d)    ACF Distribution. In addition to, and after payment of, the Series A Preferred Distribution, during the first (6) six years after the issuance of the Series A Preferred, a minimum of fifty percent (50%) of the Available Cash Flow, shall be distributed, of which fifty percent (50%) will be payable to the Series A Holders and, the remainder will be distributed to the Common Units (the "**ACF Distribution**"). The payment of the ACF Distribution shall be subject to the determination of Available Cash Flow by the Board of Managers. It is expected that such ACF Distribution will be payable annually and upon a Deemed Liquidation Event or upon conversion or redemptioI(e)  Liquidation Preference. In the event of any liquidation, dissolution or winding up of the Company, the proceeds shall be paid as follows: (i) first, prior to any distribution in respect of any other Units, pay one (1) times the Original Purchase Price plus all accrued and unpaid Series A Preferred Distribution and all accrued and unpaid ACF Distributions on each Series A Preferred Unit; and (ii) second, the balance of any proceeds shall be distributed pro rata to holders of Common Units and Series A Preferred Units on an as converted basis.

In the event of a Deemed Liquidation Event, the distributions to the Series A Holders indicated in the paragraph set forth above shall occur unless the Series A Holders holding at least a majority of the issued and outstanding Series A Preferred Units affirmatively elect not to receive such distributions. The Series A Preferred Units' liquidation preference shall not be abrogated or diminished in the event part of the consideration is subject to escrow in connection with a Deemed Liquidation Event.

(f)    Voting Rights. Each Series A Preferred Unit shall carry the right to cast one vote on any matter submitted to the Members of the Company. Holders of Series A Preferred Units shall be considered Members of the Company. The holders of the Series A Preferred Unit  shall vote together with the holders of Common Units on an as-converted basis, and not as a separate class, except that: so long as any Series A Preferred Units are issued and outstanding, the holders the Series A Preferred Units as a class shall be entitled to elect two (2) members of the Board of Managers, (the "**Series A Managers**").

(g)    Optional Conversion. The Series A Preferred Units may initially be converted 1:1 to Class A Common Units at any time at the option of Series A Holders. The number of Class A Common Units into which each Series A Preferred Unit may be converted (the "Conversion Ratio") will be adjusted in the same proportion as the outstanding number of Class A Common Units may change as a result of adjustments for unit distributions, splits and combinations. In addition, the Conversion Ratio will be adjusted as described below in Section 4.2(h).

(h)    Anti-Dilution Rights.

i. Broad-Based Weighted Average.

For purposes of this Section 4.2(h), the original conversion price shall be the Original Purchase Price but the same shall be subject to adjustment indicated below (the "**Conversion Price**").

In the event that the Company issues additional securities (including Units, Membership Interests and securities convertible into or exchangeable for Units) at a purchase price per Class A Common Unit that is less than the then current Conversion Price, such Conversion Price shall be adjusted in accordance with the following formula:

$CP2 = CP1 * (A+B) / (A+C)$

$CP2$ = Conversion Price in effect immediately after new issue

$CP1$ = Conversion Price in effect immediately prior to new issue

$A$ = Number of Class A Common Units deemed to be outstanding immediately prior to new issue (includes all membership units of outstanding Common Units, all membership units of outstanding preferred units on an as-converted basis, and all outstanding options on an as-exercised basis; and does not include any convertible securities)

$B$ = Aggregate consideration received by the Company with respect to the new issue divided by $CP1$

$C$ = Number of Class A Common Units issued in the subject transaction

In the event of an adjustment to the Conversion Price under this Section 4.2(h), the Conversion Ratio shall be adjusted in accordance to the following formula:

$CR2 = CR1 / CP2$

$CR1$ = Conversion Ratio in effect immediately prior to new issue

$CR2$ = Conversion Ratio in effect immediately after new issue

$CP2$ = Conversion Price in effect immediately after new issue

The following issuances shall not trigger anti-dilution adjustment: (i) securities issuable upon conversion of any of the preferred equity, or as a distribution on the preferred equity; (ii) securities issued upon the conversion of any debenture, warrant, option, or other convertible security; (iii) equity issuable upon a membership unit split, equity distribution, or any subdivision of membership units of outstanding equity; and (iv) membership units (or options to purchase such membership units) issued or issuable to employees or directors of, or consultants to, the Company pursuant to any plan approved by the Board of Managers which includes the affirmative vote of the Series A Managers.

ii. Specific Anti-Dilution Protection

Notwithstanding the foregoing, in the event that either or both Flexitank, Inc. and Danosa Caribbean, Inc., holders of certain convertible notes[1] issued by the Company, exercise their right to convert such convertible notes into Units, then the Company shall be obligated to issue to Semillero and PRFG, without any additional payment or consideration and within five (5) business days after the conversion of any such notes, the number of Series A Units required in order for Semillero and PRFG's Membership Interest in the Company, on an as converted basis, not to be diluted after the issuance of the Units to the mentioned holders of the convertible notes, all as contemplated in Annex I. The Company shall take any actions reasonably requested by the Series A Holders to document the issuance of such u.

(475)    (i)    <u>Redemption Rights</u>.

(1) <u>General</u>. Unless prohibited by the laws applicable in the Commonwealth of Puerto Rico, at the option of each Series A Holder, Series A Preferred Units shall be redeemed by the Company at a price equal to three times (3x) the Original Purchase Price plus accrued and unpaid Series A Preferred Distributions and the ACF Distribution (the "**Redemption Price**"), in two (2) equal annual installments, the first of which installments shall be payable no later than sixty (60) days after receipt by the Company of written notice from the exercising Series A Holder (the "**Redemption Notice**") requesting redemption of all Series A Preferred Units held by such Series A Holder (the "**Redemption Request**"); provided, however, that the Series A Holders shall only have the right to give said notice on or after the seventh (7th) anniversary of the Effective Date. The second installment shall be payable by the one (1) year anniversary of the date of the first payment.

Upon receipt by the Company of a Redemption Request, the Company shall apply all of its assets to any such redemption, except to the extent prohibited by Puerto Rico law. The date of payment of each installment of the Redemption Price shall be referred to as a "**Redemption Date**." On each Redemption Date, the Company shall redeem, on a pro rata basis in accordance with the number of units of Series A Preferred Units owned by each Series A Holder, that number of outstanding shares of Series A Preferred Units determined by dividing (i) the total number of units of Series A Preferred Units outstanding immediately prior to such Redemption Date by (ii) the number of remaining Redemption Dates (including the Redemption Date to which such calculation applies). If on any Redemption Date the laws applicable in the Commonwealth of Puerto Rico prevent the Company from redeeming all units of Series A Preferred Units to be redeemed, the Company shall ratably redeem the maximum number of units that it may redeem consistent with such law, and shall redeem the remaining units as soon as it may lawfully do so under such law.

(2) <u>Redemption Notice</u>.  The Each Redemption Notice shall state:

(i)    the number of units of Series A Preferred held by the holder that the Company shall redeem on the Redemption Date specified in the Redemption Notice;

---

[1] Note Purchase Agreement by and between Danosa Caribbean Inc. and BGF, dated August 21, 2019 and corresponding promissory note issued by BGF; and the Note Purchase Agreement by and between Flexitank, Inc. and the Company, dated April 13, 2020 and corresponding promissory note issued by the Company.

(ii)  the Redemption Date and the Redemption Price; and

(iii)  for holders of Series A Preferred Units in certificated form, that the Series A Holder is to surrender to the Company, in the manner and at the place designated, his, her or its certificate or certificates representing the Series A Preferred Units to be redeemed.

(3)  Effect of Redemption.  All Series A Preferred Units redeemed pursuant to the terms of this Section 4.2(i) shall be cancelled upon the payment of the Redemption Price and shall cease to be issued and outstanding.

(j)  Protective Provisions.  So long as ten percent (10%) of the Series A Preferred Units are outstanding, in addition to any other vote or approval required under this Agreement, the Company will not, without the written consent of the Series A Holders holding at least a majority of the Series A Preferred Units then outstanding, either directly or by amendment, merger, consolidation, or otherwise: (i) effect any waiver or amendment of any covenant, term or condition of the Agreement and the Certificate of Formation of the Company (ii) create or authorize the creation of or issue any other security convertible into or exercisable for any equity security, having rights, preferences or privileges senior to or on parity with the Series A Preferred Units, or increase the authorized number of units of Series A Preferred Units; (iii) effect any Deemed Liquidation Event or other conveyance, sale, lease, transfer or other disposition of all or substantially all of the Company's business or assets, or the merger, consolidation or similar transaction of the Company with another entity; or (iv) effect the liquidation, recapitalization, reorganization or dissolution of the Company or the filing of a voluntary bankruptcy petition by the Company.

(k)  Management and Information Rights.  The Series A Holders shall have the right to access to Company facilities and personnel during normal business hours and with reasonable advance notification. The Company shall deliver to Series A Holders: (i) annual, quarterly, and monthly financial statements on a consolidated basis, as well as any other information determined by the Board of Managers; (ii) thirty (30) days prior to the end of each fiscal year, a comprehensive operating budget forecasting the Company's revenues, expenses, and cash position on a consolidated basis on a month-to-month basis for the upcoming fiscal year; and (iii)  thirty (30) days following the end of each year an up-to-date capitalization table.

Section 4.3  **Approvals by the Members**.  Any actions with respect to the Company that are subject to the approval, consent, determination or vote of the Members shall require Majority Approval of the Members.

Section 4.4  **Registry of Transfers.**  Units shall be transferable upon the books of the Company by the holders thereof, in person, or by a duly authorized attorney, upon surrender and cancellation of certificates for a like number of Units of the same class, with duly executed assignment and power of transfer endorsed thereon or attached thereto, and with such proof of the authenticity of the signatures to such assignment and power of transfer as the Company or its agents may reasonably require.

Section 4.5  **Redemption of Units**.  Except as provided in Section 4.2(i), Members may not redeem their Units, except with the unanimous consent of all the Members.

**Section 4.6**     **Limited Liability.** The Members will not be liable for the debts, obligations, or liabilities of the Company beyond the Members' Initial or Additional Contributions to the Company.

## ARTICLE V
## DISTRIBUTIONS

**Section 5.1**    **Cash Distributions**. Cash distributions to the Members shall be made in accordance with Section 4.2 of this Agreement

**Section 5.2**     **Distributions on Termination**.  Upon the dissolution and winding- up of the Company, its assets will be distributed in the manner prescribed in Article IX of this Agreement.

**Section 5.3**   **Limitation on Distributions**.  Any other provision of this Agreement to the contrary notwithstanding, no cash distribution or distribution on termination to the Members will be declared and paid unless, (a) after the distribution is made, the Fair Market Value of all of the assets of the Company is in excess of all liabilities of the Company, other than liabilities to the Members on account of their Capital Contributions; and (b) such distribution is in conformity with any outstanding loan agreements of the Company.  For these purposes, the Fair Market Value of the assets of the Company will be determined, in good faith, by the Board of Managers.

## ARTICLE VI
## MANAGEMENT OF THE COMPANY

**Section 6.1**     **Management Generally**.

(a) Except as otherwise expressly required under this Agreement (including, without limitation, section 4.2(j)) or the Act, the full, absolute and exclusive right, power and authority to manage the Company is vested in, and reserved to, the Board of one or more Managers designated by the Members (the "**Board of Managers**").

(b)     Only Members holding Class A Common Units shall be entitled to vote on the election of Managers, *provided notwithstanding*, that each Founding Member which is not a Disqualified Person shall have the right to occupy one board seat or appoint a member to the Board of Managers of the Company.  Each Manager elected, designated or appointed by the Members shall not be a Disqualified Person and shall hold office until a successor is elected and qualified or until such Manager's earlier death, resignation, expulsion or removal.  The initial Managers designated by the Members holding Class A Common Units are listed in Exhibit I

(c)     Notwithstanding as provided in Section 6.1(b) above, as of the Effective Date and while the Series A Preferred Units are held by either Semillero or PRFG (or their transferees pursuant to a Permitted Transfer or as otherwise allowed under this Agreement), the Board of Managers shall consist of at least five (5) managers of which: (i) two (2) representatives shall be designated by the Founding Members which shall not be a Disqualified Person (the "Founding Members' Managers"), (ii) one (1) representative designated by Semillero which shall not be a Disqualified Person (for so long as it, or a transferee pursuant to a Permitted Transfer or as

otherwise allowed under this Agreement, holds Series A Preferred Units), (iii) one (1) representative designated by PRFG which shall not be a Disqualified Person (for so long as it, or a transferee pursuant to a Permitted Transfer or as otherwise allowed under this Agreement, holds Series A Preferred Units), and (iv) one manager designated by the Founding Members Managers, the representative designated by Semillero (or a transferee pursuant to a Permitted Transfer or as otherwise allowed under this Agreement) and the representative designated by the PRFG (or a transferee pursuant to a Permitted Transfer or as otherwise allowed under this Agreement), which manager shall be an Independent Manager of the Board of Managers and shall not be a Disqualified Person.

(d)     The creation of at the most two (2) observer seats of the Board of Managers could be approved by the Majority Approval of the Members at their sole discretion ("Board Observer"). Subject to execution of a customary non-disclosure agreement, the Board Observers have the right to attend, observe and participate in all Board meetings, but have no right to vote on any matters coming before the Board. A Board Observer has to be a Member of the Company. The Company shall give such Board Observers copies of all notices, minutes, consents and other materials, financial or otherwise, which the Company provides to its Board; provided, however, that the Board Observers may be excluded from any portion of any meeting where (a) counsel for the Company is present and such exclusion is necessary to preserve any attorney-client privilege with respect to the communications during such portion of the meeting; or (b) such exclusion is necessary to avoid a conflict of iIrest.

(e)     Without limiting, and in furtherance of, the foregoing, the business and affairs of the Company shall be managed and conducted, and its capital, assets, funds and liabilities shall be managed, dealt with and disposed of, exclusively by and under the direction of the Board of Managers and, except as otherwise expressly required under this Agreement or the Act, all decisions to be made by or on behalf of the Company or in respect of the Company's business, capital, assets, funds and liabilities of the Company shall be made solely and exclusively by the Board of Managers; provided that the Board of Managers agree to act in good faith in taking such actions or making such decisions.

(f)     The Board of Managers, by a majority vote of its members, may determine that a Manager should be disqualified to serve as a Manager for Cause and upon such determination, the Manager, if removed as provided in Section 6.7 of this Agreement shall be disqualified to be a Manager after his or her removal from the Board of Managers, *provided however*, that such disqualification shall become effective upon the Majority Approval of the Members. The vote of the Manager subject to the vote of disqualification in the Board of Managers shall not be taken into consideration in the disqualification determination of the Board of Managers. A Disqualified Person may be reinstated and cease to be a Disqualified Person upon the unanimous vote of the Board of Managers to that effect and the Majority Approval of the Members.        (g) Notwithstanding the provisions of section 6.1(d) immediately above, Danosa Caribbean, Inc. and Flexitank Inc. shall continue to have the observer rights set forth in the Convertible Notes, which shall continue in full force and effect as provided thereof. For the avoidance of doubt, the observer rights of Danosa Caribbean, Inc. related to Biomass will be honored at the Company level as observers in the Company's Board of Managers.

**Section 6.2    Management by the Board of Managers**. Except as otherwise expressly required under this Agreement (including, without limitation, section 4.2(j)) the Board of Managers shall have the power to do any and all acts necessary, convenient or incidental to or for the furtherance of the purposes herein, including exercising all powers, statutory or otherwise.  Among those powers are:

(a)    appoint one or more individuals to hold offices and carry the day to day activities of the Company (the "**Officers**"), and such Officers of the Company shall consist of such officers as may be deemed necessary or desirable by the Board of Managers, and shall have such title, authority, and duties as the Board of Managers may delegate to him or her;

(b)    make from the Company assets any and all expenditures that the Board of Managers may deem necessary or desirable for the conduct of the Company and the carrying out of the Company's obligations and responsibilities under this Agreement to the extent permissible under any other agreements (including mortgages) to which the Company is a party;

(c)    take such steps as necessary to fulfill the determination of the Members to declare and make distributions of capital or income, in cash or property to Members;

(d)    draft such documents at the request of the Members to admit additional Persons as Members, including substituted Members as provided herein;

(e)    purchase, at the expense of the Company, liability and other insurance to protect the Company and the Company's assets and Business;

(f)    invest the Company's assets in Company and savings and loan association savings accounts, commercial paper, government securities, certificates of deposit, Company's acceptances, other short term interest bearing obligations and any other investments in the sole and absolute discretion of the Board of Managers;

(g)    maintain, at the expense of the Company, adequate records and accounts of all operations and expenditures and furnish the Members with annual statements of accounts as of the end of each Company Fiscal Year, together with tax reporting information;

(h)    subject to Section 6.3, make, refrain from making, or revoke such elections under the tax laws of the Commonwealth of Puerto Rico, the United States, the several States and other relevant jurisdictions as to the treatment of items of Company income, gain, loss, deduction, and credit and as to all other relevant matters;

(i)    (h)(i)  change the classification of the Company for Puerto Rico or federal income tax purpose;

(j)    enter into any leases for property, real or personal. in the ordinary course of the Company's Business;

(k)    make any purchases for, on behalf of, or in the name of, the Company in the ordinary course of the Company's Business;

(l)     establish and maintain reserves, in such amount as the Board of Managers determine appropriate, in Board of Managers' reasonable discretion under the then existing circumstances; and

(m)     take any and all other action permitted by law and that is reasonably related to Company purposes.

### Section 6.3     Matters Requiring Series A Managers' Approval.

Notwithstanding anything provided to the contrary in this Agreement, the Company will not, without the express and affirmative approval of both Series A Managers:

(a)     approve the annual budget of the Company for a particular fiscal year;

(b)     make any loan or advance to, or own any securities of, any subsidiary or other corporation, limited liability company, partnership, or other entity in excess of one hundred and fifty thousand dollars ,000);

(b)     guarantee any indebtedness except for trade accounts of the  Company or any subsidiary arising in the ordinary course ofness;

(c)     make any investment inconsistent with any investment policy approved by the Board ofagers;

(d)     incur any aggregate indebtedness in excess of one hundred and fifty thousand dollars ($150,000) that is not already included in a budget approved by the Board of Managers, other than trade credit incurred in the ordinary course ofIsiness;

(e)     hire, fire, or change the compensation of the executive officers;

(f)     enter new lines of business outside the landfill gas industry, reject or refrain from undertaking any project or opportunity within or related to the Business, or exit the current line of business within the landfill gas industry;

(g)     sell, assign, license, pledge or encumber material technology or intellectual property, other than licenses granted in the ordinary course of business;

(h)     enter into any corporate strategic relationship involving the payment contribution or assignment by the Company or to the Company of assets greater than one hundred fifty thousand dollar150,000);

(i)     make any loan or advance to any person, including, any employee or director, except advances and similar expenditures in the ordinary course of business or under the terms of an employee equity or option plan approved by the Board of Managers;

(j)      enter into, or be a party to any transaction with any officer, director or employee of the Company or any "associate" (as defined in Section 12b-2 of the Securities Exchange Act of 1934, as amended) of any such person;

(k)      the selection of independent auditors of the Company, outside of: (a) one of the big (4) four accounting firms; or (b) top ten (10) global accounting firms registered with the Public Company Accounting Oversight Board (excluding BDO or any of its affiliates); and

(l)      address any real or potential conflict of interest matter, including the hiring, firing or otherwise entering into or be a party to, or permit any subsidiary to hire, fire or otherwise enter into or be a party to, any transaction with any Family Member or Affiliate of any Initial Member of the Company or its subsidiaries. All real or potential conflict of interest shall be addressed in accordance with the terms of the Board of Managers' Conflicts of Interest Policy.

**Section 6.4      Restrictions on Authority of the Board of Managers.**  In addition to the restrictions provided elsewhere herein, without the affirmative vote or written consent of the Members, the Board of Managers shall not have the authority to approve and the Company will not take any of the following actions:

(a)      merge or consolidate the Company, whether or not the Company is the surviving entity;

(b)      change the Company's purposes long-term business strategy or scope;

(c)      liquidate, dissolve or wind up the Company; or

(d)      redeem, retire or otherwise acquire for value any Units or other equity security, except as provided for in this Agreement.

**Section 6.5      Liabilities. Exculpation and Indemnification of Members, and Managers.**

(a)      No Member, Manager employee or agent of the Company and no employee, agent or Affiliate of a Member (collectively, the "**Covered Persons**") shall be liable to the Company or any other Person who has an interest in or claim against the Company for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement, except that a Covered Person shall be liable for any such loss, damage or claim incurred by reason of such Covered Person's gross negligence or willful misconduct. Notwithstanding the above, a Member of the Company may voluntarily agree to guarantee the obligations of the Company, including but not limited to the performance of actions of the Company under valid contracts entered into by the Company, and the extent of the liabilities and obligations of such Members shall be those included in the guaranty agreement.

(b)      To the fullest extent permitted by and in accordance with the Act, a Covered Person shall be entitled to indemnification from the Company for any loss, damage or claim incurred by

such Covered Person by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement, except that no Covered Person shall be entitled to be indemnified in respect of any loss, damage or claim incurred by such Covered Person by reason of such Covered Person's gross negligence or willful misconduct with respect to such acts or omissions; provided, however, any indemnity under this Section 6.4 shall be provided out of and to the extent of Company assets only.

(c)      To the fullest extent permitted by and in accordance with the Act, the Company shall have the power to purchase and maintain insurance, including insurance on behalf of any Covered Person against any liability asserted against such Person and incurred by such Covered Person in any such capacity, or arising out of such Covered Person's status as an agent of the Company, whether or not the Company would have the power to indemnify such Person against such liability under the Act. As of the Effective Date and while there are one or more Series A Managers as members of the Board of Managers, the Company purchase directors & officers insurance with a carrier and in an amount satisfactory to the Series A Holders. The Company shall enter into indemnification agreement with the Series A Holders and the Series A Managers in form acceptable to the Series A Holders and the Series A Managers in their sole discretion. All other Members and Managers of the Company shall have the right to enter into indemnification agreements with identical (to the extent possible) terms to the terms of the indemnification agreements with Series A Holders and Series A Managers. In the event the Company merges with another entity and is not the surviving corporation, or transfers all its assets, proper provisions shall be made so that successors of the Company assume the Company's obligations with respect to indemnification of Investor.

(d)      The rights provided to Covered Persons pursuant to this Section 6.4 (a) shall be contract rights based upon good and valuable consideration, pursuant to which a Covered Person may bring suit as if the provisions of this Section were set forth in a separate written contract between the Covered Person and the Company, (b) shall fully vest at the time the Covered Person first assumes his or her position as a Manager of the Company (c) are intended to be retroactive and shall be available with respect to any act or omission occurring prior to the adoption of this Section, (d) shall continue as to a Covered Person who has ceased to be a Manager of thIompany, and (e) shall inure to the benefit of the Covered Person's heirs, executors and administrators. In the event the Company merges with another entity and is not the surviving entity, or transfers all its assets, the Company agrees to make proper provisions so that successors of the Company assume the Company's obligations with respect to indemnification of Covered Persons.

Section 6.6      **Competition of the Managers and Members.** The Managers shall not be compensated for their services except as approved by the Board of Managers. Any compensation of Managers shall be commensurate to the amount of time dedicated to the business of the Company. The Members shall not receive compensation for their services as Members of the Company. The Members may be reimbursed for out-of-pocket expenses incurred by them on behalf of the Company in accordance with Company policies, and after approval of the Members.

Section 6.7      **Removal of a Manager(s).** A Manager may only be removed as a Manager of the Company by the affirmative vote or written consent of the Member or

Members that had the right under this Agreement to appoint him or her as Manager. Upon removal, the removed Manager(s) shall immediately cease to have any authority to act as a Manager for the Company. Any of the Company's funds or other Property in the possession or under the control of such removed Manager shall immediately be released and transferred to its successor. The removed Manager shall cooperate in the orderly transition of affairs to the Manager's successor.

**Section 6.8    Election of Successor Managers.** The Members, by an affirmative vote or written consent of the Members, shall elect a successor Manager.

**Section 6.9    Committees of the Board of Managers.** Committees of the Board of Managers can be established with the Majority Approval of the Members and such committees shall have at least one member that is a Series A Manager and at least one member that is Founding Members Manager. In the event that the creation of an audit committee is approved by the Majority Approval of the Members, the Independent Manager shall be required to be a member of such audit committee.

**Section 6.10    Meetings.** The Board of Managers shall meet at least quarterly during a particular fiscal year.

**Section 6.11    Business Opportunities.** Notwithstanding any other provision of this Agreement to the contrary, if any Manager is offered or discovers a business opportunity of any type and character that is within the scope of the Business (a "**Business Opportunity**"), such Person shall offer to the Company, by providing notice of such Business Opportunity to the Company, the right to pursue such Business Opportunity for the benefit of the Company, regardless of whether such Manager believes the Company would be able or willing to pursue such Business Opportunity. For purposes of clarity, this provision shall not apply to opportunities that may be presented to or in connection with any private equity, venture capital or other pooled investment vehicles that, after the Effective Date, may be organized or managed by any Manager or its Affiliates. A majority of the Managers shall determine on behalf of the Company whether such Business Opportunity shall be pursued by the Company.

**Section 6.12    Non-Completion and Non-Solicitation Agreements.** The Company shall require after the Effective Date that the executives and key employees, as determined by the Board of Managers, will enter into a non-competition and non-solicitation agreement (the "**Non-Competition and Non-Solicitation Agreement**") that shall have a duration of not less than one (1) year from the termination of employment or any other longer period allowed under the law. The Non-Competition and Non-Solicitation Agreement shall be approved by the Board of Managers.

**Section 6.13    Non-Disclosure and IP Transfer Agreement.** The Company shall require after the Effective Date that the executives and key employees, as determined by the Board of Managers, will enter into a non-disclosure and intellectual property rights assignment agreement (the "**Non-Disclosure and Intellectual Property Rights Assignment Agreement**"). The Non-Disclosure and Intellectual Property Rights Assignment Agreement shall be approved by the Board of Managers.

**Section 6.14   Advisory Services.** Semillero Partners will provide the Company business assistance and guidance advisory services pursuant to an Advisory Service Agreement to be signed by and between the Company or Biomass and Semillero on the Effective Date (the "**Advisory Service Agreement**"). Semillero would receive a quarterly advisory fee equal to the higher of 1% of Adjusted EBITDA or $40,000 per annum that provides for the business assistance, guidance, and advice post-closing. This fee shall begin to accrue immediately following the Effective Date.

**ARTICLE VII**
**MEMBERSHIP INTERESTS**

**Section 7.1   Certificates Representing Units**. Upon the Company's issuance of Units to any Person, the Company shall issue a receipt to such Member confirming such issuance. Generally, Certificates in the name of a Member evidencing the number of Units held by such Member will not be issued. However, the Board of Managers may authorize the issuance of Certificates in its sole discretion. Certificates shall be executed on behalf of the Company by the Officer designated by the Board of Managers.

**Section 7.2   Registration**. The Board of Managers shall cause to be kept on behalf of the Company a register in which, subject to such reasonable regulations as it may prescribe, the Board of Managers, will provide for the registration and the transfer of the Units. The Company shall not recognize transfers of Units, or Certificates representing the Units, unless the same are done in the manner described in this Section 7.2, and provided the transfer is in accordance with the provisions of this Article VII and Article X. Upon surrender for registration of transfer of any Units evidenced by a Certificate, the Board of Managers, on behalf of the Company shall cause the execution and delivery in the name of: the designated transferee or transferees, as required pursuant to the holder's instructions, one or more new Certificates evidencing the same aggregate number of Units as was evidenced by the Certificate so surrendered that are to be so transferred; and the designated transferor, if pursuant to such transfer the transferor has not thereby transferred all of its Units held by it that are evidenced by such Certificate, as required pursuant to the holder's instructions, one or more new Certificates evidencing the same aggregate number of Units as was evidenced by the Certificate so surrendered that are not to be so transferred. The Company shall not recognize any transfer of Units until the Certificates evidencing such Units, if any, are surrendered for registration of transfer duly executed by the transferor (or the transferor's attorney-in-fact duly authorized in writing). No charge shall be imposed by the Company for such transfer, provided, that, as a condition to the issuance of any new Certificate under this Section 7.2, the Secretary may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed with respect thereto.

**Section 7.3   Mutilated, Destroyed, Lost or Stolen**. If any mutilated Certificate is surrendered to the Board of Managers, the Board of Managers, on behalf of the Company shall cause the execution and delivery in exchange therefor, of a new Certificate evidencing the same number of Units as the Certificate so surrendered. The Board of Managers, on behalf of the Company shall cause the execution and delivery of a new Certificate in place of any Certificate previously issued if the Record Holder of the Certificate: makes proof by affidavit, in form and substance satisfactory to the Board of Managers, that a previously

issued Certificate has been lost, destroyed or stolen; requests the issuance of a new Certificate before the Company has received notice that the Certificate has been acquired by a purchaser for value in good faith and without notice of an adverse claim; if requested by the Board of Managers, delivers to the Company such security and indemnity as may be required by the Board of Managers, in form and substance satisfactory to the them, with surety or sureties and with fixed or open penalty as the Members may direct, in their sole discretion, to indemnify the Company, the Members, and the Board of Managers, against any claim that may be made on account of the alleged loss, destruction or theft of the Certificate; and satisfies any other reasonable requirement imposed by the Members.  If a Member fails to notify the Company or the Board of Managers within a reasonable time after it has notice of the loss, destruction or theft of a Certificate, and a transfer of the Units represented by the Certificate is registered before the Company or the Board of Managers receives such notification, the Member shall be precluded from making any claim against the Company, the Board of Manager, or the other Members for such transfer or for a new Certificate.  As a condition to the issuance of any Certificate under this Section 7.3, the Board of Manager, may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses connected therewith.

Section 7.4    Record Holder.  In accordance with Section 7.2, the Company shall be entitled to recognize the Record Holders as the Members with respect to the Units and, accordingly, shall not be bound to recognize any equitable or other claim to or interest in such Units on the part of any other Person, whether or not the Company shall have actual or other notice thereof, except as otherwise provided by applicable law.  Without limiting the foregoing, when a Person (such as a broker, dealer, bank, trust company or clearing corporation or an agent of any of the foregoing) is acting as nominee, agent or in some other representative capacity for another Person in acquiring or holding Units, as between the Company on the one hand and such other Persons on the other hand, such representative Person: shall be the Member of record and beneficially in the case of Units of Members; and shall be bound by this Agreement and shall have the rights and obligations of a Member hereunder and as provided for herein.

Section 7.5    Legend.  The Certificates evidencing the number of Units shall be bear the following legend:

**THE INTERESTS IN THE COMPANY (THE "UNITS") EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, THE PUERTO RICO UNIFORM SECURITIES ACT  OR ANY APPLICABLE STATE SECURITIES LAWS AND MAY NOT BE SOLD OR TRANSFERRED WITHOUT COMPLIANCE WITH THE REGISTRATION OR QUALIFICATION PROVISIONS OF APPLICABLE FEDERAL, PUERTO RICO AND STATE SECURITIES LAW OR APPLICABLE EXEMPTIONS THEREFROM.**

**IN ADDITION, BY AGREEMENT AMONG THE COMPANY AND ITS MEMBERS RESTRICTIONS HAVE BEEN PLACED ON THE TRANSFER OF THE UNITS REPRESENTED BY THIS CERTIFICATE.  THE COMPANY WILL FURNISH TO THE RECORD HOLDER OF THIS CERTIFICATE WITHOUT CHARGE UPON WRITTEN**

REQUEST TO THE COMPANY AT ITS PRINCIPAL PLACE OF BUSINESS OR REGISTERED OFFICE A COPY OF THAT AGREEMENT.

## ARTICLE VIII
## ACCOUNTING AND TAX MATTERS

**Section 8.1    Books and Records**. The Company will maintain such books and records of the operations and expenditures of the Company as the Board of Managers shall determine.

**Section 8.2    Tax**. The Board of Managers shall cause the Company to duly and timely file all Tax returns that the Company is required to file and to duly and timely pay all Taxes required to be paid by the Company determine whether or not to make elections or file returns for income tax purposes. The Company has duly elected to be treated as a corporation for Puerto Rico income tax purposes. The Company shall not undertake and transactions or issuance that would cause it to be deemed a Controlled Foreign Corporation for purposes of the U.S. Internal Revenue Code.

## ARTICLE IX
## DISSOLUTION AND LIQUIDATION

**Section 9.1    Dissolution**. The Company will be dissolved upon the earliest to occur of the following events (each such event is referred to as a "**Dissolution Event**"): the Members unanimously vote in favor of the liquidation and dissolution of the Company; or any other event that, under the Act, would cause the Company's dissolution.

**Section 9.2    Effect of Dissolution**. Upon the dissolution of the Company, the Company will cease to carry on its business, except insofar as may be necessary for the winding up of its business, and the assets of the Company will be determined and valued effective as of the day on which the event occurs that results in such dissolution, but the Company will not terminate until there has been a winding-up of the Company's business and affairs and the assets of the Company have been liquidated and distributed as provided in this Agreement.

**Section 9.3    Winding Up Procedures**. Upon the dissolution of the Company, the Company will (a) proceed to collect its assets; (b) convey and dispose of such of its properties as are not to be distributed in kind to the Members; (c) pay, satisfy, and discharge its liabilities, or make adequate provision for payment and discharge of such liabilities; and (d) do all other acts required to liquidate its business and affairs.

**Section 9.4    Distribution of Assets Upon Dissolution**. In settling the accounts of the Company after its dissolution, the assets of the Company will be applied and distributed in the following order of priority: First, to the extent permitted by law, and in accordance with the priorities, if any, established by applicable law, to creditors in satisfaction of liabilities of the Company, including liabilities of the Company to its Members as a creditor (other than for distributions and Capital Contributions), whether by payment or establishment of reserves; Second, to the Series A Holders as proviI in Section 4.2(e); and Third, then to its Members pro-rata and an as converted and fully diluted basis.

**Section 9.5** **Distributions in Kind**.  If any assets of the Company are distributed in kind, such assets will be distributed in accordance with the provisions of Section 9.4 above to the Members.

**Section 9.6** **Articles of Dissolution**.  When all liabilities and obligations of the Company have been paid or discharged, or adequate provision has been made for such liabilities, or in case its property and assets are not sufficient to satisfy and discharge all of the liabilities and obligations of the Company, then when all the property and assets of the Company have been applied to the extent available to the bona fide liabilities and obligations of the Company, and all of the remaining property and assets of the Company have been distributed to its Members, the Company shall cause the Certificate of Formation to be cancelled and will take such other actions as are necessary or appropriate to reflect the dissolution and termination of the Company.

**ARTICLE X**
**TRANSFERS**

**Section 10.1** **General Restrictions on Transfer; No Right to Withdraw**. Except as set forth in this Article X, no Member has the right or power to (i) Transfer all or any portion of its Units (other than a Permitted Transfer); (ii) voluntarily withdraw from the Company; or (iii) require the Company to purchase or redeem all or any portion of its Units, provided however, that the Series A Preferred Units may be subject to redemption pursuant to Section 4.2(g).  Any attempted Transfer of a Member's Units or withdrawal in contravention of any of the provisions of this Agreement shall be void *ab initio* and shall not bind or be recognized by the Company.  A Member may voluntarily withdraw from the Company only with the prior written consent of the Board of Managers, which consent shall not be unreasonably withheld.  A Member may Transfer all or any portion of such Member's Units provided that such Transfer is made in compliance with Sections 10.3, and 10.4 hereof.

**Section 10.2** **Parties to Agreement**.  Notwithstanding anything to the contrary contained in this Agreement, no Units may be Transferred to any Person (other than a Permitted Transfer), and no Units may be issued by the Company to any Person, unless such Person is or becomes a Member by becoming a party to this Agreement by executing and delivering to the Company an executed joinder agreement.  Upon receipt of the joinder agreement so executed the Company will amend or supplement Exhibit A hereto to reflect such Transfer or issuance.

**Section 10.3** **Transfer of Units Pursuant to a Purchase Offer**.

(a) Notice of Transfer.  A Member may Transfer (other than a Permitted Transfer) any of such Member's Units (the "**Offered Interests**") to a Third Party; provided, however, that any such Transfer made by a Member (each such Member, a "**Transferring Member**") must be made only pursuant following receipt of a bona fide sale offer from a Third Party (the "**Proposed Sale**") and otherwise in accordance with this Section 10.3.  Prior to Transferring Offered Interests to a Third Party, the Transferring Member shall first give the Company, then the Series A Holder, and then the other Members (in accordance with Section 10.3(b) below) the right and option (the "**Purchase Right**") to purchase the Offered Interests by providing the Company, the Series A

Holders and the other Members written notice of the Proposed Sale, which notice shall contain the name and address of the proposed Third Party transferee (the "**Proposed Transferee**"), and the price, terms and conditions at which the Proposed Sale is to be made (including a description of the number of Units to be sold and proposed price per Membership Interest) (the "**Transfer Notice**").

(b)    Purchase Right.  For a period of fifteen (15) days after the date of delivery of the Transfer Notice (the "**Company Option Period**"), the Company shall have the right and option to purchase all of the Offered Interests at the same price and subject to the same terms and conditions offered by the Proposed Transferee as specified in the Transfer Notice.  The Company shall exercise its Purchase Right by providing written notice (the "**Company Acceptance Notice**") to the Transferring Member within the Company Option Period.  The closing date of the Company's purchase of the Offered Interests shall occur thirty (30) days after the date of the delivery to the Company of the Transfer Notice.  If the Company does not deliver a Company Acceptance Notice prior to the expiration of the Company Option Period or does not purchase all of the Offered Interests within such thirty (30) day period, then within three (3) business days after the earlier of (i) the delivery by the Company of notice of its intent not to exercise any portion of its Purchase Right or (ii) the end of the applicable period, the Transferring Member shall deliver to the Series A Holders an additional Transfer Notice notifying the Company's intent not to exercise its Purchase Right with respect to the Offered Interests (the "**Additional Transfer Notice**").  For a period of fifteen (15) days after the date of delivery of the Additional Transfer Notice (the "**Series A Holder Option Period**"), the Series A Holders shall have the Purchase Right with respect to the Offered Interests at the same price and subject to the same terms and conditions offered by the Proposed Transferee as specified in the Transfer Notice.  Each Series A Holder that desires to exercise its Purchase Right shall do so by providing written notice (the "**Series A Holder Acceptance Notice**") to the Transferring Member within the A Holder Option Period, provided, however, that if there shall be any oversubscription for the Offered Interests, the Offered Interests shall be allocated among the Series A Holders on a pro rata basis (i.e. by calculating each Series A Holder percentage ownership of the Units on a as converted basis, excluding the Offered Interests, and multiplying such percentage interest by the number of Offered interests); and provided further that if any  Series A Holder elects not to purchase its pro rata share of the remaining Offered Interests available pursuant to this subsection within the Series A Holder Option Period, then the Transferring Member shall promptly give written notice (the "**Overallotment Notice**") to each Series A Holder that has elected to purchase all of its pro rata share of the remaining Offered Interests, which notice shall set forth the number of remaining Offered Interests not purchased by the Series A Holder , and shall offer such Series A Holder the right to acquire the unsubscribed Offered Interests.  Each Series A Holder shall have five (5) days after delivery of the Overallotment Notice to deliver a written notice to the Transferring Member of its election to purchase its pro rata share of the unsubscribed Offered Interests at the same price and subject to the same terms and conditions as set forth in the Additional Transfer Notice and indicating the maximum number of the unsubscribed Offered Interests that it will purchase in the event that any other Series A Holder elects not to purchase its pro rata share of the unsubscribed Offered Interests. The closing date of each holders of Series A Preferred Units' purchase of the Offered Interests shall occur thirty (30) days after the date of the expiration of the Series A Holder Option Period. If the Series A Holders do not deliver a Series A Holder Acceptance Notice prior to the expiration of the Series A Holder Option Period or does not purchase all of the Offered Interests within such thirty (30) day period, then within three (3) business days after the earlier of (i) the delivery by the

Series A Holder of notice of its intent not to exercise any portion of its Purchase Right or (ii) the end of the applicable period, the Transferring Member shall deliver to the other Members an additional Transfer Notice notifying the Series A Holders' intent not to exercise its Purchase Right with respect to the Offered Interests (the "**Second Additional Transfer Notice**").  For a period of ten (10) days after the date of delivery of the Second Additional Transfer Notice (the "**Members Option Period**"), the other Members have the Purchase Right with respect to the unsubscribed Offered Interests at the same price and subject to the same terms and conditions offered by the Proposed Transferee as specified in the Transfer Notice.  Each Member that desires to exercise its Purchase Right shall do so by providing written notice (the "**Member Acceptance Notice**") to the Transferring Member within the Member Option Period, provided, however, that if there shall be any oversubscription for the Offered Interests, the Offered Interests shall be allocated among the other Members on a pro rata basis (i.e. by calculating each Member's percentage ownership of the Units, excluding the Offered Interests, and multiplying such percentage interest by the number of Offered interests); and provided further that if any Member elects not to purchase its pro rata share of the remaining Offered Interests available pursuant to this subsection within the Member Option Period, then the Transferring Member shall promptly give written notice (the "**Second Overallotment Notice**") to each Member that has elected to purchase all of its pro rata share of the remaining Offered Interests, which notice shall set forth the number of remaining Offered Interests not purchased by the other Members, and shall offer such Members the right to acquire the unsubscribed Offered Interests.  Each Member shall have five (5) days after delivery of the Second Overallotment Notice to deliver a written notice to the Transferring Member of its election to purchase its pro rata share of the unsubscribed Offered Interests at the same price and subject to the same terms and conditions as set forth in the Second Additional Transfer Notice and indicating the maximum number of the unsubscribed Offered Interests that it will purchase in the event that any other Member elects not to purchase its pro rata share of the unsubscribed Offered Interests. The closing date of each Member's purchase of the Offered Interests shall occur thirty (30) days after the date of the expiration of the Member Option Period.  If (i) the other Members do not deliver Member Acceptance Notice(s) prior to the expiration of the Option Period to purchase all the Offered Interests or (ii) the other Members do not purchase all of the Offered Interests within such thirty (30) day period (including pursuant to an election in response to an Overallotment Notice), then, until the date that is one-hundred twenty (120) days after the date of delivery of the Transfer Notice (the "**Transfer Deadline**"), the Transferring Member shall be permitted to sell to the Proposed Transferee on the terms set forth in the Transfer Notice the remaining Offered Interests for which neither the Company nor any other Member has elected to purchase pursuant to its Purchase Right.

(c)     Re-offer on Failure to Transfer.  If the Transferring Member fails to Transfer to the Proposed Transferee before the Transfer Deadline all of the Offered Interests not purchased by the Company, the Series A Holder  or the other Members, then no Transfer of the Offered Interests shall be made thereafter to any Person without again complying with the provisions of this Article X.

(d)     Certain Limitations on Transfer.  Notwithstanding the provisions of Sections 10.3 no Member or Members may agree to transfer Units representing fifty percent (50%) or more of the issued and outstanding Units to any Third Party or any one or more Persons that are affiliates of any Third Party or Persons acting in concert with any Third Party, without the prior approval of the Board of Managers.

**Section 10.4    Drag-Along Right.**

(a)    **Drag-Along Right**.  If a sale of the Company is approved by the Requisite Drag Holders in writing, then each Member shall (i) vote (in person, by proxy or by action by written consent, as applicable), or cause to be voted, all Units directly or indirectly owned of record or beneficially by such Member, or over which such Member has voting control, in favor of, and adopt, such sale of the Company and (ii) execute and deliver all related documentation and take such other action in support of such sale of the Company as may reasonably be requested by the Company to carry out the terms and provision of this Section 10.4, including executing and delivering instruments of conveyance and transfer, and any purchase agreement, merger agreement, indemnity agreement, escrow agreement, consent, waiver, governmental filing, share certificates duly endorsed for transfer (free and clear of impermissible liens, claims and encumbrances) and any similar or related documents.

(b)    **Exceptions to Drag Along Right.**  Notwithstanding the foregoing, a Member need not comply with Section 10.4 in connection with any proposed sale of the Company (the "**Drag Along Sale**") unless:

(c)    any representations and warranties to be made by any Member that is not a Manager or Officer in connection with the Drag Along Sale are several and not joint and are limited to representations and warranties related to authority, ownership and the ability to convey title to such Units, including representations and warranties that (i) such Member holds all right, title and interest in and to the Units such Member purports to hold, free and clear of all liens and encumbrances, (ii) the obligations of such Member in connection with the transaction have been duly authorized, if applicable, and (iii) the documents to be entered into by such Member have been duly executed by such Member and delivered to the acquirer and are enforceable against the Member in accordance with their respective terms and (iv) neither the execution and delivery of documents to be entered into in connection with the transaction, nor the performance of such Member's obligations thereunder, will cause a breach or violation of the terms of any agreement, law, or judgment, order, or decree of any court or governmental agency that applies to such Member;

(d)    the Member shall not be liable for the breach of any representation, warranty or covenant made by any other Person in connection with the Drag Along Sale (except to the extent that funds may be paid out of an escrow established to cover breach of representations, warranties, and covenants of the Company as well as breach by any Member of any identical representations, warranties and covenants provided by all Members);

(e)    liability for breach of any representation, warranty or covenant made by a Member with respect to itself shall be limited to the proceeds actually received by such Member except with respect to claims related to  fraud by the Member, the liability for which need not be limite to the Member;

(475)    (f)    upon the consummation of the Drag Along Sale (i) each holder of each class or series of the Units of the Company will receive the same form of consideration for their units of such class or series as is received by other holders in respect of their units of such same class or series of units, (ii) each holder of a class or series of Preferred Units will

receive the same amount of consideration per unit of such class or series of Preferred Units as is received by other holders in respect of their units of such same class or series, (iii) each holder of Common Units will receive the same amount of consideration per unit of Common Unit as is received by other holders in respect of their units of Common Units, and (iv) unless waived pursuant to the terms of the Restated Certificate and as may be required by law, the aggregate consideration receivable by all holders of the Preferred Unit and Common Unit shall be allocated among the holders of Preferred Unit and Common Unit on the basis of the relative liquidation preferences to which the holders of each respective class or series of Preferred Unit and the holders of Common Unit are entitled in a Deemed Liquidation Event (assuming for this purpose that the Drag Along Sale is a Deemed Liquidation Event) in accordance with Section 4.2 and the Company's Articles of Formation in effect immediately prior to the Drag Along Sale; provided, however, that, notwithstanding the foregoing provisions of this Subsection 10.4(d), if the consideration to be paid in exchange for the Units held by any Member includes any securities and due receipt thereof by such Member would require under applicable law (x) the registration or qualification of such securities or of any person as a broker or dealer or agent with respect to such securities; or (y) the provision to any Member of any information other than such information as a prudent issuer would generally furnish in an offering made solely to "accredited investors" as defined in Regulation D promulgated under the Securities Act, the Company may cause to be paid to any such Member in lieu thereof, against surrender of the Unit held by such Member, as applicable, which would have otherwise been sold by such Member, an amount in cash equal to the fair value (as determined in good faith by the Board) of the securities which such Member would otherwise receive as of the date of the issuance of such securities in exchange for the Units held by such Member; and

(g)    subject to Section 10.4(d), if any holders of any Units are given an option as to the form and amount of consideration to be received as a result of such Drag Along Sale, all holders of such Units will be given the same option; provided, however, that nothingI this Section 10.4(e) shall entitle any holder to receive any form of consideration that such holder would be ineligible to receive as a result of such holder's failure to satisfy any condition, requirement or limitation that is generally applicable to the Company's Members.

### Section 10.5    <u>Tag Along Right</u>.

(a)    <u>Tag-Along Right</u>.  Subject to the terms and conditions specified in Section 10.5, if, at any time, holders of at least a majority of the Units (collectively the "**Exercising Members**") desire to Transfer  their Units to any Third Party (a "**Tag-Along Sale**"), and such Transfer is approved by the Board of Managers, then prior to effecting such Transfer, the Exercising Members shall provide written notice of such proposed Transfer (the "**Tag-Along Notice**") to each other Member, which Tag-Along Notice shall contain all the material terms and provisions of the proposed Transfer.  The Exercising Members shall also provide, as soon as reasonably practicable, all material information with respect to the proposed Tag-Along Sale and the applicable Third Party as shall be reasonably requested by the other Members receiving the Tag-Along Notice and is in the possession of, or can be readily obtained from such Third Party by, the Exercising Members.  Each such other Member shall have the right and option (the "**Tag-Along Right**"), exercisable as set forth below, to include in the Tag-Along Sale such Units comprising its Tag-Along Portion (as defined below), and the Exercising Members shall not consummate the Tag-

Along Sale unless the Tag-Along Portion of each such Member (or such lesser number of Units for which such right and option is exercised) is so included.

(b)    Exercise.  If a Member is entitled and desires to exercise a Tag-Along Right, then such Member shall provide the Exercising Members with written irrevocable notice specifying the number of its Units that such Member wishes to include in the Tag-Along Sale (which number shall not exceed such Member's Tag-Along Portion) within ten (10) days after the date the Exercising Members deliver the Tag-Along Notice (the "**Tag-Along Notice Period**") and shall simultaneously provide a copy of such notice to the Company.  Within ten (10) days following the termination of the Tag-Along Notice Period, and in any event prior to the consummation of the Tag-Along Sale, each Member that has exercised its Tag-Along Right (each, a "**Tag-Along Member**") shall deliver to a representative of the Exercising Members designated in the Tag-Along Notice or otherwise all documents required to be executed or delivered by such Tag-Along Member in connection with the Transfer of the Units pursuant to this Tag-Along Right at the closing for such Tag-Along Sale against delivery to such Tag-Along Member of the consideration therefor.  All participating Members will bear their pro rata share of the costs and expenses incurred by the Company in connection with a Tag-Along Sale (based on the respective consideration received by such Members in the transaction, to the extent such costs and expenses are incurred for the benefit of all Members and are not otherwise paid by the Company or the purchaser).  Costs incurred by any Member on its own behalf will not be shared by other Members.  The aggregate consideration in a Tag-Along Sale shall be allocated among the Exercising Members and the Tag-Along Members in proportion to their percentage ownership of their Units (to all issued and outstanding Units), (the "**Tag-Along Portion**").  In no event shall a Tag-Along Member receive less consideration per Units than the consideration per Units received by any other holders of Units (after taking into account, if the Tag Along Sale is a Deemed Liquidation Event, the relative liquidation preferences to which the holders of each respective class or series of Preferred Unit and the holders of Common Unit are entitled in a Deemed Liquidation Event in accordance with Section 4.2 and the Company's Articles of Formation in effect immediately prior to the Drag Along Sale).  If a Member (i) does not elect before the end of the Tag-Along Notice Period to have all or any part of its Tag-Along Portion included in the Tag-Along Sale or (ii) fails to deliver to the Exercising Members the Units or any required documentation within the period described in this Section 10.5 (collectively, a "**Tag-Along Failure**"), then such Member will be deemed to have waived any and all of its rights under this Section 10.5 with respect to the Transfer of any or all of its Units pursuant to such Tag-Along Sale.  The Exercising Members shall have ninety (90) days (or such longer period as may be required to obtain any approval necessary under applicable securities laws, other federal laws applicable to such transaction or similar state or local laws) after the Tag-Along Failure in which to Transfer all (but not less than all) of the applicable Units at a price not higher than contained in the Tag-Along Notice and on terms and conditions not more favorable to the Exercising Members or the proposed transferee than were contained in the Transfer Notice.  Promptly (but in no event more than three (3) Business Days) after the consummation of a Tag-Along Sale, the Exercising Members shall give notice thereof to the Tag-Along Members, shall remit to each such Tag-Along Member the total consideration for the Tag-Along Portion and shall furnish such other evidence of the completion and time of completion of the Tag-Along Sale and the terms thereof as may be reasonably requested by any such Tag-Along Member.

**Section 10.6    Involuntary Transfers**.

(a)    To the extent permitted by applicable law, If as a result of the exercise of creditor's rights, including, without limitation, any charging order against any Units (including the Membership Interest represented thereby), foreclosure of a security interest, bankruptcy, divorce, death or retirement of a Member, any Units (including the Membership Interest represented thereby) are transferred to a person who is not a Member (an "**Involuntary Transfer**"), such transfer occurs and upon such transfer (i) such Member's transferred interest shall become non-voting units (the "**Non-Voting Units**"), and (ii) the transferee of such interest (the "**Involuntary Transferee**") shall only be considered and assignee and have the economics rights of a Member (the right to receive distributions whenever made by the Company), but without any right to vote upon any action or matter whatsoever upon which Members may vote and solely until the other Members' and Company's rights to acquire the involuntarily transferred interests are exercised or waived as provided in this Agreement. The Involuntary Transferee shall have no management rights, duties or obligations pursuant to this Agreement and shall not be considered a Member.

(b)    To the extent permitted by applicable law, upon the Involuntary Transfer of such Member's Units as a result of the exercise of creditor's rights, including, without limitation, any charging order against any Units, foreclosure of a security interest or bankruptcy, the Involuntary Transferee shall promptly (but in no event later than thirty (30) days after such Involuntary Transfer) furnish written notice to the Company and the other Members indicating that the Involuntary Transfer has occurred, specifying the name of the Involuntary Transferee, giving a detailed description of the circumstances giving rise to, and stating the legal basis for, the Involuntary Transfer. Upon the receipt of such notice, the Company shall have the first option within thirty (30) days after receipt of such notice of Involuntary Transfer, by written notice to the Involuntary Transferee, to elect to purchase, and the Involuntary Transferee shall have the obligation to sell, all or any of the transferred interest acquired by the Involuntary Transferee at a price per Unit equal to the Fair Market Value per Unit at the time of the Involuntary Transfer. If the Company does not purchase any of the Units, the Members shall have the second option to acquire on a pro-rata, as converted and fully diluted basis within thirty (30) days of the Company's election to purchase or not the Units. All notifications of the election to purchase Units shall be in writing; provided, however, that it shall be understood that either the Company and/or Members elected to not purchase any of the Units if no notification is sent within their respective thirty (30) day option period. If the Company and/or other Members elect to purchase, all or any of the transferred interest acquired by the Involuntary Transferee, they shall have the right to make the payment to the Involuntary Transferee in ten (10) equal annual installments at an interest rate equal to the Prime Rate. In the event that any Units are not acquired pursuant to this section from the Involuntary Transferee, the Non-Voting Units shall become voting Units and the Involuntary Transferee shall become Member(s) of the Company once their admission as Member(s) is approved as required under this Agreement and such Involuntary Transferee executes a joinder agreement to become a party to this Agreement.

(c)    To the extent permitted by applicable law, in the case of divorce of a Member from his/her spouse who is not a Member, the Members agree that upon such occurrence, the divorcing Member shall include as part of the divorce settlem—t the right to receive--and thereupon th—ex-spouse shall tender--as part of the divorce settlement or decree, all Units (including all Membership Interest represented thereby) to which the ex-spouse may have been entitled, if any, upon the

effectiveness of the divorce settlement or rendering of the decree, including any participation in and to the Units (including all Membership Interest represented thereby) held by the conjugal partnership composed by the Member and the ex-spouse, such Units (including all Membership Interest represented thereby) to be valued for purposes of such settlement at a price equal to the Fair Market Value per Unit. In the event that such divorcing Member is unable to acquire the Units (including all Membership Interest represented thereby) as part of the divorce settlement or decree, the Company shall have the right, but not the obligation, within ninety (90) days after receipt of notice thereof, by written notice to such divorcing Member, to elect to purchase, and the divorcing Member shall have the obligation (and use commercially reasonably efforts to impose such obligation on the ex-spouse) to sell all or any of the Units (including all Membership Interest represented thereby) to which the ex-spouse may have been entitled at a price equal to the Fair Market Value per Unit.

(d)    To the extent permitted by applicable law, in the event of a Member's retirement or death, any and all Units (including all Membership Interest represented thereby) held by such Member may be purchased by the Company or the other Members from the retiring Member or the deceased Member's heir(s) at the Fair Market Value per Unit payable in five (5) equivalent annual installments. The Company shall have the first option to acquire the Units within sixty (60) days of being notified of the death or retirement of the Member. If the Company elects not to purchase all or a portion of the Units held by the heir(s) of any Member or the retired Member, the other Members shall have the second option to purchase such remaining Units on a pro-rata, as converted and fully diluted basis within sixty (60) days of the Company's election to purchase or not the Units. All notifications of the election to purchase Units shall be in writing; provided, however, that it shall be understood that either the Company and/or other Members elected to not purchase any of the Units if no notification is sent within their respective sixty (60) day option period.  In the event that any Units are not acquired pursuant to this section from the heir(s), the Non-Voting Units shall become voting Units and the heir(s) shall become Member(s) of the Company once their admission as Member(s) is approved as required under the terms of this Agreement and such heir(s) execute a Joinder Agreement to become a party to this Agreement, in the form and substance attached hereto as Exhibit A. In the event that any Units are not acquired pursuant to this section, the Non-Voting Units shall revert to its original status and regain any rights and privileges ascribed to them in this Agreement.

## ARTICLE XI
## GENERAL PROVISIONS

**Section 11.1    Captions and Headings**.  The captions and headings used in this Agreement are for convenience of reference only and will not be taken into account in construing the meaning or intent of this Agreement.

**Section 11.2    Amendment of Certificate of Formation**.  The Certificate of Formation may be amended, supplemented or restated as provided in this Agreement.  Upon executing the necessary consent with respect to such amendment, supplement, or restatement of the Certificate of Formation, the Board of Managers will cause a Certificate of Amendment to be prepared, executed, and filed in accordance with the Act.

**Section 11.3** **Amendment of this Agreement**. This Agreement may only be amended, supplemented, or restated by the written consent of both (a) the Members holding a majority of the Common Units and (b) the Series A Holders holding a majority of the issued and outstanding Series A Units.

**Section 11.4** **Number and Gender**. Where the context so indicates, the singular will include the plural, and the use of any gender will include all other genders.

**Section 11.5** **Binding Agreement**. Notwithstanding any other provision of this Agreement, the Members agree that this Agreement, constitutes a legal, valid and binding agreement of the Members, and is enforceable against the Members, in accordance with its terms.

**Section 11.6** **Severability**. The invalidity of unenforceability of any provision herein shall not affect the validity or enforceability of any other provision herein. If a court of competent jurisdiction determines that any portion of this Agreement is in violation of any statute or public policy, only the portions of this Agreement that violate such statute or public policy shall be stricken, and all other portions of this agreement that do not violate any statute or public policy shall continue in full force and effect. Further, if any one or more of the provisions contained in this Agreement is determined by a court of competent jurisdiction to be excessively broad as to duration, scope, activity or subject, or is unreasonable or unenforceable under applicable laws, such provisions will be construed by limiting, reducing, modifying or amending them so as to be enforceable to the maximum extent permitted by law. If this Agreement is held unenforceable in any jurisdiction, such holding will not impair the enforceability of the Agreement in any other jurisdiction.

**Section 11.7** **Counterparts**. This Agreement may be executed in counterparts, each of which will be deemed to be an original and will be binding upon the Member who executed same, but all of such counterparts will constitute the same Agreement and may be sufficiently evidenced by one counterpart.

**Section 11.8** **Governing Law**. This Agreement and the construction interpretation will be governed exclusively by the Act and other applicable laws of the Commonwealth of Puerto Rico.

**[Execution on Following Page]**

**IN WITNESS WHEREOF**, this Amended and Restated Operating Agreement has been executed by a duly authorized officer of this corporation as of the date first set forth above.

**GFC HOLDINGS LIMITED LIABILIY COMPANY**

By:_____

Name: Olmar López Vidal

Title: President & Chief Executive Officer

(*Signature Page to the Amended and Restated Operating Agreement*)

**OPERATING AGREEMENT
OF
GFC HOLDINGS LIMITED LIABILITY COMPANY**

**EXHIBIT A**

**Capital Contributions of the Members**

| Members | Capital Contribution | Common Units of Membership Interests | Preferred Units of Membership Interests |
|---|---|---|---|
| Olmar López-Vidal | 250 Class A Common Units of Biomass Green Fuels LLC | 4,725,000 | |
| Gregory Boyd | 500 Class A Common Units of Biomass Green Fuels LLC | 4,252,500 | |
| Olmar López Gomez | 250 Class A Common Units of Biomass Green Fuels LLC | 3,037,500 | |
| Jonathan Lassers | | 675,000 | |
| John Dumas | | 675,000 | |
| John Richardson | | 135,000 | |
| Semillero Investment Fund I, LLC | $4,691,250 | | 4,691,250 |
| Puerto Rico Fund for Growth, L.P. | $2,000,000 | | 2,000,000 |
| The Community Development Venture Capital Alliance | $658,750 | | 658,750 |
| TOTALS | ****** | 13,500,000 | 7,350,000 |

**OPERATING AGREEMENT**
**OF**
**GFC HOLDINGS LIMITED LIABILITY COMPANY**

**EXHIBIT B**

**<u>Addresses of Members</u>**:

Gregory Boyd
584 Aldebaran Street
San Juan, PR  00920

Olmar López Gómez
584 Aldebaran Street
San Juan, PR  00920

Olmar López Vidal
584 Aldebaran Street
San Juan, PR  00920

Jonathan Lassers
P.O. Box 398394
Miami Beach, FL  33239

John Dumas
13 Robles Street
Humacao, PR  00791

John Richardson
253 San Sebastian Street
San Juan, PR  00901

**<u>Addresses of the Series A Holders</u>**

Semillero Investment Fund I, LLC
1256 Ponce de León Avenue
San Juan, PR  00907

Puerto Rico Fund for Growth, L.P.
475 Riverside Drive Suite 1264
New York, NY, 10115

The Community Development Venture Capital Alliance
475 Riverside Drive Suite 1264
New York, NY, 10115

**OPERATING AGREEMENT**
**OF**
**GFC LIMITED LIABILITY COMPANY**

**EXHIBIT C**

Board of Managers

Founding Members' Managers:

Olmar López Gómez
584 Aldebaran Street
San Juan, PR  00920

Olmar López Vidal
584 Aldebaran Street
San Juan, PR  00920

The Series A Board Managers:

Semillero Investment Fund I, LLC
Represented by: Alexander Borschow
1256 Ave. Ponce de León
STE 102
San Juan, PR 00907

Puerto Rico Fund for Growth, L.P.
Represented by: Ernesto Villarini
475 Riverside Drive Suite 1264
New York, NY, 10115

The Independent Member of the Board of Managers:

Raquel Cortés Álvarez
Calle Humacao A41
Villa Ávila
Guaynabo, PR 00969

## ANNEX I

## MEMBERSHIP INTEREST

| Members | Common Units of Membership Interests | Preferred Units of Membership Interests | Membership Interest |
|---|---|---|---|
| Olmar López-Vidal | 4,725,000 | | 22.662% |
| Gregory Boyd | 4,252,500 | | 20.396% |
| Olmar López Gomez | 3,037,500 | | 14.568% |
| Jonathan Lassers | 675,000 | | 3.237% |
| John Dumas | 675,000 | | 3.237% |
| John Richardson | 135,000 | | 0.648% |
| Semillero Investment Fund I, LLC | | 4,691,250 | 22.50% |
| Puerto Rico Fund for Growth, L.P. | | 2,000,000 | 9.592% |
| The Community Development Venture Capital Alliance | | 658,750 | 3.16% |
| TOTALS | 13,500,000 | 7,350,000 | 100.00% |

**EXHIBIT 2**

**OPERATING AGREEMENT OF**
**GFC HOLDINGS LIMITED LIABILITY COMPANY**

**EXHIBIT A**

**CAPITAL CONTRIBUTION OF MEMBERS**

| Members | Initial Capital Contribution | Common Units | Series A Preferred Units |
|---|---|---|---|
| Olmar López-Vidal | 250 Class A Common Units of Biomass Green Fuels LLC | 4,725,000 | |
| Gregory Boyd | 500 Class A Common Units of Biomass Green Fuels LLC | 4,252,500 | |
| Olmar López Gomez | 250 Class A Common Units of Biomass Green Fuels LLC | 3,037,500 | |
| Jonathan Lassers | | 675,000 | |
| John Dumas | | 675,000 | |
| John Richardson | | 135,000 | |
| Semillero Investment Fund I | $4,691,250.00 | | 4,691,250 |
| PR Fund for Growth, L.P. | $2,000,000.00 | | 2,000,000 |
| The Community Development Venture Capital Alliance, Inc. | $850,000 | | 864,918 |
| Flexitank, Inc. | $654,375.00 | | 705,416 |
| Parliament Capital Series II, LLC – Series F | $654,375.00 | | 705,416 |
| VRM Fund I L.L.C. – Renewable Series II | $1,500,000.00 | | 1,617,000 |
| **TOTALS** | | **13,500,000** | **10,584,000** |

Amendment to Second Amended and Restated Operating Agreement - 9

## EXHIBIT 3

## OPERATING AGREEMENT OF
## GFC HOLDINGS LIMITED LIABILITY COMPANY

## EXHIBIT B

## ADDRESSES OF MEMBERS

**Addresses of Members**:

**Gregory Boyd**
584 Aldebaran Street
San Juan, PR 00920

**Olmar López Gómez**
584 Aldebaran Street
San Juan, PR 00920

**Olmar López Vidal**
584 Aldebaran Street
San Juan, PR 00920

**Jonathan Lassers**
P.O. Box 398394
Miami Beach, FL 33239

**John Dumas**
13 Robles Street
Humacao, PR 00791

**John Richardson**
253 San Sebastian Street
San Juan, PR 00901

**Address of the Series A Holders**:

**Semillero Investment Fund I, LLC**
1256 Ponce de León Avenue
San Juan, PR 00907

**Puerto Rico Fund for Growth, L.P.**
475 Riverside Drive Suite 1264
New York, NY, 10115

**The Community Development Venture Capital Alliance, Inc**.
475 Riverside Drive Suite 1264
New York, NY, 10115

**VRM Penzini Fund I, L.L.C. – Renewable Series II**
Urb. Puerto Nuevo, 322 Ave. de Diego Suite 301
San Juan, PR 00920

**Parliament Capital Series II, LLC – Series F**
c/o Parliament Capital Management LLC
1511 Ponce de Leon Avenue,
Ciudadela, Torre 1000, Suite 6-A Plaza Level
San Juan, Puerto Rico 00909

**Flexitank, Inc.**
Metro Office Park 5
Calle 1
Guaynabo, Puerto Rico 00968-1705

## EXHIBIT 4

### OPERATING AGREEMENT OF
### GFC HOLDINGS LIMITED LIABILITY COMPANY

### EXHIBIT C

### BOARD OF MANAGERS

**Founding Members' Managers**:

Olmar López Gómez
584 Aldebaran Street
San Juan, PR 00920

Olmar López Vidal
584 Aldebaran Street
San Juan, PR 00920

**Series A Managers**:

Semillero Investment Fund I, LLC
Represented by: Alexander Borschow
1256 Ave. Ponce de León
STE 102
San Juan, PR 00907

Puerto Rico Fund for Growth, L.P.
Represented by: Ernesto Villarini
475 Riverside Drive Suite 1264
New York, NY, 10115

VRM Penzini Fund I, L.L.C. – Renewable Series II
Represented by: Carlos Penzini
Urb. Puerto Nuevo, 322 Ave. de Diego Suite 301
San Juan, PR 00920

Parliament Capital Series II LLC – Series F / Flexitank, Inc.
Represented by: Waleska Rivera
1511 Ponce de Leon Avenue,
Ciudadela, Torre 1000, Suite 6-A Plaza Level
San Juan, Puerto Rico 00909

**Independent Member of the Board of Managers**:

Amendment to Second Amended and Restated Operating Agreement - 11

**EXHIBIT 5**

**ANNEX I**

**MEMBERSHIP INTERESTS**

| Members | Common Units | Series A Preferred Units | Percentage Interest |
|---|---|---|---|
| Olmar López-Vidal | 4,725,000 | | 19.619% |
| Gregory Boyd | 4,252,500 | | 17.657% |
| Olmar López Gomez | 3,037,500 | | 12.612% |
| Jonathan Lassers | 675,000 | | 2.803% |
| John Dumas | 675,000 | | 2.803% |
| John Richardson | 135,000 | | 0.561% |
| Semillero Investment Fund I | | 4,691,250 | 19.479% |
| PR Fund for Growth, L.P. | | 2,000,000 | 8.304% |
| The Community Development Venture Capital Alliance, Inc. | | 864,918 | 3.591% |
| Flexitank, Inc. | | 705,416 | 2.929% |
| Parliament Capital Series II LLC – Series F | | 705,416 | 2.929% |
| VRM Fund I L.L.C. – Renewable Series II | | 1,617,000 | 6.714% |
| **TOTAL** | **13,500,000** | **10,584,000** | **100%** |