# EXHIBIT 1

## LOAN AND SECURITY AGREEMENT

THIS **LOAN AND SECURITY AGREEMENT** (this *"Agreement"*), dated September 15, 2020 is executed by and between **PCC SUB-CDE 13, LLC**, a Delaware limited liability company (together with its successors and assigns, *"Lender"*), with a mailing address of P.O. Box 362708 (Mail Code 734), San Juan, Puerto Rico 00936-2708, and **BIOMASS GREEN FUELS LLC**, a Puerto Rico limited liability company (*"Borrower"*), with a mailing address of 584 Aldebaran Street, Altamira, San Juan, Puerto Rico 00920.

## RECITALS:

**A.** Borrower has requested credit from Lender in the total amount of $7,200,000.00 to (a) finance the purchase and installation of the Loan Equipment (as defined below) in connection with the Project (as defined below) at a new state of the art recycled and renewable natural gas and carbon dioxide capture and processing facility located at Carr 923 KM 2.5, Buena Vista, Humacao, Puerto Rico 00791, more particularly described in the Ground Lease (as defined below) (hereafter, said real property, together with all improvements now and hereafter erected on same, shall be collectively referred to as the *"Premises"*); (b) fund the Reserve Account (as defined below); (c) pay the initial Third Party Expense Fee (as defined in the Fee and Services Agreement (as defined below)) pursuant to the Fee and Services Agreement; (d) pay the initial Asset Management Fee (as defined in the Fee and Services Agreement) payment pursuant to the Fee and Services Agreement; and (e) finance Borrower's reasonable and customary closing costs in connection with the Loan (as defined below), including, without limitation, legal and professional fees, which closing costs have been approved by Lender.

**B.** Lender is willing to extend credit as requested by Borrower subject to, and conditioned upon, the terms of this Agreement.

NOW THEREFORE, in consideration of the foregoing and other good and valuable consideration exchanged and received, the sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

## ARTICLE 1
## LENDING COMMITMENTS, INTERCREDITOR AGREEMENT AND DEFINITIONS:

**1.1 Commitment.** Subject to the terms and conditions of this Agreement, Lender hereby commits to extend certain credit to Borrower in an aggregate amount not to exceed SEVEN MILLION TWO HUNDRED THOUSAND AND NO/100 DOLLARS ($7,200,000.00) (the *"Loan"*), which shall be evidenced by that certain QLICI Loan A Note, dated as of the date hereof, in the aggregate principal amount of FIVE MILLION ONE HUNDRED THIRTY THOUSAND SEVEN HUNDRED FIFTY AND NO/100 DOLLARS ($5,130,750.00) (as the same may be amended, assigned, restated, modified or supplemented from time to time, *"Note A"*) and that certain QLICI Loan B Note, dated as of the date hereof, in the aggregate principal amount of TWO MILLION SIXTY-NINE THOUSAND TWO HUNDRED FIFTY AND NO/100 DOLLARS ($2,069,250.00) (as the same may be amended, assigned, restated, modified or supplemented from time to time, *"Note B"* and together with Note A, the *"Note"*), each executed by Borrower and payable to the order of Lender. The proceeds of the Loan shall be advanced in full at closing (the

"*Advance*"). A portion of the Advance (the "*Initial Disbursement*") shall thereafter be used by Borrower to (a) fund a fee reserve account for Lender in the amount of $[436,187.50] in the name of Borrower to be maintained at Banco Popular, as account no. 030-212464 (the "*Reserve Account*); (b) finance Borrower's reasonable and customary closing costs in closing the Loan as approved by Lender, including, without limitation, legal and professional fees; (c) pay the initial Third Party Expense Fee pursuant to the Fee and Services Agreement; (d) pay the initial Asset Management Fee payment pursuant to the Fee and Services Agreement and (e) transfer the net sum shown on the Flow of Funds dated of even date herewith to a deposit account in the name of Borrower to be maintained at Banco Popular de Puerto Rico, a banking corporation organized and existing under the laws of the Commonwealth of Puerto Rico ("*Banco Popular*") as account no. 030-212456 (the "*Disbursement Account*") to be used by Borrower for the purchase and installation of the Loan Equipment needed in connection with the Project as set forth in the Budget (as defined below). Notwithstanding the foregoing, but subject to **Section 1.2** below, in no event shall the sum of the Initial Disbursement and Subsequent Releases (as defined below) exceed the face amount of the Note.

      **1.2****Authorization for Other Advances.** Upon the expiration of any applicable notice and cure periods provided in the Loan Documents, without any further authorization or request by Borrower, Lender may, but shall not be obligated to, make advances of principal under the Loan for any of the following purposes: (a) to cure any Event of Default (as defined below) or any condition, event, act or omission which, with the giving of notice or lapse of time or both, would constitute an Event of Default; and (b) to pay the reasonable expenses of Lender in connection with the Loan, and the collection thereof, including the reasonable fees, notarial expenses and expenses of counsel for Lender. Each such advance is hereby authorized by Borrower and shall be evidenced by the Note and secured by the other Loan Documents as fully as if made directly to Borrower. Lender shall not be obligated to make the advances described in this section, but may do so in its sole discretion. All advances of principal made pursuant to this section shall be payable upon written demand from Lender.

      **1.3****Intercreditor Agreement Controls.** Notwithstanding any other provision contained herein, this Agreement, the liens created hereby and the rights, remedies, duties and obligations provided for herein are subject in all respects to the provisions of that certain Intercreditor Agreement, of even date herewith, among BPPR (as defined below), Lender and Borrower (as the same may be amended, supplemented, restated or otherwise modified from time to time, the "Intercreditor Agreement"), and, to the extent provided therein, the Senior Loan Documents (as therein defined), as applicable. In the event of any conflict or inconsistency between (i) the provisions of this Agreement or those of any other Loan Document (as defined below) and (ii) the provisions of the Intercreditor Agreement, the provisions of the Intercreditor Agreement shall control.

      **1.4****Definitions.** The following terms as used in this Agreement will have the following meanings:

      (a)    *Accountants.* CohnReznick LLP, or any successor accountant selected by Lender.

      (b)    *Advance.* Has the meaning set forth in Section 1.1 of this Agreement.

(c) *Agreement.* Has the meaning set forth in the preamble to this Agreement.

(d) *Affiliate.* As to any Person, any other Person: (i) that directly or indirectly, through one (1) or more intermediaries, controls or is controlled by, or is under common control with, such Person; (ii) that directly or indirectly beneficially owns or holds ten percent (10%) or more of any class of voting membership interests (units) of such Person; or (iii) ten percent (10%) or more of the voting membership interests (units) of which is directly or indirectly beneficially owned or held by the Person in question. The term "control" means the possession, directly or indirectly, of the power to direct or cause direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise; provided, however, in no event shall Lender be deemed an Affiliate of Borrower.

(e) *Allocatee.* Popular Community Capital, LLC, a Delaware limited liability company.

(f) *Allocation Agreement.* That certain New Markets Tax Credit Program Allocation Agreement, entered into by and among the CDFI Fund, Allocatee and other subsidiary allocatees of Allocatee, effective as of July 26, 2019, and as may be further amended from time to time.

(g) *Anti-Corruption Laws.* All laws, rules, and regulations of any jurisdiction applicable to Borrower or any of its Affiliates from time to time concerning or relating to bribery or corruption.

(h) *Architect.* CMA Architects & Engineers LLC.

(i) *Architect Contract.* That certain Proposal CMA 19008 dated July 9, 2020 between Borrower and CMA Architects & Engineers LLC, a Puerto Rico limited liability company, for the design of the Project and for architectural services in connection with the construction of the Project.

(j) *Assignment of Contracts.* That certain Assignment and Subordination of Contracts executed by Borrower and consented to by contractors of Borrower dated as of the date hereof.

(k) *Assignment of Plans.* That certain Assignment of Plans, Assessments, Entitlements and Intangibles executed by Borrower dated as of the date hereof.

(l) *AUP Report.* Means the Agreed Upon Procedures Report with respect to the QALICB status of Borrower, dated as of the date hereof and prepared by the Accountants.

(m) *Average Value.* The average cost basis of Borrower's owned or leased property as determined under Section 1012 of the Code and the reasonable value of its owned or leased property established by Borrower and reasonably acceptable to Lender.

(n) *Bankruptcy Code.* Means 11 U.S.C. §101, et seq.

(o) *Borrower.* Has the meaning set forth in the preamble to this Agreement.

(p) **BPPR**. Means Banco Popular de Puerto Rico, in its capacity as lender under the Direct Loan and any successor or assignee thereof, or replacement creditor of said facility by assignment, participation, refinancing or otherwise.

(q) **Budget**. The detailed budget specifying all projected construction costs and expenses expected to be incurred by Borrower in connection with the Project, including a time-line analysis of the amount and frequency of such costs and expenses, which budget is included in the Financial Projections.

(r) **Business Day**. Means any day that is not a Saturday, Sunday or other day on which commercial banks in Puerto Rico are authorized or required by law to remain closed.

(s) **Capital One**. Capital One, National Association, a national banking association.

(t) **Capitalized Leases**. Has the meaning assigned to that term in the definition of Indebtedness.

(u) **Capitalized Lease Obligations**. Means, for any Person, the capitalized amount of such Person's liabilities under Capitalized Leases, determined in accordance with GAAP.

(v) **CDE**. A "*qualified community development entity*" as defined in Section 45D of the Code and Regulations.

(w) **CDFI Fund**. The Community Development Financial Institutions Fund of the United States Department of the Treasury, or any successor agency charged with oversight responsibility for the New Markets Tax Credit program.

(x) **Census Tract**. Means, census Tract No. 72069180901, and any other "*low-income community*" as defined in Section 45D(e) of the Code and Section 1.45D-1 of the Regulations in which Lender has provided its consent for Borrower's expansion of its activities pursuant to the terms of the Loan Documents, such consent not to be unreasonably withheld or delayed (provided that Lender shall endeavor to respond to any request for consent no later than 30 days after the date of the request).

(y) **Change Order**. Has the meaning set forth in Section 3.1(j) of this Agreement.

(z) **Code**. The Internal Revenue Code of 1986, as amended from time to time, or any successor statute.

(aa) **Collateral**. Has the meaning set forth in Section 4.2 of this Agreement.

(bb) **Collectibles**. (i) any work of art; (ii) any rug or antique; (iii) any metal or gem; (iv) any stamp or coin; (v) any alcoholic beverage; or (vi) any other tangible personal property specified by the IRS as collectibles, other than collectibles that are held primarily for sale to customers in the ordinary course of business. Certain coins and bullion are not Collectibles as provided in Section 408(m)(3) of the Code.

(cc) *Community Benefits Agreement.* That certain Community Benefits Agreement between Borrower and Lender dated as of the date hereof, as the same may be amended, assigned, restated, modified or supplemented from time to time.

(dd) *Construction Contract.* That certain Supply, Procurement and Construction/Installation Contract Agreement dated June 18, 2020 between Borrower and Distributed Power Innovators JV, a joint venture between International Technical Services Inc., a Puerto Rico corporation, and Accurate Solutions Corp., a Puerto Rico corporation, for the construction of improvements and installation of equipment on the Premises.

(ee) *Danosa Note.* That certain Unsecured Convertible Promissory Note dated August 20, 2019 payable by Borrower to the order of Danosa Caribbean, Inc.

(ff) *Default Rate.* Has the meaning set forth in the Note.

(gg) *Direct Loan.* The loans in the aggregate amount of $11,869,250 granted by the Lenders (as defined in the Direct Loan Agreement) to Borrower pursuant to the terms of the Direct Loan Agreement.

(hh) *Direct Loan Agreement.* That certain Credit Agreement dated September 15, 2020 by and among Borrower, Lenders (as defined in the Direct Loan Agreement) and BPPR, as the same may be amended or refinanced from time to time.

(ii) *Direct Loan Subordination Agreement.* That certain Subordination Agreement dated September 15, 2020 made by DANOSA CARIBBEAN, INC., a Puerto Rico corporation, and Borrower in favor of BPPR and Lender, as the same may be amended or refinanced from time to time.

(jj) *Disbursement Account.* Has the meaning set forth in Section 1.1 of this Agreement.

(kk) *Disbursement Account Control Agreement.* That certain Depository Account Control Agreement executed by Borrower, Lender, and Banco Popular, with respect to the Disbursement Account held at Banco Popular, dated as of the date hereof, as the same may be amended, assigned, restated, modified or supplemented from time to time.

(ll) *Disbursement Account Pledge Agreement.* That certain Assignment and Pledge of Deposit Account executed by Borrower and Lender with respect to the Disbursement Account held at Banco Popular, dated as of the date hereof, as the same may be amended, assigned, restated, modified or supplemented from time to time.

(mm) *Disbursement Account Security Agreements.* Means, collectively, the Disbursement Account Control Agreement and the Disbursement Account Pledge Agreement.

(nn) *Disbursement Agreement.* That certain Disbursing Agreement executed by Borrower, Lender, and Banco Popular, as disbursing agent, dated as of the date hereof, as the same may be amended, assigned, restated, modified or supplemented from time to time.

(oo) *Environmental Indemnity.* That certain Environmental Indemnity Agreement executed by GFC dated as of the date hereof, as the same may be amended, assigned, restated, modified or supplemented from time to time.

(pp) *Environmental Report.* That certain Phase I Environmental Site Assessment Report, BGF Project Site adjacent to El Coqui Landfill (ECL) dated March 2020, prepared by CHES Services Corp. d/b/a Fernando L. Rodriquez, P.E. & Associates with respect to the Property.

(qq) *Equipment.* Has the meaning set forth in Section 4.1 of this Agreement.

(rr) *ERISA.* The Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder from time to time.

(ss) *Event of Default* and *Events of Default.* Have the meaning set forth in Section 8.1 of this Agreement.

(tt) *Excluded Property.* Means the equipment and machinery identified in **Exhibit F**, attached hereto.

(uu) *Fee and Services Agreement.* That certain Fee and Services Agreement among Lender, Allocatee and Borrower dated of even date herewith, as the same may be amended, assigned, restated, modified or supplemented from time to time.

(vv) *Financial Projections.* The financial projections, prepared by the Accountants dated on or about the date hereof.

(ww) *Fixtures.* Has the meaning set forth in Section 4.1 of this Agreement.

(xx) *Force Majeure.* Means war, riots, fire, flood, hurricane, typhoon, earthquake, lightning, explosion, strikes, lockouts, pandemics, prolonged shortage of energy supplies, and acts of state, commonwealth or governmental action prohibiting or impeding Borrower from performing its obligations under the Loan Documents.

(yy) *GAAP.* Means generally accepted accounting principles consistently applied and maintained consistent with the prior financial practice of Borrower.

(zz) *Gas Purchase Agreement.* Means the Landfill Gas Sale and Purchase Agreement entered into by and between the Borrower, as buyer, and El Coqui Landfill Company, LLC, as seller, dated December 28, 2018, as amended on July 19, 2019, and as may have been or may be further amended and modified from time to time.

(aaa) *General Intangibles.* Has the meaning set forth in Section 4.1 of this Agreement.

(bbb) *GFC.* Means GFC Holdings Limited Liability Company, a Puerto Rico limited liability company.

(ccc)   *Governmental Authority*.  Any nation or government, any commonwealth, state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

(ddd)   *Ground Lease*.  That certain Deed of Lease by and between Ground Lessor and Borrower dated March 28, 2019, pursuant to which Borrower leases the Property from the Ground Lessor.

(eee)   *Ground Lessor*.  El Coqui Landfill Company, LLC, a Puerto Rico limited liability company.

(fff)   *Guaranty*.  That certain Payment Guaranty by and between Lender and Guarantors dated of even date herewith, as the same may be amended, assigned, restated, modified or supplemented from time to time.

(ggg)   *Guarantors*.  Shall mean, collectively; Olmar López Vidal and Cristina Ríos Mena, individuals married to each other and residents of Guaynabo, Puerto Rico; Olmar López Gómez and Vivian Vidal De López, individuals married to each other and residents of Guaynabo, Puerto Rico; and Gregory Boyd an individual married to Julia Hathaway under a prenuptial agreement, executive and resident of Humacao, Puerto Rico.

(hhh)   *Improvements*.  All improvements now or hereafter located on the Property.

(iii)   *Inclusion Date*.  Means the date the Puerto Rico Treasury Department issues a certification approving the agreed upon procedure report prepared by a certified public accountant pursuant to Article 6.5(b) of Regulation Number 7772 issued under the Economic Incentives Act, which certifies the Project Costs (as defined in the Direct Loan Agreement) and the capital contribution to Borrower of $6,500,000 of the Equity Contribution (as defined in the Direct Loan Agreement), as provided in the Tax Credit Certification (as defined in the Direct Loan Agreement).

(jjj)   *Indebtedness*.  shall mean, for any Person, without duplication:  (a) indebtedness created, issued or incurred by such Person for borrowed money (whether by loan or the issuance and sale of debt securities or the sale of property to another Person subject to an understanding or agreement, contingent or otherwise, to repurchase such property from such Person); (b) Obligations of such Person to pay the deferred purchase or acquisition price of property or services, other than trade accounts payable (other than for borrowed money) arising, and accrued expenses incurred, in the ordinary course of business so long as such trade accounts are payable within 90 days of the date the respective goods are delivered or the respective services are rendered; (c) Obligations and liabilities of any Person secured by Liens, claim, encumbrance, or security interest upon property owned by such Person, even though such Person has not assumed or become liable for the payment thereof; (d) Obligations or liabilities created or arising under any conditional sales contract or other title retention agreement with respect to property used or acquired by such Person, even though the rights and remedies of the lessor, seller or the lender thereunder are limited to repossession of such property; (e) the principal component of all Obligations of such Person as lessee under leases that have been or should be, in accordance with GAAP, recorded as capital leases ("*Capitalized Leases*") which principal component has been or should, at the time of determination, be capitalized on a balance sheet in accordance with GAAP;

(f) Obligations of such Person in respect of letters of credit or similar instruments issued or accepted by banks and other financial institutions for the account of such Person; and (g) Indebtedness of others guaranteed by such Person. For the purpose of all computations made under this Agreement, the amount of a guaranty in respect of any Obligation shall be deemed to be equal to the maximum amount of such obligation or, if the guaranty is limited to less than the full amount of such Obligation, the maximum aggregate potential liability under the terms of the guaranty. The term "Obligations" as used herein shall mean and include all loans, advances, debts, liabilities, obligations, covenants and duties due and owing by Borrower to Lender of any kind or nature, present or future, whether or not evidenced by any note, guaranty or other instrument, arising under this Agreement, the Notes or any other Loan Document (in each case as now in effect or as thereafter amended or supplemented). The term Indebtedness also includes, without limitation, all interest, charges, expenses, fees, reasonable attorneys' fees and any other sums chargeable to Borrower under this Agreement or any other Loan Document.

(kkk) *Intercreditor Agreement.* Has the meaning set forth in Section 1.3 of this Agreement.

(lll) *Inventory.* Has the meaning set forth in Section 4.1 of this Agreement.

(mmm)*Investor.* COCRF Investor 193, LLC, a Delaware limited liability company, together with its successors and assigns.

(nnn) *IRS.* The Internal Revenue Service.

(ooo) *Lender.* Has the meaning set forth in the preamble to this Agreement.

(ppp) *Lien.* Means any interest in any property or asset securing an obligation owed to, or a claim by, a Person other than the owner of the property or asset, whether such interest is based on common law, statute or contract, including, but not limited to, the security interest lien arising from a mortgage, encumbrance, pledge, conditional sale, security agreement, assignment or trust receipt, or a lease, consignment or bailment for security purposes.

(qqq) *Loan.* Has the meaning set forth in Section 1.1 of this Agreement.

(rrr) *Loan Documents.* Collectively, this Agreement and all documents to be executed or performed in connection with the Loan by Borrower or other parties therein named (as applicable), including, without limitation, the Assignment of Contracts, Disbursement Account Security Documents, the Fee and Services Agreement, the Intercreditor Agreement, the Disbursement Agreement, Environmental Indemnity, Reserve Account Security Documents, Note, Guaranty, UCC Financing Statement and Assignment of Plans, as the same may be modified, amended, renewed, extended, and replaced from time to time.

(sss) *Loan Equipment.* Any of that equipment more particularly described on **Exhibit E**, attached hereto.

(ttt) *Low-Income Community.* A *"low-income community"* as defined in Section 45D of the Code and Regulations.

(uuu) *Material Contract.* Collectively, the Gas Purchase Agreement, the Project Contracts, the Ground Lease, the Purchase Contracts, each Other Material Contract and each other contract to which the Borrower is a party from time to time involving aggregate consideration payable to or by the Borrower of $150,000 or more in any year which the Lender may designate in its reasonable discretion, or otherwise material to the operations of the Borrower taken as a whole.

(vvv) *Major Sub-Contractor.* All sub-contractors reasonably acceptable to Lender who have entered into a Major Sub-Contract.

(www) *Major Sub-Contracts.* All sub-contracts covering any significant components of the Project having cost of at least $100,000.00.

(xxx) *New Markets Tax Credit or NMTC.* The new markets tax credit provided for in Section 45D of the Code.

(yyy) *NMTC Control.* As such term is defined in Section 1.45D-1(d)(6)(ii)(B) of the Regulations (as amended, restated, or modified from time to time).

(zzz) *NMTC Program Requirements.* Collectively, the provisions of (i) Section 45D of the Code, (ii) the Allocation Agreement, and (iii) to the extent applicable to the New Markets Tax Credit Program, the Regulations, published rulings issued by the IRS, and guidance, rules or procedures published by the CDFI Fund, including without limitation the Community Development Entity Certification Application and New Markets Tax Credit Allocation Application published by the CDFI Fund.

(aaaa) *NMTC Recapture Event.* Means a *"Specified NMTC Recapture Event"* as defined in the NMTC Recapture Indemnity.

(bbbb) *NMTC Recapture Indemnity.* That certain QALICB Indemnification Agreement among Borrower, GFC, and Capital One dated as of the date hereof.

(cccc) *NMTC Recapture Period.* The seven (7) year credit period applicable to the QEI made by Investor in Lender, commencing on the first credit allowance date (as such term is defined in Section 45D(a)(3) of the Code) with respect to the QEI made by Investor in Lender and ending on the day preceding the seventh anniversary of the first credit allowance date.

(dddd) *Nonqualified Financial Property.* Debt, cash, stock, partnership interests, options, futures contracts, forward contracts, warrants, notional principal contracts, annuities, and other similar property as described in Section 1.45D-1(d)(4)(i)(E) (as may be revised from time to time) of the Regulations and excludes reasonable amounts of working capital held in cash, cash equivalents or debt instruments with a term of eighteen (18) months or less, or accounts or notes receivable acquired in the ordinary course of trade or business for services rendered or from the sale of property. Pursuant to Section 1.45D-1(d)(4)(i)(E)(2) of the Regulations, the proceeds of an equity investment or a loan by a CDE that will be expended for construction of real property within twelve (12) months after the date the investment or loan is made are treated as a reasonable amount of working capital.

(eeee) *Note.* Has the meaning set forth in Section 1.1 of this Agreement.

(ffff) *Note A.* Has the meaning set forth in Section 1.1 of this Agreement.

(gggg) *Note B.* Has the meaning set forth in Section 1.1 of this Agreement.

(hhhh) *Obligations.* Has the meaning set forth in Section 4.3 of this Agreement.

(iiii) *Operating Account.* Borrower's primary operating account at Banco Popular.

(jjjj) *Operating Policy* Has the meaning set forth in Section 2.1(ff) of this Agreement.

(kkkk) *Other Material Contract.* Means each contract to which the Borrower is a party from time to time, the absence of which would have a material adverse impact on Borrower's business or the Premises.

(llll) *Permitted Contest.* Any appropriate proceeding conducted in good faith by Borrower to contest any tax, assessment, charge, lien or similar claim, during the pendency of which proceeding the enforcement of such tax, assessment, charge, lien or claim is stayed, provided that Borrower has delivered to Lender an amount of cash, bonds, or other collateral reasonably acceptable to Lender (Borrower acknowledges that one hundred twenty-five percent (125%) of the disputed tax, assessment, lien or claim is a reasonable amount) to assure the payment of any such tax, assessment, charge, lien or claim; provided further, to the extent that Borrower has paid relevant tax, assessment, charge lien or similar claim and is simultaneously contesting such tax, assessment, charge, lien or claim, Borrower need not deliver such collateral to Lender.

(mmmm) *Permitted Exceptions.* Shall mean (a) Liens created pursuant to this Agreement and the other Loan Documents or hereafter in favor of Lender; (b) Liens for taxes, assessments or governmental charges, but only to the extent that such taxes, assessments and charges (i) are not yet due, or (ii) are being contested in good faith by appropriate proceedings and adequate reserves (as determined by Lender in its reasonable discretion) or other appropriate provisions are being maintained with respect thereto in accordance with GAAP; (c) Liens imposed by law such as warehousemen's, mechanics', carriers', materialmen's and repairmen's Liens and other similar Liens arising in the ordinary course of business, but only to the extent that the amounts secured or to be secured by such liens (i) are not past due, or (ii) are being contested in good faith by appropriate proceedings and adequate reserves (as determined by Lender in its reasonable discretion) or other appropriate provisions are being maintained with respect thereto in accordance with GAAP; (d) Liens pledges or deposits made in the ordinary course of business to secure obligations under workers' compensation laws or similar legislation or to secure public or statutory obligations; (e) the Ground Lease; (f) [reserved]; (g) the liens set forth in the Intercreditor Agreement created for the benefit of BPPR in connection with the Direct Loan; (h) any liens securing the Direct Loan or any refinancing thereof permitted under Section 7.3, with BPPR or any other lender or institution, or arising from additional indebtedness permissible pursuant to the Direct Loan and the Intercreditor Agreement; (i) the rights of the owners of equipment loaned to Borrower in exchange for agreements to purchase supplies used in connection with such equipment; (j) such other liens or exceptions either permitted or constituted under the Loan Documents or approved from time to time by Lender in writing; and (k) extensions, renewals and replacements of any Lien referred to in subparagraphs (a) through (j) above, <u>provided</u> that the

principal amount of the obligation secured thereby is not increased and that any such extension, renewal or replacement is limited to the property originally encumbered thereby.

(nnnn) *Permitted Indebtedness*. Shall have the meaning ascribed to such term in Section 7.3 of this Agreement.

(oooo) *Person*. Shall mean and include any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, entity, party or government (whether national, federal, state, county, city, municipal, or otherwise, including, without limitation, any instrumentality, division, agency, body or department thereof), and including Borrower.

(pppp) *Plan*. Any plan subject to Title IV of ERISA and maintained by Borrower, or any such plan to which Borrower is required to contribute on behalf of its employees.

(qqqq) *Plans and Specifications*. All plans and specifications, a list of which is attached hereto as **Exhibit C**, for the Project, including all modifications and supplements thereto, all of which must be in form and content acceptable to Lender in their reasonable discretion.

(rrrr) *Premises*. Has the meaning set forth in the Recitals to this Agreement.

(ssss) *Prohibited Person*. Any Person (i) listed in the Annex to the Executive Order or identified pursuant to Section 1 of the Executive Order; (ii) that is owned or controlled by, or acting for or on behalf of, any Person listed in the Annex to the Executive Order or identified pursuant to the provisions of Section 1 of the Executive Order; (iii) with whom Lender is prohibited from dealing or otherwise engaging in any transaction by any terrorism or anti-laundering law, including the Executive Order; (iv) who commits, threatens, conspires to commit, or support "terrorism" as defined in the Executive Order; (v) who is named as a "*Specially designated national or blocked person*" on the most current list published by the OFAC at its official website, at http://www.treas.gov/offices/enforcement/ofac/sdn/t1 1sdn.pdf or any replacement website or other replacement official publication of such list; or (vi) who is owned or controlled by a Person listed above in clause (iii) or (v).

(tttt) *Project*. The construction of, installation of equipment at, and ongoing operations of a new state of the art recycled and renewable natural gas and carbon dioxide facility by Borrower on the Premises.

(uuuu) *Project Contracts*. Those certain agreements, instruments, certifications or contracts executed by the Borrower and such other third party in relation to the development, construction, installation, operation, maintenance and repair of the Project, including without limitation the Architect Contract, the Construction Contract, the Major Sub-Contracts, the Transportation Contracts and all other contracts relating to the design, development, construction and management of the Project.

(vvvv) *Property*. Means that certain parcel of land more particularly described in the Ground Lease.

(wwww)     *Purchase Contracts.* Means, individually or collectively as the context may require, the agreements between the Borrower and commercial or industrial bona-fide purchasers of renewable natural gas in liquified form, renewable carbon dioxide or electricity from the Borrower produced at the Project, in substance and form acceptable to the Administrative Agent in its sole reasonable discretion.

(xxxx) *QALICB.* A *"qualified active low-income community business,"* as such term is defined in Section 45D of the Code and the Regulations.

(yyyy) *Qualified Business.* Any trade or business except any trade or business, either as a principal or an ancillary business, that is an excluded business under Section 1.45D-1(d)(5)(iii) of the Treasury Regulations, including, without limitation, any one or more of the following: (i) the rental of (A) Residential Rental Property or (B) real property on which there are not substantial improvements; (ii) any trade or business consisting predominantly of the development or holding of intangibles for sale or license; (iii) any trade or business consisting of the operation of any private or commercial golf course, country club, massage parlor, hot tub facility, suntan facility, racetrack or other facility used for gambling, or any store the principal business of which is the sale of alcoholic beverages for consumption off premises; or (iv) any trade or business the principal activity of which is farming (within the meaning of Section 2032A(e)(5)(A) or (B) of the Code and the related Treasury Regulations).

(zzzz) *QEI.* A *"qualified equity investment"* as such term is defined in Section 45D of the Code and the Regulations.

(aaaaa) *QLICI.* A *"qualified low-income community investment"* as such term is defined in Section 45D of the Code and the Regulations.

(bbbbb)     *Regulations.* The Federal Income Tax Regulations promulgated from time to time, including interim and temporary regulations, and any guidance, rule, or procedure published by CDFI Fund.

(ccccc) *Reserve Account.* Has the meaning set forth in Section 1.1 of this Agreement.

(ddddd)     *Reserve Account Control Agreement.* That certain Reserve Account Control Agreement executed by Borrower, Lender, and Banco Popular, with respect to the Reserve Account held at Banco Popular, dated as of the date hereof.

(eeeee) *Reserve Account Pledge Agreement.* That certain Assignment and Pledge of Reserve Account executed by Borrower and Lender with respect to the Reserve Account held at Banco Popular, dated as of the date hereof.

(fffff) *Reserve Account Security Documents.* Means, collectively, the Reserve Account Control Agreement and the Reserve Account Pledge Agreement.

(ggggg)     *Residential Rental Property.* Any building or structure if eighty percent (80%) or more of the gross rental income from such building or structure for the taxable year is rental income from *"dwelling units."* For such purpose, a *"dwelling unit"* means a house or apartment used to provide living accommodations in a building or structure, but does not include

a unit in a hotel, motel, or other establishment more than one half (1/2) of the units in which are used on a transient basis. If any portion of the building or structure is occupied by the taxpayer, the gross rental income for such building or structure includes the rental value of the portion so occupied.

(hhhhh) *Sanctions.* All economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State.

(iiiii) *Sanctioned Country.* At any time, a country, region or territory that is itself the subject or target of any Sanctions.

(jjjjj) *Sanctioned Person.* At any time, (i) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, (ii) any Person operating, organized or resident in a Sanctioned Country or (iii) any Person controlled by any such Person.

(kkkkk) *Separate Books and Records.* Has the meaning set forth in Section 2.2(oo) of this Agreement.

(lllll) *Subsequent Releases.* Each release of the proceeds of the Loan from the Disbursement Account for application by Borrower for the expenses associated with the Project in accordance with the terms of this Agreement and the other Loan Documents.

(mmmmm) *Tax Credit Certification.* Means the Tax Credit Certification issued by the Puerto Rico Department of Treasury on August 26, 2020, authorizing the issuance of tax credits in the amount of $3,250,000, pursuant to Section 6(a)(2)(B) of the Economic Incentives Act.

(nnnnn) *Tenant.* Any Person who may now or hereafter hold a leasehold interest in, or the right to use or occupy, a portion of the Premises.

(ooooo) *Tenant Qualified Business.* Any trade or business of a Tenant except any trade or business consisting of the ownership or rental of Residential Rental Property, any trade or business the principal activity of which is farming (within the meaning of Section 2032A(e)(5)(A) or (B) of the Code and the related Treasury Regulations), the operation of any private or commercial golf course, country club, massage parlor, hot tub facility, suntan facility, race track or other facility used for gambling, or any store the principal business of which is the sale of alcoholic beverages for consumption off premises.

(ppppp) *Transportation Contract.* Means, individually or collectively as the context may require, the agreements between the Borrower and commercial or industrial bona-fide third party entities (including, without limitation, Flexitank, Inc.) for the transportation of renewable natural gas in liquified form, renewable carbon dioxide or electricity, in form and substance acceptable to the Lender in its sole reasonable discretion.

(qqqqq) *Treasury Regulations.* Any proposed, temporary and/or final regulations promulgated under the Code.

(rrrr) *UCC.* Article 9 of the Uniform Commercial Code as enacted and in force at the date of this Agreement in the Commonwealth of Puerto Rico.

(sssss) *UCC Financing Statement.* Collectively, all financing statements necessary to perfect any of the liens and security interests contained in the Loan Documents.

## ARTICLE 2
## NEW MARKETS TAX CREDIT DEFINITIONS, REPRESENTATIONS, WARRANTIES, AND COVENANTS:

**2.1    New Markets Tax Credits Representations and Warranties.** Borrower hereby represents and warrants to Lender that:

(a)    Borrower is engaged solely in the business of the leasing, development and construction of the Improvements and the operation of the Project, and it will not lease, develop, construct or operate any asset or property other than the Premises and the Project and incidental personal property necessary for the leasing, development and construction of the Improvements and the operation of the Project.

(b)    With respect to the current taxable year of Borrower, at least fifty percent (50%) of the total gross income (determined in accordance with GAAP) of Borrower is derived from the active conduct of its trade or business within the Census Tract.

(c)    With respect to the current taxable year of Borrower, at least forty percent (40%) of the use of the tangible property of Borrower (whether owned or leased) is within the Census Tract provided, however, that for any taxable year of Borrower in which Borrower has no employees, at least eighty-five percent (85%) of the use of the tangible property of Borrower (whether owned or leased) must be within the Census Tract (for purposes of this representation, the percentage of tangible property owned or leased by Borrower and used by Borrower during the taxable year in the Census Tract shall be determined based on a fraction (i) the numerator of which is the Average Value of the tangible property used by Borrower within the Census Tract, and (ii) the denominator of which is the Average Value of all of the tangible property owned or leased by Borrower and used by Borrower during the taxable year).  Prior to the date hereof, Borrower has used all its tangible property (whether owned or leased) within the Census Tract.

(d)    With respect to the current taxable year of Borrower, at least forty percent (40%) of the services performed for Borrower by its employees will be within the Census Tract (for purposes of this representation, this percentage is determined based on a fraction (i) the numerator of which is the total amount paid by Borrower for employee services performed in the Census Tract during the taxable year, and (ii) the denominator of which is the total amount paid by Borrower for employee services during the taxable year).

(e)    With respect to the current taxable year of Borrower, less than five percent (5%) of the average of the aggregate unadjusted bases of the property of Borrower is attributable to Nonqualified Financial Property.  Borrower has provided to Lender a true, correct, and complete listing of any Nonqualified Financial Property owned by Borrower, including therein the unadjusted bases of such property and shall maintain records thereof throughout the term of the Loan.

(f)     With respect to the current taxable year of Borrower, less than five percent (5%) of the average of the aggregate unadjusted bases of the property of Borrower is attributable to Collectibles.  Borrower has provided to Lender a true, correct, and complete listing of any Collectibles owned by Borrower, including therein the unadjusted bases of such property and shall maintain records thereof throughout the term of the Loan.

(g)     Borrower does not plan to change its name, relocate, move, or expand its operations or its principal place of business to any location outside of the Census Tract.  Borrower does not currently have plans to develop, construct or improve any real property at any location outside of the Census Tract.

(h)     No part of the Premises or any property of Borrower is Residential Rental Property.

(i)     Borrower conducts solely a Qualified Business.

(j)     The trade or business of each tenant, subtenant, or other occupant of the Project conducted on the Premises consists solely of a Tenant Qualified Business.

(k)     Borrower is not a bank, credit union or other financial institution.

(l)     No part of the Project financing includes low-income housing tax credits.

(m)     No portion of the Premises constitutes a "qualified low-income building" under Section 42 of the Code.

(n)     The assumptions underlying the Financial Projections and AUP Report relating to Borrower and GFC are reasonable in all material respects and to the best knowledge of Borrower, are accurate and complete in all material respects based on all of the facts and circumstances known to Borrower.

(o)     Borrower has not granted to any Person a mortgage or other lien against the Collateral or its interest in the Premises except as described in this Agreement and the Intercreditor Agreement.

(p)     Borrower is a limited liability company and classified as disregarded as separate from its sole member for federal income tax purposes.

(q)     Borrower has no information or knowledge tending to indicate that Borrower might not satisfy all of the requirements of this Agreement which are designed to ensure that Borrower is a QALICB.

(r)     Borrower has fully and accurately stated in writing to Lender the nature of Borrower's business and of the goods or services provided, primary sources of revenue of Borrower, primary expenditures of Borrower, and the location of all property of Borrower. Borrower has no present plans or intentions to (i) change the nature of, or manner in which it conducts, its business in any way that would cause to be untrue, in any material respects, any of the representations, warranties or covenants set out in this Agreement, (ii) move or expand its existing operations to any location outside of the Census Tract, (iii) develop, construct or improve

any property at any location outside of the Census Tract, except as permitted by the Loan Documents, (iv) reduce the percentage of gross income derived from the active conduct of a Qualified Business within the Census Tract, (v) reduce the percentage of use of tangible property in the Census Tract, (vi) maintain Collectibles not held primarily for sale in the ordinary course of business at five percent (5%) or more of the average of the aggregate unadjusted cost bases of its assets, (vii) maintain Nonqualified Financial Property at five percent (5%) or more of the average of the aggregate unadjusted cost bases of its assets; (viii) enter into leases with any tenant that is not a Tenant Qualified Business, or (ix) take any other action that in any way that would cause to be untrue, in any material respects, any of the representations, warranties or covenants set out in this Agreement or the other Loan Documents.

(s)     All material information concerning Borrower, GFC or the Project requested by Lender has been disclosed by Borrower to Lender and there are no facts or information known to Borrower or any of its Affiliates, or which should have been known to any of them in the exercise of reasonable care, which would make any of the representations or warranties set forth herein, or any of the facts or information submitted by Borrower to Lender with respect to Borrower, GFC, the Premises or the Project inaccurate, incomplete or misleading in any material respect.

(t)     All documents and information provided by Borrower to Lender are complete and accurate in all material respects and accurately describe the entire business of Borrower.

(u)     Neither Borrower nor, to the best of Borrower's knowledge, any Affiliate of Borrower has had any communications with the CDFI Fund or the U.S. Department of Treasury concerning noncompliance with, or deficiencies in, reporting practices.

(v)     Neither Borrower nor any Affiliate of Borrower, nor any of their respective principals has been or is presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from participation in a covered transaction by any federal department or agency, as such terms are defined in Executive Order 12549, nor is any such action pending or proposed.  Borrower shall simultaneously with the execution and delivery of this Agreement, execute and deliver a certificate regarding debarment, suspension, ineligibility and voluntary exclusion in the form attached hereto as **Exhibit A**.

(w)     The Premises are located in the Census Tract and the Census Tract is a Low-Income Community that meets the requirements set forth in Section 3.2(h) of the Allocation Agreement for being considered a *"targeted distressed community."*

(x)     The amount of reserves, receivables, assets or other items of working capital shown on the balance sheet of Borrower submitted to Lender is reasonable based upon Borrower's reasonably anticipated working capital needs.

(y)     There have been no irregularities or illegal acts involving Borrower or management or employees who have significant roles in the internal control structure of Borrower that would have a material effect on the matters described in this Section 2.1, and there has been no fraud involving management or employees who have significant roles in the internal control structure of Borrower, or fraud involving other employees that could have a material effect on the matters described in this Section 2.1.

(z) Borrower expects to generate revenues within three (3) years of the date hereof and specifically intends and expects to generate positive operating cash flow from the Project.

(aa) Borrower has established separate bank accounts, and does not and shall not commingle the assets of Borrower with any Person. Borrower's assets are not listed as assets on the books and records of any other Person, except to the extent that such assets are consolidated with another Person's assets for financial reporting purposes. Borrower does not and shall not possess or use assets of any other Person, and does not and shall not permit any other Person to possess or use its assets, unless in either case such assets are rented, leased, or otherwise provided for use on an arms-length basis pursuant to a lease or services agreement or similar agreement with such Person.

(bb) Any services performed for or on behalf of Borrower by employees of any other Person (including any Affiliate of Borrower) are and shall be performed on an arm's length basis pursuant to a services agreement or similar agreement with such Person.

(cc) Borrower reasonably expects that (i) it will have sufficient sources of funds to complete the development and construction of the Improvements and operate the Project; and (ii) the original principal amount of the Loan and all other sources of funds do not exceed the costs incurred or to be incurred by Borrower to complete the development and construction of the Improvements and operate the Project.

(dd) Borrower has not knowingly entered into this Agreement, or any other agreements or understandings (whether written or oral) with a principal purpose of entering into a transaction or series of transactions (i) to achieve a result that is inconsistent with Section 45D of Code, and the NMTC Program Requirements, and/or (ii) to avoid or evade federal income tax.

(ee) With respect to any Equipment acquired or installed prior to the date of this Agreement, Borrower has depreciated such Equipment in accordance with the Code and the applicable Treasury Regulations over a period not to exceed seven (7) years.

(ff) GFC has, prior to or on the date hereof, adopted the Portion of the Business Memorandum Accounting Procedures Policy attached hereto as **Exhibit H** (the "*Operating Policy*") to, among other things, maintain and respect Borrower as a separate and distinct operating unit or division of GFC with Separate Books and Records.

(gg) Borrower will take all action necessary to ensure that Borrower qualifies under the "Portions of a Separate Business Rule" exception contained in Section 45D(d)(2)(C) of the Code and Section 1.45D-1(d)(4)(iii)(A) of the Treasury Regulations, including, but not limited to, ensuring that at all times, the activities/business of Borrower would meet the requirements of a QALICB if it were separately incorporated and Borrower shall maintain Separate Books and Records for Borrower pursuant to the terms of this Agreement and the Operating Policy.

**2.2 New Markets Tax Credits Covenants.** Borrower covenants and agrees with Lender as follows during the term of the Loan:

(a) Borrower shall engage solely in the leasing, development and construction of the Improvements and the operation of the Project.

(b)     Borrower shall comply with the terms and conditions of this Agreement and the other Loan Documents which are designed to ensure that Borrower maintains its status as a QALICB.

(c)     With respect to the current taxable year of Borrower and each taxable year of Borrower thereafter, at least fifty percent (50%) of the total gross income (determined in accordance with GAAP) of Borrower will be derived from the active conduct of its trade or business as a Qualified Business within the Census Tract.

(d)     With respect to the current taxable year of Borrower and each taxable year of Borrower thereafter, at least forty percent (40%) of the use of the tangible property of Borrower (whether owned or leased) will be within the Census Tract; provided, however, that for any taxable year of Borrower in which Borrower has no employees, at least eighty-five percent (85%) of the use of the tangible property of Borrower (whether owned or leased) will be within the Census Tract (for purposes of this covenant, the percentage of tangible property owned or leased by Borrower and used by Borrower during the taxable year in the Census Tract shall be determined based on a fraction (i) the numerator of which is the Average Value of the tangible property used by Borrower within the Census Tract, and (ii) the denominator of which is the Average Value of all of the tangible property owned or leased by Borrower and used by Borrower during the taxable year). Borrower shall provide to Lender (upon request) a true, correct and complete list of tangible property owned or leased by Borrower and a description of where such property is used by Borrower. If any property of Borrower is used outside of the Census Tract, Borrower shall provide to Lender (upon request) the cost basis of all property owned by Borrower and the estimated value of any leased property and the basis of such estimate and the business hours of usage of Borrower's property within and without the Census Tract. Borrower shall retain records of the foregoing throughout the term of the Loan.

(e)     With respect to the current taxable year of Borrower and each taxable year of Borrower thereafter, at least forty percent (40%) of the services performed for Borrower by its employees will be within the Census Tract (for purposes of this representation, this percentage is determined based on a fraction (i) the numerator of which is the total amount paid by Borrower for employee services performed in the Census Tract during the taxable year, and (ii) the denominator of which is the total amount paid by Borrower for employee services during the taxable year. Borrower shall provide to Lender (upon request) a list of employees providing services, including a general description of services provided to Borrower, and if applicable compensation paid for services rendered with respect to the Project within and without the Census Tract. Borrower shall retain records of the foregoing throughout the term of the Loan.

(f)     With respect to the current taxable year of Borrower and each taxable year of Borrower thereafter, less than five percent (5%) of the average of the aggregate unadjusted bases of the property of Borrower shall be attributable to Nonqualified Financial Property. Borrower shall provide to Lender (upon request) a true, correct, and complete listing of any Nonqualified Financial Property owned by Borrower, including therein the unadjusted bases of such property, and shall maintain records thereof throughout the term of the Loan.

(g)     With respect to the current taxable year of Borrower and each taxable year of Borrower thereafter, less than five percent (5%) of the average of the aggregate unadjusted bases

of the property of Borrower shall be attributable to Collectibles. Borrower shall provide to Lender (upon request) a true, correct, and complete listing of any Collectibles owned by Borrower, including therein the unadjusted bases of such property, and shall maintain records thereof throughout the term of the Loan.

(h)     At no time during the term of the Loan shall the Premises or any property of Borrower be used as, or converted into, Residential Rental Property.

(i)     Borrower conducts solely a Qualified Business.

(j)     The trade or business of each tenant, subtenant or other occupant of the Project at the Premises shall consist solely of a Tenant Qualified Business.

(k)     Borrower shall not be a bank, credit union or other financial institution.

(l)     No part of the Project financing shall directly or indirectly include low-income housing tax credits, nor shall the proceeds of the Loan be used to finance the "eligible basis" of a "qualified low-income building" under Section 42 of the Code.

(m)     Borrower shall only use the Loan proceeds for the trade or business of Borrower in connection with the Project.

(n)     Borrower is and shall continue to be a limited liability company classified as disregarded as separate from its sole member for federal income tax purposes, and Borrower shall timely file all federal tax returns consistent therewith to the extent Borrower is required to file federal tax returns.

(o)     Borrower will have sufficient sources of funds to complete the development and construction of the Improvements and to operate the Project.

(p)     Borrower shall provide all information, reports and statements reasonably requested by Lender for purposes of Lender's reporting requirements pursuant to the Allocation Agreement to monitor compliance with Section 45D of the Code, and to measure the community benefit of the Project.

(q)     Borrower shall promptly notify Lender of any noncompliance with this Agreement.

(r)     Borrower agrees it will not enter into any lease, lease amendment or consent to any sublease that could adversely affect Lender's compliance with the NMTC Program Requirements or the status of the Loan as a QLICI.

(s)     Borrower shall provide to Lender such information and sign such documents as are reasonably necessary for Lender and Investor to make timely, accurate and complete submissions of (i) federal, commonwealth and state income tax returns, (ii) reports to governmental agencies, and (iii) any other reports required to be delivered to Lender and Investor or their members.

(t)     Borrower shall not take action resulting in nor permit a change in control or ownership of interests in Borrower or any Affiliate (to the extent Borrower controls such Affiliate)

which would result in Capital One, Investor or Lender (or their direct or indirect owners) having NMTC Control of Borrower.

(u)     Borrower shall promptly supply Lender with any reports, records, statements, documents or other information reasonably requested by Lender in connection with responding to any request by the CDFI Fund and the United States Department of Treasury, including any request pursuant to the Allocation Agreement (*e.g.*, financial and activity reports, records, statements, documents and other information for purposes of ensuring compliance herewith) as may be required to comply with the NMTC Program Requirements, and shall promptly cooperate with Lender to enable Lender to comply with all of the requirements of its Allocation Agreement. In connection therewith, Borrower shall maintain records of:

> (i)      the gross income of Borrower and sources from which such gross income is derived sufficient to establish compliance with the requirements of this Agreement;

> (ii)     the activities and services performed by employees of Borrower and the administration of their employment (including where their services are performed and, in instances where such employees also perform services for Borrower and an Affiliate of Borrower, the allocation of their time between Borrower and any Affiliate of Borrower, and including amounts paid by Borrower for employee services performed in the Census Tract and total amounts paid by Borrower for employee services, in each case during the taxable year) that are sufficient to establish compliance with the requirements of this Agreement;

> (iii)    the Average Value and location of Borrower's tangible personal property that are sufficient to establish compliance with the requirements of this Agreement; and

> (iv)     the unadjusted bases of Borrower's property generally and in particular, any Collectibles and any Nonqualified Financial Property it may own, that are sufficient to establish compliance with the requirements of this Agreement.

(v)     Borrower shall provide Lender with all information reasonably requested by Lender (i) to complete any reporting to its members in connection with the NMTCs resulting from the Loan, and (ii) in connection with Lender's NMTC reports and audits, including those made by the CDFI Fund's Awards Management Information System.

(w)     Borrower shall prepare all required federal, commonwealth, state or local income tax returns or reports in a timely manner consistent with its ownership of the entire Project, including any portion of the Project leased by Borrower to any other Person.

(x)     Borrower shall make all such records available to Lender for inspection from time to time as Lender may reasonably request.

(y)     Borrower shall collaborate with Lender with respect to the response to be made to any ninety (90) day notice of noncompliance and ability to cure the provisions hereof provided by the CDFI Fund to Lender pursuant to its Allocation Agreement.

(z)     Borrower shall reasonably cooperate with Lender in seeking any cure, waiver or extension sought by Lender with respect to any recapture of the NMTCs (regardless of whether or not Borrower has violated any covenants provided herein or failed to act as directed by Lender), pursuant to Section 1.45D-1(e)(5) of the Treasury Regulations.

(aa)    Borrower shall not by its action or inaction cause a NMTC Recapture Event.

(bb)    Borrower shall not discontinue conducting business, relocate, expand or materially change the nature of its business, or materially change the manner in which its business activities are conducted, other than changes in the nature of its business or the manner in which it conducts its business that do not cause Borrower's business to cease to be a Qualified Business or cause it to cease to constitute a QALICB, and that do not cause the Loan to cease to constitute a QLICI (as determined by Lender in their good faith judgment and based upon the advice of counsel).

(cc)    Subject to delays and modifications caused by a Force Majeure, Borrower shall use best efforts to expend all proceeds of the Loan (including by establishing the Reserve Account) within twelve (12) months after the date hereof but in no event later than eighteen (18) months after the date hereof.

(dd)    Borrower shall deliver the certifications when and as required by this Agreement and the other Loan Documents.

(ee)    Borrower shall not accept any capital contribution from, and shall not issue any equity interest to Lender, Allocatee, Investor or any Person in which Lender, Allocatee or Investor or any of their affiliates may own an interest without the prior written consent of Lender in each instance, which consent shall not be withheld unless Lender shall have a reasonable belief that such capital contribution or equity interest would cause Lender to violate the NMTC Program Requirements.

(ff)    Borrower will treat the Loan as indebtedness for all purposes, and will not take any positions contrary to such treatment.

(gg)    Borrower will not change its name, relocate, move or expand its operations or its principal place of business to any location outside of the Census Tract or develop, construct or improve any real property at any location outside of the Census Tract.

(hh)    Borrower acknowledges and agrees that the Loan shall be subject to the NMTC Program Requirements, and Borrower covenants to cooperate fully and promptly with Lender in strictly complying with the NMTC Program Requirements.

(ii)    Borrower shall be responsible for informing Lender of any default or compliance failure under this Section 2.2 of which Borrower has knowledge within fifteen (15) calendar days of Borrower's actual knowledge of the occurrence of such event.

(jj)    Borrower acknowledges and agrees that each of Lender, Allocatee and Investor, their respective direct and indirect owners, and their respective legal counsel as well as Borrower's counsel may rely on the representations, warranties and covenants contained herein.

(kk)     Borrower shall generate revenues from the Project within three (3) years after the date hereof.

(ll)     Borrower shall maintain separate bank accounts and shall not commingle its assets with any other Person.  Borrower's assets shall not be listed as assets on the books and records of any other Person, except to the extent that such assets are consolidated with another Person's assets for financial reporting purposes, which shall not relieve Borrower of its obligation to maintain a complete set of books and records for its business.  Borrower shall not possess or use assets of any other Person, and Borrower shall not permit any other Person to possess or use its assets, unless in either case such assets are rented, leased, or otherwise provided for use on an arm's length basis pursuant to a lease or services agreement or similar agreement with such Person.

(mm)     Borrower shall depreciate the Equipment in accordance with the Code and the applicable Treasury Regulations over a period of not to exceed seven (7) years.

(nn)     Borrower acknowledges that the status of the Loan as a QLICI is dependent, in part, upon Borrower's compliance with the "Portions of a Separate Business Rule" exception contained Section 45D(d)(2)(C) of the Code and Section 1.45D-1(d)(4)(iii)(A) of the Treasury Regulations, in order to establish Borrower as a QALICB.  Accordingly, Borrower agrees (i) to take all action necessary to ensure that Borrower qualifies under the "Portions of a Separate Business Rule" exception contained in Section 45D(d)(2)(C) of the Code and Section 1.45D-1(d)(4)(iii)(A) of the Treasury Regulations, including, but not limited to, (i) ensuring that at all times, the activities/business of Borrower would meet the requirements of a QALICB if it were separately incorporated and Borrower, (ii) maintaining Separate Books and Records for Borrower pursuant to the terms of this Agreement and the Operating Policy, (iii) upon written request of Lender, providing documentation reasonably acceptable to Lender that the proceeds of the Loan were used as required by this Agreement, and (iv) complying with the Operating Policy.

(oo)     Borrower shall maintain a complete and separate set of books and records, which books and records shall be separately maintained on a current basis as may be required under Section 45D of the Code and the Treasury Regulations showing that Separate Business is a portion of the business of Borrower (the "Separate Books and Records").  The Separate Books and Records shall include, without limitation, a separate income statement, balance sheet, operating budget, a written record and reconciliation of the reimbursements, allocations and payments described under the heading "Financial Statements" in the Operating Policy below, and inventory of real and personal property owned, leased or allocated to Borrower.  Borrower shall use all of the proceeds of the Loan for the trade or business of Borrower, and the Separate Books and Records shall be maintained in such a manner that the Loan proceeds can be traced to the trade or business of Borrower.

## ARTICLE 3
## BORROWER'S COVENANTS AND TERMS AND CONDITIONS GOVERNING SUBSEQUENT RELEASES:

### 3.1 Borrower's Covenants.

(a) Borrower has commenced construction of the Improvements, and subject to delays and modifications caused primarily by factors which cannot be avoided despite Borrower's best, good faith efforts, Borrower shall cause the construction of the Improvements to be prosecuted with diligence and continuity and in conformity in all material respects with the Plans and Specifications and Budget to completion (including obtaining all requisite permanent certificates of occupancy for the Project) within eighteen (18) months after the date hereof.

(b) Borrower shall rely entirely upon its own judgment in determining the quality and suitability of the Plans and Specifications and any amendments or alterations thereto. Lender is under no duty or obligation to review, or inform Borrower of, the quality or suitability of the Plans and Specifications or any amendments or alterations thereto. Any such review or approval by Lender is entirely for Lender's protection, and none of Borrower, the general contractor, or any third party shall be entitled to rely upon such review or approval by Lender.

(c) Within twenty (20) calendar days of request by Lender, Borrower shall furnish to Lender, from time to time but not more than once in a calendar year, current lists of all contractors, Major Sub-Contractors and material suppliers retained in connection with the Project. Each such list shall show the name, address, and telephone number of each such contractor or Major Sub-Contractor, a general statement of the nature of the work to be done, and the labor and materials with respect to each. Lender shall have the right to make direct contact with each contractor, Major Sub-Contractor and material supplier to verify the facts disclosed by said lists or for any other purpose reasonably related to monitoring the progress of the Project. Borrower or the general contractor shall provide Lender with information sufficient to perform said verification. Borrower agrees that Lender have the right, but neither the obligation nor the duty, to disapprove any contractor, Major Sub-Contractor or material supplier who, in Lender's good faith determination, is deemed to be financially or otherwise unqualified. The failure of Lender to disapprove a contractor, Major Sub-Contractor or material supplier shall not constitute a warranty that such individual or entity not so disapproved is in fact qualified.

(d) No materials, equipment, fixtures or any other part of the Project shall be purchased or installed under any security agreement or other arrangement whereby the seller thereof or any other person has or purports to have the right to remove or to repossess any such items or to consider such items personal property after their incorporation into the Project, except (i) statutory materialmen's liens; (ii) security interests and equipment leases with respect to equipment normally associated with construction projects of the same type as the Project, (iii) security interests and equipment leases authorized by Lender in writing; and (iv) fixtures purchased by any Tenant or subtenant of the Premises as its own separate property as expressly permitted by any lease or sublease entered by Borrower.

(e) All work done in connection with the Project shall be performed in compliance with all applicable laws, ordinances, rules and regulations of all federal, state, county and municipal

governments or agencies now in force or that may be enacted hereafter; and with all directives, rules and regulations of the fire marshal, health officer, building inspector or other proper officers of any governmental agency now having or hereafter acquiring jurisdiction.

(f)     During construction of the Improvements, Lender and/or Capital One may, at their option and sole expense, announce and publicize the source of the financing contemplated hereunder by reasonable means and media selected by Lender and may also erect (or request that Borrower erect at Lender's sole expense) at the Premises, but subject to the terms of the Ground Lease, applicable laws and Permitted Exceptions, a sign for display indicating Lender and/or Capital One are providing financing for the Project. If such sign is provided, Borrower agrees, subject to the terms of the Ground Lease, at Lender's sole expense, (i) to provide a prominent and reasonably suitable location for the display of the sign, (ii) to cause the sign to be displayed in such place by suitable attachment of the sign to a structure on the site at Lender's cost, and (iii) to maintain the display of such sign for the duration of construction of the Improvements. Notwithstanding anything contained in this Section to the contrary, Lender and/or Capital One may use media, and other Project related information, internally without consent of Borrower.

(g)     Borrower agrees to fully pay and discharge, or cause to be discharged, all claims for labor done and materials and services furnished in connection with the Project and to take all other reasonable steps to forestall the assertion of claims of liens (other than liens for real estate taxes not yet due and payable and other Permitted Exceptions) against either the Premises, any part thereof or right or interest appurtenant thereto. All labor and material used in the construction of the Improvements have been and shall be fully paid for according to the terms of all contracts for the provision of such labor and material and are not and will not be delinquent, and there are now no filed unpaid labor, mechanics or material liens or claims against any portion of the Premises; provided that, in lieu of full payment, Borrower shall have the option to bond over any lien in an amount sufficient to induce a title company to insure over such lien.

(h)     Subsequent Releases and retainage hold backs shall be made in accordance with the Disbursement Agreement.

(i)     Borrower has submitted to Lender the Budget. Proceeds of the Loan shall not be used in violation of the sub-limits for the purchase of Loan Equipment as are set forth in the Budget, subject to the Disbursement Agreement. Changes in the Budget may be made only with the prior written consent of Lender, which consent shall not be unreasonably withheld or delayed.

(j)     Borrower will not (i) cause or permit any changes in the Plans and Specifications except pursuant to a change order approved in writing by Lender and Architect, or (ii) amend or make any change in any contract or sub-contract (including, without limitation, the Construction Contract or any Major Sub-Contract) without the prior written consent of Lender (the preceding subparagraphs (i) and (ii) being referred to collectively herein as a "*Change Order*"), which consent may be granted or withheld in Lender's reasonable discretion. Anything to the contrary herein notwithstanding, Borrower may cause, permit or make a Change Order without prior written consent of Lender if such Change Order is less than $50,000 individually, and when added to all other Change Orders is less than $100,000. Notwithstanding anything to the contrary contained herein, Borrower shall not cause, permit or make any Change Order which increases the total cost

of the Project unless Borrower shall provide evidence reasonably acceptable to Lender that Borrower has adequate sources of funds to cover such increased cost.

(k)     Within ten (10) calendar days after request by Lender, Borrower shall furnish to Lender copies of all reports documenting field and laboratory tests on materials and construction quality to verify compliance of the work with the specified quality standards set forth in the Plans and Specifications.

**ARTICLE 4**
**SECURITY AGREEMENT:**

**4.1     Definition.** As used in this Article 4 only, the term "Direct Loan Agreement" shall mean the Direct Loan Agreement in the form and substance dated September 15, 2020, without further amendment or modification unless approved by Lender in writing.

**4.2     Grant of Security.** As further and additional collateral for payment and performance of the Obligations (as defined in Section 4.3 of this Agreement), and subject to the terms of the Intercreditor Agreement, Borrower hereby assigns and pledges to Lender, and grants to Lender a security interest in, all of Borrower's right, title and interest in and to all "Collateral" as that term is defined in the Direct Loan Agreement, other than the Pledged Interest (as defined in the Direct Loan Agreement), the Accounts (as defined in the Direct Loan Agreement), the Account Collateral (as defined in the Direct Loan Agreement) and the Tax Credits (as defined in the Direct Loan Agreement), including any Collateral now and hereafter owned, acquired, leased or arising (the "*Collateral*"). Pursuant to the Direct Loan Agreement, the term Collateral shall not include any Excluded Property until the Inclusion Date, and on which such Inclusion Date, the Excluded Property shall, automatically and without any further action from any party, form part of the Collateral.

Notwithstanding the foregoing, prior to an Event of Default, Borrower may continue to exercise all rights and remedies under and with respect to the Collateral, subject to the terms of Article 7 and Article 8 herein.

**4.3     Security for Obligations.** Subject to the terms of the Intercreditor Agreement, the Collateral and this Agreement secure the payment and performance of all of Borrower's obligations now or hereafter owed to Lender, including but not limited to obligations under the Note, this Agreement, and all other Loan Documents, together with all extensions, renewals and modifications thereof (no matter how evidenced and whether for payments, interest, fees, expenses or otherwise), whether direct or indirect, absolute or contingent, now existing or hereafter arising and howsoever evidenced or acquired (collectively, "*Obligations*").

**4.4     Borrower Remains Liable.** Anything herein to the contrary notwithstanding, the exercise by Lender of any of its rights hereunder shall not release Borrower from any of its duties or obligations under the contracts and agreements included in the Collateral, and, prior to Lender's assumption of Borrower's interest under the contracts and agreements included in the Collateral, Lender shall not have any obligation nor liability under the contracts and agreements included in the Collateral by reason of this Agreement, nor shall Lender be obligated to perform any of the

obligations or duties of Borrower thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

**4.5** **Representations and Warranties.** Borrower represents and warrants as follows:

(a) Borrower's place of business and the address to be inserted on all UCC-1 Financing Statements is Borrower's address appearing in the introductory paragraph of this Agreement. Borrower's Employer I.D. No. is 66-0912976.

(b) Borrower owns the Collateral free and clear of any lien, security interest, charge or encumbrance whatsoever other than the liens and security interests granted pursuant to the Loan Documents, the Intercreditor Agreement, and the Permitted Exceptions.

(c) This Agreement creates valid security interests in the Collateral securing the payment of the Obligations, and such security interests have attached and will be perfected upon the execution of this Agreement, the Reserve Account Security Documents, the Intercreditor Agreement, the Disbursement Account Security Documents, the filing of financing statements in the appropriate state, commonwealth and county offices, as applicable, and Lender having funded the Loan to Borrower.

**4.6** **Further Assurances.** Borrower:

(a) shall from time to time, at the reasonable request of Lender, at its expense, promptly execute and deliver all further instruments and documents (including UCC financing statements, continuation statements and amendments) and take all further action that may be reasonably necessary in order to perfect and protect any security interest granted or purported to be granted hereby or described herein or to enable Lender to exercise and enforce its rights and remedies hereunder with respect to all the Collateral;

(b) hereby authorizes Lender to file one (1) or more financing or continuation statements and amendments thereto, relative to all or any part of the Collateral, without the signature of Borrower;

(c) will furnish to Lender, from time to time, within thirty (30) calendar days of such request, statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as Lender may reasonably request, all in reasonable detail; and

(d) will maintain, in accordance with sound accounting practice, accurate records and books of account showing, among other things, all Collateral, the proceeds of the sale or other disposition thereof and the collections therefrom; and Lender shall have the right, without hindrance or delay, and after prior coordination with Borrower, to inspect the Collateral and to inspect, audit, check and make extracts from the books, records, journals, orders, receipts, correspondence, and other data relating to the Collateral.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES:

Borrower makes the following representations and warranties to Lender, all of which shall survive the delivery of the Note and the funding of the Loan:

**5.1 Authorization.** Borrower is a limited liability company that has been duly formed under the laws of the Commonwealth of Puerto Rico, is validly existing in good standing, and lawfully authorized to do business in the Commonwealth of Puerto Rico. Borrower has all requisite power and authority to own and operate its assets, to carry on its business as presently being conducted, to enter into and to carry out the terms of this Agreement, and to execute, deliver, and perform its obligations under the Note and all other Loan Documents.

**5.2 No Conflict.** The execution, delivery and performance by Borrower of the Loan Documents will not cause or constitute a violation of any law or regulation or any order, writ, injunction or decree of any court or Governmental Authority, or result in a breach of or constitute a default under, Borrower's certificate of organization, operating agreement, any indenture or other agreement or instrument to which Borrower is a party or by which Borrower or Borrower's properties may be bound, or result in the creation of any lien upon any property of Borrower other than those in favor of Lender pursuant to the Loan Documents.

**5.3 Binding Agreements.** This Agreement and all other Loan Documents to which Borrower is a party have been duly executed and delivered by Borrower and constitute the legal, valid and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms, except to the extent the enforceability thereof may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws limiting the enforceability of creditors' rights generally or by judicial discretion as to the availability of equitable remedies.

**5.4 Borrower Authorization.** The execution, delivery and performance by Borrower of the Loan Documents to which Borrower is a party have been duly authorized by all necessary action on the part of Borrower and its principals, officers and directors.

**5.5 No Governmental Consent.** No authorization, approval or consent by, or filing with, any Governmental Authority or public regulatory authority is required in connection with the authorization, execution, delivery and performance of any Loan Document by Borrower, except for the filing of financing statements under the UCC.

**5.6 Litigation.** There are no actions, suits or proceedings pending, or to the knowledge of Borrower threatened, against or affecting Borrower, any of Borrower's real or personal property, any of the Premises or the Project, or involving the validity or enforceability of the Note or any other Loan Document, or the priority of the liens, assignments and security interests thereof, at law or in equity, or before or by any Governmental Authority.

**5.7 Business Purpose of the Loan.** Borrower agrees that it will use the proceeds of the Note for business purposes (other than agricultural purposes) only, and not for consumer, personal, family or household purposes. The Loan is being made on Borrower's own behalf, and not as nominee, designee, or agent for another, nor is Borrower acting for another in connection with the Loan.

## 5.8 The Premises.

(a) Borrower owns a leasehold interest the Property pursuant to the Ground Lease, free and clear of all liens and encumbrances except the Permitted Exceptions and subject to the Gas Purchase Agreement.

(b) The Premises comply, and at the time of intended use will comply, in all material respects with all applicable laws, ordinances, and regulations of all governmental authorities having jurisdiction over the Premises, including without limitation all zoning ordinances and laws, and the Americans with Disabilities Act, 42 U.S.C. §12101, et seq., and all laws, ordinances and regulations affecting protected wetlands. Neither the construction of nor the use of the Improvements will violate any building permits, restrictions of record or agreements affecting the Project or any part thereof. None of the zoning authorizations, approvals or variances nor any other right to construct the Improvements or to use the Project is to any extent dependent upon any real property other than the Premises. Without limiting the generality of the foregoing, all consents, licenses and permits and all other authorizations or approvals required to complete construction of the Improvements in accordance with the Plans and Specifications have been obtained or will be obtained prior to commencement thereof, and all laws relating to the construction of the Improvements and operation of the Project have been complied with in all material respects and all permits and licenses required for the operation of the Project which cannot be obtained until such construction is completed can be obtained if the Improvements are completed in accordance with the Plans and Specifications. When construction of the Improvements is completed in accordance with the Plans and Specifications, no building or other improvement will encroach upon any property line, building line, setback line, side yard line or any recorded or visible easement (or other easement of which Borrower is aware or has reason to believe may exist) with respect to the Property; and the use of the Project will comply with all requirements of any Governmental Authority and any restrictive covenants to which the Premises may be subject.

(c) The Property constitutes one (1) or more tax parcels, and they each are assessed separately from all other lands for tax purposes.

(d) Borrower has not entered into any agreements with any person or entity for the management, leasing or operation of any of the Premises.

(e) Except for the Permitted Exceptions, there are: (i) no liens or notices of liens (including, without limitation, federal, commonwealth or state tax liens, judgment liens, real estate broker liens, appraiser liens and title examination liens) affecting the Premises, except real estate taxes and assessments not yet due and payable; (ii) no unpaid city, county, state, federal or other governmental or association taxes or assessments of any kind on the Premises; (iii) no amounts owed to any real estate broker or sales person, real estate appraiser or title examiner with respect to the Premises, nor any agreement, written or oral, which may be the basis for a broker's, appraiser's or title examiner's lien; and (iv) no improvements to the Premises (or property adjacent thereto) which may be the basis for a special assessment.

(f) There are no violations of any covenants, conditions, restrictions or plat building lines affecting the Premises.

(g)     Except for the holders of the Permitted Exceptions (including without limitation the Ground Lessor), no individual or entity other than Borrower is in possession of any portion of the Premises or has any possessory interest in any portion of the Premises or has any interest, right or estate in the Premises. Except as may be expressly provided in the documents evidencing the Permitted Exceptions, no individual or entity other than Borrower has any right or option to purchase, sell or encumber any portion of the Premises, including any right of first refusal with respect to the purchase of all or any part of the Premises.

(h)     No condemnation or eminent domain proceeding has been commenced or to the knowledge of Borrower is about to be commenced against the Premises, or any portion thereof.

**5.9     No Current Default.** On the date hereof, there exists no Event of Default, nor any event, circumstance or situation which, with the giving of notice, the passage of time, or both, could become such an Event of Default.

**5.10     Borrower Solvency.** On the date hereof, and after giving effect to the Loan from Lender to Borrower:

(a)     Each of Borrower and GFC has capital sufficient to carry on its business; and

(b)     Borrower's execution of, and performance under, the Loan Documents will not cause Borrower or GFC to be insolvent.

**5.11     No Bankruptcy.** Borrower does not contemplate filing a petition in bankruptcy or for an arrangement or reorganization under the Bankruptcy Code, nor are there any threatened or actual bankruptcy or insolvency proceedings against Borrower.

**5.12     Use of Proceeds.** The proceeds of the Loan will be used solely for those purposes stated in Article 1 and Article 2 of this Agreement.

**5.13     Information Not Misleading, etc.** Independently of and in addition to the foregoing representations and warranties, Borrower hereby represents and warrants that none of the Loan Documents, any financial statement of Borrower, or any statement, list, certificate or other information furnished or to be furnished by Borrower to Lender in connection with the Loan or the Loan Documents contains or will contain any untrue statement of a material fact, or omits or will omit to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.

**5.14     Leases.** There are no leases currently effective with respect to any portion of the Premises, other than the Ground Lease.

**5.15     Patriot Act Provisions.** Lender hereby notifies Borrower that pursuant to the requirements of Section 326 of the USA Patriot Act of 2001 31 U.S.C. Section 5318 (the "*U.S. Patriot Act*"), it is required to obtain, verify and record information that identifies Borrower, which information includes the name and address of Borrower and other information that will allow Lender to identify Borrower in accordance with the U.S. Patriot Act. In connection therewith, Borrower represents, warrants and covenants to Lender that:

(a)    Neither Borrower nor, to the knowledge of Borrower, any of its respective Affiliates is a Prohibited Person, and Borrower and, to the knowledge of Borrower, such Affiliates are in compliance with all applicable orders, rules and regulations of OFAC;

(b)    Neither Borrower nor, to the knowledge of Borrower, any of its respective Affiliates: (i) is targeted by United States or multilateral economic or trade sanctions currently in force; (ii) is owned or controlled by, or acts on behalf of, any Person that is targeted by United States or multilateral economic or trade sanctions currently in force; (iii) is a Prohibited Person; or (iv) is named, identified or described on any list of Persons with whom United States Persons may not conduct business, including any such blocked persons list, designated nationals list, denied persons list, entity list, debarred party list, unverified list, sanctions list or other such lists published or maintained by the United States, including OFAC, the United States Department of Commerce or the United States Department of State;

(c)    None of Borrower's assets constitute property of, or are beneficially owned, directly or indirectly, by any Person targeted by economic or trade sanctions under US law, including but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq. (the "*Trading With the Enemy Act*"), any of the foreign assets control regulations of the Treasury (31 C.F.R., Subtitle B, Chapter V, as amended) (the "*Foreign Assets Control Regulations*") or any enabling legislation or regulations promulgated thereunder or executive order relating thereto (which includes, without limitation, (i) Executive Order No. 13224, effective as of September 24, 2001, and relating to Blocking Property and Prohibiting Transaction With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001) (the "*Executive Order*") and (ii) the U.S. Patriot Act), if the result of such ownership would be that any Loan made by Lender would be in violation of law ("*Embargoed Person*");

(d)    No Embargoed Person has any interest of any nature whatsoever in Borrower if the result of such interest would be that any Loan would be in violation of law;

(e)    Borrower has not engaged in business with Embargoed Persons if the result of such business would be that any Loan made by Lender would be in violation of law;

(f)    Neither Borrower nor any Affiliate (i) is or will become a "*blocked person*" as described in the Executive Order, the Trading With the Enemy Act or the Foreign Assets Control Regulations or (ii) engages or will engage in any dealings or transactions, or be otherwise associated, with any such "*blocked person*." For purposes of determining whether or not a representation is true or a covenant is being complied with under this Section 5.15, Borrower shall not be required to make any investigation into (i) the ownership of publicly traded stock or other publicly traded securities or (ii) the beneficial ownership of any collective investment fund;

(g)    Borrower, its Affiliates and their respective officers and directors and to the knowledge of Borrower, its employees and agents are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects. None of (i) Borrower, any Affiliate or, to the best of Borrower's knowledge, any of their respective directors, officers or employees, or (ii) to the knowledge of Borrower, any agent of Borrower or any Affiliate that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person. To

the best of Borrower's knowledge, no Loan, use of proceeds or other transaction contemplated by this Agreement will violate Anti-Corruption Laws or applicable Sanctions; and

(h)     Borrower will maintain in effect and enforce policies and procedures designed to ensure compliance by Borrower, its Affiliates and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions.

**5.16     ERISA.** Borrower is in compliance in all material respects with the applicable provisions of ERISA, and no "reportable event," as such term is defined in Section 4043 of ERISA, has occurred with respect to any Plan of Borrower.

**5.17     Single Purpose Entity.** Borrower represents, warrants and covenants as of the date hereof and until such time as the Loan is paid in full, that Borrower:

(a)     Has not owned, does not own and will not own an interest in any asset other than (i) the Premises, (ii) Project, and (iii) other personal property incidental to the leasing, development and construction of the Improvements and the operation of the Project;

(b)     Has not engaged, is not engaged and will not engage in any business other than the leasing, development and construction of the Improvements and the operation of the Project;

(c)     Will not enter into any contract or agreement with any member, officer, director or Affiliate of Borrower or any Affiliate of any of the foregoing, except in the ordinary course of business and upon terms and conditions that are intrinsically fair and are no less favorable to it than those that would be obtained in a comparable arms-length transaction with an unrelated third party;

(d)     Does not currently have outstanding and will not incur or guarantee any Indebtedness other than Permitted Indebtedness;

(e)     Will not make any loans or advances to any third party (including any officer, director, member, or Affiliate of Borrower);

(f)     Has done or caused to be done and will do all things necessary to preserve its existence and limited liability company formalities;

(g)     Will not, nor will any member, shareholder, principal, officer or director thereof, without the consent of Lender, amend, modify or otherwise change its certificate of organization or operating agreement, in any material respect or in any way that adversely affects Borrower's existence as a single purpose, single asset "bankruptcy remote" entity;

(h)     Has maintained, and will maintain books and records and bank accounts separate from those of its Affiliates, including its members;

(i)     Will be, and at all times will hold itself out to the public as, a legal entity separate and distinct from any other entity (including any Affiliate of Borrower) and shall maintain Separate Books and Records; has corrected, and shall correct any known misunderstanding regarding its status as a separate entity (if any); has conducted, and shall conduct, its business in its own name;

has paid, and will pay, its own liabilities out of its own funds and assets (except as otherwise expressly permitted in this Agreement in connection with the Permitted Indebtedness); has not, and shall not identify itself or any of its Affiliates as a division or a part of the other; and has maintained and utilized, and shall maintain and utilize separate stationery, invoices and checks from any other entity;

(j)     Will file its own tax returns;

(k)     Will maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

(l)     Will not seek or consent to its voluntary dissolution or winding up;

(m)     Will not enter into any transaction of merger or consolidation unless (i) Borrower is the surviving party, (ii) Borrower shall remain in compliance with the terms and conditions of the Loan Documents during and after such transaction, and (iii) Borrower shall have received written consent of Lender (provided that Lender shall endeavor to respond to any request for consent no later than thirty (30) calendar days after the date of the request);

(n)     Borrower has not and will not commingle the funds and other assets of Borrower with those of any shareholder, principal, officer, director or Affiliate, or any other Person;

(o)     Has maintained, and will maintain its assets in such a manner that it is not costly or difficult to segregate, ascertain or identify its individual assets from those of any Affiliate or any other person;

(p)     Has, at all times since its formation, observed all legal and customary formalities regarding its formation and will continue to observe all such legal and customary formalities;

(q)     Does not and will not hold itself out to be responsible for the debts or obligations of any other person, other than any such debt constituting Permitted Indebtedness;

(r)     Will not acquire obligations or securities of its Affiliates;

(s)     Upon the commencement of a voluntary or involuntary bankruptcy proceeding by or against Borrower, Borrower shall not seek a supplemental stay or otherwise pursuant to 11 U.S.C. 105 or any other provision of the federal Bankruptcy Code, or any other debtor relief law (whether statutory, common law, case law, or otherwise) of any jurisdiction whatsoever, now or hereafter in effect, which may be or become applicable, to stay, interdict, condition, reduce or inhibit the ability of Lender to enforce any rights of Lender against any guarantor or indemnitor of the secured obligations or any other party liable with respect thereto by virtue of any indemnity, guaranty or otherwise.

## ARTICLE 6
## AFFIRMATIVE COVENANTS:

Until all indebtedness under the Loan has been paid and Borrower and Lender have no remaining obligations under any of the Loan Documents:

**6.1     Organizational Matters.**  Borrower shall preserve its legal existence as a limited liability company organized and existing under the laws of the Commonwealth of Puerto Rico in good standing, lawfully authorized to do business in the Commonwealth of Puerto Rico. Borrower shall not admit any members or shareholders or make any distributions or contributions of capital or income without the prior written consent of Lender.

**6.2     Compliance with Laws.**  Borrower shall comply in all material respects with all laws and regulations affecting the Premises, and pay all taxes and similar charges against the Premises, when and as required. Borrower shall maintain and preserve: (i) the Premises in good working order and condition (ordinary wear and tear excepted), and (ii) all rights, permits, licenses, approvals and privileges which are used or useful or necessary in the conduct of its business.

**6.3     Financial Statements.**  Borrower shall keep, at its expense, adequate records and books of account (all in accordance with GAAP) with respect to its business and the Premises in form and content reasonably acceptable to Lender. Borrower shall provide Lender copies of:

(a)     within forty five (45) days after the end of each fiscal quarter and fiscal year, quarterly or yearly, as applicable, unaudited financial statements of Borrower and Guarantors prepared and certified by Borrower's accountant;

(b)     within one hundred twenty (120) days after the end of Borrower's fiscal year, annual audited financial statements of Borrower prepared and certified by Borrower's accountant;

(c)     within one hundred eighty (180) days after the end of each fiscal year, complete copies of Borrower's annual federal and commonwealth tax returns, with all schedules attached;

(d)     within fifteen (15) Business Days of the applicable filing deadline, including available extensions Borrower may timely file for, Borrower's tax filing;

(e)     within fifteen (15) Business Days after request, all information and documentation requested by Lender for NMTC reporting purposes, including information that Lender is required to report annually through the CDFI Fund's Award Management Information System; and

(f)     on an ongoing basis, any other information reasonably requested by Lender in connection with the operation of the business of Borrower with respect to the Premises.

Financial statements shall include at least a balance sheet, a statement of all contingent liabilities as of the date of the balance sheet, a profit and loss or income and expense statement for the most recent calendar quarter and year-to-date, cash flow statements for the most recent calendar quarter and year-to-date, and all other financial information reasonably requested by Lender, all in form reasonably satisfactory to Lender.

**6.4     Payments to Affiliates and Others; Returns of Capital.**  All construction management fees, development fees, leasing fees and commissions related to the Project and payable to Borrower or its Affiliates shall be and hereby are subordinated to the Loan; provided however, that said fees and commissions may continue to be paid until such time as the occurrence of an Event of Default which remains uncured, beyond any applicable notice, grace and cure periods. All indebtedness of Borrower for borrowed money to any member, principal, officer,

director or other person affiliated with Borrower (*"Borrower Affiliate"*) shall be and hereby is fully subordinated to the Loan and shall not be paid after the occurrence of any Event of Default which remains uncured, beyond any applicable notice, grace and cure periods.

**6.5 Bank Accounts.** Borrower shall maintain the Operating Account, the Reserve Account and the Disbursement Account, solely with Banco Popular, until the Loan is fully repaid. Borrower agrees that it shall include all interest and earnings, if any, on the Disbursement Account and Reserve Account as its income, and shall be the owner of all funds on deposit in such accounts for federal and applicable commonwealth and local tax purposes.

**6.6 Leases.** Except with respect to the Ground Lease, Borrower shall not, without the prior written consent of Lender, enter into any lease of any portion of the Premises. The request for approval of any proposed lease that is not in the ordinary course of business shall be made to Lender in writing. As part of such request, Borrower shall furnish to Lender: (i) such biographical and financial information about the proposed tenant as Lender may require in conjunction with its review, (ii) a copy of the proposed lease or sublease; and (iii) a summary of the material terms of such proposed lease or sublease (including, without limitation, rental terms and the term of the proposed lease or sublease and any options). Borrower and Lender agree that Borrower shall not enter into any lease or sublease for a Tenant that is not a Tenant Qualified Business. Borrower shall at all times promptly and faithfully perform, or cause to be performed, all of the covenants, conditions and agreements contained in all leases, now or hereafter existing, on the part of the landlord, lessor or licensor thereunder to be kept and performed. Borrower shall promptly send copies to Lender of all notices of default, which Borrower shall send or receive under any lease. Borrower, at no cost or expense to Lender, shall enforce, short of termination, the performance and observance of each and every condition and covenant of each Tenant under each lease or sublease, as applicable. Upon the request of Lender, Borrower shall deliver to Lender (A) a copy of each lease or sublease; and (B) an estoppel certificate from the Tenant under each lease or sublease. Upon request, Borrower shall deliver to Lender information about each tenant, such tenant's use of the Premises and whether such use includes any business, which is not a Tenant Qualified Business, all in form and content acceptable to Lender. Borrower shall at all times ensure that all leases related to the Project are and remain in full compliance with the NMTC Program Requirements.

**6.7 Loan Assumption.** Borrower acknowledges that Lender may assign its interest in the Loan and all the Loan Documents to a third party (a) at any time after the occurrence of an Event of Default during the NMTC Recapture Period, or (b) at any time from and after expiration of the NMTC Recapture Period, including without limitation to Investor. Borrower may not assign its interest in the Loan and all the Loan Documents to a third party at any time.

**6.8 ERISA.** Borrower will comply with all of the applicable funding and other requirements of ERISA as such requirements relate to the Plans of Borrower. Borrower will not at any time permit any Plan maintained by it to engage in any *"prohibited transaction"* as such term is defined in Section 4975 of the Code; incur any "accumulated funding deficiency" as such term is defined in Section 302 of ERISA; or terminate any such Plan in a manner which could result in the imposition of a lien or charge upon or encumbrance of the property of Borrower pursuant to ERISA.

**6.9 Insurance.**

(a)     Borrower shall, at all times, maintain insurance in accordance with the requirements set forth in subsection (b) below and in **Exhibit D** attached to this Agreement.

(b)     Borrower shall keep the Premises (and particularly the improvements now existing or hereafter erected on the Premises) fully insured against all hazards and contingencies in amounts which are equal to the maximum insurable value of the Premises with an endorsement guaranteeing replacement coverage for all improvements thereon, and for such periods as may be required by Lender from time to time or at any time, in Lender's reasonable discretion. Borrower shall also maintain general liability insurance in accordance with the requirements set forth in **Exhibit D**. Borrower shall be responsible for payment of all premiums on such insurance. All insurance shall be carried with companies pre-approved by Lender and the policies and all renewals thereof shall be held by Lender and shall have attached thereto a standard mortgage clause and a separate lender's loss payable clause in Lender's favor. Such insurance shall also contain: (i) flood insurance, if any portion of the Premises is located in a flood plain; (ii) hurricane/wind insurance; (iii) environmental insurance, if an environmental report reveals any material ongoing environmental concerns with respect to any portion of the Premises; and (iv) coverage for any other insurable hazards or casualties which at the time are commonly insured against in the case of property similarly situated. In addition, Borrower shall give Lender thirty (30) days prior written notice before any insurance coverage is cancelled or modified.

(c)     Subject to the terms of the Intercreditor Agreement, in the event of loss, Borrower shall give, as promptly as practicable, written notice to Lender and Lender may make proof of loss if not made promptly by Borrower. Subject to the terms of the Intercreditor Agreement, each insurance company insuring the Premises is hereby authorized and directed to make payments for such loss to Borrower and Lender, as their interests may appear. Subject to the terms of the Intercreditor Agreement, Borrower shall not settle or otherwise compromise any claim for insurance proceeds relating to a Major Casualty without Lender's prior written consent, which consent shall not be unreasonably withheld or delayed. Borrower shall use the proceeds from such insurance received by it, together with other funds available to it, for the repair or replacement of the Premises damaged or destroyed by such casualty; provided, however, that subject to the terms of the Intercreditor Agreement, in the event of a Major Casualty that results in a Recapture Event, Lender may, at its sole discretion, apply or require Borrower to apply such insurance proceeds to any or all of the following, or any combination thereof: (i) all costs, expenses and reasonable attorneys' fees incurred in connection with the enforcement of this Section and the collection of such insurance proceeds; (ii) payment of all amounts outstanding under the Note and other Loan Documents, either in whole or in part, which payment shall be applied first to any interest and other charges then due and owing under Note A, with the balance to be applied as a prepayment of principal under Note B and the other Loan Documents; and (iii) repair or replacement, either partly or entirely, of any part of the Premises so destroyed or damaged, in which case Lender may impose such terms, conditions and requirements for the disbursement of such proceeds for such purposes as it, in its reasonable discretion, deems advisable. Lender shall not be a trustee with respect to any such insurance proceeds held by it, and may commingle insurance proceeds with its funds without obligation to pay interest thereon. Subject to the terms of the Intercreditor Agreement, while any Event of Default is continuing, Lender is hereby authorized to settle and compromise (in Lender's reasonable discretion) all claims, awards, damages, rights of action and

proceeds, and all other payment and relief under any insurance policy, for use as provided above. In the event of a transfer of title to the Premises, subject to the terms of the Intercreditor Agreement, all right, title, and interest of Borrower in and to any insurance policies then in force shall, to the extent assignable, constitute additional Collateral. If any Event of Default continues beyond the applicable cure period contained in this Agreement, if any, Lender may cancel any insurance policy as and when Lender deem appropriate and replace such policy with insurance satisfactory to Lender. For purposes of this Agreement, a "*Major Casualty*" shall mean a casualty involving damage to the Premises in excess of $10,000,000.

(d)     Notwithstanding paragraph (c) above, subject to the terms of the Intercreditor Agreement, Lender agrees to make all casualty insurance proceeds received by Lender available to Borrower for the repair and restoration of the Premises and the Improvements unless a Major Casualty results in a violation of the NMTC Program Requirements, in which case such proceeds shall be applied as provided in paragraph (c) above.

(e)     Subject to the terms of the Intercreditor Agreement, Borrower shall within three (3) Business Days of its receipt of notice thereof, notify Lender of any pending or threatened action or proceeding relating to any condemnation or other taking of the Premises, or part thereof, and after consultation with Lender,Borrower shall appear in and prosecute any such action or proceeding and/or settle or compromise any claim in connection therewith. Subject to the terms of the Intercreditor Agreement, in the event that such condemnation results in a violation of the NMTC Program Requirements, all related awards, payments, damages, direct, consequential and otherwise, claims and proceeds thereof will be assigned to Lender, and all proceeds of any such awards, payments, damages or claims shall be paid to Lender and shall constitute additional Collateral.

**6.10     Environmental Reports.** Borrower shall promptly forward to Lender and Capital One all environmental reports relating to the Premises that are generated during the term of the Loan, including without limitation, all reports in connection with the removal and/or closure of any fuel tanks or storage tanks located on the Premises, all reports in connection with the removal of any stained soil on the Premises, all reports regarding the abatement of asbestos on the Premises, and any lead based paint operation and maintenance plan.

**6.11     Additional Reporting.** Borrower shall furnish or cause to be furnished to Lender and Capital One (as applicable):

(a)     the CBR, as defined in and upon the due date as provided in the Community Benefits Agreement, provided, Borrower shall also promptly provide Lender with any other documentation and information Lender may reasonably request and which is reasonably available to Borrower in Borrower's course of business, from time to time, in connection with review and assessment of Borrower's economic and community benefit activities in connection with the CBR; and

(b)     within thirty (30) calendar days after the end of each fiscal year, a report and certification in the form attached hereto as **Exhibit B**, delivered to Lender and Capital One, as such form may be reasonably modified by Lender or Capital One from time to time.

(c)     Borrower will deliver to Lender such other documents and materials that Lender may reasonably request for the purpose of reviewing and assessing economic and community benefits activities derived from the Project.

(d)     Borrower acknowledges and agrees that the reporting deadlines for all community impact and financial reporting contained in the CBR and the other Loan Documents are important to Lender in order to provide the required data to the CDFI Fund.  Borrower agrees to pay a late fee of $100.00 for each day following receipt of a notice of delinquency from Lender that any community impact or financial reporting obligation is not delivered on the applicable due date.

**6.12    Payment of Fees and Costs.**  Borrower shall pay such fees as are set forth in the Fee and Services Agreement, which shall be released from the Reserve Account in accordance with the Reserve Account Pledge Agreement and the Reserve Account Control Agreement.

**6.13    Post-Closing Deliverables.**  Within ninety (90) calendar days of the date of this Agreement, Borrower shall obtain and deliver in a form reasonably satisfactory to Lender evidence of its receipt of all permits and approvals described on **Exhibit G** attached hereto and pursuant to the Permitting Review Checklist provided to Lender prior to the closing of the Loan.

## ARTICLE 7
## NEGATIVE COVENANTS:

**7.1    No Sale of Collateral.**  Unless otherwise permitted by Lender in writing, Borrower shall not sell, assign, or otherwise make any material disposition of (a) any Collateral or (b) its interest in the Premises, except for (i) personal property that is obsolete or that Borrower no longer needs for its business, (ii) personal property that is replaced in the ordinary course of business upon customary and market terms, (iii) personal property sold or disposed of in the ordinary course of business and upon customary and market terms.

**7.2    No Encumbrance of Collateral.**  Except as otherwise expressly permitted in the Loan Documents, and subject to the terms of the Intercreditor Agreement, Borrower shall not, without the consent of Lender, create or permit any lien, security interest, or other encumbrance upon or with respect to the Collateral and Borrower's assets, except for: (a) security interests in favor of Lender, (b) Permitted Exceptions, (c) customary easements for utilities serving the Premises, and (d) security interests and other encumbrances with respect to equipment normally associated with facilities of the same type as the Project.  Except as otherwise provided for in, and subject to the terms of the Intercreditor Agreement, no financing statement or other document covering the Collateral will be filed in favor of any other Person other than BPPR without Lender's prior written consent so long as the Loan remains outstanding or Lender has any obligation to advance additional sums to Borrower. Notwithstanding anything to the contrary contained in the Loan Documents, Borrower shall have the right to maintain Permitted Contests and the Permitted Exceptions.

**7.3    Indebtedness.**  Borrower shall not directly or indirectly, incur, create, assume, guarantee, become contingently liable in connection with, or suffer to exist any indebtedness except (together, the *"Permitted Indebtedness"*): (i) as otherwise set forth in and subject to the terms of the Intercreditor Agreement (including without limitation the Direct Loan), (ii) the Loan,

(iii) the debt evidenced by the Danosa Note, and (iv) any other customary debts and obligations that arise in the ordinary and usual course of Borrower's ownership, operation, development, construction and leasing of the Premises and the Project and which are related thereto.

**7.4 Negative Covenants Regarding Leases.** Borrower shall not do or suffer to be done any act that might result in a material default by the landlord, lessor or licensor under any lease of real estate or allow the Tenant thereunder to withhold payment of rent.

**7.5 Patriot Act.** Borrower shall not (a) be or become subject at any time to any law, regulation, or list of any Governmental Authority (including, without limitation, the U.S. Office of Foreign Asset Control list) that prohibits or limits Lender from making any advance or extension of credit to Borrower or from otherwise conducting business with Borrower, or (b) fail to provide documentary and other evidence of Borrower's identity as may be requested by Lender at any time to enable Lender to verify Borrower's identity or to comply with any applicable law or regulation, including, without limitation, Section 326 of the USA Patriot Act of 2001, 31 U.S.C. Section 5318.

**7.6 ERISA.** Borrower will not at any time permit any Plan maintained by it to engage in any "prohibited transaction" as such term is defined in Section 4975 of the Code; incur any "accumulated funding deficiency" as such term is defined in Section 302 of ERISA; or terminate any such Plan in a manner which could result in the imposition of a lien on the property of Borrower pursuant to Section 4068 of ERISA

**7.7 Organizational Documents; Ownership; Management.** Borrower will not at any time without Lender's prior written consent (a) cause or cause to be done, and will not, nor will any shareholder, member, principal, officer or director thereof, amend, modify or otherwise modify its organizational documents in any material respect or in any way that adversely affects its status as a QALICB or the Project's status as a Qualified Business or is otherwise inconsistent with the NMTC Program Requirements; or (b) merge or consolidate with any Person or sell, assign, transfer or encumber its membership interests unless (i) Borrower is the surviving party, (ii) Borrower shall remain in compliance with the terms and conditions of the Loan Documents during and after such transaction, and (iii) Borrower shall have received written consent of Lender (provided that Lender shall endeavor to respond to any request for consent no later than thirty (30) calendar days after the date of the request).

**7.8 Alterations.** Except for the construction of the Improvements as described in the Plans and Specifications, Borrower will not consent to any alterations, additions or improvements to the Project without Lender's prior written consent, which shall not be unreasonably denied or delayed (provided that Lender shall endeavor to respond to any request for consent no later than 30 days after the date of the request). In connection with Lender consent under this Section 7.8, Borrower will provide Lender with all plans and specifications, names and addresses of contractors, copies of contracts, necessary permits and licenses, and instruments of indemnification against any and all claims, costs, expenses, damages and liabilities which may arise in connection with such work, all in such form, substance and amount as may be reasonably satisfactory to Lender. Any such work must be completed in accordance with the requirements set forth in the Construction Contract and the Major Sub-Contracts.

**7.9** **Use of Proceeds.** Borrower will not request any Loan advance or disbursement, and Borrower shall not use, and shall require that its Affiliates and its or their respective directors, officers, employees and agents shall not use, the proceeds of any Loan (a) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, (b) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, to the extent such activities, business or transactions would be prohibited by Sanctions if conducted by a limited liability company organized in the United States, (c) in any manner that would result in the violation of any Sanctions applicable to any party hereto, or (d) for the purchase of any real property.

## ARTICLE 8
## EVENTS OF DEFAULT; REMEDIES:

**8.1** **Events of Default.** The occurrence of any one (1) or more of the following events after any relevant notice and/or cure period provided for herein (each an *"Event of Default"* and collectively called *"Events of Default"*) shall constitute a default by Borrower hereunder:

(a) **Payment Default.** Any payment required under the Note or any other Loan Document is not made when and as required thereunder.

(b) **Representations and Warranties.** Any representation or warranty made by Borrower in this Agreement, the Note, or any other Loan Document is false, in any material respect, when made.

(c) **Nonpayment Covenants; Other Loan Document Defaults.** (i) A breach by Borrower in the performance or observance of any nonpayment-related obligation, agreement, term, covenant or condition referred to or contained in this Agreement or any other Loan Document; (ii) a breach of, or default by, any party other than Lender under any other Loan Document; (iii) a breach of, or default by, any party other than Lender under the Direct Loan Subordination Agreement; or (iv) any of the Loan Documents are declared unenforceable.

(d) **Other Loan Default.** The occurrence of any uncured default under any document that continues beyond any applicable cure period contained in any document evidencing or securing a loan provided by any other third party in excess of $100,000 (including without limitation the Direct Loan Agreement), whether or not such loan is secured by a lien on the Premises or Collateral (no permission for creation of such loans or liens being implied).

(e) **Violation of Law.** A violation, whether discovered or asserted before or after the date of the Note, of any federal, state, or local law, rule regulation or order issued by a governmental agency or court which has or could have a material adverse impact on Borrower's business or the Premises, including but not limited to: (i) any of the provisions of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, or any similar law which prohibits or restricts the storage, maintenance, or discharge of hazardous materials or waste; or (ii) any of the facilities access provisions of the American with Disabilities Act of 1990, or any similar law imposing requirements relating to the accessibility of facilities to persons with disabilities.

(f) **Dissolution.** Except as permitted under the Loan Documents, the dissolution, termination, partial or complete liquidation, merger or consolidation of Borrower.

(g) **Loss of Priority Position.** Subject to the Intercreditor Agreement, Permitted Exceptions and the pendency of Permitted Contests, the loss or impairment of (i) Lender's liens or security interest in the Premises or any Collateral; or (ii) the priority of Lender's lien or security interest in the Premises or any Collateral.

(h) **Leases.** The occurrence of any default by Borrower under any lease (including without limitation the Ground Lease) which continues beyond the expiration of any applicable grace period thereunder which would have a material adverse impact on the ability of Borrower to continue its Qualified Business.

(i) **Adverse Title or Possessory Interests.** The acquisition by any Person of any legal, beneficial, or possessory interest in any material portion of the Collateral or the Premises, other than the Permitted Exceptions, or as otherwise permitted under this Loan Agreement.

(j) **Undischarged Judgments.** Subject to Borrower's right to maintain Permitted Contests, the entry of any monetary judgment or the assessment against, the filing of any tax lien against, or the issuance of any writ of garnishment or attachment against any property of or debts due by Borrower in an amount in excess of $100,000.00 which is not discharged, appealed, or execution is not stayed within ninety (90) days of entry.

(k) **Damage to Premises.** The Premises, in the reasonable judgment of Lender, shall be materially injured or destroyed by fire or other casualty such that Lender reasonably determines that the Project cannot be reconstructed in accordance with the terms and conditions of Section 6.9 of this Agreement.

(l) **Material Contract Default.** The occurrence of a breach of any material obligation under, or a material default shall have occurred and be continuing under, a Material Contract, and (i) such breach or default has had or could reasonably be expected to have a material adverse impact on Borrower's business or the Premises, and (ii) such breach or default shall not be remediable or, if remediable, shall continue unremedied for a period equal to the lesser of the cure period provided under such agreement or thirty (30) days after the Borrower receives notice of such breach.

(m) **Material Contract Failure.** (i) Any Material Contract shall for any reason cease to be valid and binding on the Persons parties thereto, except upon fulfillment of such party's obligations thereunder, or any such Person pursues a right of termination under any Material Contract; or (ii) any material provision in any Material Contract shall for any reason cease to be valid and binding on any party thereto except upon fulfillment of such party's obligations thereunder, or any such party shall so state in writing.

(n) **NMTC Recapture Event.** The occurrence of any NMTC Recapture Event.

(o) **Bankruptcy; Insolvency; Debtor Relief.** Borrower (i) makes a general assignment for the benefit of creditors; (ii) files a voluntary proceeding seeking protection from creditors under any bankruptcy or other law; (iii) is the subject of an involuntary proceeding under

any bankruptcy or other similar law and such proceeding is not dismissed within ninety (90) days; or (iv) makes any admission in writing of its inability to pay its debts generally as they become due.

(p)     **Sale, Conveyance, or Encumbrance.** A sale, conveyance or encumbrance of all or any part of the Premises or Collateral other than as may be expressly permitted in the Loan Documents.

(q)     **False Statement.** The falsity of any material statement, warranty or representation when given or made by Borrower or any of its agents to Lender, or any fraud committed by Borrower or any of its members, shareholders, principals, officers or directors in connection with the procurement, processing, funding or servicing of the Loan.

(r)     **Appointment of Trustee.** The appointment of a trustee, receiver, or liquidator for Borrower, or with respect to any portion of the Premises or any Collateral and any such appointment shall not be vacated within ninety (90) calendar days.

(s)     **Liens; Judgments; Levies.** Subject to the Permitted Exceptions, the provisions of Section 7.2 of this Agreement, and Borrower's right to maintain Permitted Contests in accordance with the express terms of this Agreement, the occurrence of any of the following with respect to Borrower or any portion of the Premises or any Collateral: (i) the imposition of any lien or other similar encumbrance not released within ninety (90) days after the earlier to occur of (A) Borrower's actual knowledge of the imposition of any such lien or other similar encumbrance or (B) notice to Borrower of the imposition of any such lien or other similar encumbrance; or (ii) the entry of a material adverse judgment by a court having jurisdiction that is not paid or appealed in accordance with applicable law.

(t)     **Invalidity or Unenforceability of Security Interests.** A determination by a court of competent jurisdiction that the security interests granted herein or in any other Loan Document against any material portion of the Collateral are invalid, unenforceable, or not perfected.

**8.2     Notices and Rights to Cure.** Borrower shall have ten (10) days following the date any payment required under the Note or any other Loan Document is due and payable to cure an Event of Default described in Subsection 8.1(a) above. Except as set forth below, Borrower shall have thirty (30) days following the date of Lender's notice to cure all Events of Default described in Subsection 8.1(b) through (m) to the extent they are capable of being cured; provided that if such Event of Default cannot reasonably be cured within such thirty (30) day period and Borrower shall have commenced to cure such default within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall be extended for so long as it shall require Borrower in the exercise of due diligence to cure such default but not to exceed one hundred eighty (180) days. **Notwithstanding the foregoing, Borrower shall have no right to notice from Lender or right to cure for the Events of Default described in Subsections 8.1(n) through (t), inclusive, or in Subsection 8.1(c) as to any violation or default under Sections 2.1 or 2.2 of this Agreement (other than a violation of Section 2.2(p), (s), (u), (v), (x) or (dd) of this Agreement).** The notice rights and opportunities to cure provisions contained herein shall control with respect to all Events of Default occurring under all the Loan Documents. **Except for the Events of Default described in Subsections**

**8.1(n) through (t), inclusive, or in Subsection 8.1(c) as to any violation or default under Sections 2.1 or 2.2 of this Agreement (other than a violation of Section 2.2(p), (s), (u), (v), (x) or (dd) of this Agreement), Borrower shall have the right to cure all Events of Default occurring under any one (1) or more of the Loan Documents as provided in this section, and this section shall control over any contrary or inconsistent terms contained in any other Loan Document.**

Notwithstanding anything else set forth in this Agreement and without limiting any other rights or remedies of Lender, Borrower acknowledges and agrees that (i) the failure of the Loan to constitute a QLICI, will have a material, adverse effect on Lender, and (ii) accordingly, in the event that any Event of Default shall arise as a result of (A) a breach or violation of any of the representations and warranties in Section 2.1 or (B) a breach, violation, or failure to comply with any of the covenants set forth in Section 2.2, such Event of Default shall be material and shall entitle Lender to exercise any and all remedies available under the Loan Documents, or at law or in equity, on account of any such Event of Default.

**8.3    Remedies.** Subject to the terms of the Intercreditor Agreement, if any Event of Default occurs and continues beyond the applicable cure period provided above or otherwise in this Agreement (if any), then upon the election of Lender, all indebtedness under the Loan shall immediately become due and payable upon demand, without presentment, protest, or further notice of any kind, all of which are expressly waived, and Lender's commitment hereunder and under all other Loan Documents shall immediately terminate, notwithstanding any contrary provision contained herein. Lender shall also have the following additional rights and remedies:

(a)    **Generally.** Lender may, at its election, (i) direct the disbursement agent under the Disbursement Agreement to stop making Subsequent Releases from the Disbursement Account, (ii) complete construction of the Improvements, or (iii) resort to any and all rights and remedies available against Borrower under any one (1) or more of the Loan Documents, and Lender's resort to any remedy shall not prevent the concurrent or subsequent employment of any other remedy.

(b)    **Remedies Against the Collateral.** Subject to the terms of the Intercreditor Agreement, Lender may exercise in respect of the Collateral, in addition to all other rights and remedies provided for herein or otherwise available to it, all the rights and remedies of a secured party under the UCC and also may (i) require Borrower to assemble all or part of the Collateral as directed by Lender and make it available to Lender; and (ii) without notice (except as specified below) sell the Collateral or any part thereof in one (1) or more parcels at public or private sale, at Lender's offices or elsewhere, for cash, on credit or for future delivery and at such price or prices and upon such other terms as Lender may deem commercially reasonable. Borrower agrees that, to the extent notice of sale shall be required by law, ten (10) days' notice to Borrower of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification. Lender shall not be obligated to make any sale of Collateral even if notice of sale is given. Lender may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned. All cash proceeds received by Lender in respect of any sale of, collection from, or other realization upon all or any part of the Collateral may, in the discretion of Lender, be held by Lender as Collateral for, and then or at any time thereafter applied in whole or in part by Lender against, all or any part of the Obligations in such order as Lender

shall elect. Any surplus of such cash or cash proceeds held by Lender remaining after payment in full of all the Obligations shall be paid over to Borrower or to whomsoever may be lawfully entitled to receive such surplus.

(c) **Expenses of Collection.** All costs, expenses, and liabilities actually incurred by Lender (including without limitation reasonable attorneys' fees) in collecting or attempting to collect any sum payable under the Note, including costs and expenses incurred in proposing to sell or selling any security, shall constitute a demand obligation owing by Borrower and shall bear interest from the date of expenditure until paid at the Default Rate as contained in the Note.

(d) **Set-Off.** Any indebtedness owed from Lender to Borrower may be set-off and applied toward repayment of the Note.

## ARTICLE 9
## MISCELLANEOUS

9.1 **Waivers.** No omission or delay by Lender in exercising any right or power under this Agreement, the Note, or any other Loan Document, will impair such right or power to be construed to be a waiver of any default or acquiescence therein, and any single or partial exercise of any right or power will not preclude other or further exercise of any other right, and no waiver will be valid unless in writing and signed by Lender and then only to the extent specified. All remedies herein and by law afforded will be cumulative and will be available to Lender until all indebtedness of Borrower owed to Lender is paid.

9.2 **Expenses.**

(a) All reasonable third-party legal fees incurred by Lender and its direct and indirect members in the preparation of this Agreement and all other Loan Documents called for herein, and all filing fees, recording fees, registration fees, documentary stamps, intangibles and other taxes, or similar costs incurred by Lender and its direct and indirect members in the filing of any promissory notes, financing statements, security agreements, financing statements, loan agreements, or other documents in respect of this Agreement, shall be paid by Borrower.

(b) Borrower shall pay Lender, Investor and Capital One all reasonable third-party costs and fees (including reasonable attorney's fees) in connection with any amendments, modifications or waivers under this Agreement or the other Loan Documents, including all reasonable costs and fees associated with any refiling or rerecording of any of the Loan Documents.

(c) Any and all payments made by Borrower hereunder, under the Notes and under the other Loan Documents shall be made free and clear of, and without deduction for, any and all present or future taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto, which are imposed on any payments made by Borrower hereunder, excluding, in the case of Lender, taxes imposed on its income, branch profits and franchise taxes and municipal license taxes imposed on it, by the United States of America and/or any other jurisdiction under the laws of which Lender is organized or its principal office or any lending office is located or (in any such case) any political subdivision thereof (all such non-excluded taxes, levies, imposts, deductions, charges, withholdings and liabilities being hereinafter referred to as *"Non-Excluded*

*Taxes*"). If Borrower shall be required by law to deduct any Non-Excluded Taxes from or in respect of any sum payable hereunder, under the Notes or under any other Loan Document to Lender, (A) the sum payable hereunder shall be increased as may be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section) Lender receives an amount equal to the sum it would have received had no such deductions been made, (B) Borrower shall make such deductions, and (C) Borrower shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law; provided, however, that Borrower shall not be obligated to pay any additional amount pursuant to this Section for or on account of any Non-Excluded Taxes required to be deducted or withheld on behalf of Lender by reason of Lender having some connection with the jurisdiction imposing such Non-Excluded Tax, other than such connections as arise from the execution, delivery, performance or enforcement of this Agreement and the transactions contemplated hereby. For the avoidance of doubt, the parties agree that Borrower shall not be obligated to pay any additional amount pursuant to this Section to Lender or Investor resulting from such entities' connection with the Commonwealth of Puerto Rico. In the event that Lender receives any credit or refund of any Non-Excluded Taxes included in any payment made by Borrower pursuant to this Section, Lender shall reimburse Borrower for the amount of such credit or refund within the term of thirty (30) days from the date of receipt.

(d)  Borrower agrees to pay any present or future stamp or documentary taxes or any other excise or property taxes, registry, recording and filing fees, charges or similar levies which arise at any time from any payment made hereunder or under the Notes or any other Loan Document or from the execution, delivery or registration or recordation of, or otherwise with respect to, this Agreement, the Notes or any other Loan Document (hereinafter referred to as *"Other Taxes"*).

(e)  Borrower agrees to indemnify Lender for the full amount of Non-Excluded Taxes and Other Taxes (including, without limitation, any Non-Excluded Taxes or Other Taxes imposed by any jurisdiction on amounts payable under this Section) paid by Lender and any liability (including penalties, interest and expenses) arising therefor or with respect thereto after demand for payment thereof by Lender. This indemnification payment shall be made within five (5) Business Days after the date Lender makes written demand therefor.

(f)  Upon the written request of Lender, Borrower, within thirty (30) days after the date of any payment of Non-Excluded Taxes, will furnish to Lender, the original or a certified copy of a receipt evidencing payment thereof.

(g)  Without prejudice to the survival of any other agreement of Borrower hereunder, the agreements and obligations of Borrower contained in this Section shall survive the payment in full of principal and interest under the Notes and of any other amounts payable under the other Loan Documents.

(h)  Without limiting the foregoing, Borrower shall also pay, the following extraordinary operating or administrative costs or expenses incurred by Lender or Investor: (i) reasonable costs incurred in the enforcement and collection of the Loan by Lender, including any advances to Lender enabling either to make protective advances in connection therewith and/or the sale, acquisition, operation, and disposition of any collateral for the Loans, (ii) reasonable costs

incurred in connection with any amendment to, or waiver or consent granted under the Loan Documents, (iii) reasonable costs incurred in any litigation or other judicial or administrative proceeding arising out of or in connection with the Loan to which either or both Lender or the Investor may be subject (excluding a dispute between the members of Lender), (iv) reasonable cost of any monitoring/compliance fee assessed by the CDFI Fund, (v) except with respect to those liabilities excluded pursuant to Section 9.2(c) hereof, any tax liabilities that may be imposed directly on Lender or the Investor, and (vi) reasonable costs involved in any challenge or audit of any tax returns of the Investor arising out of an actual or alleged failure of by Borrower to be a QALICB, to cause a Loan to be a QLICI, or to comply with NMTC Program Requirements; provided, that extraordinary expenses shall not include payments of interest, principal, and other sums payable to Investor's lender.

**9.3    Assignment.**  The rights conferred upon Lender under this Agreement will automatically extend to and be vested in and binding upon any successors, assignees, or transferees of Lender.

**9.4    Notices.**  All notices, requests, or demands required or permitted by this Agreement shall be given to or made upon the respective parties hereto by either hand-delivery, certified U.S. mail, return receipt requested, or via overnight delivery with a nationally recognized courier, to the following addresses:

| | |
|---|---|
| **Borrower:** | Biomass Green Fuels LLC<br>584 Aldebaran Street, Altamira<br>San Juan, Puerto Rico 00920<br>Attention:    Olmar Lopez Vidal<br>Telephone:  (878) 793-4290<br>E-mail:        olv@greenfuelspr.com |
| With a copy to: | Leverage Law Group, LLC<br>4501 College Boulevard, Suite 280<br>Leawood, Kansas 66211<br>Attention: Blake Mason, Esq.<br>Telephone:  (913) 469-4009<br>E-mail:        blake.mason@leveragelaw.com |
| With a copy to: | DLA Piper (Puerto Rico) LLC<br>Edificio Ochoa, Suite 401<br>500 Calle de la Tanca<br>San Juan, Puerto Rico  00901-1969<br>Attention: José A. Sosa-Lloréns, Esq.<br>Telephone:  (787) 945-9116<br>E-mail:        jose.sosa@dlapiper.com |

| | |
|---|---|
| **Lender:** | PCC Sub-CDE 13, LLC<br>c/o Popular Community Capital, LLC<br>PO Box 362708 (Mail Code 734)<br>San Juan, Puerto Rico 00936-2708<br>Attention: Cristina Domínguez<br>Telephone: (787) 765-9800<br>E-mail: Cristina.dominguez@popular.com |
| With a copy to: | Banco Popular de Puerto Rico<br>Popular Center, 6th Floor<br>208 Ponce de Léon Avenue<br>San Juan, Puerto Rico 00918<br>Attention: Corporate Banking Division<br>E-mail: liza.lugaro@popular.com |

With a copy to:

Legal notices (claims, breach of contract, indemnification requests, and regulatory compliance issues) must be sent by messenger with acknowledgement of receipt, certified mail or national courier with copy to the legal representative in the same manner as follows:

Director of the Legal Division (Code 745)
PO Box 362708
San Juan, Puerto Rico 00936-2708
Attention: Legal Division
Telephone: (787) 753-1017
E-mail: legaldivision@popular.com

And a copy to:

PCC Sub-CDE 13, LLC
c/o Popular Community Capital, LLC
PO Box 362708 (Mail Code 734)
San Juan, Puerto Rico 00936-2708
Attention: Natalia Guzman
Telephone: (787) 765-9800
E-mail:Natalia.Guzman@popular.com

And a copy to:

Kutak Rock LLP
Suite 2750
303 Peachtree Street, NE
Atlanta, Georgia 30308
Attention: Drew Marlar
Facsimile: (404) 222-4654
E-mail: drew.marlar@kutakrock.com

| With a copy to: | COCRF Investor 193, LLC |
| | c/o Capital One, National Association |
| | Debt Capital Markets |
| | Place St. Charles, Suite 2900 |
| | 201 St. Charles Avenue |
| | New Orleans, Louisiana 70170 |
| | Attention: Spencer Gagnet |
| | Telephone: (504) 533-5276 |
| | E-mail: spencer.gagnet@capitalone.com |

| And a copy to: | Jones Day |
| | 100 High Street, 21st Floor |
| | Boston, Massachusetts 02110 |
| | Attention: Jeffrey D. Gaulin, Esq. |
| | Telephone: (617) 449-6932 |
| | E-mail: jgaulin@jonesday.com |

All notices shall be deemed received either on the date of hand-delivery, on the third Business Day following deposit in the U.S. mail, or on the first Business Day following deposit of same with a nationally recognized, over-night courier, as applicable.

**9.5** **Amendment.** Borrower and Lender may from time to time enter into written agreements supplemental hereto for the purpose of modifying or adding any provision to this Agreement or changing the rights and privileges of Lender or Borrower hereunder. Any such supplemental agreement shall be binding upon Borrower and Lender and their respective successors.

**9.6** **Governing Law.** This Agreement and all notes, guaranties, and security instruments executed in connection therewith will be governed by the laws of the Commonwealth of Puerto Rico.

**9.7** **Counterparts.** This Agreement may be signed in any number of counterparts, each of which when so executed shall be deemed to constitute one and the same agreement. This Agreement may be executed and delivered by portable document format (.pdf) or other electronic transmission, all with the same force and effect as if the same was a fully executed and delivered original manual counterpart. No party hereto shall raise the use of electronic means of delivery to deliver a signature or the fact that any signature or document was transmitted or communicated through the use of electronic delivery as a defense to the formation of a contract and each such party forever waives any such defense.

**9.8** **Binding Effect.** This Agreement shall continue until payment in full of all indebtedness owing hereunder and shall be binding upon Borrower, its successors and assigns, and shall be binding upon and inure to the benefit of Lender, its successors and assigns.

**9.9** **Headings.** Article and section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

**9.10    Severability of Provisions.**  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or enforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

**9.11    Venue.**  Lender and Borrower irrevocably agree Lender may bring suit, action, or other legal proceedings arising out of this Agreement in courts having jurisdiction in the Commonwealth of Puerto Rico.  Lender and Borrower hereby consent to the jurisdiction of such courts and waives any rights any may have to request a change of venue or a removal to another court.

**9.12    Photographs and Other Media.**  Borrower hereby authorizes Lender and Capital One to reproduce and display any media (including, without limitation, photographs and illustrations) of the Project submitted to Lender or Capital One by Borrower.  Borrower represents and warrants to Lender and Capital One that Borrower has obtained any and all licenses and/or permissions necessary for Borrower's, Capital One's and Lender's use of such media.

**9.13    Waivers of Jury Trial.  Each party who executes this Agreement hereby waives the right to trial by jury in any action or proceeding based upon or related to the subject matter of this Agreement, and all other documents described herein.  This waiver is knowingly, intentionally and voluntarily made by each such party, and each party acknowledges that neither Lender nor any person acting on behalf of Lender has made any representation to induce this waiver of trial by jury or in any way to modify or nullify its effect.  Each party further acknowledges that they have been represented in the signing of this Agreement and in the making of this waiver by independent legal counsel, selected of their own free will, and that they have each had the opportunity to discuss this waiver with counsel.  Each party further acknowledges that they have each read and understood the meaning and ramifications of this waiver.  By accepting this Agreement, Lender waives the right to a trial by jury in any action or proceeding brought by any party in connection with this Agreement.**

**9.14    Waiver of Special Damages.    TO THE EXTENT PERMITTED BY APPLICABLE LAW, BORROWER SHALL NOT ASSERT, AND HEREBY WAIVES, ANY CLAIM AGAINST LENDER, ON ANY THEORY OF LIABILITY, FOR SPECIAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES (AS OPPOSED TO DIRECT OR ACTUAL DAMAGES) ARISING OUT OF, IN CONNECTION WITH, OR AS A RESULT OF, THIS AGREEMENT OR ANY AGREEMENT OR INSTRUMENT CONTEMPLATED HEREBY, THE TRANSACTIONS, THE LOAN OR THE USE OF THE PROCEEDS THEREOF.**

**9.15    Representation by Counsel.**  Borrower hereby represents that (a) it has been represented by competent counsel of its choice, or has had the opportunity to engage such counsel, in the negotiation and execution of this Agreement and the other Loan Documents; (b) it has read and fully understands the terms hereof; and (c) Borrower and its counsel have been afforded an opportunity to review, negotiate, and modify the terms of this Agreement and that Borrower intends to be bound hereby.  In accordance with the foregoing, the general rule of construction to the effect that any ambiguities in a contract are to be resolved against the party drafting the contract

shall NOT be employed in the construction and interpretation of this Agreement or the other Loan Documents.

**THE WRITTEN LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

**Borrower acknowledges receipt of a copy of this Agreement at the time of the execution hereof and copies of all other documents executed by Borrower in connection herewith**

### 9.16 Refinancing.

(a) Notwithstanding anything to the contrary in this Agreement or in the other Loan Documents, Borrower and Lender hereby agree and acknowledge that, subject only to the absence of the occurrence and continuance of an Event of Default, any refinancing loan obtained by the Borrower after the seventh (7th) anniversary of the date hereof to repay the amounts under Note A in whole or in part upon the maturity thereof will be senior to the amounts under Note B; provided, however, that the amount of such refinancing loan shall not exceed one hundred and ten percent (110%) of the then-outstanding principal amount under Note A.

(b) In the event of a refinancing in accordance with Section 9.16(a) herein, Borrower and Lender shall use commercially reasonable efforts to enter into an intercreditor agreement with such refinancing lender in a form and manner substantially similar to the Intercreditor Agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed on or about the date first written above.

**BORROWER:**

**BIOMASS GREEN FUELS LLC,**
a Puerto Rico limited liability company

By: _____
Olmar López Vidal
President & Chief Executive Officer

Affidavit No.: _1,575_

Subscribed and acknowledged to before me in San Juan, Puerto Rico this 15th day of September, 2020, by the following person who is personally known to me: Olmar López Vidal, of legal age, married, executive and resident of Guaynabo, Puerto Rico, in his capacity as President & Chief Executive Officer of Biomass Green Fuels LLC.



Notary Public



**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed on or about the date first written above.

LENDER:

**PCC SUB-CDE 13, LLC,**
a Delaware limited liability company

By:   POPULAR COMMUNITY CAPITAL,
LLC, a Delaware limited liability company,
its Managing Member

By: _____
Cristina Domínguez
Authorized Signatory

Affidavit No.: *1,408*

Subscribed and acknowledged to before me in San Juan, Puerto Rico this 15th day of September, 2020, by the following person who is personally known to me: Cristina Domínguez, of legal age, married, executive and resident of San Juan, Puerto Rico, in her capacity as Authorized Signatory of Popular Community Capital, LLC, a Delaware limited liability company, the managing member of PCC Sub-CDE 13, LLC, a Delaware limited liability company.



_____
Notary Public



4846-1021-9967

# EXHIBIT A

## FORM DEBARMENT CERTIFICATE

### CERTIFICATION REGARDING DEBARMENT, SUSPENSION, INELIGIBILITY AND VOLUNTARY EXCLUSION—LOWER TIER COVERED TRANSACTIONS

———— —, ——

## INSTRUCTIONS FOR CERTIFICATION

1.    By signing and submitting this certification, the prospective lower tier participant is providing the certification set out below.

2.    The certification in this clause is a material representation of fact upon which reliance was placed when this transaction was entered into. If it is later determined that the prospective lower tier participant knowingly rendered an erroneous certification, in addition to other remedies available to the federal government the department or agency with which this transaction originated may pursue available remedies, including suspension and/or debarment.

3.    The prospective lower tier participant shall provide immediate written notice to the person to which this certification is submitted if at any time the prospective lower tier participant learns that its certification was erroneous when submitted or has become erroneous by reason of changed circumstances.

4.    The terms covered transaction, debarred, suspended, ineligible, lower tier covered transaction, participant, person, primary covered transaction, principal, proposal, and voluntarily excluded, as used in this clause, have the meaning set out in the Definitions and Coverage sections of rules implementing Executive Order 12549. You may contact the person to which this certification is submitted for assistance in obtaining a copy of those regulations.

5.    The prospective lower tier participant agrees by submitting this certification that, should the proposed covered transaction be entered into, it shall not knowingly enter into any lower tier covered transaction with a person who is proposed for debarment under 48 C.F.R. part 9, subpart 9.4, debarred, suspended, declared ineligible, or voluntarily excluded from participation in this covered transaction, unless authorized by the department or agency with which this transaction originated.

6.    The prospective lower tier participant further agrees by submitting this certification that it will include the certification set forth below in paragraph 9 titled "Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion—Lower Tier Covered Transactions," without modification, in all lower tier covered transactions and in all solicitations for lower tier covered transactions.

7.    A participant in a covered transaction may rely upon a certification of a prospective participant in a lower tier covered transaction that it is not proposed for debarment under 48 C.F.R.

part 9, subpart 9.4, debarred, suspended, ineligible, or voluntarily excluded from covered transactions, unless it knows that the certification is erroneous. A participant may decide the method and frequency by which it determines the eligibility of its principals. Each participant may, but is not required to, check the List of Parties Excluded from federal Procurement and Nonprocurement Programs.

8. Nothing contained in the foregoing shall be construed to require establishment of a system of records in order to render in good faith the certification required by this clause. The knowledge and information of a participant is not required to exceed that which is normally possessed by a prudent person in the ordinary course of business dealings.

9. Except for transactions authorized under paragraph 5 of these instructions, if a participant in a covered transaction knowingly enters into a lower tier covered transaction with a person who is proposed for debarment under 48 C.F.R. part 9, subpart 9.4, suspended, debarred, ineligible, or voluntarily excluded from participation in this transaction, in addition to other remedies available to the federal government, the department or agency with which this transaction originated may pursue available remedies, including suspension and/or debarment.

**Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion—**

**Lower Tier Covered Transactions**

(1) The prospective lower tier participant certifies that neither it nor its principals is presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from participation in this transaction by any federal department or agency.

(2) Where the prospective lower tier participant is unable to certify to any of the statements in this certification, such prospective participant shall attach an explanation to this certification.

## EXHIBIT B

## QALICB COMPLIANCE CERTIFICATE

WHEREAS, Capital One, National Association, together with its successors and assigns ("*Capital One*"), is the investor member of COCRF Investor 193, LLC, a Delaware limited liability company ("*Investor*");

WHEREAS, on September 15, 2020 (the "*Closing Date*"), Investor made one or more "*qualified equity investments*", as that term is defined by Section 45D of the Internal Revenue Code, as amended (the "*Code*") and Section 1.45D-1(c) of the Treasury Regulations (the "*Regulations*"), eligible for New Markets Tax Credits under Section 45D of the Code, in PCC Sub-CDE 13, LLC, a Delaware limited liability company (the "*Lender*");

1.      WHEREAS, on the Closing Date, Lender made one or more loans (collectively, the "*Loan*") to Biomass Green Fuels LLC, a Puerto Rico limited liability company ("*Borrower*"), pursuant to a Loan and Security Agreement dated as of the Closing Date (the "*Loan Agreement*") in connection with the installation of equipment for a new state of the art recycled and renewable natural gas and carbon dioxide facility in the low-income community of Humacao, Puerto, Rico. (the "*Project*") in Census Tract No. 72069180901 (the "*Census Tract*"), which, as of the date the Loan was made constituted a "low-income community" under Section 45D of the Code (a "*Low-Income Community*");

**WHEREAS**, the Loan is intended to qualify as a "qualified low-income community investment", as that term is defined by Section 45D of the Code and Section 1.45D-1(d) of the Regulations (a "*QLICI*"), and Borrower is intended to be a "qualified active low-income community business", as that term is defined by Section 45D of the Code and Section 1.45D-1(d)(4) of the Regulations (a "*QALICB*") pursuant to the "Portions of a Separate Business Rule" exception contained in Section 45D(d)(2)(C) of the Code and Section 1.45D-1(d)(4)(iii)(A) of the Regulations; and

**NOW THEREFORE**, in order to ensure that the Loan qualifies as a QLICI and Borrower is a QALICB, Borrower hereby certifies, represents and warrants to Lender and Capital One, as of the date hereof, as follows:

1.      Borrower is and expects that it will meet the requirements of the Loan Agreement which are designed to ensure that it remains a QALICB during the term of the Loan.

2.      Borrower is validly existing and in good standing under the laws of the Commonwealth of Puerto Rico.

3.      With respect to the taxable year through [June 30, [____]/December 31, [____]], _____% of the total gross income of Borrower was derived from the active conduct of its trade or business within the Census Tract.

4.      With respect to the taxable year through [June 30, [____]/December 31, [____]], Borrower had one (1) or more employees and _____% of the services performed for Borrower by its employee(s) were performed within the Census Tract. For

purposes of this representation, the percentage of services performed for Borrower by its employee(s) shall be determined in accordance with the formula provided in Section 2.2(e) of the Loan Agreement.

a. **[To Be Included If Less Than 100% Of The Services Performed By Borrower Are Located Within the Census Tract:** With respect to the taxable year through [June 30, [____]/December 31 [____]], the total amount paid by Borrower for employee services performed was $_____, a true, correct and complete description of which is attached hereto as *Exhibit A.*

b. With respect to the taxable year through [June 30, [____]/December 31 [____]], the total amount paid by Borrower for employee services performed within the Census Tract was $_____.

c. With respect to the taxable year through [June 30, [____]/December 31 [____]], the total amount paid by Borrower for employee services performed outside of the Census Tract was $_____.]

5. With respect to the taxable year through [June 30, [____]/December 31, [____]], _____% of the use of the tangible property of Borrower (whether owned or leased) was within the Census Tract. For purposes of this representation, the percentage of tangible property owned or leased by Borrower and used by Borrower shall be determined in accordance with the formula provided Section 2.2(d) of the Loan Agreement.

a. **[To Be Included If Less Than 100% of Borrower's Tangible Property Is Used Within the Census Tract:** With respect to the taxable year through [June 30, [____]/December 31, [____]], the cost basis of all tangible property owned by Borrower was $_____, a true, correct and complete list of which is attached hereto as *Exhibit B.*

b. With respect to the taxable year through [June 30, [____]/December 31, [____]], the estimated value of any tangible property leased by Borrower and used by Borrower was $_____, a true, correct and complete list of which is attached hereto as *Exhibit C.*

c. With respect to the taxable year through [June 30, [____]/December 31, [____]], the business hours of usage of Borrower's tangible property within the Census Tract was _____ hours.

d. With respect to the taxable year through [June 30, [____]/December 31, [____]], the business hours of usage of Borrower's tangible property outside of the Census Tract was _____ hours.]

6. As of [June 30, [____]/December 31, [____]], ____% percent of the average of the aggregate unadjusted bases of Borrower's property was attributable to collectibles (as defined in Section 408(m)(2) of the Code) other than collectibles held primarily for sale to customers in the ordinary course of business.

a.	As of [June 30, [___]/December 31, [___]], the aggregate unadjusted bases of all collectibles owned by Borrower was $_____, a true, correct and complete list of which is attached hereto as *Exhibit D*.

b.	As of [June 30, [___]/December 31, [___]], the aggregate unadjusted bases of collectibles held by Borrower primarily for sale to customers in the ordinary course of business was $_____.

c.	As of [June 30, [___]/December 31, [___]], the average of the aggregate unadjusted bases of all of Borrower's property was $_____.

7.	As of [June 30, [___]/December 31, [___]], ____% of the average of the aggregate unadjusted bases of Borrower's property was attributable to nonqualified financial property (as defined in Section 1.45D-1(d)(4)(i)(E) of the Regulations).

a.	As of [June 30, [___]/December 31, [___]], the aggregate unadjusted bases of all debt (other than debt instruments described in section 1221(a)(4) of the Code), stock, partnership interests, options, futures contracts, forward contracts, warrants, notional principal contracts, annuities, and other similar property held by Borrower was $_____.

b.	A reasonable amount of working capital held in cash, cash equivalents, or debt instruments with a term of eighteen (18) months or less for Borrower's business is $_____.

c.	As of [June 30, [___]/December 31, [___]], the amount of working capital held in cash, cash equivalents, or debt instruments with a term of eighteen (18) months or less held by Borrower was $_____.

d.	As of [June 30, [___]/December 31, [___]], the amount of accounts or notes receiveable acquired in the ordinary course of Borrower's trade or business (i) for services rendered, or (ii) from the sale of stock or other property of a kind that would properly be included in the inventory of Borrower if on hand at the close of the taxable year, or property held by Borrower primarily for sale to customers in the ordinary course of its trade or business was $_____.

e.	As of [June 30, [___]/December 31, [___]], the aggregate unadjusted bases of Borrower's property attributable to nonqualified financial property was $_____, a true, correct and complete list of which is attached hereto as *Exhibit E*.

f.	As of [June 30, [___]/December 31, [___]], the average of the aggregate unadjusted bases of all of Borrower's property was $_____.

8.	The business activities of Borrower do not include operation of any of the following: (i) rental of residential real property (as defined under Section 168(e)(2)(A) of the Code); (ii) development or holding of intangibles for sale or license; (iii) farming (as defined in Section 2032A(e)(5)(A) or (B) of the Code), if

the aggregate unadjusted bases (or, if greater, the fair market value) of owned property and the value of leased property used in a farming trade or business exceeds $500,000; or (iv) leasing of real property which does not have substantial improvements on such real property.

    a.    With respect to the taxable year through [June 30, [____]/December 31 [____]], ____% of Borrower's gross rental income is derived from the rental of residential property.

    b.    With respect to the taxable year through [June 30, [____]/December 31 [____]], ____% of Borrower's gross rental income is derived from the rental of commercial property.

9.    The business activities of Borrower do not include operation of any of the following: (a) a massage parlor, (b) a hot tub facility, (c) a suntan facility, (d) a country club, (e) a racetrack or other facility used for gambling, (f) a private or commercial golf course, or (g) any store the principal business of which is the sale of alcoholic beverages for consumption off premises; (each of the foregoing, an "*Excluded Business*").

10.    With respect to the taxable year through [June 30, [____]/December 31 [____]], no lessee or sub-lessee of Borrower has operated any Excluded Business or engaged in the rental of residential real property (as defined under Section 168(e)(2)(A) of the Code).

11.    No part of the financing for the Project includes low-income housing tax credits, as described in Section 42 of the Code.

12.    **[To Be Included If Borrower Has Not Yet Begun Generating Revenue From The Project:** Borrower expects to begin generating revenue from the Project within three (3) years from the Closing Date.]

13.    **[To Be Included If Borrower Is Generating Revenue From The Project:** Borrower is currently generating revenues from the Project.]

14.    Borrower used all of the QLICI proceeds in its business, and Borrower's books and records have been maintained in such a manner that such QLICI proceeds can be traced to its business.

15.    Borrower has no present plans or intentions to change the nature or manner of the conduct its business.

16.    Since the Closing Date, Borrower has not moved its operations or acquired property other than in connection with and located at the Property.

17.    None of Borrower, any of its members, or the officers, directors, principals, employees or owners of Borrower or any of its members are on the list of Specially Designated Nationals and Blocked Persons promulgated by the United States

Department of the Treasury and located on the internet at http://www.treas.gov/offices/eotffc.; http://www.treas.gov/ofac/t11sdn.pdf.

18. The representations, warranties and covenants set forth in Sections 2.1 and 2.2 of the Loan Agreement continue to be true, complete and correct in all respects and are reaffirmed as of the date hereof.

19. No default under the Loan Agreement exists, or with giving of notice or passage of time, or both, would exist as of the date hereof.

20. Since the Closing Date, Borrower has not had any correspondence or communication with, to or from the Community Development Financial Institutions Fund, an agency of the United States Department of the Treasury, concerning non-compliance with, or deficiencies in, reporting practices.

**BIOMASS GREEN FUELS LLC,**
a Puerto Rico limited liability company


By: _____
     Name
     Title

**EXHIBIT C**

**LIST OF PLANS AND SPECIFICATIONS**

Those certain plans and specifications as provided in the Construction Contract as they may be approved by Lender.

# EXHIBIT D

## INSURANCE REQUIREMENTS

| Type of Policy | Wind/Named Storm (Hurricane and Hail storms) |
|---|---|
| Purpose | Protects against loss or damage from storms |
| Evidence | Same as Hazard/Property insurance whether included therein or as a separate policy |
| Amount of Coverage | 100% Insurable Value |
| Deductible | Deductible should be the same as the All Other Peril deductible unless the property is located in a Tier 1 county. Deductibles in Tier 1 counties are anywhere from 3%-5% of total insurable value, typically subject to a minimum of $100k. |

| Type of Policy | Builder's Risk on a Completed Value Basis |
|---|---|
| Purpose | Coverage during construction period. **Once a Certificate of Occupancy is obtained, an All Risk/Special Form policy is required.** |
| Evidence | Separate policy which may be evidenced by an ACORD 28 (Evidence of Commercial Property Insurance). Policy or certificate should be written on a non-reporting Completed Value, Special Form showing coverage equal to the full replacement value of the improvements from the ground up to completion. Upon completion of the structure, coverage must be transferred to an All Risk or Special Form policy. |
| Amount of Coverage | Full Insurable Value Upon Completion. An amount no less than the full replacement value of the improvements ground up to completion (typically, the amount the Bank is funding for hard costs). |
| Deductible | Most often the deductible is no greater than $10k, however, up to $25k is acceptable. |

## HAZARD OR PROPERTY INSURANCE: NOTES

Note A: If the loan amount is less than the Insurable Value, the lender might consider accepting less than 100% of Insurable Value provided (1) the coverage is at least equal to the loan amount; (2) there is no Coinsurance clause and (3) the loan documents allow the lender to control the funds (e.g., to pay off the loan). This treatment should be considered only when the loan amount is significantly below Insurable Value.

It is recommended that we accept coverage that is written to the full Insurable Value on a 'replacement cost' basis only (and not on an 'actual cash value' basis). Coverage on an Actual Cash Value basis takes depreciation into account. There is no way to predict how a carrier will pay out in the event of a loss, which could be less than our loan amount (in which case land value must be considered).

| LIABILITY INSURANCE | |
|---|---|
| **Type of Policy** | **General Liability** |
| Evidence | ACORD 25 - All liability forms contain "for information only" language. Ask for additional insured endorsement showing Bank's interest |
| Lender's & Capital One's Interest | Additional Insured [assures the lender protection in event it is included in a claim by virtue of its lender status] |
| Amount of Coverage | $1mm per occurrence / $2mm aggregate, with aggregate limits written per occurrence and per location basis. |
| Deductible | Policy should have no deductible or self-insured retention unless otherwise approved. |

| | |
|---|---|
| **Type of Policy** | **Umbrella/Excess (generally interchangeable terms although "umbrella" is preferred as it provides broader terms of coverage)** |
| Evidence | ACORD 25, separate standalone policy. |
| Lender's & Capital One's Interest | Additional Insured [assures the lender protection in event it is included in a claim by virtue of its lender status] |
| Amount of Coverage | Consider the type and use of property. For Operating Hotels and Apartment Complexes (both have lots of foot traffic) = minimum $10mm |
| | For loans $10mm or less = $5mm per occurrence / $5mm aggregate |
| | For loans >$10mm to $25mm = $5mm-$10mm per occurrence / $5mm-$10mm aggregate |
| | For loans >$25mm = at least $10mm or higher dependent on exposure |
| Deductible | Typically no greater than $10k. |

| | |
|---|---|
| **Type of Policy** | **Commercial Automobile Liability** |
| Purpose | If the borrower owns vehicles used as part of business |
| Evidence | Standalone policy |
| Lender's & Capital One's Interest | Additional Insured (assures the lender protection in event it is included in a claim by virtue of its lender status) |
| Amount of Coverage | not < $1mm |
| Deductible | Up to $25k. |

| | |
|---|---|
| **Type of Policy** | **Workers Compensation and Disability** |
| Purpose | Should be evidenced for all hotel loans and hotel employees |
| Evidence | Separate Policy. |
| Amount of Coverage | $1,000,000 per accident / disease |
| Deductible | It is dependent on location. For instance, in NY there is no deductible. |

## EQUIPMENT INSURANCE

| Evidence | ACORD 27 |
|---|---|
| Lender's & Capital One's Interest | Additional Insured |
| Amount of Coverage | Combined invoice amount of specific equipment serving as security |
| Schedule | Schedule must show a listing of all covered pieces of equipment |

## OTHER INSURANCE- RELATED TOPICS

**Deductibles:** The deductible amount the lender is willing to accept is often tied to the lender's belief in the capacity of the borrower to pay in the event of multiple casualties throughout one policy year. Deductible amount is typically $10k or less, however higher levels of up to $25k are acceptable However, we have seen $50k and higher for some REITS and larger borrowers.

**Hold Harmless:** The borrower shall release, indemnify and hold harmless Popular, Inc., its affiliates, subsidiaries, shareholders, directors, officers and/or employees from the risk for which coverage is provided under this policy. This document shall be subject to the terms and conditions of the above mentioned policy.

**Waiver of Subrogation:** The borrower hereby waives any right of subrogation against Popular, Inc., its affiliates, subsidiaries, shareholders, directors, officers, and/or employees.

**Renewal Notices:**

While lenders will typically request evidence of renewals 30 days prior to expiration, we typically see renewals 3 to 5 days prior to expiration, or less depending upon the size of the program that is being renewed. Insurance quotes can get very competitive and will often come down to the wire. Insureds will often quote with several agencies and/or carriers in order to achieve competitive pricing. It is also important to keep in mind that on large blanket programs, it takes extra time to arrange the layers of multiple carriers affording coverages.

**Notices of Cancellation:**

Thirty (30) days advanced written notice of cancellation is required (Cancellation clause should not include "endeavor to notify" language.) Often, this must be endorsed into the policy in the lender's interest. Typically this provision is not available for Liability Insurance.

**Carrier Ratings**

Carriers should have a rating of 'A' or better by S&P (and the equivalent by any other Rating Agency) and at least 'AX' or better by A.M. Best. For multiple carrier situations, no carrier should be less than BBB, but at least 75% should be 'A' or better if 4 or less carriers and 60% should be 'A' or better if 5 or more carriers.

**General Information**

- Capital One's Interest should be stated as:
  COCRF Investor 193, LLC c/o Capital One, National Association
  It's Successors and/or Assigns ATIMA
  201 St. Charles Ave. Floor 29
  New Orleans, LA 70170
  Attn: Spencer Gagnet

  Lender's Interest should be stated as:
  PCC Sub CDE 13, LLC, and/or Popular Community Capital, LLC
  It's Successors and/or Assigns ATIMA
  PO Box 362708 (Mail Code 734)
  San Juan, PR 00936 2708

- The location and improvements must be clearly described.
- The policy number must be clearly identified.
  The insurance carrier must be approved to do business in the state/commonwealth where the property is located.

# EXHIBIT E

## LOAN EQUIPMENT

### 1. Jenbacher Engines

Manufacturer: Jenbacher INNIO, Total Cost: $1,900,000

Gas Power Generators

The Premises includes the following equipment:

- One (1) 208 (335Kw) Landfill Gas (Internal Combustion Engine) Power Generator
- Three (3) 416 (1,100 Kw) Landfill Gas (Internal Combustion Engine) Power Generators
- The power generator packages include all auxiliary equipment such as oil pumps, cool water pumps, radiators, exhaust silencers, control panels and synchronizing electrical equipment.

### 2. Nitrogen Removal System

Manufacturer: Galileo Technologies Corporation, Total Cost: $1,866,379

Galileo's Nitrogen Removal System (NRS) is designed to remove all remaining Nitrogen from the Natural Gas Stream before entering the Liquefaction System. The NRS is a cryogenic flash separation system.

The Nitrogen Removal system designed for the Premises consists of the following equipment:

- Nitrogen Stripping Column
- Cryogenic Separator

### 3. LFG Upgrading Membrane

Manufacturer: Galileo Technologies Corporation, Total Cost: $4,000,000

Galileo' LFG Upgrading Membrane System will process 4,200 Nm3/h of LFG (Pre-Treated) Biogas. The LFG Upgrading Membrane system designed for the Premises consists of the following equipment:

- Two (2) Membrane Skids CSM Gas
- PSA System
- Carbon Filters
- Electrical Control Panels

4846-1021-9967.7

# EXHIBIT F

# EXCLUDED PROPERTY

**1. Liquefaction System**
Manufacturer: Galileo Technologies Corporation, Total Cost: $4,233,621

Galileo Cryobox® high-pressure thermodynamic cycle converts natural gas into liquid by cooling its temperature below -153 °C. The equipment comprises a multi-stage compression process, includes an automatic boil-off recovery system that eliminates the venting that was needed with conventional LNG storage.

**2. $CO_2$ Purification System**
Manufacturer: TPI (Tecno Project Industriale), Total Cost: $1,100,000

TPI's $CO_2$ recovery plants are optimized to run downstream to membrane, PSA or amine Biogas upgrading plants ensuring a continuous production of 99.998% pure $CO_2$ quality guidelines compliant.

The $CO_2$ purification system designed for the Premises consists of the following equipment:

- (H2s) Removal Guard Filter
- High Pressure Recipricating Compressors
- Catox (Catalytic Oxidexer Unit)
- Catox Economizer
- Catox Aftercooler
- $CO_2$ Purifier Activated Carbon Filters Units
- $CO_2$ Dryer
- $CO_2$ Stripper
- Valves
- $CO_2$ Liquid transfer pump

**3. LNG/ $CO_2$ Storage Tanks**
Total Cost: $1,170,000

LNG Tanks Manufacturer: Galileo Technologies Corporation, Cost: $810,000
$CO_2$ Tanks Manufacturer: CIMC Enric, Cost $360,000

The LNG and $CO_2$ storage facility designed for the Premises consists of the following equipment:

- Six (6) 40' Cryogenic LNG IsoTanks (12,000 gallon tanks)
- Four (4) 20' Cryogenic $CO_2$ IsoTanks (5,500 gallon tanks)
- LNG Cryogenic Pumps for loading Isotanks
- Regasifier station
- Cryogenic Control Valves
- Control System

# EXHIBIT G

## POST-CLOSING DELIVERIES

| Permit | Issuing Entity(ies) | Checklist Item |
|---|---|---|
| Stormwater Management Permits | Puerto Rico Environmental Quality Board)/Department of Natural and Environmental Resources Information | C-2, 18-19; page 2 |
| Operation Air Emissions Permit for Emergency Generators & Project | Puerto Rico Environmental Quality Board)/Department of Natural and Environmental Resources Information | C-3, 21; page 2 |
| Stormwater Management Permits | United States Environmental Protection Agency Information | F-1, 64-69; pages 6 and 7 |
| General OSHA Documentation | OSHA | G-1, 81-83; page 7 |
| Earth Removal and Processing Permit | Department of Natural and Environmental Resources | H-1, 86; page 8 |
| Fire Department Endorsement | ARPE/OGPE/Municipality/Fire Department/Health Department/Public Services Commission/PR Department of Agriculture and PR Highway and Transportation Authority | I, 90; page 8 |
| Health Department Endorsement | ARPE/OGPE/Municipality/Fire Department/Health Department/Public Services Commission/PR Department of Agriculture and PR Highway and Transportation Authority | I, 92; page 8 |

# EXHIBIT H

# OPERATING POLICY

## [See Attached]

**Portion of the Business Memorandum**

Accounting Procedures Policy

September 2020

*Re:*

*The separate portion of the business of GFC Holdings Limited Liability Company, a Puerto Rico limited liability company ("GFC"), which is the owner of 100% of the membership interests in Biomass Green Fuels LLC, a Puerto Rico limited liability company (the "Borrower" or the "Portion of the Business"), which portion consists of all of the operations of the Borrower. The Borrower is the owner of a leasehold interest in certain real property located at the El Coqui Landfill (the "Landfill"), located at Road 923 KM 2.5, Barrio Buena Vista, Humacao, Puerto Rico 00791 (the "Property"), on which it intends to construct a facility to capture and process methane-rich gas and carbon dioxide rich gas to yield renewable natural gas in liquified form, renewable carbon dioxide and electricity to be sold to commercial and industrial businesses in Puerto Rico (the "Project"). The Borrower is receiving loans for the Project (the "Project Loans") pursuant to the Loan and Security Agreement (the "Loan Agreement") dated the date set forth above between the Borrower and PCC Sub-CDE 13, LLC, a Delaware limited liability company (together with its successors and assigns, "Lender"). The Project is located entirely within census tract #72069180901, which is a "low-income community" as defined in Section 45D(e) of the Code (defined below) and Section 1.45D-1 of the regulations thereunder.*

**Background and Purpose:**

GFC owns 100% of the ownership interests in the Borrower. The portion of the trade and business of GFC consists of all of the operations of the Borrower (the "Portion of the Business"). GFC, through the Portion of the Business, desires to engage in a plan of finance (the "Plan of Finance") involving the Lender to obtain a source of funds to assist the Portion of the Business in constructing the Project. The Plan of Finance will be on favorable terms and conditions to the Portion of the Business due to the availability of certain "new markets tax credits" ("NMTC" or the "NMTCs") provided for under Section 45D of the Internal Revenue Code of 1986, as amended (the "Code").

Consistent with the NMTC program requirements, the Portion of the Business is expected to constitute a "qualified active low-income community business" in accordance with the "portions of business" rule contained in Section 45D(d)(2)(C) of the Code and in Section 1.45D-1(d)(4)(iii) of the regulations under the Code (the "Portion of the Business Regulations", the policies and procedures set forth in this Portion of the Business Memorandum-Accounting Procedures Policy and the Agreed Upon Procedures Report with respect to the Borrower dated as of the date hereof and prepared by CohnReznick LLP are hereinafter collectively, this "Policy"). Accordingly, the purpose of this Policy is to document the methodology used to maintain separate books and records for, and determine the operating expenses and revenues, assets and liabilities, services of employees, basis in collectibles, if any, and non-qualified

1

financial property related and/or allocated to, the Portion of the Business. Further, this Policy is required to comply with the covenants set forth in the Loan Agreement (together with the various loan documents referred to therein, the "Loan Documents"). GFC and the Borrower shall retain separate books and records for the Portion of the Business in accordance with this Policy and the Loan Documents for so long as required by the Loan Documents, as amended, modified or extended.

**Accounting Procedures:**

GFC intends to operate the Portion of the Business as an operating unit and division separate and distinct from GFC, and as such shall maintain a complete and separate set of books and records for the Portion of the Business in accordance with the requirements contained in Section 1.45D-1(d)(4)(iii) of the Treasury Regulations (the "Separate Books and Records") and separate bank accounts (the "Portion of the Business Bank Account") for the Portion of the Business. All funds of the Portion of the Business, including without limitation all net proceeds of the Project Loans to the Portion of the Business shall be held and maintained in the Portion of the Business Bank Account and shall not be commingled with funds of GFC. By way of example and not limitation, as part of the Separate Books and Records, the Portion of the Business shall maintain, on a quarterly and annual basis, a separate income statement, balance sheet, operating budget, a written record and reconciliation of the reimbursements, allocations and payments described under the heading "Financial Statements" below, and inventory of real and personal property owned, leased or allocated to the Portion of the Business.

In the event further regulatory guidance is hereafter issued detailing additional requirements to be met in order to demonstrate that complete and separate books and records are being maintained for purposes of the Portion of the Business Regulations, GFC will cause the books and records for the Portion of the Business to comply with such additional requirements within a reasonable time following issuance of such guidance and subject to the terms and conditions of the Loan Documents.

**Financial Statements:**

The operations of the Portion of the Business are accounted for separately from the operations of GFC. The accounting system maintained by GFC for the Portion of the Business has the ability to generate consolidated financial statements that will include all funds. On a quarterly basis, except for the last fiscal quarter of each fiscal year, financial statements (Income Statement and Balance Sheet) for the Portion of the Business will be prepared. Financial statements for the Portion of the Business for each fiscal year shall be provided by the Borrower to the Lender.

**Revenue and Expenses:**

The accounting system of GFC will identify all direct revenues, expenses (including without limitation, the amount paid for employee services), cash receipts, disbursements, assets, liabilities, basis in collectibles, if any, and non-qualified financial property of the Portion of the Business separately from the rest of GFC. Transactions will be coded and reviewed prior to entry into the accounting system. All adjustments, such as depreciation and accruals will be coded accordingly. Operating revenue and expenses attributable solely to the Portion of the Business will be wholly allocated to the Portion of the Business, in addition, items specifically tracked to the

Portion of the Business will be wholly included.

**Assets and Liabilities:**

The purposes and undertakings of the Portion of the Business shall consist solely of the undertaking and completion of the Project and the operation of the Portion of the Business as described above and in the Loan Agreement, and the books and records of the Portion of the Business shall only include assets and liabilities directly related or reasonably allocated to the Project and the Portion of the Business.

During the construction and installation phase of the Project, all costs of the Portion of the Business have been and will be tracked in balance sheet general ledger accounts segmenting deferred financing costs, fixtures, and equipment. Once the Project is completed, the work in progress will be placed into service.

The separate books and records hereunder will reflect that, with respect to the current and each subsequent taxable year, at least fifty percent (50%) of the use of the tangible property allocated to the Portion of the Business (whether owned or leased) will be within the census tract referenced above (the "Census Tract") (for purposes of this calculation, the percentage of tangible property owned or leased by the Portion of the Business and used by the Portion of the Business during the taxable year in the Census Tract shall be determined based on a fraction (i) the numerator of which is the Average Value (as defined in the Loan Agreement) of the tangible property owned or leased by the Portion of the Business and used by the Portion of the Business within the Census Tract during the taxable year, and (ii) the denominator of which is the Average Value of all of the tangible property owned or leased by the Portion of the Business and used by the Portion of the Business during the taxable year): provided, however, that for any taxable year in which no employees are allocated to the Portion of the Business, at least eighty-five percent (85%) of the use of the tangible property allocated to the Portion of the Business (whether owned or leased) shall be within the Census Tract. If any property is used by the Portion of the Business outside of the Census Tract, the separate books and records will be sufficient to substantiate the cost basis of all property allocated to the Portion of the Business, the estimated value of any leased property and the basis of such estimate, and the business hours of usage of the property allocated to the Portion of the Business within and outside of the Census Tract. A portion of the property of the Portion of the Business is expected to be used outside the Census Tract when the Portion of the Business is delivering its finished product to its customers, and for ease of calculation all such property is being treated as being used outside of a qualifying low-income community.

The separate books and records established hereunder will reflect that, to the extent sufficient to demonstrate compliance with the preceding paragraph, (a) the Portion of the Business does not commingle the assets allocable to the Portion of the Business with the reminder of GFC or any other person or entity and (b) the assets of or reasonably allocated to the Portion of the Business are and will not be allocated as assets of the remainder of GFC or any other person or entity, all except to the extent that such assets are consolidated with another's assets for financial reporting purposes. As to the tracing and allocation of certain items, see the discussion under "Revenues and Expenses" above. The Portion of the Business does not possess or use assets of any other person or entity (other than the reminder of GFC in a manner consistent with the preceding paragraph), and does not permit any other person or entity to possess or use its assets (other than the remainder of GFC outside the Portion of the Business in a manner complying with the

preceding paragraph), unless in either case such assets are rented, leased, or otherwise provided for use either (i) on an arms-length basis pursuant to a lease or services agreement or similar agreement with such person or entity; or (ii) by, to or for any affiliate of GFC in accordance with the NMTC program requirements.

Upon closing of the NMTC financing the Portion of the Business will book the Project Loans made by the Lender pursuant to the Loan Documents as long term debt of the Portion of the Business. In addition, on the date hereof Banco Popular de Puerto Rico ("BPPR") will be making a loan to the Portion of the Business in the principal amount of $11,869,250 (the "Senior Loan"), and the Portion of the Business shall also book such loan as debt of the Portion of the Business. Finally, the Borrower has previously issued its Unsecured Convertible Promissory Note dated August 20, 2019 (the "Subordinate Note") to Danosa Caribbean, Inc. ("Danosa") in the principal amount of $1,000,000. Pursuant to the terms of that certain Subordination Agreement dated as of the date hereof among Borrower, Lender, BPPR and Danosa, the Subordinate Note is subordinate to the Senior Loan and the Project Loans and is convertible at the option of the holder into equity in GFC. The Portion of the Business shall also book the Subordinate Note as debt of the Portion of the Business until such loan is converted into equity in GFC.

**Employees:**

The Portion of the Business expects to have employees, which will be employees of the Portion of the Business. The Portion of the Business will maintain records of the employees of the Portion of the Business, including records sufficient to confirm that at least fifty percent (50%) of the services performed by the employees of the Portion of the Business will be within the Census Tract. Such records will be sufficient to determine that, for purposes of calculating this percentage, such percentage is determined based on a fraction (i) the numerator of which is the total amount paid by the Portion of the Business for employee services performed in the Census Tract during the taxable year, and (ii) the denominator of which is the total amount paid by the Portion of the Business for employee services during the taxable year. Certain employees are expected to be located outside the Census Tract when such employees are delivering the Portion of the Business' finished product to its customers, and for ease of calculation such employees will be treated as performing services outside of a qualifying low-income community.

**Collectibles and NQFP:**

The Portion of the Business will maintain records of the unadjusted bases of its property. Specifically, the Portion of the Business will maintain a detailed asset and depreciation schedule that substantiates account balances for unadjusted and net asset values for facility and furniture, fixture, and equipment assets, including the value of collectibles, if any. Non-qualified financial property will be tracked in cash and cash equivalent accounts, for easy identification, and all other current assets will be identified within balance sheet accounts, (to ensure that (i) less than five percent (5%) of the aggregate unadjusted bases of the property owned by the Portion of the Business is attributable to collectibles (as defined in Section 408(m)(2) of the Code, and including any work of art, any rug or antique, any metal or gem, any stamp or coin, or any alcoholic beverage) if any and (ii) less than five percent (5%) of the average of the aggregate unadjusted bases of the property owned by the Portion of the Business is attributable to nonqualified financial property (as defined in Treasury Regulations Section 1.45D-1(d)(4)(i)(E), which includes any debt, stock,

partnership interests, options, futures contracts, forward contracts, warrants, notional principal contracts, annuities, and other similar property except for reasonable amounts of working capital held in cash, cash equivalents, or debt instruments with a term of eighteen months or less and certain other debt instruments).

No ownership interest of GFC in any wholly or partially-owned direct or indirect subsidiary shall be allocated by GFC to the Portion of the Business.

No amendment, modification, waiver or termination of any provision of this Policy or consent to any departure by the Borrower therefrom shall be effective unless in a writing signed by Borrower and consented to in writing by the Lender, and then such amendment, modification, termination, waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

*[The remainder of this page is left blank intentionally]*

This Portion of the Business Memorandum-Accounting Procedures Policy has been approved by the undersigned effective as of the date set forth above:

Approved by:

**BIOMASS GREEN FUELS LLC,**
a Puerto Rico limited liability company

By: _____

Name: Olmar López Vidal
Title: President & Chief Executive Officer

**GFC HOLDINGS LIMITED LIABILITY COMPANY,**
a Puerto Rico limited liability company

By: _____

Name: Olmar López Vidal
Title: President & Chief Executive Officer