# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| Gregory Boyd, et. al. <br><br> Plaintiffs <br><br> v. <br><br> Banco Popular de Puerto Rico <br><br> Defendant | Civil No.: 24-cv-1569 (PAD) |

## RESPONSE TO INFORMATIVE MOTION REGARDING ECF NO. 62

## TO THE HONORABLE COURT:

Gregory Boyd and Jonathan Lassers, through undersigned counsel, respectfully inform and request the Honorable Court to take notice of the following:

Yesterday in <u>Boyd, et. al. v. López-Vidal, et. al</u>., Civil No. 22-1190 (GMM), the Hon. Gina Méndez-Miró issued a Memorandum and Order (ECF No. 800) denying the request of counsel for Plaintiffs therein to represent the appearing Companies in that case. Judge Méndez-Miró's conclusion was made without the benefit of all the evidence placed in front of this Court which establishes exactly the conditions under which the Majority of Members may act by Written Consent under Section 3.2. The Majority of Members currently face such a scenario in which the Board of Managers has acted alone and improperly, in favor of the holders of the Series A preferred Units to improperly liquidate the company, which inured benefits only to them and the one other member who voted in favor of the liquidation.

In so doing, the Board of Managers breached their fiduciary duties, and they violated the Operating Agreement.

Respectfully, Judge Méndez-Miró misstates the language of the Operating Agreement, and

the actions of the Majority of Members. The Order states:

"The Court agrees with Counsel Abesada that "Plaintiffs' entire defense of the Written Consent hinges on an incorrect reading of Section 3.2," which does not authorize the members to take actions <u>explicitly reserved</u> for the Board of Managers but instead, outlines particular circumstances in which the majority members may act by Member Resolution. Namely when "any protective provisions [is] in favor of the holders of the Series A preferred Units[.]" (Docket No. 751-2 at 28). Such a situation is not present here." (Emphasis added).

The owners of the Companies have never pretended "to take actions explicitly reserved for the Board of Managers." Appointing counsel is not even mentioned, much less "explicitly reserved" for the Board of Managers in the Operating Agreement.

Because the language as to the Board of Manager's power is critical to the interpretation of the Operating Agreement in this regard, we reproduce it in full below:

**Section 6.2  Management by the Board of Managers**. Except as otherwise expressly required under this Agreement (including, without limitation, section 4.2(j)) the Board of Managers shall have the power to do any and all acts necessary, convenient or incidental to or for the furtherance of the purposes herein, including exercising all powers, statutory or otherwise.  Among those powers are:

(a)      appoint one or more individuals to hold offices and carry the day to day activities of the Company (the "**Officers**"), and such Officers of the Company shall consist of such officers as may be deemed necessary or desirable by the Board of Managers, and shall have such title, authority, and duties as the Board of Managers may delegate to him or her;

(b)      make from the Company assets any and all expenditures that the Board of Managers may deem necessary or desirable for the conduct of the Company and the carrying out of the Company's obligations and responsibilities under this Agreement to the extent permissible under any other agreements (including mortgages) to which the Company is a party;

(c)      take such steps as necessary to fulfill the determination of the Members to declare and make distributions of capital or income, in cash or property to Members;

(d)      draft such documents at the request of the Members to admit additional Persons as Members, including substituted Members as provided herein;

(e)      purchase, at the expense of the Company, liability and other insurance to protect the Company and the Company's assets and Business;

(f)      invest the Company's assets in Company and savings and loan association savings accounts, commercial paper, government securities, certificates of deposit, Company's acceptances, other short term interest bearing obligations and any other

investments in the sole and absolute discretion of the Board of Managers;

(g)     maintain, at the expense of the Company, adequate records and accounts of all operations and expenditures and furnish the Members with annual statements of accounts as of the end of each Company Fiscal Year, together with tax reporting information;

(h)     subject to Section 6.3, make, refrain from making, or revoke such elections under the tax laws of the Commonwealth of Puerto Rico, the United States, the several States and other relevant jurisdictions as to the treatment of items of Company income, gain, loss, deduction, and credit and as to all other relevant matters;

(i)     (h)(i)   change the classification of the Company for Puerto Rico or federal income tax purpose;

(j)     enter into any leases for property, real or personal. in the ordinary course of the Company's Business;

(k)     make any purchases for, on behalf of, or in the name of, the Company in the ordinary course of the Company's Business;

(l)     establish and maintain reserves, in such amount as the Board of Managers determine appropriate, in Board of Managers' reasonable discretion under the then existing circumstances; and

(m)     take any and all other action permitted by law and that is reasonably related to Company purposes.

**Section 6.3          Matters Requiring Series A Managers' Approval.**

Notwithstanding anything provided to the contrary in this Agreement, the Company will not, without the express and affirmative approval of both Series A Managers:

(a)      approve the annual budget of the Company for a particular fiscal year;

(b)     make any loan or advance to, or own any securities of, any subsidiary or other corporation, limited liability company, partnership, or other entity in excess of one hundred and fifty thousand dollars ($150,000);

(c)     guarantee any indebtedness except for trade accounts of the Company or any subsidiary arising in the ordinary course of business;[1]

(d)     make any investment inconsistent with any investment policy approved by the Board of Managers;

(e)      incur any aggregate indebtedness in excess of one hundred and fifty thousand dollars ($150,000) that is not already included in a budget approved by the Board of Managers, other than trade credit incurred in the ordinary course of business;

(f)     hire, fire, or change the compensation of the executive officers;

(g)     enter new lines of business outside the landfill gas industry, reject or refrain from undertaking any project or opportunity within or related to the Business, or exit the current line of business within the landfill gas industry;

(h)     sell, assign, license, pledge or encumber material technology or intellectual property, other than licenses granted in the ordinary course of business;

---

[1] There's a typographical error in the Operating Agreement in that it has two subsections (b). We ask the Court to note that we have corrected that error in this citation and have continued through the alphabet.

(i)      enter into any corporate strategic relationship involving the payment contribution or assignment by the Company or to the Company of assets greater than one hundred fifty thousand dollars ($150,000);

(j)      make any loan or advance to any person, including, any employee or director, except advances and similar expenditures in the ordinary course of business or under the terms of an employee equity or option plan approved by the Board of Managers;

(k)      enter into, or be a party to any transaction with any officer, director or employee of the Company or any "associate" (as defined in Section 12b-2 of the Securities Exchange Act of 1934, as amended) of any such person;

(l)      the selection of independent auditors of the Company, outside of: (a) one of the big four accounting firms; or (b) top ten (10) global accounting firms registered with the Public Company Accounting Oversight Board (excluding BDO or any of its affiliates); and

(m)      address any real or potential conflict of interest matter, including the hiring, firing or otherwise entering into or be a party to, or permit any subsidiary to hire, fire or otherwise enter into or be a party to, any transaction with any Family Member or Affiliate of any Initial Member of the Company or its subsidiaries. All real or potential conflict of interest shall be addressed in accordance with the terms of the Board of Managers' Conflicts of Interest Policy.

Nowhere therein are the words "attorney" or "counsel" even mentioned. Indeed, the only time the Operating Agreement uses the word "attorney" is to authorize an attorney in fact to transfer ownership units and to provide that Board observers should leave Board meetings when the Board of Managers is receiving advice of counsel so that the attorney-client privilege is maintained.[2]

Judge Méndez-Miró's opinion also states that the Plaintiffs *have* the right to act and "recognizes that certain limited rights may be specifically reserved to the members elsewhere in the Operating Agreement". She states, this is limited "except as otherwise expressly required under this Agreement or the Act.", and in the very "particular circumstances in which the majority members may act by Member Resolution" that the Majority of Members now face and "to the extent those rights are clearly stated.", as they are in the Operating Agreement in Section 3.2. She then concludes:

Further, Plaintiffs also mischaracterize the exception language in Section 6.1. The provision they cite merely states that the Board of Managers shall manage the company "except as otherwise expressly required under this Agreement or the Act." The

---

[2] In the meeting minutes where Atty. Abesada seeks to assert attorney client privilege, the Board observers failed to leave the meeting, as the Operating Agreement required.

Court agrees that this clause does not carve out the broad managerial authority for the members, but rather, it "recognizes that certain limited rights may be specifically reserved to the members elsewhere in the Operating Agreement (such as in section 4.2(j) regarding consent rights over particular transactions, amendments, or actions) and only to the extent those rights are clearly stated." (Docket No. 769 at 4).

Plaintiffs respectfully point out the erroneous interpretation in Judge Méndez-Miró's opinion in the conclusion of the order, which Attorney Abesada presents in his motion:

> Because Plaintiffs' Counsel has not presented a proper Written Consent from the GFC Board of Managers, as required by the Operating Agreement, nor do majority of Members in GFC have the authority to amend the Operating Agreement without the majority approval of the Series A Preferred interest holders, the *Written Consent* presented with the *Motion to Appear* cannot be considered proper informed consent for Plaintiffs' Counsel to simultaneously represent the Companies in this litigation. <u>See</u> Exhibit 1, ECF No. 800 at 19.

Plaintiffs have properly presented a Written Consent under 3.2 as the Majority of Members. There is no requirement for Written Consent to come from the Board of Managers, in fact the Operating Agreement at 3.2 specifically grants this right to the Majority of Members. The Majority of Members are not seeking to amend the Operating Agreement, simply to vindicate their rights under the Operating Agreement. That vindication is necessary because the members of the Board of Managers have violated their fiduciary duties by entering into an Asset Acquisition Agreement that benefits only the members who vote for it and liquidates the Companies without the unanimous consent of the members.[3] It is that Asset Acquisition Agreement that Atty. Abesada argues "judicially estops" the undersigned from including the Companies in this litigation, even though this litigation is the only asset the Companies have. As of January 31, 2025, the Board of Managers had exactly nothing to manage because the Board of Managers had sold all of the Companies' other assets to line their own pockets.

WHEREFORE, the appearing Plaintiffs respectfully request the Honorable Court to take notice of their above response.

---

[3] Indeed, the Operating Agreement at Section 6.4(c) forbids the Board of Managers from liquidating the company with the written consent of the Members.

**RESPECTFULLY SUBMITTED**, in San Juan, Puerto Rico, this 13th day of August 2025.

/s/ Jane A. Becker Whitaker
JANE A. BECKER WHITAKER
USDC No. 205110
P.O. Box 9023914
Urb. Baldrich, San Juan, PR 00902-3914
Tel: (787) 585-3824
Email: janebeckerwhitaker@gmail.com

/s/ Jean Paul Vissepó Garriga
JEAN PAUL VISSEPÓ GARRIGA
USDC No. 221504
P.O. Box 367116
Urb. Baldrich, San Juan, PR 00936-7116
Tel: (787) 633-9601
Email: jp@vissepolaw.com

/s/ Luis E. Miñana
LUIS E. MIÑANA, ESQ.
USDC-PR No. 225608
ESPADA, MIÑANA, & PEDROSA LAW OFFICES, PSC
123 Calle Manuel Domenech Altos
Urb. Baldrich, San Juan, PR 00918
Email: minanalaw@yahoo.com
Tel: (787) 758-1999

**CERTIFICATE OF SERVICE**

I hereby certify that on this date, we have presented the foregoing to the Clerk of the Court for filing and uploading to the CM/ECF system, which will notify all counsel of record.

/s/ Jane A. Becker Whitaker
JANE A. BECKER WHITAKER