**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO**

---

GREGORY BOYD and JONATHAN LASSERS, on their behalf and on behalf of GFC Holdings, LLC and Biomass Green Fuels, LLC, et al.,  Civil No. 3:24-cv-01569 (PAD)

       Plaintiffs,

        vs.

BANCO POPULAR DE PUERTO RICO,
       Defendants.

---

**PLAINTIFFS' SUR-REPLY TO DEFENDANT BANCO POPULAR DE PUERTO RICO'S REPLY TO OPPOSITION TO MOTION FOR JOINDER [Docket No. 95]**

**TO THE HONORABLE COURT**:

**COME NOW** Plaintiffs Gregory Boyd, Jonathan Lassers, GFC Holdings, LLC ("GFC"), and Biomass Green Fuels, LLC ("BGF") (collectively, the "Companies" or "Plaintiffs"), through undersigned counsel, and respectfully submit this sur-reply to address BPPR's erroneous assertions and reveal the complete scope of misconduct underlying this case.

**I. INTRODUCTION**

Banco Popular de Puerto Rico ("BPPR")'s Reply at Docket No. 95 exemplifies the very misconduct Plaintiffs seek to address in this lawsuit. Rather than addressing their Bank Holding Company Act ("BHCA") violations under 12 U.S.C. § 1972, BPPR has deployed a strategy of misdirection, procedural gamesmanship, and outright misrepresentation of material facts. This approach mirrors BPPR's documented 25-year pattern of regulatory violations, totaling over $100 million in fines and penalties. This figure does not include dozens of out-of-court settlements, or

their current scheme to use complex corporate structures and invalid assignments to hide improper conduct.

Most critically, BPPR's Reply fails to address the invalid assignment of their credit rights to Humacao RNG LLC, an entity owned by VRM-Penzini Capital LLC ("VRM-Penzini"), which holds Series A preferred units in GFC Holdings, LLC. This assignment to an ineligible affiliate of an owner of GFC Holdings violates both the express terms of the Credit Agreement and federal banking regulations, while underscoring the conflicts of interest that compromise the Companies' Board of Managers.

BPPR conditioned an Amendment to the $11.9 million credit facility on BGF's agreement to sell renewable liquefied natural gas ("RLNG") to BPPR on unfair terms, in direct violation of the BHCA. When combined with BPPR's pattern of regulatory violations and the Board's conflicts stemming from their approval of self-dealing transactions with VRM-Penzini affiliates, these facts demonstrate why Plaintiffs must act to protect the Companies' interests.

## II. BPPR'S PROCEDURAL OBJECTIONS FAIL TO REBUT SUBSTANTIVE VIOLATIONS

### A. The Opposition Addresses Ongoing Legal Issues, Not Moot Procedural Matters

BPPR argues that our Opposition is "moot" because their joinder motion was granted at Docket No. 70. . Plaintiffs do not complain about this Court's pause to the timing of the Answer to the Second Amended Complaint, our argument is directed to the validity of the undersigned's right to represent the Companies.

The order granting joinder was purely procedural and administrative—it did not rule on the substantive challenges we raise : (1) the standing and capacity of the Companies' owners to represent the Companies; (2) the scope of BHCA violations and their ongoing effects; and (3) the validity of the underlying debt given the assignment violations. Our Opposition provides compelling grounds for reconsideration, including newly clarified evidence of prejudice from BPPR's improper alignment with conflicted entities such as the VRM-Penzini-owned Humacao RNG LLC.

The grant of the joinder abated BPPR's response deadline to the Second Amended Complaint but did not moot substantive responses to the joined motions, which remain pending. Fed. R. Civ. P. 7(b) expressly contemplates responses to joined motions. The Opposition addresses ongoing issues of authorization,conflicts of interest, and BHCA claims that the Court must resolve.

**B. BPPR's "Multiplication of Proceedings" Claim Ignores Their Own Role in Creating Litigation Complexity**

BPPR accuses us of "needlessly multiply[ing] proceedings" by referencing related cases and BPPR's regulatory history. This accusation is both hypocritical and legally wrong. BPPR itself has created this complex web of litigation through its pattern of misconduct spanning multiple federal agencies over two decades. The interconnected nature of these cases results from BPPR's consistent pattern of regulatory violations and their role in the fraudulent schemes that generated

the parallel litigation. For example, BPPR sued to foreclose on BGF, causing Plaintiffs to file a compulsory counterclaim for predatory lending practices [1]. BPPR and its executives were directly

involved in the fraudulent schemes that led to the parallel RICO litigation in Civil No. 22-1190. These connections are not accidental—they reflect BPPR's systematic approach to exploiting borrowers through coercive lending practices.

Courts routinely consider a defendant's history of similar misconduct when evaluating current claims. BPPR's 25-year pattern of regulatory violations, documented in detail below, is directly relevant to the credibility of their defenses and the likelihood of the current violations. Rather than address this damaging history, BPPR attempts to fragment the litigation so that no court sees the full pattern of their misconduct.

BPPR's characterization of our Opposition as an improper "second bite at the apple" in opposing the Companies' underlying motions at Docket Nos. 62-64 fundamentally misrepresents the procedural posture and purpose of our filing. Under Fed. R. Civ. P. 7(b), parties are entitled to respond to any motion seeking relief from the Court, and BPPR's Motion for Joinder at Docket No. 69 constitutes a distinct motion that introduces new dynamics to the litigation—namely, BPPR's alignment with the Board of Managers' positions and its request to hold its response to the Second Amended Complaint in abeyance pending resolution of those motions. Our Opposition at Docket No. 82 directly addresses these new elements, including the prejudice arising from BPPR's joinder in light of its own regulatory history; the invalid assignment of credit rights; and the Board's

---

[1] As we have noted, Banco Popular sought dismissal of Tito Trinidad's anti-tying case in part based on the compulsory counterclaim argument. 21-1529 (ADC-BJM) Docket 17 at 10.

conflicts of interest, which BPPR now seeks to protect, rather than merely rehashing our prior responses at Docket Nos. 76-77 to the Companies' motions. Courts routinely permit such responses to joinder motions without deeming them redundant, as they serve to clarify the implications of a new party's involvement. The opposition was not an sur-reply or unauthorized additional brief; it is a targeted response to BPPR's independent request for relief.

Furthermore, BPPR's accusation ignores that our arguments highlight interconnected but distinct issues across related proceedings, without vexatiously multiplying litigation. The federal RICO case (Civil No. 22-1190) involves different causes of action (RICO violations, fraud, and aiding/abetting) and defendants (including Olmar López-Vidal and others not parties here), focusing on theft of federal funds and securities fraud rather than BHCA anti-tying claims. The counterclaim in the San Juan Superior Court was a defensive response to BPPR's collection action against GFC/BGF, Gregory Boyd, Olmar López-Vidal, and Olmar López-Gómez, incorporating anti-tying allegations as part of broader predatory lending claims in that state-court context. In contrast, this federal anti-tying case under the BHCA does not include the Lopezes as defendants and centers exclusively on BPPR's alleged conditioning of credit on unfair RLNG terms, with unique evidence like the invalid assignment to Humacao RNG LLC. These distinctions underscore that our Opposition advances the resolution of this specific BHCA claim, rather than duplicating efforts across fora. BPPR's own role in initiating parallel litigation (e.g., the collection action) is the root cause of any perceived complexity, not our procedurally proper response.

## III. BPPR'S CHARACTERIZATION OF EVIDENCE AS "IRRELEVANT" CONTRADICTS ESTABLISHED LAW

**A. BPPR's Regulatory History Directly Supports Our BHCA Claims**

BPPR dismisses references to their $21.6 million fine for Bank Secrecy Act violations as "inflammatory rhetoric" and claims events from "twenty years ago" are irrelevant. This argument fails on multiple legal and factual levels. This case was referenced in response to criticism over the settlements with the Lopezes. Just as in the case in 2003, the settlement with the Lopezes resulted in a trove of documents to strengthen our case and the federal prosecutor's case in 2003 against BPPR.

The documented facts show that in 2003, BPPR paid $21.6 million—then the largest fine of its kind—for systematically failing to report suspicious activities that aided drug money laundering. BPPR executives ignored a previous written agreement for Bank Secrecy Compliance in 2000, including $20 million in cash carried in gym bags by individuals later convicted of drug trafficking. This was not an isolated incident but part of a documented pattern spanning 25 years and involving fines and penalties of over $100 million, not including confidential settlements. (see Table 1 below). The CEO of the bank in 2003, during these violations, was Richard Carrion. Today Carrion is Chairman of the Board. The case is relevant when you examine the whole history and the executives involved.

Under the Bank Holding Company Act, courts examine whether challenged practices are "unusual" in normal banking when applying the test established in *Kenty v. Bank One*, 92 F.3d 384, 394 (6th Cir. 1996). The *Kenty* test requires proof of: (1) an anticompetitive tie, (2) unusual banking practice, and (3) an actual tie between services. A bank with BPPR's extensive history of regulatory violations cannot credibly claim that these tying arrangements represent standard banking practice.

The following table summarizes BPPR's history, demonstrating a persistent pattern of disregard and violations spanning over 25 years, totaling  million in known fines, not including confidential settlements, with systemic weaknesses in compliance, securities, wage/labor, banking/consumer protection, and employee misconduct:

**Table 1**

| Case Name (Date) | Summary of Wrongdoings | Fine Amount |
|---|---|---|
| Written Agreement for BSA Compliance (2000) | Failure to comply with Bank Secrecy Act antimoney laundering requirements, leading to a written agreement requiring enhanced programs, improved procedures, and regular monitoring. Found compliant in 2001, terminated in 2003 as part of DOJ settlement. | $0 |
| United States v. Banco Popular de Puerto Rico (2003) | Despite being under a Written Agreement for the Bank Secrecy Act from 2000, Popular continued to have anti-money-laundering deficiencies: failing to file suspicious activity reports as required by the Bank Secrecy Act and was also fined $20 million by FinCEN. Popular failed to detect obvious money laundering red flags including: $20 million in cash carried in gym bags by Roberto Ferrario; Systematic structuring by Jairo Vallejo to avoid reporting thresholds; Complete breakdown of compliance systems over 5+ years. Involved individuals: Richard Carrión (CEO; commented on the fine and bank's cooperation; led during deficiencies). | $21,600,000 plus $20,000,000 FINCEN |
| Mortgage Loan Consultants Overtime Class Action v. E-Loan, Inc. (2007) | Wage and hour violation: failure to pay overtime wages to mortgage loan consultants. | $13,600,000 |

*Supervisors and*
*Managers Overtime*     Wage and hour violation: misclassification of
*Class Action v. Banco* supervisors and managers, denying them     $1,050,000     *Popular*
*North*   overtime pay.
*America* (2009)

*Securities Class Action Lawsuit Against*

*Popular, Inc.* (2009)

Violations of the Securities Exchange Act of
1934: failed to disclose material adverse facts
including overstated deferred tax assets,
increasing loan losses in Puerto Rico and U.S.
construction sectors, deteriorating quality of
mortgage-related loans, higher percentage of
non-performing loans, declining new loan
originations, and impending liquidity concerns
and dividend cuts. Involved individuals:
Richard Carrión (CEO during class period;

See Hoff below

| Case Name (Date) | Summary of Wrongdoings | Fine Amount |
|---|---|---|
| | named as defendant in securities fraud allegations). | |
| *Hoff v. Popular, Inc. et al.* (2011) | Securities fraud: senior management knowingly failed to record a valuation allowance on deferred tax assets, concealing the company's true financial condition from investors. | $37,500,000 |
| | Involved individuals: Richard Carrión (named as defendant as CEO; securities fraud for concealing financial condition). | |
| participants to invest in *In re Popular, Inc.* ERISA Litigation (2011) as defendant as CEO; ERISA breach for allowing risky stock investments). | ERISA fiduciary breach: allowing plan company stock despite known financial issues and misrepresentations. Involved individuals: Richard Carrión (named | $8,200,000 |
| *U.S. Department of Labor Wage and Hour Division Investigations of Popular Mortgage, Inc.* (2011) | Wage and hour violations: failure to comply with Fair Labor Standards Act requirements, resulting in back wages owed. | $276,498 |
| *Popular Securities, Inc. - Puerto Rico Bond Fund Crisis* (2013-2014) | Named as co-defendant alongside UBS in multiple class action lawsuits related to the Puerto Rico bond fund crisis. Co-managed closed-end bond funds that suffered massive losses when the Puerto Rico bond market collapsed. These funds were allegedly misrepresented as safe "fixed income" investments when they were actually highly leveraged and concentrated in Puerto Rico municipal bonds. More than 2,000 arbitration cases were filed against UBS and other broker-dealers including Popular Securities, though the specific settlement amounts for Popular Securities are confidential. Involved individuals: Richard Carrión (CEO during crisis); Ignacio Alvarez (Chief Legal Officer during crisis). | $226M industry, including $162.5M settlements). Popular's share undisclosed; |
| *Wage and Hour* | | |

| Case Name (Date) | Summary of Wrongdoings | Fine Amount |
|---|---|---|
| *Settlement with Banco Popular* (2016) | Wage and hour violation: unspecified failure to pay proper wages. | $50,243 |
| *Popular Securities, LLC SEC 7 Administrative Proceeding* (2019) | Breaches of fiduciary duty and inadequate disclosures: recommending higher-cost mutual fund share classes to receive 12b-1 fees without disclosing conflicts of interest. | $544,57 |
| *Consent Prohibition Order against Ileana Acevedo Díaz* (2021) | Unauthorized transactions in customer accounts; former employee permanently prohibited from banking industry. | N/A |
| *Tito Trinidad vs. Popular* (2021-2023) | Trinidad sued in 2014 for over $63M losses in PR bonds due to alleged fraud/unsuitable investments by advisor José Ramos; won $6.88M in 2021 FINRA arbitration; filed federal anti-tying lawsuit in 2021 seeking $175M+, amended to $279M+; settled confidentially in 2023. Anti-tying allegations: the bank allegedly tied banking services to investment products illegally, causing significant financial losses to the plaintiffs. It was settled out of court by Sullivan and Cromwell. Involved individuals: Richard Carrión (former CEO/advisor; met with plaintiffs, failed to stop tying, aided conspiracy); Ignacio Alvarez (CEO since 2017; authorized ongoing tying, benefited from law firm payments; mentioned in complaint but not defendants). | Confidential Settlement + $6,880,000 (2021 arbitration) |

| Case Name (Date) | Summary of Wrongdoings | Fine Amount |
|---|---|---|
| *OFAC Settlement with Banco Popular de Puerto Rico* (2022) | Economic sanctions violation: processing transactions in apparent violation of Venezuela Sanctions Regulations. | $255,938 |
| *GFC Holdings LLC, Biomass Green Fuels, LLC, Gregory Boyd et al. v. Olmar López-Vidal et al.* (2023) | RICO violations: fraud and criminal activity involving theft of federal funds for biorefinery construction, diversion of New Market Tax Credit funds to personal use and foreign projects, false loan drawdowns, aiding in securities fraud, and breaches of loan agreements. Banco Popular aided and abetted by disbursing funds despite known fraud, falsifying inspections, and extending loans in default. Involved individuals: Javier Ferrer Fernández (Executive Vice President and Chief Operating Officer; informed of fraud but failed to act, allowing continued lending); Ignacio Alvarez (CEO; created promotional video touting control of renewable natural gas without disclosing fraud). | To Be Determined |
| *Federal Reserve Board Penalty against Popular Bank* (2023) | Banking violation: unsafe or unsound practices by processing Paycheck Protection Program loans despite fraud red flags, without adequate controls. | $2,300,000 |

| Case Name (Date) | Summary of Wrongdoings | Fine Amount |
|---|---|---|
| *Gregory Boyd, Jonathan Lassers v. Banco Popular de Puerto Rico* (2024) | Bank Holding Company Act anti-tying violation: tying loan forbearance on defaulted loans to a below-market Renewable Liquefied Natural Gas Off Take Agreement, including millions in environmental and tax credits, not standard banking practice. Involved individuals: Ignacio Alvarez (CEO; involved in promotional efforts highlighting bank's control over renewable natural gas benefits from the tying arrangement). | To Be Determined |
| *Lipsett v. Popular Bank* (2024) | Consumer protection violation: improper practices in assessing overdraft fees. | $1,500,000 |

BPPR's pattern shows continuity across different areas of misconduct: anti-money laundering violations ($41.9 million), securities fraud (over $50 million), and multiple instances involving executives like Richard Carrión and Ignacio Alvarez who appear in multiple cases, including the 2021 Trinidad anti-tying settlement and the current 2023 RICO allegations for fraud aiding and 2024 Anti-tying. This history is directly relevant to BPPR's credibility regarding their current BHCA defense and demonstrates its Board and legal conflicts that enable such tying arrangements.

**B. The Assignment to VRM-Penzini/Humacao RNG LLC Violates Federal Banking Law**

BPPR incorrectly claims Humacao RNG is a non-party to the Asset Acquisition Agreement. On page 32 of the Asset Acquisition Agreement see Exhibit 1, it states that legal notices should be sent to Carlos Penzini, whose email address is Carlos@vrmpenzini.com.

8.5    Notices. All notices, demands and other communications pertaining to this Agreement ("Notices") will be in writing addressed as follows:

If to the Buyer:        Carlos Penzini
                        PO Box 20868
                        San Juan. PR 00928
                        Email: carlos@VRMpenzini.com

On page 37 of the Asset Acquisition Agreement, Carlos Penzini, signed as a manager of Humacao RNG. Humacao RNG is majority controlled by VRM-Penzini Fund. *See* Exhibits 3-4

**BUYER:**

**HUMACAO RNG, LLC**

By:_____
Name: Carlos Penzini
Title: Manager

This assignment violates both the express terms of the Credit Agreement and the BHCA's prohibition on anti-competitive tying arrangements under 12 U.S.C. § 1972(1). The assignment to an affiliate creates the exact type of conflict and continued control that federal banking regulations prohibit. BPPR claims this assignment was valid, but both the documentary evidence and federal banking regulations prove otherwise.

The Credit Agreement defines "eligible assignee" with specific precision. According to the contract at Docket No. 48-4 at page 12, eligible assignees must be: (1) commercial banks, national banks, or savings institutions with Tier 1 capital exceeding $100,000,000; (2) affiliates of lenders

that are financial institutions meeting specific capital requirements; (3) funds; or (4) persons approved by the Administrative Agent. The contract expressly prohibits assignment to "any

Affiliate of the Borrower." *See* Exhibit 1 at 10 in Eligible Assignee

VRM-Penzini Capital is a Puerto Rico private equity firm. This entity lacks: (1) the Tier 1 capital requirements mandated for banks under 12 C.F.R. § 225; (2) any banking charter or regulatory status; (3) federal banking regulatory oversight; and (4) deposit-taking authority.

Under Basel banking regulations, "Tier 1 capital is the core measure of a bank's financial strength from a regulator's point of view." See 12 C.F.R. § 3.20. The U.S. has adopted and enforces Basel standards (particularly Basel III) via its own capital adequacy rules, such as those under the Federal Reserve's Regulation Q (12 CFR Part 217). BPPR is explicitly subject to these U.S. Basel III requirements, including minimum capital ratios, risk-weighted asset calculations, and disclosure obligations. VRM-Penzini cannot meet this fundamental requirement because it is not a regulated financial institution.

More critically, VRM-Penzini holds Series A preferred units in GFC Holdings, LLC, making it an affiliate of the borrower under both the Credit Agreement and federal banking regulations. Under the Bank Holding Company Act, "affiliate" means "any company that controls, is controlled by, or is under common control with another company." 12 U.S.C. § 1841(k). The assignment to Humacao RNG LLC (VRM-Penzini, a Series A unitholder in GFC Holdings owns 80% of Humacao RNG) violates the express prohibition against assignment to borrower affiliates and creates precisely the conflict of interest the restriction was designed to prevent.

BPPR's attempt to rely on the "portfolio exception" language fails under basic principles of contract interpretation. The doctrine of ejusdem generis, recognized by the Supreme Court in *Epic Systems Corp. v. Lewis*, 138 S. Ct. 1612, 1625 (2018), and the First Circuit in *Maine Forest Products Council v. Cormier*, 51 F.4th 1, 10 (1st Cir. 2022), limits general language to entities similar to those specifically enumerated. Even if the doctrine of ejusdem generis were not controlling, the prohibition on transferring the loan to an affiliate of the borrower is an independent prohibition.

**C. The Asset Acquisition Agreement and Board Conflicts Are Central to Our Claims**

BPPR dismisses our allegations about the Asset Acquisition Agreement with Humacao RNG LLC and the Board's conflicts of interest as "irrelevant." This characterization ignores both the legal standards for BHCA claims and the documentary evidence establishing these conflicts. The Asset Acquisition Agreement at Docket No. 52-5 reveals a classic insider transaction where VRM-Penzini: (1) illegally acquired BPPR's debt position as a Series A unitholder; (2) obtained control over the asset acquisition process using the local court's judgment against BGF; and (3) positioned itself to benefit from both debt collection and asset acquisition. This structure violates fundamental principles of arm's length dealing required in financial transactions and demonstrates the Board's breach of fiduciary duties in approving self-dealing transactions. The compromised Board of Manager's rejection of the better Cambrian Energy/Greenview letter of intent at Docket No. 49-9, directly favored BPPR by preserving their creditor leverage rather than maximizing value for the Companies. Cambrian/Greenview proposed acquiring 60% of GFC Holdings, and providing capital and expertise to fix the biorefinery, thus keeping the company operating for all its current owners. This decision, made while VRM-Penzini held Series A units and was

negotiating the Asset Acquisition Agreement, demonstrates the Board's compromised decisionmaking process.

These conflicts are governed by Puerto Rico LLC Act Section 3959, which establishes default fiduciary duties of loyalty and care for members and managers that cannot be eliminated for acts involving bad faith or intentional misconduct, as well as Sections 3563-3565 of the General Corporations Act (applicable by analogy to LLCs under Puerto Rico law), which require full disclosure, abstention from voting on conflicted matters, and approval by disinterested parties for interested transactions, with the business judgment rule rebuttable upon evidence of conflicts or negligence. The Delaware Chancery Court's decision in *Auriga Capital Corp. v. Gatz Properties, LLC,* 40 A.3d 839 (Del. Ch. 2012), *aff'd in part sub. nom*, *Gatz Properties, LLC v. Auriga Capital Corp.*, 59 A.3d 1206 (Del. 2012), directly supports our position, finding that a manager's rejection of a superior third-party offer (similar to the Cambrian proposal here) and orchestration of a sham auction to acquire assets at a below-market price (analogous to the $4.4 million sale of assets valued at hundreds of millions to VRM-Penzini) constituted breaches of the contractual equivalent of the duty of loyalty, warranting damages, fee-shifting for bad faith, and denial of exculpation.

Although the Delaware Supreme Court affirmed on contractual grounds and deemed the default fiduciary duty discussion dicta, the 2013 amendment to Del. Code Ann. tit. 6, § 18-1104 codified default fiduciary duties of loyalty and care, confirming that such breaches can lead to judicial intervention, as in *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 658-59 (Del. Ch. 2012) (holding that bad-faith self-dealing overrides exculpatory provisions). Similarly, in *Allison v. Eriksson*, 479 Mass. 626, 98 N.E.3d 143 (2018), the Massachusetts Supreme Judicial Court held that a freeze-out merger breaching fiduciary duties allowed courts to fashion equitable remedies beyond statutory

appraisal rights, including amending the LLC operating agreement to restore minority protections, prevent further dilution, and adjust ownership interests—remedies directly applicable here to override the Board's conflicted approval of the Asset Acquisition and preserve the Companies' claims against BPPR.

At this pre-trial stage, we need only plead plausible breaches to survive dismissal; proof of damages or specific remedies, as awarded post-trial in *Gatz* and *Allison*, comes later. It is precisely the Board of Managers' illegal agreement to sell all of the Companies' assets, with each Board member benefitting individually from that sale, that motivates the Board of Managers to seek to strike the Amended Complaint. The Asset Acquisition prohibits the Companies from suing Banco Popular, even or especially for the very conduct that caused the Companies' demise. Far from being irrelevant, the notice of dismissal of the Second Amended Complaint is the linchpin of the corrupt deal among Banco Popular, VRM Penzini via Humacao RNG, and the Board of Managers of GFC Holdings and Biomass Green Fuels. Banco Popular ends this litigation; Humacao RNG gets a highly lucrative business; and the members of the Board of Managers and Olmar Lopez Gomez each get thirty pieces of silver.

**D. The Performance Bond Issues Demonstrate BPPR's Pattern of Selective Enforcement**

BPPR's dismissal of our allegations about their failure to enforce performance bond requirements as "irrelevant" and "already before other Courts" purposely misses the legal significance of these facts for our BHCA claims. The Credit Agreement at Section 3.1(h) required a performance bond covering 100% of the project direct costs, which should have been approximately $18.7 million. BPPR accepted and put in place only a $5 million bond, leaving BGF, its partners and guarantors exposed to significant risk. BPPR then used this exposure as additional leverage in their tying

arrangements, creating precisely the type of discriminatory treatment that characterizes illegal tying under the BHCA.

When banks selectively enforce contract terms based on borrowers' willingness to accept tied products, they violate 12 U.S.C. § 1972. This selective enforcement pattern is consistent with BPPR's documented history of regulatory violations and their current tying scheme. These issues appearing in parallel proceedings (Civil No. 22-1190 Docket 48-16 ¶¶ 144-149; Boyd counterclaim Docket 52-84 ¶¶ 229-233) demonstrates a pattern of misconduct, not multiplication of proceedings.

## IV. BPPR'S CORPORATE GOVERNANCE ARGUMENTS MISSTATE THE LAW

### A. Delaware and Puerto Rico Law Support Member Override of Conflicted Decisions

BPPR attempts to distinguish the Delaware Supreme Court's decision in *Gatz* by claiming it involved internal company disputes and post-trial findings, but those are distinctions without a difference. Here, there is an internal company dispute. The members of the Board of Managers hope to keep their ill-gotten gains. The procedural distinction between this case and *Gatz* favors Plaintiffs herein. Plaintiffs only need make a plausible claim; Auriga had proven its claim.

*Gatz* established that when LLC managers have conflicts of interest and engage in selfdealing, their authority should be revoked. The Delaware Supreme Court held that the LLC Agreement can impose "a contractual equivalent of the entire fairness equitable standard of conduct and judicial review." 59 A.3d at 1218. The 2013 amendments to 6 Del. C. § 18-1104 confirmed that "the rules of law and equity, including the rules of law and equity relating to fiduciary duties" apply unless the LLC agreement provides otherwise.

The Companies' Board of Managers has documented conflicts stemming from: (1) their alignment with BPPR's interests rather than the Companies' interests in the ongoing litigation; 2) their approval of the Asset Acquisition Agreement that benefits only themselves and VRM-Penzini as both Preferred unitholders and the acquiring entity; and (3) their rejection of superior offers like the Cambrian/Greenview proposal that would have resolved the Companies' financial distress.

Under Puerto Rico law, member consent is valid under Section 3.2 of the Operating Agreement and P.R. Laws Ann. tit. 14, § 3975, which permits majority member actions. Conflicts forfeit Board authority under P.R. Laws Ann. tit. 14, § 3963, which establishes loyalty and care duties that are non-waivable for bad faith and self-dealing. The corporate law provisions in P.R. Laws Ann. tit. 14, §§ 3563-3565 require abstention, disclosure, and approval for conflicted transactions, with business judgment protection being rebuttable by evidence of negligence or conflicts under § 3564.

## B. The Parallel Court Order Supports Our Position on Conflicts

The recent order in Civil No. 22-1190 (Docket 94-1/August 12, 2025) actually supports our position regarding the Board's conflicts, even though it denied the specific motion filed there. The court's order affirmed that conflicts exist while denying the particular procedural remedy sought, which supports the futility exception under P.R. Laws Ann. tit. 14, § 4003 that allows member action when board action would be futile due to conflicts. BPPR's distinction that this case involves "no internal dispute" fails because our Second Amended Complaint asserts direct claims on behalf of the Companies amid Board conflicts that enable the BHCA violations. The conflicts are not separate from the BHCA claims—they are integral to how BPPR was able to implement and maintain their tying scheme.

**V. THE ASSIGNMENT COMPOUNDS THE ORIGINAL BHCA VIOLATION**

By assigning the credit agreement to VRM-Penzini/Humacao RNG LLC, BPPR has created multiple additional legal violations that compound their original BHCA misconduct:

1.      **Conversion to Unregulated Enforcement**: The assignment transferred control from a regulated banking relationship to an unregulated collection matter, removing the transaction from federal banking oversight while maintaining the coercive effect of the original tying arrangement.

2.      **Enabled Continued Market Manipulation**: Banco Popular can now enforce their RLNG supply terms directly throughVRM-Penzini/Humacao, perpetuating the market distortion and manipulation that the BHCA was designed to prevent.

3.      **Circumvented Regulatory Framework**: By moving enforcement outside the banking regulatory framework while maintaining the essential character of the tying arrangement, BPPR has attempted to insulate its misconduct from regulatory and judicial scrutiny. This Court should not grant its imprimatur to this evasion of federal law.

## VI. BPPR'S ATTACKS ON COUNSEL AND EVIDENCE ARE UNFOUNDED

### A. The Disqualification Request Lacks Legal Merit

BPPR incorporates arguments seeking to disqualify counsel while providing no substantive basis for such an extreme remedy. Disqualification is a drastic measure that courts impose only when necessary to protect the integrity of proceedings and only when actual prejudice or clear conflict exists that cannot be resolved through other means.

Under the standard established in *Richmond Hilton Associates v. City of Richmond*, 690 F.2d 1086, 1089 (4th Cir. 1982), courts are reluctant to grant disqualification absent clear prejudice. Cases like *Cora v. Amgen*, No. 21-1626 (D.P.R. Aug. 1, 2024), and *Estrada v. Cabrera*, 632 F. Supp. 1174, 1175 (D.P.R. 1986), emphasize that disqualification requires actual harm, which BPPR has not demonstrated.

The conflicts BPPR alleges stem from the Board of Managers' own conflicted positions, and their actions with the bank, not from any conduct by our counsel. Under Model Rules of Professional Conduct Rule 1.13, these Board-driven conflicts do not create attorney conflicts requiring disqualification.

Indeed, the counsel chosen by the majority of the owners of the Companies have a confluence of interest with the Companies and the pursuit of this litigation. The Board of Managers' actions of entering into the Asset Acquisition Agreement have deprived the Companies of all their assets. This lawsuit seeks to recover those assets. The undersigned counsel are acting in the Companies' best interests. The only interest of the Board of Managers is to decimate the Companies to hide their actions.

Time and time again, the Board of Managers have cited to jurisprudence that states that the owners are to appoint the managers, who should be given full rein to manage. But that scenario is absent here, precisely because the Board of Managers have rigged the Operating Agreement so that the owners cannot obtain a majority of the Board of Managers. See Exhibit 5. Third amendment to the second amended and restated Operating Agreement S.6.1c . Thus, the Board of Managers have insulated themselves from scrutiny from the owners. This Court should not insulate them and at

the same time Banco Popular from liability for collaborating to violate the Bank Holding Companies Act.

## B. The Exhibits Are Relevant and Not Privileged

BPPR's challenges to our exhibits fail under established evidence law. The exhibits are relevant to our BHCA claims and not protected by attorney-client privilege under the standards established in *Upjohn*, 449 U.S. at 395-97, and *MIT*, 129 F.3d at 683-84.

BPPR has not demonstrated the prejudice required for Rule 12(f) motions to strike under *Sheffield v. City of Boston*, 319 F.R.D. 52, 54 (D. Mass. 2016). While the attorney-client privilege belongs to the corporate entity rather than individual managers under 1 McCormick on Evidence § 93, the Board's conflicts of interest forfeit their authority to assert privilege on behalf of the entity. Ironically a quick check of the Operating Agreement for the word "attorney" found only four mentions. Two for an attorney in fact for the transfer of units, and the other two reminding the Board of Managers that non managers should exit board meetings when attorneys were providing privileged advice to maintain the privilege. The minutes that the Board of Managers cite as privileged indicate that non-managers were present during the time when the attorneys were providing advice, thereby waiving the privilege.

## VII. CONCLUSION

BPPR's Reply exemplifies the very misconduct we seek to address in this lawsuit. The Board of Managers' Notice of Dismissal is part of its collaboration with the bank's violation of the BHCA. Banco Popular spent 18 pages trying to rebut a "moot" opposition. All the bank did was provide further evidence of its breach of the law. This conduct is consistent with BPPR's

documented 25-year history of regulatory violations and their pattern of using complex corporate structures to hide improper conduct.

The evidence shows that BPPR illegally tied banking services to unfavorable commercial arrangements in violation of federal law, then compounded these violations by assigning their credit rights to an ineligible affiliate in direct contravention of their own contract terms and federal banking regulations. This Court should reject the attempt to use a contract clause barring suit against the bank that the bank extracted from the Board of Managers through exclusive financial incentives.

The Opposition stands as a complete and accurate statement of the legal issues before this Court. BPPR's request to strike or disregard our Opposition is unwarranted and should be denied.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court:

1. DENY BPPR's requests to disregard or strike the Opposition;

2. FIND that the assignment of the credit agreement to VRMPenzini/Humacao RNG LLC violated the express terms of the Credit Agreement and federal banking regulations;

3. DECLARE that VRM-Penzini's status as a Unitholder creates prohibited conflicts of interest that void the assignment;

4. LIFT the abeyance on BPPR's answer deadline and require them to respond to the Second Amended Complaint forthwith;

5. GRANT the relief requested in the motions at Docket Nos. 62-64; and

6. AWARD such other relief as the Court deems just and proper.

Respectfully submitted,

In San Juan, Puerto Rico, this 18th day of August 2025.

/s/ Jane A. Becker Whitaker

**JANE A. BECKER WHITAKER**
USDC No. 205110
P.O. Box 9023914
San Juan, PR 00902-3914
Tel: (787) 585-3824
Email: janebeckerwhitaker@gmail.com

/s/ Jean Paul Vissepó Garriga

**JEAN PAUL VISSEPÓ GARRIGA**
USDC No. 221504
P.O. Box 367116
San Juan, PR 00936-7116
Tel: (787) 633-9601
Email: jp@vissepolaw.com

/s/ Luis E. Miñana

**LUIS E. MIÑANA, ESQ.**
USDC-PR No. 225608
ESPADA, MIÑANA, & PEDROSA LAW OFFICES, PSC
123 Calle Manuel Domenech Altos
Urb. Baldrich, San Juan, PR 00918
Email: minanalaw@yahoo.com
Tel: (787) 758-1999

---

**CERTIFICATE OF SERVICE**

We hereby certify that on this 18th day of August, 2025, we have presented the foregoing to the Clerk of the Court for filing and uploading to the CM/ECF system, which will notify all counsel of record.

/s/ Jane A. Becker Whitaker