# Exhibit 2

$11,869,250.00

## CREDIT AGREEMENT

By and Among

**BIOMASS GREEN FUELS LLC,**
as Borrower

**the LENDERS Party Hereto,**
as Lenders

and

**BANCO POPULAR DE PUERTO RICO,**
as Administrative Agent

# TABLE OF CONTENTS

Page

ARTICLE I    DEFINITIONS ...................................................................................................4

Section 1.1    Defined Terms ...................................................................................4
Section 1.2    Terms Generally................................................................................30
Section 1.3    Accounting Terms; GAAP................................................................30

ARTICLE II    AMOUNTS AND TERMS OF THE ADVANCES; PROJECT
BUDGET..........................................................................................................30

Section 2.1    Commitment, Amount and Purpose...................................................30
Section 2.2    Making the Advances .......................................................................31
Section 2.3    Repayment ........................................................................................34
Section 2.4    Interest..............................................................................................35
Section 2.5    Interest Rate Determination .............................................................36
Section 2.6    Increased Costs .................................................................................36
Section 2.7    Non-Excluded Taxes and Other Taxes .............................................37
Section 2.8    Sharing of Payments, etc..................................................................39
Section 2.9    Mandatory and Optional Prepayments..............................................39
Section 2.10    Fees .................................................................................................41
Section 2.11    Payments.........................................................................................43
Section 2.12    Authorized Representatives ............................................................41
Section 2.13    Change Orders ................................................................................42

ARTICLE III    CONDITIONS OF LENDING................................................................43

Section 3.1    Conditions Precedent to Effectiveness of this Agreement and to
Initial Borrowing.............................................................................43
Section 3.2    Further Conditions Precedent to Non-Revolving Facility Advances ........50
Section 3.3    Further Conditions Precedent to the Converted Loan Facility .................52
Section 3.4    Further Conditions Precedent to Each Borrowing.............................54
Section 3.5    Determination Under Article III .......................................................54

ARTICLE IV    REPRESENTATIONS AND WARRANTIES .......................................54

Section 4.1    Representations and Warranties of the Borrowers.............................54

ARTICLE V    COVENANTS OF THE BORROWERS ................................................64

Section 5.1    Affirmative Covenants......................................................................64
Section 5.2    Negative Covenants ..........................................................................76
Section 5.3    Financial Covenants..........................................................................82

ARTICLE VI    SPECIAL PROVISIONS AS TO COLLATERAL; INSURANCE,
CASUALTY AND CONDEMNATION; ACCOUNTS......................82

Section 6.1    Special Provisions as to Collateral....................................................82
Section 6.2    Insurance; Casualty and Condemnation............................................85
Section 6.3    Accounts ...........................................................................................93

**ARTICLE VII EVENTS OF DEFAULT** ........................................................................ 100

    Section 7.1    Events of Default .......................................................................... 100
    Section 7.2    Prepayments After Default ........................................................... 104
    Section 7.3    Foreclosure of Collateral .............................................................. 104

**ARTICLE VIII AGENCY** ........................................................................................... 104

    Section 8.1    Authorization and Action .............................................................. 104
    Section 8.2    Liability of the Administrative Agent ........................................... 105
    Section 8.3    Administrative Agent and Affiliates ............................................. 106
    Section 8.4    Lender Credit Decision ................................................................. 106
    Section 8.5    Indemnification ............................................................................. 106
    Section 8.6    Successor Administrative Agent .................................................... 107
    Section 8.7    Borrower Not a Third-Party Beneficiary ...................................... 107

**ARTICLE IX ASSIGNMENTS AND PARTICIPATIONS** ...................................... 107

    Section 9.1    Assignments .................................................................................. 107
    Section 9.2    Participations ................................................................................. 109
    Section 9.3    Cooperation in Assignments and Participations ............................ 109
    Section 9.4    Disclosure of Information ............................................................. 110

**ARTICLE X MISCELLANEOUS** ............................................................................ 110

    Section 10.1    Amendments, Etc. ....................................................................... 110
    Section 10.2    Notices ....................................................................................... 111
    Section 10.3    No Waiver; Remedies ................................................................ 112
    Section 10.4    Costs, Expenses and Taxes; Indemnification ............................. 112
    Section 10.5    Right of Set-Off ......................................................................... 114
    Section 10.6    Binding Effect; Governing Law; Jurisdiction and Venue ........... 114
    Section 10.7    Execution in Counterparts .......................................................... 115
    Section 10.8    Severability of Provisions .......................................................... 115
    Section 10.9    Survival of Covenants ................................................................ 115
    Section 10.10    Application of Payments ........................................................... 115
    Section 10.11    No Third Party Beneficiaries .................................................... 116
    Section 10.12    WAIVER OF JURY TRIAL ..................................................... 116
    Section 10.13    Joint and Several Oblications .................................................... 116
    Section 10.14    USA Patriot Act ........................................................................ 116
    Section 10.15    Entire Agreement ...................................................................... 117

## SCHEDULES

Schedule 1.1(a)        -        Excluded Property
Schedule 1.1(b)        -        Project Schedule
Schedule 2.2(a)(iii)   -        Project Budget
Schedule 3.1(w)        -        Permits
Schedule 4.1(n)        -        Indebtedness
Schedule 4.1(s)        -        Pending Litigation
Schedule 4.1(cc)       -        Material Contracts
Schedule 4.1(ee)       -        Major Subcontracts
Schedule 4.1(ff)       -        Registered Principal Office, Principal Place of Business, Etc.
Schedule 4.1(ii)       -        Organizational Chart, Capital Structure and Ownership
Schedule 4.1(jj)       -        Patents, Trademarks, Trade Names, Etc.
Schedule 4.1(nn)       -        No Material Adverse Effect
Schedule 4.1(oo)       -        Accounts
Schedule 6.2.1         -        Insurance Requirements

## EXHIBITS

Exhibit A       -        Notice of Borrowing
Exhibit B-1     -        Non-Revolving Facility Note
Exhibit B-2     -        Converted Loan Facility Note
Exhibit C       -        Solvency Certificate
Exhibit D       -        Assignment Agreement
Exhibit E       -        Draw Request Documents

## CREDIT AGREEMENT

CREDIT AGREEMENT entered into as of September 15, 2020, by **BIOMASS GREEN FUELS LLC**, as Borrower, the **LENDERS** party hereto, and **BANCO POPULAR DE PUERTO RICO**, as Administrative Agent.

### WITNESSETH:

WHEREAS, the Borrower has requested that the Lenders make certain loans to the Borrower in the aggregate principal amounts set forth herein; and

WHEREAS, the Lenders have agreed to the requests of the Borrower set forth above subject, however, to the terms, covenants and conditions hereafter set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises and of the mutual agreements set forth herein, the parties hereby agree as follows:

### ARTICLE I
### DEFINITIONS

1.1 **Defined Terms.** As used in this Agreement, the following terms shall have the meanings specified below (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"Account Collateral" means: (i) the Accounts, and all cash, checks, drafts, certificates and instruments, if any, from time to time deposited or held in the Accounts; (ii) all interest, dividends, cash, instruments and other property from time to time received, receivable or otherwise payable in respect of, or in exchange for, any or all of the foregoing; and (iii) to the extent not covered by clauses (i) and (ii) above, all "proceeds" (as defined in the UCC) of any or all of the foregoing.

"Accounts" means, individually or collectively as the context may require, the Cash Concentration Account, the Reserve Accounts, the Equity Escrow Account, the Tranche One Tax Credits Account and the Operating Account.

"Accounts Control Agreement" has the meaning assigned to that term in Section 3.1(c)(ii)(E).

"Additional Project Documents" means any contract or agreements related to the maintenance, repair, warranties, operation or use, as applicable, of the Project entered into by the Borrower subsequent to the Closing Date and that either (a) replace or substitutes for an existing Project Document, (b) has a term greater than one (1) year or (c) involves annual revenues or expenses to the Borrower in excess of $150,000.00; provided, however, that notwithstanding the foregoing, any contract or agreement between the Borrower and any Affiliate thereof in relation to the Project (including, without limitation, any management service agreement) shall be deemed an Additional Project Document hereunder.

"Administrative Agent" means Banco Popular de Puerto Rico, in its capacity as administrative agent for the Lenders hereunder.

"Administrative Agent's Account" means an account of the Administrative Agent maintained by the Administrative Agent at its principal office at 208 Ponce de León Avenue, San Juan, Puerto Rico.

"Advance(s)" means, individually or collectively as the context may require, the Non-Revolving Facility Advance(s) and/or the Converted Loan Facility Advance(s).

"Affiliate" means, with respect to any Person, any other Person (i) that directly or indirectly through one or more intermediaries Controls, or is Controlled by, or is under common Control with, such Person, (ii) that directly or indirectly, of record or beneficially, owns or holds ten percent (10%) or more of the shares of any class of the capital stock, membership interests or other equity interests of such Person having voting powers, or (iii) ten percent (10%) or more of the shares of stock or other equity interests of which are owned or held, directly or indirectly, of record or beneficially, for such Person. All of the officers, shareholders, directors, subsidiary corporations, subsidiary companies, joint venturers, members and partners of Borrower shall be deemed to be its Affiliates.

"Affiliate Advances" means a loan, advances or any other extension of credit made by the Borrower to an Affiliate thereof.

"Agreement" or "this Agreement" includes this Credit Agreement and all amendments, restatements, modifications and supplements hereto and shall refer to this Credit Agreement as the same may be in effect at the time such reference becomes operative.

"Annual Budget" means, with respect to each Fiscal Year, the annual operating and capital budget prepared by the Borrower (in such form and with at least such detail as the Administrative Agent may reasonably require) for the Project and its assets.

"Architect Agreement" means any and all contracts, in form and substance reasonably satisfactory to the Administrative Agent, between the Borrower and the Design Architect entered into with respect to the Project and providing for the design of the Project and for architectural services in connection with the construction of the Project.

"Assignment Agreement" means an assignment and acceptance agreement entered into by a Lender and an Eligible Assignee pursuant to Section 9.1, and accepted by the Administrative Agent, in the form of Exhibit D or any other form approved by the Administrative Agent.

"Assignment of Leasehold Interest" has the meaning assigned to that term in Section 3.1(c)(ii)(B).

"Assignment of Project Contracts" has the meaning assigned to that term in Section 3.1(c)(ii)(C).

"Assignment of Tax Credits" has the meaning assigned to that term in Section 3.1(c)(ii)(E).

"Authorized Representative" means Olmar López Vidal, acting singly, or any other Person designated in writing by the Borrower pursuant to a resolution of the Board of Directors (or analogous governing body) of the Borrower.

"Beneficial Owner" means any individual who owns, directly or indirectly, twenty-five percent (25%) or more of the ownership interest of the Borrower, and any individual with the power to direct or cause the direction of management and policies of the Borrower.

"Borrower" means Biomass Green Fuels LLC, a limited liability company duly organized and existing under the laws of the Commonwealth of Puerto Rico, and authorized to do business in the Commonwealth of Puerto Rico.

"Borrowing(s)" means, individually or collectively, as the context may require, the Non-Revolving Facility Borrowing(s) and/or the Converted Loan Facility Borrowing(s).

"Business Day" means any day of the year that is not a Saturday, Sunday or other day on which commercial banks in New York City or Puerto Rico are authorized or required by law to remain closed.

"Capital Expenditures" means, for any period and for any Person, the sum of (without duplication) (a) all expenditures made by such Person during such period in respect of the purchase or other acquisition of fixed or capital assets that are required or permitted to be capitalized for financial reporting purposes in accordance with GAAP (other than any such expenditures funded with the proceeds of Non-Revolving Facility Advances), plus (b) the aggregate principal amount of all Indebtedness (including Capital Lease Obligations and Purchase Money Obligations, but not including the Non-Revolving Advance) assumed or incurred in connection with any such expenditures.

"Capital Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Cash Concentration Account" has the meaning assigned to that term in Section 6.3.1(a).

"Casualty" has the meaning assigned to that term in Section 6.2.2(a)(i).

"Certificate of Substantial Completion" means a certificate in the form of AIA Form G704 or in another format requested by the Borrower and approved by the Administrative Agent and the Independent Engineer, executed by the Design Architect, General Contractor and the Borrower.

"Certification Regarding Beneficial Owners" means the certification regarding beneficial owners of legal entity customers required by bank regulatory authorities requiring each Beneficial Owner to provide evidence of his/her name, address, date of birth and social security number (or passport number or other similar information in the case of a non U.S. citizen).

"Change of Control" means that Borrower shall cease to be directly Controlled by Member and indirectly by one or more of the Sponsors.

"Change Orders" means any change in the Plans and Specifications, the General Contract, the Project Schedule, the Project Budget, any Major Subcontracts, the Project Costs, the warranties, payment and performance guaranties, the certifications, instruments and any other agreements in relation to the Construction of the Project.

"Closing Date" means the date on which the conditions specified in Section 3.1 shall have been satisfied or waived in writing by the Lenders.

"Code" means the United States Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means and includes the "Collateral" (as defined in the Security Agreement), the Material Contracts, the Pledged Interests, the Accounts, the Account Collateral, the Leasehold Interest, the Tax Credits and all of the other real and personal property in which a Lien is granted, or purported to be granted, from time to time in accordance with the terms of this Agreement and the other Loan Documents; provided, however, that the term "Collateral" shall not include any Excluded Property nor Excluded Equity Interest until the Inclusion Date. For avoidance of doubt, on the date of the Inclusion Date, the Excluded Property and the Excluded Equity Interest shall, automatically and without any further action from any of the Loan Parties, the Administrative Agent or the Lenders, form part of the Collateral.

"Commercial Operation Date" shall mean that the date on which all of the following shall have occurred: (i) the Commercial Operation Date, as such term is defined in the Gas Purchase Agreement, shall have occurred; (ii) all applicable Permits and certifications required to be obtained with respect to the Project as of such date have been obtained; and (iii) the Project is producing methane rich gas and carbon dioxide and electricity for sale as projected in a safe and lawful manner, for which the Borrower has billed any such sale.

"Commitment(s)" means, individually or collectively as the context may require, the Non-Revolving Facility Commitment(s) and/or the Converted Loan Facility Commitment(s).

"Condemnation" has the meaning assigned to that term in Section 6.2.3(a).

"Consenting Lender" has the meaning assigned to that term in Section 10.1(b).

"Construction" or "construction" means the construction and equipping of the Project substantially in accordance with the Plans and Specifications (including all off-site improvements reasonably required for the use and operation of the Project) and the installation of all personal property, fixtures and equipment required for the operation of the Project.

"Control" means possessing the power to direct or cause the direction of management and policies of a Person, whether through direct or indirect ownership of voting interests, by irrevocable contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Conversion Date" means the Non-Revolving Facility Commitment Termination Date; provided, however, that the Conversion Date shall not occur until such date as each of the applicable conditions set forth in Sections 3.3, 3.4 and 3.5 have been satisfied.

"Converted Loan Facility" has the meaning assigned to that term in Section 2.1(c).

"Converted Loan Facility Advance" has the meaning assigned to that term in Section 2.1(c).

"Converted Loan Facility Borrowing" has the meaning assigned to that term in Section 2.1(c).

"Converted Loan Facility Commitment" has the meaning assigned to that term in Section 2.1(b).

"Converted Loan Facility Lender" has the meaning assigned to that term in Section 2.1(b).

"Converted Loan Facility Maturity Date" has the meaning assigned to that term in Section 2.3(b).

"Converted Loan Facility Note" has the meaning assigned to that term in Section 2.3(b).

"Corporate Guarantor" means GFC HOLDINGS LIMITED LIABILITY COMPANY, a limited liability company duly organized and existing under the laws of the Commonwealth of Puerto Rico.

"Corporate Guaranty" has the meaning assigned to that term in Section 3.1(c)(ii)(H).

"Debt Service" means, for any period with respect to the Borrower, the sum of (i) the aggregate interest paid or payable (whether or not paid) on all Indebtedness during such period plus (ii) the aggregate scheduled payments of principal (whether or not paid) on all Indebtedness (including the principal component of Capitalized Lease Obligations) during such period.

"Debt Service Coverage Ratio" means, for any period with respect to the Borrower, the ratio of (i) EBITDA as of the last day of such period to (ii) Debt Service during such period.

"Debt Service Reserve Account" has the meaning assigned to that term in Section 6.3.2(a).

"Default" means any event or condition which constitutes an Event of Default or the occurrence of which with the passage of time or the giving of notice, or both would, unless cured or waived, become an Event of Default.

"Default Rate" means two hundred (200) basis points above the interest rate per annum otherwise required to be paid on the Advances pursuant to the terms of this Agreement.

"Design Architect" means CMA Architects & Engineers LLC, or such other engineer(s) or architect(s), reasonably satisfactory to the Administrative Agent, as are engaged by the Borrower for the design of the Project.

"Direct Costs" means all costs incurred for labor performed in the Construction of the Project and the materials incorporated (or, in the case of Stored Materials, to be incorporated) into the Project, as and to the extent reflected in the Project Budget, but excluding any fees for architectural or engineering services, financing costs, developer's fees, construction management fees, and other soft costs and fees.

"Disbursement Account" has the meaning assigned to that term in Section 6.3.5(a).

"Disposition" means any sale, assignment, transfer or other disposition of any property (whether now owned or hereafter acquired) by the Borrower to any other Person, excluding (i) any sale, assignment, transfer or other disposition of any property sold, assigned, transferred or otherwise disposed of in the ordinary course of business and on ordinary business terms in accordance with the terms of this Agreement and (ii) any sale made in connection with the purchase of replacement Equipment as provided in clause (y) of Section 6.1.4.

"Distribution" means (i) any dividend or other distribution, direct or indirect, on account of any shares of stock, membership interests or other ownership interests in the Borrower now or hereafter outstanding, (ii) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any shares of stock, membership interests or other ownership interests in the Borrower now or hereafter outstanding,

(iii) any payment made to retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire shares of stock, membership interests or other ownership interests in the Borrower now or hereafter outstanding, or (iv) any prepayments of principal of, premium, if any, or interest on, or redemption, purchase, retirement, defeasance (including in substance or legal defeasance), sinking fund or similar payment with respect to any Indebtedness owing to the Borrower or any equity holder or Affiliate of the Borrower that is subordinated, or required to be subordinated, to the Obligations of the Borrower under the Loan Documents.

"Dollars", "dollars" or "$" refers to lawful money of the United States of America.

"Draw Request Documents" has the meaning assigned to that term in Exhibit E.

"EBITDA" means, for any period with respect to the Borrower, Net Income plus the sum of (i) interest expense, (ii) income tax expense, (iii) depreciation expense, and (iv) amortization expense.

"Economic Incentives Act" means Act No. 73 of May 28, 2008, as amended, known as the Economic Incentives Act for the Development of Puerto Rico.

"Eligible Assignee" means (i) any Lender; (ii) any Affiliate of a Lender that is a financial institution, is majority-owned by such Lender or by the corporation controlling such Lender and has Tier 1 capital (as defined under the applicable federal regulatory capital guidelines) in excess of $100,000,000; (iii) any commercial bank, national bank, savings and loan association or savings bank organized under the laws of the United States, or any State thereof, or Puerto Rico, and having Tier 1 capital (as defined under the applicable federal regulatory capital guidelines) in excess of $100,000,000; or (iv) any Fund; or (v) any other Person approved by the Administrative Agent; provided, further, that for purposes of the sale of a portfolio of loans that includes this Agreement and the Note(s), the definition of "Eligible Assignee" shall also include any Person. Notwithstanding the foregoing, neither the Borrower nor any Affiliate of the Borrower shall qualify as an Eligible Assignee.

"Environmental Action" means any administrative, regulatory or judicial action, suit, demand, demand letter, claim, notice of non-compliance or violation, investigation, proceeding, consent order or consent agreement relating in any way to any Environmental Law or any Environmental Permit including, without limitation, (a) any claim by any Governmental Authority for enforcement, cleanup, removal, response, remedial or other actions for damages pursuant to any Environmental Law and (b) any claim by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief resulting from the emission, Release or discharge of Hazardous Materials in violation of Environmental Laws or Environmental Permits or arising from alleged injury to health, safety or the environment.

"Environmental Indemnity Agreement" has the meaning assigned to that term in Section 3.1(c)(ii)(J).

"Environmental Law" means all laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by any Governmental Authority, relating in any way to pollution or protection of the environment or similar health or safety matters, or natural resources, including, without limitation, those relating to the uses, handling, transportation, treatment, storage, disposal, Release or discharge of Hazardous Materials.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities, and including any Lien filed against any property covered by the Liens under the Loan Documents or any part of the property subject thereto in favor of any Governmental Authority), of the Borrower directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Environmental Lien" has the meaning assigned to that term in Section 5.1(h).

"Environmental Permit" means any permit, approval, identification number, license, endorsement, concession or other authorization required under any Environmental Law.

"Environmental Site Assessment" has the meaning assigned to that term in Section 3.1(o).

"Equipment" means all furnishings, fixtures and equipment from time to time owned by the Borrower and used in connection with the operation of the business of the Borrower.

"Equity" means, as of any date, an amount equal to the aggregate capital contributions made to Borrower in cash by its members.

"Equity Contribution" means a minimum contribution of Equity no less than the aggregate amount of Eight Million Four Hundred Sixty Thousand Dollars ($8,460,000.00).

"Equity Escrow Account" means the account whereby all Equity Contribution shall be deposited and maintained in accordance to this Agreement.

"Equity Security" means any stock, unit or similar security, certificate of interest or participation in any profit sharing agreement, preorganization certificate or subscription, transferable share, voting trust certificate or certificate of deposit for an equity security, limited partnership interest or any other type of partnership interest, interest in a joint venture, interest in

a limited liability company or certificate of interest in a business trust; or any security convertible, with or without consideration into such a security, or carrying any warrant or right to subscribe to or purchase such a security; or any such warrant or right; or any put, call, straddle, or other option or privilege of buying such a security from or selling such a security to another without being bound to do so.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time. Section references to ERISA are to ERISA as in effect on the date of this Agreement and any subsequent provisions of ERISA, amendatory thereof, supplemental thereto or substituted therefor.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with the Borrower would be deemed to be a single employer within the meaning of Section 414(b) or (c) of the Code, or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" means (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to a Plan (other than an event for which the 30-day notice period is waived); (b) the existence with respect to any Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived; (c) the filing pursuant to Section 412(d) of the Code or Section 303(d) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (d) the incurrence by the Borrower or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan; (e) the receipt by the Borrower or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan; (f) the incurrence by the Borrower or any of its ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan; or (g) the receipt by the Borrower or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from the Borrower or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA.

"Event(s) of Default" has the meaning assigned to that term in Section 7.1.

"Excluded Equity Interest" means twenty-six percent (26%) of the issued and outstanding ownership interest in the Borrower that cannot be pledged pursuant to the Tax Credit Certification.

"Excluded Property" means the equipment and machinery identified in Schedule 1.1(a).

"Extension Fee" has the meaning assigned to that term in Section 2.10(b).

"Facilities" means, individually or collectively as the context may require, the Non-Revolving Facility and/or the Converted Loan Facility.

12

"FDIC" means the Federal Deposit Insurance Corporation.

"Federal Funds Effective Rate" means, for any day, a fluctuating interest rate per annum equal to the rate for Federal Funds as published in H.15(519) under the heading "Federal Funds (Effective)" or, if not published by 3:00 p.m., New York City time on such day (or if such day is not a Business Day, on the immediately preceding Business Day), the rate on such day as published in Composite Quotations under the heading "Federal Funds/Effective Rate." In the event that such rate is not published in either H.15(519) or Composite Quotations by 3:00 p.m. New York City time, on such day (or if such day is not a Business Day, for the immediately preceding Business Day) the Federal Funds Effective Rate will be the arithmetic mean of the rates as of 9:00 a.m., New York City time on such day for the last transaction in overnight Dollar federal funds arranged by three leading brokers of federal funds transactions in the City of New York selected by the Administrative Agent.

"FF&E" means the furniture, furnishings, fixtures, equipment and systems (not including OS&E) to be installed as part of the Project (and any replacements thereof).

"Fiscal Quarter" means the three-month period commencing on January 1st, April 1st, July 1st, and October 1st of each Fiscal Year.

"Fiscal Year" means the twelve-month period commencing on January 1st and ending on December 31st of every year.

"Fixed Charge Coverage Ratio" means, for any period with respect to the Borrower, the ratio of (i) EBITDA as of the last day of such period to (ii) the sum of (A) Debt Service as of the last day of such period, (B) the aggregate income tax expenses paid during such period, (C) the aggregate Distributions made or declared during such period, (D) Affiliate Advances made during such period, and (E) the aggregate Capital Expenditures funded during such period with internally-generated cash flow.

"Flood Insurance Acts" has the meaning assigned to that term in Schedule 6.2.1.

"Force Majeure" means acts of God; strikes; lockouts; failure of power; riots; landslide; insurrections; atypical, severe adverse weather conditions preventing the performance of work above normal Puerto Rico weather conditions, such as hurricanes; war; orders or restrictions of a Governmental Authority; and other casualties beyond the Borrower's reasonable control. Lack of adequate funds or financial inability to perform and unavailability of materials at reasonable costs shall not be deemed to be a cause beyond the reasonable control of the Borrower.

"Fund" means any Person that is engaged in making, purchasing, investing in or otherwise holding commercial, construction, real estate or similar extensions of credit in the ordinary course of its business with total assets in excess of $100,000,000.

"Gas Purchase Agreement" means the Landfill Gas Sale and Purchase Agreement entered into by and between the Borrower, as buyer, and El Coqui Landfill Company, LLC, as seller, dated December 28, 2018, as amended on July 19, 2019, and as may have been or may be further amended and modified from time to time.

"GAAP" means generally accepted accounting principles in the United States of America.

"General Contract" means any contract in form and substance satisfactory to the Administrative Agent, between the Borrower and the General Contractor as shall be entered into with respect to the Project, and providing for the construction of the Project in accordance with the Plans and Specifications and the Project Schedule at a fixed price consistent with the Project Budget.

"General Contractor" means Distributed Power Innovators JV, a Joint Venture among International Technical Services Inc. and Accurate Solutions Corp., or such other Person, reasonably satisfactory to the Administrative Agent, engaged by the Borrower as the general contractor for the Project pursuant to the General Contract.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local (including the Commonwealth of Puerto Rico), and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of, or pertaining to, government.

"Gross Revenues" means all income from operations, investments or otherwise, computed in accordance with GAAP, derived by the Borrower from whatever source, including, but not limited to, revenues from its business operations, fees charged under the Material Contracts, sums generated by the operation of the Project, including payments received under the Purchase Contracts, proceeds resulting from the sale of all or any portion of its properties or any other Collateral or any other assets of the Borrower and/or from the ownership interests in the Borrower, Proceeds, and proceeds of business interruption or other loss of income insurance.

"guarantee" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor (including, without limitation, the Guarantors), guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services from the primary obligor for the purpose of assuring the holder of such Indebtedness or other obligation of the payment thereof by the primary obligor, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty

issued to support such Indebtedness or obligation; provided that the term "guarantee" shall not include endorsements for collection or deposit in the ordinary course of business.

"Guarantors" means, individually or collectively, as the context may require, the Personal Guarantors and the Corporate Guarantor.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other chemicals, materials, substances or wastes of any nature designated, classified or regulated as hazardous or toxic or as a pollutant or contaminant under any Environmental Law.

"In Balance" has the meaning assigned to that term in Section 2.2(b).

"Inclusion Date" means the date the Puerto Rico Treasury Department issues a certification approving the agreed upon procedure report prepared by a certified public accountant pursuant to Article 6.5(b) of Regulation Number 7772 issued under the Economic Incentives Act, which certifies the Project Costs and the capital contribution to Borrower of $6,500,000 of the Equity Contribution, as provided in the Tax Credit Certification.

"Indebtedness" means for any Person, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all Obligations of such Person for the deferred purchase price of property or services, (c) all Obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) Purchase Money Obligations (e) the principal component of all Obligations of such Person as lessee under leases that have been or should be, in accordance with GAAP, recorded as Capital Lease Obligations which principal component has been or should, at the time of determination, be capitalized on a balance sheet in accordance with GAAP, (f) all Obligations, contingent or otherwise, of such Person under acceptance, letter of credit or similar facilities, (g) all Obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any capital stock of, or other ownership or profit interest in such Person or any other Person or any warrants, rights or options to acquire such capital stock, valued at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends and interest, (h) all Indebtedness of others referred to in clauses (a) through (g) above guaranteed directly or indirectly in any manner by such Person, or in effect guaranteed directly or indirectly by such Person through an agreement (i) to pay or purchase such Indebtedness or to advance or supply funds for the payment or purchase of such Indebtedness, (ii) to purchase, sell or lease (as lessee or lessor) property, or to purchase or sell services, primarily for the purpose of enabling the debtor to make payment of such Indebtedness or to assure the holder of such Indebtedness against loss, (iii) to supply funds to or in any other manner invest in the debtor (including any agreement to pay for property or services irrespective of whether such property is received or such services are rendered) to assure a creditor against loss or (iv) otherwise to assure a creditor against loss, and (v) all Indebtedness referred to in clauses (a) through (h) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property (including, without limitation, accounts and contract rights) owned by such Person, even though such Person has not assumed or

become liable for the payment of such Indebtedness in an amount equal to the lesser of the amount of the Indebtedness secured by the Lien or the fair market value of such property. The Indebtedness of any Person shall include the Indebtedness of any other entity to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"Indemnified Party" has the meaning assigned to that term in Section 10.4(b).

"Independent Engineer" means such Person(s) as may be engaged by the Administrative Agent and the Lenders, at the cost and expense of the Borrower, to advise and render reports to the Administrative Agent and the Lenders concerning the Project, the construction and to otherwise consult with the Administrative Agent and the Lenders with respect to the Project and the Borrower.

"Indirect Costs" means all costs incurred for ancillary services performed in connection with the Construction of the Project, such as architectural, engineering, development management, construction management, survey, legal, permit, franchise and license fees, title insurance premiums and the like, and interest and fees payable to the corresponding Lenders with respect to their Non-Revolving Facility Advances, as and to the extent reflected in the Project Budget.

"Insurance Premiums" has the meaning assigned to that term in Section 6.2.1(c).

"Insurance Requirements" means all terms of any insurance policy required hereunder and under the other Loan Documents covering or applicable to Borrower or any other property of the Borrower or any part thereof, and all requirements of the issuer of any such policy.

"Intercreditor Agreement" has the meaning assigned to that term in Section 3.1(c)(ii)(K).

"Interest Reserve Budget Line Item" has the meaning assigned to that term in Section 2.4(c).

"Inventory" means and includes all of the Borrower's now owned and hereafter acquired inventory, and all other goods, merchandise and other personal property furnished under any contract of service or intended for sale or lease, all raw materials, work in process, finished goods and materials and supplies of any kind, nature or description which are or might be used, consumed or sold in the Borrower's business or are or might be used in connection with the packing, shipping, advertising, selling or finishing of such goods, merchandise and other personal property, all returned or repossessed goods now, or at any time or times hereafter, in the possession or under the control of the Borrower, the Administrative Agent or any Lender, and all documents of title or documents representing the same.

"Leasehold Interest" means the Borrower's leasehold rights in and to the Site pursuant to the Site Lease.

"Legal Requirements" means all applicable federal, state, Puerto Rico, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities. In the case of the Borrower, the Project or the Borrower's assets, the term "Legal Requirements" shall include all applicable federal, state, Puerto Rico, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities affecting the Borrower, the Project, the Collateral or any assets or other property owned or leased by the Borrower or any part thereof, or the construction, use, alteration or operation thereof, or any part thereof, whether now or hereafter enacted and in force, and all Permits, licenses and authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments either of record or otherwise, at any time in force affecting the Borrower, the Project, the assets or any other property owned or leased by the Borrower or any part thereof, including any which may (i) require repairs, modifications or alterations thereof, in whole or in part, or (ii) in any way limit the construction, use or enjoyment thereof.

"Lender" means a Person listed as such on the signature pages hereof and each Person that shall become a party hereto pursuant to Section 9.1.

"Lending Office" means, with respect to any Lender, the office of such Lender specified as its "Lending Office" on the signature page hereof or in the Assignment Agreement pursuant to which it became a Lender, or such other office of such Lender as such Lender may from time to time specify to the Borrower and the Administrative Agent.

"Leverage Ratio" means, for any period with respect to the Borrower, the ratio of (i) the outstanding principal balance under the Facilities as of the last day of such period to (ii) EBITDA as of the last day of such period.

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, collateral assignment, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset, (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities and (d) any easement, right of way or other encumbrance on title to real property.

"Loan Documents" means, collectively, this Agreement, the Notes, the Security Agreement, the Environmental Indemnity Agreement, the Membership Interest Pledge Agreement, the Assignment of Leasehold Interest, the Assignment of Project Contracts, the Personal Guaranties, the Corporate Guaranty, the Accounts Control Agreement, the Assignment of Tax Credits, the Subordination Agreement, the Intercreditor Agreement, each of the other security instruments referred to in Section 3.1(c)(ii), and on and after the date of delivery thereof, such other guaranties, security instruments and other agreements as are required to be delivered

by a Loan Party under the terms of this Agreement or any other Loan Document, in each case as amended or otherwise modified from time to time.

"Loan Parties" means the Borrower, the Guarantors and each other Person (other than the Administrative Agent, the NMTC Lender or any Lender) which is or becomes or, under the terms of any Loan Document is required to become, a party to a Loan Document and their respective successors and permitted assigns.

"Major Subcontractors" means all subcontractors under Major Subcontracts that are reasonably satisfactory to the Administrative Agent.

"Major Subcontracts" means Subcontracts with Major Subcontractors providing for payments by the Borrower in excess of $100,000 and such other material Subcontracts as the Administrative Agent may designate in its sole reasonable discretion. All Major Subcontracts shall be in form and substance reasonably satisfactory to the Administrative Agent.

"Material Adverse Change" or "Material Adverse Effect" means, with respect to any circumstance, act, condition or event of whatever nature (including any adverse determination in any litigation, arbitration, or governmental investigation or proceeding), whether singly or in conjunction with any other event or events, act or acts, condition or conditions, or circumstance or circumstances, whether or not related, which would reasonably be expected to have a material adverse change in or a materially adverse effect upon (i) the assets, business, operations or condition (financial or otherwise) of any Loan Party; (ii) the rights and remedies available to the Administrative Agent and the Lenders under the Loan Documents; (iii) the ability of any Loan Party to perform its Obligations under the Loan Documents; (iv) the ability of the Borrower to construct and complete the Project in accordance with the requirements of this Agreement; (v) the ability of the Borrower to operate and perform its Obligations under the Purchase Contracts in relation to the Project; (vi) the Lien of the Administrative Agent, for the benefit of the Lenders, in any of the Collateral, or the priority of any such Lien; or (vii) the validity, legality or enforceability of any Material Contract, the Tax Concession Documents, or the rights and remedies of the Borrower thereunder.

"Material Casualty" has the meaning assigned to that term in Section 6.2.2(c).

"Material Condemnation" has the meaning assigned to that term in Section 6.2.2(c).

"Material Contract(s)" means the Gas Purchase Agreement, the Project Contracts, the Site Lease, the Purchase Contracts, the Major Subcontracts, the Transportation Contract, each Other Material Contract, and each other contract to which the Borrower is a party from time to time involving aggregate consideration payable to or by the Borrower of $150,000 or more in any year which the Administrative Agent or the Required Lenders may designate in their reasonable discretion, or otherwise material to the operations of the Borrower taken as a whole, including, without limitation, those contracts identified in Schedule 4.1(cc).

"Member" means the Corporate Guarantor as the sole member and manager of the Borrower.

"Membership Interest Pledge Agreement" has the meaning assigned to that term in Section 3.1(c)(ii)(D).

"Multiemployer Plan" means a multiemployer plan, as defined in Section 4001 of ERISA and subject to Title IV of ERISA, which is maintained or at any time during the five (5) calendar years preceding the date of this Agreement was maintained for employees of the Borrower or of an ERISA Affiliate.

"Net Cash Payments" means, with respect to any Disposition, the aggregate amount of all cash payments (including, without limitation, all cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or otherwise, but only as and when received); provided that:

(a) Net Cash Payments shall be net of (i) the amount of any reasonable legal, real estate brokerage (other than those payable to any Affiliate of the Borrower), title and recording tax expenses, commissions and other fees and expenses paid by the Borrower in connection with such Disposition, (ii) any federal, state, Puerto Rico, and local income or other Taxes estimated to be payable by the Borrower as a result of such Disposition (but only to the extent that such estimated Taxes are due and payable and in fact paid to the relevant federal, state, Puerto Rico or local Governmental Authority on or before their required payment date); and (iii) any contingency or so-called "holdback" escrow established and maintained in connection with such Disposition, but only until such funds are released to or for the benefit of the Borrower, and

(b) Net Cash Payments shall be net of any repayments by the Borrower of permitted Indebtedness to the extent that (i) such Indebtedness is secured by a Permitted Lien on the property that is the subject of such Disposition and (ii) the transferee of (or holder of a Lien on) such property requires that such Indebtedness be repaid as a condition to the Disposition of such property.

"Net Income" means, for any period with respect to any Person, an amount equal to net income (or net deficit, as the case may be) properly attributable to the conduct of business of such Person for such period, as determined in accordance with GAAP consistently applied.

"Net Proceeds Deficiency" has the meaning assigned to that term in Section 6.2.2(c)(vi).

"NMTC" means federal new markets tax credits pursuant to Section 45D of the U.S. Internal Revenue Code of 1986, as amended.

"NMTC Compliance Agreement" means that certain New Markets Tax Credit Statement of Representations, Warranties and Covenants dated of even date herewith and executed by Borrower.

"NMTC Lender" means PCC Sub-CDE 13, LLC, which granted the NMTC Loan to the Borrower.

"NMTC Loan" means that certain term loan agreement in the aggregate principal amount of $7,200,000 granted to Borrower by the NMTC Lender on the Closing Date.

"NMTC Loan Documents" means the NMTC Loan, the QLICI Notes and such other loan documents executed in connection therewith.

"NMTC Program" means the program authorized under the Community Renewal and Tax Relief Act of 2000, subject to reauthorization since 2006, which allows for the issuance of NMTC.

"Non-Consenting Lender" has the meaning assigned to that term in Section 10.1(b).

"Non-Excluded Taxes" has the meaning assigned to that term in Section 2.7(a).

"Non-Revolving Facility" has the meaning assigned to that term in Section 2.1(b).

"Non-Revolving Facility Advance" has the meaning assigned to that term in Section 2.1(b).

"Non-Revolving Facility Borrowing" has the meaning assigned to that term in Section 2.1(b).

"Non-Revolving Facility Commitment" has the meaning assigned to that term in Section 2.1(b).

"Non-Revolving Facility Commitment Termination Date" the earlier of (i) twelve (12) months from the Closing Date, that is September 15, 2021, (ii) the Commercial Operation Date; or (iii) the date of termination in whole of the Commitments pursuant to Section 7.1; provided, however, the Non-Revolving Facility Commitment Termination Date may be extended for an additional three (3) months if (a) the Borrower notifies in writing to the Administrative Agent its intention to extend the Non-Revolving Facility Commitment Termination Date with at least thirty (30) days prior to the Non-Revolving Facility Commitment Termination Date; (b) no Default or Event of Default has occurred or is continuing; (c) the Borrower has paid to the Administrative Agent, in full and in immediate available funds, the Extension Fee, (d) the applicable conditions precedent set forth in Sections 3.1 and 3.2 have been satisfied, and (e) the Borrower has deposited in the Disbursement Account an amount equivalent to the estimated

shortfall in the Interest Reserve Budget Line Item under the Project Budget for the three (3) months extension period.

"Non-Revolving Facility Lender" has the meaning assigned to that term in Section 2.1(b).

"Non-Revolving Facility Note" has the meaning assigned to that term in Section 2.3(b).

"Note(s)" means, individually or collectively as the context may require, the Non-Revolving Facility Note(s) and the Converted Loan Facility Note(s).

"Notice of Borrowing" has the meaning assigned to that term in Section 2.2(a)(i).

"Obligations" means, with respect to any Person, any obligation of such Person of any kind (including, without limitation, overdrafts) on account of any claim, whether or not the right of any creditor to payment in respect of such claim is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, disputed, undisputed, legal, equitable, secured or unsecured, and whether or not such claim is discharged, stayed or otherwise affected by any proceeding referred to in Section 7.1(f). Without limiting the generality of the foregoing, the Obligations of the Loan Parties under the Loan Documents include (a) the obligation to pay principal, interest, charges, expenses, fees, reasonable attorneys' fees and any disbursements, indemnities and other amounts payable by any Loan Party under this Agreement or any other Loan Document, and (b) the obligation to reimburse any amount in respect of any of the foregoing that the Administrative Agent or any Lender, in its sole discretion, may elect to pay or advance on behalf of such Loan Party as permitted under the Loan Documents.

"OFAC" has the meaning assigned to that term in Section 4.1(kk).

"Officer's Certificate" means a certificate executed by an Authorized Representative of the Borrower. Without limitation of the foregoing, if the individual signing the certificate is doing so on behalf of a corporation, then such individual shall hold the office of President, Vice President, Treasurer, Secretary or Assistant Secretary with respect to such corporation.

"Operating Account" has the meaning assigned to that term in Section 5.1(l).

"Order" has the meaning assigned to that term in Section 4.1(kk).

"Organizational Documents" means (i) with respect to any corporation, its certificate or articles of incorporation, as amended, and its by-laws, as amended, (ii) with respect to any limited partnership, its certificate of limited partnership, as amended, and its partnership agreement, as amended, (iii) with respect to any general partnership, its partnership agreement, as

amended, and (iv) with respect to any limited liability company, its articles of organization, as amended, and its operating agreement, as amended.

"OS&E" means the operating supplies and equipment (not including FF&E) to be purchased as part of the Project (and any replacements thereof).

"Other Charges" means all ground rents, impositions other than Taxes, and any other charges, including license fees, now or hereafter levied or assessed or imposed by a Governmental Authority against Borrower's business operations, the Collateral or any asset or other property owned or leased by the Borrower or any part thereof and payable by the Borrower.

"Other Material Contract" means each contract to which the Borrower is a party from time to time, the absence of which would have a Material Adverse Effect.

"Other Taxes" has the meaning assigned to that term in Section 2.7(b).

"PBGC" means the Pension Benefit Guaranty Corporation.

"Permits" means all certifications, permits, licenses, approvals and other authorizations from Governmental Authorities and other Persons as are necessary for the operation of Borrower's business and for the development, construction, ownership, use and operation of the Project in the manner contemplated herein.

"Permitted Encumbrances" or "Permitted Liens" means such of the following as to which no collection, execution or enforcement proceeding shall have been commenced: (a) Liens in favor of the Administrative Agent for the benefit of the Lenders pursuant to the Loan Documents; (b) Liens for Taxes or Other Charges not yet payable; (c) statutory Liens of landlords, Liens of carriers, warehousemen, mechanics and materialmen and other Liens imposed by law and created in the ordinary course of the Borrower's business, but only to the extent that the amounts secured or to be secured by such Liens (i) are not past due for a period of more than 45 days, or (ii) are being contested in good faith by appropriate proceedings and adequate reserves are being maintained with respect thereto in accordance with GAAP and the provisions of Section 5.1(j); or (iii) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect; (d) deposits made in the ordinary course of the business of the Borrower (including, without limitation, surety bonds and appeal bonds to which the Borrower is a party and as to which full reserves are maintained) in connection with workers' compensation, unemployment insurance and other types of social security benefits or to secure the performance of tenders, bids, leases, contracts (other than for the repayment of borrowed money or the deferred purchase price of property or services), statutory obligations and other similar obligations arising as a result of progress payments under government contracts; (e) Liens securing Purchase Money Obligations, or Liens securing Capital Lease Obligations, in each case arising in connection with permitted Indebtedness set forth under Section 5.2(b); (f) easements, rights-of-way, restrictions and other similar charges or encumbrances on real property now or hereafter constituted without violating the terms of the Loan Documents which do not, singly or in the aggregate, render title to the property encumbered thereby unmarketable or materially adversely affect the use of such property for its present or intended purposes, including,

but not limited to, restrictions imposed over the Site by Governmental Authority; (g) Liens upon the underlying real properties wherein the Project and the Site are located existing on the Closing Date or otherwise permitted under the Site Lease; (h) junior Liens pursuant to the NMTC Loan Documents; and (i) Liens consented to in writing by the Administrative Agent and the Required Lenders.

"Permitted Indebtedness" has the meaning assigned to that term in Section 4.1(n) hereof.

"Person" means and includes any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, Governmental Authority or any other entity, and shall include Borrower.

"Personal Guaranties" has the meaning assigned to that term in Section 3.1(c)(ii)(G).

"Personal Guarantors" has the meaning assigned to that term in Section 3.1(c)(ii)(G).

"Plan" means any single employer plan, as defined in Section 4001 ERISA and subject to Title IV of ERISA, which is maintained, or at any time during the five calendar years preceding the date of this Agreement was maintained, for employees of the Borrower or an ERISA Affiliate of each.

"Plans and Specifications" means the plans and specifications for the construction and design of the Project, including any document describing the scope of work performed by Borrower's contractors under the General Contract or any other contract or subcontract for the development and construction of the Project and any feeder lines and interconnections, all work drawings, engineering and construction schedules, project schedules, project monitoring systems, specifications status lists, material and procurement ledgers, drawings and drawing lists, manpower allocation documents, management and project procedures documents, project design criteria, and any other document referred to in the Project Contracts or any of the documents referred to in this definition, as the same may be amended to the extent permitted by this Agreement.

"Pledged Interest" has the meaning assigned to that term in Section 3.1(c)(ii)(D).

"Policies" has the meaning assigned to that term in Section 6.2.1(b).

"Proceeds" means amounts, awards or payments payable to the Borrower, the Administrative Agent or the Lenders in respect of all or any part of the Borrower's business operations at the Project in connection with a Casualty or Condemnation thereof (after the deduction therefrom and payment to the Borrower, the Administrative Agent and the Lenders, respectively, of any and all reasonable out-of-pocket expenses incurred by each of them in the

recovery thereof, including all reasonable attorneys' fees and expenses, the reasonable fees of insurance experts and adjusters and the out-of-pocket costs incurred in any litigation or arbitration with respect to such Casualty or Condemnation).

"Project" means, collectively, the development, construction, restoration, renovation, landscaping, financing and equipping on the Site and other adjoining properties leased by the Borrower pursuant to the Site Lease, and any other action (including, without limitation, demolition work and offsite work) necessary for capturing and processing methane-rich gas and carbon dioxide rich gas to yield renewable natural gas in liquified form, renewable carbon dioxide and electricity to be sold to commercial and industrial businesses in Puerto Rico, with all alterations thereto or replacements thereof, all fixtures, attachments, appliances, Equipment, machinery and any other articles attached thereto or used in connection therewith and all parts which may from time to time be incorporated or installed in or attached thereto, all contracts and agreements for the purchase or sale of commodities or other personal property related thereto, all real or personal property owned or leased related thereto, and all other real and tangible and intangible personal property leased or owned by the Borrower and placed upon or used in connection with the yielding of renewable natural gas in liquified form, renewable carbon dioxide and electricity.

"Project Budget" means the budget for the Project attached hereto as Schedule 2.2(a)(iii) prepared by the Borrower and approved by the Administrative Agent, which sets forth all Project Costs, as amended from time to time with the prior written approval of the Administrative Agent.

"Project Contracts" means those certain agreements, instruments, certifications or contracts executed by the Borrower and such other third party in relation to the development, construction, installation, operation, maintenance and repair of the Project, including without limitation the Architect Contract, the General Contract, the Major Subcontracts, the Transportation Contracts and all other contracts relating to the design, development, construction and management of the Project.

"Project Costs" means the total Direct Costs (including Stored Materials) and Indirect Costs, as shown on the Project Budget, required to be incurred in order to fully develop, construct, furnish and equip the Project through final completion.

"Project Documents" means, collectively, the Site Lease, the Project Contracts, the Material Contracts, the Major Subcontracts; the Permits, the Project Costs, the Project Schedule, the Project Budget, the Plans and Specifications, the warranties, payment and performance guaranties, the Environmental Site Assessments, the certifications, instruments and any other agreements in relation to the Project, and each Additional Project Document.

"Project Schedule" means the schedule for construction and completion of the Project as a whole (including a trade by trade breakdown of the estimated periods of commencement and completion of construction by each such trade) prepared by the Borrower and approved by the Administrative Agent, as amended from time to time with the prior approval of the Administrative Agent and the Independent Engineer.

"Project Termination Date" means the last day of the 12th month from the Closing Date, which shall be extended for an additional period of three (3) months to the extent the Non-Revolving Facility Commitment Termination Date is extended pursuant to this Agreement.

"Proportionate Share" means, with respect to each Lender and each Commitment, the percentage for such Commitment set forth opposite such Lender's name on the signature pages hereof or, if such Lender has entered into an Assignment Agreement, the percentage for such Commitment set forth therein.

"Puerto Rico" means the Commonwealth of Puerto Rico.

"Purchase Contracts" means, individually or collectively as the context may require, the agreements between the Borrower and commercial or industrial bona-fide purchasers of renewable natural gas in liquified form, renewable carbon dioxide or electricity from the Borrower produced at the Project, in substance and form acceptable to the Administrative Agent in its sole reasonable discretion.

"Purchase Money Obligations" means (as such term is defined in the UCC), including, without limitation, all Obligations of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property).

"QALICB Requirements" means such requirements necessary for the Borrower to be qualified as an active low-income community business pursuant to the NMTC Program.

"QLICI Notes" means (i) a term note in the principal amount of $5,160,000 payable to NMTC Lender evidencing the loan granted by NMTC Lender to Borrower for the financing of the Project; and (ii) a term note in the principal amount of $2,040,000 payable to NMTC Lender evidencing the loan granted by NMTC Lender for the financing of the Project, pursuant to the NMTC Loan Documents.

"Receivables" means and includes all of the Borrower's present and future rights to payments for goods, merchandise or inventory sold or leased or for services rendered, whether or not represented by instruments or chattel paper, and whether or not earned by performance; all of the Borrower's now owned or hereafter acquired accounts, contract rights, chattel paper, instruments, documents, and proceeds, including, without limitation, all amounts payable to the Borrower under any contract; all insurance proceeds; and all proceeds of any letter of credit under which the Borrower is beneficiary; together with all instruments and documents of title representing any of the foregoing, all rights in any services, goods, merchandise or inventory which any of the foregoing may represent, all rights in any returned or repossessed goods, merchandise or inventory, and all rights, security and guaranties with respect to each of the foregoing, including, without limitation, any right of stoppage in transit.

"Recovery Event" means any loss of, or damage to, property as a result of a Casualty or Condemnation.

"Register" has the meaning assigned to that term in Section 9.1(c).

"Release" means any release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, leaching or migration into the indoor or outdoor environment of Hazardous Materials, including the movement of Hazardous Materials through ambient air, soil, surface water, ground water, wetlands, land or subsurface strata.

"Replacement Reserve Account" has the meaning assigned to that term in Section 6.3.4(a).

"Reportable Event" has the meaning assigned to that term in Title IV of ERISA.

"Required Lenders" shall mean Lenders having in the aggregate not less than 50.01% of the sum of the total Commitments, or if any of the Commitments have terminated or expired, not less than 50.01% of the sum of (i) the aggregate outstanding principal amount of the Advances at such time and (ii) the total Commitments that have not terminated or expired at that time.

"Reserve Accounts" means individually and collectively, as the context may require, the Debt Service Reserve Account, the Working Capital Reserve Account and the Replacement Reserve Account.

"Restoration" has the meaning assigned to that term in Section 6.2.2(b).

"Restoration Consultant" has the meaning assigned to that term in Section 6.2.2(c)(iii).

"Restoration Retainage" has the meaning assigned to that term in Section 6.2.2(c)(iv).

"Security Agreement" has the meaning assigned to that term in Section 3.1(c)(ii)(A).

"Site" means the premises leased by the Borrower pursuant to the Site Lease known as Humacao El Coqui Landfill located in the Municipality of Humacao where the Project shall be installed and located at Road 923 KM 2.5, Barrio Buena Vista, Humacao, Puerto Rico 00791.

"Site Lease" means the Lease Agreement by and between the Borrower, as tenant, and El Coqui Landfill Company, LLC, as landlord, dated March 28, 2019 pursuant to which

the Borrower is granted leasehold and easement interests with respect to the Site where the Project is located and installed.

"Small or Medium Business Certification" means the Certification issued under case no. 19-73-I-011 by the Puerto Rico Industrial Development Company, in conjunction with the Puerto Rico Department of the Treasury, on January 29, 2020, whereby the Borrower is designated a small or medium business for the credit for industrial investment under Section 2(i) and Section 6(a)(2)(B) of the Economic Incentives Act;

"Solvent" means, as to any Person, that (a) the fair value and present fair saleable value of such Person's assets is in excess of such Person's stated liabilities; (b) the present fair saleable value of such Person's assets is in excess of the amount that will be required to pay such Person's probable liability on such Person's Indebtedness as such Indebtedness becomes absolute and mature; (c) such Person has capital sufficient to carry on its business and transactions and all business and transactions in which it is about to engage; and (d) such Person has not incurred Indebtedness beyond such Person's ability to pay such Indebtedness as it matures.

"Sponsors" means Olmar López Vidal, Olmar López Gómez and Greg Boyd.

"Stored Materials" means materials to be installed or incorporated into the Project and purchased or to be purchased by the Borrower, the General Contractor, or a Major Subcontractor as of the date of a Notice of Borrowing for a Non-Revolving Facility Advance, but not yet installed or incorporated into the Project, to the extent the cost thereof is included in the Project Budget.

"Structuring Fee" has the meaning set forth in Section 2.10(a).

"Subcontracts" means contracts or subcontracts for labor, materials, supplies, FF&E and OS&E to be furnished to the Project.

"Subordination Agreement" means a subordination agreement whereby each subordinated creditor that is party thereto, agrees to subordinate in full any and all payments of Indebtedness owed to such subordinated creditor in favor of the Obligations of the Borrower under the Loan Documents, in form and substance satisfactory to the Administrative Agent.

"Subsidiary" means, with respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, Controlled or held, or (b) that is, as of such date, otherwise Controlled, by the parent or one or more subsidiaries of the parent.

"Substantial Completion" means that each of the following has occurred or has been met: (a) the Certificate of Substantial Completion, or any replacement certificate providing the same certifications, has been delivered with respect to the operation of the Project; (b) all machinery, fixtures and Equipment for the Project have been delivered to and installed at the Site for the Project; (c) all requirements necessary with respect to the Project under the Project Contracts have been satisfied such that the Project is operational; and (d) the Independent Engineer has provided a certificate, in form and substance reasonably acceptable to the Administrative Agent, confirming that the requirements set forth in (a) through (c) above have occurred.

"Survey" means a current survey of the Project (and any other property constituting a part of the Project) certified to the Administrative Agent and its successors and assigns that is in form and content satisfactory to the Administrative Agent.

"Tax Concession" means the Tax Exemption Decree under case no. 19-73-I-011 issued by the Department of Economic Development and Commerce on November 5, 2019 to the Borrower, pursuant to the Economics Incentives Act.

"Tax Concession Documents" means the Tax Concession, the Tax Credit Certification and the Small or Medium Business Certification.

"Tax Credits" means the Tranche One Tax Credits and the Tranche Two Tax Credits.

"Tax Credit Certification" means the Tax Credit Certification issued by the Puerto Rico Department of Treasury on August 26, 2020, authorizing the issuance of tax credits in the amount of $3,250,000, pursuant to Section 6(a)(2)(B) of the Economic Incentives Act.

"Tax" or "Taxes" means any and all taxes, imposts, deductions, duties, charges, fees, levies, or other charges or assessments of whatever nature, including income, gross receipts, "patente", excise, real or personal property, sales, withholding, social security, retirement, unemployment, occupation, use, service, license, net worth, payroll, franchise, consumption and transfer and recording, imposed by the United States Internal Revenue Service, the Puerto Rico Treasury Department, Municipal Revenue Collection Center ("CRIM") or any other taxing authority (whether domestic or foreign, including any federal, state, Puerto Rico, United States possession, county, municipal, local or foreign government or any subdivision or taxing agency thereof), whether computed on a separate, consolidated, unitary, combined or any other basis, including interest, fines, penalties, surcharges or additions to tax attributable to or imposed on or with respect to any such taxes, charges, fees, levies or other assessments.

"Termination Event" shall mean (a) a Reportable Event described in Section 4043 of ERISA and the regulations issued thereunder (other than a Reportable Event not subject to the provision for 30-day notice to the PBGC under such regulations), or (b) the withdrawal of the Borrower or any ERISA Affiliate of the Borrower from a Plan during a plan year in which it was a "substantial employer" as defined in Section 4001(a)(2) of ERISA, or (c) the filing of a notice of intent to terminate a Plan or the treatment of a Plan amendment as a termination under Section 4041 of ERISA, or (d) the institution of proceedings to terminate a Plan by the

PBGC under Section 4042 of ERISA, or (e) any other event or condition which would constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan.

"Threshold Lenders" shall mean Lenders having in the aggregate not less than 50.00% of the sum of the total Commitments, or if any of the Commitments have terminated or expired, not less than 50.00% of the sum of (i) the aggregate outstanding principal amount of the Advances at that time and (ii) the total Commitments that have not terminated or expired at that time.

"Tranche One Tax Credits" means the first fifty percent (50%) of the Tax Credits to be received by the Borrower under the Tax Credit Certification.

"Tranche One Tax Credits Account" has the meaning assigned to that term in Section 6.3.7(a).

"Tranche Two Tax Credits" means the second fifty percent (50%) of the Tax Credits to be received by the Borrower under the Tax Credit Certification.

"Tranche Two Tax Credit Proceeds" has the meaning assigned to that term in Section 2.9(d).

"Transfer" has the meaning assigned to that term in Section 5.2(g)(i).

"Transportation Contract" means, individually or collectively as the context may require, the agreements between the Borrower and commercial or industrial bona-fide third party entities (including, without limitation, Flexitank, Inc.) for the transportation of renewable natural gas in liquified form, renewable carbon dioxide or electricity, in form and substance acceptable to the Administrative Agent in its sole reasonable discretion.

"UCC" means the Puerto Rico Commercial Transactions Act, as now or hereafter amended.

"Unfunded Non-Revolving Facility Commitment" means the aggregate amount of the Non-Revolving Facility Commitments less all disbursements of the proceeds of Non-Revolving Facility Advances made prior to the date on which the amount of the Unfunded Non-Revolving Facility Commitment is being calculated.

"USA Patriot Act" has the meaning assigned to that term in Section 4.1(kk).

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"Working Capital Reserve Account" has the meaning assigned to that term in Section 6.3.3(a).

1.2     **Terms Generally.** The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

1.3     **Accounting Terms; GAAP.** Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time.

## ARTICLE II
## AMOUNTS AND TERMS OF THE ADVANCES; PROJECT BUDGET

2.1     **Commitment, Amount and Purpose.** (a) Each Lender with a Non-Revolving Facility Commitment (each a "Non-Revolving Facility Lender") severally agrees, on and subject to the terms and conditions hereinafter set forth, to make non-revolving advances (each a "Non-Revolving Facility Advance") to the Borrower from time to time on any Business Day during the period from the Closing Date up to and including the Non-Revolving Facility Commitment Termination Date, under a non-revolving line of credit ("Non-Revolving Facility") in an aggregate principal amount not to exceed such Non-Revolving Facility Lender's Proportionate Share of ELEVEN MILLION EIGHT HUNDRED SIXTY-NINE THOUSAND TWO HUNDRED FIFTY DOLLARS ($11,869,250.00) (such Non-Revolving Facility Lender's "Non-Revolving Facility Commitment"). Each borrowing made by the Borrower under this Section 2.1(a) (a "Non-Revolving Facility Borrowing") shall be in an aggregate principal amount of not less than $100,000 and shall consist of one or more Non-Revolving Facility Advances made on the same day by the Non-Revolving Facility Lenders ratably in accordance with their respective Non-Revolving Facility Commitments. Each Non-Revolving Facility Borrowing shall reduce the amount of the Non-Revolving Facility Commitments ratably by the principal amount of such Non-Revolving Facility Borrowing. The Borrower may not reborrow any Non-Revolving Facility Advances after any repayment and/or prepayments of the whole or any part thereof. The Borrower shall not make more than two (2) request for Non-Revolving Facility Advances per month. The proceeds of the Non-Revolving Facility Advances shall be used by the Borrower on or prior to the Non-Revolving Facility Commitment Termination Date for the following purposes: (i) to partially

finance the payment or reimbursement of Project Costs pursuant to the amounts set forth in the Project Budget, as such Project Costs are incurred in accordance with the Draw Request Documents; (ii) to fund the Reserve Accounts as required under Section 6.3; and (iii) on the Closing Date, to finance for the payment of fees, costs and expenses payable by the Borrower in connection with the transactions contemplated by the Loan Documents.

(b)     Each Lender with a Converted Loan Facility Commitment (each a "Converted Loan Facility Lender") severally agrees, on the terms and conditions hereinafter set forth, to make a term loan advance (each a "Converted Loan Facility Advance") to the Borrower on the Conversion Date under a term loan facility ("Converted Loan Facility") in an amount equal to such Converted Loan Facility Lender's Proportionate Share of the aggregate outstanding principal amount of the Non-Revolving Facility Advances on the Conversion Date (such Lender's "Converted Loan Facility Commitment"). The borrowing made under this Section 2.1(b) shall be hereinafter referred to as the "Converted Loan Facility Borrowing." The Converted Loan Facility Borrowing shall be effected, subject to the terms and conditions hereafter set forth, by the conversion on the Conversion Date of the outstanding Non-Revolving Facility Advances of each Non-Revolving Facility Lender into Converted Loan Facility Advances, without any disbursement of Converted Loan Facility Advances to the Borrower. The Borrower may not reborrow Converted Loan Facility Advances after repayment and/or prepayment of the whole or any part thereof. The Converted Loan Facility Advances shall be used to evidence the permanent financing of the Non-Revolving Facility Advances.

2.2     **Making the Advances.**  (a) (i) Subject to the prior satisfaction of the applicable conditions precedent set forth in Article III, each Borrowing shall be made on written notice given not later than 2:00 P.M. (Puerto Rico time) five (5) Business Days prior to the date of the proposed Borrowing by an Authorized Representative on behalf of the Borrower to the Administrative Agent, which shall give to each Lender prompt notice thereof on the same Business Day by telephone, telecopier, electronic mail, or personal delivery. Each such notice of a Borrowing (a "Notice of Borrowing") shall be by telephone, telecopier or electronic mail (in each such case confirmed immediately in writing) or by personal delivery, in substantially the form of Exhibit A, specifying therein the (A) requested date of such Borrowing, (B) the aggregate amount of such Borrowing and (C) the use of each Borrowing in accordance with the Project Budget. Each such Notice of Borrowing shall be delivered together with the corresponding Draw Request Documents, as applicable (which shall include Annex A thereto related to the Project Costs in the format attached to the Draw Request Documents) and the report of approval of the Independent Engineer as set forth in Section 2.2(a)(iv). The Administrative Agent shall (to the extent that the Administrative Agent has received such funds from the Lenders and subject to the fulfillment of the applicable conditions set forth in Article III in the sole judgment of the Administrative Agent) make such funds available to the Borrower at the Administrative Agent's address set forth in Section 10.2 by 4:00 P.M. (Puerto Rico time) five (5) Business Days after the receipt and approval of the Draw Request Documents (including the approval of the Independent Engineer thereof) by depositing the proceeds of such Non-Revolving Facility Advance in the Operating Account of the Borrower with the Administrative Agent; provided, however, that the Administrative Agent, with respect to the Non-Revolving Facility Advance and the proceeds of which are payable to any contractor or supplier of the Project, may, in its sole discretion, elect to make such funds available

by check or other instrument payable directly to the contractor or supplier or jointly to the Borrower and the contractor or supplier.

(ii)     The Administrative Agent shall be entitled to rely on any electronic or telephonic notice given by the Borrower pursuant to subsection (a)(i) above (regardless of whether or not such telephonic or electronic notice is subsequently confirmed in writing, but without prejudice to the Borrower' obligation to deliver such written confirmation) which the Administrative Agent in good faith reasonably believes to be from an Authorized Representative of the Borrower.

(iii)     Notwithstanding anything set forth herein to the contrary, (A) the Lenders shall have no obligation to make any Advance unless the Administrative Agent and the Required Lenders, in their sole reasonable judgment, are satisfied that each of the applicable conditions precedent set forth in Article III have been fully satisfied, and (B) any and all Non-Revolving Facility Advance made by any Non-Revolving Facility Lender pursuant to this Agreement shall be made against certifications, invoices and/or purchase orders duly approved by the Administrative Agent, the Lenders and the Independent Engineer, and shall not exceed the amounts established for each specific use under the Project Budget attached hereto as Schedule 2.2(a)(iii), unless a reallocation of funds is previously approved in writing by the Required Lenders, in their sole discretion or as set forth in Section 2.13 hereof; provided further, however, that no such permitted reallocation may be made from the "Interest Reserve Budget Line Items". The maximum amount of Non-Revolving Facility Advances that each Lender shall be obligated to disburse for any item of Project Costs of the Project shall not exceed the amount designated for such category shown in the Project Budget. Any and all amendments to the Project Budget shall be evidenced by a new Project Budget approved in advanced by the Required Lenders and the Independent Engineer, with the modified Project Costs for the Project. Notwithstanding the foregoing, all Change Orders and costs over the approved Project Budget (as adjusted to consider any reallocation of funds) are for the account of the Borrower.

(iv)     In no event shall the amount of any Non-Revolving Facility Advance exceed (i) the sum of (A) the cost of construction work in place, (B) disbursements, if any, for Indirect Costs, (C) the cost of Stored Materials, and (D) any other costs, expenses and fees actually paid or payable by the Borrower for approved Project Costs for the Project, as applicable, described in the Project Budget as of the date of the Notice of Borrowing for a Non-Revolving Facility Advance, less (ii) (A) any Non-Revolving Facility Advances previously disbursed under the Non-Revolving Facility for such items, (B) the proceeds received from the QLICI Notes, and (C) Equity Contribution previously used to pay for such items. Any amounts deposited with the Administrative Agent pursuant to Section 2.2(b) to put a Facility "In balance" shall be the next funds disbursed by the Administrative Agent. The Administrative Agent shall not be required to make any Advance unless the corresponding Draw Request Documents shall have first been approved by the Independent Engineer.

(b)     The Borrower shall pay all Project Costs in excess of the amount of the Commitments.  The Lenders shall be required to make Advances (including the initial Non-Revolving Facility Borrowing) only when the Facility is "In balance." The Facility will be "In-balance" only at such times as, in the sole reasonable judgment of the Administrative Agent, the

undisbursed portion of the Non-Revolving Facility shall be sufficient to fully complete the Project, and pay all Project Costs to be funded from the Facility after all Equity in the Equity Escrow Account and the funds received from the QLICI Notes were drawn and used for such purposes, pursuant to the Project Budget. The determination as to whether or not the Facility is "In-balance" may be made by the Administrative Agent at any time, including at the time of each request for a Non-Revolving Facility Advance (including the initial Non-Revolving Facility Borrowing). The Borrower shall, within ten (10) days after notice from the Administrative Agent that the Facility is not "In-balance," deposit in the Equity Escrow Account with the Administrative Agent, in cash, the amount necessary to put the Facility "In-balance," which funds shall be used to fund the corresponding Project Costs before disbursing any additional Advances.

(c)     If the Project is not Substantially Completed on or before the Project Termination Date, the Borrower acknowledges that the Administrative Agent and the Lenders may incur certain administrative costs and expenses and other damages, the amount of which will be difficult and impractical to determine. Therefore, the Borrower agrees that if the Project is not Substantially Completed on or before the Project Termination Date for any reason, the Administrative Agent and the Lenders shall be entitled to the reimbursement of all reasonable expenses, charges, costs and fees incurred or payable by the Lenders and the Administrative Agent as a result of the Project not having been Substantially Completed on or before the Project Termination Date (including, without limitation, reasonable fees of any consultants and reasonable attorneys' fees) immediately upon demand therefor.

(d)     Each Notice of Borrowing shall be irrevocable and binding on the Borrower. The Borrower shall indemnify each Lender against any loss, cost or expense incurred by such Lender as a result of any failure to fulfill on or before the date specified in such Notice of Borrowing for such Borrowing the applicable conditions set forth in Article III, including, without limitation, any loss, cost or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by such Lender to fund the Advance to be made by such Lender as part of such Borrowing when such Advance, as a result of such failure, is not made on such date.

(e)     Unless the Administrative Agent shall have received notice from a Lender prior to the date of any Borrowing under a Facility under which such Lender has a Commitment that such Lender will not make available to the Administrative Agent such Lender's ratable portion of such Borrowing, the Administrative Agent may assume that such Lender has made such portion available to the Administrative Agent on the date of such Borrowing in accordance with subsection (a)(i) of this Section 2.2 and the Administrative Agent may, in reliance upon such assumption, but shall not have the obligation to, make available to the Borrower on such date a corresponding amount. If and to the extent that such Lender shall not have so made such ratable portion available to the Administrative Agent, such Lender and the Borrower severally agree to repay to the Administrative Agent forthwith on demand such corresponding amount together with interest thereon, for each day until the date such amount is repaid or paid to the Administrative Agent, at (i) in the case of the Borrower, the interest rate applicable under Section 2.4 to Advances comprising such Borrowing and (ii) in the case of such Lender, the Federal Funds Effective Rate. If such Lender shall repay to the Administrative Agent such corresponding amount, such amount

so paid shall constitute such Lender's Advance as part of such Borrowing for purposes of this Agreement.

(f) The failure of any Lender to make the Advance to be made by it as part of any Borrowing shall not relieve any other Lender of its obligation, if any, hereunder to make its Advance on the date of such Borrowing, but no Lender shall be responsible for the failure of any other Lender to make the Advance to be made by such other Lender on the date of any Borrowing.

2.3 **Repayment.** (a) The Non-Revolving Facility Advances made to the Borrower shall be evidenced by a promissory note of the Borrower to the order of the corresponding Non-Revolving Facility Lender in substantially the form of Exhibit B-1 (each, a "Non-Revolving Facility Note"). The aggregate outstanding principal amount of the Non-Revolving Facility Advances and the Non-Revolving Facility Notes shall not exceed ELEVEN MILLION EIGHT HUNDRED SIXTY-NINE THOUSAND TWO HUNDRED FIFTY DOLLARS ($11,869,250.00). The aggregate unpaid principal balance of all outstanding Non-Revolving Facility Advances shall be payable in full on the Non-Revolving Facility Commitment Termination Date (but shall be converted, without any disbursement of funds, to Converted Loan Facility Advances on the Conversion Date, subject to the terms and conditions of this Agreement).

(b) The Converted Loan Facility Advances made to the Borrower shall be evidenced by a promissory note of the Borrower to the order of the corresponding Converted Loan Facility Lender in substantially the form of Exhibit B-2 (each a "Converted Loan Facility Note"). The aggregate principal amount of the Converted Loan Facility Notes shall not exceed ELEVEN MILLION EIGHT HUNDRED SIXTY-NINE THOUSAND TWO HUNDRED FIFTY DOLLARS ($11,869,250.00). The aggregate principal amount of the Converted Loan Facility Notes shall be payable in seventy-two (72) consecutive monthly installments in accordance with the following 7-year amortization schedule, plus accrued interests, commencing on the first (1st) day of the first (1st) calendar month following the Conversion Date, and thereafter on the first (1st) day of each succeeding month; provided, however, that the last installment shall be payable no later than September 15, 2027 (the "Converted Loan Facility Maturity Date") in the amount necessary to repay in full the unpaid principal amount of the Converted Loan Facility Advances and all other amounts outstanding under the Converted Loan Facility Notes:

| Year | Monthly Installments | Monthly Principal Payments | Annual Principal Payment |
|------|----------------------|----------------------------|--------------------------|
| 1 | 1-12 | $ 116,100.00 | $ 1,393,200.00 |
| 2 | 13-24 | $ 123,600.00 | $ 1,483,200.00 |
| 3 | 25-36 | $ 131,600.00 | $ 1,579,200.00 |
| 4 | 37-48 | $ 140,200.00 | $ 1,682,400.00 |
| 5 | 49-60 | $ 149,300.00 | $ 1,791,600.00 |
| 6 | 61-71 | $ 159,000.00 | $ 1,749,000.00 |
| | 72 (Balloon) | | $2,190,650.00 |

In the event that the aggregate amount of the Converted Loan Facility is less than $11,869,250.00, the amount of the monthly installments of principal set forth in the foregoing amortization schedule shall be reduced in inverse order of maturity of installments based on such lesser amount.

Notwithstanding the foregoing, if Borrower extended the Non-Revolving Commitment Termination Date by an additional three (3) months in accordance with this Agreement, the aggregate principal amount of the Converted Loan Facility Notes shall be payable in sixty-nine (69) consecutive installments in accordance with the 7-year amortization schedule set forth above, plus accrued interests; provided, however, that the last installment shall be made on the Converted Loan Facility Maturity Date (which in this case would be the sixty-ninth (69th) installment) for an amount not less than $2,534,800 (for avoidance of doubt, this amount includes the balloon payment amount for the 72nd installment plus the principal amounts for installments 69 -71 set forth in the amortization schedule set forth above, the totality of which shall be payable on the Converted Loan Facility Maturity Date).

2.4     **Interest**. (a) The Borrower shall pay interest on the unpaid principal amount of each Advance made by each Lender from the date of such Advance, payable monthly on the first (1st) day of each month during such periods and on the day until such principal amount shall be paid in full, at the following rates per annum:

(i)     With respect to the Non-Revolving Facility Advances, a fixed rate per annum equal at all times to six-point twenty-five percent (6.25%); provided, however, should the Borrower extend the Non-Revolving Facility Commitment Termination Date for an additional three (3) month period, the Borrower shall pay a fixed rate per annum equal at all times to six-point fifty percent (6.50%) with respect to the Non-Revolving Facility Advances during such three (3) month period.

(ii)     With respect to the Converted Loan Facility Advances, a fixed rate per annum equal at all times to six-point twenty-five percent (6.25%) as of the Conversion Date.

(b)     Upon the occurrence and during the continuance of an Event of Default pursuant to Section 7.1, the Borrower shall pay interest on (i) the unpaid principal amount of each Advance owing to each Lender, from the date such amount is due until such amount shall be paid in full payable in arrears on the dates referred to in Section 2.4(a) above, at a rate per annum equal at all times to the Default Rate and (ii) to the extent permitted by law, on the amount of any interest, fee or other amount payable hereunder which is not paid when due, from the date such amount shall be due until such amount shall be paid in full, payable in arrears on the date such amount shall be paid in full and on demand, at a rate per annum equal at all times to the Default Rate.

(c)     All computations of interest under the Notes shall be made on the basis of a year of 360 days, but shall be paid on the basis of the actual number of days elapsed in the period being covered by such interest payment.

(d)     In the event that any applicable law limiting the amount of interest or other charges permitted to be collected from the Borrower is interpreted so that any interest, fee or charge provided for in this Agreement, whether considered separately or together with other charges levied in connection with this Agreement, violates such law and the Borrower are entitled to the benefit of such law, such charge is hereby reduced to the extent necessary to eliminate such violation. The amounts, if any, previously paid to the Administrative Agent for the benefit of the Lenders in excess of the amounts payable to the Administrative Agent for the benefit of the

Lenders pursuant to such interest, fee or charges as reduced shall be applied by the Administrative Agent to reduce the principal of the Indebtedness owed by the Borrower hereunder. For purposes of determining whether any applicable law limiting the amount of interest, fees or other charges permitted to be collected from the Borrower has been violated, all payment obligations under this Agreement which constitute interest, fees and charges shall be deemed to be allocated and spread over the stated term of this Agreement. Unless otherwise required by applicable law, such allocation and spreading shall be effected in such a manner that the rate of interest computed thereby is uniform throughout the stated term of this Agreement.

(e)     For the Borrower's benefit, the Project Budget includes a Budget Line Item for interest on the Non-Revolving Facility Note (the "Interest Reserve Budget Line Item"). The Borrower hereby authorizes the Administrative Agent from time to time, for the mutual convenience of the Administrative Agent and Borrower, to disburse proceeds of the Non-Revolving Facility Advance to pay all of the then accrued interest on the Non-Revolving Facility Note when due, regardless of whether the Borrower shall have specifically requested a disbursement of such amount. Any such disbursement, if made, shall be added to the outstanding principal balance of the Non-Revolving Facility Note and shall, when disbursed, bear interest pursuant to the terms of this Agreement. The Borrower may request Non-Revolving Facility Advances from the Interest Reserve Budget Line Item to pay interest on the Non-Revolving Facility Note upon qualifying for such disbursement by satisfying the applicable requirements of Article III. Without limiting the foregoing, once the Interest Reserve Budget Line Item has been expended, the Borrower shall pay interest on the Non-Revolving Facility Note from its own funds.

2.5     **Interest Rate Determination.**  The interest rate applicable to the Advances hereunder shall be as set forth in Section 2.4 hereof.

2.6     **Increased Costs.**  (a) If, due to either (i) the introduction of or any change (including, without limitation, any change by way of imposition or increase of reserve, special deposit, insurance charge or similar requirements, or any other costs or expenses, or by way of imposition or increase in any tax (federal, state or municipal), levy, impost, duty or similar charge) in, or in the interpretation of, any law or regulation after the date hereof, which is of general application to financial institutions in the United States or Puerto Rico, or (ii) compliance with any guideline implemented after the date hereof or request from any central bank or other Governmental Authority (whether or not having the force of law) which is of general application to financial institutions in the United States or Puerto Rico, there shall be any increase in the cost to any Lender of agreeing to make or making, funding or maintaining Advances, then the Borrower shall from time to time, within five (5) Business Days after written demand by such Lender (with a copy of such demand to the Administrative Agent, together with the certificate referred to in subsection (c) of this Section), pay to the Administrative Agent, for the account of such Lender additional amounts sufficient to compensate such Lender for such increased cost.

(b)     If any Lender determines that compliance with any law or regulation or any written guideline or request from any central bank or other Governmental Authority (whether or not having the force of law) which is of general application to financial institutions in the United States or Puerto Rico affects or would affect the amount of capital required or expected to be maintained by such Lender or any corporation Controlling such Lender and that the amount of

such capital is increased by, or based upon the existence of such Lender's Commitment(s) to lend hereunder, and other commitments of such type, then, within five (5) Business Days after written demand by such Lender (with a copy of such demand to the Administrative Agent), together with the certificate referred to in subsection (c) of this Section, the Borrower shall pay to the Administrative Agent for the account of such Lender from time to time as specified by such Lender, additional amounts sufficient to compensate such Lender or such corporation (whether or not such amounts arise prior to the receipt of written notification from such central bank or other Governmental Authority) in the light of such circumstances, to the extent that such Lender reasonably determines such increase in capital to be allocable (in the proportion that such Lender's Commitment(s) hereunder bears to all of such Lender's commitments of this type, as applicable) to the existence of such Lender's Commitment to lend hereunder.

(c)     A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in subsections (a) and (b) of this Section, submitted to the Borrower and the Administrative Agent by such Lender, shall be conclusive and binding, absent manifest error.

2.7     **Non-Excluded Taxes and Other Taxes.** (a) Any and all payments made by the Borrower hereunder, under the Notes and under the other Loan Documents shall be made free and clear of, and without deduction for, any and all present or future Taxes, and all liabilities with respect thereto, which are imposed on any payments made by the Borrower hereunder, excluding (i) in the case of each Lender and the Administrative Agent, Taxes imposed on its income, branch profits and franchise taxes and municipal license taxes imposed on it, by the Commonwealth of Puerto Rico, the United States of America and/or any other jurisdiction under the laws of which such Lender or the Administrative Agent (as the case may be) is organized or its principal office is located or (in any such case) any political subdivision thereof and (ii) in the case of each Lender, Taxes imposed on its income, and franchise taxes and municipal license taxes imposed on it, by the Commonwealth of Puerto Rico, the United States of America and/or any other jurisdiction of such Lender's Lending Office or any political subdivision thereof (all such non-excluded Taxes and liabilities being hereinafter referred to as "Non-Excluded Taxes"); provided, however, that the Borrower shall not be obligated to pay any additional amount for or on account of any Non-Excluded Taxes required to be deducted or withheld on behalf of any Lender or the Administrative Agent by reason of such Lender or the Administrative Agent having some connection with the jurisdiction imposing such Non-Excluded Tax, other than such connections as arise from the execution, delivery, performance or enforcement of this Agreement and the transactions contemplated hereby. If the Borrower shall be required by law to deduct any Non-Excluded Taxes from or in respect of any sum payable hereunder, under the Notes or under any other Loan Document to any Lender or the Administrative Agent, (A) the sum payable hereunder shall be increased as may be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section) such Lender or the Administrative Agent (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made, (B) the Borrower shall make such deductions, and (C) the Borrower shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b)     The Borrower agrees to pay any present or future stamp or documentary taxes or any other excise or property taxes, registry, recording and filing fees, charges or similar levies which arise at any time from any payment made hereunder or under the Notes or any other Loan Document or from the execution, delivery or registration or recordation of, or otherwise with respect to, this Agreement, the Notes or any other Loan Document (hereinafter referred to as "Other Taxes").

(c)     The Borrower agrees to indemnify each Lender and the Administrative Agent for the full amount of Non-Excluded Taxes and Other Taxes (including, without limitation, any Non-Excluded Taxes or Other Taxes imposed by any jurisdiction on amounts payable under this Section) paid by such Lender or the Administrative Agent (as the case may be) and any liability (including penalties, interest and expenses, unless arising as a result of the Administrative Agent's or any Lender's gross negligence or willful misconduct) arising therefor or with respect thereto after demand for payment thereof by the corresponding Lender. This indemnification payment shall be made within five (5) Business Days from the date such Lender or the Administrative Agent (as the case may be) makes written demand therefor.

(d)     Upon the written request of the Administrative Agent, the Borrower, within thirty (30) days after the date of any payment of Non-Excluded Taxes, will furnish to the Administrative Agent, at its address referred to in Section 10.2, the original or a certified copy of a receipt evidencing payment thereof.

(e)     If any party determines, in its sole discretion exercised in good faith, that it has received a refund of Taxes as to which it has been indemnified or are attributable to additional amounts paid pursuant to this Section, it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 2.7 with respect to the Taxes giving rise to such refund), net of all out of pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the appropriate taxing authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this Section 2.7(e) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this Section 2.7(e), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this Section 2.7(e) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This Section 2.7(e) shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(f)     To the extent that the Administrative Agent or any Lender is entitled to an exemption from or reduction of withholding Taxes with respect to payments made under the Notes and the other Loan Documents, the Administrative Agent or the relevant Lender shall deliver to the Borrower, at the time or times prescribed by applicable law or as reasonably requested in

writing by the Borrower, such properly completed and executed documentation prescribed by applicable law as will permit such payments to be made without withholding or at a reduced rate of withholding.

(g)     Within thirty (30) days of the written request of the Borrower therefor, the Lender shall execute and deliver to the Borrower such certificates, forms or other documents which can be furnished consistent with the facts and which are reasonably necessary to assist the Borrower in applying for refunds of Taxes remitted hereunder; provided, however, that (i) neither the Administrative Agent or the Lender shall be required to deliver any certificates, forms or other documents if in its respective sole and reasonable discretion it is determined that the deliverance of such certificate, form or other document would have a material adverse effect on the Administrative Agent or such Lender, (ii) nor shall the Administrative Agent or Lender be required to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the Borrower or any other Person; and (iii) the Borrower shall reimburse the Administrative Agent and the Lender for any reasonable expenses incurred in the delivery of such certificate, form or other document.

(h)     Without prejudice to the survival of any other agreement of the Borrower hereunder, the agreements and obligations of the Borrower contained in this Section shall survive the payment in full of principal and interest under the Notes and of any other amounts payable under the other Loan Documents.

2.8     **Sharing of Payments, etc.**  If any Lender shall obtain any payment or other recovery (whether voluntary, involuntary, through the exercise of any right of set-off or otherwise) on account of any Advance made by it (other than pursuant to Sections 2.6, 2.7, 9.1, or 9.2 hereof) or other Obligation under the Loan Documents in excess of its ratable share of payments and other recoveries obtained by all Lenders on account of the Advances or other Obligations under the Loan Documents then held by them, such Lender shall purchase from the other Lenders such participation in the Advance or other Obligation under the Loan Documents held by them as shall be necessary to cause such purchasing Lender to share the excess payment or other recovery ratably with each of them; provided, however, that if all or any portion of the excess payment or other recovery is thereafter recovered from such purchasing Lender, such purchase from each Lender shall be rescinded and each Lender shall repay to the purchasing Lender the purchase price to the extent of such recovery together with an amount equal to such selling Lender's ratable share (according to the proportion of (a) the amount of such selling Lender's required repayment to the purchasing Lender to (b) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered.  The Borrower agrees that any Lender so purchasing a participation from another Lender pursuant to this Section may, to the fullest extent permitted by law, exercise all its rights of payment (including the right of set-off) with respect to such participation as fully as if such Lender were the direct creditor of the Borrower in the amount of such participation.

2.9     **Mandatory and Optional Prepayments.**

(a)     <u>Sale of Assets</u>.  Without limiting the prohibition set forth in Section 5.2(g) hereof, in the event that the Net Cash Payments of any Disposition to be made (a "<u>Current</u>

Disposition"), and of all prior Dispositions as to which a prepayment has not yet been made under this subsection, shall exceed $200,000.00 in the aggregate during any calendar year then, no later than five (5) Business Days prior to the occurrence of the Current Disposition, the Borrower will deliver to the Administrative Agent a statement, in form and substance reasonably satisfactory to the Administrative Agent, showing the calculation of the amount of the Net Cash Payments of the Current Disposition and of all such prior Dispositions and will prepay the Advances, in an aggregate amount equal to one hundred percent (100%) of the Net Cash Payments of the Current Disposition and such prior Dispositions, such prepayment to be effected in each case in the manner specified in subsection (f) of this Section; provided that the Borrower, pursuant to Section 5.2(g)(ii) hereof, may use the proceeds of the sale, transfer or other disposition of obsolete Equipment for the replacement of such Equipment.

(b)     Recovery Events. Upon the receipt of the proceeds of any insurance, condemnation award or other compensation in respect of any Recovery Event affecting the property of the Borrower, and to the extent required by Section 6.2, the Borrower shall prepay the Advances, such prepayment to be applied in each case in the manner specified in subsection (f) of this Section.

(c)     Change of Control. Upon the occurrence of a Change of Control, the Borrower shall prepay the Advances in full and the Commitments hereunder shall terminate. Upon any such prepayment, the Borrower shall pay to the Administrative Agent, for the account of the Lenders a prepayment fee in an amount equal to the applicable percentage set forth in subsection (e)(ii) below of the outstanding principal amount of the Advances that are prepaid.

(d)     Tax Credits. Upon Borrower's receipt of any proceeds (net of reasonable third party commissions and expenses) resulting from the sale of any Tranche Two Tax Credits (the "Tranche Two Tax Credit Proceeds"), the Borrower shall prepay the Notes, in an amount equal to one hundred percent (100%) of the Tranche Two Tax Credit Proceeds, and such prepayment to be effected in each case in the manner specified in subsection (f) of this Section.

(e)     Optional Prepayments. The Borrower may, upon at least five (5) Business Days' prior written notice to the Administrative Agent stating the proposed date of prepayment, and if such notice is given the Borrower shall, prepay, in whole or in part in an aggregate minimum amount of $100,000.00 and integral multiples of $100,000.00 in excess of that amount, the outstanding principal amount of the Advances. Amounts prepaid as aforesaid may not be reborrowed. Upon any such prepayment, the Borrower shall pay to the Administrative Agent, for the account of the Lenders, as applicable, a prepayment fee in an amount equal to three percent (3%) of the outstanding principal amount of the Advances that are prepaid; provided, however, that no such prepayment fee shall be payable if the Borrower makes the prepayment with internally-generated funds and/or proceeds from a refinancing with any Lender. Each such prepayment shall be applied in the manner specified in subsection (f) of this Section.

(f)     Application. (i) Prepayments made pursuant to subsections (a), (b), (d) and (e) of this Section shall be applied as follows:

(A)    first, ratably to the Non-Revolving Facility Notes until payment in full thereof; and

(B)    second, ratably to the Converted Loan Facility Notes in the inverse order of the maturities of the installments thereof until payment in full thereof.

(ii)    No such application shall postpone or reduce any payments otherwise required pursuant to the Notes.

(g)    Accrued Interest. All prepayments hereunder shall be made together with accrued interest to the date of such prepayment on the aggregate principal amount prepaid.

(h)    No Prepayment Fee or Premium. Except in the case of a pre-payment pursuant to subsection (c) and/or (e) of this Section, all of the prepayments made under this Section shall be made without prepayment fee or premium.

2.10    **Fees.** (a) The Borrower agrees to pay to Banco Popular de Puerto Rico, in full and in immediate available funds, on the Closing Date, a structuring fee equal to Two Hundred Thirty Three Thousand Seven Hundred Fifty Dollars ($233,750.00) (the "Structuring Fee"). The Structuring Fee shall be fully earned when due and shall not be subject to pro-ration, rebate or reimbursement upon the early termination of this Agreement or any Commitment hereunder for any reason.

(b)    Additionally, the Borrower agrees to pay to Banco Popular de Puerto Rico, in full in immediate available funds, on the date the Borrower notifies to the Administrative Agent that it will extend the Non-Revolving Facility Commitment Termination Date for an additional three (3) month period, an extension fee equal to point twenty-five percent (.25%) of the aggregate Non-Revolving Facility Commitments (the "Extension Fee"), which shall be fully earned when due and shall not be subject to pro-ration, rebate or reimbursement upon the early termination of this Agreement or any Commitment hereunder for any reason.

2.11    **Payments.** (a) The Borrower shall make each payment hereunder and under the Notes by not later than 2:00 p.m. (Puerto Rico time) on the day when due in lawful money of the United States of America in same day funds to the Administrative Agent, for the ratable benefit of the Lenders, at its address referred to in Section 10.2. The Administrative Agent will promptly thereafter cause like funds to be distributed (i) if such payment by the Borrower is in respect of principal, interest, fees or any other Obligations then payable hereunder and under the Notes to more than one Lender, to such Lenders ratably in accordance with the amounts of such respective Obligations then payable to such Lenders and (ii) if such payment by the Borrower is in respect of any Obligation then payable hereunder to one Lender, to such Lender, in each case to be applied in accordance with the terms of this Agreement. Upon its acceptance of any Assignment Agreement and recording of the information contained therein in the Register maintained by the Administrative Agent pursuant to Section 9.1(c), from and after the effective date of such Assignment Agreement, the Administrative Agent shall make all payments hereunder and under the Notes in respect of the interest assigned thereby to the Lender assignee thereunder, and the parties to such Assignment Agreement shall make all appropriate adjustments in such payments

for periods prior to such effective date directly between themselves. Any payments made by the Borrower hereunder to the Administrative Agent for the benefit of the Lenders shall be deemed to be payment made by the Borrower to the Lender or Lenders entitled to receive such payments.

(b)     Whenever any payment to be made hereunder or under the Notes or any other Loan Document shall be stated to be due on a day other than a Business Day, such payment may be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of interest.

(c)     The Borrower hereby expressly acknowledges and agrees that scheduled payments due hereunder and under the Notes may be debited directly by the Administrative Agent from the Operating Account on the date due, and the Borrower hereby expressly authorizes the Administrative Agent so to charge against the Operating Account any such scheduled payments as the same become due.  Any time after the occurrence and continuance of an Event of Default, the Borrower hereby also authorizes the Administrative Agent, if and to the extent any payment owed to the Administrative Agent and/or the Lenders by the Borrower is not made when due hereunder or under any Note held by the Lenders or under any other Loan Document, to charge from time to time against any or all of the Borrower's Accounts (including, without limitation, the Operating Account) with the Administrative Agent any amount so due.

2.12    **Authorized Representatives**.    The Borrower hereby appoints each of the Authorized Representatives, acting singly, as its authorized representative for purposes of dealing with the Administrative Agent and the Lenders on behalf of the Borrower in respect of any and all matters in connection with this Agreement and the other Loan Documents.  Each Authorized Representative, acting singly, shall have the power, in his or her discretion, to give and receive all notices, monies, approvals, and other documents and instruments, and to take any other action on behalf of the Borrower.  All actions by the Authorized Representative shall be final and binding on the Borrower.  The Administrative Agent and each of the Lenders may rely on the authority given to the Authorized Representatives until actual receipt by each of them of a duly authorized resolution substituting a different Person as the Authorized Representative.  If the Borrower appoints more than one Authorized Representative, the action of any one Authorized Representative shall be binding and sufficient.

2.13    **Change Orders**. The Borrower agrees that no Change Orders may be implemented without the prior written approval of the Required Lenders and the Independent Engineer; provided, however, that the Borrower, without the prior written consent of the Administrative Agent and the Lenders, but only after giving prior written notice to the Administrative Agent and the Lenders, and after the Borrower submits a revised Project Budget to the Administrative Agent and the Lenders incorporating the permitted change or modification, may reallocate amounts from one line item of the Project Budget to another line item, provided it does not exceed $50,000 within each line item and $100,000 in the aggregate for all lined items; provided further, however, that (a) such adjustments do not increase the Project Budget; (b) no such permitted reallocation may be made from the "Interest Reserve Budget Line Items" line item; and (c) such adjustment does not cause and Event of Default. The Borrower shall also obtain the prior approval of all parties whose approval of the Change Order is legally required, including any surety, Governmental Authority and any other Person to the extent approval from such party is required. Notwithstanding

the foregoing, the Borrower shall have the right to choose to proceed with (or not proceed with) "alternates" set forth in the Plans and Specifications or Project Budget, provided that (i) such "alternates" have been previously approved in writing by (A) the Administrative Agent, based on the recommendation of the Independent Engineer, and (B) such other parties as may be legally required, (ii) such alternates do not increase the Project Budget; and (iii) the Non-Revolving Facility shall be "In Balance" after proceeding with such "alternates". Changes in the scope of Construction or to any Major Subcontract must be documented with a Change Order on AIA Form G701 or equivalent form. The Borrower shall notify the Administrative Agent and the Independent Engineer in writing of any Change Order by not later than the date of the next Notice of Borrowing following the Borrower's agreement to the changes.

## ARTICLE III
## CONDITIONS OF LENDING

3.1 **Conditions Precedent to Effectiveness of this Agreement and to Initial Borrowing.** The effectiveness of this Agreement, and the obligation of each Lender to make an Advance on the Initial Borrowing are subject to the following conditions precedent:

(a) <u>No Material Adverse Change</u>. There shall have occurred no Material Adverse Change since December 31, 2019.

(b) <u>Fees and Expenses</u>. The Borrower shall have paid to the Administrative Agent and the Lenders, as applicable, all reasonable accrued fees and expenses of the Administrative Agent and the Lenders (including the reasonable accrued fees and expenses of counsel to the Administrative Agent) then due and payable.

(c) <u>Loan Documents</u>. The Administrative Agent shall have received on or before the day of the initial Borrowing, in form and substance reasonably satisfactory to the Lenders (unless otherwise specified):

(i) The Non-Revolving Facility Notes of the Borrower to the order of the corresponding Lenders.

(ii) The following security instruments and other documents, duly executed and delivered by the parties identified below or in such instruments:

(A) a security agreement (the "<u>Security Agreement</u>") pursuant to which the Borrower grants a first-priority Lien in all of its interests in the Collateral (as defined in the Security Agreement) to the Administrative Agent, for the benefit of the Lenders;

(B) a collateral assignment of all rights, title and interests of the Borrower in the Site Lease pursuant to an assignment of leasehold interest agreement (the "<u>Assignment of Leasehold Interest</u>") pursuant to which the Borrower grants a first-priority Lien in all of its Leasehold Interests, right and title

in and to the contractual rights described in the Site Lease to the Administrative Agent, for the benefit of the Lenders;

(C)     a collateral assignment of, and a Lien in, all rights of the Borrower in the Project Contracts, and in the amounts payable to the Borrower thereunder, pursuant to an assignment and security agreement (the "Assignment of Project Contracts") creating a first-priority Lien in the Project Contracts, and in such rights and amounts, together with all notices, consents, estoppels, acknowledgments and instruments which the Administrative Agent may reasonably require in order to perfect such Lien and assignment;

(D)     a pledge of not less than seventy-four percent (74%) of the issued and outstanding ownership interests (the "Pledged Interest") in the Borrower, pursuant to one or more pledge, assignment and security agreements (collectively, the "Membership Interest Pledge Agreement") creating a first priority Lien in the Pledged Interest executed by the Member as the legal and beneficial owner thereof, as the legal and beneficial owner of the Pledged Interest, in favor of the Administrative Agent, for the benefit of the Lenders;

(E)     a collateral assignment of all rights of the Borrower in the Tax Credits, pursuant to an assignment and security agreement (the "Assignment of Tax Credits") pursuant to which the Borrower grants a first priority Lien in the Tax Credits, in favor of the Administrative Agent, for the ratable benefit of the Lenders;

(F)     a deposit account pledge and control or other similar agreement (the "Accounts Control Agreement"), pursuant to which the Borrower pledges and grants a first-priority Lien in, and exclusive control and dominion of, the Accounts and Account Collateral as more particularly set forth therein, to the Administrative Agent for the benefit of the Lenders;

(G)     one or more guaranty agreements (the "Personal Guaranties") executed by each Sponsor pursuant to which the Sponsors (collectively, the "Personal Guarantors") guarantee, jointly and severally ("*solidariamente*") with the Borrower and any other guarantor, the Obligations of the Loan Parties under this Agreement, the Notes and the other Loan Documents;

(H)     a guaranty agreement (the "Corporate Guaranty") executed by the the Corporate Guarantor pursuant to which the Corporate Guarantor guarantees, jointly and severally ("*solidariamente*") with the Borrower and any other guarantor, the Obligations of the Loan Parties under this Agreement, the Notes and the other Loan Documents;

(I)     one or more Subordination Agreements by each Subordinated Creditor (as defined therein) in favor the Administrative Agent, for the ratable benefit of the Lenders, whereby each such Subordinated Creditor agrees, subject to the terms, conditions and limitations thereof and except as specifically provided herein or therein, to subordinate the rights each may have to receive payments from

the Borrower, including without limitation, any management fees or development fees, among others, in favor of the payment and performance of the Borrower's Obligations under this Agreement and the other Loan Documents;

(J)    an environmental indemnity agreement dated as of the date hereof (the "Environmental Indemnity Agreement"), pursuant to which the Borrower indemnifies the Lenders and the Administrative Agent from any and all Costs and Liabilities (as defined therein) related to Environmental Liability as more particularly described therein; and

(K)    an intercreditor agreement dated as of the date hereof among the Borrower, the NMTC Lenders and the Administrative Agent (the "Intercreditor Agreement"), related to this Agreement and the NMTC Loan.

(d)    Grant and Perfection of Liens.    The Administrative Agent shall have received evidence reasonably acceptable to the Administrative Agent that the Loan Parties have executed all other agreements, documents and instruments, and have taken all other actions, as may be necessary or desirable, in the reasonable opinion of the Administrative Agent, so that the Administrative Agent, for the benefit of the Lenders, has a valid and perfected first priority Lien in all of the Collateral. Such actions shall include, without limitation, (i) the delivery pursuant to the applicable Loan Documents of all certificates, promissory notes and other instruments (duly endorsed, where appropriate, in a manner reasonably satisfactory to the Administrative Agent) evidencing any Collateral; (ii) the delivery to the Administrative Agent of the results of recent Lien searches, by a Person satisfactory to the Administrative Agent, of all effective mortgage, UCC financing statements, fixture filings and all judgment and tax Lien filings which may have been made with respect to any Collateral, together with copies of all such filings disclosed by such searches; (iii) the delivery to the Administrative Agent of UCC financing statements in form suitable for filing as to all such Collateral granted by the Borrower for all jurisdictions as may be necessary or reasonably desirable to perfect the Administrative Agent's Lien in such Collateral; (iv) the delivery to the Administrative Agent of all notices (including, without limitation, the notice required under the Tax Concession pursuant to Section 13(d)(2)(E) and Section 13(d)(3) of the Economic Incentives Act), evidence that the Tax Credit Certification includes language satisfactory to the Administrative Agent certifying the validity of the Assignment of Tax Credits over Borrower's assets and the pledge of all Equity Interest as provided in the Loan Documents, duly issued by Puerto Rico Treasury Department, consents, estoppels, acknowledgments and instruments which the Administrative Agent deems reasonably necessary or advisable to establish, preserve and perfect the first priority Liens granted, or purported to be granted, to the Administrative Agent, for the benefit of the Lenders, in any Collateral; and (v) the delivery to the Administrative Agent of evidence reasonably satisfactory to the Administrative Agent that all other filings (including, without limitation, cancellations, termination statements and releases), recordings and other actions which the Administrative Agent reasonably deems necessary or advisable to establish, preserve and perfect in any jurisdiction the first priority Liens granted, or purported to be granted, to the Administrative Agent, for the benefit of the Lenders, in any Collateral shall have been made.

(e)    Resolutions. The Administrative Agent shall have received certified copies of the resolutions of the Board of Directors (or analogous governing body) of each Loan Party and, if required, the consent of the stockholders or members of each Loan Party, approving such Loan Document to which such Loan Party is or will be a party, and certificates of all documents evidencing other necessary organizational or other action and governmental approvals, if any, with respect to each such Loan Document, all in form and substance reasonably satisfactory to the Administrative Agent and its counsel.

(f)    Incumbency Certificate. The Administrative Agent shall have received a certificate of the Secretary or Assistant Secretary of each Loan Party certifying the names and true signatures of the officers of such Loan Party authorized to sign each Loan Document to which it is a party and the other documents to be delivered by it hereunder.

(g)    Opinions. The Administrative Agent shall have received a favorable opinion of DLA Piper (Puerto Rico) LLC, counsel to the Loan Parties, in substantially the form previously agreed to by the Administrative Agent and such counsel.

(h)    Insurance. The Administrative Agent shall have received evidence required under Section 6.2.1(a) of the existence of all the required Policies and the designation of the Administrative Agent, for the ratable benefit of the Lenders, as the loss payee or additional insured, as the case may be, thereunder to the extent required hereby, and evidence that all Insurance Premiums then due and payable with respect thereto have been paid, including without limitation, evidence that the required payment and performance bond(s) in relation to the Project, name the Borrower and the Administrative Agent, for the benefit of the Lenders, as dual obligees, for not less than one hundred percent (100%) of the amount of the Direct Costs with respect to the whole Project from an insurance company reasonably acceptable to the Administrative Agent, and reasonably satisfactory evidence that the premiums on such bonds have been paid in full.

(i)    Solvency Certificate. The Administrative Agent shall have received an Officer's Certificate, substantially in the form of Exhibit C attesting to the Solvency of the Borrower after giving effect to the transactions contemplated by this Agreement.

(j)    Taxes. The Administrative Agent shall have received evidence of payment of all Taxes payable by the Borrower for any period prior to the Closing Date.

(k)    Good Standing. The Administrative Agent shall have received certificates of good standing dated not more than thirty (30) days prior to the execution of this Agreement evidencing that each Loan Party is in good standing in the Commonwealth of Puerto Rico.

(l)    Material Contracts. The Administrative Agent shall have received a true and complete copy of each of the Material Contracts that are in effect as of the Closing Date, including those listed in Schedule 4.1(cc) hereof.

(m)    Organizational Documents. The Administrative Agent shall have received copies, certified by the Secretary or Assistant Secretary of each Loan Party, of all Organizational Documents of such Loan Party.

(n)     Project Documents.  The Administrative Agent shall have received a true and complete copy of each of the Project Documents (including, without limitation the Project Budget and Project Schedule), together with a certificate, signed by an Authorized Representative of the Borrower, to the effect that (i) neither the Borrower, nor to the best knowledge of the Borrower, any other party to any Project Document, is or, but for the passage of time or giving of notice will be, in breach of any material obligation thereunder, and (ii) all conditions precedent to the performance of the Borrower and, to the best knowledge of the Borrower, all conditions to the performance of the other parties under the Project Documents, have been satisfied.

(o)     Environmental Surveys and Assessments.  Delivery to the Administrative Agent of Administrative Agent's Environmental Questionnaire, and the environmental phase I report (and Phase II report if necessary pursuant to the Administrative Agent and the Independent Engineer's sole determination), prepared by one or more firms or licensed engineers (familiar with the identification of toxic and hazardous substances) reasonably satisfactory to the Administrative Agent, in form and substance reasonably satisfactory to the Administrative Agent, such environmental surveys and assessments ("Environmental Site Assessments") to be based upon physical on-site inspections by such firms of the Site and the Project, as well as an historical review of the uses of the Project and of the business and operations of the Borrower and its predecessors therein.

(p)     Developmental Approvals and Project Reports.  The Administrative Agent shall have received (i) evidence reasonably acceptable to the Independent Engineer that the Site and the Project comply with all zoning, flood and other applicable laws, regulations and ordinances applicable to the development, construction and operation of the Project at the Site, including without limitation, copies of all final and unappealable development approvals and the Plans and Specifications for the Project, including all amendments and required authorizations thereunder; and (ii) a report from the Independent Engineer containing an analysis of the Plans and Specifications, the Project Budget, the Project Schedule and the Project Contracts (including, without limitation, the review of the equipment warranties, payment and performance bonds, the landfill gas emission models (LandGEM) or similar gas emission models, and related documentation). The Project Budget and the Project Schedule must incorporate the final accepted bids from the General Contractor and all Major Subcontractors under Major Subcontracts and must be consistent with the Plans and Specifications. Such report shall be solely for the benefit of the Administrative Agent and shall contain (i) an analysis satisfactory to the Administrative Agent demonstrating the adequacy of the Project Budget to complete the Project; (ii) a confirmation that the Project Schedule and the construction of the Project is feasible and realistic; and (iii) a certificate indicated the amount of the Project Costs that have already been incurred and paid by the Borrower with respect to the Project as of the date of such report.

(q)     Payment of Fees.  The Administrative Agent shall have received evidence that the Borrower has indefeasibly paid the Structuring Fee in full.

(r)     Accounts.  The Borrower shall have established the Accounts with the Administrative Agent as required pursuant to Section 6.3 hereof, and the Borrower shall have deposited in (i) the Disbursement Account, all proceeds received by the Borrower under the QLICI Notes and the NMTC Program as set forth in the NMTC Loan Documents, (ii) the Equity Escrow

Account, all of the Equity Contribution in full, and (iii) a reserve amount not less than $555,000.00 in a New Market Tax Credit Account as required under the NMTC Loan Documents.

(s) <u>Financial Statements; Projections</u>. The Administrative Agent shall have received (i) all of the financial statements and interim financial statements referred to in Section 4.1(o) hereof, and (ii) cash flow projections, in form and substance reasonably satisfactory to the Administrative Agent.

(t) <u>Evidence of Payment</u>. The Administrative Agent shall have received certificates or other documentation reasonably acceptable to the Administrative Agent evidencing that, as of the Closing Date, and to the extent applicable: (i) the Borrower is current and up-to-date in the payment of social security and unemployment insurance; (ii) there are no undisputed claims nor past due debts by or against the Borrower from the Puerto Rico Department of Labor and Human Resources, the Puerto Rico State Insurance Fund Corporation, municipal taxes ("*patentes municipales*"), real and personal property Taxes imposed upon the real property or upon personal property related to or used in the Borrower's operations, and payroll taxes withheld from its employees and that all Taxes upon income and all corresponding sales and use taxes of the Borrower have been paid, and (iii) the Borrower has filed with the Puerto Rico Treasury Department its income tax returns and sales and use tax returns.

(u) <u>Consents</u>. The Administrative Agent shall have received on or before the Closing Date, a consent and acknowledgment in form and substance reasonably acceptable to the Administrative Agent from each of the General Contractor, the Major Subcontractors and the Design Architect, to the effect that, upon notice by the Administrative Agent in accordance with the terms of the Loan Documents, the Administrative Agent, for the benefit of the Lenders, shall be entitled to exercise the rights of the Borrower under the any of such Project Contracts and they shall continue to fulfill their respective obligations thereunder, among other matters.

(v) <u>Major Subcontracts</u>. The Administrative Agent shall have received, in form and substance reasonably satisfactory to the Administrative Agent, a list setting forth each Major Subcontract executed by the Borrower that are in effect as of the Closing Date, in connection with the Construction of the Project, indicating the amounts thereof, the counterparties thereto and expiration dates thereof, together with a copy of any Major Subcontractor quotes utilized to develop the cash-flow projections and a true and correct copy of each Major Subcontract duly executed by all parties thereto.

(w) <u>Applicable Permits</u>. The Administrative Agent shall have received true and complete copies of all applicable Permits required for the Borrower to operate the Project, in form and substance reasonably satisfactory to the Administrative Agent and Independent Engineer, together with a certificate of an Authorized Representative of the Borrower certifying that all such applicable Permits have been obtained (other than for those Permits that need not be obtained until a later stage of the Construction or completion of Construction as determined by the Administrative Agent and the Independent Engineer, who shall have concluded that there is no reasonable basis to believe that any such Permits will not be obtained in the ordinary course of business and by the date needed, in which case such Permits will be obtained by Borrower on a timely basis and copies will be promptly delivered to the Administrative Agent and the Independent Engineer. All applicable Permits for the Project shall be in full force and effect, unless

the same ought to be obtained at later date to the Closing Date, and the same are not subject to any appeal or further proceeding or to any unsatisfied condition.

(x)    Certification Regarding Beneficial Owners. Delivery to the Administrative Agent by the Borrower of the Certification Regarding Beneficial Owners.

(y)    Landlord to Site Lease. The Site Lease shall be in full force and effect, and no default, or any event that, with the passage of time or the giving of notice, or both, would constitute a default, shall have occurred and be continuing, and the Administrative Agent shall have received an estoppel certificate and a non-disturbance agreement, in form and substance reasonably acceptable to the Administrative Agent, from the landlord under the Site Lease addressing the status of the Site Lease and acknowledging the collateral assignment thereto in favor of the Administrative Agent, for the benefit of the Lenders.

(z)    No Litigation. There shall exist no action, suit, investigation, litigation or proceeding pending or, to the knowledge of the Borrower, threatened before any court, governmental agency or arbitrator that, if adversely determined, will negatively impact the Project, any applicable Permits, the Collateral or is reasonably likely to have a Material Adverse Effect.

(aa)    No Casualty or Condemnation. The Project shall not have been materially damaged by Casualty, or condemned or taken (or subject to any pending or, to the knowledge of the Borrower, threatened Condemnation) by any Governmental Authority or other regulatory body, unless Proceeds shall have been made available, in the manner contemplated in Sections 6.2.2 and 6.2.3, as applicable, sufficient in the reasonable judgment of the Required Lenders and the Independent Engineer to effect the satisfactory Restoration of the Project, and the conditions for Restoration of the Project set forth in Sections 6.2.2 and 6.2.3, as applicable, have been satisfied.

(bb)    Flood Hazard. The Administrative Agent shall have received evidence reasonably satisfactory to the Administrative Agent that the Site is not located in an area designated by the Secretary of Housing and Urban Development as a special flood hazard area, or flood hazard insurance acceptable to the Required Lenders in their reasonable discretion.

(cc)    Bona-fide Purchasers. The Administrative Agent shall have received evidence of executed letters of intent, memorandums, agreements, option agreements or commitments from commercial or industrial bona-fide purchasers of renewable natural gas in liquified form, renewable carbon dioxide or electricity from the Borrower, in form and substance reasonably acceptable to the Administrative Agent, at its sole discretion, representing at least $3,500,000 in the aggregate of projected annual revenues for the Borrower commencing after the Commercial Operation Date.

(dd)    Tax Concession Documents. The Administrative Agent shall have received a true, correct and complete copy of the Tax Concession and the acceptance submitted thereunder, the Small or Medium Business Certification, the Tax Credit Certification and any other related certifications issued to the Borrower pursuant to the Economics Incentives Act; and in the case of the Tax Credit Certification, the Administrative Agent shall have received evidence that the same

includes language that is satisfactory to the Lender, at its sole discretion, which certifies the validity of the Assignment of Tax Credits, the collateral security over the equipment and the pledge of the Equity Interest as provided in the Loan Documents, was filed with the Puerto Rico Treasury Department.

(ee) Survey. Delivery to the Administrative Agent, a copy of a current survey of the Site where the Project will be installed, in form and substance satisfactory to the Administrative Agent prepared by a surveyor acceptable to the Administrative Agent.

(ff) Additional Information. The Administrative Agent shall have received such financial, business and other information regarding the Borrower, the Project and the Site, as the Administrative Agent and the Lenders may reasonably request, including without limitation, information as to possible contingent liabilities, tax matters and environmental matters.

(gg) Other Documents. The Administrative Agent shall have received such other documents, instruments and agreements as the Administrative Agent or any Lender or counsel to the Lenders may reasonably request.

3.2 **Further Conditions Precedent to Non-Revolving Facility Advances.** The obligation of each Non-Revolving Facility Lender to make a Non-Revolving Facility Advance on the occasion of a Non-Revolving Facility Borrowing, including without limitation the initial Non-Revolving Facility Borrowing, is subject to the further conditions precedent that on the date of such Non-Revolving Facility Borrowing:

(a) Funds in the Equity Contribution Account and the Disbursement Account. The Administrative Agent shall have received written evidence satisfactory to the Administrative Agent that: (i) the Borrower has received the Equity Contribution, in full, and deposited the same in the Equity Escrow Account or delivered reasonably evidence acceptable to the Administrative Agent and the Lenders having used such funds for the payment of Project Costs, authorized by the Independent Engineer; (ii) all funds received by the Borrower from the QLICI Notes have been deposited, in full, in the Disbursement Account; and (iii) a certification that the full amount of the Equity Contribution required to be deposited in the Equity Escrow Account and the proceeds of the QLICI Notes required to be deposited in the Disbursement Account have been fully disbursed for the payment by the Borrower of the Project Costs in accordance with the Project Budget.

(b) Draw Request Documents. The Administrative Agent shall have received, on or before 2:00 pm on the date which is five (5) Business Days prior to the day of such Borrowing, (i) copies of all the items required pursuant to Exhibit E hereto, including, without limitation, the Draw Request Documents with respect to the requested Advance, (ii) certification that the aggregate principal amount of the proposed Non-Revolving Facility Borrowing, when added to the aggregate principal amount of the Total Non-Revolving Facility Outstanding on the date of such Non-Revolving Facility Borrowing, does not exceed such Non-Revolving Facility Lender's Non-Revolving Facility Commitment, and (iii) certification that the Non-Revolving Facility is "In-balance" in accordance with the provisions of Section 2.2(b).

(c)     Report of Independent Engineer. The Administrative Agent shall have received a report from the Independent Engineer containing an analysis of the Plans and Specifications, the Project Budget, the Project Schedule and the Project Contracts with respect to the Project, which report shall be solely for the benefit of the Administrative Agent and the Lenders, and shall contain (A) an analysis satisfactory to the Administrative Agent demonstrating the continued adequacy of the Project Budget to complete the Project, (B) a confirmation that compliance with the Project Schedule for the Project is feasible, and (C) a certification of the Project Costs incurred and paid by the Borrower as of the date prior to any Notice of Borrowing;

(d)     Additional Permits. With respect to the development and construction of the Project required to have been obtained by the date of such Non-Revolving Facility Advance, the Administrative Agent shall have received true and complete copies of all Permits from any Governmental Authority required for such stage, in form and substance reasonably satisfactory to the Administrative Agent, together with a certificate of an Authorized Representative of the Borrower certifying that all such Permits have been obtained, in full force and effect, and the same are not subject to any appeal or further proceeding or to any unsatisfied condition that may allow modification or revocation of the applicable Permit. With respect to any of the Permits not yet required, the Administrative Agent and the Independent Engineer shall have concluded that there is no reasonable basis to believe that any such Permits will not be obtained in the ordinary course of business and by the date needed.

(e)     Work to Date. All work that has been performed on the Project has been performed in a good and workmanlike manner, in accordance with the Plans and Specifications and in a manner reasonably satisfactory to the Administrative Agent and the Independent Engineer, and all improvements, equipment and machinery purchased for the Project is substantially in accordance with the Plans and Specifications. Additionally, there has not been filed with or served upon Borrower with respect to the Project or any part thereof notice of any Lien, claim of Lien or attachment upon or claim affecting the right to receive payment of any of the monies payable to any of the Persons named in the Draw Request Documents which has not been released or which will not be released upon the payment of such obligation with the proceeds of such Advance.

(f)     Project Budget; Project Schedule. The Administrative Agent shall have received true, correct and complete copies of the Project Budget and the Project Schedule, as approved by the Administrative Agent and the Independent Engineer, and said Project Budget or Project Schedule shall not have been amended or modified, except as permitted in this Agreement or as otherwise consented to in writing by the Administrative Agent and the Independent Engineer.

(g)     Plans and Specifications. The Administrative Agent shall have received a certified copy of the Plans and Specifications and all amendments thereto, together with evidence of the approval by all required Persons (including, without limitation, by all Governmental Authorities with jurisdiction).

(h)     Purchase Contracts. The Administrative Agent shall have received copies of any existing and valid Purchase Contracts, together with such notification letters executed by purchasers acknowledging the collateral assignment of such agreement in favor of the Administrative Agent and such supplement letters to the Security Agreement.

(i)     No Adverse Action by the Financial Oversight and Management Board for Puerto Rico.  The Financial Oversight and Management Board for Puerto Rico established under The Puerto Rico Oversight, Management, and Economic Stability Act (Pub. Law 114-187) shall not have taken any adverse action with respect to any of the Tax Concession Documents granted to the Borrower.

(j)     Fees and Expenses. The Borrower shall have paid all accrued fees and expenses of the Administrative Agent and the Lenders (including the accrued fees and expenses of counsel to the Administrative Agent) then due and payable.

(k)     No Material Adverse Change.  There shall have occurred no Material Adverse Change since the Closing Date.

3.3     **Further Conditions Precedent to the Converted Loan Facility Advances**. The obligation of each Converted Loan Facility Lender to make a Converted Loan Facility Advance on the Conversion Date is subject to the further conditions precedent that on the date of the Converted Loan Facility Borrowing:

(a)     Substantial Completion; Commercial Operation Date. The Administrative Agent shall have received (i) a Certificate of Substantial Completion signed by an Authorized Representative of the Borrower, in form and substance satisfactory to the Administrative Agent, which certifies that Substantial Completion has been achieved in accordance with the Project Budget, the Plans and Specifications and in compliance with all applicable Legal Requirements, free and clear of all Liens except for Permitted Liens; (ii) a certificate signed by an Authorized Representative of the Borrower, in form and substance acceptable to the Administrative Agent, certifying that the Commercial Operation Date has occurred; (iii) a certificate of the Independent Engineer, in form and substance acceptable to the Administrative Agent, certifying that Substantial Completion and the Commercial Operation Date have been achieved; and (iv) a Certificate of Substantial Completion from the General Contractor, the Design Architect and each Major Subcontractor, in form and substance satisfactory to the Administrative Agent, confirming that (A) Project completion (to the extent applicable to the General Contractor, the Design Architect and each Major Subcontractor under their corresponding Project Contract to which each is a party) has occurred, (B) all warranties under each Project Contract to which each is a party are absolutely, irrevocably and unconditionally in effect on and after the date of Substantial Completion, and (C) there exist no material defaults or disputes under any Project Contract to which each is a party.

(b)     Fees and Expenses. The Borrower shall have paid to the Administrative Agent and the Lenders, as applicable, all accrued fees and expenses of the Administrative Agent and the Lenders (including the accrued fees and expenses of counsel to the Administrative Agent) then due and payable.

(c)     Funding of Accounts. The Borrower shall have completed the initial funding of such Accounts pursuant to Section 6.3 of this Agreement.

(d) <u>Additional Documents</u>. The Administrative Agent shall have received on or before the day of the Converted Loan Facility Borrowing, in form and substance reasonably satisfactory to the Administrative Agent:

(i) <u>Converted Loan Facility Notes</u>. The Converted Loan Facility Notes of the Borrower to the order of the corresponding Lenders, each of which shall specify the fixed interest rate applicable thereto pursuant to Section 2.4(a)(iii), and shall have attached thereto an amortization schedule of principal and interest prepared in accordance with Section 2.3(c).

(ii) <u>Grant and Perfection of Liens</u>. Evidence acceptable to the Administrative Agent that the Borrower has executed all agreements, documents and instruments, and has taken all other actions, as may be necessary or desirable, in the reasonable opinion of the Administrative Agent, so that the Administrative Agent, for the ratable benefit of the Lenders, has a valid and perfected first priority Lien in the Collateral to the extent contemplated in this Agreement and the other Loan Documents. Such actions shall include, without limitation, the delivery to the Administrative Agent of evidence reasonably satisfactory to the Administrative Agent that all filings (including, without limitation, cancellations, termination statements and releases), recordings and other actions, and all notices, consents, estoppels, acknowledgments and instruments, which the Administrative Agent reasonably deems necessary or advisable to establish, preserve and perfect in any jurisdiction the first priority Liens granted, or purported to be granted, to the Administrative Agent in any Collateral shall have been made, given or delivered.

(iii) <u>Applicable Permits</u>. True and complete copies of all applicable final use Permits required for the Borrower to operate, use and occupy the Project, in form and substance reasonably satisfactory to the Administrative Agent, together with a certificate of an Authorized Representative of the Borrower certifying that all such Permits have been obtained. All Permits for the Project shall be in full force and effect, not subject to any appeal or further proceeding or to any unsatisfied condition.

(iv) <u>Other Documents</u>. Such other documents, instruments and agreements as the Administrative Agent or any Lender or counsel to the Lenders shall reasonably request in writing to evidence the Converted Loan Facility Advances and the perfection of the security interests of the Administrative Agent and the Lenders contemplated by this Agreement and the other Loan Documents.

(e) <u>Purchase Contracts</u>. The Administrative Agent shall have received copies of all existing and valid Purchase Contracts representing at least $7,000,000 in the aggregate of annual revenues for the Borrower commencing as of the Conversion Date, together with any such notification letters executed by purchasers acknowledging the collateral assignment of such agreement in favor of the Administrative Agent, for the benefit of the Lenders, and such supplement letters to the Security Agreement

(f) <u>Reserve Accounts</u>. The Administrative Agent shall have received evidence of the establishment and funding of the Accounts as set forth in Section 6.3.

(g)     No Adverse Action by the Financial Oversight and Management Board for Puerto Rico.  The Financial Oversight and Management Board for Puerto Rico established under The Puerto Rico Oversight, Management, and Economic Stability Act (Pub. Law 114-187) shall not have taken any adverse action with respect to any of the Tax Concession Documents granted to the Borrower.

(h)     No Material Adverse Change; Default.  There shall have occurred no Material Adverse Change since the Closing Date nor has an Event of Default occurred or is continuing under this Agreement.

3.4     **Further Conditions Precedent to Each Borrowing.**  The obligation of each Lender to make an Advance on the occasion of each Borrowing, shall be subject to the further conditions precedent that on the date of such Borrowing:

(a)     All of the representations and warranties contained herein and in each of the other Loan Documents shall be true and correct in all material respects on and as of the date of such Borrowing, as though made as of such date, before and after giving effect to such Borrowing, and to the application of the proceeds therefrom, except to the extent that any such representation or warranty expressly relates to an earlier date.

(b)     At the time of and immediately after giving effect to such Borrowing, no Default shall have occurred and be continuing, or would result from such Borrowing.

Each request or acceptance by the Borrower of the proceeds of any Borrowing shall be deemed to constitute, as of the date of such request, (i) a representation and warranty by the Borrower that the conditions in this Section have been satisfied and (ii) a confirmation by the Borrower of the granting and continuance of the Liens in the Collateral pursuant to the Loan Documents.

3.5     **Determination Under Article III.**  For purposes of determining compliance with the conditions specified in this Article III on the occasion of any Borrowing, each Lender shall be deemed to have consented to, approved or accepted or to be satisfied with each document or other matter required thereunder to be consented to, or approved by, or acceptable or satisfactory to the Lenders, unless the Administrative Agent shall have received written notice from such Lender prior to the relevant Borrowing specifying its objection thereto and such Lender shall not have made available to the Administrative Agent such Lender's ratable portion of such Borrowing.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES

4.1     **Representations and Warranties of the Borrower.**  In order to induce the Administrative Agent and the Lenders to enter into this Agreement and make the Advances hereunder, the Borrower make the following representations and warranties to the Administrative Agent and the Lenders, each and all of which shall survive the execution and delivery of this Agreement:

(a)	(i) Each, the Borrower and the Corporate Guarantor, is a limited liability company duly organized, validly existing and in good standing under the laws of the Commonwealth of Puerto Rico, and (ii) each, the Borrower and the Corporate Guarantor (A) has all requisite power and authority necessary to own its assets and conduct its business as now being or as proposed to be conducted, and (B) is qualified to do business and is in good standing in all jurisdictions (including, without limitation, the Commonwealth of Puerto Rico) in which the nature of the business conducted by it makes such qualification necessary.

(b)	Each of the Loan Parties has all necessary power (organizational and otherwise) and authority to execute, deliver and perform its obligations under this Agreement and each of the other Loan Documents to which it is or will be a party; and the execution, delivery and performance by each of the Loan Parties of this Agreement and each of the other Loan Documents to which it is or will be a party have been duly authorized by all necessary organizational or other action on its part. Borrower has all Permits that are necessary to perform its various Obligations under this Agreement and the other Loan Documents, to own, Construct and operate the Project, its properties and assets and to conduct its business as currently conducted, which remain valid and enforceable.

(c)	(i) This Agreement and each of the other Loan Documents have been duly and validly executed and delivered by or on behalf of the Loan Parties and constitutes, and each of the other Loan Documents to which it will be a party, when executed and delivered by or on behalf of the Loan Parties will constitute, its legal, valid and binding obligation, enforceable against the Loan Parties in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws of general applicability affecting the enforcement of creditors' rights.

(ii)	To the best of the Borrower's knowledge, each of the Project Documents is enforceable against each participant party thereto in accordance with their terms (except as such enforceability may be limited by applicable bankruptcy, insolvency, moratorium, reorganization or other similar laws affecting the enforcement of creditors' rights generally), and no such party thereto is, or but for the passage of time or giving of notice or both will be, in breach of any obligation thereunder which could reasonably be expected to have a Material Adverse Effect.

(iii)	Each Lien created and perfected under the Loan Documents in favor of the Administrative Agent, for the benefit of the Lenders, shall remain so perfected as of each date this representation is made or deemed made and shall constitute a valid and enforceable first-priority Lien on the Collateral that is subject to such Lien (other than Permitted Liens).

(d)	None of the execution and delivery of this Agreement, the Notes and the other Loan Documents, the consummation of the transactions herein and therein contemplated or compliance with the terms and provisions hereof and thereof will (i) conflict with or result in a breach of, or require any consent under, the Organizational Documents of the Borrower or any Material Contract, (ii) violate in any material respect any applicable law or regulation, or any order, writ, injunction or decree of any court or Governmental Authority, by or to which the Borrower or any of its property, or the Project, is bound or subject, (iii) constitute a default or result in a breach

(in either such case, with or without the giving of notice or the lapse of time) under any agreement or instrument to which the Borrower is a party or (iv) result in the creation or imposition of any Lien upon the Project, the Site Lease, the Leasehold Interest or any property of the Borrower pursuant to the terms of any such agreement or instrument (except for Permitted Liens).

(e)     No authorization, approval or consent of, and no filing, recordation or registration with, any Governmental Authority or regulatory body or any other Person is necessary for (i) the due execution, delivery or performance by any Loan Party of this Agreement, the Notes or any other Loan Document to which any Loan Party is or will be a party, or for the consummation of the transactions contemplated hereby or thereby, (ii) the grant by Borrower of the Liens granted by it pursuant to any Loan Document (except for the notice required under the Tax Concession, pursuant to Section 13(d)(2)(E) and (3) of the Economic Incentives Act and the provisions of the Tax Credit Certification approving the Assignment of Tax Credits), (iii) the perfection or maintenance of any Liens created by any Loan Document (including the first priority nature thereof) (except the filing in the corresponding Commercial Transactions Registry of the Puerto Rico Department of State in order to perfect the Liens on the Collateral and governmental consents as to any assignments of government agreements, if any) or (iv) the obtaining by the Administrative Agent and the Lenders of the practical benefits intended by the rights and remedies granted to them under the Loan Documents.

(f)     A true, complete and correct copy of (i) each of the Organizational Documents of the Borrower and Corporate Guarantor, (ii) the Tax Concession and acceptance thereof, (iii) the Small or Medium Business Certification and the Tax Credit Certification, with language, satisfactory to the Lender and the Administrative Agent, approving the Assignment of Tax Credits, among other Collateral, and (iv) the Material Contracts, in each case as in effect on the date of this Agreement has been delivered to the Administrative Agent (unless delivery is required to be made at another date as set forth hereunder).

(g)     No proceeds of any Advance will be used to acquire any security in any transaction that is subject to Sections 13 and 14 of the Securities Exchange Act of 1934, as amended.

(h)     The Borrower is not engaged in the business of extending credit for the purpose, whether immediate, incidental or ultimate, of purchasing or carrying margin stock (within the meaning of Regulation U issued by the Board of Governors of the Federal Reserve System), and no proceeds of any Advance will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock.

(i)     The use of the proceeds of each Advance made, or to be made, by the Lenders hereunder is a legal and proper use by the Borrower and such use is in compliance with the provisions of the Organizational Documents of the Borrower and in compliance in all material respects with all applicable Legal Requirements and applicable Permits.

(j)     The Borrower has obtained all necessary Permits, equipment warranties, payment and performance bonds, duly endorsed to the Administrative Agent as additional payee, the landfill gas emission models (LandGEM) or similar gas emission models for the Construction,

installation, operation and maintenance of the Project, except that it is understood and agreed that the Borrower has not yet obtained certain Permits that will be required for the operation of the Project, but it represents that such Permits or models will be obtained on an as-needed basis to permit the operation of the Project in accordance with applicable Legal Requirements, the Project Schedule and the Plans and Specifications, without material delay caused by the obtaining of such Permits.

(k)     The Borrower is not an "investment company", or an "affiliated person" of, or "promoter" or "principal underwriter" for, an "investment company", as such terms are defined in the Investment Company Act of 1940, as amended.  Neither the making of any Advance, nor the application of the proceeds or repayment thereof by the Borrower, nor the consummation of the other transactions contemplated hereby, will violate any provision of such Act or any rule, regulation or order of the Securities and Exchange Commission thereunder.

(l)     The Borrower is not a "holding company", or an "affiliate" of a "holding company" or a "subsidiary company" of a "holding company", within the meaning of the Public Utility Holding Company Act of 1935, as amended.

(m)     The Borrower does not have any direct or indirect Subsidiaries, and the Borrower is not engaged in any joint venture or partnership with any Person.

(n)     The Borrower does not have any Indebtedness outstanding other than the Indebtedness set forth on Schedule 4.1(n) hereto ("Permitted Indebtedness").

(o)     The most recent pro-forma balance sheets and statements of income and projected cash flows of the Borrower and the Corporate Guarantor, and the personal financial statements and copies of the filed tax returns of the Personal Guarantors as of December 31, 2019 for Olmar López Gómez and Olmar López Vidal, and the personal financial statements as of June 30, 2019 for Greg Boyd, complete copies of which have been furnished to the Administrative Agent, fairly and accurately present the financial condition of such Persons at such dates and the results of their operations for the periods ended on such dates, all in accordance with GAAP applied on a consistent basis, and since such dates, there has been no Material Adverse Change in such financial condition or operations.

(p)     The Borrower has not at any time maintained an employee benefit plan or other Plan for its employees that are covered by Title IV of ERISA.

(q)     The Borrower is, and after giving effect to the consummation of the transactions contemplated by this Agreement will be, Solvent.

(r)     The Borrower has filed all federal, Puerto Rico, and local tax returns required to be filed by the Borrower and has paid all Taxes shown thereon to be, or otherwise, due by the Borrower, including interest and penalties, or has provided adequate reserves therefor; no unpaid or uncontested assessments have been made against the Borrower or the Project or any other Collateral by any taxing authority, nor has any penalty or deficiency been assessed by any such authority, and all contested assessments have been disclosed in writing to the Administrative

Agent and the Lenders and adequate reserves have been made therefor. Such tax returns properly reflect the income and Taxes of the Borrower for the periods covered thereby, provided that additional Taxes, interest and penalties may be owed pursuant to reasonable adjustments required by the corresponding taxing authorities upon audit and having no Material Adverse Effect.

(s) Schedule 4.1(s) sets forth all pending actions or proceedings affecting the Borrower, the Project, the Leasehold Interest or any other Collateral or property of the Borrower before any court, governmental agency or arbitrator. None of such actions or proceedings, if adversely determined, would reasonably be expected to result in a Material Adverse Effect or would reasonably be expected to materially impair any of the rights of the Borrower in (i) any of the Permits or other authorizations (either from public or private parties) required for the operation of the business of the Borrower or the Project, or (ii) the access to and from the Project or any part thereof and adjacent public roadways. To the best of the Borrower's knowledge, there is no threatened action or proceeding affecting the Borrower or the Project (including, without limitation, the Permits relating to the Site) before any court, governmental agency or arbitrator which, if adversely determined, would reasonably be expected to result in a Material Adverse Effect or would reasonably be expected to materially impair any of the rights of the Borrower in any of the Permits or other authorizations (either from public or private parties) required for the operation of any part of its business or the Project.

(t) No Person has any option or right to acquire any portion of the Project, the Leasehold Interest, the Material Contracts or any other Collateral or any interest relating thereto, or a right of first offer or right of refusal to do so.

(u) The Borrower does not operate any business other than the ownership, leasing, development, construction, installation, operation and maintenance of the Project and landfill gas and electricity collection projects.

(v) The Borrower has good and marketable title to all of the assets carried on its books and reflected in the financial statements referred to in Section 4.1(o), free and clear of all Liens whatsoever except the Permitted Liens. The Permitted Liens do not and will not Materially Adversely Affect or interfere with the value, or current or proposed use of the Project, or the Borrower's ability to operate its business or to pay and perform its Obligations in accordance with the terms of the Loan Documents or the Material Contracts. There are no claims for payment for work, labor or materials affecting the Site, the Leasehold Interest or the Project which are or may become a Lien on the Project or any part thereof, other than the Permitted Liens.

(w) The operations and properties of Borrower comply in all material respects with all applicable Environmental Laws; all necessary Environmental Permits for the operation, development and Construction of the Project have been obtained and are in effect for the operations and properties of the Borrower (including, without limitation, the Construction of the Project), except to the extent that the failure to obtain such Environmental Permits is not reasonably likely to result in a Material Adverse Effect; the Borrower is in compliance in all material respects with all such Environmental Permits; none of the operations or properties of the Borrower (including, without limitation, the Construction of the Project) are subject to any Environmental Action alleging the violation of any Environmental Law; no circumstances exist that could form the basis

of an Environmental Action against the Borrower or any of its operations or properties (including, without limitation, the Construction of the Project) that could reasonably be expected to have a Material Adverse Effect or cause any such property to be subject to any restrictions under any Environmental Law which could reasonably be expected to have a Material Adverse Effect; none of the operations of the Borrower (including, without limitation, the Construction of the Project) are the subject of an investigation by a Governmental Authority evaluating whether any remedial action is needed to respond to a Release of any Hazardous Material where such remedial action could reasonably be expected to have a Material Adverse Effect; the Borrower has not filed any notice under any Environmental Law indicating past or present treatment, storage or disposal of Hazardous Materials in violation of any Environmental Law; and the Borrower does not have any contingent liability in connection with any Release which contingent liability, if liquidated, would not be adequately covered (in the reasonable determination of the Administrative Agent) by insurance or other indemnification rights or which could reasonably be expected to have a Material Adverse Effect. Notwithstanding the foregoing, it is understood and agreed that the Borrower has not yet obtained certain Environmental Permits that will be required for the operation of the Project, but it represents that such Environmental Permits will be obtained on an as-needed basis to permit the operation of the Project in accordance with applicable Environmental Laws without material delay caused by the obtaining of such Environmental Permits.

(x)     The Construction of the Project and the use and proposed use thereof, and the Project Documents comply and will comply in all material respects with all applicable Legal Requirements (including, without limitation, all Material Contracts, the Plans and Specifications and applicable Permits and all applicable building, Construction and zoning ordinances and codes) and all Insurance Requirements. The Borrower is not in default or violation of any order, writ, injunction, decree or demand of any Governmental Authority as to the Project or Project Documents. There has not been committed by or on behalf of the Borrower or, to Borrower's knowledge, by any other Person in operation or occupancy of the Site, any act or omission affording any Governmental Authority the right of forfeiture as against the Project or any part thereof or any monies paid in performance of the Borrower's obligations under any of the Loan Documents or Project Documents. The Borrower hereby covenants and agrees not to commit any act or omission affording such right of forfeiture. The Project Budget and the Project Schedule are based on reasonable assumptions as to all legal and factual matters material to the estimates set forth therein, are consistent with the Project Documents, and indicate that the estimated Project Costs will not exceed funds available to pay the same. As of the date hereof, there are no Project Costs (including anticipated sales and use taxes) that are not included in the Project Budget.

(y)     There are no tenants, squatters or other parties in possession on the Site or Project (other than landlord to the Site Lease) and the Borrower is and will remain for as long as any Obligations under the Loan Documents or any Commitments hereunder are outstanding, in complete, exclusive, peaceable and undisturbed possession of the Site and operation of the Project and its Leasehold Interest, free and clear of Liens, other than the Permitted Liens, and subject to the Site Lease and the Gas Purchase Agreement. The Borrower does not know of any facts by reason of which any claim to the Site or Leasehold Interest could reasonably be expected to have a Material Adverse Effect.

(z)     All utility services (including water supply, storm and sanitary sewer facilities, electric and telephone facilities) that are necessary and appropriate for the proper use of the Site and the Project for their intended purposes are now, or prior to Substantial Completion of the Project will be, available at or to the Site as set forth in the Plans and Specifications. All such utilities are located in the public rights-of-way abutting the Site (which are connected so as to serve the Site without passing over other property) or in recordable easements constituted on or prior to the Closing Date serving the Site.

(aa)     The Equipment and improvements comprising the Project will lie within the boundaries of the Site as set forth in the Site Lease and the Purchase Contract, and all roads and accesses thereto which are necessary for the Construction of the Project and for the full utilization of the Site for their intended purposes have been, or prior to Substantial Completion of the Project will be, completed, are or will be serviceable and are or will be physically and legally open for use by the public.

(bb)     Neither the Site nor the Project is subject to extraordinary hazard conditions (including subsoil conditions) which are reasonably likely to hamper, restrict, endanger or delay the Construction of the Project or the operation thereof or make the Construction or operation thereof more costly in any material respect than what is set forth in the Project Budget.

(cc)     Set forth in Schedule 4.1(cc) is a complete and accurate list of all Material Contracts of the Borrower in effect as of the date of this Agreement.

(dd)     Each Material Contract, including, without limitation, the Project Contracts, is in full force and effect, valid and binding on the Borrower. The Borrower is capable of performing all of its obligations under the Material Contracts. No party thereto has given any notice of default, and the execution of this Agreement and the other Loan Documents will not constitute a breach or a default or event of default under the Material Contracts. There are no legal proceedings commenced (or, to the knowledge of the Borrower, threatened) against the Borrower by any party thereto under the Material Contracts; and no certifications in excess of amounts due for work performed have been paid or prepaid under the Material Contracts. No other party to the Material Contract (i) has any right of set-off, material claim or defense to the enforcement by the Borrower of any material right under the Material Contract, (ii) is in arrears in the payment of any certifications due or any other charges whatsoever due under the Material Contract and (iii) to the knowledge of the Borrower, is in default in the performance of any other material obligations thereof under the Material Contract.

(ee)     Status of the Major Subcontracts.     Unless otherwise specified in Schedule 4.1(ee):

(i)     each Major Subcontract is in full force and effect as of the date of its execution;

(ii)     the Borrower has not given any notice of default to any third party under any Major Subcontract;

(iii)  no third party under any Major Subcontract has any material claim or defense to the enforcement of any material right under any Major Subcontract;

(iv)  to the best of the Borrower's knowledge, no third party under any Major Subcontract is in default in the performance of any material obligations of such third party under the applicable Major Subcontract; and

(v)  there are no legal proceedings commenced (or, to the knowledge of the Borrower, threatened) against the Borrower by any third party under any Major Subcontract; no certifications in excess of amounts due for work performed have been paid or prepaid under any Major Subcontract; each Major Subcontract is valid and binding on the Borrower and, to the Borrower's knowledge, on all other parties thereto in accordance with its terms; and the execution of this Agreement and the other Loan Documents will not constitute a breach or a default or event of default under any of the Major Subcontracts.

(ff)  The chief executive office and principal place of business of Borrower, and the place where Borrower maintains all records relating to the Collateral, is at the address(es) set forth in Schedule 4.1(ff).  Borrower has such other places of business, and maintains Collateral at such other locations, as are specified on Schedule 4.1(ff). Except as set forth on Schedule 4.1(ff) or as permitted by Section 5.2(r), the Borrower does not have any other place of business, nor maintain Collateral at any other location.

(gg)  During the five (5) years preceding the date of this Agreement (or, if shorter, at all times since its organization), Borrower has been known by its current name and has not used any other company name or any trade or fictitious name.

(hh)  No petition in bankruptcy has been filed by or against any Loan Party in the last seven (7) years, and in the last seven (7) years, no Loan Party has made any assignment for the benefit of creditors or taken advantage of any creditors rights laws.

(ii)  The organizational structure of Borrower is as set forth in Schedule 4.1(ii), and the capital structure and ownership of Borrower is as set forth in Schedule 4.1(ii).  As of the Closing Date, (i) the authorized, issued and outstanding capital stock and other securities of Borrower consists of the capital stock and other securities described in Schedule 4.1(ii), (ii) Schedule 4.1(ii) sets forth the registered and beneficial owners of the capital stock, and other securities of Borrower, the aggregate of which constitutes one hundred percent (100%) of the issued and outstanding ownership interest and other securities thereof, and (iii) all of the ownership interest and other securities of Borrower have been validly issued and duly authorized, are fully paid and non-assessable and are not subject to any Liens or to any options, warrants, conversion privileges or any other rights with respect thereto (other than Liens in the Pledged Interest in favor of the Administrative Agent, for the benefit of the Lenders).

(jj)  Set forth on Schedule 4.1(jj) hereto is a complete and accurate list of all patents, trademarks, trade names, service marks and copyrights, and all applications therefor and licenses thereof, of Borrower, showing the jurisdiction in which registered, the registration number, the date of registration and the expiration date.

(kk)     No information, report, financial statement, exhibit, schedule or disclosure letter furnished in writing by or on behalf of any Loan Party to the Administrative Agent or any of the Lenders in connection with the negotiation, preparation or delivery of this Agreement and the other Loan Documents or included therein or delivered pursuant hereto or thereto contains any untrue statement of a material fact or omits or omitted to state any material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading. All written information furnished after the date hereof by or on behalf of any Loan Party to the Administrative Agent or the Lenders in connection with this Agreement and the other Loan Documents and the transactions contemplated hereby and thereby will be true, complete and accurate in every material respect in light of the circumstances under which they were made on the date as of which such information is stated or certified; provided that, with respect to projected financial information, the Borrower represents only that such information was prepared in good faith based upon assumptions believed by the Borrower to be commercially reasonable at the time as to Borrower's industry standards and as of the date hereof.

(ll)     Neither the extensions of credit made or to be made pursuant to this Agreement nor the use of the proceeds thereof will violate the Trading with the Enemy Act, as amended, or any of the regulations of the Office of Foreign Assets Control ("OFAC") of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended), or any enabling legislation or any Executive Order of the President of the United States relating thereto, or The United and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (USA Patriot Act), Public Law 10756, October 26, 2001 (the "USA Patriot Act"), or Executive Order 13224 of September 23, 2001 Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit or Support Terrorism, issued by the President of the United States (66 Fed. Reg. 49049 (2001)) (the "Order"). None of the Borrower, any Personal Guarantors or any other Person owning an interest in the Borrower is (or will be) a Person with whom the Lenders are restricted from doing business with under regulations of OFAC (including, those Persons named on OFAC's Specially Designated and Blocked Persons list) or under any statute, executive order, or other governmental action and is not and shall not knowingly engage in any dealings or transactions or otherwise be associated with such persons. In addition, Borrower hereby agrees to provide the Administrative Agent with any additional information that Administrative Agent deems reasonably necessary from time to time in order to ensure compliance with all applicable Legal Requirements concerning money laundering and similar activities.

(mm)     The Borrower is identified as a qualified low-income community business that complies, in all material respects, with all applicable QALICB Requirements.

(nn)     Except as set forth in Schedule 4.1(nn) hereto, there are no agreements, instruments or corporate or other restrictions to which the Borrower is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.

(oo)    All depository accounts maintained by the Borrower are listed in <u>Schedule 4.1(oo)</u>, and no other depository accounts other than those listed therein are maintained by the Borrower.

(pp)    The Site and the Project is or will be assessed for real property tax purposes as on or more wholly independent tax lots or lots, separate from any adjoining land or improvements not constituting a part of such lot or lots, and no other land or improvements are assessed and taxed together with the Site and Project or any portion thereof.

(qq)    The Borrower is not currently required to obtain approval from the Puerto Rico Electric Power Authority, the Puerto Rico Public Service Commission, the Financial Oversight and Management Board for Puerto Rico or any other Governmental Authority in connection with any of the transactions contemplated hereby or by any other Loan Document or the Project Documents, except for such approvals that the failure to obtain is not reasonably likely to result in a Material Adverse Effect.

(rr)    The Borrower has been issued the Tax Concession Documents pursuant to the Economic Incentives Act in the manner and with the benefits applied for, has unconditionally accepted the Tax Concession, the Tax Concession Documents are in full force and effect, and Borrower is in compliance with all of the terms of the Tax Concession Documents and with all relevant provisions of the Economic Incentives Act, and of all applicable regulations and other rules promulgated thereunder and by the Puerto Rico Secretary of the Treasury applicable to the Borrower; all representations made in writing by the Borrower to Governmental Authorities in connection with its application for the Tax Concession Documents are true, correct and accurate as of the date when given; and the Borrower knows of no facts or circumstances that may reasonably be expected to result in a breach of any of the terms of the Tax Concession Documents.

(ss)    With respect to the Tax Credits:

(i)    the Tax Credits constitute validly generated tax credits pursuant to the Economics Incentives Act;

(ii)    all consents, authorizations, approvals or orders of or from any Governmental Authority which are necessary for the issuance, authorization, sale and transfer of the Tax Credits and the Tax Concession Documents have been or will be obtained; and

(iii)    there is no action, suit, proceeding, inquiry or investigation at law or in equity or before or by any court, public board or body pending or, to the best of the Borrower's knowledge, threatened to restrain or enjoin or to adversely affect the validity, enforceability or issuance of the Tax Credits or the Tax Concession Documents.

All representations and warranties made in this Agreement and the other Loan Documents by the Borrower or any other Loan Party shall be deemed to have been relied upon by the Administrative Agent and each of the Lenders notwithstanding any investigation heretofore or hereafter made by the Administrative Agent or any Lender or on its or their behalf.

## ARTICLE V
## COVENANTS OF THE BORROWER

5.1 **Affirmative Covenants.** So long as any Advance shall remain unpaid or any Lender shall have any Commitment hereunder, the Borrower will, unless the Required Lenders shall otherwise consent in writing:

(a) Comply with all applicable Legal Requirements, except where the failure to do so, individually or in the aggregate, is not reasonably likely to result in a Material Adverse Effect. There shall never be committed by the Borrower any act or omission affording any Governmental Authority the right of forfeiture against the Project, the Site, the Leasehold Interest or any other Collateral or any part thereof or any monies paid in performance of the Borrower's obligations under any of the Loan Documents. The Borrower hereby covenants and agrees not to commit, permit or suffer to exist any act or omission affording such right of forfeiture.

(b) Furnish to the Administrative Agent for distribution to each Lender:

(i) Following the Conversion Date, each of the following:

(A) as soon as available and in any event within forty-five (45) days after the end of each Fiscal Quarter of each Fiscal Year following the Conversion Date, the following items, accompanied by an Officer's Certificate certifying that such items are true, correct, accurate and complete, in all material respects, and fairly present, in all material respects, the financial condition and results of the operations of the Borrower in a manner consistent with GAAP (subject to normal year-end adjustments and the absence of footnotes) for the relevant period, as applicable:

(1) quarterly and year-to-date unaudited income statement and statement of cash flows and capital expenditure report for such period with respect to the Borrower, with a balance sheet of the Borrower as at the last day of such quarter; and

(2) a calculation in reasonable detail reflecting the Debt Service Coverage Ratio, the Fixed Charge Coverage Ratio and the Leverage Ratio (each determined in a manner consisting with GAAP) as of the last day of such Fiscal Quarter, for such Fiscal Quarter, year-to-date and for each of the last four quarters.

(B) as soon as available and in any event within one hundred twenty (120) days after the end of each Fiscal Year following the Conversion Date, the annual financial statements of the Borrower, each audited and certified (without "going concern" or like exception or qualification and without any exception or qualification

as to the scope of such audit), by an independent certified public accounting firm reasonably acceptable to the Administrative Agent and the Required Lenders, prepared in accordance with GAAP, for such Fiscal Year and containing balance sheets, income statements and cash flow statements for the Borrower, together with (1) a special report of such independent certified public accounting firm stating that in its regular audit of the business of the Borrower which audit was conducted in accordance with GAAP, nothing came to its attention which would lead it to conclude that a Default has occurred and is continuing, or if in the opinion of such accounting firm a Default has occurred and is continuing, a statement as to the nature thereof; (2) a certificate of good standing dated not more than thirty (30) days prior to its delivery evidencing that the Borrower is in good standing in the Commonwealth of Puerto Rico; and (3) to the extent required by Legal Requirements applicable to the Borrower, a copy of the Merchants' Registration Certificate or Exemption Certificate (*Certificado de Registro de Comerciante o Certificado de Exención*) issued by the Puerto Rico Treasury Department to the Borrower and currently in effect;

(C)     Upon Lender's written request, as soon as available and not later than one hundred twenty (120) days after the close of the Fiscal Year of the Corporate Guarantor, an annual unaudited financial statements of the Corporate Guarantor, including a statement of equity, balance sheet as of the end of such semester, and a statement of income and cash flow, all prepared in accordance with GAAP and evidence that the Corporate Guarantor is in good standing in the Commonwealth of Puerto Rico,

(D)     as soon as available and in any event within one hundred twenty (120) days after the end of each calendar year following the Conversion Date, unaudited personal financial statements of the Personal Guarantors, prepared in accordance with GAAP, for such Fiscal Year;

(E)     as soon as available and in any event within thirty (30) days after the end of each Fiscal Year following the Conversion Date, or as otherwise reasonably requested by the Administrative Agent, copies of the Annual Budget, lists of all invoices for the Construction submitted and pending payment (including aging of accounts), progress report of the Construction and/or operation of the Project, cash-flow projections and any other financial and/or operating information which the Administrative Agent may reasonably request;

(F)     as soon as available and in any event within forty (45) days after the end of each Fiscal Year following the Conversion Date, a report on the estimation of the Project's landfill gas emissions for the Fiscal Year as at the last day of such Fiscal Year based on a LandGEM model or other similar gas emission models, in form and substance reasonably satisfactory to the Administrative Agent.

(ii)     promptly but in any event within five (5) Business Days after the Borrower knows of the existence of any Default, an Officer's Certificate setting forth details of such Default and the action that the Borrower has taken and will take with respect thereto;

(iii)     promptly but in any event within five (5) Business Days after receipt thereof by the Borrower from the PBGC, copies of each notice received by the Borrower of the PBGC's intention to terminate any Plan or to have a trustee appointed to administer any such Plan;

(iv)     promptly but in any event within five (5) Business Days after the Borrower knows that any Termination Event with respect to any Plan has occurred, an Officer's Certificate describing such Termination Event and the action, if any, which the Borrower has taken or will take with respect thereto;

(v)     promptly but in any event within five (5) Business Days after receipt thereof by the Borrower from a Plan sponsor, a copy of each notice received by the Borrower concerning the imposition or amount of withdrawal liability pursuant to Section 4202 of ERISA;

(vi)     promptly but in any event within ten (10) calendar days after receipt by the Borrower of service of process or other notice of commencement thereof, or any notice threatening the commencement thereof, notice of all actual or threatened actions, suits, investigations, litigation and proceedings (other than those which the Borrower reasonably believes are covered by a Policy, except that if coverage is not confirmed in writing by the insurer within thirty (30) days after service of process or other notice of commencement thereof, then the Borrower, within five (5) Business Days after expiration of such 30-day period, shall deliver the notice required hereby) before any court, arbitrator or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, which requests an injunction against the Borrower or the Project, or any part thereof, or requests the cancellation, revocation, modification or suspension of any Permit, or requests a monetary judgment against, or other type of monetary relief from, the Borrower in the amount of $150,000.00 or more (individually or in the aggregate) in excess of the amount covered by insurance, or which is reasonably likely to otherwise result in a Material Adverse Effect, and promptly after the occurrence thereof notice of any Material Adverse Effect in the status or the financial effect on the Borrower of such actions, suits, investigations, litigation and proceedings;

(vii)     promptly but in any event within ten (10) calendar days after receipt thereof, copies of any notice of tax deficiency received by the Borrower from any

Governmental Authority; provided that this subsection (vii) shall only apply to deficiencies in each case in excess of $150,000 (individually or in the aggregate).

(viii) promptly but in any event within ten (10) calendar days after the receipt thereof, any notice received by the Borrower from any Governmental Authority or other Person which is reasonably likely to have a Material Adverse Effect or relates to any Loan Document or any Material Contract or any transactions contemplated hereby or thereby;

(ix) promptly but in any event within ten (10) calendar days after the occurrence thereof, notice of a default by the Borrower under any note, instrument or other agreement requiring the payment by the Borrower of $50,000.00 or more (individually or in the aggregate);

(x) promptly but in any event within ten (10) calendar days after the Borrower learns of the occurrence thereof, notice of any default by any obligor with respect to any amount payable to the Borrower which is in excess of $150,000.00 (individually or in the aggregate), including, without limitation the Purchase Contracts;

(xi) promptly but in any event within five (5) Business Days after the Borrower learns of the occurrence thereof, any Casualty, damage or loss, whether or not insured, through fire, theft, other hazard or casualty, or any act or omission of the Borrower, its employees, agents, contractors, consultants or representatives, or of any other Person if such Casualty, damage or loss affects the Borrower, the Project or any part thereof, or any other Collateral, in excess of $150,000.00;

(xii) promptly but in any event within five (5) Business Days after the occurrence thereof, any cancellation or material change in the terms, coverages or amounts of any of the Policies;

(xiii) promptly but in any event within five (5) Business Days after the receipt of notice thereof, initiation of any Condemnation proceeding involving the Project or any part thereof or the Site or any portion thereof;

(xiv) promptly but in any event within ten (10) calendar days after the Borrower knows of the existence thereof, notice of any labor dispute to which the Borrower or the General Contractor may become a party, any strikes or walkouts relating to any of its facilities, and the expiration of any labor contract to which the Borrower or the General Contractor is a party or by which it is bound that could reasonably be expected to result in a Material Adverse Effect;

(xv) promptly but in any event within five (5) Business Days after the Administrative Agent's request, such other information regarding the Borrower's operations, the Project or any part thereof, the renewable gas emission estimation and the assets, financial condition, operations, business or prospects of any Loan Party as the Administrative Agent or any of the Lenders may through the Administrative Agent, from time to time, reasonably request in writing;

(xvi)     promptly but in any event within five (5) Business Days after the Borrower knows of the existence or occurrence thereof, notify to the Administrative Agent any intentional withholding of compensation in excess of $150,000 to any counterparty under a Project Contracts or payment and performance bond relating to the Project, other than retentions provided by the express terms of any such Project Contracts previously approved by the Administrative Agent;

(xvii)     promptly but in any event within five (5) Business Days after the Borrower knows of the existence thereof, any termination, notice of event of default or other material notice given or received under any Project Document, payment and performance bond, or Material Contract, including without limitation notice of any major unscheduled repair or replacement of parts;

(xviii)     promptly but in any event within five (5) Business Days after the Borrower knows of the existence thereof, any event of Force Majeure asserted under any Project Document and, to the extent requested by the Administrative Agent and reasonably available to the Borrower, copies of related invoices, statements, supporting documentation, schedules, data or affidavits delivered under the relevant Project Documents;

(xix)     promptly but in any event within five (5) Business Days after the Borrower knows of the existence thereof, any Governmental Authority initiating or threatening the commencement of proceedings against the Project, any Collateral, the Borrower or any other Loan Party that could materially affect the Project or any of the Collateral, or impose material incremental expenses on the Project Budget;

(xx)     promptly but in any event within ten (10) calendar days after receipt thereof, copies of all final budgets and all operating plans and reports from any party under the Project Contracts or any other Material Contract;

(xxi)     promptly but in any event within ten (10) calendar days after the giving or receipt thereof, copies of any notice of default and other material notices from any party under any Material Contract;

(xxii)     promptly, but in no event later than ten (10) calendar days after the receipt thereof by the Borrower, copies of (A) all Permits or Additional Project Documents obtained or entered into by the Borrower after the Closing Date; and (B) any amendment, supplement or other modification to any Permit received by the Borrower after the Closing Date;

(xxiii)     promptly upon the sale of any Tax Credits, a written report detailing the Tax Credits that have been sold to date and the proceeds from such sale, and the balance of unsold Tax Credits under the Tax Credit Certification; and

(xxiv)     promptly but in any event within five (5) Business Days after the receipt thereof, any notice received by the Borrower from any Governmental Authority with the intent to revoke any Permit or any of the Tax Concession Documents issued to the Borrower.

(c)     Obtain, preserve and maintain (i) its existence as a Puerto Rico limited liability company, rights (charter and statutory) and going concern status, and (ii) all Permits necessary to enable the Borrower to construct the Project and to operate and maintain its property, business and operations at the Site.

(d)     Keep proper books of record and account in which complete and correct (subject to normal year-end audit adjustments) entries shall be made of all financial transactions and the assets and businesses of the Borrower in accordance with GAAP consistently applied and separate from those of its Affiliates.

(e)     Permit the Administrative Agent, the Lenders or any agents, consultants or representatives thereof, to audit and examine and make copies of and abstracts from, the records and books of account of, and visit the construction, the Site, the Project or properties of the Borrower and to discuss the affairs, finances and accounts of the Borrower with the Authorized Representatives and the appropriate representatives of the independent certified public accountants of the Borrower, all during customary business hours and after giving reasonable prior written notice thereof to the Borrower. Each such audit and examination may include, without limitation, a physical inspection of the Inventory of the Borrower and of the records of all Receivables. The Borrower shall reimburse the Administrative Agent for the reasonable costs of each such audit and examination; provided, that the Administrative Agent may set off and apply available funds in the Operating Account and/or the Accounts in payment of such costs.

(f)     Utilize the proceeds of the Advances exclusively for the purposes set forth in Sections 2.1(a) and 2.1(b).

(g)     Continue to be Solvent and pay its liabilities on a current basis in accordance with customary trade practices.

(h)     During all such periods as the Borrower owns, leases, manages, operates is in possession of, or otherwise controls the Project or any other asset (whether real or personal, or part thereof or interest therein):  (A) all uses on or of the Borrower's assets (or part thereof or interest therein), whether by the Borrower or any other Person or entity, shall be in compliance in all material respects with all Environmental Laws and Environmental Permits issued pursuant thereto; (B) there shall be no Releases of Hazardous Materials by the Borrower or any Affiliate of the Borrower in, on, under or from the Site (or part thereof or interest therein) except those that are in compliance with all Environmental Laws and with Environmental Permits issued pursuant thereto (if such permits are required), and the Borrower shall use its commercially reasonable efforts to ensure that there shall be no Releases of Hazardous Materials by any other Person on, under or from the Project or the Site (or part thereof or interest therein); (C) there shall be no Hazardous Materials stored or used in, on, or under the Project or the Site (or part thereof or interest therein), except those that are used in the ordinary course of business of the Borrower and are in compliance in all material respects with all Environmental Laws and with Environmental Permits issued pursuant thereto, if and to the extent required; (D) the Borrower shall keep the Project and the Site (and every part thereof or interest therein) free and clear of all Liens and other encumbrances imposed pursuant to any Environmental Law, whether due to any act or omission of the Borrower or any other Person or entity (the "Environmental Liens"); (E) the Borrower shall,

at its sole cost and expense, comply with all reasonable written requests of the Required Lenders to reasonably effectuate remediation of any Hazardous Materials in, on, under or from the Project or the Site (or part thereof or interest therein) in order to comply with any Environmental Law or Environmental Permit; (F) Borrower shall use its commercially reasonable efforts to not allow any other Person using or occupying the Project or the Site (or part thereof or interest therein) to violate any Environmental Law and/or Environmental Permit; and (G) the Borrower shall promptly, but in any event within five (5) Business Days after obtaining knowledge thereof, notify the Administrative Agent in writing after receipt of written notice of (1) any material presence or Release or threatened Release of Hazardous Materials in, on, under, from or migrating towards the Site (or part thereof or interest therein); (2) any material non-compliance with any Environmental Law or Environmental Permit related in any way to the Project or Site (or part thereof or interest therein); (3) any actual Environmental Lien upon the Collateral; (4) any required or proposed remediation of environmental conditions relating to the Project or any Site (or part thereof or interest therein); (5) any written notice or other communication of which the Borrower becomes aware from any source whatsoever (including but not limited to a governmental entity) relating in any way to the non-compliance of any Hazardous Materials with all applicable Environmental Laws or Environmental Permits; and (6) any Environmental Action.

(i)      In the event the Required Lenders have a reasonable basis to believe that the Project or the Site (or part thereof or interest therein) is not in material compliance with all Environmental Laws and Environmental Permits, the Administrative Agent and any other Person or entity designated by the Administrative Agent, including but not limited to any representative of a Governmental Authority, and any environmental consultant, and any receiver appointed by any court of competent jurisdiction, shall have the right, but not the obligation, to enter upon the Project or Site (or part thereof or interest therein) at all reasonable times upon reasonable prior written notice to the Borrower to assess any and all aspects of the environmental condition of the Project and the Site (or part thereof or interest therein) and its use, including but not limited to, conducting any reasonably necessary environmental assessment or audit (the scope of which shall be determined in the Required Lenders' sole and absolute discretion) and taking samples of soil, groundwater or other water, air, or building materials, and conducting other invasive testing. The Borrower shall cooperate with and provide reasonable access to the Administrative Agent and any such Person or entity designated by the Administrative Agent. Upon any such entry on the Site or the Project, the Administrative Agent and each other designated Person shall use commercially reasonable efforts to avoid unreasonable interference with the conduct of business operations thereon.

(j)      File all federal, state, Puerto Rico and local tax returns and other reports required by law to be filed, and maintain adequate reserves for the payment of all Taxes, assessments, governmental charges and levies imposed upon Borrower, the Project and the Collateral. Borrower shall pay all Taxes and Other Charges now or hereafter levied or assessed or imposed against it and the Project, the Collateral or any part thereof prior to the date on which such sums become delinquent. The Borrower will deliver to the Administrative Agent, upon request, receipts for payment or other evidence reasonably satisfactory to the Administrative Agent that the Taxes and Other Charges have been so paid. The Borrower shall not suffer, and Borrower shall promptly cause to be paid and discharged, any charge whatsoever which may be or become a Lien against the Project or the Collateral (or any part thereof), and shall promptly pay for all

utility services provided to the Project and/or the Site. Notwithstanding the foregoing, after giving not less than five (5) Business Days prior written notice to the Administrative Agent, the Borrower, at its own expense, may contest by appropriate legal, administrative or other proceedings, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any Taxes or Other Charges or Lien therefor or any Legal Requirement or the application of any instrument of record affecting the Borrower, the Project, the Site Lease, the Collateral or any part thereof or any claims or judgments of mechanics, materialmen, suppliers, vendors or other Persons or any Lien therefor or any other charge whatsoever which may be or become a Lien against the Borrower, the Project or any other Collateral, and may withhold payment of the same pending such proceedings if permitted by applicable law; <u>provided</u> that such contest may be initiated and conducted **only** if (A) no Event of Default has occurred and is continuing, (B) such proceeding shall suspend any collection of the contested Taxes, Other Charges, charges or Liens from the Borrower, the Project, the Site Lease, any other Collateral, the Administrative Agent, or any Lender, (C) neither the Project, the Site Lease nor any other Collateral or any interest therein will be in imminent danger of being sold, forfeited, terminated, cancelled or lost, (D) the failure of the Borrower to comply therewith shall not impair the validity of any insurance required to be maintained by the Borrower hereunder or the right to full payment of any claims thereunder, (E) in the case of any essential or significant service with respect to the Project, the Site or any other Collateral, as applicable, any contest or failure to pay will not result in a discontinuance of any such service, (F) the granting, perfection, recording or priority of any Lien hereunder or under the Loan Documents is not jeopardized by such contest or failure to pay, (G) none of the Borrower, the Administrative Agent, or any Lender shall be subject to any civil or criminal penalties or liabilities (except, in the case of Borrower, interest) as a result of such contest or failure to pay, and (H) neither the failure to pay or perform any obligation which Borrower is permitted to contest under this Section nor an adverse determination of any such contest shall be reasonably likely to result in a Material Adverse Effect.

(k)     Deliver to the Administrative Agent (i) within ten (10) calendar days upon request from time to time, but in any event within the first thirty (30) days of each calendar year, a certificate issued by the relevant Governmental Authority (or other evidence of payment reasonably acceptable to the Administrative Agent, including, without limitation, a receipt from the relevant Governmental Authority), stating that all Taxes, and due to the relevant taxing authorities through such date, have been paid in full (except to the extent the same are contested in accordance with the provisions of Section 5.1(j) hereof), and (ii) within five (5) Business Days after payment thereof (which payment shall be made in full by not later than the due date thereof), evidence of payment in full of all Insurance Premiums then due and payable with respect to each Policy required to be maintained hereunder.

(l)     Maintain the Accounts, including, without limitation, its principal deposit account (the "<u>Operating Account</u>") with the Administrative Agent, against which all scheduled payments of principal and interest due under the Notes from time to time may be debited from time to time in accordance with Section 2.11.

(m)     Maintain, preserve and operate the Project, the Site and all of its assets (including without limitation, its Leasehold Interest, the Equipment, Inventory and improvements) in good working order and safe condition, ordinary wear and tear excepted, in accordance to

industry practice standards and in material compliance with all Legal Requirements, Insurance Requirements, the NMTC Compliance Agreement, and the QALICB Requirements and with all standards and rules imposed by all Governmental Authorities with jurisdiction, and the Project Document, and from time to time make, or cause to be made, all reasonably necessary repairs, renewals, replacements, betterments and improvements thereto, except where the failure to do so is not, individually or in the aggregate, reasonably likely to result in a Material Adverse Effect.

(n)     At any time when an Event of Default has occurred and is continuing and the Required Lenders so request, at any time if any Lender may reasonably request if so required by law or regulation, and at such other times (but not more frequently than once per calendar year) as any Lender may reasonably request, cause the delivery of an appraisal of the Project, reasonably satisfactory to the Administrative Agent, at the Borrower' cost and expense.

(o)     (i) Make all payments and otherwise perform all material obligations in respect of all Material Contracts in accordance with their respective terms, (ii) keep such Material Contracts in full force and effect in accordance with their respective terms and (iii) except as permitted under such Material Contracts, not allow such Material Contracts to lapse or be terminated or any rights to renew such Material Contracts to be forfeited or cancelled, except in accordance with their respective terms or where any failure to comply with clauses (i), (ii) or (iii) above is not reasonably likely, taken alone or otherwise, to have a Material Adverse Effect. The Borrower shall defend and protect its rights under each and every Material Contract in a commercially reasonable manner, including, if appropriate, prosecution of suit to enforce any right of the Borrower thereunder and enforcement of any claims with respect thereto.

(p)     Notify the Administrative Agent in writing at least thirty (30) days prior thereto, of the opening of any new office or place of business of the Borrower, or the closing of any existing office or place of business of the Borrower.

(q)     Comply with the NMTC Loan Documents, and promptly notify the Administrative Agent no later than five (5) Business Days of any Event of Default thereunder.

(r)     Comply in all respects with all of the terms and conditions of the issued Tax Concession Documents and with all relevant provisions of the Economics Incentives Act and the rules and regulations promulgated thereunder.

(s)     Make the required deposits and/or transactions with each of the Accounts in accordance with the provisions set forth in Section 6.3 of this Agreement.

(t)     (i) Perform and observe all of its covenants and obligations contained in each of the Project Contracts to which it is a party; (ii) take all reasonable and necessary action to prevent the termination or cancellation of any Project Contracts to which it is a party in accordance with the terms of such Project Contracts or otherwise (except for the expiration of any Project Contracts in accordance with its terms and not as a result of a breach or default thereunder); and (iii) enforce against the relevant parties thereto each covenant or obligation of such Project Contracts to which it is a party in accordance with its terms, including enforcing the rights and remedies of the Borrower under the Project Contracts to maximize the amount of liquidated

damages available to the Borrower under the Project Contracts, except in accordance with their respective terms or where failure of the Borrower to take any action under clauses (i), (ii) or (iii) above is not reasonably expected, taken alone or otherwise, to have a Material Adverse Effect.

(u)     Furnish to the Administrative Agent promptly after the filing thereof with the Secretary of Labor of the United States or the PBGC, copies of each annual report which is filed with respect to each Plan maintained by Borrower for each Plan year, including, if available to the Borrower:

(i)     a statement of assets and liabilities of such Plan as of the end of such Plan year and statements of changes in fund balance and in financial position, or a statement of changes in net assets available for Plan benefits for such Plan year, certified by independent public accountants of recognized standing reasonably acceptable to the Administrative Agent, and

(ii)     an actuarial statement of such Plan applicable to such Plan year, certified by an enrolled actuary of recognized standing reasonably acceptable to the Administrative Agent.

(v)     Conduct all transactions otherwise permitted under the Loan Documents with any of its Affiliates on terms that are commercially fair and reasonable and no less favorable to the Borrower than it would obtain in a comparable arm's-length transaction with a Person that is not an Affiliate.

(w)     Cooperate fully with the Administrative Agent and the Lenders with respect to any proceedings before any court, board or other Governmental Authority which may in any way materially and adversely affect the rights of the Administrative Agent and the Lenders hereunder or any rights obtained by the Administrative Agent and the Lenders under any of the other Loan Documents and, in connection therewith, permit the Administrative Agent and the Lenders, at its or their election, to participate in any such proceedings. Subject to the terms hereof, Borrower shall cooperate with the Administrative Agent and the Lenders in obtaining for the Administrative Agent and the Lenders the benefits of any Proceeds lawfully or equitably payable in connection with the Project or the Site, and the other Collateral, or any part thereof, and the Administrative Agent and the Lenders shall be reimbursed for any reasonable out-of-pocket expenses incurred in connection therewith (including reasonable attorneys' fees and disbursements, and including the payment by the Borrower of the expense of an appraisal on behalf of the Administrative Agent and the Lenders in case of Casualty or Condemnation affecting the Project or the Site or any part thereof) out of such Proceeds.

(x)     Preserve, renew and keep in full force and effect all trademarks, service marks and trademarks.

(y)     With respect to each Major Subcontract:

(i)     Furnish the Administrative Agent with an electronic copy of each fully-executed Major Subcontract within five (5) days after execution thereof.

(ii)     Ensure that each Major Subcontract is the result of arm's-length negotiations, provides for "market" fees and costs and other market terms (as reasonably determined by the Borrower), and does not contain any terms which would adversely affect the rights of the Administrative Agent and any Lender under the Loan Documents or which would violate any material provision of any applicable law.

(iii)    Observe and perform the obligations imposed upon the Borrower under each Major Subcontract in a commercially reasonable manner, except if the failure to do so is not reasonably likely to have a Material Adverse Effect; enforce the terms, covenants and conditions contained in each Major Subcontract on the part of the counterparty thereunder to be observed or performed in a commercially reasonable manner, except if the failure to do so is not reasonably likely to have a Material Adverse Effect  (including, to the extent commercially reasonable, terminating any Major Subcontract because of a default by the counterparty thereunder; provided, that the Borrower shall obtain the prior written consent of the Administrative Agent prior to such termination); not alter, modify or change the material terms of any Major Subcontract in a manner inconsistent with the provisions of the Loan Documents; and not terminate any Major Subcontract, except as permitted above.

(z)      Deposit, or cause the deposit of, on a daily basis in the Accounts as provided in this Agreement, or as otherwise directed by the Administrative Agent from time to time, all cash, checks, instruments and other property from time to time received in respect of Gross Revenues.

(aa)     Take or cause to be taken all commercially reasonable action necessary to obtain the Tax Credits and the benefits thereof within one hundred eighty (180) days from the Closing Date, and to avoid, once obtained, the cancellation or recapture of the Tax Credits.

(bb)     Comply in all material respects with all of the terms of the Tax Concession and with all relevant provisions of the Economics Incentives Act and the regulations promulgated thereunder and take or cause to be taken all commercially reasonable action necessary to maintain the tax exemption benefits to which the Borrower may be entitled under the Tax Concession Documents.

(cc)     With respect to the Project and the construction thereof (without limiting the generality of the foregoing):

(i)      Comply in all material respects with all terms and conditions of the Permits relating to the Construction of the Project, and maintain in full force and effect all such Permits until final completion of the Project (or, if earlier, until completion of the Project element to which such Permit applies).

(ii)     Cause the construction of the Project to be prosecuted with diligence and continuity (except to the extent that the prosecution of the construction of the Project is interrupted by a Force Majeure event), in a good and workmanlike manner and in accordance with the Project Budget, the Plans and Specifications and the Project Schedule and within the boundary limits of the Site so as not to encroach upon or overhang any easement of others, in order to cause

Substantial Completion to occur, free and clear of all claims, Liens and encumbrances related to the construction, within the Project Budget and Project Schedule, subject to and in accordance with this Agreement.

(iii)    Permit the Administrative Agent and the Independent Engineer, or designated representatives of any of them (including appraisers), after giving reasonable notice to the Borrower, to enter upon the Project, at all reasonable times, to inspect or examine (A) the Project, (B) all materials and shop drawings which are or may be kept at the construction site, (C) any contracts, bills of sale, statements, receipts or vouchers, (D) all work done, labor performed or materials furnished in and about the Project, (E) all books, contracts and records relating to the Project and (F) any other documents which are related to the Project. The Borrower will make its representative available for the Administrative Agent and the Independent Engineer upon reasonable notice to discuss the Borrower's affairs, finances and accounts relating to the Project and the Borrower will cooperate, and take all reasonable steps to cause all contractors and construction managers to cooperate, with the Administrative Agent and the Independent Engineer, as the case may be, or any designated representative of any of them, to enable such Person to perform its functions hereunder. In connection therewith, the Borrower will keep adequate records and books of account, in which complete entries will be made in accordance with GAAP, consistently applied, reflecting all financial records of the Borrower. The Borrower shall pay (or reimburse the Lender), on demand, all reasonable fees and documented costs due to the Independent Engineer for services relating to the Project. Upon any such entry on the Site or the Project, the Administrative Agent and each other designated Person (including the Independent Engineer) shall use commercially reasonable efforts to avoid unreasonable interference with the conduct of business operations thereon.

(iv)    Promptly submit to the Independent Engineer for its review and (to the extent that approval of the Independent Engineer is required pursuant to Section 5.2(aa)(i) hereof) approval all proposed changes or proposed additions to the Plans and Specifications (simultaneously with such submission, the Borrower shall deliver to the Administrative Agent a copy of the transmittal letter to the Independent Engineer with respect to such proposed changes or additions). The Borrower shall also deliver simultaneously with the proposed Plans and Specifications (and any modifications or amendments thereto) all relevant information and materials in order to facilitate a proper and adequate review of the Plans and Specifications (and any modifications or amendments thereto) by the Administrative Agent and the Independent Engineer, and the Borrower shall promptly furnish from time to time any additional information and materials reasonably requested by Independent Engineer in order to adequately review the Plans and Specifications (and any modifications or amendments thereto).

(v)    Upon demand of the Administrative Agent and the Independent Engineer, promptly correct any structural defect in the improvements comprising the Project or any departure from the Plans and Specifications not approved by the Administrative Agent and the Independent Engineer, to the extent any such approval is required pursuant to Section 5.2(aa)(i) hereof, it being agreed that the making of any Advance shall not constitute a waiver of the Administrative Agent's right to require compliance with this covenant with respect to any such defects or departures from the Plans and Specifications.

(vi)    Notify the Administrative Agent promptly upon the occurrence of:

(A)    any material default or event of default under any Project Contract;

(B)    any notice given or received pursuant to any of the Project Contracts alleging that a default or other failure by the Borrower or any counterparty has occurred thereunder; and

(C)    any condition which results, or is likely to result, in any delay in Substantial Completion beyond the applicable Project Termination Date.

(D)    Each notice pursuant to this Section 5.1(cc)(vi) shall be accompanied by a statement of the Borrower setting forth details of the occurrence referred to therein and stating what action the Borrower proposes to take with respect thereto.

(vii)    Make or cause to be made all contracts and do or cause to be done all things necessary for the Construction, improvement, equipping and Substantial Completion of the Project, and cause the Project to be constructed, improved and equipped so as to achieve Substantial Completion in accordance in all material respects with the Permits, the Plans and Specifications, the Project Contracts and the Project Budget. Without limiting the generality of the foregoing, the Borrower shall diligently pursue and enforce all of its rights and remedies under the Project Documents and ensure that the Project is constructed in accordance with all such contracts and agreements.

(viii)    Achieve Substantial Completion of the Project in accordance with the Project Schedule, as the same may be extended in accordance with the terms hereof, and by no later than the applicable Project Termination Date.

5.2    **Negative Covenants.** So long as any Advance shall remain unpaid or any Lender shall have any Commitment hereunder, the Borrower shall not, without the prior written consent of the Required Lenders (or if required under Section 10.1, of all of the Lenders):

(a)    Create, incur, assume or suffer to exist any Lien or any other type of preferential arrangement creating a similar benefit, upon or with respect to the Project or any other Collateral, whether now owned or hereafter acquired, or assign any right to receive income, excluding, however, Permitted Liens from the operation of the foregoing restrictions.

(b)    Create, incur, guarantee, endorse, assume or suffer to exist any Indebtedness, direct, contingent or otherwise, except (i) Indebtedness under this Agreement, under the Notes and the NMTC Loan Documents; (ii) trade payables incurred in the ordinary course of business; (iii) unsecured current liabilities (other than for borrowed money) incurred in the ordinary course of business; (iv) Indebtedness owed to an Affiliate of the Borrower, provided it is fully subordinated to the Obligations of the Borrower under this Agreement and the other Loan Documents pursuant to a Subordination Agreement; (v) Permitted Indebtedness; and (vi)

Indebtedness for Capital Lease Obligations, Purchase Money Obligations or other unsecured Indebtedness for borrowed money, each not exceeding $150,000.00 at any time outstanding, or $200,000 in the aggregate at any time outstanding.

(c) Make, assume, endorse or have outstanding at any time any guarantee, loan or advance to, or otherwise extend credit to any Person (including without limitation any shareholder, member, director or officer of the Borrower or any Affiliate of the Borrower).

(d) Enter into any line of business other than the line of business conducted by Borrower on the date hereof or any related line of business similar thereto, or make any material change in the scope or nature of its business objectives or purposes, or undertake or participate in activities other than activities relating to such business.

(e) Cancel or otherwise forgive or release any Indebtedness or claim owed to the Borrower by any Person, including any such Indebtedness or claim arising under any Material Contract, except in the ordinary course of the Borrower's business and on commercially reasonable terms, provided such cancellation, release or forgiveness is not reasonably likely to result in a Material Adverse Effect.

(f) Enter into, or be a party to, any transaction with an Affiliate of the Borrower or any of the shareholders, members, directors or officers of the Borrower, except (i) in the ordinary course of business and on terms which are fully disclosed to the Administrative Agent and the Lenders in advance, (ii) are no less favorable to Borrower or such Affiliate or shareholders, members, directors or officers than would be obtained in a comparable arm's-length transaction with an unrelated third party, and (iii) are subordinate to the payment in full of the Obligations set forth in this Agreement.

(g) (i) (A) Sell, assign, convey, transfer or otherwise dispose of or encumber (except Permitted Liens) any legal, beneficial or equitable interests in all or any part of the Collateral or any other part of the business or assets of the Borrower; (B) permit or suffer any owner, directly or indirectly, of a legal, beneficial or equitable interest (including any Equity Security) in the Borrower to transfer such interest, whether by transfer of an ownership interest or other beneficial interest in any entity or otherwise; or (C) mortgage, hypothecate or otherwise encumber (other than Permitted Liens) or grant a license in all or any part of the foregoing (the transfers referred to in clauses (A), (B) and (C) being, individually or collectively, a "Transfer");

(ii) Sell, convey, mortgage, grant, bargain, encumber, pledge, assign or lease all or any part of the Project, the Site or any other Collateral (other than the sale of Inventory in the ordinary course of business, and other than the sale of obsolete Equipment as provided in Section 6.1.4), grant options with respect to, or otherwise transfer or dispose of (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) the Collateral or any part thereof or any legal or beneficial interest therein, other than (A) a pledge, mortgage or encumbrance of any interest in the Project, the Site and the other Collateral in favor of the Administrative Agent, for the benefit of the Lenders, in accordance with the Loan Documents or (B) any sale (other than the sale of Inventory in the ordinary course of business, and other than the sale of obsolete Equipment as provided in

Section 6.1.4), transfer or other disposition of any part of the Project, the Site or any other Collateral as to which the net proceeds thereof, plus any other necessary amounts, are used to pay in full, concurrently with such sale (other than the sale of Inventory in the ordinary course of business, and other than the sale of obsolete Equipment as provided in Section 6.1.4), transfer or other disposition, the then outstanding amount of all of the Advances, all accrued interest thereon and all other amounts required to be paid under this Agreement or any other Loan Document.

(h)     Issue any Equity Security.

(i)     Change its Fiscal Year.

(j)     Make or permit any change in accounting policies or reporting practices, except as required or permitted by GAAP.

(k)     Permit the aggregate compensation (including salaries, bonuses, commissions and other forms of remuneration) paid to officers and directors of the Borrower to exceed an amount which is reasonable and proper in relation to the work performed and which is comparable to that paid by other companies engaged in similar lines of business.

(l)     Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner, or make any payment in violation of any subordination terms of any Indebtedness required to be subordinated pursuant to any of the Loan Documents.

(m)     During any Fiscal Year of the Borrower, directly or indirectly make or declare any Distribution (in cash, property or obligation) on, or other payment on account of, any ownership interest or Equity Security in the Borrower (including any transfers of any tax benefits) or any payments in respect of any management (or other) fees to any Affiliate of the Borrower, unless each of the following conditions are satisfied as of the date of the Distribution: (i) an Event of Default shall not have occurred and be then continuing, (ii) the Borrower would be in pro-forma compliance after taking in consideration such Distribution with the financial covenants set forth in Section 5.3 as of the last measurement date after giving effect to such Distribution, (iii) an Event of Default or Default would not exist immediately after giving effect to the making of such Distributions, and (iv) the Distribution shall not be made with the proceeds from the sale, transfer or disposition of any Tranche One Tax Credits.

(n)     Remove, demolish, expand, reduce or alter any material improvement, except in connection with repairs, replacements and improvements made in conformance with this Agreement or the Project Documents.

(o)     Assign its rights hereunder or under any of the Material Contract to any Person, or consent to the assignment by any party under a Material Contract, as the case may be, of its obligations under any Material Contract to which it is a party.

(p)     At any time, willfully and voluntarily abandon and suspend the operation of the Project or any part thereof for a period of more than thirty (30) consecutive days for any reason (other than an event of Force Majeure), provided that none of (A) scheduled maintenance of the

Project, (B) repairs to the Project, whether or not scheduled, or (C) a forced or scheduled outage of such Project or any part therein, shall constitute abandonment, so long as the Borrower is diligently attempting to end such suspension.

(q) Except as otherwise expressly provided in this Agreement, surrender, default or terminate any Material Contract (unless the other party thereto is in material default and the termination of such agreement would be commercially reasonable and would not result in a Material Adverse Effect); and, except as otherwise expressly provided herein, the Borrower shall not modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under any Material Contract in any material respect if a Material Adverse Effect is reasonably likely to result therefrom.

(r) Use any name other than its current name, or transfer its principal place of business or change its chief executive office, or maintain the Collateral or its records with respect to the Collateral at any locations other than those at which the same are presently kept or maintained, as set forth in Schedule 4.1(ff), except after the delivery to the Administrative Agent of security instruments and other documents, if required by the Administrative Agent, in order to establish or maintain a Lien on any Collateral, in form and substance reasonably satisfactory to the Administrative Agent.

(s) Become, or permit or cause any Loan Party to become, a Person whose property or interests in property are blocked or subject to blocking pursuant to Section 1 of the Order; or engage, or permit or cause any Loan Party to engage, in any of the transactions prohibited by Section 2 of the Order; or associate with, or permit or cause any Loan Party to associate with, Persons such that a violation by the Borrower or any other Loan Party of Section 2 of the Order would arise; or become, or permit or cause any Loan Party to become, a Person on the list of Specially Designated Nationals and Blocked Persons subject to financial sanctions maintained by OFAC or any similar list maintained thereby pursuant to any requirement of law including, without limitation, trade embargos, economic sanctions or other prohibitions imposed by Executive Order of the President of the United States.

(t) Create, or make any investment in any direct or indirect Subsidiary or any other Person; or enter into a partnership, joint venture or similar arrangement with any Person.

(u) Create or enter into any Plan, except in compliance with ERISA and all other Legal Requirements; and pay and discharge all obligations and liabilities under ERISA of a character which if unpaid or unperformed may result in the imposition of a Lien against any of its properties or assets.

(v) Purchase, redeem, retire or otherwise acquire for value, or set apart any money for a sinking, defeasance or other analogous fund for the purchase, redemption, retirement or other acquisition of, any Indebtedness, or prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner, or make any payment in violation of any subordination terms of, any Indebtedness, other than the prepayment of the Advances in accordance with the terms of this Agreement.

(w)     Except as otherwise expressly permitted pursuant to the terms of the Loan Documents, it has not and shall not:

(A)     Merge into or consolidate with any other Person or purchase all or substantially all of the assets of any other Person or change its legal structure.

(B)     Seek or consent to or cause the liquidation, termination, dissolution or winding up, in whole or in part, of any Loan Party.

(C)     Consent to any modification, supplement or waiver of any of the provisions of its Organizational Documents (other than minor ministerial changes).

(D)     Fail to observe its organizational formalities or preserve its existence as a corporation, duly organized, validly existing and in good standing under the laws of its jurisdiction of organization and maintain its qualification to do business in the Commonwealth of Puerto Rico.

(E)     Fail to pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same shall become due.

(F)     Guarantee or become obligated for the obligations of any other Person or hold itself out to be responsible for the obligations of another Person, except pursuant to any Loan Document and except as otherwise expressly permitted herein.

(G)     Fail to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations.

(H)     Pledge its assets for the benefit of any other Person, except as required by the Loan Documents.

(I)     Commingle its assets with the assets of any of its Affiliates or of any other Person or participate in a cash management system with any of its Affiliates or any other Person or fail to use its own stationery, invoices and checks; or otherwise cause or permit, or do anything that would reasonably be expected to cause, the assets of any other Person to be substantiality consolidated with the assets of the Borrower in the event of a bankruptcy or similar proceeding involving such constituent party or other Person.

(x)     Except as specifically provided to the contrary herein, disburse cash for Capital Expenditures in excess of the amounts provided in the Annual Budget unless the Capital

Expenditures are funded with equity, with the proceeds of the Non-Revolving Facility Advance to the extent provided in the Project Budget, or with Proceeds in accordance with Section 6.2 hereof.

(y)     Permit the violation of any of the representations, warranties or covenants contained in the NMTC Compliance Agreement or NMTC Loan Documents, and the Borrower shall not modify, change, supplement, alter or amend, any of the NMTC Loan Documents in any material respect.

(z)     Permit any violation or misrepresentation under the application of, or the issued, Tax Concession Documents, which in any way may affect the benefits established thereunder to be in full force and effect.

(aa)    With respect to the construction of the Project (without limiting the generality of the foregoing):

(i)     Create or suffer to exist any material deviation from the Plans and Specifications not approved by the Administrative Agent and the Independent Engineer nor permit the performance of any work on the Project otherwise than in accordance with such Plans and Specifications, nor change, or agree to any material changes in, the Project Budget or the Project Schedule (except with respect to Change Orders in accordance with this Agreement or as otherwise provided in this Section); or

(ii)    Suffer or permit to exist or to continue for more than thirty (30) consecutive days any order of decree in any court of competent jurisdiction enjoining or prohibiting the construction of the Project or enjoining or prohibiting the Borrower from performing this Agreement; or a shorter period, to the extent that exceeding such shorter period would be reasonably likely to result in any increase in the Project Budget that would result in the Non-Revolving Facility not being "In-balance" pursuant to Section 2.2(b) or the failure to achieve Substantial Completion of the Project on or prior to the Project Termination Date; or

(iii)   Permit the performance of any work on the Project pursuant to, or request an Advance for, any Change Order which has not been previously approved in writing by the Administrative Agent and the Independent Engineer, except with respect to Change Orders made in accordance or otherwise pursuant to the terms of this Agreement; or

(iv)    Enter into or become a party to any additional Material Contract, except (i) upon prior written consent of the Administrative Agent; (ii) in the name of the Borrower and (iii) upon delivery to the Administrative Agent of a consent to collateral assignment from such counterparty thereto in form and substance reasonably satisfactory to the Administrative Agent, to the extent such consent to collateral assignment is required thereunder; or

(v)     Initiate or support any limiting change in the permitted uses of the Project or Site (or to the extent applicable, zoning reclassification or the Site) or any portion thereof, seek any variance under existing land use restrictions, laws, rules and regulations applicable to the Project or Site which would in turn have a Material Adverse Effect to the Borrower and the Project, or use the Project or Site in a manner that would result in such use being

non-conforming under the applicable Legal Requirements or would materially impair the value or utility of the Project; or

(vi) Release, emit or discharge into the environment any Hazardous Substances in violation of any Environmental Laws, Legal Requirements or applicable Permits or disturb or allow any Hazardous Substances to impact or be present on, in, under or above the Site and/or the Project in a manner that could reasonably be expected to have a Material Adverse Effect.

5.3 **Financial Covenants.** So long as the Advances shall remain unpaid or any Lender shall have any Commitment hereunder, the Borrower shall:

(a) Maintain, as of the end of each Fiscal Quarter of each Fiscal Year following the Conversion Date (calculated on a trailing twelve-month basis, commencing on the first Fiscal Quarter after the first anniversary following the Conversion Date), a Debt Service Coverage Ratio of not less than 1.30:1.00.

(b) Maintain, as of the end of each Fiscal Quarter of each Fiscal Year following the Conversion Date (calculated on a trailing twelve-month basis, commencing on the first Fiscal Quarter after the first anniversary following the Conversion Date), a Fixed Charge Coverage Ratio of not less than 1.10:1.00.

(c) Maintain, as of the end of each Fiscal Quarter of each Fiscal Year following the Conversion Date (calculated on a trailing twelve-month basis, commencing on the first Fiscal Quarter after the first anniversary following the Conversion Date), a Leverage Ratio of not more than 4.00.

**ARTICLE VI**
**SPECIAL PROVISIONS AS TO COLLATERAL; INSURANCE,**
**CASUALTY AND CONDEMNATION; ACCOUNTS**

6.1 **Special Provisions as to Collateral.**

6.1.1 <u>Perfection of Security Interest.</u> (a) It is the intention of the Administrative Agent, the Lenders and Borrower, and the Lenders and Borrower hereby agree that, until all Obligations hereunder and under the Notes and other Loan Documents have been fully satisfied, the Administrative Agent's Lien, for the ratable benefit of the Lenders, in the Collateral, and all products and proceeds thereof, shall continue in full force and effect. Borrower shall take any and all steps reasonably requested in writing by the Administrative Agent necessary to perfect, maintain and protect the Administrative Agent's Lien, for the ratable benefit of the Lenders, in the Collateral, including, without limitation, executing and filing security instruments, or amendments thereof, and delivering notices, consents, estoppels, acknowledgments and instruments, in each case in form and substance reasonably satisfactory to the Administrative Agent. The Borrower shall pay the costs of, or incidental to, any recording or filing of any security instrument or other document concerning the Collateral and the reasonable costs of, or incidental to, any and all other steps or procedures which the Administrative Agent may reasonably request in order to perfect, maintain and protect the Administrative Agent's Lien, for the ratable benefit of the Lenders, in the

Collateral. If the Borrower fails to pay any Taxes or Other Charges levied or assessed or imposed upon or with respect to the Collateral or any part thereof promptly when due, the Lenders may (but shall not be required to) pay the same and charge the cost thereof to the Borrower's account with any Lender as part of the Obligations payable hereunder on demand and secured by the Collateral. In order to protect or perfect any Lien which the Administrative Agent is granted, for the ratable benefit of the Lenders, under any Loan Document, the Administrative Agent may, in its reasonable discretion, maintain guards, discharge any Lien or encumbrance or bond the same, pay any reasonable insurance premiums, service bureau or warehouseman, or obtain any record and charge the same (together with interest thereon at the Default Rate) to the Borrower's Account any Lender as part of the Obligations payable hereunder on demand and secured by the Collateral.

(b)     The Lenders, in their sole discretion, may (i) exchange, waive or release any security or portion of the Collateral, (ii) enforce any security or portion of the Collateral following the occurrence and during the continuance of an Event of Default, (iii) apply such security or any proceeds of the Collateral to the Obligations as specified in Section 7.2 following the occurrence and during the continuance of an Event of Default, and direct the order or manner of sale thereof as the Lenders, from time to time, may determine, and (iv) settle, compromise, collect or otherwise liquidate any such Collateral for the Obligations in any manner following the occurrence and during the continuance of an Event of Default, without affecting or impairing the right of the Administrative Agent or the Lenders to take any other further action with respect to any security or Collateral for the Obligations or any part thereof.

(c)     It is the intention and agreement of the Administrative Agent, the Lenders and the Borrower that (i) the Administrative Agent's Lien and collateral assignment in the Collateral (for the ratable benefit of the Lenders) granted pursuant to the Loan Documents, and all products and proceeds thereof, shall secure all of the Obligations of the Borrower under this Agreement and the other Loan Documents, and (ii) all of the Obligations of the Borrower under this Agreement and the other Loan Documents shall be guaranteed by each of the Guarantors, jointly and severally (*solidariamente*) with the Borrower, pursuant to the Guaranty. Except upon indefeasible payment in full in cash and performance of all of the Obligations under the Loan Documents and except as otherwise expressly provided in this Agreement, no repayment or prepayment of all or any portion of the Notes or other amounts payable under the Loan Documents shall cause, give rise to a right to require, or otherwise result in, the release of the Lien of, or a reduction in the amount of any Collateral. Notwithstanding anything to the contrary set forth in Section 2.9(d), the Lenders shall not be obligated to accept an optional prepayment of only a portion of the Advances under such Section 2.9(d), to the extent that such partial prepayment would entitle the Borrower under applicable law to require the release of any portion of the Collateral.

6.1.2   <u>Provisions Relating to Inventory and Receivables</u>. Without the prior written consent of the Required Lenders in each case, the Borrower shall not (i) re-date any invoice or sale, (ii) make sales on extended dating or (iii) change the terms of sale customarily offered to its customers. Except for Permitted Liens, the Borrower shall not sell or assign or grant any Lien in any Receivable to any Person other than the Administrative Agent, for the benefit of the Lenders, nor shall the Borrower encumber, mortgage, pledge or grant any Lien in any of its Inventory to anyone other than the Administrative Agent, for the benefit of the Lenders. The Borrower shall

place notations upon its books of account to disclose the assignment of and Lien in all Receivables in favor of the Administrative Agent, for the benefit of the Lenders, and the Administrative Agent's assignment and Lien in, of or on all Collateral and all other security held by or for the Administrative Agent for the benefit of the Lenders. The Borrower shall notify the Administrative Agent promptly of all disputes and claims in excess of $150,000 with customers or account debtors and settle or adjust them at no expense to the Administrative Agent or the Lenders, but no discount, credit or allowance shall be granted to any customer or account debtor and no returns of merchandise shall be accepted by the Borrower without the prior written consent of the Required Lenders, other than discounts, credits, allowances and returns of less than $150,000 made, given or accepted in the ordinary course of its business. The Borrower shall each notify the Administrative Agent promptly after learning that any setoff in an amount of $150,000 or more has been made by a Receivables debtor against any Receivable. At Closing, the Administrative Agent and the Borrower shall notify customers or account debtors at any time that Receivables have been assigned to the Administrative Agent or of the Administrative Agent's Lien therein, and may collect them directly and charge the collection costs and expenses to the Borrower.

6.1.3 <u>Warranties with Respect to Inventory and Receivables</u>. (a) The Borrower agrees, represents and warrants that each Receivable will be owned by it, free and clear of any Liens, claims or encumbrances other than those in favor of the Administrative Agent, for the benefit of the Lenders, and Permitted Liens, and will cover a bona fide sale of goods usually dealt in by it or the rendition by it of services to customers in the ordinary course of business, and will be for a liquidated amount maturing as stated in the schedules thereof and in the invoice or contract covering said sale, and the Administrative Agent's Lien therein will not be subject to any other Lien (other than Permitted Liens) or to any offset, deduction, counterclaim or other similar condition.

(b) The Borrower agrees, represents and warrants that all Inventory is and will be owned by it free of all Liens, claims or encumbrances other than those in favor of the Administrative Agent, for the benefit of the Lenders, and Permitted Liens, and shall be kept by the Borrower at its place of business specified in Schedule 4.1(x) hereto, and that they shall not remove the Inventory therefrom except for the purpose of sale in the ordinary course of its business. Except for sales of Inventory made in the ordinary course of its business and sales during any Fiscal Year of obsolete or unmerchantable Inventory having a value not exceeding $150,000 in the aggregate, the Borrower shall not sell, encumber or dispose of or permit the sale, encumbrance or disposal of Inventory.

6.1.4 <u>Provisions Relating to Equipment</u>. The Borrower shall (i) keep and maintain, or cause to be kept and maintained, all Equipment in good operating condition and repair, reasonable wear and tear excepted, and shall make all necessary replacements thereof so that the value and operating efficiency thereof shall at all times be maintained and preserved and (ii) not permit any such Equipment to become a fixture to real estate or accession to other personal property unless the Administrative Agent has a first priority Lien in such real estate or other personal property. The Borrower shall, immediately on demand therefor by the Administrative Agent, deliver, or cause to be delivered, to the Administrative Agent any and all evidence of ownership of any Equipment. The Borrower shall not, without the prior written consent of the Administrative Agent and the Required Lenders, sell, lease, grant a Lien in (except for Permitted Liens) or otherwise dispose of or encumber any Equipment or any part thereof; <u>provided, however,</u>

that the Borrower may, without the prior written consent of the Administrative Agent and the Required Lenders, sell obsolete Equipment having a value not exceeding $150,000 in the aggregate for the Borrower during any Fiscal Year. In the event that any of the Equipment is sold with the prior written consent of the Administrative Agent and the Required Lenders as herein provided, or as otherwise permitted pursuant to the provision to the preceding sentence, (x) if the Equipment so sold is not replaced by the Borrower or is replaced by Equipment leased by the Borrower pursuant to a Capitalized Lease Obligation permitted by the terms of this Agreement, such sale shall be considered as a Disposition subject to the provisions of Section 2.9(a) hereof, and (y) if such sale is made in connection with the purchase by the Borrower of replacement Equipment, the Borrower shall use the cash proceeds thereof to pay the purchase price of such replacement Equipment and shall deliver, or cause to be delivered, to the Administrative Agent written evidence of the use of the proceeds of such purchase. All such replacement Equipment purchased by the Borrower shall be free and clear of all Liens, claims and encumbrances, except for the Administrative Agent's first priority Lien therein and Permitted Liens. The Borrower agrees to execute, or cause to be executed, any and all security agreements, financing statements and other instruments which the Administrative Agent may require in order to perfect its first priority Lien in all replacement Equipment.

### 6.2     **Insurance; Casualty and Condemnation**.

#### 6.2.1    Insurance.

(a)     The Borrower, at its sole cost and expense, for the mutual benefit of the Borrower, the Administrative Agent and the Lenders, shall obtain and maintain such insurance as is specified in Schedule 6.2.1 hereto.

(b)     All policies of insurance (the "Policies") required pursuant to this Section 6.2.1 shall be issued by companies reasonably acceptable to the Administrative Agent and the Required Lenders and licensed to do business (or qualified as eligible surplus lines insurers) in the Commonwealth of Puerto Rico. Further, unless otherwise approved by the Required Lenders in writing, the issuer(s) of the Policies required under this Section 6.2.1 shall have a claims paying ability rating of "B++" or better by A.M. Best's. The Policies (i) shall name the Administrative Agent and the Lenders and their respective successors and/or assigns, as their interests may appear, as additional insureds or as mortgagees and loss payees (except that in the case of general liability insurance, the Administrative Agent and the Lenders shall be named as additional insured and not as loss payee); (ii) shall contain a Non-Contributory Standard Lender Clause and name the Administrative Agent, as administrative agent for the Lenders, as the Person to which all payments made by such insurance company shall be paid; (iii) shall include effective waivers by the insurer of all claims for insurance premiums against all loss payees, additional insureds and named insureds (other than the Borrower) and all rights of subrogation against any mortgagee, loss payee, additional insured or named insured (and their respective employees, agents, successors and assigns); (iv) if in the Borrower's possession, the originals (or, if not then in the Borrower's possession, true and complete copies) thereof delivered to the Administrative Agent; (v) except as otherwise provided above, shall be subject to a deductible, if any, not greater in any material respect, in proportion to the coverage maintained, than the deductible for such coverage that a prudent owner of property located in Puerto Rico similar in nature and operation and use to the

Project and the Site would maintain; (vi) shall contain such customary provisions as the Administrative Agent and the Required Lenders deem reasonably necessary or desirable to protect their respective interests including endorsements providing that neither the Borrower, the Administrative Agent, any Lender nor any other Person shall be a co-insurer under said Policies and that no modification, reduction, cancellation or termination in amount of, or material change (other than an increase) in, coverage of any of the Policies shall be effective until at least thirty (30) days after receipt by each named insured, additional insured and loss payee of written notice thereof; (vii) shall permit the Administrative Agent and each of the Lenders to pay the premiums and continue any insurance upon failure of the Borrower to pay premiums when due, upon the insolvency of the Borrower or through foreclosure or other transfer of title to the Project or its properties (it being understood that the Borrower's rights to coverage under such Policies may not be assignable without the consent of the insurer); and (viii) shall provide that any proceeds shall be payable to the Administrative Agent, on behalf of the Lenders, and that the insurance shall not be impaired or invalidated by virtue of (A) any act, failure to act, negligence of, or violation of declarations, warranties or conditions contained in such Policy by the Borrower, the Administrative Agent, any Lender or any other named insured, additional insured, mortgagee or loss payee, except for the willful misconduct of the Administrative Agent or any Lender knowingly in violation of the conditions of such Policy, (B) the occupation, use, operation or maintenance of the Project and the Site for purposes more hazardous than permitted by the terms of the Policy, (C) any foreclosure or other proceeding or notice of sale relating to the Project and the Site or (D) any change in the possession of the Project or the Site, without a change in the identity of the holder of actual title to the Project or the Site (provided, that with respect to items (C) and (D), any notice requirements of the applicable Policies are satisfied). The Borrower shall be responsible for the payment of all deductibles.

(c)     Insurance Premiums; Insurance Certificates.

(i)     Borrower shall pay the premiums for all Policies (the "Insurance Premiums") as the same become due and payable and shall furnish to the Administrative Agent the receipts for the payment of the Insurance Premiums or other evidence of such payment reasonably satisfactory to the Administrative Agent showing full payment thereof for the next succeeding twelve-month period. Within thirty (30) days after request by the Administrative Agent, the Borrower shall obtain such increases in the amounts of coverage required hereunder as may be reasonably requested by the Required Lenders, taking into consideration changes in liability laws, changes in prudent customs and practices, and the like (such coverage, however, to be comparable to the coverage maintained by owners of properties of similar size and character in Puerto Rico). The Borrower may satisfy the requirements under this Section 6.2.1 through the use of a blanket Policy or Policies covering properties in addition to the Project; provided that any such blanket Policy shall specify, except in the case of public liability insurance, the portion of the total coverage of such Policy that is allocated to the Project, and any sublimits in such blanket Policy applicable to the Project, which amounts shall not be less than the amounts required pursuant to this Section 6.2.1 and which shall in any case comply in all other respects with the requirements of this Section 6.2.1.

(ii)     Borrower shall deliver to the Administrative Agent on or prior to the Closing Date insurance certificates, policy binders and evidence of payment (or, with respect to

builder's risk insurance, if payable in installments, evidence of payment of the installments then due and payable) with respect to each of the Policies required to be maintained by the Borrower hereunder. Subject to the notification requirements set forth in this Section 6.2.1 with respect to cancellation and modification of Policies, the Borrower shall deliver to the Administrative Agent, promptly upon each material change in any Policy, a certificate with respect to such changed Policy certified by the insurance company issuing that Policy, in substantially the same form and containing substantially the same information as the certificates required to be delivered by the Borrower pursuant to the first sentence of this subsection (c)(ii) and stating that the same are in full force and effect.

(d) Renewal and Replacement of Policies.

(i) Not less than thirty (30) days prior to the expiration, termination or cancellation of any Policy, Borrower shall renew, or cause to be renewed, such Policy or obtain a replacement Policy or Policies (or a binding commitment for such replacement Policy or Policies), which shall be effective no later than the date of the expiration, termination or cancellation of the previous Policy (leaving no gaps in coverage), and shall deliver to the Administrative Agent in respect of such Policy or Policies the same evidence of insurance required pursuant to Section 6.2.1(c)(ii).

(ii) If the Borrower does not furnish to the Administrative Agent the evidence required under subsection (d)(i) within five (5) calendar days after written request therefor, the Administrative Agent, on behalf of the Lenders, may procure, but shall not be obligated to procure, such replacement Policy or Policies and pay the Insurance Premiums therefor, and Borrower agrees to reimburse the Administrative Agent and the Lenders for the cost of such Insurance Premiums promptly on demand. All such amounts paid by the Administrative Agent and the Lenders shall bear interest at the Default Rate and shall be secured by the Collateral.

(e) Separate Insurance. The Borrower will not take out separate insurance concurrent in form or contributing in the event of loss with that required to be maintained pursuant to this Section 6.2.1 unless such insurance complies with subsection (c) above.

(f) Deliveries to the Administrative Agent. All notifications, policies, endorsements, certificates and the like which are required to be delivered to the Administrative Agent pursuant to this Section 6.2.1 shall be sent in accordance with the requirements of Section 10.2 hereof.

6.2.2 Casualty: Application of Proceeds.

(a) Right to Adjust.

(i) If the Project or the Site, or any part thereof is damaged or destroyed, in whole or in part, by fire or other casualty (a "Casualty"), the Borrower shall give prompt (but in any event within five (5) Business Days after the occurrence thereof) written notice thereof to the Administrative Agent, generally describing the nature and extent of such Casualty. Unless otherwise expressly provided in this Agreement, following the occurrence of a Casualty,

the Borrower, regardless of whether proceeds are available, shall promptly proceed to restore, repair, replace or rebuild (or cause to be restored, repaired, replaced or rebuilt) the portion(s) of the Project or Site to the extent practicable to be of at least equal value and of substantially the same character as prior to the Casualty, all in accordance with the terms hereof.

(ii)     Subject to clause (v) below, in the event of a Casualty that involves a loss that does not exceed $150,000.00, the Borrower may settle and adjust such claim; provided that such adjustment is carried out in a competent and timely manner. In such case, the Borrower is hereby authorized to collect and receive any Proceeds for the Administrative Agent and the Lenders.

(iii)     Subject to clause (v) below, in the event a Casualty involves a loss that exceeds $150,000.00, the Borrower may settle and adjust such claim only with the written consent of the Administrative Agent and the Required Lenders, and the Administrative Agent shall have the opportunity to participate, at the Borrower's reasonable cost, in any such adjustments.

(iv)     The proceeds of any Policy shall be due and payable solely to the Administrative Agent, for the ratable benefit of the Lenders, and held and applied in accordance with the terms hereof.

(v)     Notwithstanding the terms of clauses (ii) and (iii) above, the Administrative Agent, as administrative agent for the Lenders, shall have the sole authority to adjust any claim with respect to a Casualty and to collect all Proceeds if an Event of Default shall have occurred and is continuing.

(b)     <u>Borrower' Right to Apply to Restoration.</u>

In the event of a Casualty where the loss is in an aggregate amount equal to or less than $150,000.00, or a Condemnation where the loss is in an aggregate amount equal to or less than $150,000.00, then the Lenders shall apply the Proceeds (after reimbursement of any reasonable expenses incurred by the Administrative Agent and the Lenders) to reimburse the Borrower for the cost of restoring, repairing, replacing or rebuilding the applicable Equipment, the Project or the Leased Site (the "<u>Restoration</u>") in the manner required hereby, provided and on the condition that (I) no Event of Default shall have occurred and be then continuing, and (II) the Borrower shall (A) commence settlement of the insurance claim within thirty (30) days after the date of the Casualty, (B) diligently pursue the preparation of plans and specifications, the issuance of all necessary Permits and approvals, the execution of construction contracts, and all other actions necessary to commence Restoration, (C) commence Restoration as soon as reasonably practicable (but in no event later than sixty (60) days after completion of the matters referred to in clause (B) above), and (D) diligently pursue each of the same to satisfactory completion (but subject to the requirements of clause (III) below), and (III) the Borrower will provide reasonable evidence to the Administrative Agent that the Proceeds (together with any remaining available Advances) will be sufficient to permit the Restoration to be substantially completed on or prior to the scheduled termination date with no deviation from the plans and specifications therefor and in accordance with the Restoration budget. If any of the conditions set forth in clauses (I), (II) and (III) of this subsection (b) is not satisfied, then, notwithstanding anything herein to the contrary,

unless the Required Lenders shall otherwise elect, at their sole option, the Proceeds shall be applied to the prepayment of the Notes in accordance with the terms of Section 6.2.2(d).

(c) <u>Lenders' Right to Apply to Repayment or Restoration.</u>

(i) In the event of a Casualty that involves a loss in an aggregate amount of more than $150,000.00 (a "<u>Material Casualty</u>"), or a Condemnation where the loss is in an aggregate amount of more than $150,000.00 (a "<u>Material Condemnation</u>"), the Lenders shall permit the application of the Proceeds (after reimbursement of any reasonable expenses incurred by the Administrative Agent and the Lenders) to reimburse the Borrower for the cost of Restoration in the manner required hereby, provided and on the condition that:

(A) no Event of Default shall have occurred and be then continuing;

(B) (I) in the event of a Casualty or Condemnation occurring prior to the date of Substantial Completion of the Project, the Non-Revolving Facility shall be In Balance and the Proceeds (together with any Net Proceeds Deficiency deposited by the Borrower with the Lender in accordance with the terms of this Agreement) will be sufficient, in the reasonable judgment of the Administrative Agent, to permit the Project (including the Restoration) to be Substantially Completed on or before the Project Termination Date with no material deviation from the Plans and Specifications and in accordance with the Project Budget; or (II) in the event of a Casualty or Condemnation occurring after the date of Substantial Completion of the Project, the Restoration can be completed by the earliest to occur of:

(1) the 180th day following the receipt of the Proceeds, or, with the prior written approval of the Required Lenders, such longer period as may reasonably be required;

(2) the day scheduled for the payment of the last installment of principal under the Notes; and

(3) the expiration of the payment period on the business interruption insurance coverage in respect of such Casualty;

(C) the Borrower shall (I) commence settlement of the insurance claim within thirty (30) days after the date of the Casualty, (II) diligently pursue the preparation of plans and specifications, the issuance of all necessary Permits and approvals, the execution of construction contracts, and all other actions necessary to commence

89

Restoration, (III) commence Restoration as soon as reasonably practicable (but in no event later than sixty (60) days after completion of the matters referred to in clause (II) above), and (IV) diligently pursue the Restoration to satisfactory completion;

(D)     in the reasonable judgment of the Administrative Agent and the Required Lenders, any operating deficits which will be incurred with respect to any Project or the business operations of the Borrower as a result of the occurrence of any such Casualty or Condemnation will be covered out of (1) the Proceeds, (2) business interruption insurance, or (3) other funds of the Borrower;

(E)     the Borrower shall deliver, or cause to be delivered, to the Administrative Agent a signed, reasonably-detailed initial budget containing the Borrower's reasonable estimates of the cost of completing the Restoration and shall furnish to the Administrative Agent no less frequently than once every thirty (30) days an updated budget prepared by the Borrower containing all revisions and refinements to such budget and the amounts incurred through the date of such budget. Such initial budget and all subsequent budgets shall be reasonably acceptable to the Required Lenders;

(F)     the Material Contracts in effect as of the date of the occurrence of such Casualty or Condemnation, whichever the case may be, shall (1) remain in full force and effect during the Restoration and shall not otherwise terminate as a result of the Casualty, Condemnation or the Restoration or (2) if terminated, be replaced with a new Material Contract, as applicable, within sixty (60) days after such termination;

(G)     the Guarantors reaffirm in writing the continued validity and effectiveness of the Guaranties, respectively;

(H)     the Project, the Site and the use thereof after the Restoration will be in compliance with and permitted under all Legal Requirements, including, without limitation, all applicable zoning laws, ordinances, rules and regulations; and

(I)     the Restoration shall be done and completed by the Borrower in an expeditious and diligent fashion and in compliance with all Legal Requirements and Insurance Requirements.

If any of the conditions set forth in clauses (A) through (G) of this subsection (c)(i) is not satisfied, then, notwithstanding anything herein to the contrary, unless the Required Lenders shall otherwise

elect, at their sole option, the Proceeds shall be applied to the prepayment of the Notes in accordance with the terms of Section 6.2.2(d).

(ii)     The Proceeds shall be held by the Administrative Agent, for the ratable benefit of the Lenders, and, until disbursed in accordance with the provisions hereof, shall constitute additional security for the Obligations under the Loan Documents. The Proceeds shall be disbursed by the Administrative Agent from time to time during the course of the Restoration, upon receipt of such documents as the Administration Agent and the Restoration Consultant may reasonably require and satisfaction of such other terms and conditions as the Administrative Agent and the Required Lenders may determine in their sole discretion.

(iii)     All plans and specifications required in connection with the Restoration shall be subject to prior review and acceptance in all respects by the Administrative Agent and by an independent consulting engineer or other Person selected by the Required Lenders after consultation with the Borrower (the "Restoration Consultant"). No approval of the plans, specifications, or working drawings for any Restoration or other alterations of the Project or Site shall create any responsibility or liability on behalf of the Administrative Agent, any Lender or the Restoration Consultant for their completeness, design, sufficiency or their compliance with Legal Requirements or Insurance Requirements. The Lenders shall have the use of the plans and specifications and all Permits, licenses and approvals required or obtained in connection with the Restoration.  The identity of the contractors, subcontractors and materialmen engaged in the Restoration, as well as the contracts under which they have been engaged, shall be subject to prior review and acceptance by the Required Lenders and the Restoration Consultant.  All reasonable out-of-pocket costs and expenses incurred by the Administrative Agent and the Lenders in connection with making the Proceeds available for the Restoration including, without limitation, reasonable legal fees and disbursements and the Restoration Consultant's fees, shall be paid by the Borrower.

(iv)     In no event shall the Lenders be obligated to make disbursements of the Proceeds in excess of an amount equal to the costs actually incurred from time to time for work in place as part of the Restoration, as certified by the Restoration Consultant, minus the Restoration Retainage; provided that, upon completion of each identifiable design element of the Restoration, and subject to the provisions of the last sentence of this paragraph (v), the Lenders shall release the related portion of the Restoration Retainage for the purpose of paying the contractors and other obligees with respect to such design element.  The term "Restoration Retainage" shall mean an amount equal to ten percent (10%) of the costs actually incurred for work in place as part of the Restoration, as certified by the Restoration Consultant.  The Restoration Retainage shall in no event, and notwithstanding anything to the contrary set forth herein, be less than the amount actually held back by the Borrower from contractors, subcontractors and materialmen engaged in the Restoration.  The Administrative Agent shall specify the conditions for the release of the Restoration Retainage.

(v)     The Administrative Agent shall not be obligated to make disbursements of Proceeds more frequently than once every calendar month.

(vi)     If at any time the Proceeds or the undisbursed balance thereof shall not, in the reasonable opinion of the Required Lenders, be sufficient to pay in full the balance of the costs which are estimated by the Administrative Agent to be incurred in connection with the completion of the Restoration, the Borrower shall deposit the deficiency (the "Net Proceeds Deficiency") in immediately available funds with the Administrative Agent before any further disbursement of Proceeds shall be made.  The Net Proceeds Deficiency deposited with the Administrative Agent shall be held by the Administrative Agent and shall be disbursed for costs actually incurred in connection with the Restoration on the disbursement conditions established by the Administrative Agent, and until so disbursed pursuant to this Section 6.2.2(c) shall constitute additional security for the Obligations under the Loan Documents.

(vii)     The excess, if any, of the Proceeds and the remaining balance, if any, of the Net Proceeds Deficiency deposited with the Administrative Agent after the Restoration Consultant certifies to the Administrative Agent and the Lenders that the Restoration has been completed in accordance with the provisions of this Section 6.2.2(c), and the receipt by the Administrative Agent of evidence reasonably satisfactory to the Required Lenders that all costs incurred in connection with the Restoration have been paid in full, shall be remitted by the Administrative Agent to the Borrower, provided no Event of Default shall have occurred and be continuing.

(viii)     All Proceeds not required to be made available for the Restoration may be retained and applied by the Lenders toward the payment of the Notes whether or not then due and payable in the manner provided in Section 6.2.2(d) or, at the discretion of the Required Lenders, the same may be paid, either in whole or in part, to the Borrower for such purposes as the Required Lenders shall designate, in their discretion.

(d)     Application to Prepayment.  Any application of Proceeds to the Notes pursuant to Sections 6.2.2(b) or (c) shall be without any prepayment premium or penalty. Any such application to the Notes shall be as set forth in Section 2.9(b).  No such application shall postpone or reduce any payments otherwise required pursuant to the Notes.

6.2.3     Condemnation.  (a) Borrower shall promptly (but in any event within five (5) Business Days after obtaining knowledge thereof) give the Administrative Agent written notice of the actual or threatened commencement of any condemnation or eminent domain proceeding affecting the Project or the Site (a "Condemnation") and shall deliver to the Administrative Agent copies of any and all papers served in connection with such Condemnation. Following the occurrence of a Condemnation, the Borrower, regardless of whether Proceeds are available, shall promptly proceed to the Restoration the same to the extent practicable to be of at least equal value and of substantially the same character as prior to such Condemnation, all to be effected in accordance with the terms of this Agreement applicable to Restorations.

(b)     The Administrative Agent is hereby irrevocably appointed as Borrower's attorney-in-fact, coupled with an interest, with exclusive power to collect, receive and retain, on behalf of the Lenders, any Proceeds in respect of a Condemnation and to make any compromise or settlement in connection with such Condemnation, subject to the provisions of this Section 6.2.3. Provided no Event of Default has occurred and is continuing, (x) in the event of a

Condemnation where the loss does not exceed $150,000.00, the Borrower may settle and compromise such Proceeds, provided that the same is effected in a competent and timely manner, and (y) in the event of a Condemnation where the loss exceeds $150,000.00, the Borrower may settle and compromise the Proceeds only with the prior written consent of the Required Lenders and the Administrative Agent, on behalf of the Lenders, and the Lenders shall have the opportunity to participate, at the Borrower's cost, in any litigation and settlement discussions in respect thereof. Notwithstanding any Condemnation by any public or quasi-public authority (including any transfer made in lieu of or in anticipation of such a Condemnation), the Borrower shall continue to pay the Obligations under the Loan Documents at the time and in the manner provided for therein. The Lenders shall not be limited to the interest paid on the Proceeds by the condemning authority but shall be entitled to receive out of the Proceeds interest at the rate or rates provided in the Notes. Borrower shall cause any Proceeds that are payable to the Borrower to be paid directly to the Administrative Agent, for the ratable benefit of the Lenders, to be held and applied in accordance with the terms hereof.

6.2.4 <u>Borrower' Cooperation</u>. Borrower shall cooperate with the Lenders in obtaining for the Lenders the benefits of any Proceeds lawfully or equitably payable in connection with the Project, and the Administrative Agent and the Lenders shall be reimbursed for any out-of-pocket expenses reasonably incurred in connection therewith (including reasonable attorneys' fees and disbursements, and, if necessary to collect such Proceeds, the expense of an appraisal on behalf of the Lenders in case of a Recovery Event affecting the Project or the Site or any part thereof) out of such Proceeds.

6.2.5 <u>Payment of Obligations</u>. No Casualty or Condemnation shall affect the continuing obligation of the Borrower to pay the principal of, and interest on, the Advances and all other amounts payable under or pursuant to the Loan Documents.

**6.3 <u>Accounts</u>.**

6.3.1 <u>Establishment and Maintenance of Cash Concentration Account</u>.

(a) On or prior to the Closing Date, the Borrower established with the Administrative Agent a separate account under account number <u>030-218896</u> (the "<u>Cash Concentration Account</u>"). The Cash Concentration Account shall be in the name of the Borrower but shall be under the sole dominion and control of the Administrative Agent, on behalf of the Lenders, and the Borrower shall not have the authority or power to make withdrawals from the Cash Concentration Account. The Borrower shall, and shall cause each other Person in receipt thereof to, deposit all Gross Revenues into the Cash Concentration Account within one (1) Business Day after receipt. Without limiting the foregoing, if the Borrower or any other Person shall receive any cash, electronic transfers, checks or other instruments in respect of Gross Revenues that is or are made payable in a manner contrary to the foregoing requirements of this Section, or any funds in respect of such sums by wire transfer or other means, then the Borrower shall deposit upon receipt, and shall direct such other Person to deposit upon receipt, such cash, electronic transfers, checks and funds in the Cash Concentration Account (and in any event not later than the close of business on the Business Day after the same is received by the Borrower or such other Person). Until deposited into the Cash Concentration Account, any Gross Revenues held by or on behalf of the Borrower shall be

held in trust by it for the benefit of the Administrative Agent and the Lenders, and shall not be commingled with any other funds or property of the Borrower.

(b)     At any time and from time to time, the Administrative Agent, on behalf of the Lenders, may apply funds in the Cash Concentration Account in payment of any and all Obligations under the Loan Documents then due and payable.

(c)     Unless an Event of Default shall have occurred and be continuing and, when applicable, all Reserve Accounts have been replenished as set forth in this Section, on each Business Day, subject to Sections 6.3.1(b) above and 6.3.11(b) below, the Administrative Agent shall transfer any available funds in the Cash Concentration Account, to the extent therein, to the Operating Account.

(d)     The Borrower shall pay the reasonable costs of establishing and maintaining the Cash Concentration Account.

6.3.2     Debt Service Reserve Account.

(a)     On or before the Closing Date, the Borrower established with the Administrative Agent, for the benefit of the Lenders, a separate account under account number 030-218888 (the "Debt Service Reserve Account"), and no later than the Conversion Date the Borrower shall deposit therein an amount of no less than $620,000.00. The Debt Service Reserve Account shall be in the name of the Borrower but shall be under the sole dominion and control of the Administrative Agent, on behalf of the Lenders, and the Borrower shall not have the authority to make withdrawals from the Debt Service Reserve Account. The Borrower shall pay the reasonable costs of establishing and maintaining the Debt Service Reserve Account.

(b)     The Administrative Agent, upon receipt of instructions from the Required Lenders, shall withdraw and apply all or any part of the sums available in the Debt Service Reserve Account to the payment of any amount of principal and/or interest payable under the Notes or the QLICI Notes which has not been paid when due.

(c)     The Borrower shall replenish, with its own funds, any amounts withdrawn from the Debt Service Reserve Account pursuant to subsection (b) above within sixty (60) days after withdrawal.

6.3.3     Working Capital Reserve Account.

(a)     On or before the Closing Date, the Borrower established with the Administrative Agent, for the benefit of the Lenders, a separate account under account number 030-218837 (the "Working Capital Reserve Account"), and no later than the Conversion Date the Borrower shall deposit therein a reserve amount not less than $1,000,000.00 to cover working capital needs and other related expenses of the Borrower in connection with the operation of the Project. The Working Capital Reserve Account shall be in the name of the Borrower but shall be under the sole dominion and control of the Administrative Agent, on behalf of the Lenders, and the Borrower shall not have the authority to make withdrawals from the Working Capital Reserve

Account. The Borrower shall pay the reasonable costs of establishing and maintaining the Working Capital Reserve Account.

(b) Provided no Event of Default shall have occurred and be continuing, the Borrower may request for withdrawal from the Working Capital Reserve Account through written requests sent to the Administrative Agent, which request shall be subject to the Required Lender's prior written consent. Any withdrawal from the Working Capital Reserve Account shall be restricted to cover working capital needs and other related expenses of the Borrower in connection with the Project, which disbursements shall be made by transfer of the corresponding funds to the Operating Account or, at the Administrative Agent's discretion, by direct payment to the Person entitled to receive such payment, as applicable.

(c) Each request for disbursement by the Borrower shall be on a form reasonably acceptable to the Administrative Agent, shall specify the fees and/or expenditure costs for which the disbursement is requested and shall include (i) an Officer's Certificate from an Authorized Representative of the Borrower certifying that (A) no Event of Default has occurred and is continuing and (B) such funds will be applied to pay or reimburse the Borrower for actual fees and costs as to working capital needs and other related expenses incurred or to be incurred by the Borrower, and (ii) if required by the Administrative Agent in its sole discretion, evidence reasonably satisfactory to the Administrative Agent that the Borrower incurred, or will incur, such fees and costs.

(d) The Borrower shall replenish, with its own funds, any amounts withdrawn from the Working Capital Reserve Account pursuant to subsection (b) above within sixty (60) days after withdrawal.

6.3.4   Replacement Reserve Account.

(a) On or before the Closing Date, the Borrower established with the Administrative Agent, for the benefit of the Lenders, a separate account under account number 030-218853 (the "Replacement Reserve Account"), and the Borrower shall deposit therein on the first (1st) day of each month an amount equal to and not less than $10,000.00 (or such other amounts reasonably determined by the Required Lenders and the Independent Engineer upon prior written notice to the Borrower, including a detailed explanation to their determination to request such other amount), commencing on the first (1st) day of the seventh (7th) month immediately following the Conversion Date. The Replacement Reserve Account shall be in the name of the Borrower but shall be under the sole dominion and control of the Administrative Agent, on behalf of the Lenders, and the Borrower shall not have the authority to make withdrawals from the Replacement Reserve Account, except to the extent otherwise expressly provided herein. The Borrower shall pay the reasonable costs of establishing and maintaining the Replacement Reserve Account.

(b) Provided no Event of Default shall have occurred and be continuing, the Borrower may request for withdrawal from the Replacement Reserve Account through written requests sent to the Administrative Agent, which request shall be subject to the Required Lender's prior written consent. Any withdrawal from the Replacement Reserve Account shall be restricted

to cover maintenance and capital improvement needs of the Borrower in connection with the Project, which disbursements shall be made by transfer of the corresponding funds to the Operating Account or, at the Administrative Agent's discretion, by direct payment to the Person entitled to receive such payment, as applicable.

(c)     Each request for disbursement by the Borrower shall be on a form reasonably acceptable to the Administrative Agent, shall specify the fees and/or capital expenditure costs for which the disbursement is requested and shall include an Officer's Certificate from an Authorized Representative of the Borrower certifying that (A) no Event of Default has occurred and is continuing and (B) such funds will be applied to pay or reimburse the Borrower for actual fees and costs as to maintenance and capital improvements incurred or to be incurred by the Borrower.

(d)     If required by the Administrative Agent in its sole discretion, the Administrative Agent shall have received from the Borrower evidence reasonably satisfactory to the Administrative Agent that the Borrower incurred, or will incur, such capital improvements, fees and costs.

### 6.3.5   Disbursement Account.

(a)     On or before the Closing Date, the Borrower established with the Administrative Agent, for the benefit of the Lenders, a separate account under account number 030-212456 (the "Disbursement Account"), and the Borrower shall deposit therein all proceeds received in relation to the QLICI Notes and the other NMTC Loan Documents. The Borrower shall pay the reasonable costs of establishing and maintaining the Disbursement Account.

(b)     The funds deposited in the Disbursement Account shall be restricted to cover the funding of one hundred percent (100%) of the costs and expenses related to the Construction of the Project in accordance with the Project Budget and the Project Schedule, which disbursements shall be made against certifications received and approved by the Required Lenders and the Independent Engineer, and shall not exceed the amounts established for each specific use under the Project Budget, unless a reallocation of funds from one line item to another is previously approved in writing by the Required Lenders, in their sole and absolute discretion or otherwise permitted as set forth in Section 2.13 hereof. All Change Orders and costs over the approved Project Budget (as adjusted to consider any reallocation of funds) shall be paid by the account of the Borrower.

(c)     The Borrower shall pay all Project Costs in excess of the amount of the Commitments, and the Lenders shall be required to make Advances (including the initial Non-Revolving Facility Borrowing) **only** when the Facility is "In balance" as set forth in Section 2.2(b) of this Agreement.

### 6.3.6   Equity Escrow Account.

(a)     On or before the Closing Date, the Borrower established with the Administrative Agent, for the benefit of the Lenders, a separate account under account number

030-218861, known and identified as the Equity Escrow Account, whereby the Borrower shall deposit therein all proceeds received in relation to the Equity Contribution or any Equity received by the Borrower. The Borrower shall pay the reasonable costs of establishing and maintaining the Equity Escrow Account.

(b)     The funds deposited in the Equity Escrow Account shall be restricted to cover the funding of one hundred percent (100%) of the costs and expenses related to the Construction of the Project in accordance with the Project Budget and the Project Schedule, which disbursements shall be made against certifications inspected and approved by the Required Lenders and the Independent Engineer, and shall not exceed the amounts established for each specific use under the Project Budget, unless a reallocation of funds is otherwise permitted as set forth in this Agreement or previously approved in writing by the Required Lenders, in their reasonable discretion.

(c)     If the Facility is not "In-balance," the Borrower shall, no later than ten (10) days following the Administrative Agent's notice that the Facility is not "In-balance", deposit in the Equity Escrow Account with the Administrative Agent, in cash, the amount necessary to put the Facility "In-balance," which funds shall be used to fund the corresponding Project Costs before disbursing any additional Advances.

### 6.3.7   Tranche One Tax Credits Account.

(a)     On or before the Closing Date, the Borrower established with the Administrative Agent, for the benefit of the Lenders, a separate account under account number 030-218845 (the "Tranche One Tax Credits Account"), and no later than the Conversion Date the Borrower shall deposit therein 100% of the proceeds received from the sale of the Tranche One Tax Credits, if any. The Tranche One Tax Credits Account shall be in the name of the Borrower but shall be under the sole dominion and control of the Administrative Agent, on behalf of the Lenders, and the Borrower shall not have the authority to make withdrawals from the Tranche One Tax Credits Account. The Borrower shall pay the reasonable costs of establishing and maintaining the Tranche One Tax Credits Account. For avoidance of doubt, 100% of the net proceeds received from the Disposition of Tranche Two Tax Credits shall be applied as set forth in Section 2.9(d).

(b)     Provided no Event of Default shall have occurred and be continuing, the Borrower may request for withdrawal from the Tranche One Tax Credits Account any proceeds received from the sale of the Tranche One Tax Credits through written requests sent to the Administrative Agent, which request shall be subject to the Required Lender's prior written consent. Any withdrawal from the Tranche One Tax Credits Account thereof shall be restricted to cover out-of-pocket fees and costs as to working capital needs of the Borrower, incurred or to be incurred, in connection with the Project, which disbursements shall be made by transfer of the corresponding funds to the Operating Account or, at the Administrative Agent's discretion, by direct payment to the Person entitled to receive such payment, as applicable.

(c)     Each request for disbursement by the Borrower shall be limited to the proceeds received under Tranche One Tax Credits and in a form reasonably acceptable to the Administrative Agent, shall specify the fees and/or expenditure costs for which the disbursement

is requested and shall include (i) an Officer's Certificate from an Authorized Representative of the Borrower certifying that (A) no Event of Default has occurred and is continuing and (B) such funds will be applied to pay or reimburse the Borrower for actual fees and costs as to working capital needs incurred or to be incurred by the Borrower, and (ii) if required by the Administrative Agent in its sole discretion, evidence reasonably satisfactory to the Administrative Agent that the Borrower incurred, or will incur, such fees and costs.

6.3.8 **Operating Account.** On or prior to the Closing Date, the Borrower shall establish and maintain with the Administrative Agent, for the benefit of the Lenders, the Operating Account for the deposit of all Gross Revenues. The Operating Account shall be in the name of the Borrower but shall be under the sole dominion and control of the Administrative Agent, on behalf of the Lenders, subject to the terms and conditions of the Accounts Control Agreement. The Borrower shall pay the reasonable costs of establishing and maintaining the Operating Account. Until deposited into the Operating Account, any Gross Revenues held by or on behalf of the Borrower shall be deemed to be Collateral and shall be held in trust by it for the benefit of the Administrative Agent, for the benefit of the Lenders, and shall not be commingled with any other funds or property of the Borrower. Except as set forth in the following sentence, the Borrower shall have the right to make withdrawals from and originate instructions with respect to the Operating Account and funds on deposit in the Operating Account may be withdrawn and used by Borrower in its discretion for any business operating purpose. Pursuant to the Accounts Control Agreement, upon the occurrence of a Default or an Event of Default, the Administrative Agent, at its sole discretion, may originate any instructions with respect to the Operating Account (including blocking the Operating Account and the application of funds therein to the payment of the amounts as set forth in Section 6.3.8(b)), and thereafter the Borrower shall not have the right to make any withdrawals from or originate instructions with respect to the Operating Account. The Administrative Agent shall notify the Borrower after any such blocking of the Operating Account, provided that the failure to give such notice shall not affect the validity thereof.

6.3.9 **Obligation to Fund; Release upon Repayment.**

(a) The Borrower acknowledges that, notwithstanding the establishment of each of the Accounts and the availability of funds therein, it shall remain as Borrower's obligation to make full payment of all amounts due under the Loan Documents on their required due dates. The Borrower acknowledges that no due dates, grace periods or notice requirements (if any) set forth in the Loan Documents shall be deemed to have been extended, tolled, waived or otherwise affected by the provisions of Section 6.3. In no event shall the availability of funds in any of the Accounts be deemed as a payment of any amount due under any of the Loan Documents or otherwise.

(b) The Lenders shall instruct the Administrative Agent to release to the Borrower, on the date that all of the Obligations under the Loan Documents shall be indefeasibly paid in full by the Borrower, all amounts remaining in the Accounts.

(c) Notwithstanding the terms hereof, in no event shall the Administrative Agent or the Lenders have any obligation to disburse, or authorize the disbursement of, or apply funds from any of the Accounts, or to transfer funds in any of the Accounts to the Operating Account, for so long as an Event of Default shall have occurred and be continuing.

98

### 6.3.10 <u>Grant of Security Interest; Rights upon Default</u>.

(a) The Borrower hereby pledges, assigns and grants a security interest to and in favor of the Administrative Agent, for the benefit of the Lenders, as security for the payment and performance of all Obligations under the Loan Documents, all of Borrower's right, title and interest in and to (i) each of the Accounts and (ii) all of the Account Collateral. Except for Permitted Liens, the Borrower shall not further pledge, assign or grant any security interest in the Accounts or the Account Collateral, or permit any Lien or encumbrance to attach thereto, or any levy to be made thereon, or any financing statements to be filed with respect thereto, except those relating to the Obligations under the Loan Documents. Notwithstanding the foregoing, the Administrative Agent and the Lenders hereby acknowledge and agree that the Accounts will also be subject to the terms of the Account Control Agreement.

(b) Anything herein to the contrary notwithstanding, upon the occurrence and during the continuance of an Event of Default, (i) the Borrower shall have no further rights in respect of the Accounts or the Account Collateral, and (ii) the Administrative Agent and the Lenders shall have all rights and remedies with respect to the Accounts and the amounts on deposit therein and the Account Collateral as described in this Agreement and in the Loan Documents, in addition to all of the rights and remedies available to a secured party under the UCC, to the extent applicable, and other applicable laws, and, notwithstanding anything to the contrary contained in this Agreement or in the Loan Documents, may, but shall not be required to, apply funds on deposit in such Accounts and all other Account Collateral, in such amounts and in such order as the Lender determines in its sole discretion, to (A) the payment of amounts due under this Agreement and/or the other Loan Documents including, but not limited to, payment of the Notes and interest thereon, (B) the payment of Taxes and premiums on the Insurance Policies, (C) the payment of operating expenses, (D) the payment of repairs and replacements of the Project or any Collateral, (E) the payment of the costs of Construction, operating and maintaining the Project, and (F) the payment of any other sums payable by the Borrower pursuant to the Loan Documents.

(c) The Borrower hereby authorizes the Administrative Agent to execute and deliver on the Borrower's behalf, in favor of the Administrative Agent, for the ratable benefit of the Lenders, the filing of such financing statement or statements under the UCC in order to perfect the Lenders' Lien in the Accounts and the Account Collateral. The Borrower agrees that at any time and from time to time, at the expense of the Borrower, the Borrower will promptly execute and deliver, and hereby authorizes the Administrative Agent to file and deliver on Borrower's behalf, all further instruments and documents (including, without limitation, account control agreements), give such further notices, and take all further action, that may be reasonably necessary or desirable, or that the Administrative Agent, for the ratable benefit of the Lenders, may reasonably request, in order to perfect and protect any Lien granted or purported to be granted hereby or to enable the Administrative Agent, for the ratable benefit of the Lenders, to exercise and enforce its rights and remedies hereunder with respect to any Account or Account Collateral. The Administrative Agent shall release to the Borrower all amounts, if any, remaining in the Accounts on the date that is the later of (i) the date on which all Lenders and the Administrative Agent have received indefeasible payment in full in cash of the Obligations under the Loan

Documents and (ii) the date of expiration or termination of the Commitments under this Agreement.

6.3.11 <u>Lenders Not Responsible</u>. Nothing in this Section 6.3 or elsewhere in the Loan Documents shall make the Administrative Agent, any Lender responsible for making any payment, including without limitation, payment of any principal or interest on the Notes or any other amounts payable under the Loan Documents, payment of any Taxes or Other Charges or any Insurance Premiums, or for making, completing or paying the cost of any work in respect of the Project, or obligate the Administrative Agent or any of the Lenders to demand from the Borrower additional sums to make or complete any work or make any payment.

## ARTICLE VII
## EVENTS OF DEFAULT

7.1 **Events of Default.** If any of the following events ("<u>Events of Default</u>") shall occur and be continuing:

(a)     (i) The Borrower shall fail to pay when due, any principal of or interest on any Advance or any other amount payable under this Agreement, the Notes or any other Loan Document or (ii) any Loan Party shall fail to pay when due any of its obligations under any Loan Document to which it is a party or (iii) the Borrower shall fail to deposit, or cause to be deposited, any amounts required under this Agreement to be deposited in any of the Accounts when due; or

(b)     The Borrower shall fail to perform or observe any other term, covenant or agreement contained in Section 5.1(b), (c), (e), (f), (g), (j), (k), (l), (o), (p), (q), (z) and (aa), Section 5.2, Section 5.3, or Article VI; or

(c)     Any Loan Party shall fail to perform or observe any other term, covenant or agreement contained in this Agreement or any Loan Document on its part to be performed or observed (other than those specified elsewhere in this Section 7.1), and in any such case any such failure shall remain unremedied for a period of thirty (30) calendar days from the date of notice of the occurrence of such failure; <u>provided</u>, however, that, if such failure to perform is reasonably determined by the Required Lenders to be susceptible of cure, but not within such thirty (30) day period, such Loan Party shall have up to fifty (50) calendar days after the date of the occurrence of such failure to cure such default provided that such Loan Party diligently and continuously pursues such cure; or

(d)     The Borrower shall fail to pay any principal of, premium or interest on any of its respective Indebtedness (excluding Indebtedness evidenced by the Notes), that is outstanding in a principal amount of $150,000.00 or more, respectively (or $200,000.00 or more in the aggregate, respectively), when due and owing (whether at scheduled maturity, by required prepayment, acceleration, demand or otherwise) or any other default under any agreement or instrument relating to any such Indebtedness, or any other event, shall occur, if the effect of such default or event is to accelerate, or to permit the acceleration of, the maturity of such Indebtedness; or any such Indebtedness shall be declared to be due and payable, or required to be prepaid (other than by a regularly scheduled required prepayment), prior to the stated maturity thereof; or

(e)     Any representation, warranty or certification made by any Loan Party (or any of its authorized officers or representatives) contained in any Loan Document, any NMTC Loan Documents or any document, instrument or certificate delivered to the Administrative Agent or the Lenders (including without limitation, the NMTC Compliance Certificate) pursuant to the provisions thereof (including any modification or supplement thereto), shall prove to be materially incorrect or intentionally misleading when or as of the date made; or

(f)     Any Loan Party shall generally not pay its debts as such debts become due and owing, or shall admit in writing its inability to pay its debts generally, or shall make a general assignment for the benefit of creditors; or any proceeding shall be instituted by or against any Loan Party seeking to adjudicate it bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, or other similar official for it or for any substantial part of its property, and, in the case of any such proceeding instituted against it (but not instituted by it) that is being diligently contested by it in good faith, either such proceeding shall remain undismissed or unstayed for a period of sixty (60) consecutive days or any of the actions sought in such proceeding (including, without limitation, the entry of any order for relief against, or the appointment of a receiver, trustee, custodian or other similar official for, it or any substantial part of its property) shall occur; or any Loan Party shall take any action to authorize any of the actions set forth above in this subsection (f); or

(g)     An ERISA Event shall have occurred with respect to the Borrower that, in the opinion of the Required Lenders, when taken together with all other ERISA Events that have occurred, could reasonably be expected to result in a Material Adverse Effect, and in any such case such failure shall remain unremedied for a period of fifteen (15) days after written notice thereof shall have been given to the Borrower by the Administrative Agent or any Lender; or

(h)     Any of the Liens created by any of the Loan Documents shall at any time for any reason, except to the extent (i) permitted by the terms thereof, or (ii) not attributable to the direct actions or omissions of the Administrative Agent and/or the Lenders, not constitute a valid and perfected first-priority Lien on the Collateral intended to be covered thereby in favor of the Administrative Agent, for the ratable benefit of the Lenders, free and clear of all other Liens (other than Permitted Liens), or any of the Loan Documents shall for any reason not attributable to the Administrative Agent or the Lenders, be terminated or shall otherwise cease to be in full force and effect, or the validity or enforceability thereof shall be contested in writing by any Loan Party; or

(i)     Any Transfer or Change of Control shall have occurred; or

(j)     Any final and unappealable judgment or order for the payment of money (unless such payment is covered by insurance and coverage has been confirmed in writing by the relevant insurer) in excess of $150,000.00 shall be rendered against the Borrower, and either (i) enforcement proceedings shall have been commenced by any creditor upon such judgment or order or (ii) there shall be any period of thirty (30) consecutive calendar days during which such

judgment shall remain unpaid or a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; or

(k)     Any final and unappealable non-monetary judgment or order shall be rendered against the Borrower or Member that (i) could reasonably be expected to materially impair or inhibit to the Borrower's use and operation of the Project (or any portion thereof) for the purpose for which the Project was intended or (ii) is otherwise reasonably likely to result in a Material Adverse Effect; or

(l)     There shall have been asserted against the Borrower an Environmental Action that is reasonably likely to be determined adversely against the Borrower and result in a Material Adverse Effect; or

(m)     Any material provision of any Loan Document after delivery thereof pursuant to this Agreement shall for any reason (other than pursuant to the terms hereof or thereof or not attributable to the direct actions or omissions of the Administrative Agent and/or the Lenders) cease to be valid and binding on or enforceable against any Loan Party thereto, or any such Loan Party shall so state in writing; or

(n)     The Borrower shall be in breach of any material obligation under, or a material default shall have occurred and be continuing under, a Material Contract, and (A) such breach or default has had or could reasonably be expected to have a Material Adverse Effect, and (B) such breach or default shall not be remediable or, if remediable, shall continue unremedied for a period equal to the lesser of the cure period provided under such agreement or thirty (30) days after the Borrower receives notice of such breach; or

(o)     Any Material Contract shall for any reason cease to be valid and binding on the Persons parties thereto, except upon fulfillment of such party's obligations thereunder, or any such Person pursues a right of termination under any Material Contract; or (B) any material provision in any Material Contract shall for any reason cease to be valid and binding on any party thereto except upon fulfillment of such party's obligations thereunder, or any such party shall so state in writing; or

(p)     The Borrower shall cease to be a qualified active low-income community business pursuant to the QALICB Requirements or failed to comply with the NMTC Compliance Agreement beyond any applicable cure period; or

(q)     A Default has occurred under the QLICI Notes and the other NMTC Loan Documents, beyond any applicable cure period; or

(r)     The Borrower shall fail to obtain any Permit on or before the date that such Permit is required to be obtained and such failure could reasonably be expected to have a Material Adverse Effect; or

(s)     Any of the Permits, after being obtained, shall for any reason cease to be in full force and effect and shall not be reinstated within a period of thirty (30) consecutive days thereafter if such event is reasonably likely to have a Material Adverse Effect; or

(t)     There shall have occurred a condition or a change of circumstances which results in a Material Adverse Effect;

THEN, and in any such Event of Default, the Administrative Agent shall at the request, or may with the consent, of the Required Lenders, by notice to the Borrower (i) declare the obligation of each Lender to make Advances to be terminated, whereupon the same shall forthwith terminate; (ii) declare the Notes or any portion thereof, all or any portion of the interest thereon and all or any portion of the other amounts payable under the Notes and the other Loan Documents to be forthwith due and payable, whereupon the Notes or such portion thereof, all such interest or such portion thereof and all such amounts or such portion thereof shall become and be forthwith due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Borrower; (iii) foreclose on all or any portion of the Collateral and exercise all its rights under the Loan Documents and under applicable law; and/or (iv) require the appointment of a receiver for the Borrower or for all or any part of its or their assets, without regard to the adequacy of any security, the solvency thereof, or a showing of fraud or mismanagement on the part of the Borrower; provided, however, that in the event of an actual or deemed entry of an order for relief with respect to the Borrower under the Federal Bankruptcy Code, (a) the obligation of each Lender to make Advances shall automatically be terminated and (b) the Notes, all such interest and all such amounts shall automatically become and be due and payable, without presentment, demand, protest or any notice of any kind, all of which are hereby expressly waived by the Borrower.

In furtherance of, and not in limitation of, any other remedies available hereunder or at law or in equity, upon the occurrence of an Event of Default, the Administrative Agent and/or the Lenders may take possession of the Project and the Site, and do anything that is necessary or appropriate in the sole judgment of the Lenders to fulfill the obligations of the Borrower under this Agreement and the other Loan Documents, including either the right to avail itself of and procure performance of existing contracts or let any contracts with the same contractors or others. Without restricting the generality of the foregoing and for the purposes aforesaid, Borrower hereby appoints and constitutes the Lender as its lawful attorney-in-fact from and after the occurrence of an Event of Default with full power of substitution in the Project to complete the Construction in the name of Borrower; to use unfunded amounts under the Non-Revolving Facility or that may be reserved, escrowed or set aside for any purposes hereunder at any time, or to fund amounts in excess of the amount of the Non-Revolving Facility to complete the Construction; to make changes in the Plans and Specifications that the Lender deems necessary or desirable to complete the Construction in substantially the manner contemplated by the Plans and Specifications; to retain or employ new contractors, subcontractors, architects, engineers and inspectors as shall be required for said purposes; to pay, settle or compromise all existing bills and claims that may be Liens, or to avoid such bills and claims becoming Liens against the Project or any other Collateral; to execute all applications and certificates in the name of Borrower; to prosecute and defend all actions or proceedings in connection with the Project; and to do any and every act that Borrower might do

on its own behalf; it being understood and agreed that this power of attorney shall be a power coupled with an interest and cannot be revoked.

7.2 **Prepayments After Default.** Anything in this Agreement to the contrary notwithstanding, if, after the occurrence and during the continuance of an Event of Default, payment of all or any part of the Obligations under the Loan Documents is tendered by the Borrower or otherwise recovered by the Administrative Agent or any Lender (including through set-off or realization upon Collateral), such tender or recovery shall be applied by the Administrative Agent and the Lenders, (i) first, to reimbursement of all out-of-pocket losses, costs and expenses (including reasonable legal fees) reasonably suffered or incurred by the Administrative Agent or any Lender as a result of such Event of Default, (i) second, to the payment of interest (not including default interest) then due under the Notes in such order as the Required Lenders shall elect in their sole discretion, (iii) third, to the amount of principal then due under the Notes in such order as the Required Lenders shall elect in their sole discretion, (iv) fourth, to the payment of default interest and other amounts due under the Notes in such order as the Required Lenders shall elect in their sole discretion, and (v) fifth, to the payment of any other Obligations of the Borrower under the Loan Documents in such order as the Required Lenders shall elect in their sole discretion.

7.3 **Foreclosure of Collateral.** Nothing contained herein or in any other Loan Document shall be construed as requiring the Administrative Agent and the Lenders to resort to the Project, Leasehold Interest or any other Collateral for the satisfaction of any of the Obligations of the Borrower in preference or priority to any other Collateral, and the Administrative Agent and the Lenders may seek satisfaction out of the Project or all of the Collateral or any part thereof, in their absolute discretion, in respect of the Obligations of the Borrower. In addition, while an Event of Default has occurred and is continuing, the Administrative Agent, for the ratable benefit of the Lenders, shall have the right from time to time to partially foreclose all or any part of the Collateral in any manner and for any amounts secured by the Loan Documents then due and payable as determined by the Required Lenders in their sole discretion including, without limitation, the following circumstances: (i) in the event the Borrower defaults beyond any applicable grace period in the payment of one or more payments of principal or interest, the Administrative Agent, for the ratable benefit of the Lenders, may foreclose all or any part of the Collateral to recover such delinquent payments, or (ii) in the event the Required Lenders elect to accelerate less than the entire outstanding principal balance of the Advances, the Administrative Agent, for the ratable benefit of the Lenders, may foreclose all or any part of the Collateral to recover so much of the principal balance of the Advances as the Required Lenders may elect to accelerate and such other sums secured by the Loan Documents as the Required Lenders may elect. Notwithstanding one or more partial foreclosures, the Project, Leasehold Interest and the other Collateral shall remain subject to the Loan Documents to secure payment of sums secured by the Loan Documents and not previously recovered by the Administrative Agent and the Lenders.

**ARTICLE VIII**
**AGENCY**

8.1 **Authorization and Action.** Each Lender hereby appoints and authorizes the Administrative Agent to take such action as agent on its behalf and to exercise such powers to the

extent provided herein or in any document or instrument delivered hereunder or in connection herewith, together with such other action as may be reasonably incidental thereto. The provisions of this Article VIII are solely for the benefit of the Administrative Agent and the Lenders and neither the Borrower nor any other Loan Party shall have any rights as a third party beneficiary of any such provisions. As to matters not expressly provided for by this Agreement (including, without limitation, enforcement or collection of this Agreement, the Notes or any other Loan Document), the Administrative Agent shall not be required to exercise any discretion, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Required Lenders or all of the Lenders, as the case may be, and such instructions shall be binding upon all Lenders. The Lenders hereby agree that whenever the consent of the Lenders is required pursuant to the terms hereof, the Administrative Agent shall so notify each Lender and provide thereto copies of all notices, documents or other materials received by it from the Borrower relating to such consent request and, unless the Administrative Agent receives within fifteen (15) Business Days of such notice, a written statement from a Lender stating that such Lender has elected to withhold its consent, such Lender shall be deemed to have granted its consent; provided, however, that any Lender's failure to deliver such written statement shall not be deemed to constitute such Lender's consent to any action that requires the unanimous written consent of the Lenders pursuant to Section 10.1 hereof. Under no circumstances shall the Administrative Agent be required to take any action which exposes the Administrative Agent to personal liability or which is contrary to this Agreement or to the Loan Documents or applicable law. The Administrative Agent agrees (a) to give to each Lender prompt notice of each notice given to it by the Borrower pursuant to the terms of this Agreement and, upon request, to deliver forthwith to each Lender a copy of every communication or other document that may be sent by any Loan Party to the Administrative Agent pursuant to this Agreement and the other Loan Documents, and (b) upon the receipt by the Administrative Agent of any notice of the occurrence of a Default or Event of Default to promptly forward such notice to each Lender.

8.2 **Liability of the Administrative Agent**. The Administrative Agent shall not have any duty (fiduciary or otherwise) to any of the Lenders except to the extent expressly provided in this Agreement. Neither the Administrative Agent, nor any of its directors, officers, agents or employees, shall be liable to the Lenders for any action taken or omitted to be taken by it or them under or in connection with this Agreement and the other Loan Documents, except for its or their own gross negligence or willful misconduct. Without limiting the generality of the foregoing, the Administrative Agent (a) may treat the payee of any Note as the holder thereof until the Administrative Agent receives an executed Assignment Agreement entered into between a Lender and an Eligible Assignee pursuant to Section 9.1; (b) may consult with legal counsel (including counsel for any of the Loan Parties), independent public accountants and other experts or consultants selected by it and shall not be liable for any action taken or omitted to be taken in good faith by the Administrative Agent in accordance with the advice of such counsel, accountants, consultants or experts; (c) makes no warranty or representation to any Lender and shall not be responsible to any Lender for any recitals, statements, warranties or representations, whether written or oral, made by any Loan Party in or in connection with this Agreement or the other Loan Documents; (d) shall not have any duty to ascertain or to inquire as to the performance or observance of any of the terms, obligations, covenants or conditions of this Agreement or any other Loan Document on the part of any Loan Party or to inspect the property (including, without limitation, any books and records) of any Loan Party; (e) shall not be responsible to any Lender

for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement, any other Loan Document, any Collateral or other support or security, or any other document furnished in connection with any of the foregoing; and (f) shall incur no liability under or in respect of this Agreement or any other Loan Document by action upon any written notice, statement, certificate, order, telephone message, facsimile or other document which the Administrative Agent believes in good faith to be genuine and correct and to have been signed, sent or made by the proper party or parties.

8.3 **Administrative Agent and Affiliates**. With respect to any Advances made by the Administrative Agent in its capacity as a Lender, the Administrative Agent shall have the same rights and powers under this Agreement and the other Loan Documents as any other Lender and may exercise the same as though it were not the Administrative Agent; and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated, include the Administrative Agent in its individual capacity as a Lender. The Administrative Agent, in its capacity as a Lender, and its Affiliates may accept deposits from, lend money to, act as trustee under indentures of, and generally engage in any kind of business with, any of the Loan Parties and any of their Affiliates and any Person who may do business with or own securities of any of the Loan Parties or any such Affiliate, all as if the Administrative Agent, in its capacity as a Lender, was not the Administrative Agent and without any duty to account therefor to the Lenders.

8.4 **Lender Credit Decision**. Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender and based on the financial statements provided to it by the Borrower and such other documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement.

8.5 **Indemnification**. Each Lender agrees to indemnify the Administrative Agent (to the extent not reimbursed by the Borrower or any other Loan Party), from and against such Lender's ratable share of any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or assessed against the Administrative Agent in any way relating to or arising out of this Agreement or the other Loan Documents, or any action taken or omitted by the Administrative Agent under this Agreement or the other Loan Documents, provided that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Administrative Agent's gross negligence or willful misconduct. Without limiting any of the foregoing, each Lender agrees to reimburse the Administrative Agent promptly upon demand for its ratable share of any out-of-pocket expenses (including reasonable counsel fees) incurred by Administrative Agent in connection with the preparation, execution, delivery, administration, modification, amendment, waiver or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under this Agreement or the other Loan Documents to the extent that the Administrative Agent is not reimbursed for such expenses by the Borrower or any other Loan Party. The failure of any Lender to reimburse the Administrative

Agent promptly upon demand for its ratable share of any amount required to be paid by the Lenders to the Administrative Agent as provided herein shall not relieve any other Lender of its obligation hereunder to reimburse the Administrative Agent for its ratable share of such amount, but no Lender shall be responsible for the failure of any other Lender to reimburse the Administrative Agent for such other Lender's ratable share of such amount. All obligations provided for in this Section 8.5 shall survive termination of this Agreement.

8.6     **Successor Administrative Agent.** The Administrative Agent may resign at any time by giving written notice thereof to the Lenders and the Borrower, and the Administrative Agent may be removed at any time with or without cause by the Required Lenders. Upon any such resignation or removal, the Required Lenders shall have the right to appoint a successor Administrative Agent; provided that such appointment shall be made from among the Lenders, if any of the Lenders is willing to accept such appointment. If no successor Administrative Agent shall have accepted such appointment within thirty (30) days after the retiring Administrative Agent's giving of notice of resignation or the Required Lenders' removal of the retiring Administrative Agent, then the retiring Administrative Agent may, on behalf of the Lenders, appoint a successor Administrative Agent. Upon the acceptance of any appointment as Administrative Agent hereunder by a successor Administrative Agent, such successor Administrative Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent and the retiring Administrative Agent shall be discharged from its duties and obligations in its capacity as Administrative Agent under this Agreement. The retiring Administrative Agent and the successor Administrative Agent shall divide pro-rata among themselves any agency fees paid to either of them to the extent such fees cover a time period during which both acted as Administrative Agent hereunder. After any retiring Administrative Agent's resignation or removal hereunder, the provisions of this Article VIII shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent under this Agreement.

8.7     **Borrower Not a Third-Party Beneficiary.** The provisions of this Article VIII are solely for the benefit of the Administrative Agent and the Lenders, and neither the Borrower nor any other Loan Party shall have any rights as a third party beneficiary of any such provisions.

**ARTICLE IX**
**ASSIGNMENTS AND PARTICIPATIONS**

9.1     **Assignments.** (a) Each Lender may assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including, without limitation, all or a portion of its Commitments, the Advances owing to it, the Note or Notes held by it and the remaining Loan Documents); provided, however, that (i) each such assignment shall be of a constant, and not a varying, percentage of all rights and obligations under this Agreement, (ii) the amount of the Commitment of the assigning Lender being assigned pursuant to each such assignment (determined as of the date of the Assignment Agreement with respect to such assignment) shall in no event be less than $1,000,000.00 (or such lesser amount as is reasonably acceptable to the Required Lenders) (unless such lesser amount is the entire amount of such assigning Lender's Commitment or outstanding Advances) and shall be an integral multiple of $100,000.00, (iii) each such assignment shall be to an Eligible Assignee, and (iv) the parties to

each such assignment shall execute and deliver to the Administrative Agent, for its acceptance and recording in the Register, an Assignment Agreement, together with any Note or Notes subject to such assignment and a processing and recordation fee of $5,000.00. Upon execution, delivery, acceptance and recording of an Assignment Agreement, from and after the effective date specified in such Assignment Agreement, (A) the assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such Assignment Agreement, have the rights and obligations of a Lender hereunder and (B) the assigning Lender thereunder shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment Agreement, relinquish its rights and be released from its obligations under this Agreement (and, in the case of an Assignment Agreement covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto).

(b)    By executing and delivering an Assignment Agreement, the Lender assignor thereunder and the assignee thereunder confirm to and agree with each other and the other parties hereto as follows: (i) other than as provided in such Assignment Agreement, such assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement or any other Loan Document or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement  or any other Loan Document or any other instrument or document furnished pursuant hereto or thereto; (ii) such assigning Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of any Loan Party or the performance or observance by any Loan Party of any of its Obligations under this Agreement or any other Loan Document or instrument or document furnished pursuant hereto; (iii) such assignee confirms that it has received a copy of this Agreement, together with copies of the financial statements of each Loan Parties, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment Agreement; (iv) such assignee will, independently and without reliance upon the Administrative Agent, such assigning Lender or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement; (v) such assignee confirms that it is an Eligible Assignee; (vi) such assignee appoints and authorizes the Administrative Agent to take such action as agent on its behalf and to exercise such powers under this Agreement and the other Loan Documents as are delegated to the Administrative Agent by the terms hereof and thereof, together with such powers as are reasonably incidental thereto; and  (vii) such assignee agrees that it will perform in accordance with their terms all of the obligations which by the terms of this Agreement are required to be performed by it as a Lender.

(c)    The Administrative Agent shall maintain at its address referred to in Section 10.2 a copy of each Assignment Agreement delivered to and accepted by it and a register for the recordation of the names and addresses of the Lenders and the Commitments of, and principal amount of the Advances owing to, each Lender from time to time (the "Register"). The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Borrower, the Administrative Agent and the Lenders may treat each Person whose name is recorded in the Register as a Lender hereunder for all purposes of this Agreement. The Register

shall be available for inspection by the Borrower and each Lender at any reasonable time and from time to time upon reasonable prior notice to the Administrative Agent.

(d) Upon its receipt of an Assignment Agreement executed by an assigning Lender and an assignee representing that it is an Eligible Assignee, together with any Note or Notes subject to such assignment, the Administrative Agent shall, if such Assignment Agreement has been completed and is in substantially the form of Exhibit D hereto, (i) accept such Assignment Agreement, (ii) record the information contained therein in the Register and (iii) give prompt notice thereof to the Borrower. Within five (5) Business Days after its receipt of such notice, the Borrower, at no cost to the Administrative Agent or the Lenders, shall execute and deliver to the Administrative Agent, in exchange for the surrendered Note or Notes, a new Note or new Notes to the order of such Eligible Assignee in an amount equal to the Commitments assumed by it pursuant to such Assignment Agreement and, if the assigning Lender has retained a Commitment hereunder, a new Note or new Notes to the order of the assigning Lender in an amount equal to the Commitments retained by it hereunder. Such new Note or Notes shall be in an aggregate principal amount equal to the aggregate principal amount of such surrendered Note or Notes, shall be dated the effective date of such Assignment and shall otherwise be in substantially the form of Exhibits B-1 and/or B-2, as applicable.

9.2 **Participations.** Each Lender may sell participations to one or more Eligible Assignees in or to all or a portion of its rights and obligations under this Agreement (including, without limitation, all or a portion of its Commitments, the Note or Notes held by it); provided, however, that (a) unless the Administrative Agent so consents, the amount of the participating interest being sold shall be not less than $1,000,000.00, and (b) such Lender's obligations under this Agreement (including, without limitation, its Commitments to the Borrower hereunder) shall remain unchanged, such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, such Lender shall remain the holder of any such Note for all purposes of this Agreement, and the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.

9.3 **Cooperation in Assignments and Participations.** In connection with the any proposed assignment or participation, an information package containing relevant information about the Borrower, the other Loan Parties, the Project and the other Collateral may be provided to potential lenders and participants. The Borrower agrees to cooperate with the Administrative Agent and the Lenders from time to time in connection with such proposed assignment or participation in all respects reasonably requested by the Administrative Agent, including but not limited to participation in a reasonable number of meetings held in connection with such syndication, and to provide, for inclusion in such information package, all information which the Administrative Agent may reasonably request or which the Borrower or the Administrative Agent may consider material to a lender or participant, or necessary or appropriate for accurate, complete and adequate disclosure. In connection with any such assignment or participation, the Borrower will indemnify the Lenders and the Administrative Agent against any losses that relate to any misleading or incorrect information provided in writing by the Borrower and included in the information package and not brought to the attention of the Administrative Agent and the relevant Lenders after the Borrower has had the reasonable opportunity to review such information.

9.4 **Disclosure of Information**. Any Lender may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section, disclose to the assignee or participant or proposed assignee or participant, any information relating to the Loan Parties furnished to such Lender by or on behalf of the Loan Parties.

## ARTICLE X
## MISCELLANEOUS

10.1 **Amendments, Etc.** (a) No amendment or waiver of any provision of any Loan Document, nor consent to any departure by the Borrower or other Loan Party therefrom, shall in any event be effective unless the same shall be in writing and signed by Borrower and the Required Lenders, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no amendment, waiver or consent shall, unless in writing and signed by all the Lenders, do any of the following at any time: (i) waive any of the conditions specified in Article III, (ii) change the percentage of the Commitments or of the aggregate unpaid principal amount of the Notes or the Advances, or the number of Lenders that shall be required for the Lenders or any of them to take any action hereunder, (iii) permit the creation, incurrence, assumption or existence of any Lien (other than Permitted Liens) on any part of the Collateral to secure any Obligations other than Obligations owing to the Lenders and the Administrative Agent under the Loan Documents, (iv) amend Section 2.9 or this Section 10.1, (v) increase the Commitments of the Lenders or subject the Lenders to any additional obligations, (vi) reduce the principal of, or interest on, the Notes or any fees or other amounts payable to the Administrative Agent or the Lenders hereunder, (vii) postpone any date fixed for any payment of principal of, or interest on, the Notes or any fees or other amounts payable hereunder, (viii) limit the liability of any party under any Loan Document, (ix) release any of the Collateral, or (x) amend the definitions of the terms "Required Lenders", "Threshold Lenders" or "Event of Default"; and provided, further, that no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent and the Lenders required above to take such action, affect the rights or duties of the Administrative Agent under this Agreement or any other Loan Document. Each amendment shall be filed with the proper and necessary authorities and filing offices, and Borrower agrees to execute all documents which may be reasonably required by the Administrative Agent in connection with such filing (including, without limitation, the corresponding amendments to any security instruments).

(b) If, in connection with any proposed amendment or waiver of any provision of any Loan Document or any consent to a departure by the Borrower or other Loan Party therefrom, as contemplated in Section 10.1(a) hereof (other than any consent to any action that requires the unanimous consent of the Lenders pursuant to Section 10.1(a) hereof), the consent of Threshold Lenders is obtained (the "Consenting Lenders") but the consent of one or more of such other Lenders whose consent is required is not obtained (the "Non-Consenting Lenders"), then the Consenting Lenders and the Non-Consenting Lenders shall have a period of fifteen (15) Business Days (in addition to the 15-Business Day period referred to in Section 8.1) to attempt to resolve any such impasse; provided that failure to resolve any such impasse within such additional 15-Business Day period shall not be deemed to constitute the consent of any Non-Consenting Lender and the proposed amendment or waiver shall be deemed to not have been approved.

(c)　If, in connection with any proposed amendment or waiver of any provision of any Loan Document or any consent to a departure by the Borrower or other Loan Party therefrom which requires the unanimous consent of the Lenders pursuant to Section 10.1(a) hereof, the consent of Threshold Lenders is obtained but the consent of one or more of such other Lenders whose consent is required is not obtained, then one or more of the Consenting Lenders may (but shall not have the obligation to) require all, but not less than all, of the Non-Consenting Lenders to assign its or their Notes and all of its or their rights and obligations under this Agreement and the other Loan Documents to the Consenting Lender(s), and the Consenting Lender(s) shall assume all of each Non-Consenting Lender's rights and obligations, pursuant to an Assignment Agreement executed by the Consenting Lender(s) and the Non-Consenting Lender(s). In connection with such assignment and assumption, the Consenting Lenders shall pay to the Non-Consenting Lenders an amount equal to the outstanding principal amount under the Notes of the Non-Consenting Lenders plus all interest accrued thereon, and the Borrower shall pay to the Non-Consenting Lenders all other amounts, if any, then due and payable to the Non-Consenting Lenders. In the event that the Consenting Lenders do not acquire the rights, and assume the obligations, of all of the Non-Consenting Lenders under the Notes and the other Loan Documents pursuant to one or more Assignment Agreements as provided above, then the proposed amendment or waiver shall be deemed to not have been approved.

10.2　**Notices.**　All notices, consents, approvals and requests required or permitted hereunder or under any other Loan Document shall be given in writing and shall be effective for all purposes if hand delivered or sent by (a) personal delivery, (b) expedited prepaid delivery service, either commercial or United States Postal Service, with proof of attempted delivery or (c) e-mail (with confirmation of receipt), addressed as follows (or at such other address and Person as shall be designated from time to time by any party hereto, as the case may be, in a written notice to the other parties hereto in the manner provided for in this Section 10.2):

If to the Borrower:

Biomass Green Fuels LLC
584 Aldebarán Street
San Juan, Puerto Rico 00920
Attention: Olmar López Vidal
Telecopier: (787) 793-4333
E-Mail: <u>olv@greenfuelspr.com</u>

With a copy to:

DLA Piper (Puerto Rico) LLC
Ochoa Building, Suite 401
500 Calle de la Tanca
San Juan, Puerto Rico 00901-1969
Attention: José A. Sosa Lloréns, Esq.
Telecopier: (787) 945-9102
E-Mail: jose.sosa@us.dlapiper.com

If to the Administrative Agent:

Banco Popular de Puerto Rico
208 Ponce de León Avenue
Popular Center, 6th Floor
San Juan, Puerto Rico 00918
Attention: Corporate Banking Division
Telecopier: (787) 756-3909
E-Mail: Humberto.Gonzalez@popular.com

With a copy to:

Pietrantoni Méndez & Alvarez LLC
Popular Center, 19th Floor
208 Ponce de León Avenue
San Juan, Puerto Rico 00918
Attention: Antonio R. Molina, Esq.
Telecopier: (787) 274-1470
E-Mail: amolina@pmalaw.com

If to a Lender, at the address therefor set forth on the signature pages hereof.

All notices, elections, requests and demands under this Agreement shall be effective and deemed received upon the earliest of (i) the actual receipt of the same by personal delivery or otherwise, (ii) two (2) Business Days after being deposited with a nationally recognized overnight courier service as required above, (iii) three (3) Business Days after being deposited in the United States mail as required above or (iv) on the day sent if sent by e-mail with confirmation of receipt on or before 4:00 p.m. Puerto Rico time on any Business Day or on the next Business Day if so delivered after 4:00 p.m. Puerto Rico time or on any day other than a Business Day. Rejection or other refusal to accept or the inability to deliver because of changed address of which no notice was given as herein required shall be deemed to be receipt of the notice, election, request, or demand sent.

10.3 **No Waiver; Remedies.** No failure on the part of the Administrative Agent or any Lender to exercise and no delay in exercising, and no course of dealing with respect to, any right, power or privilege under any Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right under any Loan Document preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The remedies provided in the Loan Documents are cumulative and not exclusive of any remedies provided by law, except to the extent expressly set forth to the contrary in this Agreement.

10.4 **Costs, Expenses and Taxes; Indemnification.**

(a) The Borrower agrees to pay on demand all reasonable out-of-pocket costs and expenses in connection with the negotiation, preparation, execution, delivery, administration,

modification, amendment or waiver of this Agreement and the other Loan Documents (whether proposed or made effective). The Borrower further agrees to pay on demand all reasonable costs and expenses of the Administrative Agent and the Lenders (including, without limitation, reasonable outside counsel fees) in connection with the enforcement (whether through negotiations, legal proceedings or otherwise) of this Agreement, the Notes, the other Loan Documents and the other documents to be delivered hereunder, including, without limitation, reasonable counsel fees and expenses in connection with the enforcement of this Section 10.4. In addition, the Borrower shall pay any and all transfer, stamp, documentary or other similar taxes, assessments or charges levied by any governmental or revenue authority in respect of this Agreement or any of the other Loan Documents or any other documents referred to herein or therein and all reasonable fees, costs and expenses, and all taxes assessments and other charges, incurred in connection with any appraisal, search, title insurance policy, filing, registration, recording or perfection of any security interest contemplated by this Agreement or any other Loan Document or any other document referred to herein or therein. The Borrower also agrees to pay, and to save and hold harmless the Administrative Agent and the Lenders from any delay by the Borrower in paying, or omission to pay, any documentary stamp and other taxes, fees or assessments, if any, that may be payable in connection with the execution and delivery of this Agreement, the Notes or any of the other Loan Documents, or the recording of any thereof, or in any modification hereof or thereof.

(b)     The Borrower shall pay to the Administrative Agent and the Lenders on demand, any and all fees, costs and expenses that any of the Administrative Agent or the Lenders pays to a bank or other similar institution arising out of or in connection with (A) the transfer to the Borrower, or any other Person on the Borrower's behalf, by the Administrative Agent or any of the Lenders of monies pursuant to this Agreement and (B) the depositing for collection by any of the Administrative Agent or any of the Lenders of any check or item of payment received and/or delivered to any of the Administrative Agent or the Lenders on account of the Obligations under this Agreement, the Notes or any other Loan Document.

(c)     The Borrower hereby agrees to indemnify the Administrative Agent and each Lender, and each of their respective Affiliates and each director, officer, employee and agent of any of the foregoing Persons (each an "Indemnified Party") against, and to hold each Indemnified Party harmless from, any and all out-of-pocket damages, liabilities and related expenses, and all reasonable out-of-pocket costs and expenses (including the reasonable fees, charges and disbursements of any counsel for any Indemnified Party), incurred by or asserted against any Indemnified Party arising out of, in connection with, or as a result of (i) the execution or delivery by the Borrower and the other Loan Parties of this Agreement, the Loan Documents or any agreement or instrument contemplated hereby or thereby, the performance by the Borrower and the other Loan Parties of their obligations hereunder or under the other Loan Documents or the consummation by Borrower and the other Loan Parties of the transactions contemplated hereby or thereby, (ii) any Advance or the use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by the Borrower or any Environmental Liability related in any way to the Borrower, (iv) the development, construction, use or occupancy of the Project, (v) the lease of all or any part of the Site or the Project, (vi) any act, or failure to act, of the Borrower, any other Loan Party or any representative or agent thereof with respect to any of the Collateral, (vii) the performance or failure to perform

any obligations set forth in any Material Contract, or (viii) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory; provided that such indemnity shall not, as to any Indemnified Party, be available to the extent that such losses, claims, damages, liabilities or related expenses result from the gross negligence or willful misconduct of such Indemnified Party. The Borrower further agrees that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Borrower or its stockholders, officers, directors, partners, members or creditors for or in connection with the transactions contemplated by this Agreement and the other Loan Documents, except to the extent such liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's bad faith, gross negligence or willful misconduct; provided, however, that the provisions of this Section shall not in any way alter any contractual remedy of any Indemnified Party.

(d)     If any Loan Party fails to pay when due any costs, expenses or other amounts payable by it under any Loan Document, including, without limitation, reasonable fees and expenses of counsel and indemnities, such amount may be paid on behalf of such Loan Party by the Administrative Agent or any Lender, in its sole discretion, and any such amount so paid by the Administrative Agent or any Lender, together with interest thereon at the Default Rate, shall be payable by the Borrower on demand and shall be secured by the Collateral.

10.5    **Right of Set-Off.** The Lenders are hereby authorized at any time and from time to time when an Event of Default is continuing, without notice to the Borrower (any such notice being expressly waived by Borrower), to set-off and apply any and all deposits (general or special, time or demand, provisional or final, matured or unmeasured) at any time held and other indebtedness at any time owing by the Lenders to or for the credit or the account of the Borrower against any and all of the Obligations of the Borrower now or hereafter existing with the Lenders irrespective of whether or not the Lenders shall have made any demand therefor. Each Lender agrees promptly to notify the Borrower after any such set off and application made by such Lender, provided that the failure to give such notice shall not affect the validity of any such set-off and application. The rights of the Lenders under this Section are in addition to any other rights and remedies (including, without limitation, other rights of set-off and rights under the Loan Documents and any other security instruments delivered hereunder) that the Lenders may have.

10.6    **Binding Effect; Governing Law; Jurisdiction and Venue; Service of Process.**

(a)     This Agreement shall become effective on the date on which it shall have been executed by Borrower, the Administrative Agent and each of the Lenders and thereafter shall be binding upon and inure to the benefit of the Borrower, the Administrative Agent and the Lenders and their respective successors and assigns, except that the Borrower shall have the right to assign its rights hereunder or any interest herein.

(b)     This Agreement, the Notes and the other Loan Documents shall be governed by, and construed in accordance with, the laws of Puerto Rico.

(c)     THE BORROWER, THE ADMINISTRATIVE AGENT AND THE LENDERS HEREBY CONSENT AND AGREE THAT ALL ACTIONS OR PROCEEDINGS

ARISING IN CONNECTION WITH THIS AGREEMENT AND THE LOAN DOCUMENTS MAY BE TRIED AND LITIGATED IN, AND THE BORROWER HEREBY SUBMITS TO THE NONEXCLUSIVE JURISDICTION OF, THE COURT OF FIRST INSTANCE OF SAN JUAN AND THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO, UNLESS SUCH ACTIONS OR PROCEEDINGS ARE REQUIRED TO BE BROUGHT IN ANOTHER COURT TO OBTAIN SUBJECT MATTER JURISDICTION OVER THE MATTER IN CONTROVERSY. THE BORROWER HEREBY WAIVES ANY RIGHT IT MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS, TO ASSERT THAT IT IS NOT SUBJECT TO THE JURISDICTION OF SUCH COURTS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION. EACH PARTY HEREBY AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT OR JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY APPLICABLE LAW.

10.7 **Execution in Counterparts.** This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. This Agreement may be executed and delivered by portable document format (.pdf) or other electronic transmission, all with the same force and effect as if the same was a fully executed and delivered original manual counterpart. Delivery of an executed signature page of this Agreement by .pdf or other electronic transmission shall be as effective as delivery of a manually executed counterpart of such signature page.

10.8 **Severability of Provisions.** Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

10.9 **Survival of Covenants.** All covenants, agreements, representations and warranties made by any Loan Party in this Agreement or in any Loan Document or any instrument, document or certificate delivered pursuant hereto shall be deemed to have been material and relied on by the Administrative Agent and each of the Lenders, notwithstanding any investigation made by the Administrative Agent or any Lender, and shall survive the execution and delivery of this Agreement, of each Loan Document and of such instrument, document or certificate.

10.10 **Application of Payments.** The Administrative Agent and the Lenders shall have the continuing and exclusive right to apply or reverse and reapply any and all payments to any portion of the Obligations of Borrower and the Loan Parties. The Borrower expressly agrees that to the extent that the Borrower or any Loan Party makes a payment or payments to the Administrative Agent or any Lender or the Administrative Agent or any Lender receives any payment or proceeds of the Collateral for the Borrower's benefit, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, local, state, Puerto Rico or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the Obligations or part thereof of the Borrower or the Loan Party intended to

be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by the Administrative Agent or the Lenders.

10.11 **No Third Party Beneficiaries**. This Agreement is made for the sole benefit of the Borrower, the Administrative Agent and the Lenders, and their respective successors and assigns, and no other Person or Persons shall have any benefits, rights or remedies under or by reason of this Agreement, or by reason of any actions taken by the Administrative Agent or any Lender pursuant to this Agreement. Neither the Administrative Agent nor any Lender shall be liable for any debts or claims accruing in favor of any such parties against the Borrower or others or against the Project. The Lenders, by making the Advances or taking any action pursuant to any of the Loan Documents, shall not be deemed a partner or a joint venturer with the Borrower or fiduciary of the Borrower. No payment of funds directly to a contractor or subcontractor or provider of services shall be deemed to create any third-party beneficiary status or recognition of same by the Administrative Agent or any Lender.

10.12 **WAIVER OF JURY TRIAL. THE BORROWER, THE ADMINISTRATIVE AGENT AND THE LENDERS EACH HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO ANY OF THE LOAN DOCUMENTS, THE ADVANCES OR THE ACTIONS OF THE ADMINISTRATIVE AGENT OR ANY LENDER IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT THEREOF.**

10.13 **Joint and Several Obligations**. The Obligations of each Loan Party under this Agreement, the Notes and the other Loan Documents shall be joint and several ("*solidaria*") obligations of each other Loan Party. Such Obligations may be enforced against each Loan Party separately, whether or not enforcement of any right or remedy hereunder has been sought against any other Loan Party. The Borrower acknowledges that its Obligations will not be released or affected by a determination that all or a part of this Agreement or any other Loan Document (or any Obligation hereunder or thereunder) with respect to any other Loan Party is invalid or unenforceable. In any action or proceeding involving any state or Commonwealth law, or any state, Commonwealth or Federal bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the Obligations of any Loan Party hereunder or under any other Loan Document would otherwise be held or determined to be void, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability hereunder or thereunder, then, notwithstanding any other provision hereof or thereof to the contrary, the amount of such liability shall, without any further action by such Loan Party, any Lender or any other Person, be automatically limited and reduced to the highest amount that is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceeding.

10.14 **USA Patriot Act**. The Administrative Agent and each Lender subject to the requirements of the USA Patriot Act hereby notify the Borrower, the Guarantors and each other Loan Party that pursuant to the requirements of the USA Patriot Act, the Administrative Agent and the Lenders are required to obtain, verify and record information that identifies the Borrower,

116

the Guarantors and/or each other Loan Party, which information includes the name, address and tax identification number of such parties and such other information as will allow the Administrative Agent and the Lenders to identify the Borrower, the Guarantors and/or each other Loan Party in accordance with the USA Patriot Act.

10.15 **Entire Agreement**. This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral and written, relating to the subject matter hereto.

[NO FURTHER TEXT ON THIS PAGE]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

<u>**BORROWER:**</u>

**BIOMASS GREEN FUELS LLC**

By:_____

Name: Olmar López Vidal

Title:  Authorized Signatory

[NO FURTHER TEXT ON THIS PAGE]

**ADMINISTRATIVE AGENT**:

**BANCO POPULAR DE PUERTO RICO,**
as Administrative Agent

By: _____
Name: Joval F. Rodríguez Barnes
Title: Commercial Relationship Officer

[NO FURTHER TEXT ON THIS PAGE]

119

**Proportionate Share of**
  **Term Facility Commitment: 100%**

**Proportionate Share of**
  **Non-Revolving Facility Commitment: 100%**

**Proportionate Share of**
  **Converted Loan Facility Commitment: 100%**

**BANCO POPULAR DE PUERTO RICO**

By:_____
Name:   Joval H. Rodríguez Barnes
Title:    Commercial Relationship Officer

Address for Notices:

Banco Popular de Puerto Rico
208 Ponce de León Avenue
Popular Center, 6th Floor
San Juan, Puerto Rico 00918
Attention: Corporate Banking Division
Telecopier: (787) 756-3909
E-Mail: Humberto.Gonzalez@popular.com

Lending Office:

Banco Popular de Puerto Rico
208 Ponce de León Avenue
Popular Center, 6th Floor
San Juan, Puerto Rico 00918
Attention: Corporate Banking Division
Telecopier: (787) 756-3909
E-Mail: Humberto.Gonzalez@popular.com

[NO FURTHER TEXT ON THIS PAGE]

Affidavit No.: _1,554_

Acknowledged and subscribed before me in San Juan, Puerto Rico on September 15, 2020 by the following persons who are personally known to me: Olmar López Vidal, of legal age, married, executive and resident of Guaynabo, Puerto Rico, in his capacity as Authorized Representative of BIOMASS GREEN FUELS LLC; and Joval F. Rodríguez Barnes, of legal age, married, executive and resident of San Juan, Puerto Rico, in his capacity as Commercial Relationship Officer of BANCO POPULAR DE PUERTO RICO.



_____
Notary Public

[NO FURTHER TEXT ON THIS PAGE]

121

**[Form of Notice of Borrowing]**

_____, 20__

Banco Popular de Puerto Rico, as Administrative Agent
  for the Lenders parties to the Credit
  Agreement referred to below, and the Lenders
Popular Center, Sixth Floor
208 Ponce de León Avenue
San Juan, Puerto Rico 00918

Attention: Corporate Banking Division

Gentlemen:

      The undersigned Borrowers refer to the Credit Agreement, dated as of September 15, 2020 (the "Credit Agreement", the terms defined therein being used herein as therein defined), among Biomass Green Fuels LLC, as borrower, certain Lenders parties thereto and Banco Popular de Puerto Rico, as Administrative Agent for said Lenders, and hereby gives you notice, irrevocably, pursuant to Section 2.2(a)(i) of the Credit Agreement that the undersigned hereby requests a [Non-Revolving/Converted Facility Advance] Borrowing under the Credit Agreement, and in that connection sets forth below the information relating to such Borrowing (the "Proposed Borrowing") as required by Section 2.2(a)(i) of the Credit Agreement:

The Business Day of the Proposed Borrowing is _____, 20__.

The aggregate amount of the Proposed Borrowing is $_____.

The proceeds of the Proposed Borrowing shall be used for the following purposes _____.

      The undersigned hereby certify that the following statements are true on and as of the date hereof, and will be true on the date of the Proposed Borrowing:

      (1)    all of the representations and warranties contained in the Credit Agreement and in each of the other Loan Documents are true and correct in all material respects on and as of the date of the Proposed Borrowing, before and after giving effect to the Proposed Borrowing and to the application of the proceeds therefrom, as though made on and as of such date; and

      (2)    at the date of the Proposed Borrowing and immediately after giving effect thereto, no event has occurred and is continuing, or would result from such Proposed Borrowing or from the application of the proceeds therefrom, which constitutes a Default or Event of Default.

Very truly yours,

**BIOMASS GREEN FUELS LLC**

By:_____
Name:
Title:

[Form of Non-Revolving Facility Note]

## PROMISSORY NOTE

$11,869,250.00                                      Date of Issuance:  September 15, 2020
San Juan, Puerto Rico

   **FOR VALUE RECEIVED, BIOMASS GREEN FUELS LLC,** a limited liability company organized and existing under the laws of the Commonwealth of Puerto Rico (the "Borrower" ), hereby promises to pay to the order of **BANCO POPULAR DE PUERTO RICO,** a Puerto Rico banking corporation (the "Lender" ), at the offices of Banco Popular de Puerto Rico, 208 Ponce de Leon Avenue, San Juan, Puerto Rico 00918, the principal sum of **ELEVEN MILLION EIGHT HUNDRED SIXTY-NINE THOUSAND TWO HUNDRED FIFTY DOLLARS ($11,869,250.00)** (or such lesser amount as shall equal the aggregate unpaid principal amount of Non-Revolving Facility Advances made by the Lender to the Borrowers under the Credit Agreement), in lawful money of the United States of America and in immediately available funds, on the dates and in the principal amounts set forth in the Credit Agreement, and to pay interest on the unpaid principal amount of each such Non-Revolving Advance, at such offices, in like money and funds, for the period commencing on the date of such Non-Revolving Facility Advance until such Non-Revolving Facility Advance shall be paid in full, at the rates per annum and on the dates provided in the Credit Agreement.

   The date, amount and interest rate applicable to each Non-Revolving Facility Advance made by the Lender to the Borrowers, and each payment made on account of the principal thereof, shall be recorded by the Lender on its books and, prior to any transfer of this Note, endorsed by the Lender on the schedule attached hereto or any continuation thereof, provided that the failure of the Lender to make any such recordation or endorsement shall not affect the obligation of the Borrowers to make a payment when due of any amount owing under the Credit Agreement or hereunder in respect of any Non-Revolving Facility Advance made by the Lender.

   This Note is one of the Non-Revolving Facility Note referred to in the Credit Agreement dated as of September 15, 2020 (as modified and supplemented and in effect from time to time, the "Credit Agreement") among the Borrowers, the Lenders party thereto and Banco Popular de Puerto Rico, as Administrative Agent, and evidences the Non-Revolving Facility Advances made by the Lender thereunder. Terms used but not defined in this Note have the respective meanings assigned to them in the Credit Agreement. Reference is made to the Credit Agreement for provisions concerning the repayment of this Note, the calculation of interest rate payable hereunder and as to such other relevant matters not expressly contained herein.

   The Credit Agreement provides for the acceleration of the maturity of this Note upon the occurrence of certain events and for optional and mandatory prepayments of Non-Revolving Facility Advances upon the terms and conditions specified therein.

The undersigned hereby waive presentment, demand, notice and protest with respect to this Note.

This Note shall be governed by, and construed in accordance with, the laws of the Commonwealth of Puerto Rico.

The Borrower acknowledge receipt of a true and exact copy of this Note.

**EXECUTED** in San Juan, Puerto Rico, on this 15th day of September, 2020.

**BIOMASS GREEN FUELS LLC**

By:_____

Name:  Olmar López Vidal

Title:  Authorized Signatory

Affidavit No._____

Acknowledged and subscribed before me in San Juan, Puerto Rico, on this 15th day of September, 2020, by the following person who is personally known to me: Olmar López Vidal, of legal age, married, executive and resident of Guaynabo, Puerto Rico, in his/her capacity as Authorized Signatory of BIOMASS GREEN FUELS LLC.

_____
Notary Public

**[Form of Converted Facility Note]**

## PROMISSORY NOTE

$_____                                         Date of Issuance:_____

**San Juan, Puerto Rico**

        **FOR VALUE RECEIVED, BIOMASS GREEN FUELS LLC,** a limited liability company organized under the laws of the Commonwealth of Puerto Rico (the "Borrower"), hereby promises to pay to the order of **BANCO POPULAR DE PUERTO RICO** (the "Lender"), at the principal offices of Banco Popular de Puerto Rico (as Administrative Agent), located at Popular Center, 208 Ponce de León Avenue, San Juan, Puerto Rico, the principal sum of _____ **AND 00/100 DOLLARS ($_____.00)**, in lawful money of the United States of America and in immediately available funds, on the dates and in the principal amounts provided in the Credit Agreement, and to pay interest on the unpaid principal amount of each such Converted Loan Facility Advance, at such offices, in like money and funds, for the period commencing on the date of each such Converted Loan Facility Advance until such Converted Loan Facility Advance shall be paid in full, at the rates per annum and on the dates provided in the Credit Agreement.

        This Note is the Converted Loan Facility Note to evidence the Converted Loan Facility referred to in the Credit Agreement dated as of September 15, 2020 (as the same may hereafter be amended or otherwise modified from time to time, the "Credit Agreement") between the Borrower, the Lenders from time to time parties thereto and Banco Popular de Puerto Rico, as Administrative Agent and as a Lender, and is subject to the provisions of the Credit Agreement. Terms used but not defined in this Note have the respective meanings assigned to them in the Credit Agreement. Reference is made to the Credit Agreement for provisions concerning the repayment of this Note, the calculation of interest rate payable hereunder and as to such other relevant matters not expressly contained herein.

        The Loan Agreement provides for the acceleration of the maturity of this Note upon the occurrence of certain events and for optional and mandatory prepayments hereof upon the terms and conditions specified therein.

        The Credit Agreement provides for the acceleration of the maturity of this Note upon the occurrence of certain events and for prepayments of Converted Loan Facility Advances upon the terms and conditions specified therein.

        The undersigned hereby waive presentment, demand, notice and protest with respect to this Note.

        This Note shall be governed by, and construed in accordance with, the laws of the Commonwealth of Puerto Rico.

.

This Note may be modified only by writing duly executed by the holder hereof and the Borrower.

The Borrower acknowledge receipt of a true and exact copy of this Note.

**EXECUTED** in San Juan, Puerto Rico, on this ___ day of _____, ___.

**BIOMASS GREEN FUELS LLC**

By:_____

Name:

Title:

Affidavit No._____

Acknowledged and subscribed before me in San Juan, Puerto Rico, on this ____ day of _____, ___, by the following person who is personally known to me: _____, of legal age, _____, executive and resident of _____, Puerto Rico, in his/her capacity as Authorized Representative of BIOMASS GREEN FUELS LLC.

_____

Notary Public

**EXHIBIT C**

## Form of Solvency Certificate

I, Olmar López Vidal, hereby certify that I am the Chief Executive Officer and President of **Biomass Green Fuels LLC**, a Puerto Rico limited liability company organized and existing under the laws of the Commonwealth of Puerto Rico (the "Borrower" ), that I am familiar with the properties, businesses, assets, finances and operations of the Borrower and that I am duly authorized to execute this certificate on behalf of the Borrower, which is being delivered pursuant to the Credit Agreement dated as of September 15, 2020 (the "Credit Agreement" ) among the Borrower, the lenders party thereto and Banco Popular de Puerto Rico, as lender and administrative agent (the "Agent"). Terms defined in the Credit Agreement are used herein as therein defined unless otherwise defined herein.

For purposes of this certificate, the terms below shall have the following definitions:

(a)     "fair value"

The amount at which the assets, in their entirety, of the Borrower would likely change hands as part of a going concern and for continued use as part of a going concern between a willing buyer and a willing seller, within a commercially reasonable period of time, each having reasonable knowledge of the relevant facts, with neither being under any compulsion to act.

(b)     "present fair saleable value"

The amount that could be obtained by an independent willing seller from an independent willing buyer if the assets of the Borrower are sold with reasonable promptness in an arm' s-length transaction under present conditions for the sale of comparable business enterprises.

(c)     "unreasonably small capital"

Insufficient capital to ensure that it will continue to be a going concern in the business in which it is engaged and proposes to be engaged.

I further certify that I have reviewed the Loan Documents and the contents of this certificate and, in connection herewith, have made such investigations and inquiries as I deem necessary and appropriate therefor.

I hereby further certify that:

1.     On the date hereof, after giving effect to the transactions contemplated by the Credit Agreement and the other Loan Documents, the fair value and fair saleable value of any and all property of the Borrower is greater than the total amount of liabilities, including contingent liabilities, of the Borrower.

127

2. On the date hereof, after giving effect to the transactions contemplated by the Credit Agreement and the other Loan Documents, the present fair saleable value of the assets of the Borrower exceeds the amount that will be required to pay the probable liability of the Borrower on the Indebtedness of the Borrower as such Indebtedness becomes absolute and mature.

3. In reaching the conclusions set forth in paragraphs 1 and 2 above, I have considered, among other things:

(a) all contingent liabilities of the Borrower including, without limitation, claims arising out of pending or, to the best of my knowledge, threatened litigation against it, which liabilities have been computed at the amount that, in light of all the facts and circumstances existing on the date hereof, can reasonably be expected to become an actual or matured liability; and

(b) the experience of the Borrower in acquiring and disposing of properties forming part of the Borrower' s business.

4. The Borrower does not intend to or believe that it will incur Indebtedness that will be beyond its ability to pay as such Indebtedness becomes absolute and mature.

5. On the date hereof, after giving effect to the transactions contemplated by the Credit Agreement and the other Loan Documents, the Borrower is not engaged in business or a transaction, and is not about to engage in business or a transaction, for which its property would constitute an unreasonably small capital.

6. In reaching the conclusions set forth in paragraphs 4 and 5 above, I have considered, among other things:

(a) the experience of the Borrower in acquiring and disposing of properties forming part of the Borrower' s business;

(b) the amortization requirements of the Credit Agreement and anticipated interest payable on the Advances under the Credit Agreement; and

(c) the level of capital customarily maintained by the Borrower and other entities engaged in the same or similar business as the businesses of the Borrower.

7. The Borrower does not intend, in consummating the transactions contemplated by the Credit Agreement and the other Loan Documents, to hinder, delay or defraud either present or future creditors.

This Solvency Certificate is being delivered solely to satisfy the obligations of the Borrower pursuant to the Credit Agreement and in my capacity as Chief Executive Officer and President of the Borrower (and not in my personal capacity). All statements made herein are true and correct to the best of my knowledge after making such inquiries and analyses as I have deemed necessary or appropriate for the opinions herein stated. The execution of this certificate by the signatory shall not result in any personal liability of the signatory.

**IN WITNESS WHEREOF**, the undersigned has executed this certificate on behalf of the Borrower this 15th day of September, 2020.

BIOMASS GREEN FUELS LLC

By:_____
Name: Olmar López Vidal
Title:   Authorized Signatory

.

## Assignment and Acceptance

Dated _____, ____

Reference is made to the Credit Agreement dated as of September 15, 2020 (the "Credit Agreement") among **BIOMASS GREEN FUELS LLC**, a Puerto Rico limited liability company (the "Borrower" ), the Lenders (as defined in the Credit Agreement) and **BANCO POPULAR DE PUERTO RICO**, as Administrative Agent for the Lenders (the "Administrative Agent" ). Terms defined in the Credit Agreement are used herein with the same meaning set forth therein.

_____ (the "Assignor") and _____ (the "Assignee") agree as follows:

The Assignor hereby sells and assigns to the Assignee, and the Assignee hereby purchases and assumes from the Assignor, that interest in and to all of the Assignor's rights and obligations under the Credit Agreement as of the date hereof which represents the percentage interest specified in Section 1 of Schedule 1 of all outstanding rights and obligations under the Credit Agreement, including, without limitation, such interest in the Assignor's [Non-Revolving/Converted] Facility Commitment, the [Non-Revolving/Converted] Facility Advances owing to the Assignor, and the [Non-Revolving/Converted] Facility Note[s] held by the Assignor. After giving effect to such sale and assignment, the Assignor's and the Assignee's [Non-Revolving/Converted] Facility Commitments and the amount of the [Non-Revolving/Converted] Facility Advances owing to the Assignor and the Assignee will be as set forth in Section 2 of Schedule 1.

The Assignor (i) represents and warrants that it is the legal and beneficial owner of the interest being assigned by it hereunder and that such interest is free and clear of any adverse claim; (ii) makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with the Credit Agreement or the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Agreement or any other instrument or document furnished pursuant thereto; (iii) makes no representation or warranty and assumes no responsibility with respect to the financial condition of any Loan Party or the performance or observance by any Loan Party of any of its obligations under the Credit Agreement or any other instrument or document furnished pursuant thereto; and (iv) attaches the [Non-Revolving/Converted] Facility Note[s] referred to in paragraph 1 above and requests that the Administrative Agent exchange such [Non-Revolving/Converted] Facility Note[s] for a new [Non-Revolving/Converted] Facility Note[s] payable to the order of the Assignee in an amount equal to the [Non-Revolving/Converted] Facility Commitment assumed by the Assignee pursuant hereto or new [Non-Revolving/Converted] Facility Note[s] payable to the order of the Assignee in an amount equal to the [Non-Revolving/Converted] Facility Commitment assumed by the Assignee pursuant hereto and the Assignor in an amount equal to the [Non-Revolving/Converted] Facility Commitment retained by the Assignor under the Credit Agreement, respectively, as specified on Schedule 1 hereto.

The Assignee (i) confirms that it has received a copy of the Credit Agreement, together with copies of the financial statements referred to in Section 5.1(b) thereof and such other documents (including all Loan Documents) and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Acceptance; (ii) agrees that it will, independently and without reliance upon the Administrative Agent, the Assignor or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Credit Agreement; (iii) confirms that it is an Eligible Assignee; (iv) appoints and authorizes the Administrative Agent to take such action as agent on its behalf and to exercise such powers under the Credit Agreement and the other Loan Documents as are delegated to the Administrative Agent by the terms thereof, together with such powers as are reasonably incidental thereto; (v) agrees that it will perform in accordance with their terms all of the obligations which by the terms of the Credit Agreement and the other Loan Documents are required to be performed by it as a Lender; and (vi) specifies as its Lending Office and address for notices the offices set forth beneath its name on the signature pages hereof.

Following the execution of this Assignment and Acceptance by the Assignor and the Assignee, it will be delivered to the Administrative Agent for acceptance and recording by the Administrative Agent. The effective date of this Assignment and Acceptance shall be the date of acceptance thereof by the Administrative Agent, unless otherwise specified on Schedule 1 hereto (the "Effective Date").

Upon such acceptance and recording by the Administrative Agent, as of the Effective Date, (i) the Assignee shall be a party to the Credit Agreement and, to the extent provided in this Assignment and Acceptance, have the rights and obligations of a Lender thereunder and (ii) the Assignor shall, to the extent provided in this Assignment and Acceptance, relinquish its rights and be released from its obligations under the Credit Agreement.

Upon such acceptance and recording by the Administrative Agent, from and after the Effective Date, the Administrative Agent shall make all payments under the Credit Agreement and the [Non-Revolving/Converted] Notes in respect of the interest assigned hereby (including, without limitation, all payments of principal and interest with respect thereto) to the Assignee. The Assignor and Assignee shall make all appropriate adjustments in payments under the Credit Agreement and the [Non-Revolving/Converted] Facility Notes for periods prior to the Effective Date directly between themselves.

This Assignment and Acceptance shall be governed by, and construed in accordance with, the laws of the Commonwealth of Puerto Rico.

[Signature Page Follows]

131

IN WITNESS WHEREOF, the parties hereto have caused this Assignment and Acceptance to be executed by their respective officers thereunto duly authorized, as of the date first above written.

**[NAME OF ASSIGNEE]**

By:_____
Title:

LENDING OFFICE:

_____

_____

_____

ADDRESS FOR NOTICES:

_____

_____

_____

**ACCEPTED:**

**BANCO POPULAR DE PUERTO RICO,**
  as Administrative Agent

By:_____
Title:_____
Date:_____

Attachment: Schedule 1

**Schedule 1**
**to**
**Assignment and Acceptance**
**Dated _____, 201_**

<u>Section 1</u>.

Percentage Interest: _____%

<u>Section 2</u>.

Assignor's [Non-Revolving/Converted] Facility Commitment:    $_____
Aggregate Outstanding Principal
   Amount of [Non-Revolving/Converted] Facility Advances
   owing to the Assignor:    $_____

Assignee's [Non-Revolving/Converted] Facility Commitment:    $_____
Aggregate Outstanding Principal
   Amount of [Term/Non-Revolving/Converted] Facility Advances
   owing to the Assignee:    $_____

A [Non-Revolving/Converted] Facility Note payable to the
   order of the Assignee

Dated:_____, 201_
Principal amount:    $_____

A [Non-Revolving/Converted] Facility Note payable to the
   order of the Assignor

Dated:_____, 201_
Principal amount:    $_____

<u>Section 3</u>.

Effective Date:* _____, 201__

---

\*     This date should be no earlier than the date of acceptance by the Administrative Agent.

I.     General.

The Lenders shall have no obligation to disburse any Non-Revolving Facility Advances unless the Borrower shall have satisfied the relevant conditions set forth in Section 2.1(a) and Article III of this Credit Agreement and shall have submitted to the Independent Engineer, and the Independent Engineer shall have approved, the following documents (the "Draw Request Documents"), completed and signed by the appropriate parties:

(A)     A Notice of Borrowing from Borrower, together with all Appendices, Schedules and Attachments required therein.

(B)     For Direct Costs relating to construction:

(1)     For each item of Direct Costs in an amount of $10,000.00 or more, when and as required by the Administrative Agent or the Independent Engineer, in their sole discretion, copies of invoices or purchase orders from each payee with an identifying reference to the Project, which invoices or purchase orders shall support the full amount of Direct Costs contained in the requested disbursement; and

(2)     For each item of Direct Costs in an amount less than $10,000.00, when and as required by the Administrative Agent or the Independent Engineer, in their sole discretion, a certified statement from the Borrower reflecting the identity of the supplier or contractor, and the materials or services purchased.

(3)     Copies of (i) conditional and unconditional lien releases from the General Contractor and each Major Subcontractor and (ii) unconditional lien releases for progress or, as appropriate, final payments for those subcontractors and materialmen whose contracts with the General Contractor or any Major Subcontractor exceed $10,000.00.

(C)     For Indirect Costs:

(1)     For each item of Indirect Costs in an amount of $10,000.00 or more, when and as required by the Administrative Agent or the Independent Engineer, in their sole discretion, copies of invoices or purchase orders from each payee with an identifying reference to the Project, which invoices or purchase orders shall support the full amount of Indirect Costs contained in the requested disbursement.

(2)     For each item of Indirect Costs in an amount less than $10,000.00, when and as required by the Administrative Agent or the Independent Engineer, in their sole discretion, a certified statement from the Borrower reflecting the identity of the supplier, and the materials or services purchased.

(D)     For Stored Materials:

(1)     Evidence satisfactory to the Administrative Agent that such Stored Materials are insured against all risk of loss for their full replacement cost, and that such insurance contains a standard mortgagee loss payable endorsement.

(2)     Evidence satisfactory to the Administrative Agent that security measures have been taken to protect the Stored Materials from theft, casualty and deterioration.

(3)     If requested by the Administrative Agent, written evidence from the supplier of the Stored Materials identifying such materials and indicating that, upon disbursement of the proceeds of the Non-Revolving Facility Advance and application of such proceeds in the manner indicated in the Notice of Borrowing, ownership thereof will be vested in the Borrower, free and clear of all Liens in favor of the supplier.

(4)     For each item of Stored Materials, when and as required by the Administrative Agent or the Independent Engineer, in their sole discretion, copies of invoices or purchase orders from each payee with an identifying reference to the Project, which invoices or purchase orders shall support the full amount of the cost of Stored Materials contained in the requested disbursement.

II.     Retainage.

Notwithstanding anything to the contrary in this Credit Agreement, the Borrower shall not use the proceeds of the Non-Revolving Facility Advance for the payment of Retainage, and the Lender shall not disburse any Non-Revolving Facility Advance for the payment of Retainage, unless and until the satisfaction of all of the following conditions: (i) the Borrower shall have Substantially Completed of the Project and the Lender shall have received a Certificate of Substantial Completion for the Project, (ii) no Default or Event of Default shall have occurred and be continuing, (iii) the Borrower shall have complied with all the applicable conditions set forth in Article III for the making of such Non-Revolving Facility Advance, (iv) the Borrower shall have submitted to the Lender and the Lender's Consultant copies of all Permits, licenses, approvals and agreements relating to the use, operation or occupancy of the Project, (v) the Administrative Agent shall have received copies of the unconditional lien releases (subject to receipt of the amount specified in such release) for final payment from the General Contractor and each Major Subcontractor, and the Lender shall have received a written release stating that, upon payment of the Retainage, the General Contractor and the Major Subcontractors shall not have any claim for payment against the Borrower or the Administrative Agent or any Lender, and (vi) written authorization to disburse such amount is received from the insurance or surety company issuing the corresponding performance and payment bonds required by this Credit Agreement.

**DRAWDOWN CERTIFICATE**

Date: _____, 20__

TO:    Banco Popular de Puerto Rico
Popular Center, 6th Floor
208 Ponce de León Avenue
San Juan, Puerto Rico 00918

Attention: Manager - Construction Loans Division

1.    This Drawdown Certificate is delivered to you pursuant to (i) that certain Credit Agreement, dated as of September 15, 2020 (the "Credit Agreement" ), by and between Biomass Green Fuels LLC (the " Borrower" ), the lender parties thereto from time to time (the "Lenders") and Banco Popular de Puerto Rico, as administrative agent (the "Administrative Agent" ), and (ii) the Notice of Borrowing dated _____, 202_. All terms in initial capitals used in this Drawdown Certificate shall have the respective meanings specified in the Credit Agreement unless the context requires otherwise or unless otherwise defined herein.

2.    We have read the provisions of the Credit Agreement which are relevant to the furnishing of this Drawdown Certificate. To the extent that this Drawdown Certificate evidences, attests or confirms compliance with any covenants or conditions precedent provided for in the Credit Agreement, we have made such examination or investigation as was, in our opinion, necessary to enable us to express an informed opinion as to whether such covenants or conditions have been complied with.

3.    BORROWER HEREBY CERTIFIES THAT, as of the date hereof:

3.1    The excel spread sheet in the form attached hereto as part of Appendix I hereto which includes information related to the Project Costs is true, correct and complete as of the date hereof. The Project Costs incurred by or on behalf of Borrower through the date of the immediately preceding Advance are $____, segregated by major categories as described on Appendix I hereto.

3.2    The Project Costs to be paid with the Non-Revolving Facility Advances requisitioned hereby for the current month are $_____, segregated by major categories as described on Appendix I hereto. All items shown on Appendix I represent work that has been satisfactorily performed in a good and workmanlike manner and in conformity with the Credit Agreement, Stored Materials that have been supplied and delivered to the Site prior to the date of this Certificate, or goods in transit, amounts payable for Indirect Costs or amounts otherwise permitted to be funded with Construction Advances, all as described in the Project Budget. Except as provided in Appendix I hereto or in Appendix I to Drawdown Certificate(s) heretofore provided

to and approved by the Administrative Agent and Independent Engineer, all amounts requested conform to the Project Budget.

3.3    The estimated date for Substantial Completion of the Project is set forth in Appendix I hereto.

3.4    The estimated Project Costs to completion of the Project are $_____, segregated by major categories and described on Appendix I hereto.

3.5    A detailed description of the variances, if any, from the estimated Project Costs for the Project as of the date of the Credit Agreement is summarized on Appendix I hereto.

3.6    The undisbursed Advances available under the Non-Revolving Facility, and other free cash of the Borrower deposited with the Administrative Agent pursuant to Section 2.2(b) of the Credit Agreement to bring the Facility "In-balance" and Section 6.3.2 of the Credit Agreement are sufficient to achieve Substantial Completion of the Project by the Project Termination Date.

3.7    To the best of Borrower's knowledge, there has not occurred any development which materially adversely affects the likelihood of achieving Substantial Completion of the Project by the Project Termination Date.

3.8    Each of the conditions specified in Article III of the Credit Agreement has been satisfied or will be satisfied on the date of disbursement.

3.9    All proceeds of all Advances made prior to the date hereof have been expended and have been applied to Project Costs in accordance with the Credit Agreement and the Plans and Specifications.

3.10    All Policies of insurance required under the Credit Agreement are in place, in good standing and in full force and effect and all premiums then due thereon have been paid.

3.11    Except for Permits which are not presently required in connection with the construction or operation of the Project, all Permits with respect to the construction and operation of the Project required to have been obtained by the date of the Advances to which this Drawdown Certificate relates from any Governmental Authority or other required Persons have been issued and are in full force and effect, including all Permits with respect to the construction of the Project to which this Drawdown Certificate relates and, with respect to any of the Permits not yet required, there is no reason to believe that any such Permits will not be obtained. The Construction Permits with respect to the Project to which this Drawdown Certificate relates are heretofore delivered to the Administrative Agent and the Independent Engineer for approval with this Drawdown Certificate.

3.12    Each Permit necessary for the Construction (i) has been issued, is in full force and effect and is not subject to any appeals or further proceedings or to any unsatisfied condition that may allow material modification or revocation, (ii) is being complied with, (iii) runs

in favor of the Project or the Borrower and may be enforced by Borrower, and (iv) is sufficient in every respect to permit the construction of the Project.

3.13    Applications for all other Permits which are not yet necessary are proceeding in a timely fashion. Borrower expects no delay in the issuance of such Permits or variation in their terms and conditions from those consistent with the Plans and Specifications for the construction of the Project.

3.14    Attached to this Drawdown Certificate as <u>Appendix II</u> are complete and accurate listings of the General Contract and all Major Subcontracts entered into by the Borrower and the General Contractor, as applicable, and not reflected on <u>Appendix II</u> to a Drawdown Certificate heretofore delivered to the Lender.

3.15    All property, rights and assets acquired for the Project are free and clear of all Liens except for Permitted Encumbrances

3.16    All of the representations and warranties of Borrower contained in the Credit Agreement are true and correct to the extent provided therein on and as of the date hereof with the same effect as if given on the date hereof and will be true and correct to the extent provided therein on and as of the date the Advances requested hereby are made, with the same effect as if given on such date (except to the extent such representations and warranties relate to a prior date).

3.17    A list of all approved, pending and proposed Change Orders, together with copies of all such Change Orders not previously delivered to the Administrative Agent and the Independent Engineer, is attached hereto as <u>Appendix III</u>.

3.18    Attached hereto as <u>Attachment A</u> is a true and correct copy of the certificate of the General Contractors and the Major Subcontractors, to the extent applicable.

3.19    The aggregate outstanding principal amount of the Non-Revolving Facility Advances under the Credit Agreement after giving effect to the contemplated Advance required under this Drawdown Certificate is $_____.

**BIOMASS GREEN FUELS LLC**


By:_____
Name:
Title:

**CONSTRUCTION ADVANCE REQUISITION for the month of _____, 20__**

GENERAL CONTRACTS AND MAJOR SUBCONTRACTS

# CHANGE ORDERS

## [SUB]CONTRACTOR CERTIFICATE

Date: _____, 202__

TO:   Banco Popular de Puerto Rico
Popular Center, 17th Floor
208  Ponce de León Avenue
San Juan, Puerto Rico 00918

Attention: Manager – Construction Loans Division

1.      This Contractor Certificate is delivered to you pursuant to (i) that certain Credit Agreement, dated as of September 15, 2020 (the "Credit Agreement" ), by and between Biomass Green Fuels LLC (the " Borrower" ), the lender parties thereto from time to time (the "Lenders") and Banco Popular de Puerto Rico, as administrative agent (the "Administrative Agent" ), and (ii) the Notice of Borrowing dated _____ __, 202_. All terms in initial capitals used in this Subcontractor Certificate shall have the respective meanings specified in the Credit Agreement unless the context requires otherwise or unless otherwise defined herein.

2.      _____, a _____ ("[General Contractor/Subcontractor]"), HEREBY CERTIFIES THAT, as of the date hereof:

2.1     Payments to the [General Contractor/Subcontractor] under the [General Contract/Major Subcontract] through the immediately previous date on which the immediately preceding Advance was made equal, in the aggregate, $_____.

2.2     Payment to be made to the [General Contractor/Subcontractor] from the proceeds of the requisition for the current month equals $_____, such payment to be applied by [General Contractor/Subcontractor] to the payment of Project Costs.

2.3     The estimated date of Substantial Completion under the General Contract is set forth in Appendix I hereto.

2.4     The estimated allocation by [General Contractor/Subcontractor] to Project Costs to be incurred to the date of Substantial Completion under the [General Contract/Major Subcontract] is $_____.

2.6     There has not occurred any development that is actually known to [General Contractor/Subcontractor] and (i) that materially affects the likelihood of achieving Substantial Completion by the Project Termination Date for the Project, or (ii) that constitutes, or with the

giving of notice or passage of time would constitute, a default under the terms of the [General Contract/Major Subcontract], other than as set forth in Appendix III hereto. True and correct copies of all default notices delivered pursuant to the terms of the Major Subcontract are attached hereto as part of Appendix III.

2.7 [General Contractor/Subcontractor] has been paid all amounts due to it under the [General Contract/Major Subcontract], net of applicable retainage, and has paid all amounts due to its subcontractors under its subcontracts, net of applicable retainage, other than amounts to be paid with proceeds of this requisition or as otherwise set forth on Appendix IV. Neither General Contractor nor, to the best of General Contractor' s actual knowledge, any other contractor, Subcontractor, laborer or materialman has filed or recorded any mechanic' s or materialman' s Lien, claim of Lien or stop order against the Project (other than Permitted Liens).

2.8 To the best of [General Contractor' s/Subcontractor' s] actual knowledge, all Policies of insurance required to be maintained by the [General Contractor/Subcontractor] under the [General Contract/Major Subcontract] are in place, in good standing and in full force and effect, and all premiums due thereon have been paid.

2.9 All approved and, to the best of [General Contractor's/Subcontractor's] actual knowledge, pending, contemplated and heretofore proposed Change Orders to the [General Contract/Major Subcontract] are listed in Appendix II hereto, and copies of all such Change Orders not previously delivered to the Lender are attached hereto.

_____

By:_____
Name:
Title:

## Excluded Property

### 1. Liquefaction System
Manufacturer: Galileo Technologies Corporation
Total Cost: $4,233,621

Galileo Cryobox® high-pressure thermodynamic cycle converts natural gas into liquid by cooling its temperature below -153 °C. The equipment comprises a multi-stage compression process, includes an automatic boil-off recovery system that eliminates the venting that was needed with conventional LNG storage.

### 2. $CO_2$ Purification System
Manufacturer: TPI (Tecno Project Industriale)
Total Cost: $1,100,000

TPI's $CO_2$ recovery plants are optimized to run downstream to membrane, PSA or amine Biogas upgrading plants ensuring a continuous production of 99.998% pure $CO_2$ quality guidelines compliant. The $CO_2$ purification system designed for the Premises consists of the following equipment:
- (H2s) Removal Guard Filter
- High Pressure Recipricating Compressors
- Catox (Catalytic Oxidexer Unit)
- Catox Economizer
- Catox Aftercooler
- $CO_2$ Purifier Activated Carbon Filters Units
- $CO_2$ Dryer
- $CO_2$ Stripper
- Valves
- $CO_2$ Liquid transfer pump

### 3. LNG/$CO_2$ Storage Tanks
Total Cost: $1,170,000

LNG Tanks Manufacturer: Galileo Technologies Corporation, Cost: $810,000
$CO_2$ Tanks Manufacturer: CIMC Enric, Cost $360,000

The LNG and $CO_2$ storage facility designed for the Premises consists of the following equipment:
- Six (6) 40' Cryogenic LNG IsoTanks (12,000 gallon tanks)
- Four (4) 20' Cryogenic CO2 IsoTanks (5,500 gallon tanks)
- LNG Cryogenic Pumps for loading Isotanks
- Regasifier station
- Cryogenic Control Valves
- Control System

**Project Schedule**

See Attached.

Project Lead: Olmar Lopez Vidal

Budget: Estimated: $22,945,000 | Baseline: $0 | Cost: Estimated: $0 | Baseline: $0 | Actual: $0

| WBS | Task Name | Resource Names | Start | Finish | Duration | Percent Complete |
|---|---|---|---|---|---|---|
| 1 | Project Development/Permitting (Phase I) | | Mon 28/Jan/19 | Fri 10/Apr/20 | 315 | 100% |
| 2 | Global Methane Initiative Endorsement | | Thu 03/Jan/19 | Thu 03/Jan/19 | 1 | 100% |
| 3 | EPA LMOP Project Endorsement | | Fri 01/Mar/19 | Fri 01/Mar/19 | 1 | 100% |
| 4 | ADS 100% Recycling Letter Signature | | Tue 06/Aug/19 | Tue 06/Aug/19 | 1 | 100% |
| 5 | Project Feasability Study | | Fri 20/Sep/19 | Fri 20/Sep/19 | 1 | 100% |
| 6 | BGF Law 73 Tax Decree Approval | | Tue 05/Nov/19 | Tue 05/Nov/19 | 1 | 100% |
| 7 | BGF Tax Credit Approval (Pymes Letter) | | Fri 31/Jan/20 | Fri 31/Jan/20 | 1 | 100% |
| 8 | Municipality of BGF Humacao Project Endorsement | | Fri 20/Dec/19 | Fri 20/Dec/19 | 1 | 100% |
| 9 | Environmental Assesment (Cumplimiento Ambiental) | | Wed 30/Oct/19 | Wed 30/Oct/19 | 1 | 100% |
| 10 | Construction permit Approval (Parcel A) | | Fri 06/Sep/19 | Fri 06/Sep/19 | 1 | 100% |
| 11 | Construction Permit Approval (Parcel B) | | Wed 04/Mar/20 | Wed 04/Mar/20 | 1 | 70% |
| 12 | Project Phase 1 Report | | Wed 04/Mar/20 | Wed 04/Mar/20 | 1 | 90% |
| 13 | BPPR Project Closing | | Fri 10/Apr/20 | Fri 10/Apr/20 | 1 | 60% |
| 14 | Engineering - Design Phase (Phase II) | | Tue 20/Aug/19 | Tue 11/Aug/20 | 256 | 65% |
| 14.1 | Mechanical Design | | Tue 20/Aug/19 | Mon 30/Mar/20 | 160 | 65% |
| 14.2 | Electrical Design | | Tue 20/Aug/19 | Mon 30/Mar/20 | 160 | 80% |
| 14.3 | Infrastructure Design | | Tue 20/Aug/19 | Mon 30/Mar/20 | 160 | 80% |
| 14.4 | Foundations Design | | Sun 20/Oct/19 | Fri 29/May/20 | 160 | 50% |
| 14.5 | Project Final Detail Design | | Wed 25/Nov/19 | Tue 11/Aug/20 | 190 | 50% |
| 15 | Equipment Manufacturing/Procurement (Phase III) | | Fri 25/Jan/19 | Fri 18/Dec/20 | 496 | 30% |
| 15.1 | LFG Upgrading Purification System | | Thu 18/Apr/19 | Fri 18/Dec/20 | 437 | 20% |
| 15.1.1 | Quoting Phase | | Thu 18/Apr/19 | Wed 04/Sep/19 | 100 | 100% |
| 15.1.2 | Equipment Purchase Order | | Mon 13/Apr/20 | Mon 13/Apr/20 | 1 | 0% |
| 15.1.3 | Equipment Submittals | | Mon 13/Apr/20 | Tue 21/Apr/20 | 7 | 0% |
| 15.1.4 | Equipment Manufacturing/Lead Time | | Tue 21/Apr/20 | Mon 30/Nov/20 | 160 | 0% |
| 15.1.5 | Equipment Shipment/Shipping Delivery | | Mon 30/Nov/20 | Fri 18/Dec/20 | 15 | 0% |
| 15.2 | RNG/CO2 Liquefaction System | | Fri 19/Apr/19 | Fri 18/Dec/20 | 436 | 20% |
| 15.2.1 | Quoting Phase | | Fri 19/Apr/19 | Thu 05/Sep/19 | 100 | 100% |
| 15.2.2 | Equipment Purchase Order | | Mon 13/Apr/20 | Mon 13/Apr/20 | 1 | 0% |
| 15.2.3 | Equipment Submittals | | Mon 13/Apr/20 | Tue 21/Apr/20 | 7 | 0% |
| 15.2.4 | Equipment Manufacturing/Lead Time | | Tue 21/Apr/20 | Mon 30/Nov/20 | 160 | 0% |
| 15.2.5 | Equipment Shipment/Shipping Delivery | | Mon 30/Nov/20 | Fri 18/Dec/20 | 15 | 0% |
| 15.3 | LNG/CO2 Tanks (Transport/Storage) | | Fri 19/Apr/19 | Fri 25/Sep/20 | 376 | 20% |
| 15.3.1 | Quoting Phase | | Fri 19/Apr/19 | Thu 05/Sep/19 | 100 | 100% |
| 15.3.2 | Equipment Purchase Order | | Mon 13/Apr/20 | Mon 13/Apr/20 | 1 | 0% |
| 15.3.3 | Equipment Submittals | | Mon 13/Apr/20 | Tue 21/Apr/20 | 7 | 0% |

| | | | | | |
|---|---|---|---|---|---|
| 15.3.4 | Equipment Manufacturing/Lead Time | Tue 21/Apr/20 | Mon 07/Sep/20 | 100 | 0% |
| 15.3.5 | Equipment Shipment/Shipping Delivery | Mon 07/Sep/20 | Fri 25/Sep/20 | 15 | 0% |
| **15.4** | **Natural Gas Power Generators** | **Fri 25/Jan/19** | **Tue 15/Sep/20** | **428** | **72%** |
| 15.4.1 | Quoting Phase | Fri 25/Jan/19 | Thu 07/Feb/19 | 10 | 100% |
| 15.4.2 | Equipment Purchase Order | Fri 08/Feb/19 | Fri 08/Feb/19 | 1 | 100% |
| 15.4.3 | Equipment Submittals | Fri 08/Feb/19 | Thu 14/Feb/19 | 5 | 100% |
| 15.4.4 | Equipment Manufacturing/Lead Time | Thu 14/Feb/19 | Wed 26/Aug/20 | 400 | 60% |
| 15.4.5 | Equipment Shipment/Shipping Delivery | Wed 26/Aug/20 | Tue 15/Sep/20 | 15 | 0% |
| **15.5** | **Control System/Motor Control Center/SCADA** | **Wed 14/Aug/19** | **Fri 25/Sep/20** | **293** | **16%** |
| 15.5.1 | Quoting Phase | Wed 14/Aug/19 | Tue 17/Dec/19 | 90 | 80% |
| 15.5.2 | Equipment Purchase Order | Mon 13/Apr/20 | Mon 13/Apr/20 | 1 | 0% |
| 15.5.3 | Equipment Submittals | Mon 13/Apr/20 | Tue 21/Apr/20 | 7 | 0% |
| 15.5.4 | Equipment Manufacturing/Lead Time | Tue 21/Apr/20 | Mon 07/Sep/20 | 100 | 0% |
| 15.5.5 | Equipment Shipment/Shipping Delivery | Mon 07/Sep/20 | Fri 25/Sep/20 | 15 | 0% |
| **16** | **Project Construction Phase (Phase IV)** | **Fri 10/Apr/20** | **Fri 19/Feb/21** | **226** | **0%** |
| **16.1** | **Pre-Construction Phase** | **Fri 10/Apr/20** | **Mon 25/May/20** | **32** | **0%** |
| 16.1.1 | Sub-Contractors Recruitment | Fri 10/Apr/20 | Fri 01/May/20 | 16 | 0% |
| 16.1.2 | Construction Kick-Off Meeting @ El Coqui Landfill | Fri 01/May/20 | Fri 01/May/20 | 1 | 0% |
| 16.1.3 | Construction Equipment Movilization to Site | Mon 04/May/20 | Tue 05/May/20 | 2 | 0% |
| 16.1.4 | Movilization of Construction Container to Site | Mon 04/May/20 | Mon 04/May/20 | 1 | 0% |
| 16.1.5 | Site Preparation/Cleaning and Earth Movement | Tue 05/May/20 | Mon 25/May/20 | 15 | 0% |
| **16.2** | **Site Soil Compaction** | **Wed 15/Apr/20** | **Tue 28/Apr/20** | **10** | **0%** |
| 16.2.1 | Soil Study of Parcel B | Wed 15/Apr/20 | Wed 15/Apr/20 | 1 | 0% |
| 16.2.2 | Soil Compaction Testing | Wed 15/Apr/20 | Tue 28/Apr/20 | 10 | 0% |
| **16.3** | **Civil Works** | **Wed 15/Apr/20** | **Thu 24/Sep/20** | **117** | **0%** |
| 16.3.1 | Concrete Improvements of (Parcel B) | Wed 15/Apr/20 | Tue 28/Apr/20 | 10 | 0% |
| 16.3.2 | Concrete Pad Construction of (Parcel B) | Tue 28/Apr/20 | Mon 18/May/20 | 15 | 0% |
| 16.3.3 | Concrete Samples/Testing (Parcel B) | Mon 18/May/20 | Mon 18/May/20 | 1 | 0% |
| 16.3.4 | Concrete Curing Period (Parcel B) | Mon 18/May/20 | Fri 29/May/20 | 10 | 0% |
| 16.3.5 | Concrete Pads Construction (Parcel A) | Mon 03/Aug/20 | Fri 11/Sep/20 | 30 | 0% |
| 16.3.6 | Concrete Samples/Testing (Parcel A) | Fri 11/Sep/20 | Fri 11/Sep/20 | 1 | 0% |
| 16.3.7 | Concrete Curing Period (Parcel A) | Fri 11/Sep/20 | Thu 24/Sep/20 | 10 | 0% |
| **16.4** | **Mechanical Installation** | **Fri 01/May/20** | **Fri 19/Feb/21** | **211** | **0%** |
| 16.4.1 | Equipment Placements (Crane Works) | Fri 25/Sep/20 | Thu 24/Dec/20 | 65 | 0% |
| 16.4.1.1 | LNG/CO2 Storage Tanks | Fri 25/Sep/20 | Thu 08/Oct/20 | 10 | 0% |
| 16.4.1.2 | LNG System | Fri 18/Dec/20 | Thu 24/Dec/20 | 5 | 0% |
| 16.4.1.3 | CO2 System | Fri 18/Dec/20 | Thu 24/Dec/20 | 5 | 0% |
| 16.4.1.4 | LFG Membrane System | Fri 18/Dec/20 | Mon 21/Dec/20 | 2 | 0% |
| 16.4.2 | Piping Installation from Actual Flare Station to BGF Site | Thu 13/Aug/20 | Wed 23/Sep/20 | 30 | 0% |
| 16.4.3 | Stainless Steel/Carbon Steel Piping | Fri 18/Dec/20 | Thu 21/Jan/21 | 25 | 0% |
| 16.4.4 | Piping Racks and Supports | Fri 18/Dec/20 | Thu 31/Dec/20 | 10 | 0% |

| | | | | | |
|---|---|---|---|---|---|
| 16.4.5 | **Electrical Installation** | Fri 01/May/20 | Fri 19/Feb/21 | 211 | 0% |
| 16.4.5.1 | 208 Jenbacher Electrical Connections | Fri 01/May/20 | Thu 21/May/20 | 15 | 0% |
| 16.4.5.2 | High Voltage Connection (13.2V) | Fri 18/Dec/20 | Thu 14/Jan/21 | 20 | 0% |
| 16.4.5.3 | Low Voltage Installation (480V-120V-208V) | Fri 18/Dec/20 | Thu 21/Jan/21 | 25 | 0% |
| 16.4.5.4 | Outdoor and Lightning Wiring Installation | Fri 18/Dec/20 | Thu 21/Jan/21 | 25 | 0% |
| 16.4.5.5 | Power Generator Wiring Installation | Thu 01/Oct/20 | Wed 28/Oct/20 | 20 | 0% |
| 16.4.5.6 | Instrumentation Installation | Fri 18/Dec/20 | Thu 14/Jan/21 | 20 | 0% |
| 16.4.5.7 | PLC and Control Installation | Fri 18/Dec/20 | Thu 07/Jan/21 | 15 | 0% |
| 16.4.5.8 | Lighting Rod Installation | Tue 01/Dec/20 | Tue 01/Dec/20 | 1 | 0% |
| 16.4.5.9 | Grounding Installation | Thu 01/Oct/20 | Wed 14/Oct/20 | 10 | 0% |
| 16.4.5.10 | Security System Installation (Cameras, Security Gates) | Sun 31/Jan/21 | Fri 19/Feb/21 | 15 | 0% |
| 16.4.6 | **Final Project Details** | Mon 04/Jan/21 | Fri 19/Feb/21 | 35 | 0% |
| 16.4.6.1 | Equipment and Site Painting | Sun 31/Jan/21 | Fri 19/Feb/21 | 15 | 0% |
| 16.4.6.2 | Piping Pressure Testing | Fri 22/Jan/21 | Thu 04/Feb/21 | 10 | 0% |
| 16.4.6.3 | Welding Testing/Certification | Fri 22/Jan/21 | Thu 28/Jan/21 | 5 | 0% |
| 16.4.6.4 | Security Fence Installation | Sat 23/Jan/21 | Fri 19/Feb/21 | 20 | 0% |
| 16.4.6.5 | Fire Protection System for Site | Mon 04/Jan/21 | Fri 15/Jan/21 | 10 | 0% |
| 17 | Project Start Up/Commissioning (Phase V) | Tue 29/Dec/20 | Mon 01/Mar/21 | 45 | 0% |
| 18 | Official Commercial Operations | Mon 01/Mar/21 | Mon 01/Mar/21 | 1 | 0% |

**Project Budget**

See Attached.

| Schedule [ ] | PROJECT: | BIOMASS GREEN FUELS, LLC | | | | | |
|---|---|---|---|---|---|---|---|
| **PROJECT BUDGET** | | | | | | | |
| DESCRIPTION | EQUITY ACT 73 | EQUITY | ADDITIONAL EQUITY | ACT 73 TAX CREDITS | QUCI NOTES | DIRECT LOAN | PROJECT COST |
| | A | B | C | D | E | F | G (A+B+C+D+E+F) |
| SOURCES | $6,503,621.00 | $1,956,379.00 | $540,000.00 | $1,282,500.00 | $7,200,000.00 | $11,869,250.00 | $29,351,750.00 |
| | | | | | | | |
| USES | | | | | | | |
| **Machinery & Equipment** | | | | | | | |
| Jenbacher Engines (Gas Power Generators) | - | 817,897.00 | - | - | 1,082,103.00 | - | 1,900,000.00 |
| (Nitrogen Removal System) | - | - | - | - | 928,647.00 | 937,732.00 | 1,866,379.00 |
| (LFG Upgrading) Membrane | - | - | - | - | 4,000,000.00 | - | 4,000,000.00 |
| (Liquefaction System) | 4,233,621.00 | - | - | - | - | - | 4,233,621.00 |
| (CO2 Purification System ) | 1,100,000.00 | - | - | - | - | - | 1,100,000.00 |
| Medium Feed Compressors | - | - | - | - | - | 800,000.00 | 800,000.00 |
| LNG/CO2 Storage Tanks | 1,170,000.00 | - | - | - | - | - | 1,170,000.00 |
| Energy Storage (Batteries) (Accurate Solutions) | - | - | - | - | - | 687,000.00 | 687,000.00 |
| Office Containers/Supplies/Equipment/Tools | - | - | - | - | - | 140,000.00 | 140,000.00 |
| Solar Outdoor Lighting (Office and Perimeter) | - | - | - | - | - | 40,000.00 | 40,000.00 |
| Fire Control System (Fire Protection System) | - | - | - | - | - | 100,000.00 | 100,000.00 |
| Perimeter Security Cameras and Fence | - | - | - | - | - | 80,000.00 | 80,000.00 |
| Other | - | - | - | - | - | - | - |
| Jenbacher Engine Enclosures (Accurate Solutions) | - | - | - | - | - | 822,651.00 | 822,651.00 |
| Absorption Chiller/Pumps/Cooling Tower/Chilled Water | - | - | - | - | - | 550,000.00 | 550,000.00 |
| Blowers/Skid/Scrubbers/Dryers (208 and 416 Modules) | - | - | - | - | - | 440,000.00 | 440,000.00 |
| Motor Control Center/Control System | - | - | - | - | - | 340,000.00 | 340,000.00 |
| Controls Container/Spare parts Container | - | - | - | - | - | 110,000.00 | 110,000.00 |
| Thermal Oxidizer/Emergency Vent Flare | - | - | - | - | - | 150,000.00 | 150,000.00 |
| Gas Sphere (Raw Gas) with Controls | - | - | - | - | - | 150,000.00 | 150,000.00 |
| *Total Direct Costs* | $6,503,621.00 | $817,897.00 | $0.00 | $0.00 | $6,010,750.00 | $5,347,383.00 | $18,679,651.00 |
| Planning, Legal, Studies & Other | | | | | | | |
| Professional & Consultant Fees | - | 156,773.12 | - | - | - | 116,000.00 | 272,773.12 |
| Legal Fees | - | 33,987.40 | - | - | - | - | 33,987.40 |
| Insurance & Bonds | - | 161,862.51 | - | - | - | 104,518.00 | 266,380.51 |
| EC Waste Contract Payments | - | 764,858.97 | - | - | - | - | 764,858.97 |
| Other | - | - | - | - | - | - | - |
| *Subtotal Planning, Legal, Studies & Other* | $0.00 | $1,117,482.00 | $0.00 | $0.00 | $0.00 | $220,518.00 | $1,338,000.00 |
| *Engineering Design* | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $395,000.00 | $395,000.00 |
| Construction/Installation | | | | | | | |
| LNG/CO2 Storage Tanks Installation (Pads/Piping, etc) | - | - | - | - | - | 100,000.00 | 100,000.00 |
| Electrical Synchronization (208/416) Main Switchgear (Accurate | - | - | - | - | - | 100,000.00 | 100,000.00 |
| Fire Control System Installation | - | - | - | - | - | 40,000.00 | 40,000.00 |
| Civil Design (CMA) | - | - | - | - | - | 100,000.00 | 100,000.00 |
| Perimeter Security Cameras and Fence | - | - | - | - | - | 60,000.00 | 60,000.00 |
| Civil and Mechanical Installation | - | - | - | - | - | 950,000.00 | 950,000.00 |
| Electrical Installation | - | - | - | - | - | 600,000.00 | 600,000.00 |
| CO2 System Installation | - | - | - | - | - | 300,000.00 | 300,000.00 |
| Electrical Interconnection 13.2-480 V | - | - | - | - | - | 152,349.00 | 152,349.00 |
| Site Prep | - | - | - | - | - | 40,000.00 | 40,000.00 |
| *Subtotal Construction/Installation* | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $2,442,349.00 | $2,442,349.00 |
| *Legal Fees* | $0.00 | $0.00 | $0.00 | $0.00 | $287,250.00 | $62,750.00 | $350,000.00 |
| NMTC Expenses | | | | | | | |
| Asset Mgt | - | - | - | - | 341,250.00 | - | 341,250.00 |
| 3rd Party Expense Fee | - | - | - | - | 96,000.00 | - | 96,000.00 |
| Success Fee | - | - | - | - | 15,000.00 | - | 15,000.00 |
| NMTC Legal & Professional Fees | - | - | - | - | 102,750.00 | - | 102,750.00 |
| *Subtotal NMTC Expenses* | $0.00 | $0.00 | $0.00 | $0.00 | $555,000.00 | $0.00 | $555,000.00 |
| Financing Costs | | | | | | | |
| Bank Fees | - | - | - | - | - | 234,000.00 | 234,000.00 |
| Interest Reserves | - | - | - | - | 347,000.00 | 453,000.00 | 800,000.00 |
| Debt Service Reserve | - | - | - | - | - | 620,000.00 | 620,000.00 |
| Working Capital Reserve | - | - | - | - | - | 1,000,000.00 | 1,000,000.00 |
| *Subtotal Financing Costs* | $0.00 | $0.00 | $0.00 | $0.00 | $347,000.00 | $2,307,000.00 | $2,654,000.00 |
| Other Costs | | | | | | | |
| Professional & Legal Fees | - | - | - | - | - | 386,910.00 | 386,910.00 |
| Consultant & Legal Fees | - | 21,000.00 | - | - | - | 92,090.00 | 113,090.00 |
| Interim Finance Reimbursement | - | - | 97,000.00 | 50,000.00 | - | - | 147,000.00 |
| EC Waste Payment | - | - | 100,000.00 | - | - | - | 100,000.00 |
| Other Project Expenses | - | - | 343,000.00 | - | - | - | 343,000.00 |
| Additional Employment | - | - | - | 300,000.00 | - | - | 300,000.00 |
| Legal Fees | - | - | - | 128,552.60 | - | - | 128,552.60 |
| Professional Fees | - | - | - | 272,200.00 | - | - | 272,200.00 |
| Consultant Fees | - | - | - | 103,000.00 | - | - | 103,000.00 |
| *Subtotal Other Costs* | $0.00 | $21,000.00 | $540,000.00 | $853,752.60 | $0.00 | $479,000.00 | $1,893,752.60 |
| Total Soft Costs | $0.00 | $1,138,482.00 | $540,000.00 | $853,752.60 | $1,189,250.00 | $5,906,617.00 | $9,628,101.60 |
| Contingencies | $0.00 | $0.00 | $0.00 | $428,747.40 | $0.00 | $615,250.00 | $1,043,997.40 |
| Total Uses | $6,503,621.00 | $1,956,379.00 | $540,000.00 | $1,282,500.00 | $7,200,000.00 | $11,869,250.00 | $29,351,750.00 |

**Indebtedness**

1. The Indebtedness evidenced by the QLICI Notes, subordinated to the Obligations of the Loan Parties pursuant to the Loan Documents.

1. The Indebtedness in the aggregate principal amount of $1,000,000 payable to Danosa Caribbean, Inc., pursuant to (i) the Convertible Note Purchase Agreement dated August 16, 2019 by and between Danosa Caribbean, Inc. and Borrower and (ii) the Unsecured Convertible Promissory Note dated August 20, 2019 issued by the Borrower, subordinated to the Obligations of the Loan Parties pursuant to the Subordination Agreement in accordance with the terms and conditions thereof.

**Pending Litigation**

1. Case Number SJ2018CV03188 by Ballester Hermanos Inc. against Olmar López Gómez and his spouse, Vivian Vidal claiming the payment of the amount of $58,000, plus interests.

**Material Contracts**

1. The Gas Purchase Agreement
2. The Project Contracts
3. The Purchase Contracts
4. The Site Lease
5. The Additional Project Contracts

.

## Major Subcontractors

None.

## Registered Principal Office, Principal Place of Business, Etc.

**Chief Executive Office:**

584 Aldebarán Street
San Juan, Puerto Rico 00920

Road 923 KM 2.5, Barrio Buena Vista,
Humacao, Puerto Rico 00791

**Locations of Records relating to Collateral:**

584 Aldebarán Street
San Juan, Puerto Rico 00920

Road 923 KM 2.5, Barrio Buena Vista,
Humacao, Puerto Rico 00791

**Other Collateral Locations:**

584 Aldebarán Street
San Juan, Puerto Rico 00920

Road 923 KM 2.5, Barrio Buena Vista,
Humacao, Puerto Rico 00791

## Organizational Chart, Capital Structure and Ownership

### GFC Holdings Capital Structure

#### Class A Common Units

| Holder: | Units: | Percentage (%): |
|---|---|---|
| Gregory Boyd | 4,252,500 | 31.50% |
| Olmar López Vidal | 4,725,000 | 35.00% |
| Olmar López Gómez | 3,037,500 | 22.50% |
| Jonathan Lassers | 675,000 | 5.00% |
| John Dumas | 675,000 | 5.00% |
| John Richardson | 135,000 | 1.00% |
| Total: | 13,500,000 | 100.00% |

#### Series A Preferred Units

| Holder: | Units: | Percentage (%): |
|---|---|---|
| Semillero Investment Fund I LLC | 4,500,000 | 69.23% |
| Puerto Rico Fund for Growth LLC | 2,000,000 | 30.74% |
| | 6,500,000 | 100.00% |

### Borrower's Capital Structure

#### Class A Common Units

| Holder: | Units: | Percentage (%): |
|---|---|---|
| GFC Holdings Limited Liability Company | 1,000 | 100.00% |

# BIOMASS GREEN FUELS ORGANIZATION CHART





Olmar López Vidal

President

Mimi Holder

Executive Assistant

| Olmar López Gómez | Greg Boyd | George Economou | TBD |
|---|---|---|---|
| Chief Technical Officer | Chief Operating Officer | Chief Financial Officer | Plant Manager/GM |
| Engineering | In-House Runner/Accounting | External Accounting | RNG System Operators |
| | | | Labor |
| | | | Technicians |



Fernando Rodríguez and Associate (Fianna)

Environmental

Laura Rossy/DLA Piper

Environmental Attorney

Jose Sosa/DLA Piper

General Counsel

**Patents, Trademarks, Trade Names, Etc.**

| Registration/ Presentation Number | Class | Owner | Type | Design |
|---|---|---|---|---|
| 234222-35-0<br>234222-04-0<br>234222-39-0 | Class 35<br>Class 4<br>Class 39 | Biomass Green Fuels LLC | Logo and Letters for Green Fuels | GreenFuels |
| 234224-04-0<br>234224-35-0 | Class 4<br>Class 35 | Biomass Green Fuels LLC | Logo and Letters for Green CO2 | GreenCO2 |

**No Material Adverse Effect**

None.

**Accounts**

| Account Holder | Account Name | Financial Institution | Account Number |
|---|---|---|---|
| Biomass Green Fuels LLC | Cash Concentration Account | Banco Popular de Puerto Rico | 030-218896 |
| Biomass Green Fuels LLC | Equity Escrow Account | Banco Popular de Puerto Rico | 030-218861 |
| Biomass Green Fuels LLC | Tranche One Tax Credits Account | Banco Popular de Puerto Rico | 030-218845 |
| Biomass Green Fuels LLC | Operating Account | Banco Popular de Puerto Rico | 347-276244 |
| Biomass Green Fuels LLC | Debt Service Reserve Account | Banco Popular de Puerto Rico | 030-218888 |
| Biomass Green Fuels LLC | Working Capital Reserve Account | Banco Popular de Puerto Rico | 030-218837 |
| Biomass Green Fuels LLC | Replacement Reserve Account | Banco Popular de Puerto Rico | 030-218853 |

**Insurance Requirements**

(1)     Prior to the commencement of Construction of the Project, and during any period of construction, expansion, alteration, repair or restoration with a cost of $150,000 or more, Borrower shall maintain builders' risk insurance on an "all risk basis" on a completed value form with "extended coverage" (including windstorm, earthquake, flood, collapse, sinkhole and subsidence), and providing (A) coverage for the Projects and Sites, including removal of debris, demolition, insuring the buildings, structures, machinery, equipment, facilities, fixtures and other properties constituting a part of the Project and Sites in a minimum aggregate amount not less than full replacement cost of the Project and Sites with a minimum of $50,000 for the peril of windstorm, $50,000 for earthquake and $500,000 for flood, (B) off site coverage with a limit of insurance of $100,000 to cover off site equipment for which there have been progress payments, (C) transit coverage (including ocean cargo where ocean transit will be required) with a per occurrence limit sufficient to cover the full insurable value of any item in transit but in no event less than a limit of insurance of $50,000, whichever is higher, and (D) expediting/extra expense insurance in an amount not less than $100,000.  All such policies may have deductibles of not greater than $10,000 per loss; provided that windstorm, earthquake and flood coverage shall have a deductible of not greater than five percent (5%) of full replacement cost, the flood coverage will have a sub-limit of at least $500,000; and transit coverage shall have a deductible of not greater than 10% of the loss.  Earthquake coverage shall include coverage for movement, earthquakes, shocks, tremors, landslides, subsidence, sinkhole coverage, mud flow or rockfall, or any other earth movement, all whether direct or indirect, proximate or remote or in whole or in part caused by, contributed to or aggravated by any physical damage insured against by such policy regardless of any other cause or event that contributes, concurrently or in sequence, to the loss. Flood coverage shall include, but not be limited to, coverage for waves, tide or tidal water, inundation, rainfall and/or resulting runoff or the rising (including the overflowing or breaking of boundaries) of lakes, ponds, reservoirs, rivers, harbors, streams, or other bodies of water, whether or not driven by wind. The Borrower shall be responsible for the payment of all deductibles.

(2)     Insurance insuring against loss or damage in an "all risk" form such as "special causes of loss" in an amount equal to the full replacement cost, as reasonably determined by the Administrative Agent from time to time, of the Project and Sites (without deduction for physical depreciation) and providing, without limitation, (A) coverages against loss or damage by fire, lightning, windstorm, explosion, riot, civil commotion, aircraft, vehicles, smoke, other risks from time to time included under "all risk" or "special form" policies, and, to the extent such required minimum limits are commercially available at reasonable rates and terms (provided that any lower limits shall not, in any event, be subject to co-insurance limitations), including a minimum limit of $100,000 for the peril of windstorm, $100,000 for earthquake, and such other perils as the Administrative Agent may from time to time require to be insured with a sublimit of not less than $5,000,000 for on-site clean up required as a result of the occurrence of an insured risk, (B) off site coverage, and (C) machinery coverage on a "comprehensive" basis including breakdown and repair with limits not less than full replacement cost of the insured objects.  The Borrower shall also maintain or cause to be maintained business interruption and/or rental loss insurance on an "all risk" basis, in an amount equal to satisfy policy coinsurance conditions, but not less than the

sum of twelve (12) months of Debt Service and continuing expenses. The Borrower shall also maintain or cause to be maintained, expediting or extra expense coverage in an amount not less than $500,000. The policies required by this sub-section (2) shall each have a deductible of not greater than $50,000 per loss; provided that earthquake and flood coverage shall have a deductible of not greater than five percent (5%) of full replacement cost; windstorm coverage or flood shall have a deductible of not greater than two percent (2%) of full replacement cost; and business interruption insurance shall have a deductible of not greater than thirty (30) days. The policy/policies shall include increased cost of construction coverage, demolition cost, and building ordinance coverage to pay for loss of "undamaged" property which may be required to be replaced due to enforcement of local, territorial or federal ordinances. The Borrower shall be responsible for the payment of all deductibles.

(3)     Comprehensive or commercial general liability insurance for the Project and Site and all other property owned or leased by the Borrower on an "occurrence" basis, including coverage for premises/operations, explosion, collapse and underground hazards, products/completed operations, broad form property damage, injuries to or the death of any Person, reasonable attorney's fees, blanket contractual liability for both oral and written contracts, garage liability and garage keepers legal liability, independent contractor's and personal injury, for the Borrower and for contractors, with primary coverage limits of no less than $2,000,000 for injuries or death to one or more persons or damage to property resulting from any one occurrence and a $2,000,000 aggregate limit. The comprehensive or commercial general liability policy shall also include a cross liability or severability of interest clause.  Work performed by others for the Borrower shall not commence until a certificate of insurance has been delivered verifying coverages outlined above to be in place and naming the Borrower as additional insured and the Administrative Agent, for the benefit of the Lenders, as additional insureds. All deductibles in excess of $10,000 shall be subject to review and approval by the Administrative Agent.

(4)     Automobile liability insurance, including coverage for owned, non-owned and hired automobiles for bodily injury, property damage and contractual liability, and sudden or accidental pollution insurance, and containing appropriate no fault insurance provisions or other endorsements in accordance with all Legal Requirements, with limits of no less than $1,000,000 per accident with respect to bodily injury, property damage, liability or death, with deductibles in of not greater than $25,000.

(5)     Workers' compensation insurance, disability benefits insurance and such other forms of employer liability insurance which the Borrower is required by applicable Legal Requirements in amount not less than $1,000,000 per accident, and $1,000,000 per employee by decease, to provide for the operation of the Project and all other property owned or leased by the Borrower.

(6)     Umbrella excess liability insurance of not less than $8,000,000 for the Borrower. Such coverages shall be on "occurrence" forms basis and over and above coverage provided by the policies described in subsections (3), (4) and (5) above.  The umbrella and/or excess policies shall not contain endorsements which restrict coverages as set forth in subsections (3), (4) and (5) above, and which are provided in the underlying policies. The Borrower shall immediately notify

the Administrative Agent in the event any loss occurs which could reduce the limits by more than $25,000.

(7)     Insurance in comprehensive form against loss or damage from explosion of steam boilers, air conditioning equipment, high pressure piping, machinery and equipment, pressure vessels or similar apparatus now or hereafter installed in the Project, Sites or any other property owned or leased by the Borrower or any part thereof (without exclusion for explosions) and including coverage for expediting expenses and business interruption on an actual loss sustained basis (with a " joint loss agreement" if this coverage is placed with a carrier other than the carrier for the insurance described in subsections (1) and (2) above) in an amount of not less than $2,000,000.

(8)     Without duplication of any other insurance required hereunder, an environmental liability or impairment insurance in amounts and types sufficient to cover any exposure related to any hazardous materials stores, generated, handled or disposed of by the Borrower, its agents or employees at the Site or the Project, and any storage tanks maintained at the Site by the Borrower, but in no event less than $5,000,000 per incident.

(9)     Such other insurance as may from time to time be reasonably required by the Administrative Agent or the Required Lenders or required under any Material Contract in order to protect their interests, such required insurance to be comparable to the insurance carried by owners and operators of similar properties of similar size and character in the United States.