# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**GREGORY S. BOYD;** *et al.*
**Plaintiffs**

vs.

**BANCO POPULAR DE PUERTO RICO**
**Defendants**

CIVIL NÚM.: 24-cv-1569 (PAD)

ANTI TYING-12 U.S.C. § 1972

JURY TRIAL DEMANDED

**PLAINTIFFS' MEMORANDUM OF LAW ON STANDING**

**Table of Contents**

Introduction ........................................................................................................... 5

I.    FIRST SECTION: BHCA's Expansive Definition of "Customer" Encompasses Unit Holders and Guarantors ....................................................................................... 6

A.    The Statutory Framework ........................................................................... 6

B.    Federal Reserve Board Guidance Supports Broad Customer Definition............................ 6

C.    Legal Commentary Reinforces Broad Standing Principles ................................ 7

II.    Established Case Law Consistently Recognizes Standing for Shareholders, Guarantors, and Analogous Unit Holders ........................................................... 7

III. Application to GFC Holdings, LLC Unit Holders ............................................. 9

A.    Non-Guarantor Plaintiff............................................................................ 9

B.    Guarantor Unit Holder .............................................................................. 10

C.    Direct Economic Harm Establishes Concrete Injury ................................. 10

IV. Congressional Intent ......................................................................................... 11

V. Conclusion on Standing....................................................................................... 11

SECOND SECTION: The Majority Members' Authority for Litigation, Representation, Manager Removal, When Faced with Mismanagement and a Conflicted Board .................... 12

VI. PUERTO RICO LAW AND THE OPERATING AGREEMENT SUPPORT AFFORDING STANDING TO THE MEMBERS ............................................... 12

A.    Statutory Framework and Member Rights.............................................. 12

B.    Actions Taken by the Board of Managers for their Personal Benefit that Harm the Company Are Not Permitted Under Puerto Rico Corporate Law .................................... 13

VII. BOARD BREACHES OF FIDUCIARY DUTIES JUSTIFY MAJORITY INTERVENTION ................................................................................................ 15

A. Self-Dealing Transactions ......................................................................... 15

B. Allison v. Eriksson ..................................................................................... 17

VIII.  THE MAJORITY OF MEMBERS' WILL SHOULD PREVAIL WHEN THE BOARD OF MANAGERS IS CONFLICTED ........................................................ 18

IV. THE APA'S INVALIDITY AS A DEEMED LIQUIDATION EVENT WITHOUT UNANIMOUS APPROVAL ............................................................. 20

A.    The Transaction's Nature and Requirements ........................................ 20

X. AUTHORITY TO DIRECT SPECIFIC COMPANY ACTIONS...................... 22

CONCLUSION .......................................................................................................... 22

**Table of Authorities**

**Cases**

*Allison v. Eriksson* .......... 17, 21

*Assoc. Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519 (1983) .......... 11

*Auriga Capital Corp. v. Gatz Properties, LLC*, 40 A.3d 839 (Del. Ch. 2012), *aff'd in part*, *Gatz Properties, LLC v. Auriga Capital Corp.*, 59 A.3d 1206 (Del. 2012) .......... 16, 17, 21

*Bay Center Apartments Owner, LLC v. Emery Bay PKI, LLC* .......... 18, 21

*Continental Illinois National Bank & Trust Co. of Chicago v. Stanley*, 585 F. Supp. 1385 (N.D. Ill. 1984) .......... 8

*Costner v. Blount National Bank*, 578 F.2d 1192 (6th Cir. 1978) .......... 8

*Davis v. First National Bank of Westville*, 868 F.2d 206 (7th Cir. 1989) .......... 8, 9

*In re Dole Food Co. Inc., S'holder Litig.*, 2015 WL 5052214 (Del. Ch. Aug. 27, 2015) .......... 14

*In re Match Group, Inc. Derivative Litigation* .......... 18

*In re Pattern Energy Group Inc. Stockholders Litigation* .......... 18

*Johnstone v. First Bank System, Inc.*, 947 F. Supp. 1220 (N.D. Ill. 1996) .......... 8, 9

*Kahn v. M & F Worldwide*, 88 A.3d 635 (Del. 2014) .......... 18

*Kuramo Capital Management, LLC v. Surama*, 2024 Del. Ch. LEXIS 177 .......... 14

*Largo Legacy Group, LLC v. Charles*, 2021 WL 2692426 (Del. Ch. June 30, 2021) .......... 17, 18

*Schnell v. Chris-Craft Industries, Inc.* .......... 17

*Swerdloff v. Miami National Bank*, 584 F.2d 54 (5th Cir. 1978) .......... 6, 7, 8, 9, 11

*Thorpe v. CERBCO*, 676 A.2d 436 (Del. 1996) .......... 14

**Statutes**

12 U.S.C. § 1972 .......... 5, 8, 11

12 U.S.C. § 1975 .......... 5, 6, 8, 10, 11

14 L.P.R.A. § 3502 .......... 13, 14, 21

Del. Code Ann. tit. 6, § 18-1001 .......... 15

Puerto Rico General Corporations Act of 2009 (Act No. 164-2009) .......... 20

Puerto Rico Limited Liability Company Act (Act No. 154 of Aug. 6, 1996) .......... 12, 15

**Regulations/Rules**

Federal Rules of Appellate Procedure Rule 28(a)(3) .......... 1

**Administrative Materials**

Federal Reserve Board's 2003 interpretation of § 106 .......... 6

Federal Reserve Board Guidance .......... 6

Federal Reserve's document on Internal Controls and Recommended Best Practices .......... 7

**Treatises/Books**

*The Bluebook* (20th ed. 2015) .......... 1

**Articles/Periodicals**

Timothy D. Naegele, *[Anti-Tying Analysis]* .......... 5, 7, 11

**Legislative Materials**

Senate Banking Committee Report .......... 6

**Miscellaneous**

Bank Holding Company Act Amendments of 1970 .......... 5

Operating Agreement (Amended and Restated Operating Agreement dated Sept. 14, 2020) .......... *passim*

**TO THE HONORABLE COURT:**

Gregory Boyd and Jonathan Lassers, through the undersigned counsel, respectfully state and pray:

**INTRODUCTION**

The Bank Holding Company Act (BHCA) anti-tying provision, codified at 12 U.S.C. § 1972, prohibits banks from engaging in certain anticompetitive tying arrangements, such as conditioning the extension of credit on the customer's purchase of additional products or services from the bank or its affiliates. Enacted in 1970 as part of the Bank Holding Company Act Amendments, this statute was designed to curb banks' use of economic leverage in credit transactions to coerce customers into unfair practices, thereby protecting consumers of financial services from predatory behavior. As Timothy D. Naegele, the provision's author, explains in his comprehensive analysis, the anti-tying provision establishes per se illegality for such arrangements. It provides a private right of action under 12 U.S.C. § 1975 for "any person who is injured in his business or property because of anything forbidden in section 1972," allowing for treble damages, costs, and attorneys' fees. [Emphasis added.] This broad remedial framework reflects Congress's intent to enable those directly harmed—beyond just the nominal borrower—to seek redress, ensuring robust enforcement against bank misconduct. Plaintiffs, who allege financial harm from Banco Popular de Puerto Rico's tying violations, have standing to sue under established legal precedent and regulatory guidance that broadly interprets "customer" status under the BHCA.

In a hearing held in chambers on Thursday, August 14, 2025, Hon. Judge Pedro Delgado issued an order to show cause on why Plaintiffs have standing to litigate the matter of the private right of action under 12 U.S.C. § 1975 in front of this Court. Through this Motion in Compliance, Plaintiffs incorporate by reference the arguments they have already set forth regarding standing in their Opposition to Banco Popular's Motion to Dismiss and their Sur Reply to the bank's Reply.

After this review of the law as to standing in BHCA cases, Plaintiffs also renew their argument that the Members' Resolution affords the undersigned counsel to represent GFC Holdings, LLC and Biomass Green Fuels, LLC because the Board of Managers has forfeited that role through their breach of their fiduciary duties; their bad faith; conflicts of interest; negligence and self-dealing.

## I. FIRST SECTION: BHCA'S EXPANSIVE DEFINITION OF "CUSTOMER" ENCOMPASSES UNIT HOLDERS AND GUARANTORS

### A. The Statutory Framework

The term "customer" in § 1972 is deliberately undefined in the statute, requiring courts to interpret its scope based on the provision's remedial purpose and legislative history. The Senate Banking Committee Report emphasized that the anti-tying provision was intended to prevent banks from using their "economic power" to impose "anticompetitive practices which require bank customers to accept or provide some other service or product or refrain from dealing with other parties." This broad language signals Congressional intent to protect all parties economically affected by tying arrangements, not merely the nominal borrower. The Fifth Circuit in *Swerdloff v. Miami National Bank,* in finding standing for shareholders, held that courts should consider "the economic realities of ownership and control to determine who is a customer within the meaning of the Act." This economic substantive approach looks beyond formal corporate structures to identify parties with genuine economic stakes in the lending relationship.

### B. Federal Reserve Board Guidance Supports Broad Customer Definition

Regulatory guidance from the Federal Reserve Board confirms this expansive interpretation, aligning with the statute's purpose to prevent coercive tying without requiring proof of market power or explicit coercion. The Board's 2003 interpretation of § 106 highlights that anti-tying restrictions apply to arrangements where banks condition credit on additional requirements, and that "customers" include those affected by such conditions in lending contexts. The Federal Reserve's supervisory guidance encourages affected parties to contact federal banking agencies for enforcement,

specifically noting that injured persons—including those providing guarantees—may seek injunctions or damages. This reflects a regulatory policy focused on protecting the economic realities of transactions rather than rigid adherence to corporate forms.

The Federal Reserve's document on Internal Controls and Recommended Best Practices further emphasizes the need for banks to implement robust internal controls, policies, procedures, training, and audit processes to ensure compliance with Section 106, underscoring the broad protective intent of the provision. This guidance explicitly contemplates application to guarantors, as it permits banks under reciprocity exceptions to require owners or affiliates to provide personal guarantees in credit extensions, reinforcing that guarantors are integral to the customer relationship and subject to protection from tying abuses.

### C. Legal Commentary Reinforces Broad Standing Principles

Legal commentary further reinforces this expansive approach. Naegele's seminal article elucidates this regulatory intent, setting out that the provision was crafted to extend protections to individuals like guarantors and shareholders who bear the financial brunt of tying, preventing banks from exploiting entity structures to evade liability. For LLC unit holders, whose economic interests mirror shareholders' stakes, this reasoning applies directly: LLC members have immediate economic ties to the entity's dealings, especially when harmed by tying that diminishes unit value and/or impose personal obligations.

## II. ESTABLISHED CASE LAW CONSISTENTLY RECOGNIZES STANDING FOR SHAREHOLDERS, GUARANTORS, AND ANALOGOUS UNIT HOLDERS

Federal courts have consistently recognized standing for individuals in positions analogous to the GFC unit holders. No post-1996 cases contradict these decisions, leaving the decisions below as authoritative guidance.

*Swerdloff v. Miami National Bank*, 584 F.2d 54 (5th Cir. 1978) remains the seminal case

establishing that individual shareholders and guarantors possess customer status under § 1975. The plaintiffs, who were 100% shareholders and personal guarantors of a corporate loan, alleged the bank conditioned loan continuation on transferring 51% of their stock to another bank customer. As background, the Court stated:

> The economic realities of ownership and control must be considered in determining who is a "customer" within the meaning of this section if the purpose of the Act is to be accomplished. A great deal of important business is done through closely held corporations. To decide in favor of the bank here would mean that banks throughout the country could require all manner of anticompetitive practices of the stockholders of such corporations with impunity. The law cannot be unmindful of the fact that substantial credit to such corporations is generally extended because of the credit rating of the stockholder guarantors, regardless of the credit-worthiness of the corporation itself. This credit practice recognizes that the financial fortunes of closely held corporations can turn directly upon the maneuverings of the stockholders.

*Id.* at 58. The Court noted that decisions regarding the antitrust laws broadly interpreted the term "customer." *Id.* at 58-59. Critically, the Fifth Circuit held that "any injury to the Swerdloffs, the bank's customers, could be redressed under Sec. 1975, whether or not there had been damage to the corporation." *Id.* at 60. This language supports standing for unit holders who suffer economic harm independent of any injury to the LLC itself. The court emphasized that "where there has been a direct relationship between the bank and purported customer, as well as privity of contract with the bank, it is reasonable to conclude that a customer relationship exists." Here, Banco Popular vehemently asserts and accepts that Mr. Boyd is a guarantor of the loan. His customer relationship is referenced throughout their loan documentation as a guarantor, sponsor and certified the loan as the manager of Biomass along with Olmar Lopez Gomez and Olmar Lopez Vidal. *See* Exhibits 1-2 and Exhibit 4 in Docket 47-3 Second Amended Anti-Tying (BPPR Credit Agreement). *Davis v. First National Bank of Westville*, 868 F.2d 206 (7th Cir. 1989) involved individual borrowers who sued over a loan tied

to forced business liquidation. While the case was dismissed on the merits, the court positively referenced *Swerdloff* in recognizing stockholders' customer status for standing purposes, with standing remaining uncontested throughout the proceedings.

In *Continental Illinois National Bank & Trust Co. of Chicago v. Stanley*, 585 F. Supp. 1385 (N.D. Ill. 1984), which involved shareholder-guarantors who counterclaimed under §1972, the court held that "Stanley as a stockholder and guarantor has standing to pursue his counterclaim under the BHCA." *Johnstone v. First Bank System, Inc.*, 947 F. Supp. 1220 (N.D. Ill. 1996) involved trust beneficiaries (analogous to unit holders) bringing claims over loans tied to note purchases. The court affirmed that the standing was affirmed based on ownership, control, and economic involvement in the relevant transactions, citing *Swerdloff*. This precedent is especially apt for LLC unit holders, as trusts and LLCs share similar economic structures where beneficial ownership creates direct economic interests in the underlying transactions.

In *Costner v. Blount National Bank*, 578 F.2d 1192 (6th Cir. 1978), Costner, a 50% shareholder who obtained a personal loan to acquire additional stock in a corporation successfully sued under § 1972 for a tying arrangement that conditioned the loan on the corporation's agreement to sell installment paper to the bank and employ a bank-designated individual. The Sixth Circuit affirmed the bank's liability and the shareholder's recovery of damages, holding that the plaintiff could recover for direct injury as a shareholder (e.g., forced sale of stock at reduced value due to the tying), distinct from any corporate injury. This case reinforces standing for shareholders suffering direct economic harm from tying arrangements, even where the tie impacts the corporation, and aligns with the economic realities approach in *Swerdloff*.

### III. APPLICATION TO GFC HOLDINGS, LLC UNIT HOLDERS

#### A. Non-Guarantor Plaintiff

Jonathan Lassers possesses standing based on his unit ownership's economic equivalence to

shareholding, as recognized in *Johnstone*'s trust analogy and reinforced by regulatory emphasis on transactional economic realities. His financial harm—including diminished unit value resulting from the tying arrangement—constitutes concrete injury under § 1975. Under *Swerdloff* and *Davis*, mere ownership suffices to establish customer status when the owner is directly affected by the tying violation. The fact that he is not a guarantor does not defeat standing, as multiple courts have recognized that ownership interests alone can create the requisite direct relationship with the bank's credit decisions. The *Johnstone* court's recognition that trusts beneficiaries have standing provides direct support, as LLC unit holders occupy an analogous position to trust beneficiaries—both represent beneficial ownership interests in entities that contract with banks.

### B. Guarantor Unit Holder

Gregory Boyd (17.66%) possesses even stronger standing as a personal guarantor. Federal Reserve guidance specifically treats guarantors as integral participants in credit extensions, often requiring their direct involvement in credit arrangements. Multiple precedents, including Swerdloff, Continental Illinois, and Stanley, recognize guarantors as customers under the BHCA. As guarantor, Boyd assumes personal liability and suffers direct harm from coercive tying arrangements that may impair the LLC's ability to service debt or that force them to provide additional guarantees or services. His substantial ownership stakes (17.66%) further amplifies his economic exposure and strengthens his customer status, as they bear disproportionate risk from any tying-related harm to the LLC's financial position. Mr. Boyd is also on the Board of Managers of Biomass Green Fuels.

### C. Direct Economic Harm Establishes Concrete Injury

All unit holders can demonstrate the concrete economic injury required for § 1975 standing: Diminished Unit Values: Tying arrangements that impair the LLC's business operations or impose additional costs directly reduce the value of membership interests. For Boyd as a guarantor, the tying arrangement increases his personal financial risk and may trigger additional guarantee obligations.

Moreover, the offtake agreement reduced LLC's income and value, harming all unit holders' economic returns.

## IV. CONGRESSIONAL INTENT

Denying standing to unit holders would substantially undermine the BHCA's enforcement mechanism and the objective of having an alternative prosecution tool to Department of Justice intervention. Just as with Section 4 of the Anti-Trust Act, *Assoc. Gen Contractors of Cal., Inc. v. Carpenters,* 459 U.S. 519, 546 (1983), the BHCA seeks broad remedial goals, and this Court should facilitate the implementation of those goals. Limiting standing to nominal borrowers such as GFC Holdings, which is essentially defunct, would allow banks to evade liability by structuring transactions through entities while imposing tying requirements on the beneficial owners who bear the economic risk.

## V. CONCLUSION ON STANDING

The GFC Holdings, LLC unit holders possess standing to sue Banco Popular de Puerto Rico under § 1972 based on: (1) their status as "customers" under the expansive interpretation established by *Swerdloff* and its progeny; (2) Federal Reserve guidance recognizing broad customer definitions; (3) Timothy D. Naegele's authoritative analysis of the provision's scope; and (4) the economic realities test that focuses on substance over form. For non-guarantor unit holder Lassers, standing derives from their direct economic stake in the LLC, analogous to the trust beneficiaries in *Johnstone*. For guarantor unit holder Boyd, standing is firmly established under various cases recognizing guarantors as customers with direct economic exposure to tying arrangements. Denying standing would contravene the BHCA's remedial purpose and Congressional intent to provide broad private enforcement against bank tying practices. The unit holders' economic injuries from Banco Popular's alleged tying violations satisfy both the statutory requirements of § 1975 and the standing principles established in federal case law.

## SECOND SECTION: THE MAJORITY MEMBERS' AUTHORITY FOR LITIGATION, REPRESENTATION, MANAGER REMOVAL, WHEN FACED WITH MISMANAGEMENT AND A CONFLICTED BOARD

The majority members of GFC Holdings Limited Liability Company ("GFC" or the "Company") possess clear authority under Puerto Rico law, the Amended and Restated Operating Agreement dated September 14, 2020 (the "Operating Agreement" or "OA"), and analogous Delaware principles to authorize the Company's participation in litigation, direct changes in legal representation, remove conflicted managers, and take related actions to remedy harms. This authority is particularly compelling when the Board of Managers (the "Board") engages in willful misconduct and conflicts of interest, as the Board of Managers did by entering into the Asset Acquisition Agreement: Breach of the Duty of Loyalty.

The majority's authority stems from their voting power—55.468% of total voting Units on an as-converted basis, as detailed in Exhibit 3: A of the Written Consent by the Majority of the Members dated June 13, 2025 (the "June 2025 Member Consent"). This includes 13,365,000 Class A Common Units held by Olmar López Vidal (7,762,500 Units, 32.231%), Gregory Boyd (4,252,500 Units, 17.657%), Jonathan Lassers (675,000 Units, 2.803%), and John Lee Dumas (675,000 Units, 2.803%).

## VI. PUERTO RICO LAW AND THE OPERATING AGREEMENT SUPPORT AFFORDING STANDING TO THE MEMBERS

### A. Statutory Framework and Member Rights

In a manager-managed LLC like GFC, governed by the Puerto Rico Limited Liability Company Act (Act No. 154 of August 6, 1996, as amended, the "PR LLC Act"), the Board holds primary management authority under OA Section 6.1: "the full, absolute and exclusive right, power and authority to manage the Company is vested in ... the Board of Managers." The members, however, retain significant reserved powers.

The OA grants members voting rights proportional to their units:

- OA Section 3.2: Members listed on Annex I

- Section 4.3: "Approvals by the Members" requiring majority vote for certain

actions, and unanimous consent for fundamental changes like dissolution or liquidation under

OA Section 9.1 and PR LLC Act defaults.

**B. Actions Taken by the Board of Managers for their Personal Benefit that Harm the Company Are Not Permitted Under Puerto Rico Corporate Law**

14 L.P.R.A. §3502 allows the Board of Managers to limit its liability in certain circumstances, but

it contains strict constraints. In pertinent part, the law states:

> (1)   A provision to eliminate or limit the personal liability of the directors or stockholders of a corporation in cases of monetary claims for damages resulting from the breach of the fiduciary duties as a director [is permitted], provided that such provision does not eliminate or limit the liability of the director for:
> (A) Any breach of the duty of loyalty of the director to the corporation or its stockholders;
>
> (B)   for acts or omissions not in good faith, or which involve intentional misconduct or knowing violations of law;
> (C) under§ 3602 of this title [which prohibits illegal dividends], or
>
> (D) for any transaction whereby the director derives an improper personal benefit.

GFC Holding's Operating Agreement does not eliminate or limit the personal liability of the

people on the Board of Members in any way. Moreover, each manager of the Board of Managers,

with the exception of Olmar Lopez Vidal, committed one or more of the actions that Section provides

cannot be eliminated or limited. They each breached their duty of loyalty to the Company by voting

to sell all of its assets for a fraction of their worth for their personal benefit. The sale of all of the

company's assets is defined in the Operational Agreement as a liquidation of the company, which

requires unanimous consent, which they did not have. They did this despite a competing offer that

would have paid off 75% of the bank loan and kept Biomass Green Fuels operational. Thus, the vote

to sell of all the company's assets to Humacao RNG was not taken in good faith. Each member of

the Board of Managers who voted for the sale of all of the company's assets to Humacao RNG

received a personal benefit, while shuttering the company.

Finally, a key element of the Asset Acquisition Agreement was absolution for Banco Popular. This lawsuit had already been filed by the time the Board of Managers executed the Agreement, and the bank was clear that it needed to be dismissed. Thus, the bank hoped that the Asset Acquisition Agreement was the final piece of the puzzle for Banco Popular: impunity.

But Puerto Rico Corporate Law, which looks to Delaware law for guidance, does not permit a Board of Managers to reject all scrutiny, much less all liability. This particular Board of Managers making the particular decision not to sue Banco Popular for the very substantial damage that Banco Popular has caused to the Companies is a bridge too far. "In the case of LLCs, members and managers are subject to the same fiduciary duties as the directors, officers and shareholders of a Puerto Rico corporation."[2] Additionally, "Under Puerto Rico law, the Corporations Act ... [is similar to] Delaware,"[3] with no PR-specific cases deviating from Delaware models. "Once a fiduciary breach has been established, this court's powers are complete to fashion any form of equitable and monetary relief as may be appropriate." *Kuramo Capital Management, LLC v. Surama,* 2024 Del Chan. Lexis 177 *citing In re Dole Food Co. Inc., S'holder Litig.,* 2015 WL 5052214 at *44 (Del Ch. August 27, 2015). In *Kuramo,* "the plain language of the agreement favored Surama," but there was an argument that "the equities favor[ed] Kuramo." Because that was true, the Delaware Chancery Court afforded Kuramo an opportunity to argue why since "the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly", *citing Thorpe v. CERBCO,* 676 A.2d 436, 445 (Del. 1996), and Kuromo should be afforded relief that directly contradicted the Operating Agreement.

The current appointed counsel for the Companies had no opposition to a Summary Judgement motion at Tribunal de Primera Instancia in San Juan Superior Court, nor had any objection or any plead to lift a default judgment nor did they appeal as did the appearing Owners here, as the appearing owners did at TA2025CE00316, in a *Certorari* defending the Companies there and here, be it because

of their folly, negligence or ill will, the Board of Manager then breached their fiduciary duty to benefit the Companies and in detriment of them and of Plaintiffs by selling their assets for a fraction of their value for the managers' benefit and not that of the Companies. The coup de grâce was the agreement not to sue Banco Popular, knowing that the Companies possessed a strong case against the bank. Why else would the bank have demanded exoneration for its misdeeds as a condition of transferring the loan to an ineligible recipient? Is this not ineffective assistance of counsel, or grounds for a derivative cause to intervene by the owners?

This authority is amplified in conflicts, where majority members can amend the Operating Agreement, remove Managers (OA Section 6.7: "Removal of a Manager(s)" by affirmative vote), or vote to authorize litigation as an "approval" under OA Section 4.3. Derivative suits are permitted under PR LLC Act equity, modeled on Delaware law. *See* Del. Code Ann. tit. 6, § 18-1001 (permitting derivative actions).

It is important to point out that the PR LLC Act defaults to equity, empowering majority intervention.

## VII. BOARD BREACHES OF FIDUCIARY DUTIES JUSTIFY MAJORITY INTERVENTION

### A. Self-Dealing Transactions

The Board's breaches eviscerate its authority, shifting control to majority members. Managers Ernesto Villarini and Alexander Borschow signed the Board Consent, with Borschow also signing the Asset Acquisition Agreement dated January 31, 2025 (the "APA"). These managers represent Series A Preferred Unit holders who received direct benefits not shared pro rata:

- Community Development Venture Capital Alliance ("CDVCA"): $208,576

- Puerto Rico Fund for Growth ("PRFG"): $528,526

- Semillero Investment Fund I, LLC ("Semillero"): $1,239,723 plus $163,348.36 and $65,000 in AP settlements

These payments, detailed in APA Schedule 2.9 and Schedule H, deviate from the OA's waterfall provisions. The Operating Agreement's Section 9.4 Distribution of Assets Upon Dissolution provides that first all creditors are to be paid 100% in the order of priorities established by law. The Asset Acquisition Agreement, which the Board of Managers approved, violates Section 9.4 by providing that, except for the company owned by Olmar Lopez Gomez, whose vote Humacao RNG bought with the 100% payment of International Technical Services so-called debt, all creditors would receive only 50% of the amounts due, not the 100% the OA required. VRM Penzini and Semillero simultaneously exonerated Mr. Lopez Gomez from the $40 million lawsuit they had filed against Mr. Lopez Gomez, further demonstrating that their interests were aligned with whatever would extricate them from the Companies and placate Banco Popular.

This self-dealing constitutes at the very least "gross negligence" and more appropriately "willful misconduct" (OA Section 6.5) and "improper personal benefit, "PR GCA § 3502(a)(13)(D), breaching loyalty to the Companies and substituting self-interest. _Auriga Capital Corp. v. Gatz Properties, LLC_, 40 A.3d 839 (Del. Ch. 2012), _aff'd in part_, _Gatz Properties, LLC v. Auriga Capital Corp._, 59 A.3d 1206 (Del. 2012) counsels this Court to validate the members' effort to hold Banco Popular accountable, rather than the Board of Managers who have capitulated to the bank thanks to a deal that compensates them and not the Companies, rather than pursuing the best interests of the Companies.

Cases faced with situations analogous to circumstances herein all have ruled that a company's owners have the authority to overrule decisions made by boards that have breached their fiduciary duties. In _Auriga Capital Corp. v. Gatz Properties, LLC_,[7] a manager's sham auction, rejection of a $6 million offer, and undervalued buyout ($50,000 cash + $5.4 million debt for $8.9–$15 million

assets) breached loyalty. The Delaware Chancery Court found "default fiduciary duties apply to those managers... under traditional equitable principles"[8] and condemned the "bad faith course of conduct to enrich himself."[9]

This parallels the rejection of Mr. Evan Williams' offer and the board insider VRM Penzini through Humacao RNG paying $4.4 million cash for assets valued at over $300 million. In *Auriga*, the court awarded $776,515 in damages plus interest and half of the attorneys' fees for bad faith conduct, including misleading minorities.[10] The Delaware Supreme Court affirmed contractual entire fairness as "the contractual equivalent of the entire fairness equitable standard,"[11] noting that "bad faith bars exculpation."[12]

Here, the owners of GFC Holdings ask this Court to find that they have the authority to hold Banco Popular responsible for violating the Bank Holdings Company because the Board of Managers has entered into an unseemly bargain with Banco Popular to forgo suing the bank as part of their exit from GFC Holdings. Just as in *Gatz Properties,* the buyout was undervalued, although in this case the proportions are disproportionate by a power of ten.

This empowers GFC's majority to authorize litigation, as minorities did in *Auriga*.

### B. Allison v. Eriksson

Similarly, *Allison v. Eriksson*[13] involved secretive dilution breaching enhanced duties requiring good faith, justifying OA amendments to restore fiduciary duties, anti-dilution protections, and record access. The court held that "§ 60(b) provides the exclusive remedy for dissenting members only when a merger complies with statutory requirements and does not involve breaches of fiduciary or contractual duties."[14] The court recognized "broad equitable authority to remedy the harm, including amending the operating agreement to restore fiduciary duties, protect minority interests, and prevent further dilution."[15]

Here, Plaintiffs never even saw the Asset Acquisition Agreement before it was executed,

probably because the signatories feared that Plaintiffs herein would seek an injunction against its execution because they were well are aware that they were violating the Operating Agreement as well as the corporate law of Puerto Rico. Plaintiffs were only able to secure a copy of the Asset Acquisition Agreement through the settlement of its claims with, yes, the family members who perpetrated the fraud with Semillero and CDCVA and the Puerto Rico Fund for Growth and Banco Popular. Here, this Court should exercise its broad equitable authority to permit the Members to continue their litigation against Banco Popular to remedy the harm done to the Companies. Doing so will both "restore fiduciary duties" and fulfill the purpose of holding banks accountable for the harm they do when they undermine competitive markets by tying favorable contracts to issuing credit.

## VIII. THE MAJORITY OF MEMBERS' WILL SHOULD PREVAIL WHEN THE BOARD OF MANAGERS IS CONFLICTED

In *Largo Legacy Group, LLC v. Charles*, 2021 WL 2692426 (Del. Ch. June 30, 2021) [17], the Chancery Court held that a manager's fiduciary duties of loyalty and care persist unless unambiguously disclaimed. "The duty of loyalty mandates that the best interests of the company and its stakeholders take precedence over any interest possessed by the manager and not shared by the stakeholders generally." *Id.* Here, the OA never revoked the Board's fiduciary duties. The court found that the majority of owners could authorize litigation to enforce duties, stating: "Although 85 percent of the members authorized the transaction, 'inequitable action does not become permissible simply because it is legally possible,'" the very same language the Court in *Gatz Properties* used, *quoting Schnell v. Chris-Craft Industries, Inc.*[18] This supports the majority of GFC's owners authorizing suit against Banco Popular, as rejection of a statutory right cannot be implemented by managers who are placing their interests over those of the Companies and the stakeholders generally *Largo Legacy Grp., LLC v. Charles*, 2021 WL 2692426 (Del. Ch. June 30, 2021) Similarly in *Bay Center Apartments Owner, LLC v. Emery Bay PKI, LLC*,[19] the court recognized fiduciary duties of LLC managers and members, denying dismissal of breach claims for self-dealing such as withholding

distributions. It affirmed majority members' rights to litigate derivatively when managers breach loyalty, holding: "The Chancery Court denied the defendants' motion to dismiss because Bay Center sufficiently stated claims for breaches of the duties of good faith and fair dealing."[20] Here, the Board of Managers did not withhold distributions, it just kept all the money from the Companies' assets for itself and the one member who would vote with them, thanks to the buyer recognizing a fraudulent debt. This self dealing parallels that in *Bay Center,* and this Court should reach the same result: allow the majority of the Companies' owners to pursue this litigation.

In *Kahn v. M &F Worldwide,* 88 A.3d 635 (Del. Supreme Court 2014), the Delaware Supreme Court set the standard for reviewing corporate transactions involving self dealing. "Where a transaction involving self dealing where a controlling stockholder is challenged, the applicable standard of judicial review is 'entire fairness' with the defendants having the burden of persuasion." This has become known as the MFW rule. *In re Match Group, Inc. Derivative Litigation,*[21] involving a transaction analogous to LLC manager conflicts, the Delaware Supreme Court reaffirmed entire fairness for conflicted deals, requiring independent processes. Failure shifts the burden, allowing stockholder (member-equivalent) challenges. The court held: "MFW is the only way to reduce entire fairness review to business judgment in conflicted controller transactions," emphasizing independence, not just majority approval. For LLCs, this means majority members who are not the Board of Manages can authorize derivative litigation to invoke the companies' rights.

\In *In re Pattern Energy Group Inc. Stockholders Litigation,*[25] the court upheld a covenant not to sue for fiduciary breaches in a drag-along sale, but only if not involving willful misconduct. The court held: "The commentary confirms that the Covenant is intended to do what it says and bar breach of fiduciary duty claims based on the Drag-Along Sale," but public policy bars waivers for intentional harms. This allows GFC majority to litigate despite approvals, as the release of Banco Popular from responsibility for breaching the BHCA was an intentional harm to the Companies.

### IX. THE APA'S INVALIDITY AS A DEEMED LIQUIDATION EVENT WITHOUT UNANIMOUS APPROVAL

#### A. The Transaction's Nature and Requirements

The APA's execution without unanimous member approval for a Deemed Liquidation Event represents additional willful misconduct by the Board, invalidating the transaction and providing majority members with grounds to authorize litigation to enjoin it or seek remedies. The APA, executed by GFC, Biomass Green Fuels LLC ("Biomass"), and Humacao RNG, L.L.C. ("Buyer"), purports to effect the sale of substantially all of Biomass's assets for approximately $30,500,000, as contemplated in a prior Letter of Intent dated September 10, 2024. Since Biomass is GFC's wholly owned subsidiary and represents the entirety of GFC's operational "Business," this constitutes a "Deemed Liquidation Event" under the OA.\

The OA defines a "Deemed Liquidation Event" as:

a merger or consolidation (other than one in which equity holders of the Company own a majority by voting power of the outstanding shares or membership interest of the surviving or acquiring entity) and a sale, lease, transfer, exclusive license or other disposition of all or substantially all of the assets of the Company.
This definition appears on page 7 of the OA and aligns with standard venture-style provisions encompassing asset sales of subsidiaries where the subsidiary holds core business assets.

The APA provides for the purchase of "substantially all of the assets of Biomass" (APA Recital D and Section 2.1), including all personal property, contracts, permits, intellectual property, and other project-related assets (APA Section 2.1(b)). Since Biomass represents GFC's entire operational "Business" as defined in OA Section 3.1: "Purposes and Scope. The purposes of the Company are to engage in the Business [defined as the design, development, construction and operation of recycled biomass & renewable natural gas and carbon dioxide projects]," the sale disposes of substantially all of GFC's assets. This was confirmed by Borschow's communication to the members of GFC, dated March 31st, 2025. (Exhibit 3)

The OA in Section 9.1 provides the requirement for a unanimous vote for "liquidation and

dissolution" or any other event that, under the Act, would cause the Company's dissolution."

**Section 9.1 Dissolution**. The Company will be dissolved upon the earliest to occur of the following events (each such event is referred to as a "**Dissolution Event**"): the Members unanimously vote in favor of the liquidation and dissolution of the Company; or any other event that, under the Act, would cause the Company's dissolution.

Were the OA to be silent, the default rule under the Puerto Rico General Corporations Act of 2009 (Act No. 164-2009, as amended) would apply. The Act mandates unanimous consent for dissolution unless the operating agreement provides otherwise (Act Section 11.1: The LLC shall dissolve upon ... (c) the written consent of all members). The Members have not unanimously voted in favor of liquidation and dissolution. The Deemed Liquidation Event is an efffective dissolution because it winds up the Company's Business, triggers liquidation distributions (OA Section 4.2(e)), and leaves GFC as a shell entity without assets or operations (OA Sections 9.3-9.4).

The Board Consent relied on prior member approval where "Members holding 71% of the membership interest of the Company, including the holders of 86.67% of the Series A Preferred Units" approved the Transaction. This falls short of unanimous consent:

- Only 71% of total membership interests approved, not 100%
- The vote was for the LOI, not the APA contract which had different terms
- No evidence shows separate unanimous member approval for the APA

The APA is thus ultra vires and invalid, violating the OA and the Act. This breach constitutes willful misconduct, empowering the majority to authorize litigation to challenge the invalid APA, similar to cases where courts invalidate transactions lacking required consents.[26]

## X. AUTHORITY TO DIRECT SPECIFIC COMPANY ACTIONS

The majority members' override powers extend to specific protective actions. These breaches constitute willful misconduct and loyalty violations, justifying equitable remedies including directing litigation strategy, changing conflicted counsel, engaging independent representation, and removing managers.[27]

The majority members' authority is rooted in OA voting provisions (Sections 3.2, 4.3, 6.7, 9.1) and PR LLC Act, as interpreted by analogy by the Delaware Courts and the *ultra vires* nature of the APA that render the Board's actions null and void under PR GCA § 3502(a)(13)(A)-(B) (no exculpation for loyalty breaches or bad faith). This enables authorization of litigation participation— derivative suits following the *Auriga* model, injunctions against the APA, or disgorgement claims— without Board consent. Remedies include damages (*Auriga*: return of capital + 10% return), fee-shifting for bad faith, or OA amendments (*Allison*: preventing dilution; *Bay Center*: enforcing duties via suits).

This authority prevents Company harm, allowing the majority of members (55.468%) to authorize litigation participation, halt closing, pursue independent review, direct representation changes, and remove conflicted individuals to safeguard GFC and Biomass.

## CONCLUSION

The majority members possess authority under Puerto Rico law, the Operating Agreement, and Delaware precedent to take the protective actions outlined above. The Board's conflicts of interest, self-dealing conduct, negligence in dealing with legal and corporate matters, ineffective assistance of counsel and *ultra vires* approval of the APA without unanimous consent justify immediate majority intervention to protect the Company's interests and remedy ongoing harms. This together with the fact that the Plaintiffs have standing to take this action under BHCA's Anti Tying section make an imperative too find for Plaintiffs, which otherwise would mean a miscarriage of

justice under our Constitutional structures.

Whereby, very Respectfully, Plaintiffs ask for this Honorable Court to find that Plaintiffs have standing and that they represent derivatively, the GFC and Biomass Green Fuels in this action, with any other remedies in Law that the Court deems fit.

**[1]RESPECTFULLY SUBMITTED**, in San Juan, Puerto Rico, this 22nd day of August 2025.

---

[1][7] Auriga Capital Corp. v. Gatz Properties, LLC 40 A.3d 839 (Del. Ch. 2012), aff'd in part, rev'd in part sub nom. Gatz Properties, LLC v. Auriga Capital Corp., 59 A.3d 1206 (Del. 2012).

[8] Auriga, 40 A.3d at 849.

[9] Id. at 876.

[10] Id. at 880.

[11] Gatz Properties, 59 A.3d at 1213.

[12] Id. at 1222.

[13] Allison v. Eriksson, 98 N.E.3d 143 (Mass. 2018).

[14] Id. at 152.

[15] Id. at 155.

[16] Ferraiuoli Corporate Governance 2021 and Chambers 2025.

[17].Largo Legacy Group, LLC v. Charles, 2021 WL 2692426, at *13 (Del. Ch. June 30, 2021)

[18] Schnell v. Chris-Craft Indus., Inc., 285 A.2d 437 (Del. 1971).

[19] Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC, 2009 WL 1124451 (Del. Ch. Apr. 20, 2009).

[20] Corporate Securities Law Blog, Apr. 28, 2009.

[21] In re Match Grp., Inc. Derivative Litig., 315 A.3d 169 (Del. 2024).

[22] Skadden Insights, June 13, 2024.

[23] Skye Mineral Invs., LLC v. DXS Capital (U.S.) Ltd., 2020 WL 881544 (Del. Ch. Feb. 24, 2020).

[24] Morris James alert, Nov. 14, 2019.

[25] In re Pattern Energy Grp. Inc. Stockholders Litig., 2021 WL 1812674 (Del. Ch. May 6, 2021).

[26] In re Domain Assocs., LLC, 2018 WL 1587555 (Del. Ch. Mar. 30, 2018); Largo Legacy Grp., LLC v. Charles, 2021 WL 2692426 (Del. Ch. June 30, 2021).

---

[1] Puerto Rico General Corporations Act of 2009, Act No. 164-2009, § 3502(a)(13).

[2] Chambers Global Practice Guides 2025.

[3] Ferraiuoli LLC, Corporate Governance 2021.

[4] Obeid v. Hogan, 2016 WL 3356851 (Del. Ch. June 10, 2016).

[5] Fin. Oversight & Mgmt. Bd. for P.R. v. Centro de Periodismo Investigativo, Inc., 598 U.S. 339 (2023).

[6] 2013 Delaware LLC Act § 18-1104 amendment incorporating "rules of law and equity relating to fiduciary duties"; HB 126 Synopsis: "the agreement may not eliminate the core elements of the fiduciary duty of loyalty, which include duties of good faith and fair dealing"; Delaware Code Title 6, Chapter 18.

[27] Del. Code Ann. tit. 6, § 18-402 (permitting removal per agreement terms, with equity intervening

/s/ Jane A. Becker Whitaker
JANE A. BECKER WHITAKER
USDC No. 205110
P.O. Box 9023914
Urb. Baldrich, San Juan, PR 00902-3914
Tel: (787) 585-3824
Email: janebeckerwhitaker@gmail.com

/s/ Jean Paul Vissepó Garriga
JEAN PAUL VISSEPÓ GARRIGA
USDC No. 221504
P.O. Box 367116
Urb. Baldrich, San Juan, PR 00936-7116
Tel: (787) 633-9601
Email: jp@vissepolaw.com

/s/ Luis E. Miñana
LUIS E. MIÑANA, ESQ.
USDC-PR No. 225608
ESPADA, MIÑANA, & PEDROSA LAW OFFICES, PSC
123 Calle Manuel Domenech Altos
Urb. Baldrich, San Juan, PR 00918
Email: minanalaw@yahoo.com
Tel: (787) 758-1999


**CERTIFICATE OF SERVICE**

I hereby certify that on this date, we have presented the foregoing to the Clerk of the Court

for filing and uploading to the CM/ECF system, which will notify all counsel of record.

/s/ Jane A. Becker Whitaker

JANE A. BECKER WHITAKER

---

in conflicts).