# Exhibit 2

# BIOMASS GREEN FUELS LLC

## CERTIFICATE OF MANAGERS

### Dated: September 15, 2020

Each of the undersigned, all of the managers of **BIOMASS GREEN FUELS LLC**, a limited liability company duly organized and existing under the laws of the Commonwealth of Puerto Rico (the "Company"), **DO HEREBY CERTIFY**, in connection with the execution of (a) the Credit Agreement dated on or about September 15, 2020, by and among the Company, the lenders party thereto, and Banco Popular de Puerto Rico, as administrative agent (the "Credit Agreement"), and (b) the Loan and Security Agreement dated on or about September 15, 2020, by and among the Company and PCC SUB-CDE 13, LLC (the "Loan and Security Agreement"), as follows:

1. The Company is a limited liability company duly organized and validly existing under and by virtue of the laws of the Commonwealth of Puerto Rico and is in good standing in said jurisdiction.

2. Attached hereto as Exhibit A is a true, correct and complete copy of the Good Standing Certificate of the Company issued on August 31, 2020 by the Secretary of State of the Commonwealth of Puerto Rico.

3. Attached hereto as Exhibits B is a true, correct and complete copy of the Certificate of Formation, as amended and in effect on the date hereof.

4. Attached hereto as Exhibits C is a true, correct and complete copy of the Operation Agreement of the Company, as amended and in effect on the date hereof.

5. Attached hereto as Exhibit D is a true, correct and complete copy of the resolutions, including all exhibits thereto, unanimously adopted by the Board of Managers of the Company, authorizing the execution, delivery and performance of the Credit Agreement and the Loan and Security Agreement, and each other Loan Document thereunder, to which such Company is a party. Such resolutions have not been amended, annulled, rescinded or revoked and are in full force and effect as of the date hereof.

6. The person listed below has been duly elected or appointed officer of the Company, is duly qualified, and on the date of this Certificate is an authorized signatory of the Company, holding the office set forth below opposite to his name, and the signature appearing opposite to his name is the genuine signature of such officer:

| NAME | TITLE | SIGNATURE |
|------|-------|-----------|
| Olmar López Vidal | President & Chief Executive Officer | |

The foregoing authorized signatory is authorized (i) to sign on behalf of the Company each document with respect to which this Certificate is being delivered (and each document referred to therein or contemplated thereby) and (ii) to act as a representative of the Company for the purposes of signing such documents and giving notices and other communications in connection therewith and the transactions contemplated thereby.

Each legal counsel that is furnishing an opinion in connection with the transactions authorized by the aforementioned resolutions to which the Company is, or is to be, a party is entitled to rely upon this Certificate for purposes of such legal counsel's opinion.

**[Remainder of Page Intentionally Left Blank]**

**[Signature Page Follows]**

**IN WITNESS WHEREOF**, the undersigned has executed this Certificate as of the date first before written.

By: _____
Name:   Gregory S. Boyd
Title:   Manager

By: _____
Name:   Olmar López Vidal
Title:   Manager

By: _____
Name:   Olmar López Gómez
Title:   Manager

Affidavit No. 1,559

Acknowledged and subscribed before me by the following persons, who are personally known me, in San Juan, Puerto Rico, this 15th day of September, 2020: Gregory S. Boyd, of legal age, married, executive and resident of Humacao, Puerto Rico Olmar López Vidal, of legal age, married, executive and resident of Guaynabo, Puerto Rico, Olmar López Gómez of legal age, married, executive and resident of Guaynabo, Puerto Rico, each in their capacity as a Manager of Biomass Green Fuels LLC.

_____
Notary Public







# CERTIFICATE OF GOOD STANDING

**(See attached)**



Government of Puerto Rico

# CERTIFICATE OF GOOD STANDING

I, **María A. Marcano de León, Under Secretary of State** of the Government of Puerto Rico,

**CERTIFY:** That, pursuant to Puerto Rico's General Law of Corporations, **BIOMASS GREEN FUELS LLC**, register number **404180**, a **for profit domestic** Limited Liability Company organized under the laws of Puerto Rico on **January 29, 2018**, has complied with the payment of its Annual Fees.



**IN WITNESS WHEREOF**, the undersigned by virtue of the authority vested by law, hereby issues this certificate and affixes the Great Seal of the Government of Puerto Rico, in the City of San Juan, Puerto Rico, today, **August 31, 2020.**

**María A. Marcano de León**
Under Secretary of State

To validate this certificate go to:          http://estado.pr.gov/

This certificate is valid for one (1) year from issue date (Regulation 8688, Art. 26). However, it is subject to faithful compliance with the provisions of Chapter XV and Chapter XXI of Act 164-2009, as applicable.

Certificate Validation Number: **361331-50910368**

**CERTIFICATE OF FORMATION**

**(See attached)**



Government of Puerto Rico
Department of State

Transaction Date: 29-Jan-2018
Register No: 404180
Order No: 1350338

# Government of Puerto Rico

## Certificate of Formation of a Limited Liability Company

### Article I - Limited Liability Company Name

The name of the Domestic Limited Liability Company is: **BIOMASS GREEN FUELS  LLC**
Desired term for the entity name is: **LLC**

### Article II - Principal Office and Resident Agent

Its principal office in the Government of Puerto Rico will be located at:

| | |
|---|---|
| Street Address | **584 Aldebaran Street, SAN JUAN, PR, 00920** |
| Mailing Address | **584 Aldebaran Street, SAN JUAN, PR, 00920** |
| Phone | **(787) 637-4375** |

The name, street and mailing address of the Resident Agent in charge of said office is:

| | |
|---|---|
| Name | **Lopez Vidal, Olmar** |
| Street Address | **584 Aldebaran Street, SAN JUAN, PR, 00920** |
| Mailing Address | **584 Aldebaran Street, SAN JUAN, PR, 00920** |
| Email | **o.lopezvidal@internationaltechnical.com** |
| Phone | **(787) 637-4375** |

### Article III - Nature of Business

This is a For Profit entity whose nature of business or purpose is as follows:

**Renewable Fuels (Biomass)**

### Article IV - Authorized Persons

The name, street and mailing address of each Authorized Person is as follows:

| | |
|---|---|
| Name | **Lopez Vidal, Olmar** |
| Street Address | **584 Aldebaran Street, SAN JUAN, PR, 00920** |
| Mailing Address | **584 Aldebaran Street, SAN JUAN, PR, 00920** |
| Email | **o.lopezvidal@internationaltechnical.com** |

### Article V - Administrators

If the faculties of the Authorized Persons will end upon the filing of the Certificate of Formation of a Limited Liability Company, the names, physical and mailing address of the persons who will act as Administrators until the first annual meeting of the members or until their successors replace them are as follows:

| | |
|---|---|
| Name | **Lopez Vidal, Olmar** |

Title                 **Vice president**
Street Address        **584 Aldebaran Street, SAN JUAN, PR, 00920**
Mailing Address       **584 Aldebaran Street, SAN JUAN, PR, 00920**
Email                 **o.lopezvidal@internationaltechnical.com**
Expiration Date       **Indefinite**

## Article VI - Terms of Existence

The term of existence of this entity will be: **Perpetual**

The date from which the entity will be effective is: **29-Jan-2018**

## Supporting Documents

| Document | Date Issued |
|---|---|

## STATEMENT UNDER PENALTY OF PERJURY

IN WITNESS WHEREOF, I/We Lopez Vidal, Olmar, the undersigned, for the purpose of forming a limited liability company pursuant to the laws of Puerto Rico, hereby swear that the facts herein stated are true. This 29th day of January, 2018.

**Exhibit C**

# OPERATING AGREEMENT

## (See attached)

EXHIBIT C

AMENDED AND RESTATED

OPERATING AGREEMENT

OF

BIOMASS GREEN FUELS LLC

.

# TABLE OF CONTENTS

**Page**

ARTICLE I ORGANIZATIONAL MATTERS ........................................................1

    Section 1.1    Formation ...............................................................1
    Section 1.2    Name. .....................................................................1
    Section 1.3    Registered Office and Principal Office of Company. ...................1
    Section 1.4    Term. .....................................................................2
    Section 1.5    Limits of Company.........................................................2
    Section 1.6    Authorized Person; Certificate. ..........................................2

ARTICLE II DEFINITIONS.......................................................................2

ARTICLE III PURPOSE, MEMBER AND SHARES.............................................5

    Section 3.1    Purposes and Scope.........................................................5
    Section 3.2    Members......................................................................5
    Section 3.3    Members' Information. ....................................................5

ARTICLE IV MEMBERS; CAPITAL CONTRIBUTIONS; CLASSES OF MEMBERSHIP INTERESTS ......................................................................6

    Section 4.1    Capital Contribution; Membership Interests: Preemptive Rights. ....6
    Section 4.2    Approvals by the Members. ...............................................7
    Section 4.3    Registry of Transfers........................................................7
    Section 4.4    Redemption of Membership Interests. ...................................7
    Section 4.5    Maintenance of Capital Account..........................................7
    Section 4.6    Limited Liability of Members. ...........................................7

ARTICLE V ALLOCATIONS AND DISTRIBUTIONS .......................................7

    Section 5.1    Cash Distributions..........................................................7
    Section 5.2    Distributions on Termination. ............................................7
    Section 5.3    Limitation on Distributions. ..............................................7

ARTICLE VI MANAGEMENT OF THE COMPANY..........................................8

    Section 6.1    Management Generally. ....................................................8
    Section 6.2    Management by the Board of Managers. .................................8
    Section 6.3    Restrictions on Authority of the Managers. .............................9
    Section 6.4    Liabilities. Exculpation and Indemnification of Members and Managers. ....9
    Section 6.5    Compensation of the Managers and Members...........................10
    Section 6.6    Removal of a Manager(s).................................................10
    Section 6.7    Election of Successor Managers..........................................11
    Section 6.8    Business Opportunities....................................................11

ARTICLE VII MEMBERSHIP INTERESTS...................................................11

    Section 7.1    Certificates Representing Membership Interests.......................11
    Section 7.2    Registration. ...............................................................11
    Section 7.3    Mutilated, Destroyed, Lost or Stolen. ..................................12
    Section 7.4    Record Holder. ............................................................12
    Section 7.5    Legend.....................................................................12
    Section 7.6    Opt-In. ....................................................................12

# TABLE OF CONTENTS
## (Continued)

| | | Page |
|---|---|---|
| **ARTICLE VIII ACCOUNTING AND TAX MATTERS** | | **13** |
| Section 8.1 | Books and Records. | 13 |
| Section 8.2 | Income Tax. | 14 |
| **ARTICLE IX DISSOLUTION AND LIQUIDATION** | | **14** |
| Section 9.1 | Dissolution. | 14 |
| Section 9.2 | Effect of Dissolution. | 14 |
| Section 9.3 | Winding Up Procedures. | 14 |
| Section 9.4 | Distribution of Assets Upon Dissolution. | 14 |
| Section 9.5 | Distributions in Kind. | 14 |
| Section 9.6 | Articles of Dissolution. | 14 |
| **ARTICLE X TRANSFERS** | | **15** |
| Section 10.1 | General Restrictions on Transfer; No Right to Withdraw. | 15 |
| Section 10.2 | Parties to Agreement. | 15 |
| Section 10.3 | Transfer of Membership Interests Pursuant to a Purchase Offer. | 15 |
| Section 10.4 | Tag Along Right. | 17 |
| **ARTICLE XI GENERAL PROVISIONS** | | **18** |
| Section 11.1 | Captions and Headings. | 18 |
| Section 11.2 | Amendment of Certificate of Formation. | 18 |
| Section 11.3 | Amendment of this Agreement. | 18 |
| Section 11.4 | Number and Gender. | 18 |
| Section 11.5 | Binding Agreement. | 18 |
| Section 11.6 | Severability. | 18 |
| Section 11.7 | Counterparts. | 19 |
| Section 11.8 | Governing Law. | 19 |

## AMENDED AND RESTATED
## OPERATING AGREEMENT

This Amended and Restated Operating Agreement (the "**Agreement**") of **BIOMASS GREEN FUELS LLC** (the "**Company**") dated as of September 14, 2020 among **GFC HOLDINGS LIMITED LIABILITY COMPANY**, as sole member (the "**Member**").

## RECITALS

**WHEREAS**, the Company has been formed as a Puerto Rico limited liability company under the Puerto Rico General Corporations Act, as amended;

**WHEREAS**, the Initial Members of the Company entered into an Operating Agreement on August 14, 2019 (the "**Original Operating Agreement**");

**WHEREAS**, on November 5, 2019, the Initial Members of the Company conveyed and transferred their membership interest in the Company to the Member in exchange of membership interest in the Member ("**GFC Capital Contribution**");

**WHEREAS**, the current Member desires to adopt and enter into this Agreement to amend and restate the Original Operating Agreement to set forth the rules, regulations and provisions regarding the management and business of the Company, the governance of the Company, and the conduct of its business;

**NOW, THEREFORE**, in consideration of the mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Agreement agree as follows:

## ARTICLE I
## ORGANIZATIONAL MATTERS

**Section 1.1** **Formation**. The Company was formed as a limited liability company in accordance with the Act on January 29, 2018 (the "**Commencement Date**"). The Member hereby agrees to continue the Company as a Puerto Rico limited liability company under and pursuant to the Act and agree that except as expressly provided and permitted herein to the contrary, the rights and obligations of the Members and the administration and termination of the Company shall be governed by the Act.

**Section 1.2** **Name**. The name of the Company shall be, and the business of the Company shall be conducted under the name of Biomass Green Fuels LLC. The Company's business may be conducted under any name or names approved by the Members.

**Section 1.3** **Registered Office and Principal Office of Company**. The Company shall maintain a registered office and a designated and duly qualified agent for service of process on the Company in the Commonwealth of Puerto Rico. The Company may maintain offices at such locations as the Members deem advisable.

1

**Section 1.4    Term.** The existence of the Company commenced on the Commencement Date, and the Company shall continue in existence until the dissolution of the Company pursuant to the express provisions of Article IX hereof.

**Section 1.5    Limits of Company.** The Members intend that the Company shall be treated as a limited liability company in accordance with the Act for all purposes under Puerto Rico law and this Agreement shall not be construed to provide otherwise.

**Section 1.6    Authorized Person; Certificate.** The Members hereby confirm that Olmar López Vidal was an "authorized person" under the Act at the time that she executed, delivered and filed the Certificate of Formation in such capacity. The Members may execute, deliver and file any other certificates (and any amendments and/or restatements thereof) necessary for the Company to do business in Puerto Rico and in any other jurisdiction in which the Company may wish to conduct business.

## ARTICLE II
## DEFINITIONS

The following definitions shall for all purposes, unless otherwise clearly indicated to the contrary, apply to the terms used in this Agreement.

"**Act**" means the Puerto Rico General Corporations Act of 2009, as amended from time to time.

"**Additional Contribution**" means any Capital Contribution other than the Initial Contribution made to the Company pursuant to Section 4.2 hereof.

"**Additional Transfer Notice**" has the meaning set forth in Section 10.3(b).

"**Affiliate**" means an entity (i) that a Person owns 50% or more of the voting equity of such entity; or (ii) under common control of a Person.

"**Agreement**" shall have the meaning set forth in the preamble hereto.

"**Business**" means the development and construction of the Bio Economic Recycled & Renewable Natural Gas and Carbon Dioxide projects.

"**Capital Account**" means the capital account maintained for each of the Members pursuant to Section 4.5.

"**Capital Contribution**" means any Initial Contribution or Additional Contribution to the capital of the Company in cash, assets or services provided to the Company when and as such contribution is actually made to the Company by the Members.

"**Capital Gain**" means, for each Fiscal Year of the Company, the Company's net income or gain resulting from all sales or other dispositions (including any deemed dispositions under the Code) of capital assets during such Fiscal Year with respect to which income, gain or loss is

2

recognized for income tax purposes, taking into account in the computation thereof all capital gains reportable by the Company for such Fiscal Year.

"**Capital Loss**" means, for each Fiscal Year of the Company, the Company's net loss resulting from all sales or other dispositions (including any deemed dispositions under the Code) of capital assets during such Fiscal Year with respect to which income, gain or loss is recognized for income tax purposes, taking into account in the computation thereof all capital losses reportable by the Company for such Fiscal Year.

"**Certificate**" means a certificate issued by the Company evidencing ownership of one or more Membership Interests.

"**Certificate of Formation**" means the Certificate of Formation of the Company filed with the Department of State of Puerto Rico, as it may be amended or restated from time to time.

"**Class A Common Unit/s**" means, with respect to any Member, the ownership interest of such Member in the Company, including the right to vote on or participate in the management of the Company as applicable and as set forth in Exhibit A, as the same may be amended from time to time.

"**Class B Common Unit/s**" means, with respect to any Employee Member, the ownership interest of such Employee Member in the Company, as may be set forth in Exhibit A and/or as the same may be amended from time to time. Membership Interest B shall not have voting rights.

"**Commencement Date**" shall have the meaning set forth in Section 1.1 hereto.

"**Company**" shall have the meaning set forth in the preamble hereto.

"**Company Acceptance Notice**" has the meaning set forth in Section 10.3(b).

"**Company Option Period**" has the meaning set forth in Section 10.3(b).

"**Dissolution Event**" has the meaning set forth in Section 9.1.

"**Distributable Cash**" means the amount by which the aggregate amount of all cash and cash equivalents from time to time held by the Company on hand or in bank accounts or other temporary investments pending distribution, exceeds the aggregate of all amounts to be paid or set aside by the Company for: (i) when due, all principal and interest payments on indebtedness of the Company and all other sums payable to lenders; (ii) all cash expenditures to be incurred in the normal operations of the business of the Company; and (iii) such cash reserves as the Managers may deem reasonably necessary for the proper operation of the business of the Company.

"**Employee Members**" means any and all employee(s) who opt(s) to buy, or by any other means acquire(s), Class B Common Units.

"**Exercising Members**" has the meaning set forth in Section 10.4(a).

"**Fair Market Value**" means the price in cash, or its equivalent, that an asset would bring considering its highest and most profitable use, if then offered for sale in the open market in competition with other similar assets at or near the same location, with a reasonable time allowed to find a purchaser.

"**Founding Members**" means Gregory Boyd, Olmar López Gómez and Olmar López Vidal.

"**GFC Capital Contribution**" has the meaning assigned to such term in the recitals.

"**Initial Contribution**" means the initial Capital Contribution to the Company made by the Member as set forth in Exhibit A hereto.

"**Initial Members**" means Gregory Boyd, Olmar López Gómez and Omar López Vidal.

"**Majority Approval of the Members**" means the approval, consent, determination or vote (as the case may be) of the holders of Membership Interests Class A which, in the aggregate, represent more than fifty percent (50%) of the then outstanding Membership Interests Class A.

"**Manager**" means each Person elected to act as manager of the Company as provided for in Exhibit C and designated by the Company as an additional or substitute Manager pursuant to this Agreement. "Managers" refers to such Persons as a group.

"**Member Acceptance Notice**" has the meaning set forth in Section 10.3(b).

"**Member Option Period**" has the meaning set forth in Section 10.3(b).

"**Member(s)**" means GFC HOLDINGS LIMITED LIABILITY COMPANY, who acquired its membership interests from the Initial Members pursuant to the GFC Capital Contribution and, to the extent permitted hereby, each Person that may hereafter become an additional member of the Company or a substitute member of the Company, not including Employee Members, pursuant to the provisions of this Agreement, in his/her/its capacity as a member of the Company.

"**Membership Interest/s**" has the meaning set forth in Section 4.1(a).

"**Offered Interests**" has the meaning set forth in Section 10.3(a).

"**Overallotment Notice**" has the meaning set forth in Section 10.3(b).

"**Person**" means any individual, corporation, partnership, joint venture, limited liability company, limited liability partnership, association, joint stock company, trust, unincorporated organization, or other organization, whether or not a legal entity, and any governmental authority.

"**Preferred Unit/s**" has the meaning set forth in Section 4.1(b).

"**Proposed Sale**" has the meaning set forth in Section 10.3(a).

"**Proposed Transferee**" has the meaning set forth in Section 10.3(a).

"**Purchase Right**" has the meaning set forth in <u>Section 10.3(a)</u>.

"**Record Holder**" means the Person in whose name a Membership Interest is registered on the books of the Company as of the opening of business on a particular Business Day.

"**Tag-Along Failure**" has the meaning set forth in <u>Section 10.4(b)</u>.

"**Tag-Along Member**" has the meaning set forth in <u>Section 10.4(b)</u>.

"**Tag-Along Notice**" has the meaning set forth in <u>Section 10.4(a)</u>.

"**Tag-Along Notice Period**" has the meaning set forth in <u>Section 10.4(b)</u>.

"**Tag-Along Portion**" has the meaning set forth in <u>Section 10.4(b).</u>

"**Tag-Along Right**" has the meaning set forth in <u>Section 10.4(a)</u>.

"**Tag-Along Sale**" has the meaning set forth in <u>Section 10.4(a)</u>.

"**Third Party**" means any Person other than the Company and its Members and their respective affiliates.

"**Transfer**" means to endorse, sell, give, pledge, encumber, assign, transfer or otherwise dispose of, voluntarily or involuntarily or by operation of law all of or a portion of a Member's Membership Interests. Similar terms, such as "**Transferred**" or "**Transferring**" shall have correlative meanings.

"**Transfer Deadline**" has the meaning set forth in <u>Section 10.3(b)</u>.

"**Transfer Notice**" has the meaning set forth in <u>Section 10.3(a)</u>.

"**Transferring Member**" has the meaning set forth in <u>Section 10.3(a)</u>.

**ARTICLE III**
**PURPOSE, MEMBER AND SHARES**

**Section 3.1    Purposes and Scope**. The purpose of the Company is to transact any and all lawful business for which limited liability companies may be organized under the Puerto Rico Act.

**Section 3.2    Members**. The sole Member of the Company is GFC Holdings Limited Liability Company, who owns all of the Membership Interests as shown on <u>Exhibit A</u> of this Agreement and any Persons who subsequently become Members. The Members may act by written consent. The Members may assign all or part of their Membership Interests upon the admission of a transferee pursuant to <u>Section 10.4</u>.

**Section 3.3    Members' Information**. The mailing addresses of the Member is set forth on <u>Exhibit B</u> of this Agreement.

5

## ARTICLE IV
## MEMBERS; CAPITAL CONTRIBUTIONS; CLASSES OF MEMBERSHIP INTERESTS

### Section 4.1    Capital Contribution; Membership Interests: Preemptive Rights.

(a)    The Company is authorized to issue a total of 50,000,000 Membership Units consisting of two classes, including 25,000,000 Common Units and 25,000,000 Preferred Units (interchangeably referred to as "**Membership Interests**"). The rights, duties, and obligations of the Members of the Company shall be governed by the terms and conditions of this Agreement and shall be represented by Membership Interests. The issuance of fractional Membership Interests shall be allowed. The Company intends to pay preferred dividends and redeem preferred units over time from cash flows, if any, from business operations. The Company shall not issue Membership Interests in bearer form.

(b)    In the future, the Company intends to raise working capital through sales of preferred units (the "**Preferred Units**"). The Board of Managers has authority, in accordance with the provisions of this Agreement, and without action by the Members, to designate and issue all or any portion of the authorized but unissued Preferred Units, and to determine the voting rights, preferences, privileges and restrictions, including dividend rights, conversion rights, voting rights, terms of redemption, liquidation preferences and the number of units constituting any series in the designation of such series. Such Preferred Units, if and when issued, may carry rights superior to those of the common units.

(c)    The common units shall include Class A Common Units and, Class B Common Units.

(d)    The Company may issue Class A Common Units. Each Class A Common Units shall carry the right to cast one vote on any matter submitted to the Members of the Company and be entitled to profit and loss distributions and allocations. Holders of Class A Common Units and shall be considered Members of the Company.

(e)    The Company may issue interests in the manner of Class B Common Units to its employees as an additional benefit or compensation for performance or services rendered. Such Class B Common Units shall not have voting rights or other benefits upon those Membership Interests and shall not be considered Members, for the purpose of this Agreement, except that they shall have the right to receive dividends upon such Class B Common Units, as may be determined by the Managers, from time to time.

(f)    The Member has made the GFC Capital Contribution in exchange for the Membership Interests as set forth in Exhibit A hereto. The Members shall make additional Capital Contributions to the Company after evaluating the written request of the Managers and for the purposes established under a Resolution adopted thereunder and if further approved by the Members upon a Member Resolution.

(g)    If the Managers propose to issue additional Membership Interests or request additional Capital Contributions, the Member shall be given written notice of such issuance at least twenty (20) days prior to the proposed date of such issuance and every other Member shall be given written notice of such issuance at least ten (10) days prior to the proposed date of such

6

issuance, and both shall have the opportunity, but not the obligation, to purchase the number of Membership Interests as will allow such Member to maintain its percentage Membership Interest on a fully diluted basis, immediately prior to such issuance; provided that, such purchase does not require the registration of such issuance under Federal, Puerto Rico, or state securities laws.

(h) The Company may issue additional capital or other securities convertible to additional capital; provided that, such additional capital or securities are issued as approved by the Majority Approval of the Members.

**Section 4.2 Approvals by the Members**. Any actions with respect to the Company that are subject to the approval, consent, determination or vote of the Members shall require Majority Approval of the Members, except as otherwise provided herein.

**Section 4.3 Registry of Transfers**. Membership Interests shall be transferable upon the books of the Company by the holders thereof, in person, or by a duly authorized attorney, upon surrender and cancellation of certificates for a like number of Membership Interests of the same class, with duly executed assignment and power of transfer endorsed thereon or attached thereto, and with such proof of the authenticity of the signatures to such assignment and power of transfer as the Company or its agents may reasonably require.

**Section 4.4 Redemption of Membership Interests**. Members may not redeem their Membership Interests, except with the unanimous consent of all the Members.

**Section 4.5 Maintenance of Capital Account**. A Capital Account will be established and maintained for each of the Members.

**Section 4.6 Limited Liability of Members**. The Members will not be liable for the debts, obligations, or liabilities of the Company beyond the Members' Initial or Additional Contributions to the Company.

## ARTICLE V
## ALLOCATIONS AND DISTRIBUTIONS

**Section 5.1 Cash Distributions**. Distributions of Distributable Cash will be made by the Company to the Members in proportion to the number of Membership Interests held by each Member at the discretion of the Managers and in accordance with this Article V.

**Section 5.2 Distributions on Termination**. Upon the dissolution and winding-up of the Company, its assets will be distributed in the manner prescribed in Article IX of this Agreement.

**Section 5.3 Limitation on Distributions**. Any other provision of this Agreement to the contrary notwithstanding, no cash distribution or distribution on termination to the Members will be declared and paid unless, (a) after the distribution is made, the Fair Market Value of all of the assets of the Company is in excess of all liabilities of the Company, other than liabilities to the Members on account of their Capital Contributions; and (b) such distribution is in conformity with any outstanding loan agreements of the Company. For these purposes, the Fair Market Value of the assets of the Company will be determined, in good faith, by the Managers.

## ARTICLE VI
## MANAGEMENT OF THE COMPANY

**Section 6.1** **Management Generally**. Except as otherwise expressly required under this Agreement or the Act, the full, absolute and exclusive right, power and authority to manage the Company is vested in, and reserved to, the Board of one or more Managers designated by the Members (the "Board of Managers"). Only Members holding Class A Common Units shall be entitled to vote on the election of Managers, *provided notwithstanding*, that each Founding Member shall have the right to occupy one board seat or appoint a member to the Board of Managers of the Company. Each Manager elected, designated or appointed by the Members shall hold office until a successor is elected and qualified or until such Manager's earlier death, resignation, expulsion or removal. The initial Managers designated by the Members holding Class A Common Units are listed in Exhibit C.

Without limiting, and in furtherance of, the foregoing, the business and affairs of the Company shall be managed and conducted, and its capital, assets, funds and liabilities shall be managed, dealt with and disposed of, exclusively by and under the direction of the Managers and, except as otherwise expressly required under this Agreement or the Act, all decisions to be made by or on behalf of the Company or in respect of the Company's business, capital, assets, funds and liabilities of the Company shall be made solely and exclusively by the Managers; provided that the Managers agree to act in good faith in taking such actions or making such decisions.

**Section 6.2** **Management by the Board of Managers**. The Board of Managers shall have the power to do any and all acts necessary, convenient or incidental to or for the furtherance of the purposes herein, including exercising all powers, statutory or otherwise. Among those powers are:

(a) appoint one or more individuals to hold offices and carry the day to day activities of the Company (the "Officers"), and such Officers of the Company shall consist of such officers as may be deemed necessary or desirable by the Board of Managers, and shall have such title, authority, and duties as the Board of Managers may delegate to him or her;

(b) make from the Company assets any and all expenditures that the Managers may deem necessary or desirable for the conduct of the Company and the carrying out of the Company's obligations and responsibilities under this Agreement to the extent permissible under any other agreements (including mortgages) to which the Company is a party;

(c) take such steps as necessary to fulfill the determination of the Members to declare and make distributions of capital or income, in cash or property to Members;

(d) draft such documents at the request of the Members to admit additional Persons as Members, including substituted Members as provided herein;

(e) purchase, at the expense of the Company, liability and other insurance to protect the Company and the Company's assets and Business;

(f) invest the Company's assets in Company and savings and loan association savings accounts, commercial paper, government securities, certificates of deposit, Company's

acceptances, other short term interest bearing obligations and any other investments in the sole and absolute discretion of the Managers;

(g) maintain, at the expense of the Company, adequate records and accounts of all operations and expenditures and furnish the Members with annual statements of accounts as of the end of each Company Fiscal Year, together with tax reporting information;

(h) make, refrain from making, or revoke such elections under the tax laws of the Commonwealth of Puerto Rico, the United States, the several States and other relevant jurisdictions as to the treatment of items of Company income, gain, loss, deduction, and credit and as to all other relevant matters;

(i) enter into any leases for property, real or personal. in the ordinary course of the Company's Business;

(j) make any purchases for, on behalf of, or in the name of, the Company in the ordinary course of the Company's Business;

(k) borrow money and issue evidences of indebtedness in furtherance of any or all of the purposes of the Company, and secure the same by mortgage, pledge or other lien on the assets of the Company;

(l) establish and maintain reserves, in such amount as the Managers determine appropriate, in Managers' reasonable discretion under the then existing circumstances; and

(m) take any and all other action permitted by law and that is reasonably related to Company purposes.

Section 6.3   Restrictions on Authority of the Managers. In addition to the restrictions provided elsewhere herein, without the affirmative vote or written consent of Members, the Managers shall not have the authority to approve and the Company will not take any of the following actions:

(a) merge or consolidate the Company, whether or not the Company is the surviving entity;

(b) change the Company's purposes long-term business strategy or scope;

(c) liquidate, dissolve or wind up the Company; or

(d) redeem, retire or otherwise acquire for value any Membership Interest or other equity security, except as provided for in this Agreement.

Section 6.4   Liabilities. Exculpation and Indemnification of Members and Managers.

(a) No Member, Manager employee or agent of the Company and no employee, agent or Affiliate of a Member (collectively, the "Covered Persons") shall be liable to the Company or

any other Person who has an interest in or claim against the Company for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement, except that a Covered Person shall be liable for any such loss, damage or claim incurred by reason of such Covered Person's gross negligence or willful misconduct. Notwithstanding the above, a Member of the Company may voluntarily agree to guarantee the obligations of the Company, including but not limited to the performance of actions of the Company under valid contracts entered into by the Company, and the extent of the liabilities and obligations of such Members shall be those included in the guaranty agreement.

(b)     To the fullest extent permitted by and in accordance with the Act, a Covered Person shall be entitled to indemnification from the Company for any loss, damage or claim incurred by such Covered Person by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement, except that no Covered Person shall be entitled to be indemnified in respect of any loss, damage or claim incurred by such Covered Person by reason of such Covered Person's gross negligence or willful misconduct with respect to such acts or omissions; provided, however, any indemnity under this Section 6.4 shall be provided out of and to the extent of Company assets only.

(c)     To the fullest extent permitted by and in accordance with the Act, the Company shall have the power to purchase and maintain insurance, including insurance on behalf of any Covered Person against any liability asserted against such Person and incurred by such Covered Person in any such capacity, or arising out of such Covered Person's status as an agent of the Company, whether or not the Company would have the power to indemnify such Person against such liability under the Act.

(d)     The rights provided to Covered Persons pursuant to this Section 6.4 (a) shall be contract rights based upon good and valuable consideration, pursuant to which a Covered Person may bring suit as if the provisions of this Section were set forth in a separate written contract between the Covered Person and the Company, (b) shall fully vest at the time the Covered Person first assumes his or her position as a Manager of the Company, (c) are intended to be retroactive and shall be available with respect to any act or omission occurring prior to the adoption of this Section, (d) shall continue as to a Covered Person who has ceased to be a Manager of the Company, and (e) shall inure to the benefit of the Covered Person's heirs, executors and administrators.

Section 6.5     **Compensation of the Managers and Members.** The Managers shall not be compensated for their services except as unanimously approved by the Members. Any compensation of Managers shall be commensurate to the amount of time dedicated to the business of the Company. The Members shall not receive compensation for their services as Members of the Company. The Members may be reimbursed for out-of-pocket expenses incurred by them on behalf of the Company in accordance with Company policies, and after approval of the Members.

Section 6.6     **Removal of a Manager(s).** A Manager(s) may, by the affirmative vote or written consent of the Members be removed as a Manager(s) of the Company. Upon removal, the removed Manager(s) shall immediately cease to have any authority to act as a Manager for the

Company. Any of the Company's funds or other Property in the possession or under the control of such removed Manager shall immediately be released and transferred to its successor. The removed Manager shall cooperate in the orderly transition of affairs to the Manager's successor.

**Section 6.7    Election of Successor Managers.** The Members, by an affirmative vote or written consent of the Members, shall elect a successor Manager.

**Section 6.8    Business Opportunities.** Notwithstanding any other provision of this Agreement to the contrary, if any Manager or his Affiliate is offered or discovers a business opportunity of any type and character that is within the scope of the Business (a "Business Opportunity"), such Person shall offer to the Company, by providing notice of such Business Opportunity to the Company, the right to pursue such Business Opportunity for the benefit of the Company, regardless of whether such Manager or his Affiliate believes the Company or any of its Affiliates would be able or willing to pursue such Business Opportunity. A majority of the Managers shall determine on behalf of the Company whether such Business Opportunity shall be pursued by the Company.

**ARTICLE VII**
**MEMBERSHIP INTERESTS**

**Section 7.1    Certificates Representing Membership Interests.** Upon the Company's issuance of Membership Interests to any Person, the Company shall issue a receipt to such Member confirming such issuance. Generally, Certificates in the name of a Member evidencing the number of Membership Interests held by such Member will not be issued. However, the Managers may issue Certificates in its sole discretion. Certificates shall be executed on behalf of the Company by the Managers.

**Section 7.2    Registration.** The Managers, shall cause to be kept on behalf of the Company a register in which, subject to such reasonable regulations as it may prescribe, the Managers, will provide for the registration and the transfer of the Membership Interests. The Company shall not recognize transfers of Membership Interests, or Certificates representing Membership Interests, unless the same are done in the manner described in this Section 7.2, and provided the transfer is in accordance with the provisions of this Article VII and Article X. Upon surrender for registration of transfer of any Membership Interests evidenced by a Certificate, the Managers, on behalf of the Company shall cause the execution and delivery in the name of: the designated transferee or transferees, as required pursuant to the holder's instructions, one or more new Certificates evidencing the same aggregate number of Membership Interests as was evidenced by the Certificate so surrendered that are to be so transferred; and the designated transferor, if pursuant to such transfer the transferor has not thereby transferred all of its Membership Interests held by it that are evidenced by such Certificate, as required pursuant to the holder's instructions, one or more new Certificates evidencing the same aggregate number of Membership Interests as was evidenced by the Certificate so surrendered that are not to be so transferred. The Company shall not recognize any transfer of Membership Interests until the Certificates evidencing such Membership Interests, if any, are surrendered for registration of transfer duly executed by the transferor (or the transferor's attorney-in-fact duly authorized in writing). No charge shall be imposed by the Company for such transfer, provided, that, as a condition to the issuance of any

11

new Certificate under this <u>Section 7.2</u>, the Secretary may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed with respect thereto.

        **Section 7.3**   <u>Mutilated, Destroyed, Lost or Stolen</u>. If any mutilated Certificate is surrendered to the Managers, the Managers, on behalf of the Company shall cause the execution and delivery in exchange therefor, of a new Certificate evidencing the same number of Membership Interests as the Certificate so surrendered. The Managers, on behalf of the Company shall cause the execution and delivery of a new Certificate in place of any Certificate previously issued if the Record Holder of the Certificate: makes proof by affidavit, in form and substance satisfactory to the Managers, that a previously issued Certificate has been lost, destroyed or stolen; requests the issuance of a new Certificate before the Company has received notice that the Certificate has been acquired by a purchaser for value in good faith and without notice of an adverse claim; if requested by the Managers, delivers to the Company such security and indemnity as may be required by the Managers, in form and substance satisfactory to the them, with surety or sureties and with fixed or open penalty as the Members may direct, in their sole discretion, to indemnify the Company, the Members, and the Managers, against any claim that may be made on account of the alleged loss, destruction or theft of the Certificate; and satisfies any other reasonable requirement imposed by the Members. If a Member fails to notify the Company or the Managers within a reasonable time after it has notice of the loss, destruction or theft of a Certificate, and a transfer of the Membership Interests represented by the Certificate is registered before the Company or the Managers receives such notification, the Member shall be precluded from making any claim against the Company, the Managers, or the other Members for such transfer or for a new Certificate. As a condition to the issuance of any Certificate under this <u>Section 7.3</u>, the Managers, may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses connected therewith.

        **Section 7.4**   <u>Record Holder</u>. In accordance with <u>Section 7.2</u>, the Company shall be entitled to recognize the Record Holders as the Members with respect to the Membership Interests and, accordingly, shall not be bound to recognize any equitable or other claim to or interest in such Membership Interests on the part of any other Person, whether or not the Company shall have actual or other notice thereof, except as otherwise provided by applicable law. Without limiting the foregoing, when a Person (such as a broker, dealer, bank, trust company or clearing corporation or an agent of any of the foregoing) is acting as nominee, agent or in some other representative capacity for another Person in acquiring or holding Membership Interests, as between the Company on the one hand and such other Persons on the other hand, such representative Person: shall be the Member of record and beneficially; and shall be bound by this Agreement and shall have the rights and obligations of a Member hereunder and as provided for herein.

        **Section 7.5**   <u>Legend</u>. The Certificates evidencing the number of Membership Interests shall be bear the following legend:

**THE INTERESTS IN THE COMPANY (THE "MEMBERSHIP INTERESTS") EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY APPLICABLE STATE SECURITIES LAWS AND MAY NOT BE SOLD OR TRANSFERRED WITHOUT COMPLIANCE WITH THE REGISTRATION OR QUALIFICATION PROVISIONS OF**

APPLICABLE FEDERAL AND STATE SECURITIES LAW OR APPLICABLE EXEMPTIONS THEREFROM.

IN ADDITION, BY AGREEMENT AMONG THE COMPANY AND ITS MEMBERS, RESTRICTIONS HAVE BEEN PLACED ON THE TRANSFER OF THE MEMBERSHIP INTERESTS REPRESENTED BY THIS CERTIFICATE. THE COMPANY WILL FURNISH TO THE RECORD HOLDER OF THIS CERTIFICATE WITHOUT CHARGE UPON WRITTEN REQUEST TO THE COMPANY AT ITS PRINCIPAL PLACE OF BUSINESS OR REGISTERED OFFICE A COPY OF THAT AGREEMENT.

Section 7.6    Opt-In.

(a)    Each Membership Interest in the Company shall constitute and shall remain a "security" within the meaning of (i) Article 8 of the Uniform Commercial Code (including Section 8-102(a)(15) thereof) as in effect from time to time in the Commonwealth of Puerto Rico and (ii) the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995 (and each Membership Interest in the Company shall be treated as such a "security" for all purposes, including, without limitation perfection of the security interest therein under Article 8 of each applicable Uniform Commercial Code as the Company has "opted-in" to such provisions). Notwithstanding any provision of this Agreement to the contrary, to the extent that any provision of this Agreement is inconsistent with any non-waivable provision of Article 8 of the Uniform Commercial Code as in effect in the Commonwealth of Puerto Rico, such provision of Article 8 shall control.

(b)    Notwithstanding anything to the contrary herein, Article X of this Agreement shall not apply to any Transfer, either directly or indirectly, by a Member in connection with (i) the constitution or grant of any pledge, hypothecation, encumbrance or creation of any security interest or lien on any Membership Interest as may be required by a third-party lender providing credit to the Company (a "Lender") pursuant to loan documentation approved by the Board of Managers, and (ii) any foreclosure, sale, assignment in lieu of foreclosure or other disposition or Transfer as a result of the enforcement of any such pledge, hypothecation, encumbrance, security interest or lien on any such Membership Interest. Any such transfer notified in writing to the Company will be recorded as set forth in Section 7.4 and (i) the transferring member shall automatically cease to be a Member of the Company, and (ii) the transferee shall automatically be admitted as successor Member of the Company, with all of the rights and privileges and shall be subject to all of the obligations and liabilities of a "Member" for all purposes, including without limitation, with respect to the ownership, distribution, voting and other matters relating to Members under this Agreement.

## ARTICLE VIII
## ACCOUNTING AND TAX MATTERS

Section 8.1    Books and Records. The Company will maintain such books and records of the operations and expenditures of the Company as the Managers shall determine.

13

**Section 8.2    Income Tax.** The Managers shall determine whether or not to make elections or file returns for income tax purposes.

**ARTICLE IX**
**DISSOLUTION AND LIQUIDATION**

**Section 9.1    Dissolution.** The Company will be dissolved upon the earliest to occur of the following events (each such event is referred to as a "**Dissolution Event**"): the Members unanimously vote in favor of the liquidation and dissolution of the Company; or any other event that, under the Act, would cause the Company's dissolution.

**Section 9.2    Effect of Dissolution.** Upon the dissolution of the Company, the Company will cease to carry on its business, except insofar as may be necessary for the winding up of its business, and the assets of the Company will be determined and valued effective as of the day on which the event occurs that results in such dissolution, but the Company will not terminate until there has been a winding-up of the Company's business and affairs and the assets of the Company have been liquidated and distributed as provided in this Agreement.

**Section 9.3    Winding Up Procedures.** Upon the dissolution of the Company, the Company will (a) proceed to collect its assets; (b) convey and dispose of such of its properties as are not to be distributed in kind to the Members; (c) pay, satisfy, and discharge its liabilities, or make adequate provision for payment and discharge of such liabilities; and (d) do all other acts required to liquidate its business and affairs.

**Section 9.4    Distribution of Assets Upon Dissolution.** In settling the accounts of the Company after its dissolution, the assets of the Company will be applied and distributed in the following order of priority: First, to the extent permitted by law, and in accordance with the priorities, if any, established by applicable law, to creditors in satisfaction of liabilities of the Company, including liabilities of the Company to its Members as a creditor (other than for distributions and Capital Contributions), whether by payment or establishment of reserves; Second, to its Members.

**Section 9.5    Distributions in Kind.** If any assets of the Company are distributed in kind, such assets will be distributed in accordance with the provisions of Section 9.4 above to the Members.

**Section 9.6    Articles of Dissolution.** When all liabilities and obligations of the Company have been paid or discharged, or adequate provision has been made for such liabilities, or in case its property and assets are not sufficient to satisfy and discharge all of the liabilities and obligations of the Company, then when all the property and assets of the Company have been applied to the extent available to the bona fide liabilities and obligations of the Company, and all of the remaining property and assets of the Company have been distributed to its Members, the Company shall cause the Certificate of Formation to be cancelled and will take such other actions as are necessary or appropriate to reflect the dissolution and termination of the Company.

# ARTICLE X
## TRANSFERS

**Section 10.1** <u>General Restrictions on Transfer; No Right to Withdraw</u>. Except as set forth in this <u>Article X</u>, no Member has the right or power to (i) Transfer all or any portion of its Membership Interests; (ii) voluntarily withdraw from the Company; or (iii) require the Company to purchase or redeem all or any portion of its Membership Interests. Any attempted Transfer of a Member's Membership Interests or withdrawal in contravention of any of the provisions of this Agreement shall be void *ab initio* and shall not bind or be recognized by the Company. A Member may voluntarily withdraw from the Company only with the prior written consent of the Managers, which consent shall not be unreasonably withheld. A Member may Transfer all or any portion of such Member's Membership Interests provided that such Transfer is made in compliance with <u>Sections 10.3</u>, and <u>10.4</u> hereof.

**Section 10.2** <u>Parties to Agreement</u>. Notwithstanding anything to the contrary contained in this Agreement, no Membership Interests may be Transferred to any Person, and no Membership Interests may be issued by the Company to any Person, unless such Person is or becomes a Member by becoming a party to this Agreement by executing and delivering to the Company an executed Joinder Agreement. Upon receipt of the Joinder Agreement so executed the Company will amend or supplement <u>Exhibit A</u> hereto to reflect such Transfer or issuance.

**Section 10.3** <u>Transfer of Membership Interests Pursuant to a Purchase Offer</u>.

(a) <u>Notice of Transfer</u>. A Member may Transfer any of such Member's Membership Interests (the "**Offered Interests**") to a Third Party; <u>provided, however</u>, that any such Transfer made by a Member (each such Member, a "**Transferring Member**") must be made only pursuant to a bona fide sale (the "**Proposed Sale**") and otherwise in accordance with this <u>Section 10.3</u>. Prior to Transferring Offered Interests to a Third Party, the Transferring Member shall first give the Company and then the other Members (in accordance with <u>Section 10.3(b)</u> below) the right and option (the "**Purchase Right**") to purchase the Offered Interests by providing the Company and the other Members written notice of the Proposed Sale, which notice shall contain the name and address of the proposed Third Party transferee (the "**Proposed Transferee**"), and the price, terms and conditions at which the Proposed Sale is to be made (including a description of the number of Membership Interests to be sold and proposed price per Membership Interest) (the "**Transfer Notice**").

(b) <u>Purchase Right</u>. For a period of thirty (30) days after the date of delivery of the Transfer Notice (the "**Company Option Period**"), the Company shall have the right and option to purchase all of the Offered Interests at the same price and subject to the same terms and conditions offered by the Proposed Transferee as specified in the Transfer Notice. The Company shall exercise its Purchase Right by providing written notice (the "**Company Acceptance Notice**") to the Transferring Member within the Company Option Period. The closing date of the Company's purchase of the Offered Interests shall occur forty-five (45) days after the date of the delivery to the Company of the Transfer Notice. If the Company does not deliver a Company Acceptance Notice prior to the expiration of the Company Option Period or does not purchase the Offered Interests within such forty-five (45) day period, then within three (3) business days after the earlier of (i) the delivery by the Company of notice of its intent not to exercise any portion of its Purchase

Right or (ii) the end of the applicable period, the Transferring Member shall deliver to the other Members an additional Transfer Notice notifying the Company's intent not to exercise its Purchase Right with respect to the Offered Interests (the "**Additional Transfer Notice**"). For a period of twenty (20) days after the date of delivery of the Additional Transfer Notice (the "**Member Option Period**"), the other Members shall have the Purchase Right with respect to the Offered Interests at the same price and subject to the same terms and conditions offered by the Proposed Transferee as specified in the Transfer Notice. Each other Member that desires to exercise its Purchase Right shall do so by providing written notice (the "**Member Acceptance Notice**") to the Transferring Member within the Member Option Period, provided, however, that if there shall be any oversubscription for the Offered Interests, the Offered Interests shall be allocated among the Members on a pro rata basis (i.e. by calculating each Member's percentage ownership of the Membership Interests, excluding the Offered Interests, and multiplying such percentage interest by the number of Offered interests); and provided further that if any Member elects not to purchase its pro rata share of the remaining Offered Interests available pursuant to this subsection within the Member Option Period, then the Transferring Member shall promptly give written notice (the "**Overallotment Notice**") to each Member that has elected to purchase all of its pro rata share of the remaining Offered Interests, which notice shall set forth the number of remaining Offered Interests not purchased by the other Members, and shall offer such Members the right to acquire the unsubscribed Offered Interests. Each Member shall have five (5) days after delivery of the Overallotment Notice to deliver a written notice to the Transferring Member of its election to purchase its pro rata share of the unsubscribed Offered Interests at the same price and subject to the same terms and conditions as set forth in the Additional Transfer Notice and indicating the maximum number of the unsubscribed Offered Interests that it will purchase in the event that any other Member elects not to purchase its pro rata share of the unsubscribed Offered Interests. The closing date of each Member's purchase of the Offered Interests shall occur forty-five (45) days after the date of the expiration of the Member Option Period. If (i) the other Members do not deliver Member Acceptance Notice(s) prior to the expiration of the Option Period to purchase all the Offered Interests or (ii) the other Members do not purchase all of the Offered Interests within such forty-five (45) day period (including pursuant to an election in response to an Overallotment Notice), then, until the date that is one-hundred eighty (180) days after the date of delivery of the Transfer Notice (the "**Transfer Deadline**"), the Transferring Member shall be permitted to sell to the Proposed Transferee on the terms set forth in the Transfer Notice the remaining Offered Interests for which neither the Company nor any other Member has elected to purchase pursuant to its Purchase Right.

(c)　Re-offer on Failure to Transfer. If the Transferring Member fails to Transfer to the Proposed Transferee before the Transfer Deadline all of the Offered Interests not purchased by the Company or the other Members, then no Transfer of the Offered Interests shall be made thereafter to any Person without again complying with the provisions of this Article X.

(d)　Certain Limitations on Transfer. Notwithstanding the provisions of Sections 10.3 no Member or Members may agree to transfer Membership Interests representing fifty percent (50%) or more of the issued and outstanding Membership Interests to any Third Party or any one or more Persons that are affiliates of any Third Party or Persons acting in concert with any Third Party, without the prior approval of the Managers.

16

**Section 10.4 Tag Along Right.**

(a) Tag-Along Right. Subject to the terms and conditions specified in Section 10.3, if, at any time, holders of at least a majority of the Membership Interests (collectively the "**Exercising Members**") desire to Transfer their Membership Interests to any Third Party (a "**Tag-Along Sale**"), and such Transfer is approved by the Managers, then prior to effecting such Transfer, the Exercising Members shall provide written notice of such proposed Transfer (the "**Tag-Along Notice**") to each other Member, which Tag-Along Notice shall contain all the material terms and provisions of the proposed Transfer. The Exercising Members shall also provide, as soon as reasonably practicable, all material information with respect to the proposed Tag-Along Sale and the applicable Third Party as shall be reasonably requested by the other Members receiving the Tag-Along Notice and is in the possession of, or can be readily obtained from such Third Party by, the Exercising Members. Each such other Member shall have the right and option (the "**Tag-Along Right**"), exercisable as set forth below, to include in the Tag-Along Sale such Membership Interests comprising its Tag-Along Portion (as defined below), and the Exercising Members shall not consummate the Tag-Along Sale unless the Tag-Along Portion of each such Member (or such lesser number of Membership Interests for which such right and option is exercised) is so included.

(b) Exercise. If a Member is entitled and desires to exercise a Tag-Along Right, then such Member shall provide the Exercising Members with written irrevocable notice specifying the number of its Membership Interests that such Member wishes to include in the Tag-Along Sale (which number shall not exceed such Member's Tag-Along Portion) within ten (10) days after the date the Exercising Members deliver the Tag-Along Notice (the "**Tag-Along Notice Period**") and shall simultaneously provide a copy of such notice to the Company. Within ten (10) days following the termination of the Tag-Along Notice Period, and in any event prior to the consummation of the Tag-Along Sale, each Member that has exercised its Tag-Along Right (each, a "**Tag-Along Member**") shall deliver to a representative of the Exercising Members designated in the Tag-Along Notice or otherwise all documents required to be executed or delivered by such Tag-Along Member in connection with the Transfer of the Membership Interests pursuant to this Tag-Along Right at the closing for such Tag-Along Sale against delivery to such Tag-Along Member of the consideration therefor. All participating Members will bear their pro rata share of the costs and expenses incurred by the Company in connection with a Tag-Along Sale (based on the respective consideration received by such Members in the transaction, to the extent such costs and expenses are incurred for the benefit of all Members and are not otherwise paid by the Company or the purchaser). Costs incurred by any Member on its own behalf will not be shared by other Members. The aggregate consideration in a Tag-Along Sale shall be allocated among the Exercising Members and the Tag-Along Members in proportion to the their percentage ownership of their Membership Interests (to all issued and outstanding Membership Interests), (the "**Tag-Along Portion**"). In no event shall a Tag-Along Member receive less consideration per Membership Interests than the consideration per Membership Interests received by any other holders of Membership Interests. If a Member (i) does not elect before the end of the Tag-Along Notice Period to have all or any part of its Tag-Along Portion included in the Tag-Along Sale or (ii) fails to deliver to the Exercising Members the Membership Interests or any required documentation within the period described in this Section 10.4 (collectively, a "**Tag-Along Failure**"), then such Member will be deemed to have waived any and all of its rights under this Section 10.4 with respect to the Transfer of any or all of its Membership Interests pursuant to such Tag-Along Sale. The Exercising Members shall have ninety (90) days (or such longer period as

17

may be required to obtain any approval necessary under applicable securities laws, other federal laws applicable to such transaction or similar state or local laws) after the Tag-Along Failure in which to Transfer all (but not less than all) of the applicable Membership Interests at a price not higher than contained in the Tag-Along Notice and on terms and conditions not more favorable to the Exercising Members or the proposed transferee than were contained in the Transfer Notice. Promptly (but in no event more than three (3) Business Days) after the consummation of a Tag-Along Sale, the Exercising Members shall give notice thereof to the Tag-Along Members, shall remit to each such Tag-Along Member the total consideration for the Tag-Along Portion and shall furnish such other evidence of the completion and time of completion of the Tag-Along Sale and the terms thereof as may be reasonably requested by any such Tag-Along Member.

## ARTICLE XI
## GENERAL PROVISIONS

**Section 11.1  Captions and Headings**. The captions and headings used in this Agreement are for convenience of reference only and will not be taken into account in construing the meaning or intent of this Agreement.

**Section 11.2  Amendment of Certificate of Formation**. The Certificate of Formation may be amended, supplemented or restated by written consent of a majority of the votes of the Member. Upon executing the necessary consent with respect to such amendment, supplement, or restatement of the Certificate of Formation, the Managers will cause a Certificate of Amendment to be prepared, executed, and filed in accordance with the Act.

**Section 11.3  Amendment of this Agreement**. This Agreement may only be amended, supplemented, or restated by the unanimous written consent of the Members.

**Section 11.4  Number and Gender**. Where the context so indicates, the singular will include the plural, and the use of any gender will include all other genders.

**Section 11.5  Binding Agreement**. Notwithstanding any other provision of this Agreement, the Members agree that this Agreement, constitutes a legal, valid and binding agreement of the Members, and is enforceable against the Members, in accordance with its terms.

**Section 11.6  Severability**. The invalidity of unenforceability of any provision herein shall not affect the validity or enforceability of any other provision herein. If a court of competent jurisdiction determines that any portion of this Agreement is in violation of any statute or public policy, only the portions of this Agreement that violate such statute or public policy shall be stricken, and all other portions of this agreement that do not violate any statute or public policy shall continue in full force and effect. Further, if any one or more of the provisions contained in this Agreement is determined by a court of competent jurisdiction to be excessively broad as to duration, scope, activity or subject, or is unreasonable or unenforceable under applicable laws, such provisions will be construed by limiting, reducing, modifying or amending them so as to be enforceable to the maximum extent permitted by law. If this Agreement is held unenforceable in any jurisdiction, such holding will not impair the enforceability of the Agreement in any other jurisdiction.

18

Section 11.7 <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which will be deemed to be an original and will be binding upon the Member who executed same, but all of such counterparts will constitute the same Agreement and may be sufficiently evidenced by one counterpart.

Section 11.8 <u>Governing Law</u>. This Agreement and the construction interpretation will be governed exclusively by the Act and other applicable laws of the Commonwealth of Puerto Rico.

**[Execution on Following Page]**

IN WITNESS WHEREOF, the Member has executed this Operating Agreement as of the date first set forth above.

**GFC HOLDINGS LIMITED LIABILITY COMPANY**

By: _____

Name: Olmar López Vidal

Title: President & Chief Executive Officer

**OPERATING AGREEMENT**
**OF**
**BIOMASS GREEN FUELS LLC**

**EXHIBIT A**

**Capital Contributions**

| Member | Number of Membership Interests |
|---|---|
| GFC Holdings Limited Liability Company | 1000 Class A Common Units |

**OPERATING AGREEMENT**
**OF**
**BIOMASS GREEN FUELS LLC**

**EXHIBIT B**

Address of Member:

GFC Holdings Limited Liability Company
584 Aldebaran Street
San Juan, PR  00920

**OPERATING AGREEMENT**
**OF**
**BIOMASS GREEN FUELS LLC**

**EXHIBIT C**

Board of Managers:

Gregory Boyd
584 Aldebaran Street
San Juan, PR 00920

Olmar López Gómez
584 Aldebaran Street
San Juan, PR 00920

Olmar López Vidal
584 Aldebaran Street
San Juan, PR 00920

## RESOLUTIONS
## OF
## BIOMASS GREEN FUELS LLC

**WHEREAS,** Biomass Green Fuels LLC (the "Company"), as borrower, the lender parties from time to time thereto (the "Senior Lenders"), and Banco Popular de Puerto Rico, as administrative agent (the "Agent"), have agreed to enter into that certain Credit Agreement on or about September 15, 2020 (as amended and as the same may be further amended, supplemented or otherwise modified from time to time, the "Senior Credit Agreement"; capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Credit Agreement and the Junior Credit Agreement (as defined below), as the case may be), whereby the Senior Lenders will grant certain credit facilities to the Company in the aggregate principal amount of $11,869,250;

**WHEREAS,** the Company, as borrower, and PCC SUB-CDE 13, LLC, as lender (the "Junior Lender"), have agreed to enter into that certain Loan and Security Agreement on or about September 15, 2020 (as amended and as the same may be further amended, supplemented or otherwise modified from time to time, the "Junior Credit Agreement"; and, together with the Senior Credit Agreement, collectively, the "Credit Documents"), whereby the Junior Lenders will grant certain credit facilities to the Company in the aggregate principal amount of $7,200,000;

**WHEREAS,** Capital One, National Association ("Investor"), is providing equity to the Project (as defined in the Junior Credit Agreement) in exchange for New Markets Tax Credits made available under Section 45D of the Internal Revenue Code of 1986, as applicable (the "New Markets Tax Credit Transaction");

**WHEREAS,** the Board of Managers of the Company deem it advisable and in the best interest of the Company to adopt the following resolutions:

**NOW THEREFORE, BE IT RESOLVED,** that it is in the best interest of the Company that it enter into the Credit Documents for the purposes described above, and that the form, terms and provisions of the Credit Documents and the Company's performance of its obligations thereunder be, and the same hereby are, in all respects, approved;

**FURTHER RESOLVED,** that Olmar López Vidal, as President and Chief Executive Officer of the Company (an "Authorized Signatory"), be and is hereby authorized and empowered, acting singly, to negotiate, execute and deliver on behalf of the Company, the Credit Documents and all agreements, deeds, notes, instruments and other documents required under the Credit Documents, including, without limitation:

A. Under the Senior Credit Agreement, the following Loan Documents:

1.     the Notes;

2. the Security Agreement;
3. the Deposit Account Control Agreement;
4. the Assignment of Leasehold Interest;
5. the Assignment of Project Contracts;
6. the Assignment of Tax Credits;
7. the Pledge of Equity Interests;
8. the Corporate Guaranty;
9. the Personal Guaranty;
10. the Subordination Agreement;
11. the Environmental Indemnity Agreement;
12. the Landlord Consent and Estoppel; and
13. any other instrument, certificate, agreement and other Loan Document related to the Credit Agreement, including, without limitation, any UCC financial statements, continuation statements or amendment statements to be filed at the Puerto Rico Commercial Transactions Registry pursuant to the Loan Documents, and/or any amendments, modifications or supplements to any of the foregoing.

B. Under the Junior Credit Agreement, the following Loan Documents:

1. the Notes;
2. the Disbursement Agreement;
3. the Payment Guaranty;
4. the Assignment and Pledge of Deposit Account;
5. the Reserve Account Control Agreement;
6. the Assignment and Pledge of Reserve Account;
7. the Assignment of Contracts;
8. the Assignment of Plans, Assessments, Entitlements and Intangibles;
9. the Depository Account Control Agreement;
10. the Environmental Indemnity Agreement;
11. the Intercreditor Agreement; and
12. any other instrument, certificate, agreement and other Loan Document related to the Junior Credit Agreement, including, without limitation, any UCC financial statements, continuation statements or amendment statements to be filed at the Puerto Rico Commercial Transactions Registry pursuant to the Loan Documents, and/or any amendments, modifications or supplements to any of the foregoing.

C. With respect to the New Markets Tax Credit Transaction, the following documents:

1. the Portion of Business Memorandum;
2. the Community Benefits Agreement;
3. the Confirmation of Favorable Project Loan Terms;
4. the But For Statement;
5. the Investment Fund Put/Call Agreement;
6. the QALICB Indemnification Agreement;

7. the Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion;
8. the Fee and Services Agreement;
9. the Flow of Funds; and
13. any other instrument, certificate, agreement and other document related to the New Markets Tax Credit Transaction, and/or any amendments, modifications or supplements to any of the foregoing.

**FURTHER RESOLVED**, that the Authorized Signatory is hereby authorized and empowered, acting singly, to do and perform all other acts and things and to sign all such documents, notices and certificates and to take all such other steps deemed by such officer to be necessary, convenient or proper to carry out any of the foregoing resolutions, hereby ratifying, approving and confirming all that said officer has done or may do in connection to any of the foregoing.

\*\*\*\*

## GFC HOLDINGS LIMITED LIABILITY COMPANY

### Written Consent of the Sole Member

September 15, 2020

The undersigned, being the sole member of Biomass Green Fuels LLC, a Puerto Rico limited liability company (the "Company"), waiving all notice, hereby adopts by written consent the resolutions attached hereto as Exhibit D without the holding of a meeting, such resolutions to have the same force and effect as if they had been adopted at a dully called and held meeting of the sole member of the Company.

**IN WITNESS WHEREOF**, the undersigned has executed this written consent to be effective as of the date first above written.

**GFC HOLDINGS LIMITED LIABILITY COMPANY,**
as sole member of the Company

By: _____
Name: Olmar López Vidal
Title: President & Chief Executive Officer