## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| GREGORY BOYD; <u>ET AL.</u>,<br><br>Plaintiff,<br><br>v.<br><br>BANCO POPULAR DE PUERTO RICO,<br><br>Defendant. | CIVIL NO. 24-1569 (PAD) |

## OPINION AND ORDER

This is an anti-tying case under the Bank Holding Company Act, 12 U.S.C. §§ 1841, <u>et seq.</u> ("BHCA"). Original plaintiffs Gregory Boyd and Jonathan Lassers are members of newly added co-plaintiff GFC Holdings LLC ("GFC"), the sole owner of fellow newly added co-plaintiff Biomass Green Fuels, Inc. ("BGF"), a company organized to build a biorefinery to convert landfill gas to renewable liquid natural gas ("RLNG"). In the main, they allege that defendant Banco Popular de Puerto Rico ("BPPR") conditioned a loan to BGF and a subsequent forbearance on collection of that loan, on the execution an off-take agreement pursuant to which BGF would sell RLNG to BPPR at below-market rates.[1] Presently before the court are three issues: (1) whether GFC and BGF are proper parties here; (2) whether Boyd and Lassers have standing to assert the claims they make; and (3) whether certain exhibits should be struck or restricted. For the reasons explained below, the case must be dismissed and the exhibits restricted.

---

[1] Additionally, almost as a throw-away, the operative complaint (Second Amended Complaint or "SAC") includes a supplementary claim under Puerto Rico law to the effect that BPPR's actions "breached the fiduciary duties it assumed as Administrative Agent for its loan and Disbursing Agent for the NMTC loan." <u>See</u>, Docket No. 57, pp. 58-59; ¶¶ 255-257. More on this later.

## I.    FACTUAL BACKGROUND

The disputes underlying this action are complicated; extend across a number of years; and have resulted in various lawsuits.  The SAC is 60 pages long and contains a whopping 89 exhibits. So, following is a summarized background of the SAC's well-pleaded allegations.

### A.  GFC and its Members

GFC is a limited liability company ("LLC") organized under the laws of the Commonwealth of Puerto Rico.  See, Docket No. 57, p. 9; ¶ 3.   It is the sole owner of BGF, another Puerto Rico LLC.  Id., p. 9; ¶¶ 3-4.  In turn, Boyd and Lassers are founding members of GFC, owning, respectively, 4,252,500 Class A Common Units (17.657% of voting units) and 675,000 Class A Common Units (2.803%).  Id., p. 9; ¶¶ 4-5.  Olmar López-Vidal, a fellow founding member, was the CEO of BGF during the relevant time-period.  See, id., p. 8.  From September 14, 2020, until May 26, 2025, he owned 4,725,000 Class A Common Units (23.6250% of voting units) of GFC.  See, Docket No. 52-7, p. 51.  His father, Olmar López-Gómez was also a member of GFC and owned—for the same time period— 3,037,500 Class A Common Units (15.1875%).  Id.[2]

### B.  Initial Marketing of an Offtake Agreement With BPPR

By March 22, 2019, BPPR and BGF were discussing a potential loan for BGF to build a biorefinery and the possibility of BGF selling RLNG to BPPR.  See, Docket No. 57, p. 5.  With this in mind, on September 26, 2019, López-Vidal sent BPPR a proposal to sell it RLNG.  See, Docket Nos. 48-2; 49-11.  In particular, he proposed a transaction by which BPPR would provide a permanent loan and a New Markets Tax Credit Loan to BGF, while BGF would sell BPPR RLNG

---

[2] On May 26, 2025, López-Gómez transferred his membership units in GFC to López-Vidal thus giving him a total of 7,762,500 Class A Common Units (32.231%).  Docket No. 47-1, p. 6.

at a rate of $13.50 per MBTU with a minimum of 800-900 MMBTU's per day.  See, Docket No. 48-2, p. 20.  Further, he offered to provide "about $5.5 million in RLNG to BPPR" with a principal and interest payment "of about $2.4MM a year."  See, Docket No. 49-11.

## C.  Financing BGF's Biorefinery

In 2019, BGF applied to several banks for a construction loan to build a biorefinery.  Id., pp. 13 & 18; ¶¶ 21 & 46.[3]  On November 13, 2019, BGF received a term sheet from BPPR.  Id., p. 4.  Ultimately, BGF obtained, among other sources of funds, an $11,869,250 construction loan from BPPR as lender and administrative agent.[4]  Boyd provided his personal guaranty as collateral to the loan.  Id., p. 9; ¶ 4.  Additionally, GFC accepted investments of $4,500,000 and $2,000,000, respectively, from Semillero Investment Fund I, LLC ($4,500,000) and the Puerto Rico Fund for Growth, L.P. ($2,000,000), in exchange for Series A Preferred Units.  See, id., pp. 10 & 12; ¶¶ 10 & 17.

## D.  Red Flags at Closing Ignored by BPPR

Unbeknownst to Boyd and Lassers, López-Vidal and López-Gómez wanted to award the construction contract to one of their own companies, International Technical Services, Inc. ("ITS").  See, id., pp. 18-19; ¶¶ 48-58.[5]  But ITS was not credit worthy and was unable to obtain a payment and performance bond.  Id.  Moreover, ITS and López-Gómez were sued in 2018 by Ballester Hermanos, Inc., whose president Alejandro J. Ballester, is a member of BPPR's holding

---

[3] A biorefinery is a facility that processes landfill gas into purified products including RLNG.  Id., p. 13; ¶ 21.

[4] The SAC does a poor job of explaining this, but review of the operative complaint in a related action before Judge Méndez-Miró- see below -makes clear that GFC also obtained a $ 7,200,000 New Markets Tax Credit Loan from PCE-SUB CDE 13, LLC, a wholly owned subsidiary of BPPR, and Capital One as lenders, and BPPR as distribution agent.

[5] López-Vidal, his brother, Carlos López-Vidal, and their father, López-Gómez, also own other companies besides ITS.  See, Docket No. 57, pp. 12 & 18; ¶¶ 15 & 48.

company's Board of Directors and a member of its Audit Committee, for non-performance on an energy project and failure to refund a deposit. Id., pp. 19-20; ¶¶ 59-60. To boot, ITS lacked the experience to build a biorefinery. Id., p. 20; ¶ 61. To gloss over these weaknesses, the Lopezes proposed that the construction be carried out by a joint venture between ITS and Accurate Solutions Corp. ("ASC") named JV Distributed Power Innovators (the "JV"). Id., pp. 12 & 19; ¶¶ 15 & 57. Despite these anomalies, BPPR allowed the JV to be the designated contractor to build the biorefinery, and approved the loan, which closed on September 15, 2020. Id., pp. 23 & 32; ¶¶ 80 & 111. But that was not the end of the story.

The Credit Agreement required a Payment and Performance Bond of not less than 100% of the direct costs of the project, or $18,679.651. Id., p. 21; ¶¶ 68-73. Instead, BPPR allowed the posting of a mere $5,000,000 payment and performance bond. Id., p. 22; ¶ 75. BPPR then deliberately withheld this information from BGF's investors. Id., p. 22; ¶ 76. Similarly, a condition precedent to closing was that the JV had to provide proof of having paid for and obtained a payment and performance bond. Even so, the JV did not acquire the bond prior to closing but rather, after closing, with the proceeds of BGF's own loan. Id., p. 32; ¶ 111. Moreover, BPPR officer Joval Rodríguez hid the disbursal from Boyd and other investors as a "closing cost." Id., p. 26; ¶¶ 87-89. And by allowing this payment to take place, BPPR failed to comply with the Credit Agreement and to follow its own disbursal controls. Id., p. 32; ¶¶ 109-113.[6]

---

[6] Another anomaly raised by the SAC is that whereas the Small Business Administration ("SBA") and U.S. Department of Agriculture ("USDA") conditioned the provision of guarantees for the loan on BGF having Offtake Agreements with good-credit buyers in place and the lender being able to secure a lien over such agreements, BPPR did not require any such agreement to be in place. Id., p. 20, ¶ 65. This, because (allegedly) BPPR planned on obtaining an offtake agreement for its own facilities. Id., p. 20, ¶ 66.

### D. The RICO Action

Against this backdrop, on April 25, 2022, Boyd and Lassers sued multiple parties including the Lópezes, BPPR, and the Series A investors for, *inter alia*, violations of the Racketeer Influenced Corrupt Organizations ("RICO") Act.  Id., p. 33; ¶ 115.  That case, titled Boyd v. López-Vidal, Civil No. 22-1190 ("the RICO Action"), is presently before Judge Méndez-Miró.  The Lópezes reacted to the complaint by paying over $1.1MM to suppliers, despite those payments being due only on completion, in exchange for commissions for themselves.  Id., p. 33; ¶¶ 116-120.  From April to June 2022, BGF missed four principal payments.  Id., p. 33; ¶ 122.  The biorefinery was still not complete and, with the $1.1 million that the Lópezes had paid out, there were not enough funds to complete the project.  Id., pp. 33-34; ¶¶ 121-125.

### E. The Offtake Agreement

On July 18, 2022, BPPR and BGF executed an offtake agreement under which BGF would provide BPPR with RLNG at $14/MMBtu which was less than 50% the average market RLNG price for 2022.  See, id., pp. 35-37; ¶¶ 132-142.  Another abnormally beneficial term for BPPR was that the carbon credits that BGF would obtain from producing the RLNG that would be sold to BPPR, which would normally be sold by BGF for profit, would be transferred to BPPR for seemingly no other overt consideration.  See, id., pp. 35 & 41-42; ¶¶ 133 & 170-175.  In exchange, BPPR would extend the loan, grant forbearance on defaults, and extend an additional $1MM in credit.  See, id., p. 7.  A week later, on July 25, 2022, BPPR and BGF executed a Third Amendment to the Credit Agreement.  See, id., p. 23; ¶ 80.  The Amendment falsely denied or omitted that BGF was in default with BPPR as well as with the Landfill from which it would source the gas it would convert to RLNG.  See, id., p. 7.  More important, if BGF obtained an additional $1.5 million in equity investment, BPPR would give to BGF benefits amounting to over $3MM.  See,

id., p. 36; ¶ 136. And the Amendment extended the completion date of the biorefinery and allowed BPPR to pay itself interest with loan proceeds. See, id., pp. 38-40; ¶¶ 148-160.

### F. The End of the Relationship

By mid-2023, BPPR realized that the biorefinery would not be completed under the Lopezes. See, id., pp. 40-41; ¶¶ 161-165. So, on May 22, 2024, BPPR took estoppel on 100% of the assets of GFC and BGF and filed a collection lawsuit against BGF and GFC as well as the Lópezes and Boyd as personal guarantors. Id., p. 44; ¶¶ 185-186. Boyd filed a counterclaim in that case. Id., p. 54; ¶ 225. Early in 2025, BPPR sold the loan to VRM-Penzini, a private equity firm, despite a better offer from Cambrian Energy. Id., p. 54; ¶¶ 226-227. Finally, an Asset Acquisition Agreement was executed on February 7, 2025, in which VRMP purchased essentially all of BGF's assets for $4.4 million. Id., p. 54; ¶ 228.

## II.    PROCEDURAL BACKGROUND

On December 9, 2024, Boyd and Lassers initiated this action. See, Docket Nos. 1 & 7.[7] In that version of the complaint, they claimed entitlement to a share of BGF's alleged damages based on "their respective percentage ownership in [GFC]" (Docket No. 7, p. 46). On February 7, 2025, BPPR requested dismissal for lack of standing and failure to state a claim upon which relief may be granted (Docket Nos. 20; 31).[8] Plaintiffs opposed the request (Docket No. 38); BPPR replied (Docket No. 42); and plaintiffs sur-replied (Docket No. 46). On June 30, 2025, Boyd and Lassers filed a motion for leave to amend their complaint to, among other things, join GFC and BGF as

---

[7] Boyd and Lassers filed an Amended Complaint on December 12, 2024–barely three days after filing the original complaint–for the sole purpose of redacting some financial account numbers. See, Docket Nos. 5-7.

[8] The original motion to dismiss (Docket No. 20) contained Spanish-language exhibits. Accordingly, the court ordered BPPR to re-file the motion with all the corresponding certified translations once the latter were obtained. See, Docket No. 24. BPPR did so (Docket No. 31).

plaintiffs. See, Docket No. 47. This would ostensibly nullify BPPR's lack of standing argument to dismiss.

As authorization to act on behalf of GFC and BGF, they proffered a "Written Consent" executed by a majority of the Common Unit Holders of GFC (Docket No. 47-1) which purported to authorize GFC and BGF to join this case as plaintiffs; terminate the legal representation of GFC and BGF by Attorney Roberto Abesada; and replace him with Attorneys Jane Becker and Jean Paul Vissepó —current counsel for Boyd and Lassers. The motion for leave to amend was granted, resulting in the SAC. See, Docket No. 57. Shortly thereafter, however, Attorney Abesada entered an appearance, asserting that the Written Consent on which counsel relied to purport to represent GFC and BGF was invalid, and that he was the true and proper legal representative of GFC and BFG (Docket No. 61). As such, he filed a Notice of Voluntary Dismissal (Docket No. 63) and a motion to strike certain exhibits filed in support of the SAC (Docket No. 64). Boyd and Lassers opposed those requests. (Docket Nos. 76; 77; 82). Attorney Abesada replied (Docket No. 85); and Boyd and Lassers sur-replied (Docket No. 109).

On August 6, 2025, the court scheduled a motion hearing for August 14th. See, Docket No. 87. Just two days prior to the hearing, Attorney Abesada informed the court that Judge Méndez-Miró had issued a Memorandum and Order in the RICO Action. See, Docket Nos. 94 and 94-1 (copy of Judge Méndez-Miro's Memorandum and Order). In that action, Boyd and Lassers used the same Written Consent to argue that Attorneys Becker and Vissepó had replaced Attorney Abesada. But Judge Méndez-Miró rejected the argument, holding that the Written Consent was invalid, and that Attorney Abesada was the proper legal representative of GFC and BGF. See, Docket No. 94-1. On this account, during the hearing, the court informed the parties that it agreed with Judge Méndez-Miró's Memorandum and Order. See, Docket No. 101, p. 1 (so

noting).  And with this in mind, the court gave the parties two alternatives: either (A) agree to a stay pending adjudication of the RICO Action before Judge Méndez-Miró or (B) continue this case (Docket No. 101, pp. 1-2).  Under Plan B, the court would receive briefing on Boyd and Lassers' standing to maintain the action, and adjudicate the issue (Id., p. 2).  The parties chose Plan B.  See, Docket Nos. 110-111.  Then, they filed simultaneous briefs on standing (Docket Nos. 113 and 115).  Plaintiffs responded (Docket No. 117); BPPR replied (Docket No. 127); and plaintiffs sur-replied (Docket No. 130).

## III.    DISCUSSION

With this narrative in place, it is now simpler to address the three pending issues: (1) whether GFC and BGF should be taken off this case; (2) whether Boyd and Lassers have standing; and (3) whether certain exhibits should be struck or restricted.

### A.  Should BGF and GFC Be Dismissed?

The court answered this question during the August 14, 2025, motion hearing.  In particular, it expressed that it was persuaded by Judge Méndez-Miró's Memorandum and Order in the RICO Action, in that the written consent on which plaintiffs rely to support the position that Attorneys Becker and Vissepó are the proper legal representatives of BGF and GFC is invalid. See, Docket No. 101, p. 1.  The reasoning underlying this conclusion follows.

#### 1.  *The Arguments*

The centerpiece of the dispute over who is the proper legal representative of GFC and BGF is the "Written Consent" (Docket No. 47-1), on which Boyd and Lassers rely to contend that the majority of GFC's members validly terminated Attorney Abesada as GFC's legal representative; retained Attorneys Becker and Vissepó as counsel; and had GFC and BGF join this case as co-plaintiffs.  See, Docket No. 76, pp. 2-3.  Attorney Abesada counters that the "Written Consent" is

invalid because it was not authorized by the Board of Managers of GFC (Docket No. 62, pp. 3-5).

And the Board of Managers, he posits, may only be overridden with the consent of a majority of

Series A Preferred Units—which Boyd and Lassers failed to obtain. Id. Boyd and Lassers

predictably disagree. They put forth two principal arguments. First, they argue that Section 3.2

of the GFC Operating Agreement allows a majority of members to override the Board of Managers

(Docket No. 76, p. 6). Second, they assert that the Board has forfeited its management rights by

violating its fiduciary duties and acting in bad faith (Id., pp. 5 & 7-9).

### 2. *The GFC Operating Agreement*

The governing document of a limited liability company like GFC and BGF is its "limited

liability company agreement," commonly referred to as the "operating agreement," defined as the

"written agreement (whether referred to as a limited liability company agreement, operating

agreement, or otherwise) adopted by the members . . . to govern the internal affairs and

administration of [the LLC]." P.R. Laws Ann. tit. 14, § 3951(g). That agreement sets forth the

rights and powers of members and managers of the company. See, P.R. Laws Ann. tit. 14, §§

3967; 3973 (so providing). Here, the operating agreement is the Second Amended and Restated

Operating Agreement, dated May 22, 2021, as amended. See, Docket No. 64-1.

From a bird's eye view, the Operating Agreement stipulates that GFC has two categories

of members. The first category includes the individual founding members (including Boyd and

Lassers), who hold common membership units. The second category are investors who, in

consideration for their investment, were provided with Series A preferred membership units.

These units give their holders a variety of rights and benefits such as voting, redemption, seniority,

distribution, and anti-dilution rights. See, Docket No. 64-1, pp. 30-34. Importantly, the Series A

preferred units are convertible to common units, and their holders have the right to vote with the

holders of common units on an as-converted-basis.  Id., p. 31.  All these members would, in accordance with a scheme that changed over time, be able to appoint managers to the Board of Managers.

The Written Consent on which plaintiffs rely is signed by four members who hold common membership units: Boyd (17.657%); Lassers (2.803%); John Lee Dumas (2.803%); and Olmar López-Vidal (32.231%).  See, Docket No. 47-1, p. 4.  Together, these members own 55.468% of all units (common and Series A preferred on a converted basis).  However, no Series A preferred unit holder consented nor did the Board of Managers.  And, as Judge Méndez-Miró held, the decisions on which attorney to appoint to represent the LLC and whether to join a litigation as a party are the clear and exclusive province of the Board of Managers.  See, Docket No. 94-1, pp. 14-19.

The Operating Agreement, which reigns supreme in this context, states that the Board of Managers is vested with the "full, absolute and exclusive right, power and authority to manage the Company."  See, Operating Agreement, Section 6.1(a) (Docket No. 64-1, p. 35).  As well, the Board has "the power to do any and all acts necessary, convenient or incidental to or for the furtherance of the purposes herein, including exercising all powers, statutory or otherwise."  Id., Section 6.2 (Docket No. 64-1, p. 37).  In this light, the decisions that the Written Consent purports to take are vested on the Board of Managers, not on a majority of common unit members.  This, however, begs the question of if (and when) the Board of Managers may be bypassed or overridden.

***3. Can the Board of Managers by Overridden or Bypassed Without Amending the Operating Agreement?***

Attorney Abesada asserts that the only way to bypass or override the Board is to amend the Operating Agreement itself, a process that would require the vote of a majority of Series A preferred members (Docket No. 62, p. 3). But no Series A preferred member approved the Written Consent –let alone a majority thereof. On this, Attorney Abesada is correct. The Operating Agreement explicitly requires the approval of both the majority of the common units and the majority of the Series A preferred units. See, Docket No. 64-1, p. 53. Boyd and Lassers ratified this provision in the second amendment to the Operating Agreement. See, id., pp. 4 & 7. For their part, Boyd and Lassers do not dispute that they lack the votes to amend the Operating Agreement. See, Docket No. 76, p. 6. Instead, they claim that there is no need to amend the Operating Agreement to bypass or override the Board. As to why, they put forth two arguments.[9]

a. Section 3.2 of the Operating Agreement

First, Boyd and Lasssers direct the court's attention to Section 3.2 of the Operating Agreement, which states in part:

> Subject to any protective provisions in favor of the holders of the Series A Preferred Units, the Members may, subject to Section 4.2(j), act by written consent by the Majority Approval of the Members (a "Member Resolution").

Docket No. 64-1. p. 28 (Section 3.2 of Operating Agreement). Boyd and Lassers take this clause to mean that the members can bypass the Board of Managers. But as Judge Méndez-Miró pointed out, Section 3,2 merely "outlines particular circumstances in which the majority members may act

---

[9] Boyd and Lassers also write "Section 6.6 further provides that "[a]ny action required or permitted to be taken at any meeting of the Members may be taken without a meeting if a consent in writing, setting forth the action so taken, shall be signed by Members having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all Members entitled to vote thereon were present and voted." SAC Ex. 87 at 38" (Docket No. 76, p. 6). However, Section 6.6 of Exhibit 87, does not contain such language and in fact merely pertains to the compensation of the Board of Managers and members. Consequently, it is of no use here.

Boyd; et al. v. Banco Popular de Puerto Rico, Inc.
Civil No. 24-1569 (PAD)
Opinion and Order
Page 12

by Member Resolution." Docket No. 94-1, p. 18. It does not provide that the majority of Common

Unit Members may usurp or bypass the Board of Managers. So, this argument fails.

      b.  <u>The "Bad Faith and Violation of Fiduciary Duties" Argument</u>

Second, Boyd and Lassers posit that the Board of Managers forfeited its own authority by

acting in bad faith and breaching its fiduciary duty of loyalty by engaging in "self-dealing and

conflicts" (Docket No. 76, p. 7). They point to Section 6.1(e) of the Operating Agreement, which

provides in part:

> [E]xcept as otherwise expressly required under this Agreement or the Act, all
> decisions to be made by or on behalf of the Company or in respect of the Company's
> business, capital, assets, funds and liabilities of the Company shall be made solely
> and exclusively by the Board of Managers; **provided that the Board of Managers
> <u>agree to act in good faith</u> in taking such actions or making such decisions**.

Docket No. 52-7, p. 21 (Section 6.1(e) of Operating Agreement)(emphasis added). Based on this

language, Boyd and Lassers argue that the Board of Managers forfeited its authority when it acted

in bad faith and violated its fiduciary duties by approving an Asset Acquisition Agreement in

January 2025 that handed payouts to its members, without unanimous member approval. See,

Docket No. 76, pp. 7-8. But no such cause of action was explicitly asserted in the SAC. Rather,

the Asset Acquisition Agreement brings forth a distinct issue, based on different factual allegations

unrelated to the present case, particularly because BPPR is not a party to the putative improper

asset sale, and the purchaser is not a party in this action.

Moreover, this matter arises under the Puerto Rico Law of Corporations – a state statute.

In this vein, Boyd and Lassers' argument is premised on this court having jurisdiction to adjudicate

what in effect is a state law controversy within a federal question case in which neither the

members of the Board of Managers nor the purchaser of BGF's assets are parties. The process

leads to an unsurmountable jurisdictional hurdle. To elaborate, Boyd and Lassers initiated this

action invoking federal question jurisdiction under 28 U.S.C. § 1331. See, Docket No. 57, p. 9, ¶ 1 (so stating). Still, Section 1367(a) provides that in civil actions where the federal courts have original jurisdiction: "the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action . . . that they form part of the same case or controversy under Article III of the United States Constitution."

Claims are part of the "same case or controversy" if they "derive from a common nucleus of operative fact" and are such that they would ordinarily be expected to be tried in one judicial proceeding. United Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966). For that reason, not every dispute "that arises between parties litigating a federal claim constitutes a part of the same Article III case" even when they are part of the same "ongoing and bitter dispute." Council of Unit Owners of the Wisp Condo, Inc. v. Recreational Indus., Inc., 793 F. Supp. 120, 122 (D. Md. 1992). That is what the court faces here.

This case revolves on an anti-tying claim under the Bank Holding Company Act, 12 U.S.C. § 1972. The only defendant is BPPR. The "nucleus of operative facts" necessary to adjudicate that claim has no overlap with the corporate boardroom dispute between Boyd and Lassers and the Board of Managers of GFC. Furthermore, a breach of fiduciary duty claim against the Board of Managers for the execution of the Asset Acquisition Agreement is "separately maintainable and determinable without any reference to the facts alleged or contentions stated in or with regard to" the anti-tying claim asserted in the instant case. O'Bannon v. Friedman's, Inc., 437 F.Supp.2d 490, 493 (D. Md. 2006)(quoting Hales v. Winn-Dixie Stores, Inc., 500 F.2d 836, 848 (4th Cir. 1974)). Federal courts "were not designated by the [Bank Holding Company Act] to be arbitrators of corporate boardroom disputes between shareholders." Lipham Constr. Co., Inc. v. Lipham, 2014

WL 11512410, *3 (N.D. Tex. July 22, 2014).[10]  Thus, the "bad faith-fiduciary duties" argument

fails.

### 4.  Result

Based on the Operating Agreement of GFC, choosing, terminating, and hiring attorneys as

well as deciding whether to join a litigation are decisions reserved to the Board of Managers.  Boyd

and Lassers have not demonstrated how a Written Consent subscribed by a majority of Common

Unit Holders but without the consent of the Board of Managers or any Series A Preferred Unit

Holder can override or bypass the Board of Managers.  In consequence, the Written Consent on

which Attorneys Becker and Vissepó rely to justify their purported representation of GFC and

BGF is invalid.  Attorney Abesada remains as GFC's and BGF's appointed legal counsel.  Hence,

his notice of voluntary dismissal must be granted.  On that basis, only Boyd and Lassers remain as

plaintiffs.

## B.  Do Boyd and Lassers Have Standing?

Now that GFC and BGF are no longer in the picture, the next issue is whether Boyd and

Lassers have standing.  If not, dismissal is appropriate.  This concern, raised in BPPR's first motion

to dismiss (Docket No. 20), was evidently the catalyst behind the SAC and plaintiffs' strategy to

bring in GFC and BGF as parties.  But with the new case configuration, Boyd and Lassers are back

to square one.  So, BPPR asserts that Boyd and Lassers lack standing because they failed to allege

that they suffered a direct injury.  According to BPPR, as alleged in the SAC, any injuries to Boyd

and Lassers derive from injuries to BGF.  In response, Boyd and Lassers claim that they did

properly allege direct injury pursuant to BHCA caselaw and that, alternatively, Boyd's capacity as

a guarantor provides him with the requisite standing.

---

[10] Lipham held this as to the Lanham Act but the analogy is equally applicable to the Bank Holding Company Act.

### 1. Legal Standard

A federal court "must satisfy itself as to its jurisdiction, including a plaintiff's Article III standing to sue, before addressing his particular claims, regardless of whether the litigants have raised the issue of standing." Pagán v. Calderón, 448 F.3d 16, 26 (1st Cir. 2006). Just as the plaintiff bears the burden of plausibly alleging a viable cause of action, "so too the plaintiff bears the burden of pleading facts necessary to demonstrate standing." Hochendoner v. Genzyme Corp., 823 F.3d 724, 730 (1st Cir. 2016).

Each element of standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992). Along this line, the First Circuit has directed courts to apply "the plausibility standard applicable under Rule 12(b)(6) to standing determinations at the pleading stage." Hochendoner, 823 F.3d at 730. Thus, the court takes the SAC's "well-pleaded facts as true and indulge all reasonable inferences in the pleader's favor." Id.

### 2. The Bank Holding Company Act's Anti-Tying Provision

The BHCA was enacted in 1956. Its original aim was to regulate "the power of bank holding companies to prevent a small number of powerful banks from dominating commerce and to ensure a separation of economic power between banking and commerce." Baggett v. First Nat. Bank of Gainesville, 117 F.3d 1342, 1345 (11th Cir. 1997) (citing S.Rep. No. 91–1084, 91st Cong., 2d Sess., reprinted in 1970 U.S.C.C.A.N. 5519, 5535 (1970); 116 Cong.Rec. 32127 (1970)). But in 1970, Congress amended the BHCA to "reach the anti-competitive practices of even smaller banks, which notwithstanding their comparative size, were able to exert economic power over businesses because of their control over credit." Id. In this manner, Congress added a section to

the BHCA prohibiting certain tying arrangements. The present incarnation of this provision is found in 12 U.S.C. § 1972(1), which provides in part:

> A bank shall not in any manner extend credit, lease or sell property of any kind, or furnish any service, or fix or vary the consideration for any of the foregoing, on the condition or requirement- . . . that **the customer** provide some additional credit, property, or service to such bank, other than those related to and usually provided in connection with a loan, discount, deposit, or trust service.

12 U.S.C. § 1972(1)(C) (emphasis added). Simultaneously, Congress enacted § 1975 of the BHCA, creating a private right of action in favor of individuals harmed by virtue of violations of § 1972(1):

> **Any person who is injured in his business or property by reason of anything forbidden in section 1972** of this title may sue therefor in any district court of the United States in which the defendant resides or is found or has an agent, without regard to the amount in controversy, and shall be entitled to recover three times the amount of the damages sustained by him, and the cost of suit, including reasonable attorney's fees.

12 U.S.C. § 1975 (emphasis added). This business-or-property formula tracks Section 4 of the Clayton Act —the damages provision of the antitrust laws— and RICO. Compare, 12 U.S.C. § 1975 with 15 U.S.C. § 15 (Clayton Act) and 18 U.S.C. § 1964(c) (RICO). From this perspective, courts have consistently held that "the rules established in anti-trust cases for identifying the proper plaintiffs should be applied to RICO and the BHCA too." Mid-State Fertilizer Co. v. Exch. Nat. Bank of Chicago, 877 F.2d 1333, 1335 (7th Cir. 1989)(collecting cases).[11]

---

[11] Incidentally, in Holmes v. Sec. Inv. Prot. Corp., 503 U.S. 258, 268 (1992), the Supreme Court endorsed the application of anti-trust standing principles to RICO:

> We may fairly credit the 91st Congress, which enacted RICO, with knowing the interpretation federal courts had given the words earlier Congresses had used first in § 7 of the Sherman Act, and later in the Clayton Act's § 4. It used the same words, and we can only assume it intended them to have the same meaning that courts had already given them.

Id. at 268 (internal citations omitted). The same reasoning should logically apply to the BHCA.

### *3. Standing Analysis*

Reading the SAC as a whole and taking its well-pleaded factual allegations as true, it is apparent that Boyd and Lassers seek to recover damages derived from injuries inflicted on BGF and GFC.[12]  That is, they contend that the acts and omissions of BPPR damaged BGF and GFC thus resulting in diminished unit values which, in turn, injured GFC's members including Boyd and Lassers.[13]  As they claim in their "Memorandum on Standing:"

> All unit holders can demonstrate the concrete economic injury required for § 1975 standing: Diminished Unit Values[.] Tying arrangements that impair the LLC's business operations or impose additional costs directly reduce the value of membership interests.

Docket No. 115, p. 10.  However, that presents a problem, for as the First Circuit has held, generally, "[a]ctions to enforce corporate rights or redress injuries to [a] corporation cannot be maintained by a stockholder in his own name . . . even though the injury to the corporation may incidentally result in the depreciation or destruction of the value of the stock." Pagán, 448 F.3d at 28 (quoting In re Dein Host, Inc., 835 F.2d 402, 405 (1st Cir. 1987).  The same precept has been consistently applied in cases under the BHCA, RICO, and the Clayton Act.  See, e.g., Mid-State Fertilizer Co., 877 F.2d at 1335 (collecting cases).  At the same time, like all general rules, this one has exceptions, and they must be discarded prior to reaching a final decision.

---

[12] See, e.g., Docket No. 57, p. 8 (alleging that BPPR "destroyed the value of BGF and its parent company, GFC"); id., p. 40; ¶ 163 (BPPR allegedly caused "substantial financial damage to the company"); id., p. 44; ¶ 185 ("By tying the Third Credit Agreement and Offtake Agreements, BPPR ensured that, under the Lopezes' control, BGF was destined to run out of money"); id., p. 44; ¶ 187 (alleging that BPPR caused the "demise" of "BGF/GFC"); id., p. 53; ¶ 223 (alleging that BPPR "render[ed] BGF worthless"); id., p. 56; ¶ 242 ("BPPR injured [BGF] by destroying the value of BGF and GFC"); id., p. 59; ¶ 258 ("BPPR's tying practices caused BGF and GFC substantial damages").

[13] In fact, Boyd and Lassers assert that they "allege direct harm resulting from the destruction of value in their ownership Interests" (Docket No. 117, p. 16).  But this is a non-sequitur.  A corporation and its shareholders "are distinct juridical persons." Pagán, 448 F.3d at 28.  If a company's value is destroyed then the injury the owners suffer is, by definition, derivative of the one suffered by the company.  Labeling it "direct" does not make it so.

For instance, a shareholder may be able to bring an action if he sustains an injury that "is peculiar to him alone, and [that] does not fall alike upon other stockholders." Pagán, 448 F.3d at 28. Even so, the SAC "does not allege that any of the individual shareholders sustained a particularized, nonderivative injury that might deflect application of the usual shareholder standing rule or that any other exception pertains." Id. at 29.[14] Still, Boyd and Lassers ditch Lassers' claim and grab ahold of Boyd's status as guarantor of the BPPR loan which, to their way of thinking, gives him the requisite standing. See, Docket No. 117, p. 16 (stating that Boyd "alleges direct injury in his capacity as guarantor, including his exposure to $19 million in liability from tied credit extensions executed without his consent"). In support, they cite to various cases. But the cases are unavailing.

Take Swerdloff v. Miami National Bank, 584 F.2d 54 (5th Cir. 1978). See, Docket Nos. 115, pp. 8-9; 117, p. 17. There, the Swerdloffs, a couple who owned 100% of a closely held corporation, personally guaranteed an Accounts Receivable Financing Arrangement. The defendant bank, however, conditioned the continuance of the arrangement on the couple selling 51% of their shares to another customer of the bank. On this fact pattern, the Fifth Circuit held that the Swerdloffs were "customers" of the bank and had standing to sue under § 1975 of the BHCA. That scenario is patently distinguishable. The alleged tying arrangement in this case was imposed on BGF – not on Boyd. The bank did not force Boyd to provide RLNG at a below market

---

[14] Boyd and Lassers also contend that Pagán recognizes another exception to the direct injury rule: where "it is absolutely inconceivable that the corporation itself would pursue a claim for the misconduct." (Docket No. 117, p. 16)(quoting Pagán, 448 F.3d at 28). This, however, is a mischaracterization by omission. The First Circuit in Pagán merely noted that "case law also **suggests** that there **may** be room for an exception if it is absolutely inconceivable that the corporation itself would pursue a claim for the misconduct." Id. But the only case that makes such a suggestion which Boyd and Lassers can cite to is Kavanaugh v. Ford Motor Co., 353 F.2d 710, 717 (7th Cir. 1965). In that case, it was held that a shareholder had standing to individually sue in a case in which the alleged malefactor owned all of the corporation's voting stock. See, id. Conversely, the alleged malefactor here is BPPR, which was never a shareholder of BGF or GFC.

cost to BPPR in exchange for credit – it forced BGF. Moreover, as Judge Easterbrook noted in

Mid-State Fertilizer Co., Swerdloff "does not make the derivative nature of the injury irrelevant."

877 F.2d at 1336. Rather, it simply "says that no unyielding rule confines recovery under the bank

tying laws to the bank's customer." Id. That being so, Swerdloff "does not go to the other extreme

and hold that anyone who has dealt with a bank as guarantor may recover for derivative injuries."

Id. Therefore, it does not help Boyd.

      The same conclusion follows with respect to Continental Illinois National Bank v. Stanley,

585 F.Supp. 1385 (N.D. Ill. 1984), which relied on Swerdloff to hold that "a stockholder and

guarantor" had standing to sue under § 1975 of the BHCA. See, Docket Nos. 115, p .9; 116, pp.

17-18. Yet, Continental Illinois National Bank was explicitly disapproved by the Seventh Circuit

in Mid-State Fertilizar Co., 877 F. 2d at 1336, thus depriving it of any material persuasive value.[15]

As the Seventh Circuit explained:

> Guarantors are contingent creditors. If the firm stiffs a creditor, that creditor can
> collect from the guarantor; the guarantor succeeds to the original creditor's claim
> against the firm. We know that creditors cannot recover directly for injury inflicted
> on a firm, so guarantors as potential creditors likewise cannot recover.

Mid-State Fertilizer Co., 877 F.2d at 1336. Boyd attempts to distinguish Mid-State Fertilizer Co.

arguing that he is not a contingent creditor inasmuch as he has been sued by BPPR, forcing him to

incur legal fees and costs (Docket No. 117, pp. 16-17). Notwithstanding that the SAC also alleges

that Boyd's personal guaranty is null (Docket No. 57, p. 9; ¶ 4), the fact is that the court cannot

find —and Boyd does not point to— any allegation in the SAC to this effect. At bottom, those are

not the damages Boyd is after in the SAC. The BHCA "does not say that any actual loan in

---

[15] The Seventh Circuit additionally noted in Mid-State Fertilizer Co. that the Fifth Circuit subsequently "trimmed Swedloff's "sails" in Campbell v. Wells Fargo Bank, N.A., 781 F.2d 440, 443 (5th Cir. 1986). In that case, the Fifth Circuit applied the Clayton Act's rule that, to have standing, a "plaintiff must demonstrate that his injury was a direct consequence of the alleged antitrust violation," to BHCA anti-tying claims. See, 781 F.2d 443.

violation of its terms is unenforceable." Exch. Nat. Bank of Chicago v. Daniels, 768 F.2d 140, 144 (7th Cir. 1985). And although § 1975 permits a treble damages action by an injured party, an "obligation to pay back a loan actually made is not an injury." Id.

Further, Boyd looks for support in Costner v. Blount National Bank, 578 F.2d 1192 (6th Cir. 1978), a case which he characterizes as recognizing "liability and damages for a guarantor/dealership owner who suffered direct personal losses from forced unfavorable terms under a BHCA tying violation" (Docket No. 117, p. 18). In Costner, the defendant bank conditioned giving the plaintiff, a 50% owner of a car dealership, a $420,000 personal loan to buy the other 50% of the dealership's stock, to the sale of substantially all installment paper from car sales to the bank; the hiring of an employee designated by the bank to ensure compliance; and the pledging of all stock as collateral.

Eventually, the dealership experienced difficulties; the bank threatened with foreclosure; and the plaintiff was forced to assign his stock to the bank, which then proceeded to sell the business at significantly below market value to the brother of the bank vice-president in charge of the loan. The case went to trial and the jury found the bank liable, awarding $60,000 to the plaintiff. The issue of standing was put in the hands of the jury, which was instructed in part that:

> If plaintiff is to recover he must prove that as a result of the tying arrangement the sale of his stock in the corporation was for less than its fair market value at the time. **The injury to the stockholder <u>must be direct</u> and not merely consequential or derivative through the corporation. Depreciation in the value of the stock that occurred <u>before</u> the sale of the stock because of injuries directly affecting the corporation rather than the shareholder cannot be recovered**. The sale of the stock must result in further loss to the shareholder and not merely substitute the already depreciated value of the stock for money of equal value.

Id., 1195 (emphasis added). Thus, unlike in this case, in Costner there was a direct injury at play –the plaintiff's stock was sold at below market value. In other words, the depreciation of the stock

due to the tying arrangement was immaterial –what mattered was that the plaintiff was forced to sell the stock below its fair market value at the time, however low it was.  So, this case does not help Boyd.

Boyd also cites Johnstone v. First Bank System, Inc., 947 F.Supp. 1220 (N.D. Ill. 1996), asserting that it involved "trust beneficiaries" who are "analogous to unit holders" (Docket No. 115, p. 9).  Yet, Johnstone involved a derivative complaint where plaintiffs brought claims on behalf of two trusts.  See, Johnstone, 947 F. Supp. at 1222 (noting that claims were asserted on behalf of the trusts and that it involved a motion to dismiss the "First Amended Verified Derivative Complaint").  That is a bridge too far, for it was only in response to BPPR's memorandum on standing, that Boyd and Lassers asserted for the first time that they had adequately pleaded standing to sue derivatively on behalf of BGF (Docket No. 117, p. 119).  In addition to being untimely beyond hope, the argument is oblivious to the requirements set in Federal Rule of Civil Procedure 23.1 to state a derivative claim.  And the SAC does not meet those requirements.

To begin with the obvious, Rule 23.1 states that "[t]he Complaint must be verified."  The SAC, however, is not verified.  Shifting to the more granular, Rule 23.1 requires that the complaint "state with particularity any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and the reasons for not obtaining the action or not making the effort."  Fed. R. Civ. P. 23.1(b)(3).  But the SAC does not plead –let alone plead with particularity– any such elements.[16]  In consequence, plaintiffs' argument fails.

---

[16] Plaintiffs cite to paragraphs 255-257 of the SAC as proof that they adequately pleaded demand futility (Docket No. 117, p. 19).  But those three paragraphs clearly do not support that proposition.  Paragraph 255 merely incorporates all the prior allegations of the SAC; paragraph 256 then alleges that BPPR "breached the fiduciary duties" it supposedly owed plaintiffs; and paragraph 257 alleges that the purported tying transaction "saddled BGF with an additional $1 million in debt."  See, Docket No. 57, pp. 58-60; ¶¶ 255-257.

To summarize, at the end of the day, the SAC does not allege any direct injury to Boyd or Lassers; and fails to adequately plead a derivative action. In that regard, Boyd and Lassers lack standing to assert anti-tying claims under the BHCA. Correspondingly, their claims must be dismissed.

### 4. The Court Declines to Exercise Supplemental Jurisdiction Over the State Claim

As a final coda, the court must briefly address the thus far ignored state claim asserted in the SAC. See, footnote 1, supra. In the absence of any remaining federal claims, it is within the Court's discretion to retain supplemental jurisdiction over remaining state claims. See Carlsbad Tech., Inc. v. HIF Bio, Inc., 556 U.S. 635, 639 (2009) ("A district court's decision whether to exercise that jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary."). Where, as here, the federal claims are dismissed "at an early stage of the proceedings," a District Court is "well within its discretion to decline to exercise supplemental jurisdiction over pending state-law claims." Bonilla-Gonzalez v. Elevance Health Companies of Puerto Rico, LLC, 2024 WL 4769767, *2 (D.P.R. Nov. 13, 2024)(collecting cases). Hence, in the interest of judicial economy, convenience, fairness, and comity, the court declines to exercise supplemental jurisdiction over the state claim.

## C.  The Dispute Over Exhibits

In his "Motion to Strike," Attorney Abesada seeks, inter alia, to strike some of the SAC's exhibits because they potentially expose BGF and GFC to "sanctions, costs, and attorney's fees in this action and third-party litigation" (Docket No. 62 p. 5). During the August 14, 2025, motion hearing, the court expressed that the Motion to Strike at Docket No. 62 would be denied without prejudice as to the exhibits, but that Attorney Abesada could refile a Motion to Strike specifying which exhibits he moves to strike and why" (Docket No. 101, p. 2, n.1). The court also encouraged

Boyd; et al. v. Banco Popular de Puerto Rico, Inc.
Civil No. 24-1569 (PAD)
Opinion and Order
Page 23

the parties to attempt to reach an agreement as to the exhibits at issue. Id. In compliance, Attorney

Abesada filed a "Motion to Restrict Certain Exhibits in the Second Amended Complaint" (Docket

No. 119). There, he replaced his request to strike with one to simply restrict certain exhibits to

case participants only. Plaintiffs never responded to or opposed this motion. So, it is unopposed.

Nevertheless, a careful review makes it clear that the motion should be granted. With this in mind,

the Clerk is hereby ordered to restrict Exhibits 67, 68, 69, 73, and 85 (Docket Nos. 51-7; 51-8; 51-

9; 51-13; 52-5) of the SAC to "case participants only."

## IV.    CONCLUSION

For the reasons stated, BGF and GFC's "Notice of Voluntary Dismissal" (Docket No. 63)

is GRANTED; the "Motion to Withdraw the Notice of Voluntary Dismissal" (Docket No. 77) is

DENIED; the parties' "Motions in Compliance" (Docket Nos. 110-111) and "Memorandums on

Standing" (Docket Nos. 113, 115) are NOTED; the "Motion to Strike (Docket No. 62) is

GRANTED IN PART as to the contention of the Written Consent's nullity and DENIED

WITHOUT PREJUDICE IN PART as to the request to strike certain exhibits; and the "Motion to

Restrict Certain Exhibits in the Second Amended Complaint" (Docket No. 119) is GRANTED.[17]

In these circumstances, the case is dismissed. To this end, GFC and BGF are voluntarily dismissed

as parties here; and given that Boyd and Lassers lack standing to individually assert claims under

the BHCA, their claims are dismissed. The court declines to exercise supplemental jurisdiction

over the remaining state claim.

Judgment shall be entered accordingly.

**SO ORDERED.**

---

[17] As a last housekeeping matter, plaintiffs' "Motion Submitting Certified Translation (Docket No. 125) is noted and their "Motion to Amend/Correct Exhibits 6, 24, 32, and 61" (Docket No. 59) is granted *nunc pro tunc*.

<u>Boyd; et al.</u> v. <u>Banco Popular de Puerto Rico, Inc.</u>
Civil No. 24-1569 (PAD)
Opinion and Order
Page 24

In San Juan, Puerto Rico, this 22nd day of December, 2025.

<u>s/Pedro A. Delgado-Hernández</u>
PEDRO A. DELGADO-HERNÁNDEZ
United States District Judge